**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
In re                                                          :
                                                              :    Chapter 11
CALPINE CORPORATION, *et al.*,                                 :    Cases Nos. 05-60200(BRL)
                                                              :
                    Debtors.                                   :    (Jointly Administered)
-------------------------------------------------------------- x
HSBC Bank USA, National Association, as Indenture             :
Trustee, *et al.*                                             :    Case No. 1:07-cv-03088 (GBD)
                                                              :
                    Appellants,                               :
                                                              :
                    -against-                                 :
                                                              :
Calpine Corporation, *et al.,*                                :
                                                              :
                    Appellees.                                :
-------------------------------------------------------------- x
Calpine Corporation, *et al.*                                 :
                                                              :
                    Appellants,                               :
                                                              :
                    -against-                                 :
                                                              :
HSBC Bank USA, National Association, as Indenture             :
Trustee, *et al.,*                                            :
                                                              :
                    Appellees.                                :
-------------------------------------------------------------- x

## BRIEF OF APPELLANTS HSBC BANK USA, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE, AND THE BANK OF NEW YORK, AS ADMINISTRATIVE AGENT

Mark I. Bane (MB-4883)
Mark R. Somerstein (MS-9721)
David S. Elkind (DE-4054)
Amy E. Vanderwal (AV-1712)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090

Attorneys for Appellants
HSBC BANK USA, NATIONAL
ASSOCIATION, as INDENTURE TRUSTEE
and THE BANK OF NEW YORK, as
ADMINISTRATIVE AGENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF BASIS FOR APPELLATE JURISDICTION ................................3

STATEMENT OF ISSUES PRESENTED ON APPEAL........................................4

STANDARD OF APPELLATE REVIEW...................................................................5

STATEMENT OF THE CASE...................................................................................5

    A.    The Parties ....................................................................................5

    B.    The CalGen Capital Structure.........................................................6

    C.    The Second Priority Indenture, Second Priority Term Loan Agreement, and Security Agreement ..............................................................8

        (i)    Voluntary Prepayments .......................................................8

        (ii)    Events of Default.................................................................9

        (iii)    Fees, Costs, and Expenses.................................................10

        (iv)    The Security Agreement .....................................................11

    D.    The Calpine and CalGen Debtors' Chapter 11 Proceedings ...................12

    E.    The CalGen Debtors' Refinancing Motion.........................................13

    F.    The Hearing .................................................................................15

        (i)    The Damage Claims of Holders of the Second Priority Notes and Second Priority Term Loans .................................................15

        (ii)    CalGen's Solvency.............................................................17

    G.    The Bankruptcy Court's Decision .....................................................20

ARGUMENT...........................................................................................................23

I .    THE BANKRUPTCY COURT ERRED IN FAILING TO APPLY THE PROPER MEASURE OF DAMAGES AND FAILING TO AWARD APPELLANTS CLAIMS FOR THEIR FULL DAMAGES ARISING OUT OF THE DEBTORS' BREACHES OF THE NO-CALL AND PREPAYMENT PREMIUM PROVISIONS OF THE AGREEMENTS...................................................23

    A.    The Debtors' Breach of the "No-Call" and Prepayment Premium Provisions........23

    B.    The Bankruptcy Court Failed to Apply the Proper Measure of Damages...............27

II .    THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE SECOND PRIORITY INDENTURE TRUSTEE AND SECOND PRIORITY

## TABLE OF CONTENTS

**Page**

ADMINISTRATIVE AGENT WERE NOT ENTITLED TO SECURED CLAIMS
ARISING OUT OF THE DEBTORS' BREACHES OF THE NO-CALL AND
PREPAYMENT PREMIUM PROVISIONS OF THE AGREEMENTS ........................30

    A.    The Second Priority Indenture Trustee and Second Priority Administrative
Agent Are Entitled To Secured Claims for the Prepayment Premium And
Damages Under Section 506(b) of the Bankruptcy Code ......................................31

    B.    Where a Debtor Is Solvent, The Provisions of the Bankruptcy Code May Not
Be Used to Create or Retain Value for the Debtor's Shareholder or Its Estate,
And Creditors Are Entitled to Their Rights Under Applicable State Law .............35

    C.    Even If the Second Priority Indenture Trustee and Second Priority
Administrative Agent Are Not Entitled to a Secured Claim for the Full
Amount Of Their Damages, They Are Entitled to an Unsecured Claim for All
Amounts Under Section 502....................................................................................37

III .   THE BANKRUPTCY COURT ERRED IN RULING THAT THE SECOND
PRIORITY INDENTURE TRUSTEE AND SECOND PRIORITY
ADMINISTRATIVE AGENT ARE NOT ENTITLED TO RECOVER THE FULL
AMOUNT OF THEIR FEES AND EXPENSES UNDER THE SECOND
PRIORITY INDENTURE AND SECOND PRIORITY TERM LOAN
AGREEMENT ..........................................................................................................38

IV .   THE BANKRUPTCY COURT ERRED BY DISALLOWING THE CLAIMS OF
THE SECOND PRIORITY INDENTURE TRUSTEE AND SECOND PRIORITY
ADMINISTRATIVE AGENT AGAINST THE GUARANTOR DEBTORS
UNDER THE WRITTEN GUARANTEES ................................................................41

CONCLUSION..............................................................................................................42

# TABLE OF AUTHORITIES

## CASES

*In re 139-141 Owners Corp.*,
    306 B.R. 763 (Bankr. S.D.N.Y. 2004) .......................................................36

*In re 360 Inns*,
    76 B.R. 573 (Bankr. N.D. Tex. 1987) ...................................................31, 32

*In re 433 South Beverly Drive*,
    117 B.R. 563 (Bankr. C.D. Calif. 1990) ..............................................24, 25

*In re A.J. Lane and Co., Inc.*,
    113 B.R. 821 (Bankr. D. Mass. 1990) ......................................................31

*In re American Homepatient, Inc.*,
    309 B.R. 738 (M.D. Tenn. 2004) ..............................................................27

*In re Auto Specialties Mfg. Co.*,
    18 F.3d 358 (6th Cir. 1994) ......................................................................39

*Banco Portugues do Atlantico* v. *Asland, S. A.*,
    745 F. Supp. 962 (S.D.N.Y. 1990) ...........................................................42

*Bausch & Lomb Inc.* v. *Bressler*,
    977 F.2d 720 (2d Cir. 1992) .....................................................................27

*In re Boco Enterprises, Inc.*,
    204 B.R. 407 (Bankr. S.D.N.Y. 1997) ......................................................42

*Butner* v. *United States*,
    440 U.S. 48 (1979) ...................................................................................27

*In re Chicago*,
    791 F.2d 524 (7th Cir. 1986) ...................................................................36

*Citibank, N.A.* v. *Vebeliunis (In re Vebeliunis)*,
    332 F.3d 85 (2d Cir. 2003) .........................................................................5

*Consolidated Rock Products Co.* v. *Dubois*,
    312 U.S. 510 (1941) .................................................................................35

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*Continental Securities Corp.* v. *Shenandoah Nursing Home Partnership*,
    193 B.R. 769 (Bankr. W.D. Va. 1996), and *In re Vest Associates*, 217 B.R. 696, 699-
    700 (Bankr. S.D.N.Y. 1998) ...............................................................................33, 34

*Debentureholders Protective Committee of Continental Investment Corp.* v. *Continental
    Investment Corp.*,
    679 F.2d 264 (1st Cir. 1982) ........................................................................................36

*Di Pierro* v. *Taddeo (In re Taddeo)*,
    685 F.2d 24 (2d Cir. 1982) (Chapter 13) ...................................................................24

*In re Dow Corning Corp.*,
    456 F.3d 668 (6th Cir. 2006) .......................................................................................35

*Excess Ins. Co. Ltd. v. Factory Mutual Ins. Co.*, 3 N.Y. 3d 577, 582 (N.Y. 2004) ...........33

*Freund* v. *Washington Square Press, Inc.*,
    34 N.Y.2d 379 (N.Y. 1974) .......................................................................................38

*God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assoc.*, 6 N.Y. 3d 371, 374
    (N.Y. 2006) ..................................................................................................................33

*In re Goodman Bros., Inc.*,
    No. 87-00381E, 1990 WL 61758 (Bankr. W.D. Pa.).....................................................40

*In re Imperial Coronado Partners, Ltd.*,
    96 B.R. 997 (B.A.P. 9th Cir. 1989)................................................................... passim

*Indu. Craft, Inc.* v. *Bank of Baroda*,
    47 F.3d 490 (2d. Cir. 1995)........................................................................................37

*In re Johns-Manville Corp.*,
    68 B.R. 155 (S.D.N.Y. 1986)....................................................................................5, 29

*Joseph F. Sanson Inv. Co.* v. *268 Ltd. (In re 268 Ltd.)*,
    789 F.2d 674 (9th Cir. 1986) ......................................................................................37

*In re K.H. Stephenson Supply Co.*,
    768 F.2d 580 (4th Cir. 1985) ......................................................................................39

*In re LHD Realty Corp.*,
    726 F.2d 327 (7th Cir. 1984) ......................................................................................25

*Louisville Trust Co.* v. *Louisville, New Albany & Chicago Ry. Co.*,
    174 U.S. 674 (1899)....................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

*Lucente* v. *IBM Corp.*,
    310 F.3d 243 (2d Cir. 2002)...................................................................................5, 29

*In re Madeline Marie Nursing Homes*,
    694 F.2d 433 (6th Cir. 1982) ...................................................................................27

*Maltese & Sons, Inc.* v. *Juno Const. Corp.*,
    759 F.2d 253 (2d Cir. 1985)....................................................................................5, 29

*In re Manville Forest Products Corp.*,
    43 B.R. 293 (Bankr. S.D.N.Y. 1984), rev'd on other grounds, 60 B.R. 403 (S.D.N.Y.
    1986) ......................................................................................................................23, 24

*Milliken & Co.* v. *Stewart*,
    182 A.D. 2d 385 (1st Dept. 1992)............................................................................42

*In re Missionary Baptist Foundation*,
    712 F.2d 206 (5th Cir. 1983) ...................................................................................29

*New York City Dept. of Finance* v. *Twin Rivers, Inc.*,
    920 F. Supp. 50 (S.D.N.Y. 1996).............................................................................42

*In re PCH Associates*,
    122 B.R. 181 (Bankr. S.D.N.Y. 1990)......................................................................23

*In re Payless Cashways, Inc.*,
    287 B.R. 482 (Bankr. W.D. Mo. 2002).....................................................................23

*Raleigh* v. *Illinois Dep't of Rev.*,
    530 U.S. 15 (2000)...................................................................................................27, 40

*Ruskin* v. *Griffiths*,
    269 F.2d 827 (2d Cir. 1959), *cert. denied*, 361 U.S. 947 (1960)...............................36

*Sir Speedy, Inc.* v. *L&P Graphics, Inc.*,
    957 F.2d 1033 (2d. Cir. 1992)..................................................................................37

*In re Skyler Ridge*,
    80 B.R. 500 (Bankr. C.D. Calif. 1987) ...........................................................24, 25, 26

*In re Sullivan*,
    No. 03-65486, 2007 WL 987328 (Bankr. N.D.N.Y.) .................................................39

*Teachers Insurance and Annuity Association of America* v. *Ormesa Geothermal*,

## TABLE OF AUTHORITIES

**Page**

791 F. Supp. 401 (S.D.N.Y. 1991).........................................................................27, 28

*In re Thomas,*
186 B.R. 470 (Bankr. W.D. Mo. 1995).............................................................40

*Travelers Cas. and Sur. Co. of America* v. *Pacific Gas and Elec. Co.,*
127 S. Ct. 1199 (2007)......................................................................................40

*United States* v. *Ron Pair Enterprises Inc.,*
489 U.S. 235 (1996)..........................................................................................34

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.,* 1 N.Y. 3d 470, 475 (N.Y.
2004) .................................................................................................................33

*In re Weston Real Estate Fund, Inc.,*
922 F.2d 592 (10th Cir. 1991) ..........................................................................27

## STATUTES

11 U.S.C. §1124(2), quoted in fn.........................................................................23

11 U.S.C. § 362(a) ...............................................................................................23

11 U.S.C. §506(b) ................................................................................................34

28 U.S.C. § 158(a)(1)..............................................................................................4

Fed. R. Bankr. P. 8013............................................................................................5

4 N.Y. Prac., Com. Litig .......................................................................................37

## PRELIMINARY STATEMENT

Appellant HSBC Bank USA, National Association ("HSBC") is the Indenture Trustee (the "Second Priority Indenture Trustee") for the holders of $640,000,000 principal amount of Second Priority Secured Floating Rate Notes Due 2010 (the "Second Priority Notes") issued by Calpine Generating Company, LLC ("CalGen") and CalGen Finance Corp. ("CalGen Finance," and together with CalGen, the "CalGen Debtors"). Appellant The Bank of New York (together with HSBC, "Appellants") is the Administrative Agent (the "Second Priority Administrative Agent") for the holders of the $100,000,000 principal amount of Second Priority Secured Institutional Term Loans Due 2010 of CalGen ("Second Priority Term Loans," and, together with the Second Priority Notes, the "Second Priority Lien Debt"). Although CalGen and CalGen Finance have substantial shareholder equity, or a net worth, in excess of $2.6 billion, the two entities, along with their parent corporations, are debtors in possession in cases pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") pursuant to chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et. seq.* (as amended, the "Bankruptcy Code").

After more than a year in chapter 11, the CalGen Debtors decided to prepay more than $2.5 billion of their secured debt, including the Second Priority Lien Debt, to take advantage of lower interest rates and to realize interest rate savings of approximately $100 million per year through substitute financing. The Bankruptcy Court authorized the CalGEn Debtors to prepay the debt, and they prepaid the debt on March 29, 2007. This is an appeal from orders of the Bankruptcy Court which (i) improperly limited the claims of the Second Priority Indenture Trustee and Second Priority Administrative Agent under the "no call" and prepayment premium provisions of the applicable credit agreements resulting from the prepayment of the

debt, (ii) allowed Appellants' claims as unsecured claims rather than as secured claims, (iii) limited Appellants' claims for their costs and expenses under the applicable agreements, and (iv) expunged, without explanation or justification, claims against the various affiliates of the CalGen Debtors which had guaranteed the CalGen Debtors' obligations pursuant to written guarantees.

As described below, both the indenture governing the Second Priority Notes and the term loan agreement governing the Second Priority Term Loans clearly and expressly (i) prohibited prepayment of the notes and term loans prior to April 1, 2008 (the "no-call" provisions), and (ii) permitted a prepayment after April 1, 2008, only upon payment of a 3.5% prepayment premium. Such "no call" and prepayment premium provisions have consistently, and repeatedly, been upheld by the courts as binding obligations of a borrower. If a chapter 11 debtor elects to prepay its debt in breach of such provisions, as the CalGen Debtors did here, the injured creditor is entitled to a claim for the full measure of its damages resulting from the debtor's breaches of those provisions.

Here, the Bankruptcy Court failed, as a matter of law, to apply the proper measure of damages in determining Appellants' claims resulting from the prepayments. As the cases make clear, the Second Priority Indenture Trustee and Second Priority Administrative Agent were entitled to recover the sum of (x) the 3.5% prepayment premium which the debtors were obligated to pay upon a prepayment of the debt on or after April 1, 2008, the date when a prepayment was first permitted under the agreements, plus (y) Appellants' additional damages resulting from the CalGen Debtors' prepayment of the debt on March 29, 2007, more than a year prior to that date. Notwithstanding the applicable legal principles, the Bankruptcy Court improperly limited the damage claims by awarding the Second Priority Indenture Trustee and Second Priority Administrative Agent claims for only the 3.5% premium, but failing to award

Appellants claims for their substantial additional damages resulting from the prepayment on March 29, 2007, a full year prior to the April 1, 2008 date, when the debt could first be prepaid upon payment of the premium.  By failing to apply the proper measure of damages, the Bankruptcy Court understated the claims of the Second Priority Indenture Trustee and Second Priority Administrative Agent by more than $22,550,687 and $5,489,506, respectively.

In addition, the Bankruptcy Court clearly erred in other respects relating to Appellants' claims.  First, although Appellants' claims were fully secured under the applicable agreements, the Bankruptcy Court erred in determining that Appellants' claims were unsecured rather than secured claims.  Second, although the applicable indenture and term loan agreement entitled the Second Priority Indenture Trustee and Second Priority Administrative Agent to recover all of the costs, fees, and expenses, the Bankruptcy Court improperly limited their rights to recover such amounts. Finally, the Bankruptcy Court erred in expunging, without any explanation, Appellants' contractual guarantee claims against various debtor affiliates of the CalGen Debtors, which had guaranteed the obligations of the CalGen Debtors pursuant to written guarantees.

## STATEMENT OF BASIS FOR APPELLATE JURISDICTION

This appeal is taken from a Memorandum and Order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), dated March 5, 2007 (the "Decision"), and two further Orders of the Bankruptcy Court dated March 12, 2007, as amended by further Order dated March 26, 2007 (collectively, the "Orders"), which (1) allowed in part and disallowed in part claims of the Appellant Second Priority Indenture Trustee and Appellant Second Priority Administrative Agent, (2) denied Appellants' secured claims, and (3) denied Appellants' claims pursuant to contractual guarantees.  (Copies of the

Decision and the Orders are submitted, respectively, at JA 1, JA 15, JA 55, and JA 62.)[1]  The foregoing Orders constitute final, appealable orders pursuant to 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES PRESENTED ON APPEAL

1.  Did the Bankruptcy Court err in failing to apply the proper measure of damages in determining the claims of the Appellant Second Priority Indenture Trustee and Appellant Second Priority Administrative Agent arising out of the Debtors' breaches of the "no call" and prepayment premium provisions of the applicable indenture and term loan agreement?

2.  Specifically, where the Debtors prepaid the Second Priority Notes and Second Priority Term Loans on March 29, 2007, in violation of the provisions of an indenture and a term loan agreement which expressly (i) prohibited any prepayment prior to April 1, 2008, and (ii) required payment of a prepayment premium of 3.5% for a prepayment after that date, did the Bankruptcy Court err in limiting Appellants' claims to the 3.5% prepayment premium due for a prepayment after April 1, 2008, and not granting their claims for the additional damages incurred for the period from March 29, 2007, the date of the prepayment, through April 1, 2008?

3.  Where the CalGen Debtors' obligations with respect to the Second Priority Notes and Second Priority Term Loans were fully secured under a written security agreement, did the Bankruptcy Court err in failing to grant Appellants secured claims for the prepayment premium and damages resulting from the Debtors' prepayment of the debt?

4.      Where the indenture and term loan agreement expressly entitled the Second Priority Indenture Trustee and Second Priority Administrative Agent to recover all of their fees, costs and expenses (including legal expenses), did the Bankruptcy Court err in limiting the

---

[1]   Together with this Brief, Appellants HSBC, The Bank of New York, the respective appellant representatives of the First Priority Lien Debt and Third Priority Lien Debt (each as defined below), and the appellant Collateral Agent (as defined below) have submitted a Joint Appendix containing the principal documents referred to in their Briefs which are included in the record on appeal.  References to "JA__" are to pages in the Joint Appendix. References to "R.__" are to exhibits in the Joint Record in this and the related appeals.

Appellants' claims for their fees, costs, and expenses incurred and to be incurred in the chapter 11 cases?

5.  Where various of the debtor affiliates of the CalGen Debtors (the "Debtor Guarantors") expressly guaranteed all obligations of the CalGen Debtors under the indenture and term loan agreement and the related security agreement, did the Bankruptcy Court err in expunging the claims of the Second Priority Indenture Trustee and Second Priority Administrative Agent against such guarantors under those guarantees?

## STANDARD OF APPELLATE REVIEW

A Bankruptcy Court's errors of law are reviewed *de novo*, and findings of fact are reviewed for clear error.  Fed. R. Bankr. P. 8013.  Mixed questions of law and fact are reviewed *de novo*.  *See Citibank, N.A. v. Vebeliunis (In re Vebeliunis)*, 332 F. 3d 85, 90 (2d Cir. 2003). The determination of the proper measure of damages arising out of breach of contract claims, and the proper application of that measure of damages, are questions of law or mixed questions of law and fact, which are subject to *de novo* review.  *See Lucente v. IBM Corp.*, 310 F.3d 243, 261 (2d Cir. 2002); *Maltese & Sons, Inc. v. Juno Const. Corp.*, 759 F.2d 253, 255 (2d Cir. 1985); *In re Johns-Manville Corp.*, 68 B.R. 155, 158 (S.D.N.Y. 1986).

## STATEMENT OF THE CASE

### A.    The Parties

Appellant HSBC, a national banking association, is the Second Priority Indenture Trustee for the holders of the Second Priority Notes issued by CalGen and CalGen Finance. HSBC is the successor to Wilmington Trust FSB ("Wilmington Trust") as the Second Priority Indenture Trustee.

Appellant The Bank of New York, a New York chartered bank, is the Second Priority Administrative Agent for the holders of Second Priority Term Loans.  It is the successor to Morgan Stanley Senior Funding, Inc. as the Second Priority Term Loan Administrative Agent.

On December 20, 2005 (the "Petition Date"), Calpine Corporation ("Calpine") and its subsidiaries, including CalGen and CalGen Finance (together with Calpine, the "Debtors"), filed voluntary petitions for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  The Debtors are engaged in the ownership and operation of power plants and power generation facilities.  The Debtors continue to manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

Debtor CalGen is a limited liability company which owns and operates gas-fired power plants throughout the United States.  CalGen is the issuer of more than $2.6 billion of publicly traded debt.  Although CalGen is a subsidiary of Calpine, CalGen is a separate reporting company which files annual Forms 10-K and quarterly Forms 10-Q with the Securities and Exchange Commission.  CalGen is a highly profitable and valuable subsidiary of Calpine. According to CalGen's own most recent Form 10-Q filed on February 2, 2007, as of September 30, 2006, CalGen had members' equity (the equivalent of shareholder equity for a limited liability company) in excess of $2.6 billion.  (JA 76)

B.    **The CalGen Capital Structure**

On March 23, 2004, CalGen issued $2.605 billion of secured debt (the "CalGen Secured Debt") through a series of first, second, and third lien financings, comprised of (i) $235,000,000 of First Priority Secured Floating Rate Notes Due 2009; (ii) $600,000,000 of First Priority Secured Institutional Term Loans Due 2009; (iii) $200,000,000 of First Priority Revolving Loans (together with (i) and (ii), the "First Priority Lien Debt"); (iv) $640,000,000 of Second Priority Notes; (v) $100,000,000 of Second Priority Term Loans ((iv) and (v) together,

the "Second Priority Lien Debt"); (vi) $680,000,000 of Third Priority Secured Floating Rate Notes Due 2011; and (vii) $150,000,000 of 11.5% Third Priority Secured Notes Due 2011 ((vi) and (vii) together, the "Third Priority Lien Debt").  Prior to the prepayment, approximately $2.516 billion of the CalGen Secured Debt was outstanding.

Pursuant to an indenture dated as of March 23, 2004 (the "Second Priority Indenture"), by and among CalGen and CalGen Finance, as Issuers, the Debtor Guarantors, and Wilmington Trust, as the original indenture trustee and predecessor to HSBC, CalGen and CalGen Finance issued the Second Priority Notes.  The Second Priority Notes were to mature on April 1, 2010, and bear interest payable quarterly at the non-default rate of LIBOR plus 5.75%.[2] (A copy of the Second Priority Indenture is submitted at JA 315; *see* Exhibit A-2 thereto at JA 438.)

Pursuant to a Credit and Guarantee Agreement dated as of March 23, 2004 (the "Second Priority Term Loan Agreement"), among CalGen, as Borrower, the Debtor Guarantors, the Lenders party thereto, and Morgan Stanley Senior Funding, Inc., as the original administrative agent and predecessor to The Bank of New York, CalGen borrowed $100 million aggregate principal amount of the Second Priority Term Loans.  The Second Priority Term Loans were to mature on April 1, 2010, and bear interest payable quarterly.  Under the Second Priority Term Loan Agreement, the non-default rate of interest on the Second Priority Term Loans is either (i) the Base Rate (as defined in the agreement) plus 4.75% or (ii) the LIBOR Rate (as defined in the agreement) plus 5.75%.  (A copy of the Second Priority Term Loan Agreement is submitted at JA 850; *see* section 2.05, at JA 905.)

---

[2]  Pursuant to their Refinancing Motion (described below), the Debtors objected to the claims of the Second Priority Trustee and Second Priority Administrative Agent for the default and additional interest provided for in the Second Priority Indenture and Second Priority Term Loan Agreement, as well as the claims of the other appellant representatives of CalGen Secured Debt for their contractual default interest.  The Bankruptcy Court deferred ruling on the claims for default interest and the claims for those amounts are not at issue on this appeal.

The CalGen Secured Debt is secured by substantially all of CalGen's assets. Pursuant to a Security Agreement dated as of March 23, 2004 (the "Security Agreement"), among the CalGen Debtors, the Debtor Guarantors, and Wilmington Trust as Collateral Agent, the CalGen Debtors and the Debtor Guarantors granted security interests in substantially all of their assets (the "Collateral") as security for their Obligations (as defined therein) to the holders of the First, Second and Third Priority Lien Debt. (A copy of the Security Agreement is submitted at JA 1038.)[3]

**C.    The Second Priority Indenture, Second Priority Term Loan Agreement, and Security Agreement**

The relevant provisions of the Second Priority Indenture and the Second Priority Term Loan Agreement are similar to each other. However, those provisions differ from the terms of the indentures and term loan agreements governing the First Priority Lien Debt and Third Priority Lien Debt. The provisions of the Second Priority Indenture and Second Priority Term Loan Agreement are as follows.

**(i)    Voluntary Prepayments**

The Second Priority Indenture and the Second Priority Term Loan Agreement specifically prohibit the redemption or prepayment of the Second Priority Notes or the Second Priority Term Loans prior to April 1, 2008, and they condition the redemption or prepayment of the foregoing debt after April 1, 2008, upon the payment of a price of 103.5%, representing a prepayment premium of 3.5%. Only after April 1, 2009, can the Second Priority Notes and the

---

[3]    In connection with the CalGen financing, the parties also entered into a Collateral Trust and Intercreditor Agreement (the "Collateral Trust Agreement"), dated as of March 23, 2004, between, among others, Calpine CalGen Holdings, Inc., CalGen, the Debtor Guarantors, Wilmington Trust, as the original Indenture Trustee for the First, Second and Third Priority Notes, Morgan Stanley Senior Funding, Inc., as the original Administrative Agent for the First and Second Priority Term Loans, and Wilmington Trust, as Collateral Agent. (A copy of the Collateral Trust Agreement is included at JA 1098.) The Collateral Trust Agreement governs the priorities in payment among the holders of the First, Second, and Third Priority Lien Debt of CalGen from all proceeds of the Collateral pledged to the CalGen Secured Debt. (JA 1146-1148)

Second Priority Term Loans can be prepaid with no prepayment premium.

Section 3.07 of the Second Priority Indenture states:

> The Issuers may not redeem all or any part of the Notes prior to April 1, 2008.  On or after April 1, 2008, the Issuers may redeem all or a part of the Notes, upon not less man [sic] 30 nor more than 60 days prior notice, at the redemption prices (expressed at percentages of principal amount) set forth below plus accrued and unpaid interest and Special Interest, if any, on the Notes redeemed, to the applicable redemption date, if redeemed during the twelve-month period beginning on April 1 of the years indicated below, subject to the rights of the Holders on the relevant record date to receive interest on the relevant interest payment date:

| Year | Percentage |
|---|---|
| 2008 | 103.5% |
| 2009, and thereafter | 100.0% |

(JA 383).  Similarly, section 2.10(b) of the Second Priority Term Loan Agreement states:

> (i)      The Second Priority Term Loans may not be voluntarily prepaid at any time on or prior to April 1, 2008;

> (ii)      The Borrower may, at its option, upon notice as provided in clause (a) above, prepay at any time all, or from time to time any part of, the Second Priority Term Loans, if such prepayment is after April 1, 2008 but on or before April 1, 2009, in an amount equal to 103.5% of the principal amount so prepaid, plus all other amounts owed hereunder in connection with such prepayment, including amounts payable under Sections 2.05 (Interest) and 2.14 (Making or Maintaining Second Priority Term Loans) hereof; and

> (iii)      Subject to clause (a) above, Second Priority Term Loans may be prepaid at any time without premium or penalty after April 1, 2009.

(JA 909).

**(ii)    Events of Default**

Section 6.01 of the Second Priority Indenture and Section 7.01 of the Second

Priority Term Loan Agreement both provide that the filing of a bankruptcy petition by the

CalGen Debtors or their affiliates constitutes an Event of Default which accelerates the

indebtedness due on the Second Priority Notes and Second Priority Term Loans.[4]  However, under the provisions of the Bankruptcy Code, specifically sections 362 and 1124(2) discussed below, (i) debtors are under no obligation to pay or prepay their debt notwithstanding any such "automatic acceleration," (ii) creditors are automatically stayed from taking any steps to compel the payment of their debt, and (iii) the debtors have an absolute right to decelerate (or reverse) any automatic acceleration of the debt. (*See* pp. 12-13 and 23-25 below)

### (iii)   **Fees, Costs, and Expenses**

Section 7.07 of the Second Priority Indenture and section 12.02(f) of the Second Priority Term Loan Agreement both provide that the CalGen Debtors are obligated to reimburse the Second Priority Trustee and the Second Priority Term Loan Administrative Agent, respectively, for all of their costs, fees, and expenses incurred in carrying out their duties.[5]

---

[4]   Section 6.02 of the Second Priority Indenture provides that, "[i]n the case of an Event of Default . . . [caused by a bankruptcy filing] all outstanding Notes will become due and payable immediately without further action or notice."  (JA 404)  Section 7.02 of the Second Priority Term Loan Agreement provides that "[i]n the case of an Event of Default [caused by a bankruptcy filing], the outstanding Second Priority Term Loans shall become due and payable immediately without further action or notice."  (JA 949).

[5]   Section 7.07 of the Second Priority Indenture provides:

> The Company will pay to the Trustee from time to time reasonable compensation for its acceptance of this Indenture and services hereunder.  The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust.  The Company will reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services.  Such expenses will include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel. (JA 409)

Section 12.02(f) of the Second Priority Term Loan Agreement provides that the Borrower agrees to pay:

> [A]fter the occurrence of a Default or an Event of Default, all costs and expenses, including attorneys' fees and costs of settlement, incurred by any Agent and the Lenders in enforcing any Second Priority Term Loan Obligations of or in collecting any payments due from any Obligor hereunder or under the other Second Priority Term Loan Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Second Priority Term Loan Guarantees) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any Bankruptcy Case or Insolvency Proceeding.  (JA 964)

### (iv)   The Security Agreement

Pursuant to the Security Agreement, substantially all of the assets of the CalGen

Debtors, as well as the Debtor Guarantors, are pledged as Collateral for the Obligations owed to

holders of the CalGen Secured Debt.  Section 1.1 of the Security Agreement defines the

Collateral to include:

> any and all personal property of such Grantor, now owned or at
> any time hereafter acquired by such Grantor, or in which such
> Grantor now has or at any time in the future may acquire any right,
> title or interest, including all (i) Documents; (ii) Goods; (iii)
> Intellectual Property; (iv) Investment Property; (v) Letter of
> Receivable Records ... (x) to the extent not otherwise included
> above, (A) all contracts or other agreements, motor vehicles and
> other personal property of any kind ... (C) all personal property
> assigned, hypothecated or otherwise securing any of the foregoing,
> including any security agreement or other agreement granting a
> lien or security interest in such personal property, and ... (xi) to the
> extent not otherwise included above, all Proceeds, products,
> accessions, rents and profits of or in respect of any of the
> foregoing. . . .

(JA 1043)

The Security Agreement and related Collateral Trust Agreement define the

"Obligations" for which the Collateral is pledged to include, among other things, all obligations

or liabilities of any kind owed to the holders of the First, Second or Third Priority Lien Debt.

(Collateral Trust Agreement, JA 1118-1119)  The Collateral Trust Agreement defines

"Obligations" to include, among other things, "all debt, financial liabilities and obligations...of

whatsoever nature and however evidenced ... under or pursuant to each agreement, document or

instrument evidencing, securing, guaranteeing or relating to such Indebtedness...in each case,

direct or indirect, primary or secondary, fixed or contingent, now or hereafter arising out of or

relating to any such agreement, document or instrument...."  (JA 1118-1119)

**D.**    **The Calpine and CalGen Debtors' Chapter 11 Proceedings**

On December 20, 2005, Calpine, the CalGen Debtors, and their affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  (R. 123-249)

On July 31, 2006, the Second Priority Indenture Trustee filed a Secured Proof of Claim (the "Indenture Trustee's Claim") against the CalGen Debtors and each of the Debtor Guarantors on behalf of the holders of the Second Priority Notes.  The Indenture Trustee's Claim asserted a claim against each of the CalGen Debtors and Debtor Guarantors for all amounts that were or might become due in respect of the Second Priority Notes, including (a) principal, (b) postpetition interest at the default rate, (c) the Second Priority Indenture Trustee's fees and expenses, and (d) all other amounts, including the prepayment premium due upon any early prepayment of the Second Priority Notes and damages for any breach of the "no-call" provision in Section 3.07 of Second Priority Indenture.  (R. 335)

On August 1, 2006, the Second Priority Administrative Agent filed a Secured Proof of Claim (the "Administrative Agent's Claim") against Debtor CalGen and each of the Debtor Guarantors on behalf of the holders of the Second Priority Term Loans.  The Administrative Agent's Claim asserted a claim against the CalGen Debtors and the Debtor Guarantors for all amounts that were or might become due, including (a) principal, (b) postpetition interest at the default rate, (c) the Administrative Agent's fees and expenses, and (d) all other amounts, including the prepayment premium due upon any early prepayment of the Second Priority Term Loans and damages for any breach of the "no-call" provision in Section 2.01 of the Second Priority Term Loan Agreement.[6]

---

[6]   A copy of the Administrative Agent's Claim was inadvertently omitted from the record filed with the District Court.  The Administrative Agent's Claim was filed with the Bankruptcy Court.  The record will be amended to include the Administrative Agent's Claim.

**E.    The CalGen Debtors' Refinancing Motion**

        For more than a year following their chapter 11 petitions, the CalGen Debtors took no steps to pay or to prepay the indebtedness on the Second Priority Notes or Second Priority Term Loans.  Nor, despite their chapter 11 petitions, were the CalGen Debtors under any obligation whatsoever to pay or prepay that debt.  Despite the "automatic acceleration" resulting from the Debtors' own actions in filing chapter 11 petitions, the holders of the Second Priority Notes and Second Priority Term Loans were at all times "automatically stayed" from taking any steps to collect the outstanding debt pursuant to Bankruptcy Code section 362.[7]  Moreover, under section 1124(2) of the Bankruptcy Code, the Debtors had an unqualified right to decelerate any such "automatic acceleration" and to reinstate the debt according to its original terms.[8]  (*See* cases discussed at pp. 23-25 below.)  At no time did the holders of the Second Priority Notes or Second Priority Term Loans take any steps to collect or obtain payment of the Second Lien Debt.  Accordingly, the Debtors' decision in March, 2007, to prepay the CalGen Secured Debt was an entirely voluntary decision made by the Debtors to take advantage of a decline in interest rates.

        In early 2007, with available interest rates for a refinancing substantially below the interest rates on the outstanding CalGen Secured Debt, the CalGen Debtors decided that they

---

[7]  Section 362, the "automatic stay" provision of the Bankruptcy Code, provides, in pertinent part:

    (a) ... [A] petition filed under section 301, 302, or 303 of [the Bankruptcy Code], or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities,  of –

        ...

    (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under [the Bankruptcy Code].

[8]  Section 1124(2) provides, in pertinent part, as follows:

    Except as provided in section 1123(a)(4) of [the Bankruptcy Code], a class of claims or interests is impaired under a plan, unless, with respect to each claim or interest of such class, the plan –

    (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default –

        ...

    (B) reinstates the maturity of such claim or interest as such maturity existed before such default.

could save approximately $100 million per year by prepaying the $2.5 billion of outstanding CalGen Secured Debt with new debtor in possession loans obtained at significantly lower rates of interest.  The Debtors also determined that they would object to the claims of holders of the CalGen Secured Debt for damages arising out of the Debtors' breaches of the "no-call" and prepayment premium provisions of the applicable indentures and credit agreements.

On January 26, 2007, the CalGen Debtors filed a Motion for Order (i) Authorizing Debtors to Obtain Replacement Postpetition Financing to (a) Refinance Existing Postpetition Financing and (b) Repay Prepetition Debt; (ii) Allowing Debtors' Limited Objection to Claims; and (iii) Determining Value of Secured Claims (the "Refinancing Motion").  (R. 5)  In the Refinancing Motion, the CalGen Debtors sought authority to prepay the First, Second, and Third Priority Lien Debt with new debtor in possession loans to be obtained by a pledge of the Collateral currently pledged to the holders of the CalGen Secured Debt.  (R. 5, p. 28)

As part of the Refinancing Motion, the Debtors also made what they described as a "Limited Objection" to the secured claims filed by representatives of the CalGen Secured Debt, including the Indenture Trustee's Claim and the Administrative Agent's Claim.  Although the Debtors proposed to prepay the Second Priority Notes and the Second Priority Term Loans in violation of the "no-call" and prepayment premium provisions of the Second Priority Indenture and the Second Priority Term Loan Agreement, the Debtors objected to Appellants' claims for the damages resulting from those breaches of the agreements.  The Debtors proposed that they be required to pay only the principal of, and interest at the non-default rate on, the CalGen Secured Debt.  They objected to Appellants' claims for (i) the damages arising out of the breach of the "no-call" provisions which expressly prohibited prepayment prior to April 1, 2008, (ii) the 3.5% prepayment premium, (iii) interest at the default and adjusted rates specified in the agreements,

and (iv) a portion of the fees and expenses owed to the Second Priority Indenture Trustee and Second Priority Administrative Agent. The Debtors also asked the Bankruptcy Court to expunge the claims against the Debtor Guarantors. (R. 5, pp. 39-42)

The representatives of the CalGen Secured Debt filed oppositions to the Debtors' Refinancing Motion and "Limited Objection To Claims." (R. 8-11, 13 and 14)

## F. The Hearing

On February 27, 2007, the Bankruptcy Court conducted a one-day hearing on the Debtors' Refinancing Motion and Limited Objection and the oppositions thereto.[9] Among the evidence submitted at the hearing was the following:

### (i) The Damage Claims of Holders of the Second Priority Notes and Second Priority Term Loans

At the hearing, the Second Priority Indenture Trustee and the Second Priority Administrative Agent introduced the affidavits and testimony of Mr. Jason Jack, a Director of Giuliani Capital Advisors LLC ("Mr. Jack"), in support of the damage claims of the holders of the Second Priority Notes and the Second Priority Term Loans arising out of breach of the "no-call" provisions and prepayment premium provisions. (The affidavits submitted by Mr. Jack setting forth his conclusions are the Supplemental Affidavit of Mr. Jack, sworn to February 22, 2007, submitted on behalf of HSBC as Indenture Trustee (the "Jack HSBC Affid." (JA 1187); the Affidavit of Mr. Jack, sworn to February 22, 2007, submitted on behalf of The Bank of New York as Administrative Agent (the "Jack BofNY Affidavit" (JA 1200); and the Surreply Affidavit of Mr. Jack, sworn to February 26, 2007, submitted on behalf of both HSBC and The Bank of New York (the "Jack Surreply Affid.") (JA 1214); Mr. Jack's testimony, introduced through proffer and cross-examination, is at R. 50, Tr. 124-138.)

---

[9] Pages of the transcript of the hearing are hereinafter referred to as "Tr. __". The transcript is included in the Joint Record as R. 50.

As set forth in Mr. Jack's affidavits and testimony, to compensate the holders of the Second Priority Notes and Second Priority Term Loans for the breach of the "no-call" provisions (prohibiting a prepayment prior to April 1, 2008) and the prepayment premium provisions (requiring payment of a prepayment premium of 3.5% for a permitted prepayment by the Debtors after that date), the holders were entitled to damages covering two elements:  (i) first, the holders were entitled to damages resulting from the breach of the no-call provisions representing the secured creditors' lost income from the date of the prepayment (March 29, 2007) through the first date on which the Second Notes and Priority Term Loans could be first be prepaid (April 1, 2008), based upon the difference between (x) the contract rate of interest due under the agreements and (y) the interest that the holders could obtain through a comparable "replacement investment" in similar debt.  Second, the holders were entitled to the present value (as of the date of the actual prepayment) of the 3.5% prepayment premium that the holders were entitled to be paid for a prepayment of their debt after April 1, 2008.  (Jack HSBC Affid., JA 1189-1190; Jack BofNY Affidavit, JA 1202-1204; R. 50, Tr. 127)

Mr. Jack testified that the damage claim of the holders of the Second Priority Notes arising out of breach of the "no-call" and prepayment premium provisions would be a total of $44,950,687, consisting of (i) damages for the period from the date of the prepayment through April 1, 2008, in the amount of $24,060,281, representing the difference between the contract rate of interest and the return on a similarly rated note at current rates; plus (ii) the present value of the 3.5% prepayment premium that would be due upon a prepayment on April 1, 2008.  (Jack HSBC Affid., JA 1191; R. 50, Tr. 135)

Similarly, Mr. Jack testified that the damage claim of the holders of the Second Priority Term Loans arising out of breach of the "no-call" and prepayment premium provisions

would be a total of $14,153,158, consisting of (i) damages for the period from the date of the prepayment through April 1, 2008, in the amount of $8,984,506, representing the difference between the contract rate of interest and the return on a similarly rated loan at current rates; plus (ii) the present value of the 3.5% prepayment premium that would be due upon a prepayment on April 1, 2008.  (Jack BofNY Affidavit, JA 1205; R. 50, Tr. 134)

Mr. Jack further testified that, if the Bankruptcy Court calculated the damages to holders of the Second Priority Notes and Second Priority Loans without using the prepayment premium, but instead by calculating actual damages based upon the difference between the contract rates of interest and rates on replacement securities for the entire period from the date of the prepayment through April 1, 2009 (the date when the notes and loans could first be prepaid without any prepayment premium), the damage claims of the holders of the Second Priority Notes and Second Priority Term Loans would actually be higher than the amounts calculated by using the prepayment premiums for the period subsequent to April 1, 2008.  (Jack Surreply Affid., p. 4, JA 1217; R. 50, Tr. 129)[10]

### (ii)    CalGen's Solvency

In view of the well-established body of case law holding that a solvent debtor may not use the provisions of the Bankruptcy Code to limit the contractual rights or damages of creditors to benefit shareholders (*see* pp. 35-37 below), the Second Priority Indenture Trustee and Second Priority Administrative Agent, together with representatives of the other CalGen Secured Debt, sought to introduce testimony that CalGen was solvent -- indeed, by a wide margin -- and that the Debtors, therefore, could not use provisions of the Bankruptcy Code to limit the creditors' claims for damages under applicable state law.  Although the Bankruptcy

---

[10]  Mr. Jack also testified as to the default interest due and owing to the Second Priority Trustee and Second Priority Administrative Agent, but, as noted above, the Bankruptcy Court deferred ruling on that issue and that issue is not before the Court on this appeal.

Court ultimately precluded the creditors from introducing additional evidence on the issue of CalGen's solvency, the record showed that CalGen was solvent by a significant margin.

It is undisputed that CalGen's most recent Form 10-Q for the period ending September 30, 2006, filed on February 2, 2007 (only weeks prior to the hearing) reported that CalGen had total assets of $5.5 billion, total liabilities of $2.8 billion, and members' equity (the equivalent of shareholder equity) *in excess of $2.6 billion*.  (JA 0076)  Moreover, the evidence established that, even during the pendency of the chapter 11 cases, CalGen has generated and distributed to Calpine, its shareholder, more than $200 million of "excess cash."  (Deposition testimony of Sam Greene ("Greene Dep. Tr."), the Debtors' expert, JA 1313)

The representatives of the First, Second and Third Lien Debt introduced the testimony and affidavits of two widely respected experts, who all testified that CalGen's assets were worth far in excess of its liabilities.

(a)    Affidavit and Testimony of Christopher J. Kearns.  Christopher Kearns, an Executive Director and Managing Member of Capstone Advisory Group, LLC, advisors to the Third Lien Debt and Second Lien Debt, testified that CalGen had assets far in excess of its liabilities.  Mr. Kearns' principal methodology compared the dollar amount of total CalGen liabilities with the value of CalGen determined on a dollars per kilowatt capacity basis (a "$/kW capacity basis"), a traditional method for valuing power companies.  Based upon CalGen's financial statements, Mr. Kearns determined that CalGen's total net obligations (i.e., total secured and unsecured claims against CalGen, less cash on hand and intercompany liabilities of Calpine to CalGen for post-petition advances) as of March 31, 2007 were approximately $2.1 billion or $238/ kW to $278/kW of CalGen plant capacity.  Based upon valuations of comparable energy companies, Mr. Kearns determined that the valuation of CalGen was at least

$347-$354/kW, and possibly as high as the $443/kW capacity recently received by CalGen for the sale of its Goldendale project, *far* in excess of the value required to pay all CalGen claims in full.  (Kearns Amended Affidavit, sworn to February 22, 2007, JA 1229; R. 50, Tr. 104-109)

(b)     <u>Affidavit and Testimony of Anders J. Maxwell</u>.  Similarly, Anders Maxwell, a Managing Director of Peter J. Solomon Company, advisors to the First Priority Indenture Trustee, testified that, based upon valuation of comparable companies on a $/kW basis, CalGen had a valuation of approximately $3.2 billion, also well in excess of the amount of "net claims" (*i.e.*, total claims less cash on hand and cash equivalents) of approximately $2.4 billion. (Maxwell Affidavit, JA 1272;  R. 50, Tr. 139-141)

Not surprisingly, the Debtors presented no expert to dispute the fact that CalGen was solvent.  The only expert the Debtors presented on valuation issues was Mr. Samuel Greene, of Miller Buckfire, who himself testified that CalGen likely had a value even higher than the values attributed by the experts for the CalGen Secured Debt.  In his deposition, Mr. Greene testified that he performed an analysis which showed that the CalGen Secured Debt was substantially over-secured (*i.e.*, the value of the Collateral substantially exceeded the amount of the CalGen Secured Debt).  (Greene Dep. Tr., JA 1300)[11] Mr. Greene further testified that, based upon valuations of other comparable energy companies, an enterprise valuation of Debtor CalGen at $450/kW capacity would be "reasonable."[12]  (Green Dep. Tr. JA 1295-1296)  That is a

---

[11] The pertinent portions of Mr. Greene's deposition testimony are submitted at JA 1286-1322.  The complete transcript of his deposition testimony is submitted as R. 40 and annexed as Exhibit E to the Declaration Affidavit of David S. Elkind, dated February 26, 2007.

[12]  Mr. Greene testified as follows:

Q.     Let's take that pretty good proxy, you would agree then that a valuation using that methodology at approximately $450 per kilowatt hour would be a reasonable valuation?

A.     Yes, but I'd just like to correct your question, it's per kilowatt.

Q.     Per kilowatt, I'm sorry.

So a valuation at $450 per kilowatt of capacity would be a reasonable valuation for the assets of CalGen; is that right?

valuation far *higher* than the valuations of Mr. Kearns and Mr. Maxwell, and results in CalGen

having an enterprise valuation on a $/kW capacity basis of approximately 1.5 to 2 times the

amount of the total net claims against the CalGen estate.[13]  (Green Dep. Tr. 1301-1303)

## G.    The Bankruptcy Court's Decision

By Decision dated March 5, 2007 (the "Decision") (JA 1), and Orders dated

March 12, 2007, as amended by order dated March 26, 2007 (the "March Refinancing Order"

and "March Repayment Order," respectively) (JA 15, 55 and 62), the Bankruptcy Court granted

in part, and denied in part, the Debtor's Refinancing Motion and "Limited Objection" to Claims.

---

A.      Yes.  (Green Dep. Tr. JA 1295-1296)

[13]  Mr. Greene further testified as follows:

Q.      Has any – have you gotten from anyone a number as to what the dollar amount is of any intercompany issues?

A.      Yes.

Q.      What is that number that you've gotten?

A.      The current number that I have gotten is approximately $200 million, but I, again, would qualify the response by saying the analysis is not complete.

Q.      Okay.  Well, let's - even assuming that there were $200 million of additional intercompany liabilities from CalGen to - owed by CalGen to Calpine and that those were valid claims by Calpine against CalGen -

A.      Yes.

Q.      -- even on that assumption, would you agree with me that valuing the assets of CalGen on the basis that we've been talking about –

A.      Uh-huh.

Q.      -- would produce a value far, far in excess of the amount of the total secured and unsecured liabilities of CalGen?

A.      I would agree with you that it's in excess, how many fars you want to use, you can use up.

Q.      Would you agree with me that it is approximately – that it's almost – that it's between 1.5 and 2 times the amount, that the value of CalGen even on that basis is approximately 1.5 to 2 times the amount of all secured and unsecured liabilities of CalGen even assuming that you throw in the so-called intercompany issues?

A.      Yes.

Q.      Now, you testified – and by the way, that's without even taking into account and netting out the obligation that Calpine has to CalGen on account of the transfers of cash that have been made during the course of this Chapter 11; isn't that right?

A.      Yes.

Q.      And so if you took those into account, the excess solvency – or the excess value, let's use that word instead, is even greater, correct?

A.      Yeah, if those claims, you know, if you had a claim that you could recover on and there was value there, it would do as you said.  (Green Dep. Tr. JA 1301-1303)

First, the Bankruptcy Court granted permission to the Debtors to prepay the CalGen Secured Debt, and authorized the Debtors to use the Collateral pledged to the holders of the CalGen Secured Debt to obtain the new debtor in possession loans to prepay that debt. The Bankruptcy Court held that, upon the prepayment of the CalGen Secured Debt, the Debtors were required to pay only (a) the principal and non-default interest due on the CalGen Secured Debt and (b) certain costs and expenses of the indenture trustees and administrative agents. (March Repayment Order, JA 63)

Second, the Bankruptcy Court held that the holders of the CalGen Secured Debt did not have secured claims under Bankruptcy Code section 506(b) for payment of their damages resulting from breach of the "no-call" provisions or the prepayment premiums provided for in the agreements, and that those amounts were, therefore, not required to be paid at the time of the prepayment of the debt. (Decision, JA 10-11; March Repayment Order, JA 64)

Third, the Bankruptcy Court ruled that the holders of the CalGen Secured Debt were entitled to unsecured claims under Bankruptcy Code section 502 for the damages arising out of the CalGen Debtors' breaches of the applicable indentures and credit agreements. However, the court failed to apply proper legal principles to award the Second Priority Indenture Trustee and Second Priority Administrative Agent the full damage claims to which they were entitled. The Bankruptcy Court granted the Second Priority Indenture Trustee and Second Priority Administrative Agent unsecured claims for the 3.5% prepayment premiums due upon a prepayment of the debt after April 1, 2008, but granted them no additional claims for their damages resulting from breach of the "no-call" provisions for the one-year period from the date of the prepayment through April 1, 2008. (Decision, JA 10; March Repayment Order, JA 64) The Bankruptcy Court thus held that the Second Priority Indenture Trustee had a general

unsecured claim for only $22.4 million (the 3.5% premium) of the damages and prepayment

premium claimed as a result of the breach of the "no-call" and prepayment premium provisions,

leaving a deficiency of $22,550,687 in the amount claimed as a result of that breach; and (ii) that

the Second Priority Administrative Agent had a general unsecured claim for only $3.5 million

(the 3.5% premium) of the damages and prepayment premium claimed as a result of the breach

of the "no-call" and prepayment premium provisions, leaving a deficiency of $5,489,506 in the

amount claimed as the result of such breach.

   Fourth, the Bankruptcy Court held that rulings on the amounts claimed by the

Second Priority Indenture Trustee and by the Second Priority Administrative Agent for Default

Interest and certain additional interest should be deferred to a later time.  (Decision, JA 11-13;

March Repayment Order, JA 63)

   Finally, the Bankruptcy Court ruled that, after the Debtors' repayment of the

principal and non-default interest on the CalGen Secured Debt, the Debtors would have no

further liability for the fees and expenses of the Second Priority Indenture Trustee and Second

Priority Administration Agent, other than for fees incurred in the litigation of default interest

issues before the Bankruptcy Court only.  (March Repayment Order, JA 66)  Thus, the

Bankruptcy Court ruled that, despite the express terms of the Second Priority Indenture and the

Second Priority Term Loan Agreement, Appellants could not recover their additional ongoing

fees and expenses for representing the Second Priority Lien Debt in the Bankruptcy cases or for

litigating other issues and claims on behalf of the holders of the debt.

**ARGUMENT**

**I.**

**THE BANKRUPTCY COURT ERRED IN FAILING TO APPLY THE PROPER MEASURE OF DAMAGES AND FAILING TO AWARD APPELLANTS CLAIMS FOR THEIR FULL DAMAGES ARISING OUT OF THE DEBTORS' BREACHES OF THE NO-CALL AND PREPAYMENT PREMIUM PROVISIONS OF THE AGREEMENTS**

**A.    The Debtors' Breach of the "No-Call" and Prepayment Premium Provisions**

The Second Priority Indenture and Second Priority Term Loan Agreement each contain (a) "no-call" provisions which specifically prohibit the prepayment or redemption of the Second Priority Notes or Second Priority Term Loans prior to April 1, 2008, and (b) prepayment premium provisions which required CalGen to pay a prepayment premium of 3.5% if the foregoing notes or loans were prepaid pursuant to a permitted prepayment after April 1, 2008.

After more than a year in chapter 11, the Debtors elected to prepay the Second Priority Notes and Second Priority Term Loans to take advantage of lower interest rates and to generate interest rate savings, which the Debtors estimated at approximately $100 million per year. While the Debtors may have been entitled under the Bankruptcy Code to prepay the debt notwithstanding the contractual prohibition on doing so, the holders of the Second Priority Notes and Second Priority Term Loans are entitled to claims for their damages resulting from those breaches of the agreements.

There is no dispute that the Debtors made a voluntary decision to prepay the CalGen Secured Debt, and that the Debtors were under no compulsion to prepay the debt. Under section 362 of the Bankruptcy Code, the "automatic stay" provision, the holders of the CalGen Secured Debt were automatically stayed from taking any steps to collect or to demand payment of their outstanding debt. (*See* 11 U.S.C. §362(a), quoted in fn. 7 above; cases cited in fn. 14 below) Even where debt has been "automatically accelerated" as the result of a debtor's filing of

a chapter 11 petition, a debtor is under no obligation to prepay the debt, and the debtor has an absolute right to reinstate the debt and decelerate any alleged acceleration of the debt under section 1124(2) of the Bankruptcy Code.  (*See* 11 U.S.C. §1124(2), quoted in fn. 8 above.)[14]

Accordingly, as the courts have uniformly and repeatedly held, where a chapter 11 debtor elects to prepay its outstanding debt, its decision is a voluntary decision, and it is obligated to pay a prepayment premium or damages pursuant to the voluntary prepayment provisions of a credit agreement notwithstanding any alleged acceleration or "automatic acceleration" of the debt resulting from the debtor's action in filing a chapter 11 petition.  *See*, *e.g.*, *In re Imperial Coronado Partners, Ltd.*, 96 B.R. 997, 1000 (B.A.P. 9th Cir. 1989) (Even though the lender had *itself* accelerated a note pre-petition, the lender had a secured claim for the prepayment premium as the result of the debtor's voluntary prepayment because the debtor was free to prepay or not prepay the note and was free to reinstate or decelerate the note under Bankruptcy Code section 1124(2)); *In re 433 South Beverly Drive*, 117 B.R. 563, 569 (Bankr. C.D. Calif. 1990) (same); *In re Skyler Ridge*, 80 B.R. 500, 507 (Bankr. C.D. Calif. 1987) (Automatic acceleration of a debt resulting from debtor's own chapter 11 filing does not make a debtor's later decision to prepay debt involuntary, since the debtor was under no obligation to prepay the note and was free to decelerate the debt under section 1124(2)).  As stated by the Bankruptcy Court in *Skyler Ridge*,

---

[14]  As the cases make abundantly clear, an "automatic acceleration" of a debt resulting from a debtor's chapter 11 filing has the effect of enabling a creditor to file a proof of claim for the full amount of its debt; however, such an acceleration does <u>not</u> entitle a creditor to immediate payment or in any way obligate a debtor to make immediate payment.  *See, e.g., In re Manville Forest Products Corp.*, 43 B.R. 293, 297-98 (Bankr. S.D.N.Y. 1984), rev'd on other grounds, 60 B.R. 403 (S.D.N.Y. 1986) (Although bankruptcy accelerates debt for purposes of filing proofs of claim which can cover the entire amount of the debt, "the creditor is prevented, under Section 362 of the Code, from taking steps to enforce that claim."); *In re PCH Associates,* 122 B.R. 181, 198 (Bankr. S.D.N.Y. 1990) (Noting that courts have made "a distinction between acceleration of a debt upon filing of the bankruptcy petition for the purpose of the filing of a proof of claim in a case. . . and acceleration for the purpose of taking actions against a debtor in violation of the automatic stay.").

> The automatic acceleration of a debt upon the filing of a bankruptcy case is not the kind of acceleration that eliminates the right to a prepayment premium…. This acceleration is subject to deceleration in a plan under Chapter 11 or Chapter 13 of the Bankruptcy Code. *See*, *e.g.*, *Manville Forest Products*, 43 Bankr. at 298 (Chapter 11); *Di Pierro v. Taddeo (In re Taddeo)*, 685 F. 2d 24, 26-29 (2d Cir. 1982) (Chapter 13).
>
> If automatic acceleration of a debt defeats a prepayment clause, such a clause could never be enforced in a bankruptcy case. A debtor, under such a rule, could always avoid the effect of a prepayment clause by filing a bankruptcy case. Neither the Bankruptcy Code nor the case law compels so drastic a result.

80 B.R. at 507. [15]

---

[15]    In *In re Skyler Ridge*, 80 B.R. 500 (Bankr. C.D. Calif. 1987), as here, the lender's note provided that the debtor was obligated to pay a prepayment premium only if the prepayment was voluntary. The debtor argued that the lender was not entitled to its secured claim for the prepayment premium resulting from the debtor's voluntary prepayment because the debt had been "automatically accelerated" as a result of the debtor's chapter 11 filing and the repayment was therefore allegedly not "voluntary." The Court rejected the Debtor's claim.

Similarly, in *In re Imperial Coronado Partners, Ltd.*, 96 B.R. 997 (B.A.P. 9th Cir. 1989), the lender's note provided that the lender was entitled to a prepayment premium only if the prepayment of the debt was voluntary. In *Imperial Coronado*, unlike this case, the lender had itself accelerated the underlying debt prior to the debtor's chapter 11 petition. Rejecting the debtor's arguments that the lender was not entitled to a secured claim for the prepayment premium because the lender had itself accelerated note, the Court emphasized that the debtor's decision to prepay the note was voluntary both (1) because the debtor had no obligation to prepay the note and (2) because the debtor was free to decelerate and reinstate the debt under Bankruptcy Code section 1124(2). *Id.*, at 96 B.R. at 1000. The Court wrote:

> [The debtor] argues that it could not afford to pay arrearages and reinstate the loan and that it would be "unfair and inequitable" to punish the Debtor for selling the [mortgaged] property [securing the loan] pursuant to § 363 of the Bankruptcy Code. We disagree on both counts. With respect to reinstatement, the question is not whether [the debtor] could, as a practical matter, afford to exercise its right, but whether it had the right to reinstate the loan. It did. With respect to deceleration, [the debtor] assessed its situation and decided that selling the property under § 363 [and paying the note] was a better business decision than attempting to refinance the property and decelerate the loan as part of a reorganization plan. As [the debtor] admits, this was a conscious decision on its part. In our view, the decision to sell the property and pay off the loan was voluntary, and the prepayment premium is therefore enforceable.

*Id.*, at 1000.

Similarly, in *In re 433 South Beverly Drive*, 117 B.R. 563 (Bankr. C.D. Calif. 1990), the court held that the lender was entitled to the prepayment premium resulting from the debtor's voluntary prepayment even though, as in the *Imperial Coronado* case, the lender there had itself accelerated the debt. Id., at 567-69. The Court wrote:

> The Debtor's contention that the Prepayment Premium is invalid because the sale [of the mortgaged property and pre-payment of debt] is "involuntary" is disingenuous. First, the fact that Marathon accelerated its junior note one day prior to the commencement of the bankruptcy case does not make any subsequent sale "involuntary." Second, the Debtor gives no reason or explanation in support of its related contention that 'given the fact that the note was accelerated under state law, Debtor does not believe that under section 1124(2) that it would be in a position to decelerate the debt to Marathon under a plan of reorganization." [cit. om.] Third, the proposed

The law is clear that, unless a lender compels a debtor to prepay a note by obtaining relief from the automatic stay in the Bankruptcy Court and by foreclosing (in which case the prepayment will not be considered "voluntary") or by otherwise forcing the debtor to prepay the note, a debtor's election to prepay a debt is deemed a voluntary prepayment, and the lender is entitled to its prepayment premium and damages resulting from any breach of the applicable agreement. *See, e.g., In re LHD Realty Corp.*, 726 F.2d 327 (7th Cir. 1984) (After the filing of debtor's petition, lender not only itself accelerated the debt, but the lender also filed applications with the Bankruptcy Court for relief from the automatic stay and made repeated applications to the court forcing the debtor to sell the property and payment the outstanding debt).  Those cases are completely inapposite here.  As the Ninth Circuit wrote in *Imperial Coronado,* 96 B.R. at 1000:

> In those cases, however, it appears that the borrower had no choice but to pay the accelerated amount or lose the property.  For instance, in *Tan*, the acceleration occurred through enforcement of a due-on-sale clause.  There was no right to reinstate the loan or decelerate the amount due.  The only option was to pay off the note or reconvey the property….  The situation in the case at bar is different because [the debtor] had the right to reinstate the loan . . . or to decelerate the loan under bankruptcy law. [16]

Here, the Second Priority Indenture Trustee and Second Priority Administrative Agent took no steps to force the Debtors to prepay the CalGen Secured Debt. The Debtors made

---

sale [of the mortgaged property and pre-payment] was solicited by the Debtor, on the Debtor's terms and it is the Debtor which sought and received authority to complete the transaction.

*Id.*, at 568.

[16]   *See also, In re Skyler Ridge*, 80 B.R. at 507-08 (Automatic acceleration of a debt resulting from the debtor's own voluntary Chapter 11 filing did not deny the lender its right to the prepayment premium: "*LDH Realty* is consistent with this view.  The court in *LDH Realty* held that the elimination of the prepayment penalty resulted only from the creditor's own voluntary acceleration of the debt, and not from the automatic acceleration resulting from the bankruptcy filing.").

None of the cases in which the lender has compelled the debtor to prepay, foreclosed on a debt, or taken affirmative steps after the petition date to force the debtor to prepay, has any relevance to the facts here, where the holders of the Second Priority Notes and Second Priority Term Loans took no steps whatsoever to obtain payment of, or even to accelerate, the debt, and where CalGen's prepayment was entirely voluntary.

an entirely voluntary decision to prepay the debt more than a year after their chapter 11 petitions to take advantage of a decline in interest rates.  Had interest rates been on the rise, there can be no doubt that the Debtors would not have prepaid the foregoing debt, and they would have been under no compulsion to do so.

**B.**     **The Bankruptcy Court Failed to Apply the Proper Measure of Damages**

Where a debtor has breached a creditor's contractual rights, the creditor is entitled to a claim for its damages under section 502 of the Bankruptcy Code.  The amount of that claim is determined under principles of state common law governing the breach of contract claims. *See*, *e.g.*, *Raleigh v. Illinois Dep't of Rev.*, 530 U.S. 15, 24 (2000); *Butner v. United States*, 440 U.S. 48, 54-56 (1979); *In re Weston Real Estate Fund, Inc.* 922 F.2d 592, 595 (10th Cir. 1991); *In re Madeline Marie Nursing Homes,* 694 F.2d 433, 439 (6th Cir. 1982); *In re American Homepatient, Inc.* 309 B.R. 738,742 (M.D. Tenn. 2004).

The applicable principles for determining a party's breach of contract damages under New York law are well established:  The aggrieved party is entitled to damages in an amount which will put it in the same economic position it would have been in had the other party not breached the agreement.[17]  *See*, *e.g.*, *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728-29 (2d Cir. 1992); *Teachers Insurance and Annuity Association of America v. Ormesa Geothermal*, 791 F. Supp. 401, 415-16 (S.D.N.Y. 1991). Here, section 3.07 of the Second Priority Indenture and section 2.10(b) of the Second Priority Term Loan Agreement clearly provide (i) that the Second Priority Notes and Second Priority Term Loans could not be prepaid prior to April 1,

---

[17]  Second Priority Indenture and Second Priority Term Loan Agreement each provide that they are to be governed by New York law.  (Second Priority Indenture, Section 13.08, JA 426; Second Priority Term Loan Agreement Section 12.14, JA 973.)

2008, and (ii) that they could only be prepaid after that date with the payment of a 3.5% prepayment premium.

The proper measure of damages arising out of the CalGen Debtors' prepayment of the Second Lien Debt on March 29, 2007, is simple and straightforward: first, for the period from March 29, 2007, through March 31, 2008, the holders of the Second Lien Debt are entitled to be compensated for the difference between (x) the contractual rate of interest to which they were entitled and (y) the rate they could obtain through a similar replacement investment, *see*, *e.g.*, *Teachers Insurance and Annuity Association*, 791 F. Supp. at 415-16;[18] and second, the holders are entitled to recover the present value, as of the prepayment date, of the 3.5% premium which the Debtors would be required to pay to prepay the Second Lien Debt on April 1, 2008.

The Bankruptcy Court failed to apply the proper measure of damages. The Bankruptcy Court awarded the Second Priority Trustee and Second Priority Administrative Agent claims for the 3.5% premium for a prepayment after April 1, 2008, but failed to award them any damages for the period from March 29, 2007, the date of the prepayment, through April 1, 2008. In essence, the Court awarded Appellants no claim for the substantial damages that the holders of the Second Priority Notes and Second Priority Term Loans clearly suffered as the result of the prepayment of the debt a full year prior to April 1, 2008. *See*, *e.g.*, *Teachers Insurance and Annuity Association*, 791 F. Supp. at 415-16 (Lenders entitled to recover difference between contractual rate of interest and rate of interest on replacement investment).

---

[18] In *Teachers Insurance and Annuity Association*, the parties had entered into a binding agreement to provide financing at a fixed rate. After the agreement was entered into, interest rates fell, and the borrower repudiated its contractual agreement to take out financing from the lender. Applying New York law, the District Court held that the lender was entitled to recover, as its damages resulting from the borrower's breach of the contract, the difference between the contract rate to which it was entitled and the rate it could obtain making a similar new loan at the lower rates. 791 F. Supp. at 415-16.

By failing to award Appellants claims for their full damages, the Bankruptcy Court denied Appellants a significant portion of the claims to which they are entitled as a matter of law. The damage claim of the holders of the Second Priority Notes arising out of breach of the "no-call" provisions and prepayment premium provisions is $44,950,687, consisting of (i) damages for the period from the date of the prepayment through April 1, 2008, in the amount of $24,060,281 (representing the difference between the contract rate of interest and the return on a similarly loan having a similar credit rating), plus (ii) the present value of the 3.5% prepayment premium that would be due upon a prepayment after April 1, 2008. (Jack HSBC Affid., JA 1191; R. 50, Tr. 135) Similarly, the holders of the Second Priority Term Loans are entitled to a claim of $14,153,158 for breaches of the "no-call" provisions and prepayment provisions, consisting of (i) damages for the period from the date of the prepayment through April 1, 2008, in the amount of $8,984,506, plus (ii) the present value of the 3.5% prepayment premium due upon a prepayment after April 1, 2008. (Jack BofNY Affidavit, JA 1205; R. 50, Tr. 134) By failing to award the holders of the Second Lien Debt any damages for their losses prior to April 1, 2008, the Bankruptcy Court denied the holders of the Second Priority Notes $22,550,687 and holders of the Second Priority Term Loans $5,489,506 of the claims to which they are entitled.

Because the Bankruptcy Court failed to apply the proper measure of damages, its Decision should be reversed and remanded with directions to award holders of the Second Priority Notes and Second Priority Term Loans additional claims for all their damages for the period prior to April 1, 2008, under applicable state law. *See*, *e.g.*, *Lucente v. IBM Corp.*, 310 F.3d 243, 261 (2d Cir. 2002) (The proper measure of damages upon which a factual computation of damages is based is a question of law subject to plenary review by an appellate court); *Maltese & Sons, Inc. v. Juno Const. Corp.*, 759 F.2d 253, 255 (2d Cir. 1985) ("[T]he measure of

damages upon which the factual computation is based is a question of law."); *In re Johns-Manville Corp.*, 68 B.R. 155, 158 (S.D.N.Y. 1986) (Clearly erroneous standard does not apply to "mixed questions of law and fact" or "when a finding of fact is premised upon an improper legal standard."); *In re Missionary Baptist Foundation*, 712 F.2d 206, 209 (5th Cir. 1983) (same).

## II.

### THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE SECOND PRIORITY INDENTURE TRUSTEE AND SECOND PRIORITY ADMINISTRATIVE AGENT WERE NOT ENTITLED TO SECURED CLAIMS ARISING OUT OF THE DEBTORS' BREACHES OF THE NO-CALL AND PREPAYMENT PREMIUM PROVISIONS OF THE AGREEMENTS

As the Bankruptcy Court properly held, if a creditor does not have a secured claim for its breach of contract damages, it is entitled to an unsecured claim for such damages under section 502 of the Bankruptcy Code. Where there has been a breach of a contractual provision, a creditor is entitled, at the very least, to an unsecured claim for its damages. (Decision, JA 10) However, the Bankruptcy Court clearly erred in holding that, under section 506(b) of the Bankruptcy Code, the claims of the Second Priority Indenture Trustee and Second Priority Administrative Agent should be allowed only as unsecured claims, rather than as secured claims. Section 506(b) expressly provides that oversecured creditors are entitled to secured claims for the "charges provided for under the agreement ... under which such claim arose."

The Bankruptcy Court erred on two grounds: First, assuming the applicability of section 506(b) to this case involving a solvent debtor, the Second Priority Indenture Trustee and the Second Priority Administrative Agent are entitled to secured claims under that provision because the prepayment premium and "no call" obligations clearly were "provided for" under the Second Priority Indenture and the Second Priority Term Loan Agreement. Second, the Bankruptcy Court's Decision was in error because, where a debtor is solvent, as the CalGen Debtors clearly are here, section 506(b) may not be used to limit the claims of secured or

unsecured creditors to provide additional value for the shareholders of the debtor or for the

shareholders' estate; rather, creditors are entitled to the full measure of their claims under

applicable state law and rights of creditors may not be compromised to benefit shareholders or

their estates.  Finally, even assuming that a portion of Appellants' claims were not entitled to

secured status under section 506(b), Appellants were entitled to unsecured claims under Section

502(b) for the full measure of their damages.

A.    **The Second Priority Indenture Trustee and Second Priority Administrative Agent Are Entitled To Secured Claims for the Prepayment Premium And Damages Under Section 506(b) of the Bankruptcy Code**

Section 506(b) provides that, where secured creditors are oversecured (*i.e.*, the

value of their collateral exceeds the debts they are owed), they are entitled to secured claims for

amounts due under their agreements.  Section 506(b) provides, in pertinent part:

> (b) To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

Here, it was undisputed that the Second Priority Notes and Second Priority Term

Loans are oversecured by a substantial margin.  The cases are clear that a prepayment premium

and damages for breach of a "no-call" provision are "charges" under section 506(b).  *See In re*

*360 Inns,* 76 B.R. 573, 576 (Bankr. N.D. Tex. 1987); *In re Imperial Coronado Partners, Ltd.*, 96

B.R. at 1000; *In re A.J. Lane and Co., Inc.,* 113 B.R. 821, 827 (Bankr. D. Mass. 1990).

Nonetheless, the Bankruptcy Court held that Second Priority Indenture Trustee and Second

Priority Administrative Agent were not entitled to secured claims under section 506(b) for the

prepayment premium or the damages arising out of the breach of the "no-call" provisions

because such prepayment premium and damages supposedly were not "provided for" under the

applicable agreements.  The Bankruptcy Court held that, because the agreements prohibited

prepayment prior to April 1, 2008, and required a prepayment premium upon a repayment after

that date, the agreements did not require or "provide for" a prepayment premium if the Second

Lien Debt was prepaid prior to April 1, 2008.  (Decision, JA 67)  The Bankruptcy Court's

decision is wrong-- on both the facts and the law.

        Section 506(b) states that an oversecured creditor shall have a claim for all

"charges provided for under the agreement."  Here, the Second Priority Indenture and Second

Priority Term Loan Agreement each provide (i) for the prepayment premium *and* (ii) that the

Debtors cannot avoid liability for that premium by prepaying the debt prior to April 1, 2008.

The agreements each provide that a prepayment premium of 0% is due if the Second Priority

Notes or Second Priority Term Loans are redeemed after April 1, 2009, that a prepayment

premium of 3.5% is due if the notes or loans are redeemed after April 1, 2008, and that the notes

and loans cannot be prepaid *at all* prior to April 1, 2008.  In other words, the *earlier* the

redemption, the *greater* the prepayment premium due to compensate the Second Lien

Noteholders.  Contrary to the Bankruptcy Court's Decision, the prepayment premium is a charge

"provided for in the agreement," and it is not a reasonable reading of the agreement or of section

506(b) to assert that a secured claim for the premium can be avoided simply by prepaying the

debt prior to April 1, 2008, *in plain violation of the agreement*.  It makes no sense to conclude, as

the Bankruptcy Court did, that the Second Priority Indenture and Second Priority Term Loan

Agreement entitle Appellants to a secured claim for the 3.5% prepayment premium if the Second

Lien Debt is prepaid after April 1, 2008, but that the agreements fail to entitle Appellants to a

secured claim if the debt is paid one day, one month, or one year before April 1, 2008-- in *direct*

*violation* of the provisions of the agreements which say that the Second Lien Debt may not prepaid at all prior to that date.

As the cases make clear, an agreement should not be given an interpretation or an application under section 506(b) which would allow a debtor to circumvent its provisions. *See, e.g., In re 360 Inns, Ltd.*, 76 B.R. at 576-78 (Where the lender and debtor were parties to an agreement which barred voluntary prepayment of debt during initial 10 years of the loan, and provided that a prepayment premium of 10% would be due in the event of an involuntary prepayment during the first 10 years, secured lender would have an allowed, secured claim for a 10% prepayment premium where the debtor voluntarily prepaid the loan during the first 10 year period in violation of agreement). *See also Excess Ins. Co. Ltd. v. Factory Mutual Ins. Co.*, 3 N.Y. 3d 577, 582 (N.Y. 2004) (The court should construe agreements so as to give full meaning and effect to the material provisions); *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assoc.,* 6 N.Y. 3d 371, 374 (N.Y. 2006) (A reading of the contract should not render any portion meaningless); *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.,* 1 N.Y. 3d 470, 475 (N.Y. 2004) (Construction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms).

In support of its ruling, the Bankruptcy Court cited the decisions interpreting section 506(b) in *Continental Securities Corp. v. Shenandoah Nursing Home Partnership*, 193 B.R. 769, 215-16 (Bankr. W.D. Va. 1996), and *In re Vest Associates*, 217 B.R. 696, 699-700 (Bankr. S.D.N.Y. 1998), for the proposition that a party is not entitled to a secured claim under section 506(b) absent a provision in its contract "providing for" the charges. (Decision, JA 9) Those cases are completely inapposite. In *Shenandoah* and *Vest*, unlike here, the applicable

credit agreements had "no-call" provisions but they had no prepayment premium provisions of any kind.  Here, the Second Priority Indenture and Second Priority Term Loan Agreement contain an express prepayment premium which the Debtors surely could not avoid by prepaying the loans prior to April 1, 2008, in violation of those agreements.  Indeed, in *Shenandoah*, the Court specifically distinguished its facts from those present here:

> Thus, the present note contains no formula, nor any specific figure, for calculating damages stemming from prepayment.  Although the note in *360 Inns*, like the present note, did not contain a damages provision with respect to voluntary prepayment made within the first ten years of the loan, there was a concrete 10% damages figure in the note with respect to involuntary prepayment made within the same period.  Thus, the debtor, and the bankruptcy court for that matter, were able reasonably to calculate a damages figure for voluntary prepayment made within the first ten years by borrowing from another, analogous provision in the note itself -- *i.e.* the 10% figure applicable to involuntary prepayment made within the first ten years.  This court, in contrast, cannot enforce the lockout provision by simply supplying a prepayment penalty figure contained elsewhere in the note since no such figure exists.

342 B.R. at 777.[19]  Moreover, to the extent that the *Shenandoah* and *Vest* decisions are considered at all relevant to the factual setting here, they are at odds with the plain language of section 506(b) and should not be followed. Section 506(b) provides that an oversecured creditor is entitled to a secured claim for any charge "provided for" in the agreement, and the charges sought here are clearly provided for and cannot be circumvented.

Here, both the Second Priority Indenture and the Second Priority Term Loan Agreement contain express provisions for a prepayment premium and an express prohibition

---

[19]  Similarly, *United States v. Ron Pair Enterprises Inc.*, 489 U.S. 235 (1996), also cited by the Bankruptcy Court, lends no support to the court's decision. In *Ron Pair*, the Supreme Court held that, under Bankruptcy Code section 506(b), a secured creditor was entitled to post-petition interest on a secured claim even if it had *no* agreement entitling it to such interest.  Nothing in that decision holds or even suggests that an agreement such as this should be read as not "providing for" the payment of a prepayment premium provided for in the agreement.

against prepayment prior to April 1, 2008.  Even under Bankruptcy Code section 506(b),

Appellants were entitled to secured claims for the prepayment premium and their damages.

**B.    Where a Debtor Is Solvent, The Provisions of the Bankruptcy Code May Not Be Used to Create or Retain Value for the Debtor's Shareholder or Its Estate, And Creditors Are Entitled to Their Rights Under Applicable State Law**

Apart from section 506(b) of the Bankruptcy Code, the Second Priority Indenture

Trustee and Second Priority Administrative Agent are entitled to secured claims for their

prepayment premium and damages because the CalGen Debtors' estates are solvent.  As the

cases make clear, since the purpose of the Bankruptcy Code is to adjust the rights of creditors

where a debtor is unable to pay its creditors in full, and since the rights of creditors come ahead

of the rights of shareholders, the provisions of the Bankruptcy Code may not be used to limit a

secured creditor's contractual claims under state law where an estate is solvent and able to pay its

creditors in full.

As the courts have emphasized for more than 50 years, the purpose of the

Bankruptcy Code is to adjust and delimit the rights of creditors where a debtor is unable to pay

its creditors in full, not to benefit shareholders or shareholders' estates at the expense of

creditors.  As the Supreme Court wrote in *Consolidated Rock Products Co. v. Dubois*, 312 U.S.

510, 527 (1941):

> Whether a company is solvent or insolvent in either the equity or
> the bankruptcy sense, 'any arrangement of the parties by which the
> subordinate rights and interests of the stockholders are attempted
> to be secured at the expense of the prior rights' of creditors 'comes
> within judicial denunciation.' (citing *Louisville Trust Co. v.
> Louisville*, New Albany & Chicago Ry. Co., 174 U.S. 674, 684
> (1899)).

Accordingly, where a debtor is solvent, the provisions of the Bankruptcy Code

may not be used to limit the contractual rights of creditors so that added value may be retained

by or distributed to the debtor's shareholder or to the shareholder's estate.  Rather, in such cases,

it is the court's duty to enforce a creditor's contractual rights as they stand under applicable state law.  *See*, *e.g.*, *In re Dow Corning Corp.*, 456 F.3d 668, 679-680 (6th Cir. 2006) (Holding that the limits to recovery of costs under section 506(b) are inapplicable where the debtor is solvent):

> When a debtor is solvent ... the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties, and the role that equitable principles play in the allocation of competing interests is significantly reduced. . . . Absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce creditors' contractual rights.  *See Chicago*, [791 F. 2d] at 528 ("[I]f the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors rights according to the tenor of the contracts that created those rights.").

*In re 139-141 Owners Corp.*, 306 B.R. 763, 773 (Bankr. S.D.N.Y. 2004), *aff'd in part and vacated in part on other grounds*, 313 B.R. 364 (S.D.N.Y. 2004) (bankruptcy limits on the recovery of interest by creditors are inapplicable to a case in which debtor is solvent):

> Where the sole purpose of a bankruptcy filing by a wholly-solvent debtor is to avoid its contractual obligation ... the equitable power of a federal court exercising bankruptcy jurisdiction may not be invoked to nullify rights vouchsafed to a secured creditor under contract and enforceable under state law.

*In re Chicago*, 791 F. 2d 524, 528 (7th Cir. 1986) ("[I]f the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors rights according to the tenor of the contracts that created those rights."); *Debentureholders Protective Committee of Continental Investment Corp. v. Continental Investment Corp.*, 679 F. 2d 264, 268-70 (1st Cir. 1982) (Creditors of solvent debtor entitled to interest to which they would not be entitled if debtor was insolvent).  As the Second Circuit emphasized in *Ruskin v. Griffith*s, 269 F.2d 827, 832 (2d Cir. 1959), *cert. denied*, 361 U.S. 947 (1960), holding that bankruptcy limits on the recovery of interest are inapplicable where the debtor is solvent, in cases involving solvent debtors it is "the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act."

In ruling that Appellants were not entitled to secured claims for the prepayment premiums and damages pursuant to their agreements under section 506(b), the Bankruptcy Court precluded the representatives of the CalGen Secured Debt from arguing the CalGen Debtors' solvency and refused to consider the evidence that the CalGen Debtors were solvent in applying section 506(b).  It was plain error for the Bankruptcy Court to refuse to consider CalGen's solvency.  Because CalGen is solvent, the holders of the Second Lien Debt were entitled to secured claims for the full amount of their prepayment premium and damages under applicable state law; CalGen was not entitled to use the provisions of the Bankruptcy Code to limit their contractual rights to provide benefits to its parent corporations or their chapter 11 estates.

**C.    Even If the Second Priority Indenture Trustee and Second Priority Administrative Agent Are Not Entitled to a Secured Claim for the Full Amount Of Their Damages, They Are Entitled to an Unsecured Claim for All Amounts Under Section 502**

As the Bankruptcy Court properly ruled, where creditors are parties to a contract which as been breached by the debtors, they are entitled, at the very least, to an unsecured claim under Bankruptcy Code section 502 for the full amount of their contract damages. *See* Decision, p. 10, JA 10; *Joseph F. Sanson Inv. Co. v. 268 Ltd. (In re 268 Ltd.),* 789 F.2d 674 (9th Cir. 1986) (holding that lender may seek as unsecured claims damages not recoverable as secured claims under Bankruptcy Code section 506(b)).

Under New York law, which governs the contracts here at issue, a party is entitled to damages for the breach of the provisions in a contract whether or not the contract contains a liquidated damages provision specifying how the damages are to be calculated. Absent express contract provisions dictating damages calculations, damages should be calculated in accordance with the applicable common law.  *See* 4 N.Y. Prac., Com. Litig.  In New York State Courts §59:38 (2d ed. 2006) ("[w]hen a contract is silent on the issue of damages, the damages for breach of contract are usually the losses sustained and the gains prevented at the time and place

of breach."); *Sir Speedy, Inc. v. L&P Graphics, Inc.,* 957 F.2d 1033 (2d. Cir. 1992) (where

contract contained provision requiring franchisor to provide "continuing assistance" to

franchisee, but did not establish specific damage calculation in the event of a breach, non-

breaching party could submit evidence of damages caused by breach); *Indu. Craft, Inc. v. Bank

of Baroda,* 47 F.3d 490 (2d. Cir. 1995) (proper measure for damages is the amount necessary to

put non-breaching party in the same economic position he would have been in had the breaching

party fulfilled its contract); *Freund v. Washington Square Press, Inc.,* 34 N.Y.2d 379, 380 (N.Y.

1974) ("[a non-breaching party] is entitled to those damages which normally flow from the

breach of contract which are direct and proximate.").  Thus, to the extent that any portion of

Appellants' claims is not allowable as a secured claim, it must be allowed as an unsecured claim

pursuant to Bankruptcy Code section 502.

### III.

### THE BANKRUPTCY COURT ERRED IN RULING THAT THE SECOND PRIORITY INDENTURE TRUSTEE AND SECOND PRIORITY ADMINISTRATIVE AGENT ARE NOT ENTITLED TO RECOVER THE FULL AMOUNT OF THEIR FEES AND EXPENSES UNDER THE SECOND PRIORITY INDENTURE AND SECOND PRIORITY TERM LOAN AGREEMENT

Without offering any explanation, the Bankruptcy Court signed an order

presented to it by the Debtors which provided that the Second Priority Indenture Trustee and

Second Priority Administrative Agent were not entitled to recover their fees or expenses incurred

after March 29, 2007, the date that the Debtors prepaid the principal and non-default interest on

their debt.  The only exception made in the Bankruptcy Court's order was for the professional

fees incurred by Appellants in the further litigation in the Bankruptcy Court over the right of the

holders of the Second Lien Debt to recover their default interest.  The Bankruptcy Court acted in

error.

In addition to their costs of litigating their rights to default interest, the Second Priority Indenture Trustee and Second Priority Administrative Agent have a right to recover the full amounts of their fees and expenses, including those fees and expenses incurred in (i) monitoring the chapter 11 cases in which they represent creditors holding $740 million of Second Lien Debt, (ii) litigating issues on behalf of the holders of that debt, including issues relating to their secured and unsecured claims, any proposed chapter 11 plan, and any other issues affecting their recoveries, and (iii) litigating their claims to damages for breach of the "no call" provisions and other remedies in appeals before this Court and any further proceedings or appeals that may take place.  Indeed, in addition to the unresolved issues before this Court, which Appellants are entitled to pursue on behalf of the holders of the Second Lien Debt, Appellants and the other representatives of CalGen Secured Debt are holders of large unsecured claims in the chapter 11 cases of the CalGen Debtors -- claims which have not been paid to this date -- as a result of the Bankruptcy Court's decision.

Section 506(b) of the Bankruptcy Code clearly provides that the holder of a secured claim, to the extent that its claim is secured by property having a value greater than that of the claim, is entitled to recover "interest on such claim, and any reasonable fees, costs or charges" provided under the agreement under which such claim arose.  As discussed above, there is no dispute that the Second Priority Notes and the Second Priority Term Loans are oversecured. As such, under the clear language of Bankruptcy Code section 506(b), the Second Priority Indenture Trustee and the Second Priority Administrative Agent are entitled to their fees and expenses because those fees and expenses are authorized under the Second Priority Indenture and the Second Priority Term Loan Agreement.  *See In re K.H. Stephenson Supply Co.*, 768 F.2d 580 (4th Cir. 1985) (granting attorney's fees to an oversecured holder of a promissory note); *In*

*re Auto Specialties Mfg. Co.*, 18 F.3d 358 (6th Cir. 1994) (attorney's fees awarded to an oversecured creditor whose debtor sought to defer or avoid complying with the terms of a loan agreement).

Even where a creditor's claim has been satisfied in full, which is not the case here, section 506(b) allows the creditor to recover reasonable fees incurred in monitoring the bankruptcy case.  *See In re Sullivan,* No. 03-65486, 2007 WL 987328 (Bankr. N.D.N.Y.) (fees for thirteen weeks of monitoring were covered by section 506(b)); *In re Thomas*, 186 B.R. 470 (Bankr. W.D. Mo. 1995) (reasonable fees incurred monitoring the status of a lien deeming the pendency of a chapter 11 case and reviewing the treatment of that lien in the debtors' disclosure statement and plan of reorganization could be recovered pursuant to section 506(b)); *In re Goodman Bros., Inc*., No. 87-00381E, 1990 WL 61758 (Bankr. W.D. Pa.) (fees for monitoring bankruptcy case and the debtor's financial situation allowed).

Moreover, even if Appellants were not entitled to *secured* claims for their fees and expenses under section 506(b), they would clearly be entitled to unsecured claims for such contractually provided fees and expenses.  As the United States Supreme Court unambiguously ruled only two months ago in *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.* 127 S.Ct. 1199 (2007), a creditor is entitled to an unsecured claim for its fees and expenses where its contract so provides, and a Bankruptcy Court may not limit the recovery of such a claim except where (unlike here) the Bankruptcy Code expressly provides otherwise.  As the Supreme Court wrote, "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtors' obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code."  *Id.* at 1205, quoting *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20 (2000).

In short, the Bankruptcy Court erred in refusing to allow Appellants' claims for their fees and expenses under the provisions of the Second Priority Indenture and Second Priority Term Loan Agreement. Those claims should have been allowed as secured claims, or, at the very least, as unsecured claims.

## IV.

### THE BANKRUPTCY COURT ERRED BY DISALLOWING THE CLAIMS OF THE SECOND PRIORITY INDENTURE TRUSTEE AND SECOND PRIORITY ADMINISTRATIVE AGENT AGAINST THE GUARANTOR DEBTORS UNDER THE WRITTEN GUARANTEES

In the March Repayment Order, the Bankruptcy Court also expunged, without any explanation, the claims of the Second Priority Indenture Trustee and the Second Priority Administrative Agent against the Debtor Guarantors pursuant to their written guarantees of the obligations of the CalGen Debtors. The Bankruptcy Court's disallowance of the claims against the Debtor Guarantors was also plain error.

The Bankruptcy Court allowed the Second Priority Indenture Trustee and the Second Priority Administrative Agent unsecured claims against the CalGen Debtors for the prepayment premiums due under the Second Priority Indenture and Second Priority Term Loan Agreement, and has deferred ruling on the issue of default and additional interest.  In the event that the CalGen Debtors do not pay those or any other claims which Appellants may have or obtain on appeal in full, Appellants should be able to assert claims for any deficiencies against the Debtor Guarantors under the written guarantees.

Sections 11.01 of each of the Second Priority Indenture and Second Priority Term Loan Agreement expressly provide that each of the Debtor Guarantors guaranteed all the performance of all obligations of the CalGen Debtors.  (JA 420; JA 955)[20] The purpose of a

---

[20] Section 11.01 of the Second Priority Indenture states:

guarantee is to ensure that obligations will be paid in full. *See In re Boco Enterprises, Inc.*, 204 B.R. 407, 416 (Bankr. S.D.N.Y. 1997) (A guaranty is "an agreement that imposes on the guarantor the obligation of insuring the performance of another," quoting *Banco Portugues do Atlantico v. Asland, S. A.,* 745 F. Supp. 962, 974 (S.D.N.Y. 1990)); *New York City Dept. of Finance v. Twin Rivers, Inc.*, 920 F. Supp. 50, 52 (S.D.N.Y. 1996) (A guarantee is a collateral promise to answer for the debt or obligation of another, in the event that the first person liable to pay or perform the obligation fails). When a guarantor has given an unconditional guaranty, its liability is clear as a matter of law. *See Milliken & Co. v. Stewart*, 182 A.D. 2d 385, 387 (1st Dept. 1992).

It was error for the Bankruptcy Court to have expunged, without explanation, the guaranty claims against the Debtor Guarantors.

## CONCLUSION

For the reasons set forth above, the Decision and Orders of the Bankruptcy Court should be reversed, with instructions to the Bankruptcy Court (i) to allow the claims of the Second Priority Indenture Trustee and Second Priority Administrative Agent for the prepayment

---

[E]ach of the Guarantors hereby, jointly and severally, unconditionally guarantees to each holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successor and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Company hereunder, that:

(1) the principal of, premium and Special Interest, if any, and interest on the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest and Special Interest, if any on the Notes, if any, if lawful, and all other obligations of the Company to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof.

(JA 420)  Similarly, section 11.01 of the Second Priority Term Loan Agreement provides:

[T]he Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantee to the Administrative Agent, for the benefit of the Lenders making the Second Priority Term Loans and their respective successors, endorsees, transferees and assigns, the prompt and complete payment and performance by the Borrower and each Guarantor when due (whether at the stated maturity, by acceleration or otherwise) of the Second Priority Term Loan Obligations.

(JA 955)

premium and damages for breach of the "no-call" provisions for the full amounts sought, (ii) to

allow such claims as secured claims, (iii) to allow the Second Priority Indenture Trustee and

Second Priority Administrative Agent secured claims for the full amount of their fees and

expenses, and (iv) to allow their claims against the Debtor Guarantors pursuant to the written

guarantees, together with such other and further relief as this Court may deem appropriate.


Respectfully submitted,

June 1, 2007                             ROPES & GRAY LLP


By:  _/s/ David S. Elkind____
    Mark I. Bane (MB-4883)
    Mark R. Somerstein (MS-9721)
    David S. Elkind (DE-4054)
    Amy E. Vanderwal (AV-1712)
1211 Avenue of the Americas
New York, New York 10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090

Attorneys for Appellants HSBC BANK USA,
NATIONAL ASSOCIATION, as INDENTURE
TRUSTEE and THE BANK OF NEW YORK, as
ADMINISTRATIVE AGENT