**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
In re                                          :
                                               :    **Chapter 11**
                                               :
**CALPINE CORPORATION,** *et al.*,             :    **Case No. 05-60200 (BRL)**
                                               :
                                               :    **(Jointly Administered)**
                                               :
-------------------------------------------------------------x
**HSBC BANK USA, NATIONAL**                    :
**ASSOCIATION, AS INDENTURE**                  :
**TRUSTEE, THE BANK OF NEW YORK,**             :    **Case No. 1:07-cv-03088 (GBD)**
**AS ADMINISTRATIVE AGENT,**                   :
**WILMINGTON TRUST FSB, AS**                   :
**INDENTURE TRUSTEE, WILMINGTON**              :
**TRUST COMPANY, AS ADMINISTRATIVE**           :
**AGENT, AND MANUFACTURERS**                   :
**& TRADERS TRUST COMPANY,**                   :
**AS INDENTURE TRUSTEE,**                      :
                                               :
                    **Appellants,**            :
                                               :
                  **– against –**              :
                                               :
**CALPINE CORPORATION, THE OFFICIAL**          :
**COMMITTEE OF UNSECURED**                      :
**CREDITORS OF CALPINE CORPORATION,**          :
**AND THE OFFICIAL COMMITTEE OF**              :
**EQUITY SECURITY HOLDERS,**                   :
                                               :
                    **Appellees.**             :
-------------------------------------------------------------x    *caption continued on next page*

```
------------------------------------------------------------x
CALPINE CORPORATION, THE OFFICIAL    :
COMMITTEE OF UNSECURED               :
CREDITORS OF CALPINE CORPORATION,    :
AND THE OFFICIAL COMMITTEE OF        :
EQUITY SECURITY HOLDERS,             :
                                     :
            Appellants,              :
                                     :
         – against –                 :
                                     :
HSBC BANK USA, NATIONAL              :
ASSOCIATION, AS INDENTURE            :
TRUSTEE, THE BANK OF NEW YORK,       :
AS ADMINISTRATIVE AGENT,             :
WILMINGTON TRUST FSB, AS             :
INDENTURE TRUSTEE, WILMINGTON        :
TRUST COMPANY, AS ADMINISTRATIVE     :
AGENT, AND MANUFACTURERS             :
& TRADERS TRUST COMPANY,             :
AS INDENTURE TRUSTEE,                :
                                     :
            Appellees.               :
------------------------------------------------------------x
```

## JOINT OPENING BRIEF OF APPELLANTS, WILMINGTON TRUST FSB AS INDENTURE TRUSTEE AND WILMINGTON TRUST COMPANY AS ADMINISTRATIVE AGENT

NIXON PEABODY LLP
Amanda D. Darwin, Esq. (AD 2719)
Richard C. Pedone, Esq. *(Admitted Pro Hac Vice)*
Dennis A. Murphy, Esq. (*Admitted Pro Hac Vice*)
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1000

- and -

Christopher M. Desiderio, Esq. (CD 6929)
437 Madison Avenue
New York, NY 10022
Telephone: (212) 940-3000

Attorneys for
Wilmington Trust FSB as Indenture Trustee and
Wilmington Trust Company as Administrative Agent

## TABLE OF CONTENTS

STATEMENT OF APPELLATE JURISDICTION .................................................... 2

STATEMENT OF ISSUES PRESENTED ............................................................. 2

STANDARD OF REVIEW ................................................................................. 3

STATEMENT OF THE CASE ............................................................................ 3

I.     NATURE OF THE DISPUTE ..................................................................... 3

II.    PROCEDURAL AND FACTUAL HISTORY ............................................... 4

       A.     The 2004 CalGen Financing ................................................. 4

       B.     Proceedings in the Bankruptcy Court ................................. 8

       C.     The CalGen Prepayment Motion and Orders....................... 9

SUMMARY OF ARGUMENT .......................................................................... 10

ARGUMENT ................................................................................................ 13

I.     THE BANKRUPTCY COURT ERRED WHEN IT CONVERTED THE FIRST PRIORITY
SECURED PREPAYMENT PREMIUM INTO AN UNSECURED CLAIM FOR
DAMAGES ............................................................................................ 13

       A.     Bankruptcy Code Section 506(b) Requires Debtors To Pay Oversecured Creditors
Reasonable Prepayment Premiums Provided For Under Loan Documents ......... 14

       B.     Prepayment Premiums Are Enforceable Under New York State Law, and the
Bankruptcy Court was Required to Look to State Law When Determining the
Total Amount of the Claims ............................................................. 15

       C.     Courts Uniformly Enforce Prepayment Premiums as Secured Claims Under
Section 506(b) Where A Written Instrument Provides Some Formula To Calculate
The Amount ................................................................................. 17

       D.     The 2.5% Prepayment Premium Formula In The Prepayment Provisions Satisfies
The "Provided For Under The Agreement" Element Of Section 506(b).............. 21

       E.     Acceleration Of The Debt Did Not Defeat The Prepayment Premium ................ 24

II.    EVEN IF THE 2.5% WERE PROPERLY CHARACTERIZED AS DAMAGES INSTEAD
OF CONTRACTUALLY PROVIDED PREMIUMS, THOSE DAMAGES CLAIMS
ARE SECURED CLAIMS AGAINST EACH CALGEN GUARANTOR PURSUANT TO THE
GUARANTEES, THE APPLICABLE SECURITY AGREEMENT, AND OTHER LOAN
DOCUMENTS................................................................................................ 29

III. THE BANKRUPTCY COURT DEPRIVED THE FIRST PRIORITY DEBT
REPRESENTATIVES OF THEIR PROCEDURAL AND DUE PROCESS RIGHTS
WHEN IT DETERMINED THE VALIDITY AND EXTENT OF THEIR CLAIMS
OUTSIDE OF AN ADVERSARY PROCEEDING AND AUTHORIZED PREPAYMENT
OUTSIDE OF A PLAN OF REORGANIZATION ............................................................. 31

IV. THE AMENDED CLAIMS ORDER IMPROPERLY EXPUNGED CLAIMS OF THE
FIRST PRIORITY DEBT REPRESENTATIVES ................................................................ 36

CONCLUSION.......................................................................................................................... 36

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

In re 360 Inns, Ltd., 76 B.R. 573 (Bankr. N.D. Tex. 1987) ...................................... passim

In re AE Hotel Venture, 321 B.R. 209 (Bankr. N.D. Ill. 2005) ................................... 20, 28

In re Air Beds, Inc., 92 B.R. 419 (B.A.P. 9th Cir. 1988) ................................... 34

In re Anchor Resolution Corp., 221 B.R. 330 (Bankr. D. Del. 1998) ....................... 19, 20, 21

Butner v. United States, 440 U.S. 48 (1979) ..................................................... 16

In re Conroe Forge & Mfg. Corp., 82 B.R. 781 (Bankr. W.D. Pa. 1988) ........................ 34

In re Continental Air Lines, Inc., 780 F.2d 1223 (5th Cir. 1986) ...................................... 34

Continental Sec. Corp. v. Shenandoah Nursing Home P'ship, 193 B.R. 769 (W.D. Va. 1996), aff'd, 104 F.3d 359 (4th Cir. 1996) ................................... passim

In re Dow Corning, 456 F.3d 668 (6th Cir. 2006) ............................................. 16

In re First Cent. Fin. Corp., 377 F.3d 209 (2d Cir. 2004) ...................................... 3

In re Imperial Coronado Partners, Ltd., 96 B.R. 997 (B.A.P. 9th Cir. 1989) ............. 26, 27

In re LHD Realty Corp., 726 F.2d 327 (7th Cir. 1984) ............................................ passim

In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983) ................................................. 34

Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950) ........................ 34, 35

Reliable Electric Co. v. Olson Constr. Co., 726 F.2d 620 (10th Cir. 1984) ..................... 35

In re Skyler Ridge, 80 B.R. 500 (Bankr. C.D. Cal. 1987) ........................................... 21, 28

United Merchants and Manufacturers, Inc. v. Equitable Life Assurance Soc'y, 674 F.2d 134 (2d Cir. 1982) ........................................................................ 14, 15, 21

In re Vest Associates, 217 B.R. 696 (Bankr. S.D.N.Y. 1998) .................................... 20, 22

Worthington v. Ahlers, 485 U.S. 197 (1988) .................................................... 16

<u>Zervos v. Verizon N.Y., Inc.</u>, 252 F.3d 163 (2d Cir. 2001)..................................................3

**NEW YORK STATE CASES**

<u>2550 Olinville Ave., Inc. v. Crotty</u>, 566 N.Y.S.2d 500 (N.Y. Sup. Ct. 1991)...................15

<u>Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assoc.</u>, 816 N.Y.S.2d 831
     (N.Y. Sup. Ct. 2006) ..........................................................................................15

**FEDERAL STATUTES AND MISCELLANEOUS CITATIONS**

11 U.S.C. §§ 105, 361, 362, 364(c)(1).................................................................1

11 U.S.C. §§ 1121-1129 ...................................................................................32

11 U.S.C. § 1124(2) ..................................................................................26, 31

11 U.S.C. § 1125, 1126, 1129(a)(7).....................................................................34

11 U.S.C. § 1129(b)(2)(B)(ii) .............................................................................9

11 U.S.C. § 506(b) .........................................................................................9, 10,
                                                                                            14

28 U.S.C. § 157(b) ...........................................................................................2

28 U.S.C. § 158(a) ...........................................................................................2

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 356-57 (1977)...........................................14

H.R. Rep. No. 103-835 at 47-48 (1994) ...............................................................32

S. Rep. No. 95-989, 95th Cong., 2d Sess. 68 (1978) ................................................14

U.S. Const. amend. V.......................................................................................32

The Appellants, Wilmington Trust FSB, acting solely in its capacity as Indenture Trustee (the "First Priority Trustee"), pursuant to that certain First Priority Indenture dated March 23, 2004 (the "First Priority Indenture") and Wilmington Trust Company, acting solely in its capacity as Administrative Agent (the "First Priority Term Loan Administrative Agent," and together with the First Priority Trustee, the "First Priority Debt Representatives") pursuant to that certain Credit and Guarantee Agreement dated March 23, 2004 (the "First Priority Term Loan Agreement") hereby appeal from three March 2007 orders of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"):

- The "Memorandum Decision and Order Granting, in Part, Debtors' Motion for an Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims" entered by the Bankruptcy Court on March 5, 2007 (the "Memorandum Decision and Order");

- The March 12, 2007 "Order Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e)."  (the "DIP Financing Order"); and,

- The March 26, 2007 "Amended Order (I) Granting Debtors Limited Objection to Claim Numbers 2664, 3275, 3393 Through 3421 (Inclusive), 3546 Through 3554 (Inclusive), 3586 Through 3588 (Inclusive), 3731, 4073, 5653 Through 5730 (Inclusive), 5791, and 5792; (II) Determining the Value of the CalGen Secured Debt Pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedure; and (III) Authorizing Repayment of CalGen Secured Debt."  (J.A. at  62) (the "Amended Claims Order").

(Collectively, the Memorandum Decision and Order, the DIP Financing Order, Amended Claims Order, are referred to as the "Prepayment Orders").

## PRELIMINARY STATEMENT

The Prepayment Orders authorized the Debtors to refinance their post-petition debtor-in-possession financing and to pay off $2.6 billion in pre-petition secured debt outside of a plan of reorganization and without payment of all amounts due to the First Priority Debt Representatives

on their claims.  The Bankruptcy Code only authorizes the impairment of an oversecured creditors' contractual rights pursuant to a plan of reorganization.

The Prepayment Orders improperly converted the First Priority Debt Representatives' fully secured prepayment premiums into unsecured claims for damages.  That legal error was the result of a misreading of the First Priority Loan Documents (as defined below), which provide for a prepayment premium of 2.5% of the principal loan amount for prepayment more than a year in advance of maturity.  Because the Bankruptcy Code honors the sanctity of an oversecured creditor's interests that are enforceable under state law, that are provided for in the applicable agreements, and that are reasonable, it was legal error for the Bankruptcy Court to alter the First Priority Debt Representatives' fully secured position.  Accordingly, the Prepayment Orders should be modified and the Debtors ordered to immediately pay the prepayment premiums (and other amounts due) as secured claims to the First Priority Debt Representatives.  In addition, the portions of the First Priority Debt Representatives' claim that have purportedly been "expunged," should be reinstated.

## STATEMENT OF APPELLATE JURISDICTION

This appeal is from a core proceeding of the United States Bankruptcy Court for the Southern District of New York.  28 U.S.C. § 157(b).  The Prepayment Orders are final orders of the Bankruptcy Court.  This Court has jurisdiction to hear appeals from final orders of the Bankruptcy Court.  28 U.S.C. § 158(a).

## STATEMENT OF ISSUES PRESENTED

I.      Whether the Bankruptcy Court erred when it converted the First Priority Debt Representatives' secured prepayment premiums into unsecured claims for damages;

II.     Whether the prepayment damages claims should be treated as secured claims against each CalGen Guarantor, even if the 2.5% prepayment premiums were properly characterized as "contract" damages as against the CalGen Issuers;

10485488

III.     Whether the Bankruptcy Court deprived the First Priority Debt Representatives of their procedural and due process rights when it determined the validity and extent of their claims outside of an adversary proceeding and authorized prepayment outside of a plan of reorganization;

IV.     Whether the Amended Claims Order improperly "expunged" the claims of the First Priority Debt Representatives.

## STANDARD OF REVIEW

The Prepayment Orders involved erroneous conclusions of law made by the Bankruptcy Court. This Court reviews such conclusions of law *de novo,* and may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013; In re First Cent. Fin. Corp., 377 F.3d 209, 212 (2d Cir. 2004). *De novo* review is review without deference, and applies to questions of law, as well as to mixed questions of fact and law. Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 168-69 (2d Cir. 2001) ("A court abuses or exceeds the discretion accorded to it when (1) its decisions rests on an error of law (such as an application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions.").

## STATEMENT OF THE CASE

### I.     NATURE OF THE DISPUTE

The First Priority Debt Representatives' dispute stems from the partial prepayment of secured debt by the Debtors two years in advance of the full maturity of the loans, and just days in advance of the date which, pursuant to the plain terms of the loan documents, the loans could have been prepaid. The First Priority Debt Representatives' first lien claims were part of a three-tier $2.6 billion multi-power plant financing completed in 2004.

In March 2007, the Bankruptcy Court issued a series of rulings that allowed the Debtors to prepay the obligations due under the First Priority Loan Documents (the "First Priority

10485488

Indebtedness") in conjunction with a refinancing of their debtor-in-possession financing.  At issue in this appeal is whether the 2.5% Prepayment Premiums or similar amounts as secured damages claims, in addition to other amounts, should have been paid as part of the Court-ordered partial prepayments that took place on March 29, 2007, when such prepayments were strictly prohibited.

## II.    PROCEDURAL AND FACTUAL HISTORY

### A.    The 2004 CalGen Financing

On March 23, 2004, the Calpine Generating Company, LLC ("CalGen")[1] and CalGen Finance Corp. ("CalGen Finance") (CalGen and CalGen Finance are collectively referred to as the "CalGen Issuers)," together with various of their subsidiaries and affiliates acting as guarantors and pledgors (collectively, the "CalGen Debtors"), completed an offering of first, second and third lien debt consisting of floating and fixed rate term loans and a revolving line of credit, totaling more than $2.6 billion (the "CalGen Secured Debt").  The CalGen Secured Debt consisted of the following:

---

[1]    CalGen is a wholly-owned subsidiary of CalGen Holdings, Inc., which in turn is an indirect wholly-owned subsidiary of Calpine Corporation ("Calpine").

| Principal Amount | Description |
|---|---|
| $235 million | First Priority Secured Floating Rate Notes Due 2009 (the "First Priority Notes") for which Wilmington Trust FSB acts as Indenture Trustee and issued pursuant to the First Priority Indenture |
| $600 million | First Priority Secured Term Loans Due 2009 (the "First Priority Term Loan Notes") for which Wilmington Trust Company acts as Administrative Agent and issued pursuant to the First Priority Term Loan Agreement |
| $200 million | First Priority Revolving Loans |
| $100 million | Second Priority Secured Term Loans Due 2010 |
| $640 million | Second Priority Secured Floating Rate Notes Due 2010 |
| $680 million | Third Priority Secured Floating Rate Notes Due 2011 |
| $150 million | Third Priority Secured Notes Due 2011 |

The CalGen Debtors' obligations under the First Priority Indenture, First Priority Notes, First Priority Term Loan Agreement, First Priority Term Loan Notes and other documents entered into in connection with the 2004 financing (collectively, the "First Priority Loan Documents") are secured by a first priority lien against substantially all of the assets of the CalGen Debtors (the "CalGen Collateral"). Security Agreement, Art. IX (J.A. at 1060 - 61), Collateral Trust Agreement, § 2.1 (J.A. at 1134 – 1135). Thirty-nine of the CalGen entities (the "CalGen Guarantors") are obligated to the First Priority Debt Representatives for all outstanding principal, interest, the Prepayment Premiums (as defined below), default interest and other amounts that are due pursuant to the guarantee obligations contained in the applicable loan documents.

The First Priority Notes and the First Priority Term Loan Notes were each for five year terms due to mature on April 1, 2009. First Priority Note (J.A. at 137); First Priority Term Loan Agreement, p. 29 (J.A. at 697). Prepayment of the First Priority Notes and the First Priority

- 5 -

Term Loan Notes was strictly prohibited during the first three years of the issuance of the notes and the loans prior to April 2, 2007.  During the fourth year from April 2, 2007 thru March 31, 2008, the First Priority Loan Documents permitted prepayment at a price of 102.5% of the principal (the "Prepayment Premiums").  During the final year, from April 1, 2008, until maturity, prepayment was permitted without any prepayment penalty.  First Priority Indenture § 3.07 (J.A. at 218); First Priority Notes ¶ 5 (J.A. at 141); First Priority Term Loan Agreement § 2.10(b) (J.A. at 721 - 22).

The full text of the prepayment provisions, which are verbatim identical in the First Priority Indenture and the First Priority Notes, and similar in the First Priority Term Loan Agreement, are reproduced below:

First Priority Indenture and First Priority Notes:

> *Optional Redemption.*  The Issuers may not redeem all or any part of the Notes prior to April 1, 2007.  On or after April 1, 2007, the Issuers may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days prior notice, at the redemption prices (expressed at percentages of principal amount) set forth below plus accrued and unpaid interest and Special Interest, if any, on the Notes redeemed, to the applicable redemption date, if redeemed during the twelve-month period beginning on April 1 of the years indicated below, subject to the rights of the Holders on the relevant record date to receive interest on the relevant interest payment date:

| Year | Percentage |
|------|-----------|
| 2007 ……………………………………………………… | 102.5% |
| 2008, and thereafter ………………………………………… | 100% |

> Unless the Company defaults in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable redemption date.

First Priority Indenture § 3.07 (J.A. at 218); First Priority Notes ¶ 5 (J.A. at 141).

First Priority Term Loan Agreement:

    First Priority Term Loan Call Protection.

        (i)      The First Priority Term Loans may not be voluntarily prepaid at any time on or prior to April 1, 2007;

        (ii)     The Borrower may, at its option, upon notice as provided in clause (a) above, prepay at any time all, or from time to time any part of, the First Priority Term Loans, if such prepayment is after April 1, 2007 but on or before April 1, 2008, in an amount equal to 102.5% of the principal amount so prepaid, plus all other amounts owed hereunder in connection with such prepayment, including amounts payable under Section 2.05 (Interest) and 2.14 (Making or Maintaining First Priority Term Loans) hereof; and

        (iii)    Subject to clause (a) above, First Priority Term Loans may be prepaid at any time without premium or penalty after April 1, 2008.

First Priority Term Loan Agreement § 2.10(b) (J.A. at 721 - 22).

    Based on the straightforward text of these prepayment provisions (the "Prepayment Provisions"), it is undisputed that the 2.5% Prepayment Premiums were intended to be triggered if redemption occurred on or after April 1, 2007 for the First Priority Notes, and on or after April 2, 2007 for the First Priority Term Loan Notes.[2]

    At issue in this appeal is whether the 2.5% Prepayment Premiums or similar amounts as secured damages claims, in addition to other amounts, should have been paid as part of the Court-ordered partial prepayments that took place on March 29, 2007, when such prepayments were strictly prohibited.  As detailed below, as a result of the interaction of the Bankruptcy Code and the independent secured contractual obligations of the Guarantors, the analysis must be performed separately for the Issuers and the Guarantors in the event that it is determined that the Issuers are not obligated to immediately pay the amount claimed due.

---

[2]    The date on which the First Priority Notes could be prepaid, subject to the Prepayment Premium, was April 1, 2007.  Because that date was a Sunday, under the terms in the First Priority Indenture the day rolled over to the next succeeding day, April 2, 2007.  First Priority Indenture, p. 22 (J.A. at 178).

B.    **Proceedings in the Bankruptcy Court**

CalGen has long been one of the most profitable subsidiaries of Calpine Corporation.

CalGen's Form 10-Q for the period ending September 30, 2006, which was filed on February 2,

2007, showed that CalGen had total assets of $5.5 billion, total liabilities of $2.8 billion, and

members' equity in excess of $2.6 billion. CalGen Q3 2003 10-Q filed on February 2, 2007 (J.A.

at 76).

Since December 20, 2005 (the "Petition Date"), Calpine and certain of its affiliates

(including the CalGen Debtors) have each filed voluntary petitions for relief under Chapter 11 of

the Bankruptcy Code.  In the seventeen months since the Petition Date, the Bankruptcy Court has

allowed the Debtors to use cash collateral and to obtain Debtor-in-Possession ("DIP") financing

through a series of orders Authorizing Use of Cash Collateral and Granting Adequate Protection

(the "Cash Collateral Orders") (C.D. Nos. 80, 83, 95, 96, 97 & 99).  Among other things, the

Cash Collateral Orders, as amended, authorized the CalGen Debtors to lend Excess Cash Flow

(as defined in the First Priority Loan Documents) on a secured basis to non-CalGen Debtors

pursuant to § 364 of the Bankruptcy Code.  (C.D. Nos. 95 & 99).  Since the Petition Date, the

profitable CalGen Debtors have loaned over $409 million to non-CalGen Debtors.

These intercompany loans make the CalGen Debtors one of the largest post-petition

secured creditors and administrative claimants of Calpine and the non-CalGen Debtors.  Based

on information provided in the Debtor's Business Plan, the data reported in CalGen's SEC

filings, the CalGen Debtors' Schedules, and based upon the uncontroverted expert testimony at

the hearing held on February 27, 2007, it is clear that the First Priority Notes and First Priority

Term Loan Notes are over-secured by <u>billions</u> of dollars.[3]  CalGen 10-Q filed on February 2,

2007 (J.A. at 76).

> ### C.    The CalGen Prepayment Motion and Orders

On January 26, 2007, the Debtors filed their "Motion for an Order (I) Authorizing

Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition

Financing and (B) Repay the Prepetition Debt; (II) Allowing Debtors' Limited Objection to

Claims; and (III) Determining Value of Secured Claims." (the "<u>Prepayment Motion</u>") (C.D. No.

5).  With the Prepayment Motion, the Debtors sought authority to refinance their then-existing

DIP Facility and for authority to use the proceeds from that refinancing to pay off the pre-

petition CalGen Secured Debt, including the First Priority Indebtedness.  The Prepayment

Motion, <u>inter alia</u>, sought to determine the amount of the claims of the First Priority Debt

Representatives pursuant to Bankruptcy Rule 3012, and to prepay the First Priority Notes and the

First Priority Term Loan Notes without having to pay the 2.5% Prepayment Premiums or default

interest provided for under the First Priority Loan Documents.  (<u>Id.</u> at 37-38.)

The First Priority Debt Representatives objected to the Prepayment Motion arguing,

among other things, that the 2.5% Prepayment Premiums and default interest must be paid

because they are enforceable under New York state law and are provided for in the applicable

loan documents.[4]  (C.D. Nos. 8 & 9).  The First Priority Debt Representatives also argued that,

in the absence of payment in full of the Prepayment Premiums, default interest and all other

---

[3]    Under the priority scheme established by the Bankruptcy Code, over-secured creditors are entitled to payment ahead of unsecured creditors, 11 U.S.C. § 1129(b)(2)(B)(ii), and to the extent that they are over-secured they are entitled to "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." 11 U.S.C. § 506(b).

[4]    The First Priority Loan Documents are governed by New York law.  First Priority Indenture, § 13.08 (J.A. at 261); First Priority Term Loan Agreement, § 12.14 (J.A. at 785).

amounts due, the refinancing and prepayment could be accomplished only through a plan of reorganization.  (Id.).

On March 5, 2007, the Bankruptcy Court entered the Memorandum Decision and Order that allowed the Debtors to proceed with the requested refinancing and to enter into a Replacement DIP Facility.  The Memorandum Decision and Order also allowed the Debtors to prepay the CalGen Secured Debt, and held that the 2.5% Prepayment Premiums were a "reasonable prox[y]" for damages to the First Priority Debt Representatives.  Memorandum Decision and Order, pg. 11 (J.A. at 11).  The Bankruptcy Court reserved ruling on whether default interest would be awarded pursuant to 11 U.S.C. § 506(b).  (Id. at 11-13).

The Memorandum Decision and Order called for the parties to draft and settle on an order consistent with its terms.  On March 9, 2007, the parties, not having agreed on a form of order, each submitted their proposed orders.  (C.D. Nos. 51 & 52).  Without notice, hearing, or conference, the Bankruptcy Court signed and entered the orders that the Debtors had proposed, and ignored the counter-proposed orders.  The Bankruptcy Court subsequently entered the Amended CalGen Claims Order on March 26, 2007, which was also granted without notice or a hearing.  Amended CalGen Claims Order (J.A. at 62).  On March 29, 2007, the Debtors wired to the First Priority Debt Representatives the principal and basic interest due as of that date on the First Priority Indebtedness.  Accrued fees and expenses were not paid until after April 2, 2007.  To date, the CalGen Debtors have paid no default interest or prepayment premium on the First Priority Indebtedness.

## SUMMARY OF ARGUMENT

The First Priority Loan Documents barred prepayment of the First Priority Indebtedness before April 2, 2007, outside of the defeasance mechanism provided for in the First Priority Loan Documents.  However, on April 2, 2007, the First Priority Indebtedness could have been prepaid

10485488

if payment in full was accompanied by a modest 2.5% premium. The Memorandum Decision and Order is silent with regard to why the prepayment needed to take place on March 29, 2007, instead of April 2, 2007 when, at least with regard to the First Priority Indebtedness, the repayment would have been contractually permitted. Without justification the Bankruptcy Court improperly condoned a post-petition contractual breach in a procedural manner that violated the Bankruptcy Code and the constitutional rights of the First Priority Debt Representatives and the holders of the First Priority Indebtedness.

Furthermore, it does not appear that the Bankruptcy Court appreciated the contractual significance of the Debtors' failure to pay default interest to the First Priority Debt Representatives prior to April 2, 2007. When the Bankruptcy Court deferred ruling on whether or not the First Priority Debt Representatives were entitled to default interest, pursuant to the First Priority Loan Documents, it resulted in full prepayment not having taken place.[5] In connection with the Debtors' efforts to obtain approval of the Prepayment Motion, the Debtors contended that there was a magic temporal window during which no prepayment premium was provided for in the First Priority Loan Documents. By the Debtors own admission, that alleged window was set to, and in fact did, close on April 2, 2007. As noted, the purported prepayment tendered to the First Priority Debt Representatives on March 29, 2007 was incomplete, because it did not include default interest. As a result, full prepayment still has not taken place. Thus, the magic pre-April 2, 2007 window that the Debtors' sought to squeeze through with their tortured

---

[5] Even a finding that default interest is not an allowable part of the bankruptcy claims of the First Priority Debt Representatives will not change the fact that the prepayment in full was not made before April 2, 2007. Section 2.09 of the First Priority Term Loan Agreement (J.A. at 721) and Section 12.01 of the First Priority Indenture (J.A. at 258) require the actual payment of the interest, not the payment of some reduced allowed "claim" as might be determined to be allowable in a bankruptcy proceeding.

- 11 -

logic has slammed shut.  The Bankruptcy Court erred as a matter of law when it simultaneously deferred ruling on the default interest issue and ruled that no prepayment premium was due.

The Bankruptcy Court was required to honor the terms of the applicable agreements when determining the amount of the First Priority Indebtedness regardless of whether contractual and state law prepayment prohibitions are specifically enforceable against a debtor in the process of reorganizing.  Those prepayment provisions, which provide for prepayment premiums as secured claims, remain integral, binding terms of the First Priority Loan Documents.  The Bankruptcy Court was wrong to ignore them.

The first sentence of the Prepayment Provisions prohibits prepayment without exception prior to two years before maturity, i.e., on or before April 2, 2007.  The Bankruptcy Court incorrectly ruled that, because there was an absolute bar to prepayment prior to those dates, the First Priority Debt Representatives were not entitled to the Prepayment Premiums provided for in the second sentence of the Prepayment Provisions.  The Bankruptcy Court's error stems from a misreading of those provisions which were structured to bar prepayment during the first three years, permit prepayment during the fourth year (subject to the 2.5% Prepayment Premiums), and waive that premium in the fifth and final year before maturity.  The Debtors have never disputed that, had the First Priority Notes and First Priority Term Loan Notes been paid on or after April 2, 2007 (as opposed to days earlier on March 29, 2007), the 2.5% Prepayment Premiums would have been due.  In fact, the Bankruptcy Court itself borrowed the same 2.5% from the Prepayment Provisions in the loan documents as a reasonable proxy for the damages it awarded.  But prepayment earlier than April 2, 2007 should have resulted in an even higher prepayment premium, not no prepayment premium at all.  The Prepayment Orders should accordingly be vacated, and the First Priority Debt Representatives should be awarded their 2.5%

Prepayment Premiums as secured claims in connection with the repayment of the First Priority Indebtedness.

Even assuming the Bankruptcy Court correctly ruled that no Prepayment Premiums are due pursuant to section 506(b) and the First Priority Loan Documents, the Bankruptcy Court should nonetheless require the CalGen Guarantors to pay the Prepayment Premiums as secured claims pursuant to their guarantees and the First Priority Loan Documents.  The Bankruptcy Court ignored the existence of those separate guarantee agreements, which provide an unambiguous obligation of the CalGen Debtors that is fully enforceable as a secured claim under section 506(b).

Finally, the Bankruptcy Court erred by improperly allowing the Debtors to prepay the claims of the First Priority Debt Representatives and purporting to "expunge" the claims of the First Priority Debt Representatives outside a plan of reorganization.

## ARGUMENT

## I.    THE BANKRUPTCY COURT ERRED WHEN IT CONVERTED THE FIRST PRIORITY SECURED PREPAYMENT PREMIUMS INTO UNSECURED CLAIMS FOR DAMAGES

For the First Priority Debt Representatives this appeal turns on a narrow issue of law as applied to a 150 word section of a contract.  The narrow issue: "Does section 506(b) of the Bankruptcy Code permit a Chapter 11 debtor to avoid a prepayment premium that can be readily discerned from the face of the loan documents?"  Where, as here for the First Priority Debt Representatives, the amount of the premium is provided for in the First Priority Loan Documents, the Debtors cannot escape payment of the premium as a secured claim.  The Bankruptcy Court crafted a compromise decision that awarded the exact amount provided for in the First Priority Loan Documents, but as unsecured damages for the breach of those documents. The Bankruptcy Court's decision is not supported by the plain text of section 506(b), case law

10485488

construing section 506(b) in the prepayment premium context, or by the Prepayment Provisions

of the loan documents at issue.

> **A.    Bankruptcy Code Section 506(b) Requires Debtors To Pay Oversecured Creditors Reasonable Prepayment Premiums Provided For Under Loan Documents**

Section 506(b) of the Bankruptcy Code protects over-secured creditors by enforcing

agreements that require Debtors to pay interest, fees, costs, or charges where the value of the

collateral securing a debt exceeds the amount of such secured claim:

> To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b).  In general, post-petition interest, fees, costs and charges are allowed against

a Chapter 11 debtor if the creditor's claim is oversecured.  Section 506(b) codified the pre-

Bankruptcy Code rule that allowed oversecured creditors to recover, to the extent of their

security, certain expenses (interest, fees, costs and charges) provided for by the agreement giving

rise to their underlying claim.[6]

A secured party is entitled to payment pursuant to section 506(b) when they: (1) hold an

over-secured claim, (2) seek interest, fees, costs or charges of a reasonable amount that (3) are

provided for under an agreement or statute, and (4) that are lawful under applicable state law.  Of

those prerequisites, only the third is in dispute here.  The Debtors have never argued that the

CalGen Secured Debt is not oversecured, that the 2.5% Prepayment Premiums sought by the

---

[6]    United Merchants and Manufacturers, Inc. v. Equitable Life Assurance Soc'y, 674 F.2d 134, 138 (2d Cir. 1982) (noting that § 506(b) "codifies pre-Code law that an oversecured creditor can assert, as part of its secured claim, its right to interest and costs arising under its credit agreement," citing S. Rep. No. 95-989, 95th Cong., 2d Sess. 68 (1978), reprinted in U.S.C.C.A.N. 5787, 5854 (1978); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 356-57 (1977), reprinted in U.S.C.C.A.N. 5963, 6312 (1978)).

First Priority Debt Representatives is an unreasonable amount, or that it is unenforceable under New York state law.  (C.D. Nos. 9 & 10 at p. 11, n.5).  To the contrary, the Debtors' position has always been that the Prepayment Premiums would be due if only it had been provided for under the loan documents.  (C.D. No. 5 at pgs. 35-37, C.D. No. 31 at pgs. 3 & 14).  The Bankruptcy Court itself ruled that 2.5% was a "reasonable prox[y]" of the damages to the First Priority Debt Representatives. Memorandum Decision and Order, pg. 11 (J.A. at 11).  Courts uniformly hold that a prepayment premium constitutes a "charge" within the meaning of section 506(b).[7] Therefore, whether the 2.5% Prepayment Premiums should have been an allowed charge under section 506(b) against the CalGen Issuers will be determined by whether it was "provided for under the agreement."  Here, the Prepayment Provisions of the First Priority Loan Documents, as well as the Security Agreement and the guarantees, are the operative "agreements" at issue.

### B.    Prepayment Premiums Are Enforceable Under New York State Law, and the Bankruptcy Court was Required to Look to State Law When Determining the Total Amount of the Claims

As a general matter, prepayment premiums have been upheld as enforceable under New York law.[8]  Furthermore, the validity of prepayment premiums in New York must be evaluated in light of the fact that, under New York state law, which governs interpretation of the First Priority Loan Documents, prepayment is generally not permitted unless provided for in the loan documents or otherwise authorized by statute.[9]  It is in the context of this strict rule, which bars

---

[7]    E.g., Continental Sec. Corp. v. Shenandoah Nursing Home P'ship, 193 B.R. 769, 775 (W.D. Va. 1996) ("[A] typical prepayment penalty provision contained in a lending instrument is a 'charge' within the meaning of § 506(b)") (collecting cases), aff'd, 104 F.3d 359 (4th Cir. 1996).

[8]    United Merchants and Manufacturers, 674 F.2d at 142-44.

[9]    See Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assoc., 816 N.Y.S. 2d 831, 835, (N.Y. Sup. Ct. 2006) ("Under the perfect tender in time rule a mortgagor has no right to prepay a note prior to its maturity date 'in the absence of a prepayment clause in the mortgage or contrary statutory authority' and 'such rule has been settled law since the early 19th century'") (quoting Arthur v. Burkich, 131 A.D.2d 105, 106 (N.Y. App. Div. 3d Dep't 1987)); 2550 Olinville Ave., Inc. v. Crotty, 566 N.Y.S. 2d 500, 502 (N.Y. Sup. Ct. 1991) (holding under New York law that "a mortgagor has the right to prepay an obligation secured by a mortgage,

*(Footnote continued on next page)*

borrowers from prepaying loans unless they bargain for and document that right, that the Prepayment Premiums must be construed.

None of the loan documents executed by the CalGen Debtors authorized prepayment prior to April 2, 2007. First Priority Indenture § 3.07 (J.A. at 218); First Priority Notes at ¶ 5 (J.A. at 141); First Priority Term Loan Agreement at § 2.10 (J.A. at 721 - 22). To the contrary, the Prepayment Provisions explicitly confirmed applicable law and prohibited prepayment prior to that date. Nevertheless, the Bankruptcy Court authorized the CalGen Secured Debt to be prepaid just days before prepayment would have been permitted (subject to the payment of the Prepayment Premiums). Although the prepayment prohibition contained in the first sentence of the Prepayment Provisions may not be specifically enforced against a Chapter 11 debtor, it was error for the Bankruptcy Court to ignore the remainder of that section when determining the amount of the claims of the First Priority Debt Representatives.

The Prepayment Provisions expressly authorized prepayment during the fourth year of the loans, subject to payment of the 2.5% Prepayment Premiums. First Priority Indenture, § 3.07 (J.A. at 218); First Priority Notes, ¶ 5 (J.A. at 141); First Priority Term Loan Agreement, § 2.10 (J.A. at 721 - 22). No one contends that the 2.5% Prepayment Premiums would not have been due had the prepayment occurred on or after April 2, 2007. The Bankruptcy Court should have honored those provisions, which are enforceable under state law, and should not have changed the contractual rights of the parties absent the explicit authority to do so under the Bankruptcy Code.[10]

---

*(Footnote continued from previous page)*
    prior to maturity -- and a mortgagee is obligated to accept payment thereof -- only if a prepayment privilege is contained in the mortgage documents or is authorized by statute").

[10]   <u>Worthington v. Ahlers</u>, 485 U.S. 197, 206 (1988) (holding that "whatever equitable powers remain in the bankruptcy courts must and can be exercised within the confines of the Bankruptcy Code"); <u>Butner v. United States</u>, 440 U.S. 48, 54 (1979) (holding that determination of property rights in bankruptcy is governed by state

*(Footnote continued on next page)*

### C.    Courts Uniformly Enforce Prepayment Premiums as Secured Claims Under Section 506(b) Where A Written Instrument Provides Some Formula To Calculate The Amount

Few courts have had occasion to construe the meaning of section 506(b)'s third prong -- "provided for under the agreement" -- in the context of prepayment premiums disputed in bankruptcy.  Those that have share a single principle: if the amount of a prepayment premium can be fairly discerned from the face of the applicable agreements, it will be allowed; otherwise, it will not.  Here, the applicable agreements, the First Priority Loan Documents, contain an explicit 2.5% premium.  The straightforward formula for calculating the redemption price (102.5% of principal) set forth in the First Priority Loan Documents puts this case squarely among those in which prepayment premiums have been allowed.  As discussed below, whether a premium is enforceable turns on the presence of a number or formula in the applicable loan documents.  Here, the First Priority Loan Documents spell out the very number that the Bankruptcy Court seized upon.

The court in In re 360 Inns, Ltd., when ruling on confirmation of a debtor's plan of reorganization, considered a thirty-year promissory note that prohibited voluntary prepayment during the first ten years, but provided for a 10% penalty for involuntary prepayment during that time, and further provided for lesser prepayment penalties on a declining scale from 5% to 1% as the note approached maturity.[11]  In that bankruptcy case, the court rejected the debtor's initial plan of reorganization that would have tendered nothing to the noteholder for prepayment during

---

*(Footnote continued from previous page)*

law and articulating the policy that bankruptcy should not afford a party a windfall at the expense of others); In re Dow Corning, 456 F.3d 668, 679 (6th Cir. 2006) (finding that in the context of chapter 11 cases involving solvent debtors a "bankruptcy judge does not have free floating discretion to redistribute rights in accordance with his personal views of justice and fairness . . . [in this context] it is the sole role of the bankruptcy court to enforce creditors' contractual rights").

[11]    In re 360 Inns, Ltd., 76 B.R. 573, 575 (Bankr. N.D. Tex. 1987).

the first ten years.  Id. at 576.  360 Inns's modified plan, which the court deemed acceptable, called for a prepayment penalty of 10% of the principal sum if repaid -- whether voluntarily or involuntarily -- within the first ten years, and 5% if repaid after that date.  Id. at 576-77.  Like the First Priority Loan Documents, the amount of the prepayment penalty in the 360 Inns note was expressed as a percentage of the principal sum repaid.

In the Continental Securities case, by contrast, a District Court affirmed the confirmation of a reorganization plan where the note was prepaid without any premium.[12]  There, the secured creditor, Continental, conceded that the bankruptcy court had the authority to allow the debtor to prepay the note.  Id. at 773 n.5.  The bankruptcy court had held that "[w]hile there is a prepayment prohibition, which is not enforceable in this context, there is no prepayment penalty provision provided for anywhere in the contract.  Therefore, there can be no prepayment fees, costs, or charges allowed under the confirmed Plan as none are provided for in the note under § 506(b)."  Id. at 774.  The District Court affirmed based on "the absence of a penalty provision in Continental's Note."  Id. at 775.

The Court in Continental Securities distinguished 360 Inns because the notes at issue were "substantially different":

> The note in 360 Inns contained an explicit penalty formula for prepayment made
> after the first ten years of the loan. . . .  The current note, in contrast, contains no
> prepayment damages formula whatsoever. . . . .  Although the note in 360 Inns,
> like the present note, did not contain a damages provision with respect to
> voluntary prepayment made within the first ten years of the loan, there was a
> concrete 10% damages figure in the note with respect to involuntary prepayment
> made within the same period.   Thus, the debtor, and the bankruptcy court for that
> matter, were able reasonably to calculate a damages figure for voluntary
> prepayment made within the first ten years by borrowing from another, analogous
> provision in the note itself--i.e. the 10% figure applicable to involuntary
> prepayment made within the first ten years.   This court, in contrast, cannot
> enforce the lockout provision by simply supplying a prepayment penalty figure

---

[12]    Continental Sec. Corp., 193 B.R. 769, aff'd, 104 F.3d 359 (4th Cir. 1996).

contained elsewhere in the note since no such figure exists.  In essence, the
lockout provision, completely uncoupled from some sort of damages provision, is
not specific enough to be enforced by this court.

Id. at 777.

The Prepayment Provisions at issue here resemble the note in 360 Inns.  As in 360 Inns,
the Prepayment Provisions specify an explicit prepayment formula as a percentage of the
principal to be repaid (2.5%).  In contrast, Continental's note contained no prepayment damages
formula whatsoever.  Even though the 360 Inns note did not specify any penalty for voluntary
prepayment during the first ten years, the court could reasonably calculate damages by
borrowing the 10% figure applicable to involuntary prepayment from another, analogous
provision in the note itself.  Judge Lifland did just that in this case when he borrowed the 2.5%
Prepayment Premiums for payments on or after April 2, 2007 and applied that same exact 2.5%
to the prepayment made just days earlier on March 29, 2007.  With a precise formula from which
to calculate damages readily apparent in the Prepayment Provisions, the situation presented here
stands in stark contrast to that confronted by the court in Continental Securities, where the court
would have had to invent a number out of thin air.  In the Memorandum Decision and Order,
Judge Lifland found "the 2.5% prepayment premium" to be a "reasonable prox[y]" for the
damages it awarded.  Memorandum Decision and Order, p. 11 (J.A. at 11]).  Under the sound
reasoning of 360 Inns and Continental Securities, the fact that the Bankruptcy Court took the
2.5% damages figure straight out of the notes means that the Prepayment Premiums should have
been allowed as secured claims.  Section 506(b) requires nothing more.

Other cases fit well within the same prepayment rubric.  In re Anchor Resolution Corp.,
for instance, allowed a prepayment premium over the debtor's section 506(b) objection where
the applicable agreement, a note purchase agreement, "include[d] a formula for computing the

make-whole amount."[13]  That case aptly stated the underlying purpose of prepayment or make-whole premiums: "The NPA's formula for and entitlement to a make-whole amount were designed to compensate the Series B Noteholders in the event the Debtor paid amounts due under the NPA prior to their scheduled maturity and thus deprived the Series B Noteholders of their full bargained-for investment."  Id.

Even the cases that do not allow prepayment premiums follow the same general rule. Where prepayment premiums are disallowed and parties are deprived of the benefit of their bargain, it is because the notes at issue, like the one in Continental Securities, did not contain a clear number or formula.  For example, in In re Vest Associates, even though the note prohibited prepayment, no premium was allowable under section 506(b) where the note was "silent as to any penalties or damages that would arise from the breach of this provision."[14]  There, the secured creditor sought to be compensated for the adverse tax consequences that would flow from the prepayment – a type of harm not provided for in the parties' agreement and thus not allowable as a secured claim under section 506.  Because neither the mortgage nor the note provided for an amount of damages, the creditor could not recover even actual damages from the adverse tax consequences of the prepayment.  Id.  Chief Judge Brozman recognized that "there is no reported decision which allows a prepayment premium in the absence of a formula for the calculation of the premium being set forth in the instrument."  Id. (citing Continental Securities, 188 B.R. at 215-16).

The case law reveals a sensible pattern under section 506(b): prepayment premiums in debt instruments that include a formula from which damages may reasonably be calculated are

---

[13]    In re Anchor Resolution Corp., 221 B.R. 330, 333 (Bankr. D. Del. 1998); see also In re AE Hotel Venture, 321 B.R. 209, 213 (Bankr. N.D. Ill. 2005) (enforcing prepayment premium where "the Note set [] out the formula for calculating any prepayment premium").

[14]    In re Vest Associates, 217 B.R. 696, 699 (Bankr. S.D.N.Y. 1998) (Brozman, C.J.).

allowed as secured claims; those that fail to specify a formula, leaving the court to invent a number out of whole cloth, are not.  That reading of the cases also comports with the manifest purpose of section 506(b) -- to honor the contractual rights of creditors with respect to oversecured claims.  The Prepayment Provisions at issue should be interpreted in light of that purpose and the decisional law analyzing prepayment premiums under section 506(b).

> **D.     The 2.5% Prepayment Premium Formula In The Prepayment Provisions Satisfies The "Provided For Under The Agreement" Element Of Section 506(b)**

Reasonable prepayment premiums are enforceable as liquidated damages clauses.[15] Prepayment premiums are designed to compensate noteholders for the damages that flow from payment of the principal loan amount in advance of maturity.[16]  The graduated structure of prepayment premiums in the 360 Inns note underscores that purpose.[17]  As one would expect, the prepayment premium is higher the earlier the payoff date, and lower as the maturity date approaches.

The Prepayment Provisions of the First Priority Loan Documents were structured much the same way.  For each, the five year term was due to mature on April 1, 2009.  First Priority Note, ¶ 5 (J.A. at 141); First Priority Term Loan Agreement, § 1.01 (J.A. at 697).  Prepayment was prohibited, without exception, more than two years in advance of the maturity date. Prepayment is expressly provided for from April 2, 2007 through March 31, 2008, subject to the 2.5% Prepayment Premiums.  During the final year before maturity, prepayment would be permitted without penalty.  First Priority Indenture, § 3.07 (J.A. at 218); First Priority Notes, ¶ 5

---

[15]   United Merchants and Manufacturers, 674 F.2d at 142-44.

[16]   In re Anchor Resolution Corp., 221 B.R. at 333; see also In re Skyler Ridge, 80 B.R. at 504-05 ("The usual purpose of a prepayment premium provision in a loan agreement is to assure that the lender will receive the contractual rate of return for the life of the loan, or the equivalent thereof.  Such a clause provides protection to a lender . . . of its unearned interest over the unexpired portion of the loan.").

[17]   In re 360 Inns, Ltd., 76 B.R. at 575.

(J.A. at 141); First Priority Term Loan Agreement, § 2.10 (J.A. at 721 - 22).  In light of the

underlying purpose and design of the Prepayment Provisions and the inclusion of a formula, it

makes no sense to allow loans to be prepaid during the prohibition period without a premium,

where just days later prepayment would have indisputably triggered the 2.5% Prepayment

Premiums provided for in the First Priority Loan Documents.  That was not what the parties

intended, and the Bankruptcy Code does not authorize such a windfall on the Debtors.  But that

is precisely what the Bankruptcy Court sanctioned in this case.

Many notes, like those at issue here, include a blanket prepayment prohibition – a date so

far in advance of maturity that the parties cannot (or otherwise choose not) to put any monetary

value on prepayment.  Outside of bankruptcy, such absolute prepayment bars are generally

enforceable, but cannot be specifically enforced against Chapter 11 debtors because the specific

performance of such a blanket prohibition would effectively keep the debtor in bankruptcy for

years or decades until the loan matures.  The First Priority Debt Representatives do not now

seek, and indeed never have sought, the specific performance of the prepayment prohibition

contained in the first sentence of the Prepayment Provisions.

Instead, all that the First Priority Debt Representatives have ever sought is the benefit of

their bargain and the protections afforded them under the Bankruptcy Code.  If the Prepayment

Provisions stopped after that first sentence, and contained only a prepayment bar, then this case

(at least with regard to the CalGen Issuers) might well fall under the Continental Securities and

Vest line of cases without an allowable charge under section 506(b).  But the Prepayment

Provisions do not stop after the first sentence.  They go on to provide explicitly for a precise

formula -- 2.5% of the unpaid principal -- for calculating the Prepayment Premiums.  That 2.5%

Prepayment Premiums should have applied to the Court-ordered prepayment made days earlier

on March 29, 2007 when such prepayment was prohibited outright and should have included interest (at the non-default rate, at the very least) to April 2, 2007.

In light of the fact that the partial prepayment took place on March 29, 2007 instead of April 2, 2007, the Bankruptcy Court also erred when it failed to separately calculate and award the damages due for the intervening days, as detailed in the Supplemental Affidavits of Stephen Darr (C.D. Nos. 29 & 30). Damages for March 30, 2007 through April 1, 2007 should have been regarded as allowable interest or other charges under section 506(b). In the alternative, such damages should have been allowed against the CalGen Guarantors as secured obligations, or as additional unsecured damages against the CalGen Debtors.

The Debtors view the Prepayment Provisions differently. The Debtors divorce the first sentence of the Prepayment Provisions, which bar prepayment before April 2, 2007, from the sentence that immediately follows it, which permits prepayment between April 2, 2007 and March 31, 2008, subject to the 2.5% Prepayment Premiums. The Debtors misconstrue those two consecutive sentences as two separate, unrelated provisions. In reality, however, these sentences are parts of the same section. The Debtors argue that because the first sentence does not contain a number or formula, the parties intended that nothing be awarded to the First Priority Debt Representatives to compensate them for prepayments made more than two years before maturity. They ignore the careful design of the Prepayment Provisions, which prohibit prepayment for the first three years, followed by a year-long period when the loans can be prepaid for a set price, and then the final year before maturity when prepayment can be made without penalty. The Debtors mock the purpose of the Prepayment Premiums – to compensate the First Priority Debt Representatives for early prepayment - claiming that those losses would be $0 <u>earlier</u> in the term of the note, yet somehow just days later, would suddenly be worth 2.5% of the principal.

The Debtors' (and Bankruptcy Court's) reading of the Prepayment Provisions defies logic and common sense. If this interpretation were correct, then the First Priority Notes and the First Priority Term Loan Notes could have been prepaid on March 24, 2003, the day after they were executed, without any penalty simply by filing for bankruptcy protection. It is neither the intent, nor the purpose of the Bankruptcy Code to permit a debtor to walk away from its contractual obligations without consequence. If the parties wanted to permit prepayment more than two years before maturity, they knew full well how to do so. That is precisely what they did for the fourth year of the loan, starting April 2, 2007. Instead, they chose not to permit prepayment – outside of a defeasance mechanism – until after those dates.

The Bankruptcy Court's inability to specifically enforce the prepayment prohibition against the Debtors does not eviscerate the Prepayment Provisions from the First Priority Loan Documents. Just because the prepayment prohibition cannot be enforced, that does not mean the 2.5% Prepayment Premiums should not be. Had the parties provided for prepayment earlier than April 1, 2007, the premium would have been even higher. Here, the 2.5% formula is so readily apparent in the First Priority Loan Documents that the Bankruptcy Court found it and borrowed that exact same number. The Prepayment Premiums should, therefore, have been allowed as a secured claim under section 506(b).

## E.    Acceleration Of The Debt Did Not Defeat The Prepayment Premiums

Not only do the Debtors have a skewed interpretation of the Prepayment Provisions, they have a slanted reading of the relevant case law as well. The Debtors point to cases outside the section 506(b) context for the proposition that there in fact was no prepayment because the maturity date of the loan was accelerated upon the bankruptcy filing. Prepayment Motion, pgs. 32-34 (C.D. No. 5); Omnibus Reply, pgs. 12-14 (C.D. No. 32). The logic of that position follows the same rationale the Debtors employed for reading the second sentence out of the

- 24 -

10485488

Prepayment Provisions.  As demonstrated below, those non-506(b) cases relied upon by the Debtors do not support ignoring the Prepayment Premiums provided for in the First Priority Loan Documents.

The two appellate courts that have addressed the impact of "acceleration" and prepayment premiums come out opposite ways, but for similar reasons.  In In re LHD Realty Corp. the Seventh Circuit refused to award a prepayment premium to a creditor who affirmatively sought to foreclose and thus triggered acceleration by filing a motion for relief from stay in the bankruptcy court.[18]  In LHD Realty, the lender sought to collect a prepayment premium from a borrower who sold mortgaged real estate in Chapter 11 proceedings.  The note at issue in LHD Realty contained an outright prepayment prohibition for the first ten years, followed by a declining percentage premium in each of the last five years.  Id. at 329 n.1. Sixteen months post-petition and nine years after the loan was made, the mortgage holder moved for relief from the automatic stay in order to foreclose.  Id. at 329.  The lender's motion for relief was not granted, and the debtor found a purchaser for the property.  The debtors then sought to prepay without payment of the premium.  The bankruptcy court awarded the premium; the district court reversed.  On appeal, the Seventh Circuit held, "in the particular circumstances of this case," the lender forfeited the right to a prepayment premium when it sought relief from the automatic stay:

> Thus, the lender, by its acts, may establish that it prefers accelerated payment to the opportunity to earn interest over a period of years.  It is not appropriate, under these circumstances, for the lender to receive a prepayment premium in lieu of the interest foregone since it has voluntarily waived the unpaid interest in the expectation of accelerated payment of the remaining principal.

---

[18]    In re LHD Realty Corp., 726 F.2d 327 (7th Cir. 1984).

Id. at 331.  Here, the First Priority Debt Representatives have never sought relief from the automatic stay, or attempted to foreclose.

In the other appellate case, under remarkably similar facts, a bankruptcy appellate panel in the Ninth Circuit allowed a bank to collect its prepayment premium even though it initiated foreclosure against a borrower who subsequently filed for Chapter 11 protection in an effort to keep the property.[19]  As in LHD Realty, the mortgage holder in Imperial Coronado moved for relief from stay in the bankruptcy court to continue with the foreclosure, but the borrower sold the property to a third party with court approval.  Id. at 998-99.  The borrower in Imperial Coronado made the same argument that the Debtors are making here, i.e., that because of acceleration, it "did not 'prepay' the note and it could not be held liable for a 'prepayment premium.'"  Id. at 1000.  The panel held that notwithstanding the bank's actions (commencement of the foreclosure process, acceleration and motion for relief from stay), the bank was still entitled to the prepayment premium because under the Bankruptcy Code the borrower could have reinstated the loan or de-accelerated.  Instead the borrower in Imperial Coronado chose to sell the property: "In our view, the decision to sell the property and pay off the loan was voluntary, and the prepayment premium is therefore enforceable."  Id.; see 11 U.S.C. § 1124(2) (providing mechanism by which a debtor reorganizing under the Bankruptcy Code can unwind a lender's acceleration of debt and in effect, reinstate loan).

LHD Realty and Imperial Coronado are united in their reasoning that parties through their actions may waive contractual rights to which they would otherwise be entitled.  In the LHD Realty case, it was the mortgage holder who waived the right to the prepayment premium by moving for relief from stay and proceeding to foreclose.  Although under similar

---

[19]     In re Imperial Coronado Partners, Ltd., 96 B.R. 997 (B.A.P. 9th Cir. 1989).

circumstances, the mortgage holder in Imperial Coronado took the same actions (albeit in the opposite order), it was the borrower who waived the right to contest the prepayment premium by electing to resist the foreclosure and sell the property to satisfy the debt instead. The actions of the respective parties determined the outcomes in those two cases, not the mere fact of acceleration.

Unlike the creditors in LHD Realty and Imperial Coronado, the First Priority Debt Representatives have never taken any action whatsoever to accelerate the First Priority Notes or the First Priority Term Loan Notes. To the contrary, it was the Debtors who filed voluntary petitions some seventeen months ago. It was the Debtors who waited over a year before filing their Prepayment Motion in the Bankruptcy Court. It was the Debtors who sought to prepay the CalGen Secured Debt. And it was the Debtors who entered into certain DIP financing commitments with prospective lenders that expired, not coincidentally, on March 31, 2007 – just before the prepayment prohibition expired. Under LHD Realty and Imperial Coronado, it is the Debtors who should be charged with the consequence of trying to defeat the Prepayment Premiums. The First Priority Debt Representatives have done nothing to waive their contractual rights.

Furthermore, neither LHD Realty nor Imperial Coronado addressed the situation presented here, where the filing of the petition automatically accelerated the loan, rather than some affirmative action by the parties. At least one bankruptcy court has already rejected the Debtors' argument and held that automatic acceleration does not defeat a prepayment premium:

> If automatic acceleration of a debt defeats a prepayment premium clause, such a clause could never be enforced in a bankruptcy case. A debtor, under such a rule, could always avoid the effect of a prepayment premium clause by filing a bankruptcy case. Neither the Bankruptcy Code nor case law compels so drastic a

result. No bankruptcy policy compels the invalidation of a
properly drawn prepayment premium clause in all cases.[20]

Another Bankruptcy Court, following <u>LHD Realty</u>, never needed to resolve the automatic

acceleration issue "[b]ecause the loan documents [t]here expressly provide[d] for a prepayment

premium even when debt is accelerated."[21]   The fact that other indentures or notes may be more

artfully drafted to provide for prepayment premiums that survive automatic acceleration does not

render an indenture or notes that are silent on the issue invalid.   Other than the Bankruptcy Court

in this case, no court has negated an otherwise valid prepayment premium based on the artifice

that an automatically accelerated loan is not being <u>prepaid</u> simply because it happens during the

course of a bankruptcy proceeding.   As <u>Skyler Ridge</u> cautioned, such a broad rule would allow

every prepayment premium to be defeated by the simple filing of a Chapter 11 petition for

bankruptcy.

The Debtors' actions in this case were voluntary and were not the result of events thrust

upon them by their lender.   By any definition of "optional" and "voluntary," the Debtors

affirmatively and voluntarily sought to prepay and avoid the Prepayment Premiums when they

filed the Prepayment Motion.   That action was clearly a voluntary initiation of the "Optional

Redemption" process under the First Priority Indenture and the First Priority Notes and

"Voluntary Prepayment" under the First Priority Term Loan Agreement and the First Priority

Term Loan Notes.   The refinancing and "premium avoidance" proceedings initiated by the

Debtors were undertaken to drive value to CalGen's equity holders at the expense of its secured

creditors.   The Prepayment Premiums should therefore be allowed as a secured claim under

section 506(b) in favor of the First Priority Debt Representatives.

---

[20]    <u>In re Skyler Ridge</u>, 80 B.R. 500, 507 (Bankr. C.D. Cal. 1987).

[21]    <u>In re AE Hotel Venture</u>, 321 B.R. 209, 213 (Bankr. N.D. Ill. 2005).

II.    **EVEN IF THE 2.5% WERE PROPERLY CHARACTERIZED AS DAMAGES INSTEAD OF CONTRACTUALLY PROVIDED PREMIUMS, THOSE DAMAGES CLAIMS ARE SECURED CLAIMS AGAINST EACH CALGEN GUARANTOR PURSUANT TO THE GUARANTEES, THE APPLICABLE SECURITY AGREEMENT AND OTHER LOAN DOCUMENTS**

The Bankruptcy Court erred when it focused solely on the contractual obligations of the CalGen Issuers, and completely ignored the thirty-nine separate CalGen Guarantors who are obligated to the First Priority Debt Representatives for principal, interest, the Prepayment Premiums, and default interest and even contract damages that are due pursuant to the guarantee obligations contained in the applicable loan documents.  The CalGen Guarantors' obligations for those amounts are secured obligations.

CalGen and CalGen Finance are issuers and signatories to the First Priority Indenture. (J.A. at 264).  CalGen is the borrower and signatory to the First Priority Term Loan Agreement (J.A. at 790).  The remaining CalGen entities are guarantors under each of those loan documents. The Bankruptcy Court ignored the guarantees contained in the agreements when it held that the damages arising from the prepayment should be paid as unsecured claims, even as against the CalGen Guarantors.

The guarantees contained in the First Priority Loan Documents clearly state that the CalGen Guarantors are liable for the full payment of the obligations of the Issuers, whether contractual or otherwise (e.g., contract damages), whether or not such obligations are enforceable against the Issuers or Borrowers.  The Notation of Guarantee to the First Priority Notes provides:

> For value received, each Guarantor . . . has, jointly and severally, unconditionally guaranteed, on a non-recourse basis to the extent set forth in the First Priority Indenture . . . (a) the due and prompt payment of the principal of, premium, if any, and interest and Special Interest, if any, on the Notes (as defined in the Indenture), whether at maturity, by acceleration, redemption or otherwise, the due and prompt payment of interest on overdue principal of and interest and Special Interest, if any, on the Notes, if any, if lawful and the due and punctual performance of all other obligations of the Company to the Holders or the Trustee all in accordance with the terms of the Indenture . . .

(J.A. at 148).  The First Priority Indenture further provides:

> (a)    Subject to this Article 11 and the limitations set forth in Section 13.07, each of the Guarantors hereby, jointly and severally, <u>unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee</u> and its successors and assigns, <u>irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Company hereunder</u> or thereunder, that:
>
>> (1)    the principal of, premium and Special Interest, if any, and interest on the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest and Special Interest, if any, on the Notes, if any, if lawful, and <u>all other obligations of the Company to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed</u>, all in accordance with the terms hereof and thereof; and …
>> (emphasis added)
>>
>> …
>
> [The] Guarantors hereby agree that their obligations hereunder are unconditional, <u>irrespective of the validity, regularity or enforceability of the Notes</u> or this Indenture . . .

First Priority Indenture § 11.01(a), (b) (J.A. at 255)(emphasis added).

> Finally, the First Priority Term Loan Agreement provides:
>
> . . . the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantee to the Administrative Agent, for the benefit of the Lenders making the First Priority Term Loans and their respective successors, endorsees, transferees and assigns, the prompt and complete payment and performance by the Borrower and each other Guarantor when due (whether at stated maturity, by acceleration or otherwise) for the First Priority Term Loan Obligations . . .

First Priority Term Loan Agreement, § 11.01 (J.A. at 768).

These separate and independent guarantee obligations, which include the obligation to pay any Prepayment Premiums and damages (another "obligation") are part of the CalGen Guarantors Secured Obligations and thus are clearly provided for under the "agreements." Accordingly, these guarantee obligations are payable as secured obligations under section 506(b).  For example, the Security Agreement at issue provides:

- 30 -

10485488

> Section 3.1    Security for Obligations. The Article 9 Collateral is collateral security for the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise . . . of the Secured Obligations.

Security Agreement, Article III (J.A. at 1050).[22]  The Debtors never contested the validity, enforceability, or applicability of these guarantee obligations.

Accordingly, the Bankruptcy Court erred when it failed to order that the Prepayment Premiums were a secured claim against each of the CalGen Guarantors and/or when it failed to rule that any damages claim awarded against the CalGen Issuers were secured obligations of the CalGen Guarantors.

## III.    THE BANKRUPTCY COURT DEPRIVED THE FIRST PRIORITY DEBT REPRESENTATIVES OF THEIR PROCEDURAL AND DUE PROCESS RIGHTS WHEN IT DETERMINED THE VALIDITY AND EXTENT OF THEIR CLAIMS OUTSIDE OF AN ADVERSARY PROCEEDING AND AUTHORIZED PREPAYMENT OUTSIDE OF A PLAN OF REORGANIZATION

The Bankruptcy Court ordered the Debtors to prepay the CalGen Secured Debt in direct contravention of the Prepayment Provisions and without payment of the Prepayment Premiums provided for under the First Priority Loan Documents.  That Court-ordered prepayment impaired the secured claims of the First Priority Debt Representatives outside the procedural protections of the Bankruptcy Code.[23]  The Bankruptcy Court allowed the Debtors to short-circuit the plan of reorganization process by restructuring CalGen's debt on a motion with limited notice, and should not be affirmed.  The First Priority Debt Representatives were deprived of a hearing on whether the prepayment was "fair and equitable."  While claimants can be deprived of their contractual rights in connection with the reorganization process, such deprivations may only be effected pursuant to, and after compliance with, the statutory processes established by Congress.

---

[22]    "Grantor" is defined as "the Company, [and] each Guarantor."  Security Agreement, Art. I (J.A. at 1045).

[23]    See, e.g., 11 U.S.C. § 1124 (protecting rights of impaired creditors whose claims are to be cashed out by, among other things, granting the right to vote on the plan and raise objections to confirmation).

The Debtors' prepayment and their failure to pay damages arising from that prepayment "impaired" the "claims" of the First Priority Debt Representatives, as that term is utilized in connection with the analysis that would be required if these Debtors were seeking to confirm a plan of reorganization. <u>See</u> 11 U.S.C. §§ 1121-1129.[24]  While Congress enacted the Bankruptcy Code in accordance with its authority under the Bankruptcy Clause of the Constitution, and the Bankruptcy Code allows creditors' rights to be impaired, that impairment may only take place in the manner provided for in the Bankruptcy Code and pursuant to a process that complies with the Due Process Clause of the United States Constitution.[25]  Congress crafted the Bankruptcy Code to provide "impaired" creditors the right to vote on any plan of reorganization.  Furthermore, in connection with a plan confirmation, impaired creditors have the opportunity to argue why any impairment is not "fair and equitable" in light of all of the circumstances of the Debtors' cases. <u>See</u> 11 U.S.C. §§ 1121-1129.

The procedural distinction between the processes associated with the claim objection process utilized here and the plan confirmation process is significant, especially in circumstances where debt representatives file claims on behalf of debt holders.  The Debtors, by utilizing the claims objection process in lieu of the plan process, violated the Bankruptcy Code and procedural due process rights of both the First Priority Debt Representatives and the actual holders (the lenders and the note holders) of the underlying debt (the "<u>First Priority Debtholders</u>").  Congress established arduous due process protections in connection with the

---

[24]  Section 1124 of the Bankruptcy Code was amended in 1994 to eliminate former subsection 3, with the result that even a creditor whose claims are to be cashed out under a plan is deemed to be impaired and has the right to vote on the plan and raise objections to confirmation.  <u>See</u> H.R. Rep. No. 103-835 at 47-48 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3356-57 (repealing section 1124(3), which specified that creditor receiving full payment of allowed claim was not impaired, stating that "[a]s a result of this change, if a plan proposed to pay a class of claims in cash in the full amount of the claims, the class would be impaired, entitling creditors to vote for or against the plan of reorganization").

[25]  U.S. CONST. amend. V.

plan confirmation process, which include the requirement to give notice to note holders and an opportunity to solicit objections, in order to protect the rights of claim holders.

It cannot be disputed that the real beneficiaries of, if not the actual claimants on, the claims are First Priority Debtholders.  As a matter of convenience, and pursuant to the terms of the First Priority Loan Documents, the First Priority Debt Representatives are permitted to undertake certain limited actions for and on behalf of the First Priority Debtholders, such as filing a proof of claim on behalf of the First Priority Debtholders.  First Priority Term Loan Agreement, §§ 7.03 and 7.06 (J.A. at 762); First Priority Indenture, § 6.09 (J.A. at 241); see also Stipulation And Order Relating To Certain Debt Claims (C.D. No. 91, the "Credit Agreement Claim Stip."); Title 14, Chapter 2A, Subchapter III of the United States Code (the "Trust Indenture Act").

While the First Priority Debt Representatives had the power to file claims on behalf of the First Priority Debtholders, the First Priority Debt Representatives were not authorized (a) to compromise any claims of the First Priority Debtholders or (b) to vote on any plan for and on behalf of the First Priority Debtholders.  See First Priority Loan, § 12.5 (J.A. at 1062); First Priority Indenture, § 6.09 (J.A. at 241).

Through the Prepayment Motion, the Debtors obtained a Court order authorizing prepayment and sustaining claims objections without serving the Motion on the beneficiaries of these claims in complete disregard of the clear contractual and statutory limits on the powers and obligations of the First Priority Debt Representatives.  See Certificate of Service (C.D. No. 105).

The "general rule is that a distribution on pre-petition debt in a Chapter 11 case should not take place except pursuant to a confirmed plan of reorganization, absent extraordinary

10485488

circumstances."[26]   As the Second Circuit has emphasized, the voting, disclosure and other rights afforded to creditors in the plan process are critical rights because "[r]equiring acceptance by a percentage of creditors and stockholders for confirmation forces negotiation among the debtor, its creditors and its stockholders."[27]

The plan process, as opposed to the motion process that the CalGen Debtors utilized, would have afforded the First Priority Debt Representatives and the holders of the underlying debt numerous substantive and procedural protections, including: (i) actual notice to each holder; (ii) the benefit of a disclosure statement in which the CalGen Debtors would be required to explain the degree of solvency; (iii) a hearing on why the proposed impairment is "fair and equitable" pursuant to section 1129 of the Bankruptcy Code; and (iv) the right to vote on the plan.  None of these procedural protections were observed in relation to the Prepayment Motion.

The Supreme Court has concluded that "an elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.[28]   In the bankruptcy context this means that a

---

[26]    In re Air Beds, Inc., 92 B.R. 419, 422 (B.A.P. 9th Cir. 1988) (citing In re Conroe Forge & Mfg. Corp., 82 B.R. 781, 784 (Bankr. W.D. Pa. 1988)).  The CalGen Debtors cited no such "extraordinary circumstances."

[27]    In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983) (citing legislative history of Bankruptcy Reform Act of 1978); see also In re Continental Air Lines, Inc., 780 F.2d 1223, 1226-28 (5th Cir. 1986) ("[A] debtor in Chapter 11 cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization. . . . If a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), [creditors'] rights under, for example 11 U.S.C. § 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless").

[28]    Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (citations omitted).

10485488

claim cannot be objected to or discharged without even an attempt at actual notice, especially where such notice is feasible.[29]

Here, in an attempt to engineer an argument that prepayment, on or prior to April 2, 2007, was contractually permitted without the payment of a prepayment premium, and in a rush to obtain an order on such issues entered by that date, the Debtors proceeded by motion instead of filing a plan for one or more of the CalGen Debtors.  In the process, the Debtors failed to provide notice to the First Priority Debtholders whose rights were affected, and whose identities could have been easily ascertained with minimal effort relative to the dollar amounts at stake.  The CalGen Debtors' procedural election was, quite simply, unconstitutional, and the Bankruptcy Court erred when it sanctioned that procedure.

In summary, the Debtors effected a complete reorganization of the CalGen Secured Debt outside a plan of reorganization, a feat not authorized by the Bankruptcy Code.  Bankruptcy Courts that have allowed Chapter 11 debtors to prepay despite an enforceable prepayment prohibition did so in the context of the plan confirmation process.[30]  Here, by contrast, the Bankruptcy Court allowed prepayment of a secured debt without regard to a prepayment prohibition outside the plan confirmation process.  Such permission was granted in error, and accordingly, the Prepayment Orders should be vacated and this matter remanded with instructions not to permit partial prepayment except in the context of a plan of reorganization.

---

[29]  Id.; see also, Reliable Electric Co. v. Olson Constr. Co., 726 F.2d 620 (10th Cir. 1984) (holding that a creditor's due process rights were violated where the creditor never received notice of the confirmation hearing and the creditor was therefore not heard on the plan of reorganization).

[30]  In re 360 Inns, Ltd., 76 B.R. 573 (Bankr. N.D. Tex. 1987); Continental Sec. Corp. v. Shenandoah Nursing Home P'ship, 193 B.R. 769 (W.D. Va. 1996), aff'd, 104 F.3d 359 (4th Cir. 1996).

IV.     **THE AMENDED CLAIMS ORDER IMPROPERLY EXPUNGED CLAIMS OF THE FIRST PRIORITY DEBT REPRESENTATIVES**

While the Amended Claims Order provides that the First Priority Debt Representatives may continue to assert claims for the difference between the interest calculated at the default rate and interest calculated at the non-default rate, it otherwise improperly purports to "expunge" the remainder of the First Priority Debt Representatives' claims.  Amended Claims Order, ¶ 6 (J.A. at 64).  In this way the Amended Claims Order is patently inconsistent with the Memorandum Decision and Order authored by the Bankruptcy Court and entered on March 5, 2007, and its entry, was a reversible error.

The proofs of claim filed by the First Priority Debt Representatives claimed amounts due from the CalGen Debtors, and that will become due, on the First Priority Loan Documents.  The amounts include guarantee obligations, fees and expenses that continue to accrue, and other amounts that the CalGen Debtors were contractually obligated to pay.  See, e.g.,  First Priority Trustee's Proof of Claim Filed against Columbia Energy LLC (C.D. No. 288); First Priority Term Loan Agreement, §12.02 (J.A. at 776) (providing for payment of all costs and expenses); § 12.03 (J.A. at 109) (providing for indemnification). Claims for amounts such as these, which are clearly and explicitly provided for in numerous places throughout the First Priority Loan Documents, are fully allowable as secured claims pursuant to section 506(b) of the Bankruptcy Code and should not have been expunged.   To the extent that the Amended Claims Order expunged claims provided for in the First Priority Loan Documents it should be reversed.

## CONCLUSION

For the foregoing reasons, the First Priority Debt Representatives respectfully request that this Court:

10485488

(I) either (a) vacate the three Prepayment Orders and remand this case with an order (i) awarding the First Priority Debt Representatives the 2.5% Prepayment Premiums, and applicable interest and amounts due as secured claims in connection with the repayment of the First Priority Notes and First Priority Term Loan Notes; (ii) ordering a prompt hearing on the issue of default interest; and, (iii) reinstating all claims asserted in the First Priority Debt Representatives' proofs of claim; or (b) in the alternative, vacate and remand the three Prepayment Orders with instructions not to permit prepayment outside a plan of reorganization that provides for payment in full of all amounts sought in the First Priority Debt Representatives' proofs of claim; and,

(II) grant the First Priority Debt Representatives such other and further relief as this Court deems proper and just.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

10485488

Dated: June 1, 2007          **WILMINGTON TRUST FSB as Indenture Trustee
                              and
                              WILMINGTON TRUST COMPANY,
                              as Administrative Agent**

                             By its attorneys

                             */s/ Christopher M. Desiderio*
                             Amanda D. Darwin, Esq. (AD 2719)
                             Richard C. Pedone, Esq. (Admitted Pro Hac Vice)
                             Dennis A. Murphy, Esq. (Admitted Pro Hac Vice)
                             Nixon Peabody LLP
                             100 Summer Street
                             Boston, MA 02110
                             Telephone: (617) 345-1305
                             Facsimile: (617) 345-1300
                             Email: rpedone@nixonpeabody.com


                             and

                             Christopher M. Desiderio, Esq. (CD 6929)
                             Nixon Peabody LLP
                             437 Madison Avenue
                             New York, NY 10022
                             Tel. (212) 940-3000
                             Fax: (212) 940-3111
                             Email: cdesiderio@nixonpeabody.com

10485488