**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Calpine Corporation, et al.,<br><br>       Debtors. | Chapter 11<br><br>Case No.  05-60200 (BRL)<br>(Jointly Administered) |
| HSBC Bank USA, National Association, as Indenture Trustee, The Bank of New York, as Administrative Agent, Wilmington Trust FSB, as Indenture Trustee, Wilmington Trust Company, as Administrative Agent, Wilmington Trust Company, as Collateral Agent, and Manufacturers & Traders Trust Company, as Indenture Trustee,<br><br>       Appellants,<br><br>   - against -<br><br>Calpine Corporation, The Official Committee of Unsecured Creditors of Calpine Corporation, and the Official Committee of Equity Security Holders,<br><br>       Appellees. | Case No. 1:07-cv-03088 (GBD) |
| Calpine Corporation, The Official Committee of Unsecured Creditors of Calpine Corporation, and the Official Committee of Equity Security Holders,<br><br>       Appellants,<br><br>   - against -<br><br>HSBC Bank USA, National Association, as Indenture Trustee, The Bank of New York, as Administrative Agent, Wilmington Trust FSB, as Indenture Trustee, Wilmington Trust Company, as Administrative Agent, Wilmington Trust Company, as Collateral Agent, and Manufacturers & Traders Trust Company, as Indenture Trustee,<br><br>       Appellees. | |

**<u>OPENING BRIEF OF DEBTORS-APPELLANTS</u>**

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4800
Richard M. Cieri (RC 6062)
Edward O. Sassower (ES 5823)

KIRKLAND & ELLIS LLP
655 15th St., NW
Washington, D.C.  20005-5793
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)

*Counsel for the Debtors-Appellants*

KIRKLAND & ELLIS LLP
Aon Building
200 East Randolph Drive
Chicago, IL  60601-6636
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200
Marc Kieselstein (admitted *pro hac vice*)

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................ 1

JURISDICTION ............................................................................................................... 2

STATEMENT OF ISSUE ON APPEAL ........................................................................ 2

STANDARD OF REVIEW .............................................................................................. 2

STATEMENT OF THE CASE ......................................................................................... 2

STATEMENT OF RELEVANT FACTS ......................................................................... 3

       A.     The Debtors' Chapter 11 Cases ............................................................. 3

       B.     The Debtors' Refinancing Motion ......................................................... 3

              1.    The Existing DIP Facility ......................................................... 4

              2.    The CalGen Debt ...................................................................... 4

              3.    The Structure and Benefits of the Replacement DIP Facility ...................... 5

              4.    The Debtors' Requests to Allow Their Limited Objection to the CalGen Lenders' Claims and to Determine the Value of the CalGen Lenders' Claims ................................................................ 5

       C.     The Bankruptcy Court's Rulings ........................................................... 7

              1.    Memorandum Decision .............................................................. 7

                    a.    The CalGen Debt No-Call Provisions Are Unenforceable ...................................................... 8

                    b.    The Debtors' Proposed Repayment Does Not Entitle the CalGen Lenders to a Secured Claim for Damages .................... 8

                    c.    Damages ...................................................................... 9

               2.    Implementing Orders ................................................................ 10

       D.     Postscript ............................................................................................... 11

ARGUMENT .................................................................................................................... 11

I.     The Debtors' Noncompliance With The CalGen Debt No-Call Provisions Cannot Give Rise To An Unsecured Claim For Breach Of Contract Damages. ................ 13

II.    The Memorandum Decision's Damages Award For "Dashed Expectations"
       Rewrote The Debt Indentures To Provide A Remedy Not Bargained For By
       The Parties Or Authorized By The Bankruptcy Code. ....................................................15

       A.    The CalGen Lenders Could Have Bargained For (But Did Not) A
             Premium Upon Repayment Of Accelerated Debt Prior To April 1,
             2007..............................................................................................................15

       B.    The Memorandum Decision Impermissibly Remedied The CalGen
             Lenders' Drafting Omission. ................................................................................17

       C.    "Dashed Expectations" Is Not A Legally Cognizable Damages
             Measure.........................................................................................................20

       D.    The Memorandum Decision's Damages Award Ignores Multiple
             Contexts Where Creditors' "Dashed Expectations" Are Not Fully
             Compensable.................................................................................................22

CONCLUSION...............................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

Abel v. Shugrue (In re Ionosphere Clubs, Inc.),
    184 B.R. 648 (S.D.N.Y. 1995).......................................................................2

Alex Sheshunoff Mgmt. Services, L.P. v. Johnson,
    209 S.W.3d 644 (Tex. 2006).......................................................................14

Anchor Resolution Corp. v. State Street Bank and Trust Co. of Connecticut
    (In re Anchor Resolution Corp.),
    221 B.R. 330 (Bankr. D. Del. 1998) .............................................................9

Argonaut Ins. Co. v. Ames Dept. Stores, Inc.
    (In re Ames Dept. Stores, Inc.), No. 93 Civ. 4014, 1995 WL 311764,
    (S.D.N.Y. May 18, 1995)...........................................................................18

Bankruptcy Receivables Mgmt. v. Lopez (In re Lopez),
    345 F.3d 701 (9th Cir. 2003) .....................................................................13

Continental Secs. Corp. v. Shenandoah Nursing Home P'ship,
    193 B.R. 769 (W.D. Va.1996) ...............................................................passim

Financial Ctr. Assocs. of East Meadow, L.P. v. The Funding Corp.,
    140 B.R. 829 (Bankr. E.D.N.Y. 1992).........................................................16

Gulf States Exploration Co. v. Manville Prods. Corp.
    (In re Manville Prods. Corp.),
    896 F.2d 1384 (2d Cir. 1990).......................................................................2

Harsco Corp. v. Segui,
    91 F.3d 337 (2d Cir.1996)....................................................................11, 19

In re 360 Inns, Ltd.,
    76 B.R. 573 (Bankr. N.D. Tex. 1987)......................................................passim

In re Adelphia Commc'ns Corp.,
    342 B.R. 142 (Bankr. S.D.N.Y. 2006)...............................................20, 21, 22

In re AE Hotel Venture,
    321 B.R. 209 (Bankr. N.D. Ill. 2005) .........................................................16

In re Jamesway Corp.,
    201 B.R. 73 (Bankr. S.D.N.Y. 1996).........................................................13

In re Lavigne,
    114 F.3d 379 (2d Cir. 1997).......................................................................23

In re LHD Realty Corp.,
        726 F.2d 327 (7th Cir. 1984) .............................................................8, 9, 13

In re Manville Forest Products Corp.,
        43 B.R. 293 (Bankr. S.D.N.Y. 1984),
        aff'd in part, rev'd in part on other grounds,
        60 B.R. 403 (S.D.N.Y. 1986).........................................................................9

In re R.H. Macy & Co.,
        170 B.R. 69 (Bankr. S.D.N.Y. 1994)..........................................................13

In re Ridgewood Apts. of DeKalb County, Ltd.,
        174 B.R. 712 (Bankr. S.D. Ohio 1994).....................................................8, 9

In re Skyler Ridge,
        80 B.R. 500 (Bankr. C.D. Cal. 1987)..............................................8, 13, 19

In re Vest Assocs.,
        217 B.R. 696 (Bankr. S.D.N.Y. 1998)...................................................13, 19

In re WorldCom, Inc.,
        357 B.R. 223 (S.D.N.Y. 2006)....................................................................14

Kaiser-Frazer Corp. v. Otis & Co.,
        195 F.2d 838 (2d Cir. 1952)........................................................................14

Montgomery Ward & Co. v. Meridian Leasing Corp.
        (In re Montgomery Ward Holding Corp.),
        269 B.R. 1 (D. Del. 2001) ...........................................................................14

New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.
        (In re Dairy Mart Convenience Stores, Inc.),
        351 F.3d 86 (2d Cir. 2003)..........................................................................18

Noonan v. Fremont Financial
        (In re Lappin Electric Co.),
        245 B.R. 326 (Bankr. E.D. Wis. 2000) ..................................................11, 19

Nostas Assocs. v. Costich
        (In re Klein Sleep Prods., Inc.),
        78 F.3d 18 (2d Cir. 1996) ...........................................................................23

Reomar, Inc. v. LTV Corp.
        (In re Chateaugay Corp.),
        No. 92-CIV. 7054, 1993 WL 159969 (S.D.N.Y. May 10, 1993) ...............22

Supplee v. Bethlehem Steel Corp.
        (In re Bethlehem Steel Corp.),
        No. 04-CV-2413GBD, 2006 WL 510335 (S.D.N.Y. Mar. 2, 2006)............2

Travel Masters, Inc. v. Star Tours, Inc.,
        827 S.W.2d 830 (Tex. 1991)........................................................................14

United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n
    (In re UAL Corp.),
    346 B.R. 456 (Bankr. N.D. Ill. 2006) ............................................................... 23

United States v. Sutton,
    786 F.2d 1305 (5th Cir. 1986) ....................................................................... 18

United States v. Winstar,
    518 U.S. 839 (1996) .............................................................................. 11, 19

Wastemasters, Inc. v. Diversified Investors Servs. of N. America, Inc.,
    159 F.3d 76 (2d Cir. 1998) ....................................................................... 18, 19

**Statutes**

11 U.S.C. § 105 ...................................................................................... 10, 18, 19

11 U.S.C. § 361 ................................................................................................ 10

11 U.S.C. § 362 ................................................................................................ 10

11 U.S.C. § 364 ................................................................................................ 10

11 U.S.C. § 365 ................................................................................................ 13

11 U.S.C. § 506 ............................................................................................. 9, 21

28 U.S.C. § 158 ................................................................................................. 2

Tex. Bus. & Comm. Code § 15.51 ........................................................................ 14

**Other Authorities**

2 Collier on Bankruptcy ¶ 105.01[1] .................................................................... 18

George Lefcoe, Yield Maintenance and Defeasance: Two Distinct Paths to
    Commercial Mortgage Prepayment,
    28 Real Est. L.J. 202 (Winter 2000) ............................................................... 8

Restatement of Contracts, § 580 ......................................................................... 14

Restatement of Contracts, § 598 ......................................................................... 14

## INTRODUCTION

The ongoing Chapter 11 cases of Calpine Corporation and its more than 270 subsidiaries (the "Debtors") are among the largest and most complex ever filed. In early 2007, the Debtors asked the Bankruptcy Court (The Honorable Burton R. Lifland) for authority to enter into a $5.0 billion replacement debtor-in-possession financing facility (that also was, incidentally, the largest transaction ever of its kind)—and to use those funds to refinance the Debtors' existing $2.0 billion debtor-in-possession financing facility and to repay approximately $2.5 billion of high-interest prepetition debt at one of the Debtors' power plant projects, Calpine Generating Company, LLC ("CalGen").

The holders of the CalGen debt (the "CalGen Lenders") objected to the Debtors' proposed refinancing on the grounds that contractual "no-call" provisions prohibited repayment until specified later dates—or, if repayment was allowed, the Lenders were entitled to a "makewhole" premium (*i.e.*, damages) for their lost future interest payments. The Bankruptcy Court approved the Debtors' proposed refinancing, including the repayment of the CalGen debt. In so ruling, the Court also specifically held that the CalGen debt's no-call provisions were unenforceable and that repayment of the CalGen debt in the instant circumstances did not give rise to a secured claim for damages.

All of these rulings were entirely correct. But in a complete departure from those rulings, the Court also then awarded the CalGen Lenders an unsecured claim for breach of contract damages for the Lenders' "dashed expectations" of future interest income. This ruling, the Debtors contend, was legal error, and the Bankruptcy Court's damages award is the sole issue appealed by the Debtors. As explained herein, the Debtors' noncompliance with the (unenforceable) no-call provisions cannot serve as the basis for a breach of contract claim. In addition, by awarding damages for "dashed expectations," the Bankruptcy Court rewrote the CalGen debt indentures to provide a remedy not bargained for by the parties or

authorized by the Bankruptcy Code.  Accordingly, the Debtors respectfully request that this Court reverse the Bankruptcy Court's damages award and disallow the CalGen Lenders' makewhole premium claims in their entirety.

## JURISDICTION

Pursuant to 28 U.S.C. § 158(a)(1), the District Court for the Southern District of New York has jurisdiction to hear appeals from final judgments, orders, and decrees of Bankruptcy Courts of the United States.

## STATEMENT OF ISSUE ON APPEAL

Did the Bankruptcy Court err in ruling that the Debtors' repayment of the CalGen debt, prior to the debt's maturity date, entitled the CalGen Lenders to an unsecured claim for breach of contract damages, where the Bankruptcy Court also held that (1) the contractual provision allegedly "breached" by the Debtors was unenforceable, and (2) the parties' governing agreement did not otherwise provide for damages for the repayment of accelerated debt prior to April 1, 2007?

## STANDARD OF REVIEW

"A district court reviews a bankruptcy court's conclusions of law <u>de novo</u>.  Findings of fact are reviewed under the clearly erroneous standard and, therefore, may not be disturbed unless clearly erroneous."  <u>Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)</u>, No. 04-CV-2413GBD, 2006 WL 510335, at *1 (S.D.N.Y. Mar. 2, 2006) (citing Fed. R. Bankr. P. 8013; <u>Gulf States Exploration Co. v. Manville Prods. Corp. (In re Manville Prods. Corp.)</u>, 896 F.2d 1384, 1388 (2d Cir. 1990); <u>Abel v. Shugrue (In re Ionosphere Clubs, Inc.)</u>, 184 B.R. 648 (S.D.N.Y. 1995)) [attached at DA Tab G].

## STATEMENT OF THE CASE

The Bankruptcy Court correctly approved the Debtors' refinancing motion—thus authorizing the Debtors to repay the CalGen debt prior to its maturity date—but erred in awarding breach of contract damages to the CalGen Lenders as a result of the Debtors'

2

repayment.  Judge Lifland appropriately held that (1) the CalGen debt "no-call" provisions (that purport to prohibit repayment until specified later dates) were not enforceable against Chapter 11 debtors, and (2) the express terms of the parties' contracts did not require the Debtors to pay the Lenders a "makewhole" premium (to compensate for lost future interest payments).  More specifically, the acceleration clauses in the governing agreements provided that the Debtors' Chapter 11 filing rendered the debt due and payable immediately—but did not require a premium upon the repayment of accelerated debt.  Furthermore, none of the indentures required a premium if debt was repaid prior to April 1, 2007.

Accordingly, because it is black-letter law that noncompliance with an unenforceable contractual provision cannot give rise to breach of contract damages, and because it is legal error for a court to rewrite a contract to provide a remedy not bargained for by the parties or authorized by the Bankruptcy Code, it follows that the Debtors' repayment of the CalGen debt did not entitle the CalGen Lenders to an allowable claim for damages.

<u>**STATEMENT OF RELEVANT FACTS**</u>

**A.      The Debtors' Chapter 11 Cases**

Calpine Corporation and its subsidiaries own and operate one of the largest fleets of power plants in North America.[1]  DA Tab A at 2.  The Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on December 20, 2005.  <u>Id.</u>  Their reorganization cases involve more than 270 Debtors and approximately $18 billion of outstanding debt (as of the petition date).  <u>Id.</u>

**B.      The Debtors' Refinancing Motion**

Since the petition date, a critical focus of the Debtors' restructuring efforts has been to improve cash flow.  DA Tab E at 2.  One particularly effective method for doing so is to

---

[1]     Citations to the record materials included in the Opening Brief Appendix of Debtors-Appellants, *i.e.*, the "Debtors' Appendix," will be set forth as "DA Tab ___ at ___."

utilize favorable credit market conditions to replace high interest-rate debt with lower interest-rate debt. Id. To that end, on January 26, 2007, the Debtors filed a motion seeking approval for a $5.0 billion replacement debtor-in-possession financing facility (the "Refinancing Motion" and the "Replacement DIP Facility"). Id. As explained further below, the Debtors sought to use the Replacement DIP Facility funds primarily for two purposes: to refinance the Debtors' existing $2.0 billion debtor-in-possession financing (the "Existing DIP Facility") and to repay approximately $2.5 billion of secured prepetition debt at one of the Debtors' largest operating subsidiaries, Calpine Generating Company (the "CalGen Debt"). Id. In both instances, the Debtors' proposed refinancing (the "Proposed Refinancing") would replace higher interest-rate debt with lower interest-rate debt and capture substantial interest-rate savings of approximately $100 million annually, or $8 million per month. Id.

### 1.    The Existing DIP Facility

Immediately upon commencing their reorganization cases, the Debtors obtained secured postpetition financing up to the aggregate principal amount of $2.0 billion, at a weighted average interest rate of approximately 8.66%. Id. at 6-7. The Existing DIP Facility was set to expire at the latest of December 20, 2007, or the effective date of a confirmed plan of reorganization. Id. at 7.

### 2.    The CalGen Debt

CalGen indirectly owns 14 natural gas-fired power plants that are capable of producing more than one-third of Calpine's aggregate estimated peak electricity capacity. Id. at 4. On March 23, 2004, CalGen issued $2.605 billion of secured debt through a series of first, second, and third-lien financings (respectively, the "First Lien Notes," "Second Lien Notes," and "Third Lien Notes"). Id. at 4-5. As of the Debtors' petition date, $2.516 billion of CalGen Debt was outstanding, with a weighted average interest rate of 11.25%. Id. at 5.

4

###### 3.     The Structure and Benefits of the Replacement DIP Facility

Throughout late 2006 and early 2007, with capital markets experiencing new issuance volumes for leveraged loans at record highs and default rates at record lows—resulting in the lowest interest rates in almost a decade—the Debtors' financial advisor negotiated the terms of a potential refinancing with multiple institutional lenders.  Id. at 10-12, 17.  After weeks of due diligence, the Debtors selected joint lead arrangers based, in large part, on the attractiveness of the terms they proposed.  Id. at 11-12.

Described summarily, the Replacement DIP Facility was structured as a $5.0 billion secured first-priority facility with an interest rate of 7.61%—and using 7.61% Replacement DIP Facility funds to refinance the 8.66% Existing DIP Facility and to repay the 11.25% CalGen Debt would allow the Debtors to realize approximately $100 million in annual savings.  Id. at 12-15.  In addition, the Replacement DIP Facility featured a "rollover" option that allows (but does not obligate) the Debtors to convert the Replacement DIP Facility into an "exit financing" that may fund the Debtors' emergence from Chapter 11.  Id. at 16-17.  By minimizing the need to arrange for additional exit financing and by extending the Debtors' postpetition financing beyond the end of 2007 (when the Existing DIP Facility would expire), the Proposed Refinancing would provide the Debtors increased flexibility as they begin to formulate a plan of reorganization.  Id.

###### 4.     The Debtors' Requests to Allow Their Limited Objection to the CalGen Lenders' Claims and to Determine the Value of the CalGen Lenders' Claims

To be able to use Replacement DIP Facility funds to repay the CalGen Debt—again, one of the two primary purposes of the Proposed Refinancing—the Debtors' Refinancing Motion also asked the Bankruptcy Court to allow the Debtors' limited objection to the proofs of claim filed by the CalGen Lenders and thereby determine the value of the CalGen Lenders' claims.  Id. at 26-42.

As a threshold matter, the Debtors anticipated the CalGen Lenders would oppose the Proposed Refinancing on the ground that no-call provisions in the Debt indentures prohibited the Debtors from repaying the CalGen Debt before specified "lockout" periods had concluded.  Id. at 31-34.  To that end, the relevant indentures stated the First Lien Notes could not be repaid prior to April 1, 2007, the Second Lien Notes could not be prepaid prior to April 1, 2008, and the Third Lien Notes could not be repaid prior to maturity (in 2011).  Id. at 31-32.  The Debtors argued that any opposition by the CalGen Lenders on this ground could not be sustained, however, as an extensive body of caselaw holds no-call provisions are unenforceable against Chapter 11 debtors.  Id. at 34.

Furthermore, the Debtors also anticipated the CalGen Lenders would claim the Proposed Refinancing obligates the Debtors to pay a makewhole premium as compensation for discontinued future interest payments.  Id. at 35-39.  More specifically, the First Lien Notes provided for a premium equal to 102.5% of the amount of principal repaid if the Debt was "optionally redeemed" or "voluntarily prepaid" "on or after April 1, 2007."  Id. at 36, Ex. G.  The Second Lien Notes similarly provided for a 103.5% premium if repayment occurred "on or after April 1, 2008."  Id. at 36-37; Ex. G.  Lastly, the Third Lien Notes absolutely barred repayment prior to maturity (in 2011), and thus did not have any provision for a makewhole premium.  Id. at 36; Ex. G.  For many reasons, including the desire to lock in extremely favorable terms that would not be available indefinitely, the Debtors intended to complete the Proposed Refinancing prior to April 1, 2007.  Id. at 4, 17-18.

Moreover, the First, Second, and Third Lien Notes' indentures all contained "acceleration" clauses that uniformly provided the Debtors' Chapter 11 filing constituted an "event of default," and thus "all outstanding Notes" became "due and payable immediately without further action or notice"—yet none of these provisions also required payment of a

makewhole premium upon acceleration (a commonplace protection among modern indentures of this size and type).  Id. at 37-39; Ex. G.

Accordingly, any demand by the CalGen Lenders for a makewhole premium as a result of the Proposed Repayment should be denied, the Debtors argued, because the clear terms of the governing indentures plainly did not require a makewhole premium in these circumstances:  where repayment would occur before any makewhole period would begin (April 1, 2007, at the earliest) and the accelerated Debt (but not a makewhole obligation) is due and payable immediately.  Id.

In sum, the Debtors requested that the Bankruptcy Court disallow the CalGen Lenders' claims to the extent they sought amounts in excess of outstanding principal, plus unpaid interest at the non-default contract rate, through the date of proposed repayments.  Id. at 35-42.

C.    **The Bankruptcy Court's Rulings**

As expected, the CalGen Lenders objected to the Proposed Refinancing.  DA Tab A at 5-6.  Following a full-day hearing on February 27, 2007, the Bankruptcy Court issued the following series of rulings authorizing the Debtors to effect the Proposed Refinancing.

1.    **Memorandum Decision**

On March 5, 2007, the Bankruptcy Court released a Memorandum Decision and Order granting, in part, the Debtors' Refinancing Motion (the "Memorandum Decision").[2] While noting at the outset that "[n]o party seriously disputes that the proposed multi-billion dollar refinancing will provide massive benefits and advantages to the Debtors' chapter 11

---

[2]    Memorandum Decision and Order Granting, In Part, Debtors' Motion For an Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims [attached at DA Tab A].

estates and the majority of the creditors," <u>id.</u> at 2 n.1, Judge Lifland identified the primary

contested issue before the Bankruptcy Court was "whether a trust indenture drafting omission

relieves the debtors of the obligation to pay 'prepayment premiums' or similar 'make-whole'

damages upon repayment in full of principal and accrued interest short of the original

maturity dates." <u>Id.</u> at 1. The Court addressed these issues as follows.

a.    <u>The CalGen Debt No-Call Provisions Are Unenforceable</u>

The Bankruptcy Court first held that "[g]enerally, no-call provisions that purport to

prohibit optional repayment of debt are unenforceable in chapter 11 cases."[3]  This is because

"[t]he 'essence of bankruptcy reorganization is to restructure debt . . . and adjust debtor-

creditor relationships[,]'"[4] and "[i]t would violate the purpose behind the Bankruptcy Code to

deny a debtor the ability to reorganize because a creditor has contractually forbidden it."[5]

b.    <u>The Debtors' Proposed Repayment Does Not Entitle the
CalGen Lenders to a Secured Claim for Damages</u>

Next, Judge Lifland cited two reasons for holding that the Proposed Repayment did

not give rise to a secured damages claim by the CalGen Lenders.  As an initial matter, "none

of the agreements governing the CalGen Secured Debt require a prepayment premium for

repayment prior to April 1, 2007.  Thus, pursuant to the terms of the agreements, so long as

---

[3]    <u>Id.</u> at 6-7 (citing <u>Continental Secs. Corp. v. Shenandoah Nursing Home P'ship</u>, 193 B.R. 769, 774 (W.D. Va.1996) (affirming Bankruptcy Court's holding that "while there is a prepayment prohibition, [it] is not enforceable in this [Chapter 11] context"); <u>In re Skyler Ridge</u>, 80 B.R. 500, 502 (Bankr. C.D. Cal. 1987); <u>In re 360 Inns, Ltd.</u>, 76 B.R. 573, 575-76 (Bankr. N.D. Tex. 1987) (authorizing repayment of a note despite ten-year prohibition on repayment); <u>see In re LHD Realty Corp.</u>, 726 F.2d 327, 329 (7th Cir. 1984); <u>cf.</u>, George Lefcoe, <u>Yield Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Prepayment</u>, 28 Real Est. L.J. 202 (Winter 2000) (courts universally enforce absolute prohibitions against prepayment, "except in bankruptcy")).

[4]    <u>Id.</u> at 7 (quoting <u>In re Ridgewood Apts. of DeKalb County, Ltd.</u>, 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994)).

[5]    <u>Id.</u> (citing <u>Shenandoah.</u>, 188 B.R. at 213).

the refinancing is completed prior to April 1, 2007, no prepayment premium is due."[6]  The alternate rationale for the Court's holding was:  "[i]n addition, each of the CalGen Secured Debt agreements provides that a bankruptcy filing by CalGen is an event of default resulting in an automatic acceleration of debt," and "[a]s such, the CalGen Secured Debt has been accelerated by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately.'"[7]  Ultimately, the Court concluded, "*[n]one of the six tranches of CalGen Secured Debt include any form of liquidated damage provision for payment prior to April 1, 2007*"[,] and "[a]bsent a provision in the underlying agreement authorizing the payment of fees, costs or charges, the secured party is prohibited from incorporating such amounts into its allowed secured claim."[8]

### c.   Damages

Notwithstanding the Memorandum Decision's earlier holdings that the CalGen Debt indentures' no-call provisions were unenforceable, and that the indentures' terms do not expressly require a prepayment premium for either (i) repayment prior to April 1, 2007 or (ii) repayment of Debt that has been accelerated due to the Debtors' chapter 11 filing (and thus is due and payable immediately), the Bankruptcy Court nevertheless also found that, as a

---

[6]   Id. at 7-8 (citing Shenandoah, 193 B.R. at 774).

[7]   Id. at 8 (citing In re LHD Realty Corp., 726 F.2d at 330-31 ("acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity."); In re Ridgewood Apts. of DeKalb County, Ltd., 174 B.R. at 720 ("Even without specific contractual language, a bankruptcy filing acts as an acceleration of all a debtor's obligations."); In re Manville Forest Products Corp., 43 B.R. 293, 297 (Bankr. S.D.N.Y. 1984), aff'd in part, rev'd in part on other grounds, 60 B.R. 403 (S.D.N.Y. 1986)(debt is automatically accelerated upon filing bankruptcy); cf., Anchor Resolution Corp. v. State Street Bank and Trust Co. of Connecticut (In re Anchor Resolution Corp.), 221 B.R. 330, 333 (Bankr. D. Del. 1998) (agreement included an express provision that entitled the holders of the notes to a make-whole amount in the event of a prepayment of principal or an event of default; one such specified event of default was the commencement of a voluntary bankruptcy case)).

[8]   Id. at 9 (citing, inter alia, 11 U.S.C. § 506(b)) (emphasis in original).

result of the Debtors' repayment, the CalGen Lenders "still have an unsecured claim for damages for the Debtors' breach of the agreements."[9]   The Memorandum Decision's only indication as to how repayment would "breach" the parties' contract was that the "[t]he CalGen Secured Lenders' expectation of an uninterrupted payment stream has been dashed giving rise to damages . . . ."[10]

The Memorandum Decision then awarded damages as follows:

> I find that the 2.5% prepayment premium of the First Lien Notes and the 3.5% prepayment premium provided in the Second Lien Notes are reasonable proxies for measures of damages to be awarded to those creditors. While the Third Lien Notes do not provide for a premium, based on the calculations submitted by all of the experts I find that a 3.5% premium is also a reasonable proxy of damages to be awarded in respect of the Third Lien Note agreements.[11]

### 2.    Implementing Orders

Subsequent to issuing the Memorandum Decision, the Bankruptcy Court also entered three orders that authorized the Debtors to implement the Proposed Refinancing by entering into the Replacement DIP Facility and using those funds to refinance the Existing DIP Facility and to repay the CalGen Debt.[12]

---

[9]   Id. at 10.

[10]   Id.

[11]   Id. at 11 (citations omitted).   The Memorandum Decision thus provided the CalGen Lenders, in the aggregate, with a general unsecured claim for approximately $76 million.

[12]   See Order Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e) , entered on March 12, 2007 [attached at DA Tab B]; Order (I) Granting Debtors' Limited Objection to Claim Numbers 2664, 3275, 3393 Through 3421 (Inclusive), 3546 through 3554 (inclusive), 3586 through 3588 (inclusive), 3731, 4073, 5653 through 5730 (inclusive), 5791, and 5792; (II) Determining the Value of the CalGen Secured Debt Pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedure, and (III) Authorizing Repayment of CalGen Secured Debt, entered on March 12, 2007 [attached at DA Tab C]; and Amended Order (I) Granting Debtors' Limited Objection to Claim Numbers 2664, 3275, 3393 Through 3421 (Inclusive), 3546 through 3554 (inclusive), 3586 through 3588 (inclusive), 3731, 4073, 5653 through 5730 (inclusive), 5791, and 5792; (II) Determining the Value
(Continued…)

10

**D.    Postscript**

On March 29, 2007, the Replacement DIP Facility closed and the Debtors repaid the CalGen Lenders the full amounts of outstanding principal and interest on the First, Second, and Third Lien Notes.  All parties in interest have appealed to this Court the Memorandum Decision's damages award.

<u>ARGUMENT</u>

The Memorandum Decision's finding that the Debtors' repayment of the CalGen Debt constituted a "breach" of the parties' agreements, thus entitling the CalGen Lenders to an unsecured damages claim, cannot be sustained.  As a threshold issue, the Memorandum Decision did not justify its ruling; indeed, the Decision's only explanation on this point was limited to the following brief passage:

> The Debtors and Creditors' Committee assert that in the absence of any form of liquidated damage in the indentures for the period in question (pre-April 1, 2007), the CalGen Secured Lenders' quest for damages is based on an "<u>amorphous</u>" breach of contract theory which leaves them without <u>any remedy</u> especially since they will be paid the full amount of their loans plus accrued interest:  "the benefit of their bargain."  This preclusive argument for a total foreclosure of any damage recovery is incorrect. The CalGen Secured Lenders' expectation of an uninterrupted payment stream has been dashed giving rise to damages, albeit not measurable as the Lenders would wish.  <u>See</u> <u>Harsco Corp. v. Segui</u>, 91 F.3d 337, 348 (2d Cir. 1996).  Accordingly, while the agreements do not provide a premium or liquidated damages for repayment during the period the Debtors propose, the CalGen Secured Lenders still have an unsecured claim for damages for the Debtors' breach of the agreements.  <u>See</u> <u>United States v. Winstar</u>, 518 U.S. 839, 885 (1996) ("damages are always the default remedy for breach of contract"); <u>360 Inns Ltd.</u>, 76 B.R. at 576; <u>see also</u> <u>Noonan v. Fremont Financial, (In re Lappin Electric Co.)</u>, 245 B.R. 326, 330 (Bankr. E.D. Wis. 2000) ("this court is in agreement with a majority of courts that view a prepayment charge as liquidated damages, not as unmatured . . . interest that would be disallowed under section 502(b)(2)").

DA Tab A at 10 (emphases in original).

---

of the CalGen Secured Debt Pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedure, and (III) Authorizing Repayment of CalGen Secured Debt, entered on March 26, 2007 [attached at DA Tab D].

Put simply, the Memorandum Decision did not identify any predicate "breach" by the Debtors that gives rise to breach of contract damages. To the extent the Memorandum Decision awarded damages because repayment occurred during the pre-April 1, 2007 "lockout" period, the Bankruptcy Court held—only a few pages earlier in the Decision—that no-call clauses are not enforceable against Chapter 11 debtors. As set forth below, it is axiomatic that parties cannot "breach" unenforceable contract provisions and, therefore, noncompliance with an unenforceable contractual provision cannot serve as the basis for an unsecured claim for breach of contract damages.

Alternatively, to the extent the Memorandum Decision awarded damages because the Debtors' repayment "dashed" the CalGen Lenders' "expectation of an uninterrupted payment stream," the Debt agreements explicitly set forth the parties' bargained-for remedies in the event of repayment prior to maturity—and the Bankruptcy Court held that these stated remedies are unenforceable in these circumstances. The CalGen Lenders could have bargained for damages in the event the Debtors repaid accelerated Debt prior to April 1, 2007. But they did not do so. Again, Judge Lifland ruled that "[n]one of the six tranches of CalGen Secured Debt include any form of liquidated damage provision for payment prior to April 1, 2007[,]" and that "the CalGen Secured Debt has been accelerated by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately[.]'" Id. at 8, 9. Insofar as the Bankruptcy Court held that "[a]bsent a provision in the underlying agreement authorizing the payment of fees, costs or charges, the secured party is prohibited from incorporating such amounts into its allowed secured claim," id. at 9, the Memorandum Decision did not articulate any justifiable basis (and none exists) for then proceeding to award an allowed unsecured claim for damages that plainly are not required by the terms of the governing agreements.

I.    **The Debtors' Noncompliance With The CalGen Debt No-Call Provisions Cannot Give Rise To An Unsecured Claim For Breach Of Contract Damages.**

The Bankruptcy Court correctly held that "no-call provisions that purport to prohibit optional repayment of debt are unenforceable in chapter 11 cases."[13]  The most obvious reason for this rule, as noted by Judge Lifland, is that "[i]t would violate the purpose behind the Bankruptcy Code to deny a debtor the ability to reorganize because a creditor has contractually forbidden it."  Id. at 7 (citing Shenandoah, 188 B.R. at 213).  The instant matter aptly illustrates this point:  the CalGen Third Lien Notes absolutely prohibits repayment before 2011.  Thus the no-call provisions, if valid, would permit the Third Lien Noteholders to mandate the Debtors remain in Chapter 11 proceedings for another four years.

It is black-letter law that if a contract provision is unenforceable, a debtor's noncompliance with that provision cannot constitute a "breach" of the contract.  See, e.g., In re R.H. Macy & Co., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) ("Under any set of facts, however, [lessor] could not demonstrate that the Debtor *breached* the Covenant to Stay Open because this Covenant is *unenforceable* against the Debtor. . .") (emphasis added); In re Jamesway Corp., 201 B.R. 73, 79 (Bankr. S.D.N.Y. 1996) (finding that under section 365(f)(1), lease provisions were unenforceable and the lessors' claims were denied); Bankruptcy Receivables Mgmt. v. Lopez (In re Lopez), 345 F.3d 701, 710 (9th Cir. 2003)

---

[13]  DA Tab A at 6.  Judge Lifland's holding is supported by an extensive body of precedent.  See, e.g., In re Vest Assocs., 217 B.R. 696, 699 (Bankr. S.D.N.Y. 1998) (allowing repayment of loan although note provided it "cannot be prepaid without the prior written consent of the holder"); Continental Sec. Corp. v. Shenandoah Nursing Home P'ship, 193 B.R. 769, 774 (W.D. Va. 1996) (affirming Bankruptcy Court's holding that "while there is a prepayment prohibition, [it] is not enforceable in this [Chapter 11] context"); In re Skyler Ridge, 80 B.R. 500, 502 (Bankr. C.D. Cal. 1987) (stating a prepayment prohibition "is not enforceable in a bankruptcy case"); In re 360 Inns, Ltd., 76 B.R. 573, 575-76 (Bankr. N.D. Tex. 1987) (authorizing repayment of a note despite ten-year prohibition on repayment); In re LHD Realty Corp., 726 F.2d 327, 329 n.1 (7th Cir. 1984) (allowing repayment of promissory note notwithstanding clause that states "[n]o prepayment of principal may be made during the first ten (10) loan years")).

("Because the agreement is invalid under federal bankruptcy law, there is no need to review the agreement pursuant to California contract law.").

Accordingly, it follows that the Debtors' noncompliance with the CalGen Debt no-call provisions cannot give rise to an unsecured claim for breach of contract damages. For example, in In re WorldCom, Inc., 357 B.R. 223 (S.D.N.Y. 2006), a creditor sought breach of contract damages for the debtor's failure to pay a prepetition dividend that was announced but never paid, even though applicable law precluded an insolvent company from paying a dividend to shareholders. The District Court affirmed the Bankruptcy Court's denial of the creditor's claim and holding that "[t]here's no dispute that if the debtors were insolvent then the declaration of and payment of the dividend would have been unlawful and could not have been done. ***Something that is unlawful cannot give rise to a valid allowable claim*** . . . ." Id. at 226 (emphasis added). Similarly here, enforcing the CalGen Debt no-call clauses to preclude repayment would have been unlawful, and thus the Debtors' "noncompliance" with the no-call provisions cannot give rise to a valid allowable claim for breach of contract damages.[14]

---

14  See also Montgomery Ward & Co. v. Meridian Leasing Corp., (In re Montgomery Ward Holding Corp.), 269 B.R. 1, 12 (D. Del. 2001) (holding liquidated damages clause in parties' contract is an unenforceable penalty and reducing Bankruptcy Court damages award accordingly); cf. also Travel Masters, Inc. v. Star Tours, Inc., 827 S.W.2d 830, 833 (Tex. 1991), superseded by Act of May 29, 1993, 73d Leg., ch. 965, § 2, 1993 Tex. Gen. Laws 4201, amending Tex. Bus. & Comm. Code § 15.51(b), as recognized in Alex Sheshunoff Mgmt. Services, L.P. v. Johnson, 209 S.W.3d 644 (Tex. 2006) ("Since the covenant not to compete is an unreasonable restraint of trade and unenforceable on grounds of public policy, we hold that Star Tours cannot recover damages . . . for the tortious interference of the convenant not to compete"); Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838, 844 (2d Cir. 1952) ("We therefore conclude that the contract was unenforceable and that Kaiser-Frazer was not entitled to recover damages for Otis' breach thereof) (citing Restatement of Contracts, §§ 580, 598)).

14

**II.    The Memorandum Decision's Damages Award For "Dashed Expectations" Rewrote The Debt Indentures To Provide A Remedy Not Bargained For By The Parties Or Authorized By The Bankruptcy Code.**

The second apparent rationale for the Memorandum Decision's damages award—"The CalGen Secured Lenders' expectation of an uninterrupted payment stream has been dashed giving rise to damages[,]" DA Tab A at 10—constitutes legal error.  The CalGen Lenders could have bargained for a damages remedy that explicitly required a premium if the Debtors repaid accelerated Debt before April 1, 2007.  But the Lenders failed to do so, and the Bankruptcy Court was not empowered to expand the agreed-upon scope of the contracts' makewhole provisions—and certainly not by inventing and applying a "dashed expectations" damages measure that is neither legally cognizable nor justifiable.

**A.    The CalGen Lenders Could Have Bargained For (But Did Not) A Premium Upon Repayment Of Accelerated Debt Prior To April 1, 2007.**

The Bankruptcy Court appropriately held that the CalGen Debt indentures do not explicitly require a makewhole premium in these circumstances—*i.e.*, where "none of the agreements governing the CalGen Secured Debt require a prepayment premium for repayment prior to April 1, 2007[,]" and "the CalGen Secured Debt has been accelerated by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately[.]'" Id. at 7, 8.  And therefore, "[a]bsent a provision in the underlying agreement authorizing the payment of fees, costs or charges, the secured party is prohibited from incorporating such amounts into its allowed secured claim." Id. at 9.

Unable to challenge the Bankruptcy Court's straightforward reading of the plain terms of the indentures, the CalGen Lenders may attempt to defend the Memorandum Decision's damages award by invoking vague notions of "fairness" and arguing that an unsecured damages claim was intended to serve as a sort of judicially-created consolation prize.  That is to say, the CalGen Lenders may argue that (1) but for the Debtors' Chapter 11 filing accelerating the Debt and rendering the no-call provisions unenforceable, and (2) because the

Debtors repaid the Debt on almost the eve (March 29, 2007) of the earliest makewhole trigger date (April 1, 2007), it would be inequitable to allow the Debtors to evade both of the safeguards intended to protect the Lenders' expectations of future interest payments.

But any argument that an extracontractual damages award is justified as a counterbalance to the Debtors' "opportunistic" behavior should fall on deaf ears. The simple fact is, as the Bankruptcy Court noted, even though the governing agreements were drafted only a few years ago (in 2004):

> Apparently the CalGen Secured [Debt] indentures were somewhat "antiquated" or, as one party described "Model T" indentures, because they fail to contain some up-to-date commonly found bondholder protective provisions. Modern indentures generally provide for prepayment provisions or penalties *even* during a no-call period *or* if the facility is accelerated.

DA Tab A at 8 (emphasis added).

More specifically, the CalGen Lenders could have bargained for a premium upon the repayment of accelerated Debt, as parties regularly draft—and courts routinely enforce—makewhole obligations against Chapter 11 debtors ***where the acceleration clause expressly references such a premium payment***. See, e.g., In re AE Hotel Venture, 321 B.R. 209, 219 (Bankr. N.D. Ill. 2005) (finding "[b]ecause the loan documents here expressly provide for a prepayment premium ***even when the debt is accelerated***, the premium is 'provided for under the agreement'"); Financial Ctr. Assocs. of East Meadow, L.P. v. The Funding Corp. (In re Financial Center Assocs. of East Meadow, L.P.), 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992) (noting "[i]t is not disputed that the agreement between the parties specifically provides for the pre-payment charge ***even in the event of acceleration***") (emphasis added). Indeed, the CalGen Lenders even could have bargained for damages in the event of an "involuntary" repayment during the no-call period. See, e.g., In re 360 Inns, Ltd., 76 B.R. 573, 575 (Bankr. N.D. Tex. 1987) (acknowledging "[t]he note prohibits voluntary prepayment during the first ten years of its term, and thereafter provides for a prepayment penalty on a declining scale as

the note reaches maturity from 5% to a low of 1% of the amount prepaid. During the first ten loan years, however, the note does provide for an ***involuntary prepayment penalty*** in the sum of 10%.") (emphasis added).

The CalGen Lenders' drafting omissions are not reflected solely in precedent—as the Bankruptcy Court acknowledged:

> [E]arlier in these Chapter 11 cases the Debtors sold a power plant known as the "Aries Facility," whose relevant financing agreement contained an acceleration clause that specifically required payment of a "Make-Whole Amount" if an event of default accelerated the outstanding loan amounts. Accordingly, the Debtors entered into a settlement that provided for payment of the make-whole premium. The Aries loan documents and the CalGen Secured Debt indentures were executed within days of each other but contained very different terms.

DA Tab A at 8. In fact, the Aries loan documents closed on March 26, 2004—or on almost the exact same date that the CalGen Debt indentures were executed (March 23, 2004). DA Tab F at 5. In other words, the Aries' lenders negotiated for an acceleration clause that expressly provided for a makewhole payment following an event of default and acceleration of the debt—and the Debtors willingly paid this makewhole amount. The CalGen Lenders negotiated a contemporaneous agreement in which they could have bargained for similar protection. But the CalGen Lenders did not do so, and as explained immediately below, the Bankruptcy Court is not empowered to write such safeguards into the Debt indentures on the Lenders' behalf.

**B.    The Memorandum Decision Impermissibly Remedied The CalGen Lenders' Drafting Omission.**

Given the complete lack of any textual support within the unambiguous Debt indentures for the Memorandum Decision's damages award, the only reasonable explanation for the Decision's inconsistent holdings—that the Lenders are not entitled to a secured claim for the repayment of accelerated Debt prior to April 1, 2007, but they should receive an unsecured claim for the very same thing—seems to be that the Bankruptcy Court adopted a

Solomonic solution and decided the Lenders' close-but-not-quite-valid damages claim at least deserved something.  Doing so was impermissible.

In conventional commercial disputes, "courts should not rewrite the contracts before them to conform to their own conception of business equity."  Wastemasters, Inc. v. Diversified Investors Servs. of N. America, Inc., 159 F.3d 76, 79 (2d Cir. 1998).  This cautionary maxim is equally true in Chapter 11 cases, which are equitable proceedings, yet "a bankruptcy court does not have the power to rewrite contracts . . . ."  Argonaut Ins. Co. v. Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.), No. 93 Civ. 4014, 1995 WL 311764, at *2 (S.D.N.Y. May 18, 1995) [attached at DA Tab H].

More specifically, Bankruptcy Code Section 105(a) "gives the court equitable power to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'"  New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.), 351 F.3d 86, 91-92 (2d Cir. 2003) (quoting 11 U.S.C. § 105(a)).  Notwithstanding Section 105(a)'s broad language, "[i]t does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity."  Id. at 92 (quoting United States v. Sutton, 786 F.2d 1305, 1308 (5th Cir. 1986)).  Instead, "[t]he equitable power conferred on the bankruptcy court by section 105(a) is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to ***do the right thing***."  Id. (first emphasis in original, second added).  Accordingly, the Second Circuit has interpreted the Bankruptcy Code's statutory language to "suggest[] that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective."  Id. (quoting 2 Collier on Bankruptcy ¶ 105.01[1]).

The Memorandum Decision's unsecured damages award presumably was intended to be an exercise of the Bankruptcy Court's general equitable powers—yet the Court did not justify its ruling under Section 105 or **any** other Code section.[15]   For this reason alone the Memorandum Decision's damages award should be reversed and Lenders' makewhole premium demand disallowed in its entirety.  In re Vest Assocs., 217 B.R. 696, 699 (Bankr. S.D.N.Y. 1998) (denying premium claim where creditors failed to "supply any legal authority for the proposition that a bankruptcy court may read into a contract damage provisions which the parties themselves have failed to insert regarding the liquidation or calculation of damages arising out of the prepayment of a loan or note").

What is evident is that by trying to repair the Lenders' dashed expectations, the Memorandum Decision rewrote the contracts before it "to conform to [the Court's] own conception of business equity."  Wastemasters, 159 F.3d at 79.  Doing so was especially impermissible in these circumstances, where it is undisputed that "the loan agreement here at issue was entered into between sophisticated parties for a large sum of money, who were presumably represented by informed counsel."  In re Skyler Ridge, 80 B.R. 500, 503 (Bankr. C.D. Cal. 1987).  The Memorandum Decision itself noted that "[Bankruptcy] Courts cannot read into a contract damage provisions which the parties themselves had failed to insert regarding the liquidation or calculation of damages arising out of the prepayment of the loan."  DA Tab A at 9 (quoting Vest, 217 B.R. at 699-700).  And yet the Memorandum Decision then proceeded to commit precisely that error.

---

[15]   Furthermore, none of the cases cited in the damages section of the Memorandum Decision—Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996); United States v. Winstar, 518 U.S. 839, 885 (1996); In re 360 Inns, Ltd., 76 B.R. 573, 576 (Bankr. N.D. Tex. 1987); Noonan v. Fremont Financial (In re Lappin Electric Co.), 245 B.R. 326, 330 (Bankr. E.D. Wis. 2000)—even suggest (much less hold) that dashing a contractual counterparty's "expectation of an uninterrupted payment stream" is a justifiable basis for awarding an unsecured claim for breach of contract damages.

**C.    "Dashed Expectations" Is Not A Legally Cognizable Damages Measure.**

In awarding the CalGen Lenders an unsecured claim for "dashed expectations," the Memorandum Decision adopted a damages measure that has been rejected by Bankruptcy Courts within this District and elsewhere.  For example, in <u>In re Adelphia Commc'ns Corp.</u>, 342 B.R. 142, 144-45 (Bankr. S.D.N.Y. 2006), a consortium of secured bank lenders asserted a claim for a premium to compensate them for "lost" interest payments as a result of the borrower's reporting of inaccurate financial information.  The Bankruptcy Court noted that the parties' contract provided that inaccurate reporting of financial condition is an event of default, entitling the lenders to default interest, but the lenders had bargained away their default interest rights in exchange for pre- and post-petition interest payments (in the form of adequate protection during the debtors' Chapter 11 proceedings).  <u>Id.</u> at 150-52.  The governing agreements did not, however, explicitly require the type of premium sought by the lenders.  <u>Id.</u>  Thus noted the Bankruptcy Court:

> The drafters of the credit agreements provided for a different remedy [default interest]—an even greater one—which is, of course, their right.  But if the bank lenders wished to contract for additional remedies (which likewise was their right, if their contract counterparty was agreeable to providing such), the bank lenders could have done so.

<u>Id.</u> at 153.  But because the lenders did not do so, "this Court cannot agree that claims, and especially secured claims, can be defined so broadly as 'inherently encompassing' ***expectancy rights*** not provided for in the agreements in question."  <u>Id.</u> at 154 (emphasis added, internal citation omitted).

In so holding, the <u>Adelphia</u> Court relied extensively on <u>Continental Secs. Corp. v. Shenandoah Nursing Home P'ship</u>, 193 B.R. 769 (W.D. Va. 1996), <u>aff'd in unpublished opinion</u>, 104 F.3d 359, 1996 WL 733941 (4th Cir. 1996) [attached at DA Tab I].  <u>Shenandoah</u> involved a secured creditor (Continental) whose note prohibited repayment before December 1, 2001, but did not contain a makewhole premium enforcing the no-call provision.  <u>Id.</u> at

772.  The debtor's (Shenandoah) plan of reorganization, which the Bankruptcy Court approved, proposed to repay the note's outstanding principal and accrued interest, during the lockout period, but without damages for (allegedly) violating the no-call provision.  Id.  The Bankruptcy Court held:

> [W]hile there is a prepayment prohibition, which is not enforceable in this context, there is no prepayment penalty provision provided for anywhere in the contract.  Therefore, there can be no prepayment fees, costs, or charges allowed under the confirmed Plan as none are provided for in the note under § 506(b).

Id. at 774.  On appeal, Continental argued it was not seeking a secured claim under Section 506(b); rather, it sought "the full value of the Note—that is, a value that reflects Continental's entitlement to a guaranteed income stream over time."  Id. at 775.  But the Bankruptcy Court concluded "that no matter how Continental chooses to characterize its claim, at bottom, it is seeking contract damages for Shenandoah's prepayment of the Note."  Id.  And to that end, the only available measure for awarding damages for future interest income expectancy is Section 506(b)'s directive that makewhole premiums may be allowed as part of a creditor's secured claim, if (and only if) the premium is expressly provided for in the parties' contract.

Id.  Otherwise:

> [A]dopting amorphous formulations of claims such as that proffered by Continental would provide creditors with an escape-hatch from § 506(b)'s requirement that certain payments sought by secured creditors must be provided for in the instrument.  After all, most payments sought by creditors can be re-characterized as necessary to provide the creditor with the "full value" of an agreement.

Id.

The Memorandum Decision's damages award is directly contrary to the Courts' analyses in Adelphia and Shenandoah.  Having held that the CalGen Debt does not "include any form of liquidated damage provision for payment prior to April 1, 2007," and thus the Lenders are "prohibited from incorporating such amounts into [their] allowed secured claim[s]" under Section 506(b), DA Tab A at 9, the Bankruptcy Court's inquiry was

complete.   Proceeding to hold further that the Lenders' "expectation of an uninterrupted payment stream has been dashed giving rise to damages" was entirely at odds with Adelphia's and Shenandoah's proper recognition that creditors' claims cannot be "defined so broadly as 'inherently encompassing' expectancy rights not provided for in the agreements in question." Adelphia, 342 B.R. at 154 (quoting Shenandoah, 193 B.R. at 775).

> **D.**   **The Memorandum Decision's Damages Award Ignores Multiple Contexts Where Creditors' "Dashed Expectations" Are Not Fully Compensable.**

The Memorandum Decision's damages award overlooks the reality that bankruptcy jurisprudence is legion with situations where creditors' expectations are dashed due to unenforceable contract provisions—without giving rise to the equitable grant of an unsecured damages claim.

For example, assume a supplier has a below-market contract with a buyer that files for bankruptcy, and the parties' contract states that commencing a Chapter 11 proceeding renders the agreement null and void—and thus presumably allowing the seller to enter into a new, above-market contract with the debtor or a third party.   But "Section 365(e) of the Bankruptcy Code invalidates *ipso facto* or bankruptcy termination clauses which permit one contracting party to terminate or even modify an executory contract or unexpired lease in the event of the bankruptcy of the other contracting party." Reomar, Inc. v. LTV Corp. (In re Chateaugay Corp.), No. 92-CIV. 7054, 1993 WL 159969, at *5 (S.D.N.Y. May 10, 1993) (internal citation omitted) [attached at DA Tab J].   In other words, a supplier's expectation of being able to utilize an *ipso facto* clause to escape an unprofitable contract may be dashed, but the supplier is not entitled to an unsecured damages claim as a result. See, e.g., id. at *5 (noting "no reliance may be placed upon an alleged default where the only cause for default is the debtor's commencement of a bankruptcy case" and denying creditor's claim for attorneys' fees and expenses allegedly due as a result of debtor's Chapter 11 filing).

Or consider the instance of cross-default clauses, where a non-debtor may have two separate contracts with a debtor and each agreement provides that a default under one equals a default under the other as well. The Bankruptcy Code invalidates cross-default provisions to the extent they operate to prevent the debtor from assuming a profitable contract and rejecting an unprofitable one. See, e.g., United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n (In re UAL Corp.), 346 B.R. 456, 467 (Bankr. N.D. Ill. 2006) (noting Section 365 permits realization of "the value of above-market executory contracts and leases while avoiding the costs of those below-market"). Here as well, a party's expectations that a cross-default clause will be enforced are dashed—without giving rise to an unsecured damages claim for the nullification of the cross-default provision.[16]

Yet another illustrative example is Section 502(b)(6)'s cap on landlord claims, under which damage claims for long-term leases rejected by a debtor are limited to "the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease . . . ." 11 U.S.C. § 502(b)(6)(A). Yet again, a party's expectations of an uninterrupted payment stream are dashed, but "[w]hen one claimant is a landlord holding a long-term lease, its single unsecured claim for twenty or thirty years of future rent could devour so much of the debtor's estate that only crumbs could be left for other unsecured creditors." Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 20 (2d Cir. 1996).

In sum, the Bankruptcy Code often dashes parties' contractual expectations, but this does not mean Bankruptcy Courts have untrammeled discretion to administer relief by awarding equitable grants of unsecured damages.

---

[16] Of course the debtor's rejection of the less favorable contract would give rise to an unsecured damages claim for breach of the contract, see, e.g., In re Lavigne, 114 F.3d 379, 389 (2d Cir. 1997), but no additional claim arises from the counterparty's lost benefit of the cross-default provision.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that this Court reverse the Memorandum Decision's damages award and disallow the CalGen Lenders' makewhole premium claims in their entirety.

Dated: June 1, 2007

<table>
<tr><td>

KIRKLAND & ELLIS LLP
Marc Kieselstein (admitted *pro hac vice*)
Aon Building
200 East Randolph Drive
Chicago, IL  60601-6636
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

</td><td>

_____/s/_____

KIRKLAND & ELLIS LLP
Richard M. Cieri (RC 6062)
Edward O. Sassower (ES 5823)
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4800

KIRKLAND & ELLIS LLP
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
655 15th Street, NW
Washington, D.C.  20005-5793
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

*Counsel for the Debtors-Appellants*

</td></tr>
</table>