**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------

In re

      Calpine Corporation, et al.,

              Debtors.

-----------------------------------------------------------

Chapter 11

Case No. 05-60200 (BRL)
Jointly Administered

## MEMORANDUM DECISION AND ORDER GRANTING, IN PART, DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING DEBTORS TO OBTAIN REPLACEMENT POSTPETITION FINANCING TO (A) REFINANCE EXISTING POSTPETITION FINANCING AND (B) REPAY PREPETITION DEBT; (II) ALLOWING DEBTORS' LIMITED OBJECTION TO CLAIMS; AND (III) DETERMINING VALUE OF SECURED CLAIMS

      The principle issue before the Court, is whether a trust indenture drafting omission relieves the debtors of the obligation to pay "prepayment premiums"or similar "make-whole" damages upon repayment in full of principal and accrued interest short of the original maturity dates.

      Calpine Corporation and its affiliated debtors and debtors-in-possession, (the "Debtors") move for an order (I) authorizing the Debtors to obtain replacement postpetition financing to (a) refinance existing postpetition financing and (b) repay prepetition debt; (II) allowing Debtors' limited objection to claims; and (III) determining value of secured claims (the "Refinancing Motion").

      Manufacturers & Traders Trust Company ("M&T"),  Beal Bank Nevada ("Beal"), Wilmington Trust FSB, as Indenture Trustee (the "WT Trustee"), Wilmington Trust Company, as Collateral Agent (the "Collateral Agent"), Wilmington Trust Company, as Administrative

1

Agent ("WTC"), HSBC Bank USA, National Association, as Indenture Trustee ("HSBC"), Bank

of New York, as Administrative Agent ("BNY"), and collectively with M&T, Beal, the WT

Trustee, the Collateral Agent, WTC, and HSBC (the "CalGen Secured Lenders") object to the

Refinancing Motion.[1]

**Background**

On December 20, 2005 (the "Petition Date"), the Debtors, scheduling between $18 and

$22 billion in debt , filed voluntary petitions for relief under chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code").  The Debtors and certain non-debtor affiliates (the

"Company") are involved in the development, construction, ownership and operation of power

generation facilities and the sale of electricity and its by-product, thermal energy, primarily in

the form of steam, predominantly in North America. The Company operates the largest fleet of

natural gas-fired power plants in North America and has ownership interests in, and operates,

gas- fired power generation and cogeneration facilities, pipelines, geothermal steam fields and

geothermal power generation facilities.  The Company owns, leases and operates power plants

throughout the United States and Canada.  The Company markets electricity produced by its

generating facilities to utilities and other third party purchasers while thermal energy produced

by the gas-fired power cogeneration facilities is sold primarily to industrial users. The Company

offers to third parties energy procurement, liquidation and risk management services, combustion

---

[1]    Objections were also filed by the Unofficial Committee of Second Lien Debtholders (the "Second Lien
Committee") and raised by Rosetta Resources but were resolved consensually prior to the hearing.  The Bank of
Nova Scotia, as Administrative Agent for the First Priority Secured Revolving Loans, is also a secured lender, the
first in the seven tranches of CalGen Secured Debt, and filed an objection that was resolved.  No party seriously
disputes that the proposed multi-billion dollar refinancing will provide massive benefits and advantages to the
Debtors' chapter 11 estates and the majority of their creditors.  The non-settling remaining objectors point out that
despite the repayment of billions of their principal and accrued interest that they are being improperly disadvantaged

turbine component parts, engineering and repair and maintenance services. The Company is a highly integrated, interdependent set of businesses that work together on a fleet-wide basis.

Prior to the Petition Date, on March 23, 2004, Calpine Generating Company, LLC ("CalGen"), one of the Debtors' largest operating subsidiaries, issued $2.605 billion of secured debt through a series of first, second, and third-lien financings ("CalGen Secured Debt").[2] Approximately $2.516 billion of CalGen Secured Debt is currently outstanding, on which the weighted average interest rate is 11.25%. CalGen, as a member of the Calpine corporate group, receives most of its revenues from Calpine affiliates and most of its corporate functions such as

---

[2] CalGen's first lien debt is comprised of (a) the $235,000,000 First Priority Secured Floating Rate Notes Due 2009, issued by CalGen and CalGen Finance pursuant to that certain first priority indenture, dated as of March 23, 2004, among CalGen, CalGen Finance and Wilmington Trust FSB, as first priority trustee (the "First Priority Indenture"); (b) the $600,000,000 First Priority Secured Institutional Terms Loans Due 2009 (together with the $235,000,000 First Priority Secured Floating Rate Notes Due 2009, the "First Lien Notes"), issued by CalGen pursuant to that certain Credit and Guarantee Agreement, dated as of March 23, 2004 among CalGen, the guarantor subsidiaries of CalGen listed therein, Morgan Stanley Senior Funding, Inc., as administrative agent, sole lead arranger and sole bookrunner and the various lenders named therein (the "First Priority Credit and Guarantee Agreement"); and (c) the $200,000,000 First Priority Revolving Loans issued on or about March 23, 2004 (the "First Lien Revolving Loans") pursuant to that Amended and Restated Agreement, among CalGen, the guarantors party thereto, the lenders party thereto, The Bank of Nova Scotia, as administrative agent, L/C Bank, lead arranger and sole bookrunner, Bayerische Landesbank, Cayman Islands Branch, as arranger and co-syndication agent, Credit Lyonnais, New York Branch, as arranger and co-syndication agent, ING Capital LLC, as arranger and cosyndication agent, Toronto Dominion (Texas) Inc., as arranger and co-syndication agent, and Union Bank of California, N.A., as arranger and co-syndication agent (the "First Priority Amended and Restated Credit Agreement").

CalGen's second lien debt is comprised of (a) the $640,000,000 Second Priority Secured Floating Rate Notes Due 2010, issued by CalGen and CalGen Finance pursuant to that certain second priority indenture, dated as of March 23, 2004, among CalGen, CalGen Finance and Wilmington Trust FSB, as second priority trustee (the "Second Priority Indenture"); and (b) the $100,000,000 Second Priority Secured Term Loans Due 2010 (together with the $640,000,000 Second Priority Secured Floating Rate Notes Due 2010, the "Second Lien Notes"), issued by CalGen pursuant to that certain Credit and Guarantee Agreement, dated as of March 23, 2004, among CalGen, the guarantor subsidiaries of CalGen listed therein, Morgan Stanley Senior Funding, Inc., as administrative agent, sole lead arranger and sole bookrunner and the various lenders named therein (the "Second Priority Credit and Guarantee Agreement").

CalGen's third lien debt is comprised of (a) the $680,000,000 Third Priority Secured Floating Rate Notes Due 2011 and (b) the $150,000,000 11.5% Third Priority Secured Notes Due 2011 (together with the $680,000,000 Third Priority Secured Floating Rate Notes Due 2011, the "Third Lien Notes"), in each case issued by CalGen and CalGen Finance pursuant to that certain third priority indenture, dated as of March 23, 2004, among CalGen, CalGen Finance and Wilmington Trust Company FSB, as third priority trustee (the "Third Priority Indenture").

accounting, legal and information technology are provided by Calpine affiliates.  Calpine

Operating Services Company, Inc., a Calpine subsidiary and a Debtor, acts as the primary

operator for CalGen's plants.  Calpine Energy Services, L.P. ("CES"), a Calpine subsidiary and a

Debtor, is CalGen's primary customer.  CES purchases the majority of the electricity produced

by CalGen's facilities and supplies the majority of gas needed to operate those facilities.

On the Petition Date, the Debtors filed an emergency motion seeking authorization to

obtain postpetition financing and obtained an order authorizing the Debtors to obtain secured

postpetition financing up to the aggregate principal amount of $2 billion (the "Existing DIP

Facility").  The Existing DIP Facility[3] is set to expire at the earliest of: (a) December 20, 2007,

(b) the effective date of a plan or reorganization pursuant to a confirmation order of the Court, or

(c) the acceleration of the loans in accordance with the Existing DIP Credit Agreement.

On February 26, 2006, this Court entered an order (the "Cash Collateral Order"),

providing that the Debtors shall pay to the CalGen Lenders, as adequate protection, all accrued

but unpaid interest and fees at the non-default contract rates on either a quarterly or semi-annual

basis, and the reasonable fees and expenses of the CalGen Lenders' counsel and other

consultants.

**The Refinancing**

Pursuant to the Refinancing Motion, the Debtors seek to obtain replacement debtor-in-

possession financing up to the aggregate principal amount of $5.0 billion (the "Replacement DIP

Facility") to refinance the Debtors' Existing DIP Facility and to repay approximately $2.516

---

[3] The amount drawn on the Existing DIP Facility is $996.5 million, on which the weighted average interest rate is approximately 8.66%.

billion of the CalGen Secured Debt.   The proposed refinancing will replace higher interest-rate debt with lower interest-rate debt, saving the Debtors approximately $100 million annually, including approximately $92 million of interest rate savings attributable to repayment of the CalGen Secured Debt.[4] Through the proposed refinancing, the Debtors also expect to realize an additional $5 million in annual savings by no longer having to pay certain fees as adequate protection for the CalGen Secured Debt.  The Proposed Refinancing will provide the Debtors with greater liquidity, a simplified capital structure and enable the Debtors to grant security in respect of hedging obligations in the commodity market.[5]  The Proposed Refinancing also extends the maturity date should a Plan of Reorganization not be approved before the end of 2007 and can be converted to exit financing if the Debtors so chose.  The Creditors' Committee, the Equity Committee and the Second Lien Committee strongly support the Refinancing Motion.

**Objections**

The objections raised by the CalGen Secured Lenders are mainly premised on whether the terms of their agreements prohibit the Debtors from prepaying (ie., no-call provisions) and/or provide the Lenders with the right to seek a prepayment premium or "make-whole" damages upon the Debtors' repayment of the CalGen Secured Debt following acceleration of such debt caused by the occurrence of an Event of Default under the governing documents or by operation of law.  It should be noted that the Secured Debt is now matured by the occurrence of an Event

---

[4] Based on certain assumptions including favorable ratings from the rating agencies. *See also* Transcript of Hearing, February 28, 2007.

[5] Under the existing DIP Facility the Debtors, the Debtors must satisfy hedging collateral requirements by posting cash and, to a lesser degree, letters of credit, thereby reducing corporate liquidity and constraining their participation in the commodities market.  The ability of the Debtors to grant hedging liens under the proposed refinancing will mitigate the cash collateral requirements of forward hedging and increase the universe of counter-parties willing to transact with the Debtors allowing the Debtors to better manage the forward-risk profile of their assets.

of Default, ie., the filing of the chapter 11 petitions.

Six of the seven tranches of CalGen Secured Debt contain prepayment prohibitions, or so-called "no-call" clauses that purport to bar repayment of the debt within certain time periods. More specifically:

• $235,000,000 First Priority Secured Floating Rate Notes Due 2009. Section 3.07 of the First Priority Indenture, entitled "Optional Redemption," states that the "Issuers may not redeem all or any part of the Notes prior to April 1, 2007."

• $600,000,000 First Priority Secured Institutional Term Loans Due 2009. Section 2.10 of the First Priority Credit and Guarantee Agreement, entitled "Voluntary Prepayments," states that the First Lien Term Loans "may not be voluntarily prepaid at any time on or prior to April 1, 2007."

• $640,000,000 Second Priority Secured Floating Rate Notes Due 2010. Section 3.07 of the Second Priority Indenture, entitled "Optional Redemption," states that the "Issuers may not redeem all or any part of the Notes prior to April 1, 2008."

• $100,000,000 Second Priority Secured Institutional Term Loans Due 2010. Section 2.10 of the Second Priority Credit and Guarantee Agreement, entitled "Voluntary Prepayments," states that the Second Lien Term Loans "may not be voluntarily prepaid at any time on or prior to April 1, 2008."

• $680,000,000 Third Priority Secured Floating Rate Notes Due 2011. Section 3.07 of the Third Priority Indenture, entitled "Optional Redemption," states that the "Notes are not redeemable at the option of the Issuers."

• $150,000,000 11.5% Third Priority Secured Notes Due 2011. Section 3.07 of the Third Priority Indenture, entitled "Optional Redemption," states that the "Notes are not redeemable at the option of the Issuers."

**Discussion**

Generally, no-call provisions that purport to prohibit optional repayment of debt are unenforceable in chapter 11 cases. *Continental Secs. Corp. v. Shenandoah Nursing Home P'ship*, 193 B.R. 769, 774 (W.D. Va. 1996)(affirming Bankruptcy Court's holding that "while there is a prepayment prohibition, [it] is not enforceable in this [Chapter 11] context"); *In re Skyler Ridge,*

6

80 B.R. 500, 502 (Bankr. C.D. Cal. 1987);  *In re 360 Inns, Ltd.*, 76 B.R. 573, 575-76 (Bankr.

N.D. Tex. 1987) (authorizing repayment of a note despite ten-year prohibition on repayment);

*see In re LHD Realty Corp.*, 726 F.2d 327, 329 (7th Cir. 1984); *cf,* George Lefcoe, Yield

Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Prepayment, 28

REAL EST. L. J. 202 (Winter 2000) ("Lefcoe Article")(courts universally enforce absolute

prohibitions against prepayment, "except in bankruptcy").  The "essence of bankruptcy

reorganization is to restructure debt .... and adjust debtor-creditor relationships." *See In re*

*Ridgewood Apts of DeKalb County, Ltd.*, 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994).  It would

violate the purpose behind the Bankruptcy Code to deny a debtor the ability to reorganize

because a creditor has contractually forbidden it.  *Continental Securities Corp. v. Shenandoah*

*Nursing Home Partnership*, 188 B.R. 205 (W.D. Va.1995).

   This Court has previously authorized the Debtors to prepay secured debt, that is, the First

Lien Debt of Calpine Corporation, over the objections of the First Lien Trustee based in part on

the interest-rate savings to the Debtors' estates and that order was affirmed on appeal. *See In re*

*Calpine Corp.*, 2007 WL 57879, 8 (S.D.N.Y. Jan 9, 2007) (finding that the repayment of the

outstanding principal of the First Lien Debt "stopped the unnecessary loss of funds from Debtors'

estates" and that the "granting of Debtors' Repayment Motion was an appropriate use of cash

under sections 363(b) and 105(a) of the Bankruptcy Code").

   With respect to the purported prepayment premiums, none of the agreements governing

the CalGen Secured Debt require a prepayment premium for repayment prior to April 1, 2007.

Thus, pursuant to the terms of the agreements, so long as the refinancing is completed prior to

April 1, 2007, no prepayment premium is due. *See, e.g., Continental Secs. Corp. v. Shenandoah*

*Nursing Home P'ship*, 193 B.R. at 774 (loan had two-year lockout but no prepayment penalty provision). Apparently the CalGen Secured indentures were somewhat "antiquated" or, as one party described "Model T" indentures, because they fail to contain some up-to-date commonly found bondholder protective provisions. Modern indentures generally provide for prepayment provisions or penalties even during a no-call period or if the facility is accelerated.[6]

In addition, each of the CalGen Secured Debt agreements provides that a bankruptcy filing by CalGen is an event of default resulting in an automatic acceleration of debt. As such, the CalGen Secured Debt has been accelerated by virtue of the Debtors' bankruptcy filing and thus is "due and payable immediately."[7] *See, ie., In re LHD Realty Corp.*, 726 F.2d at 330-31 ("acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity."); *In re Ridgewood Apts of DeKalb County, Ltd.*, 174 B.R. at 720 ("Even without specific contractual language, a bankruptcy filing acts as an acceleration of all a debtor's obligations."); *In re Manville Forest Products Corp.*, 43 B.R. 293, 297 (Bankr. S.D.N.Y. 1984), *aff'd in part, rev'd in part on other grounds,* 60 B.R. 403 (S.D.N.Y. 1986)(debt is automatically accelerated upon filing bankruptcy); *cf., Anchor Resolution Corp. v. State Street Bank and Trust Co. of Connecticut (In re Anchor Resolution Corp.)*, 221 B.R. 330, 333 (Bankr. D. Del. 1998) (agreement included an express provision that entitled the holders of the notes to a make-whole amount in the event of a prepayment of

---

[6] For example, earlier in these Chapter 11 cases the Debtors sold a power plant known as the "Aries Facility," whose relevant financing agreement contained an acceleration clause that specifically required payment of a "Make-Whole Amount" if an event of default accelerated the outstanding loan amounts. Accordingly, the Debtors entered into a settlement that provided for payment of the make-whole premium. The Aries loan documents and the CalGen Secured Debt indentures were executed within days of each other but contained very different terms.

[7] *See* Sections 6.01 and 6.02 of the First Priority Indenture, the Second Priority Indenture and the Third Priority Indenture and Section 7.01 and 7.02 of the Second Priority Credit and Guarantee Agreement.

principal or an event of default; one such specified event of default was the commencement of a voluntary bankruptcy case).

　　*None* of the six tranches of CalGen Secured Debt include any form of liquidated damage provision for payment prior to April 1, 2007.  Absent a provision in the underlying agreement authorizing the payment of fees, costs or charges, the secured party is prohibited from incorporating such amounts into its allowed secured claim.  11 U.S.C. § 506(b); *United States v. Ron Pair Enterprises Inc.*, 489 U.S. 235 (1996);  *Continental Secs. Corp. v. Shenandoah Nursing Home P'ship.*, 188 B.R. at 215-16 (the oversecured creditor was not entitled to a prepayment penalty pursuant to section 506(b) since there was no prepayment penalty provision in the contract); *In re Vest Assocs.*, 217 B.R. 696, 699-700 (Bankr. S.D.N.Y. 1998) (Court cannot "read into a contract damage provisions which the parties themselves had failed to insert regarding the liquidation or calculation of damages arising out of the prepayment of a loan").

**Defeasance**

　　The third lien debt indentures contain a defeasance provision which under the present circumstances, including *inter alia* provisions contained in the indentures themselves, make this feature inoperable.  First, defeasance is a feature designed to protect the borrower, not the lender, allowing a borrower (in a non-bankruptcy setting) to take advantage of rising interest rates and avoid prepayment premiums or make its balance sheet more attractive.[8]  Second, the indenture itself prohibits the Debtors from utilizing defeasance providing that the debt cannot be defeased if an "Event of Default shall have occurred and be continuing."  *See* § 8.04(4).  In addition,

---

　　[8] *See* John C. Murray, *Defeasance Provisions in Securitized-Loan Documents*, 498 PLI/Real 203, 207-208 (2003); *see* Lefcoe Article, *supra*.

section 8.04(5) provides that defeasance must not result in a default under any material

agreement or instrument to which the Company or any of its subsidiaries is a party.  Finally, the

requirement for a legal opinion regarding the lack of adverse tax consequences under the

indenture cannot be met.  For the foregoing reasons, defeasance, which would require depositing

$270 billion in treasury bonds, is not an option for repayment of the third lien debt.

**Damages**

The Debtors' and Creditors' Committee assert that in the absence of any form of

liquidated damage in the indentures for the period in question (pre April 1, 2007), the CalGen

Secured Lenders' quest for damages is based on an *"amorphous"* breach of contract theory

which leaves them without *any remedy* especially since they will be paid the full amount of their

loans plus accrued interest: "the benefit of their bargain." This preclusive argument for a total

foreclosure of any damage recovery is incorrect.  The CalGen Secured Lenders' expectation of

an uninterrupted payment stream has been dashed giving rise to damages, albeit not measurable

as the Lenders would wish.  *See Harsco Corp v. Segui*,  91 F.3d 337, 348 (2d Cir. 1996).

Accordingly, while the agreements do not provide a premium or liquidated damages for

repayment during the period the Debtors propose, the CalGen Secured Lenders still have an

unsecured claim for damages for the Debtors' breach of the agreements.  *See United States v.*

*Winstar,* 518 U.S. 839, 885 (1996) ("damages are always the default remedy for breach of

contract); *360 Inns Ltd.*, 76 B.R. at 576; *see also Noonan v. Fremont Financial*, (*In re Lappin*

*Electric Co.*), 245 B.R. 326, 330 (Bankr. E. D. Wis. 2000) ("this court is in agreement with a

majority of courts that view a prepayment charge as liquidated damages, not as unmatured ...

interest that would be disallowed under section 502(b)(2)").  The Debtors' and the Creditors

Committees' arguments to the contrary are unavailing. Based on the testimony and evidence presented at the hearing, I find that the 2.5 % prepayment premium of the First Lien Notes and the 3.5% prepayment premium provided in the Second Lien Notes are reasonable proxies for measures of damages to be awarded to those creditors. While the Third Lien Notes do not provide for a premium, based on the calculations submitted by all of the experts I find that a 3.5% premium is also a reasonable proxy of damages to be awarded in respect of the Third Lien Note agreements. *See United Merchants and Manufacturers, Inc. v. Equitable Life Assurance Society of the United States (In re United Merchants and Manufacturers, Inc.),* 674 F.2d 134, 142-44 (2d Cir. 1982)(finding prepayment provision a valid liquidated damages clause under New York law); *In re Lappin Electric Co.,* 245 B.R. at 330 (early termination fee of 3% of revolving loan's limit during the first year of loan reasonable, 2% during the second year and 1% during the third year .)

**Default Interest**

The CalGen Secured Lenders also request that interest be paid at the default rate from the period after the bankruptcy filing through the payment date based on the bankruptcy filing as an event of default despite the Debtors not having defaulted on making payments either pre or postpetition. Although the Bankruptcy Code provides that an oversecured creditor is entitled to, "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose," *see* 11 U.S.C. § 506(b), courts engage in balancing of the equities when determining allowance of interest in bankruptcy, receivership and reorganization. *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 165, 167 (1946). "Bankruptcy essentially is, after all, a process of equitably adjusting contending

11

creditors' claims and rights, and effectuating a fair distribution of a debtor's property among those creditors." *In re Hollstrom*, 133 B.R. 535, 541 (Bankr. D. Colo. 1991). This equitable approach permits a court to examine the specific facts of each case to determine whether the circumstances warrant application of the higher default rate. *See In re Vest Assocs.*, 217 B.R. at 702; *see also Key Bank Nat'l Ass'n v. Milham (In re Milham),* 141 F.3d 420, 423 (2d Cir.1998) ("Most courts have awarded pendency interest at the contractual rate; but nevertheless, however widespread the practice may be, it does not reflect an entitlement to interest at the contractual rate"); *Bradford v. Crozier (In re Laymon),* 958 F.2d 72, 75 (5th Cir.) ("rate of interest [chargeable under § 506(b)] should be determined 'by examining the equities involved in the bankruptcy proceeding' "), *cert. denied,* 506 U.S. 917 (1992); *In re Liberty Warehouse Associates Ltd. Partnership*, 220 B.R. 546 (Bankr. S.D.N.Y. 1998).

This Court, therefore, must balance the equities to determine if the default rate of interest is proper. Courts consider various equitable factors in determining whether a debtor must pay default interest including: (a) whether the relative distribution rights of other creditors, and whether enforcement of the higher rate will do injustice to the concept of equitable distribution of the estate's assets; (b) the purpose of the higher interest rate; and (c) the reasonableness of the difference between the default and non-default rates. *See, e.g., In re Kalian*, 178 B.R. 308, 314 Bankr. D.R.I. 1995); *see also Liberty Warehouse, supra.* The fact that a debtor is solvent, while not dispositive, is also a consideration when determining the rate of interest due. *See In re Vest Assocs.*, 217 B.R. at 702; *In re Kalian*, 178 B.R. at 314. "If a debtor is solvent, there is much more leeway to grant the default rate because other creditors will not be injured." *See Ruskin v. Griffiths,* 269 F.2d 827, 832 (2d Cir. 1959) *cert. denied,* 361 U.S. 947 (1960).

12

The CalGen Lenders assert that because the CalGen estate is solvent, allowing the Debtors to pay only the contract rate of interest, and not the default rate of interest will enure to the benefit of the CalGen equity holders, and not to creditors.[9] The Debtors assert the issue does not turn on solvency, and that it is, "nearly impossible to determine with finality the solvency of the CalGen Debtors within the short window of time available to consummate the Proposed Refinancing." The record reveals a complex interrelationship that precludes at this time a finding one way or another as to stand alone solvency for CalGen. Whether the CalGen estate is solvent or whether the Debtors will move to substantively consolidate the Debtors' cases is not ripe for decision, but it does suggest to the Court that a decision today on the default rate of interest may be premature. Looking to the other factors, the default rate of interest is one percent increase, which may or may not be reasonable under the circumstances. In any case, the default interest issue need not be decided at this time. *See In re Vest*, 217 B.R. 696, 704 fn 7.

---

[9] This argument misses the mark, as in reality, the enuring benefit is to the larger Calpine Group creditors who as Group creditors are the stand-in equity holders of CalGen.

13

**Conclusion**

For the reasons set forth above, the Debtors' Motion to obtain the Proposed Refinancing is granted in all respects and the Court will entertain a separate order authorizing the Proposed Refinancing.  The Motion to repay prepetition debt and the Limited Objection to claims  is granted in part to the extent set forth above.  The CalGen Secured Lenders' claims for damages shall be limited  in the amount calculated in accordance with the percentage allocations set forth in the damages section of this Opinion and Order.

IT IS SO ORDERED

Dated:  New York, New York
       March 5, 2007

                                      /s/ Burton R. Lifland _____
                                      United States Bankruptcy Judge

14