**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| CALPINE CORPORATION, et al., | ) Case No. 05-60200 (BRL) |
| | ) Jointly Administered |
| Debtors. | ) |

**ORDER AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) AND 364(e)**

Upon the motion (the "**Motion**"), filed on January 26, 2007, of Calpine Corporation, a

Delaware corporation (the "**Borrower**"), and each of the direct and indirect domestic

subsidiaries of the Borrower[1] (excluding RockGen Energy LLC, the "**Guarantors**" and each a

"**Guarantor**"), each a debtor and debtor-in-possession (together with the Borrower, the

"**Debtors**" and individually a "**Debtor**"), in the above-captioned cases (the "**Cases**") pursuant to

sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e) of title 11

of the United States Code, 11 U.S.C. §§101 et seq. (the "**Bankruptcy Code**"), and Rules 2002,

4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

seeking, among other things:

(1) authorization for the Borrower to obtain post-petition financing (the

"**Financing**") to refinance its existing debtor-in-possession financing and certain

pre-petition indebtedness of the Debtors, and for all of the Guarantors to guaranty

the Borrower's obligations in connection with the Financing, on a joint and

several basis, up to the aggregate principal amount of $5,000,000,000 (which

amount may be increased up to an aggregate principal amount of $7,000,000,000

---

[1]    The Guarantors and Debtors (other than the Borrower) are set forth on Schedule 1 to this Order.

022537-0132-08741-NY03.2567734.13

in connection with the incurrence of Incremental Term Loans (as defined in the DIP Credit Agreement) on the terms and conditions set forth in the DIP Credit Agreement without further application to the Court), pursuant to a credit agreement (the "**DIP Credit Agreement**") with Credit Suisse Securities (USA), LLC ("**CSS**"), Goldman Sachs Credit Partners L.P. ("**GS**"), J.P. Morgan Securities, Inc. ("**JPMSI**"), and Deutsche Bank Securities Inc ("**DBSI**") as joint lead arrangers and joint bookrunners, (CSS, GS, JPMSI and DBSI in such capacities the, "**Joint Lead Arrangers**"), Credit Suisse ("**CS**") as administrative agent for the lenders party thereto, (in such capacity and including any successors, the "**Agent**"), a syndicate of financial institutions (together with CS, GS, JPMorgan Chase Bank, N.A. and Deutsche Bank Trust Company Americas and including the fronting and issuing banks for the letters of credit, in such capacities, the "**DIP Lenders**"), and CS as Collateral Agent for the DIP Lenders (in such capacity and including any successors, the "**Collateral Agent**").

      (2)  authorization for the Debtors to execute and enter into the DIP Documents and to perform such other and further acts as may be required in connection with the DIP Documents;

      (3)  the granting of certain superpriority claims to the DIP Lenders payable from, and having recourse to, all pre-petition and post-petition property of the Debtors' estates and all proceeds thereof (including any proceeds of Avoidance Actions (as defined below); <u>provided</u> that with respect to proceeds of Avoidance Actions, such allowed claims shall share in such proceeds on a pari-passu basis

2

with general unsecured claims) (which is an "**Extraordinary Provision**" under General Order No. M-274 of the United States Bankruptcy Court for the Southern District of New York (the "**General Order**")), in each case subject to the Carve Out (as defined below);

(4) authorization for the use of certain proceeds of the Financing (a) to irrevocably repay in full all loans and other obligations outstanding under the Amended and Restated Revolving Credit, Term Loan and Guarantee Agreement, dated as of February 23, 2006 (as amended, supplemented or otherwise modified, the "**Existing DIP Agreement**" and together with all of the Bankruptcy Court orders, the agreement, documents and instruments executed or delivered in connection therewith, the "**Existing DIP Facility Documents**"), by and among the Borrower, the Guarantors, the several lenders party thereto (collectively, the "**Existing DIP Lenders**"), Deutsche Bank Trust Company Americas, as administrative agent (in such capacity, the "**First Priority Agent**"), Credit Suisse, as administrative agent (in such capacity, the "**Second Priority Agent**" and together with the First Priority Agent, the "**Existing Agents**"), (b) to repay and redeem the CalGen Secured Debt (as defined in the Motion), (c) at the Borrower's election, to satisfy the aggregate amount, if any, of any actual or potential claims, premiums or penalties related to (i) any "makewhole", repayment, prepayment or call provisions, (ii) any contract defaults or (iii) any contractual damages, in each case payable to the holders of the CalGen Secured Debt in connection with the payment in respect to the CalGen Secured Debt or such other amounts that the

3

parties agree, or this Court or an appellate court finds, are properly included in the secured claims of the holders of the CalGen Secured Debt (the "**CalGen Makewhole Payment**"), (d) to refinance certain subsidiary secured debt, secured lease obligations and existing preferred securities, (e) for working capital purposes and other general corporate purposes of the Debtors and, to the extent permitted under the DIP Credit Agreement, their subsidiaries, and (f) to fund distributions under a confirmed Chapter 11 plan of reorganization for the Debtors (a "**Reorganization Plan**");

(5) authorization for (a) the assumption by the reorganized Debtors on the effective date of a Reorganization Plan of the loans and other obligations outstanding under the DIP Documents, (b) the granting of liens on, and security interests in, the property of certain of the reorganized Debtors (as will be set forth in the Exit Facility Agreement) to secure the obligations outstanding under an exit facility agreement with the Borrower and the Guarantors, each as reorganized Debtors (the "**Exit Facility Agreement**"), from CSS, GS, JPMSI and DBSI, as joint lead arrangers and joint bookrunners (collectively, the "**Exit Joint Lead Arrangers**"), CS, as administrative and collateral agent (the "**Exit Agent**") and a syndicate of financial institutions party thereto (collectively, the "**Exit Lenders**") and (c) the payment of certain fees and the reimbursement of certain expenses to the Exit Joint Lead Arrangers, the Exit Agent and the Exit Lenders (it being understood that any such conversion shall be at the Borrower's election); and

022537-0132-08741-NY03.2567734.13

(6)  the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code, which is an Extraordinary Provision under the General Order and authorized under the Order entered by this Court .

Due and appropriate notice of the Motion, the relief requested therein having been served by the Debtors on January 26, 2007 and on the United States Trustee for the Southern District of New York.

The Hearing having been held by this Court on February 27, 2007 and all objections to the entry of this Order having been overruled or withdrawn, upon the record made by the Debtors at the Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Jurisdiction*.  This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice*.  Under the circumstances, the Notice given by the Debtors of the Motion and the Hearing is in accordance with Sections 102(1) and 364 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(c) and the local rules of this District, and no other or further notice is required.

3.    *Findings Regarding the Financing.*

(a)    Good cause has been shown for the entry of this Order.

5

(b)    The Debtors require the proceeds of this Financing in order to maximize the value of these estates by reducing the Debtors' financing costs and to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, carriers and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operational needs. The reduction in financing costs together with continued access of the Debtors to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and enhancement of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the Collateral Agent, the Agent and the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Order and in the DIP Documents.

(d)    The terms of the Financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

(e)    The Financing has been negotiated in good faith and at arm's length between the Debtors, the Collateral Agent, the Agent and the DIP Lenders, and all of the

6

022537-0132-08741-NY03.2567734.13

Debtors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, (i) all loans made to, and all letters of credit issued for the account of, the Borrower and the other Debtors pursuant to the Credit Agreement substantially in the form attached as Exhibit A to the Motion (the "**DIP Credit Agreement**"), (ii) any "**Obligations**" (as defined in the DIP Credit Agreement), including credit extended in respect of overdrafts and related liabilities and other depository, treasury, cash management services and other services (including, without limitation, automated clearing house transfer of funds services), any Eligible Permitted Commodity Hedge Agreements (as defined in the DIP Credit Agreement) or other hedging obligations of the Debtors to the extent permitted under the DIP Credit Agreement (including pursuant to any Swap Agreement (as defined in the DIP Credit Agreement)) in each case provided by either Agent, any DIP Lender or any of their respective affiliates or any Qualified Entity and (iii) all fees, indemnity claims and reimbursement obligations payable under the separate letter agreements between the Joint Lead Arrangers and the Borrower in connection with the Financing , copies of which the Debtors represent have been provided to the Creditors Committee (as defined below) (all of the foregoing in clauses (i), (ii), and (iii) collectively,  the "**DIP Obligations**"), shall be deemed to have been extended by the Agent and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

7

(f)     The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Consummation of the Financing in accordance with this Order and the DIP Documents is in the best interests of the Debtors' estates.

4.     *Authorization of the Financing and the DIP Documents.*

(a)     The Debtors are hereby authorized to enter into and perform under the DIP Documents.  The Borrower is hereby authorized to borrow money and obtain letters of credit pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guarantee such borrowings and the Borrower's obligations with respect to such letters of credit, up to an initial aggregate principal amount of $5,000,000,000 (plus interest, fees and other expenses provided for in the DIP Documents), subject to any limitations under the DIP Documents, in accordance with the terms of this Order and the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, including, without limitation, (i) to irrevocably repay in full all loans and other obligations outstanding under the Existing DIP Facility Documents, (ii) to repay and redeem the CalGen Secured Debt, (iii) at the Borrower's election, to pay and satisfy the CalGen Makewhole Payment, if any, (iv) to refinance certain subsidiary secured debt, secured lease obligations and existing preferred securities on the terms and subject to the conditions in the DIP Documents, (v) to fund distributions to holders of prepetition unsecured claims under a Reorganization Plan, (vi) to provide working capital for the Debtors and, to the extent permitted under the DIP Documents, their subsidiaries and for other general corporate purposes and (vii) to pay interest, fees and expenses in accordance with this Order and the DIP Documents.  In addition to such amounts and obligations, the Debtors are authorized to incur overdrafts and related liabilities arising from, treasury, depository and cash management

8

services or in connection with any automated clearing house fund transfers provided to or for the benefit of the Debtors by CS, GS, JPM or DB or any of its or their affiliates, and Eligible Permitted Commodity Hedge Agreements (as defined in the DIP Credit Agreement) and other hedging obligations (including pursuant to Swap Agreements (as defined in the DIP Credit Agreement)) permitted pursuant to the terms of the DIP Credit Agreement; *provided, however*, that nothing herein shall require CS, GS, JPM or DB or any other party to incur overdrafts or to provide any such services or functions to the Debtors or to enter into any Swap Agreements with the Debtors.

       (b)    In furtherance of the foregoing and without further approval of this Court, and in accordance with the terms of this Order and section 303 of the Delaware General Corporation Law and other similar laws in the relevant jurisdictions of organization, each Debtor is authorized, directed and obligated (all without need for further action by their respective members, stockholders or partners and with like effect as if such action had been taken by unanimous action thereof) in accordance with the terms of the DIP Documents to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the amendment of any charters, bylaws or other organizational documents of such Debtor and the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under Financing, including, without limitation:

       (i)    the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, (x) the DIP Credit Agreement, (y) the Security and Pledge Agreement (as defined in

9

the DIP Credit Agreement), and the mortgages, if any, contemplated thereby and (z) the commitment letter (the "Commitment Letter") and the other letters executed in connection therewith, copies of which the Debtors represent have been shared with the Creditors Committee (collectively, the "**DIP Documents**");

(ii)     the execution, delivery and performance of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the Agent and the DIP Lenders may agree (it being understood that no further approval of the Court shall be required for amendments to the DIP Credit Agreement (and the fees paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the commitments, the rate of interest or the letter of credit fees payable thereunder nor for the payment of any fees, costs or expenses associated with such amendment), provided that no further Court approval shall be required for the aggregate commitments under the Financing to be increased to up to $7,000,000,000 in connection with the incurrence by the Borrower of Incremental Term Loans (as defined in the DIP Credit Agreement) on the terms and subject to the conditions set forth in the DIP Credit Agreement; provided further that the Debtors will provide the Creditors Committee and the Equity Committee (each as defined below) and the Unofficial Committee of Second Lien Debtholders (the "**Second Lien Committee**") with three (3) days prior written notice of (i) the terms of any such proposed amendment and related fees (other than such amendments relating to the adding of additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders) and (ii) the

10

terms and conditions of any Incremental Term Loans to be incurred under the DIP Credit Agreement. Notwithstanding any other provision hereof, without further approval of this Court or notice thereof, amendments to the DIP Documents and certain of its terms may be made as contemplated thereby (solely to permit modifications to the DIP Credit Agreement advisable to ensure successful syndication);

(iii)    the non-refundable payment to the Agent, the Collateral Agent, and the Joint Lead Arrangers as the case may be, of the fees, costs, expenses and indemnities referred to in the DIP Credit Agreement and, upon entry of this Order, the fees referred to in the separate letter agreements between CS, Goldman, JPMSI and the Borrower (copies of which the Debtors represent have been shared with the Creditors Committee) negotiated in connection with the Financing in accordance with the terms thereof, and reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable fees and expenses of the professionals retained as provided for in the DIP Documents (including the Commitment Letter and any letter agreements executed in connection therewith), provided that copies of invoices for such professionals are provided to the Debtors, the Official Committee of Unsecured Creditors (the "**Creditors Committee**") and the Official Committee of Equity Holders (the "**Equity Committee**") and the Second Lien Committee and none of the Debtors, the Creditors Committee, the Second Lien Committee or the Equity Committee interpose any written objection (delivered to such professional) to such invoices within fifteen (15) days of delivery by the relevant professional to the Debtors, the Creditors Committee, the Second Lien Committee and the Equity Committee, provided that, to the extent an objection to any such invoices are interposed within the foregoing fifteen (15) day period, the applicable professional shall be

11

entitled to receive payment for those fees and expenses for which there is no objection and the

objecting party and the applicable professional shall seek to resolve any such objection within

ten (10) days of such objection and, if the objection cannot be resolved either the advisor or the

objecting party shall be permitted to seek a ruling by this Court as to the reasonableness of such

fees and/or expenses on at least five (5) business days notice,  and

(iv)    the performance of all other acts required under or in connection

with the DIP Documents.

(c)    Upon execution and delivery of the DIP Documents, the DIP Documents

shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor

party thereto in accordance with the terms of the DIP Documents. No obligation, payment,

transfer or grant of security under the DIP Documents or this Order shall be stayed, restrained,

voidable, or recoverable under the Bankruptcy Code or under any applicable law (including

without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense,

reduction, recoupment, setoff or counterclaim.

5.    *Superpriority Claims.*

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, effective as of the

date of this Order, all of the DIP Obligations shall constitute allowed claims against the Debtors

with priority over any and all administrative expenses, diminution claims and all other claims

against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without

limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the

Bankruptcy Code, and over any and all administrative expenses or other claims arising under

sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the

12

Bankruptcy Code (the "**Superpriority Claims**"), which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof (provided that with respect to proceeds of Avoidance Actions, such allowed claims shall share in such proceeds on a pari-passu basis with general unsecured claims), subject only to the payment of the Carve Out to the extent specifically provided for herein.

(b)     For purposes hereof, the "**Carve Out**" means an amount which shall be used to pay (i) unpaid fees and expenses of professionals retained by the Debtors, the Creditors Committee, the Official Committee of Equity Holders or any statutory committee appointed in accordance with section 1102 of the Bankruptcy Code in these Case (together with the Creditors Committee and the Equity Committee, the "**Committees**") and the reasonable expenses of members of any Committee that are (a) incurred prior to the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement) and (b) allowed by the Bankruptcy Court, at any time, under sections 105(a), 330, 331 and 503(b)(3) of the Bankruptcy Code or otherwise, (ii) unpaid fees and expenses of professionals retained by the Debtors or any Committee and the reasonable expenses of members of any Committee, up to an aggregate amount not to exceed $50,000,000 that (a) are incurred after the occurrence and during the continuance of an Event of Default and (b) allowed by the Bankruptcy Court, at any time, under sections 105(a), 330, 331 and 503(b)(3) of the Bankruptcy Code or otherwise, (iii) in the event of a conversion of the Cases, the reasonable fees and expenses of a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $2,000,000, and (iv) fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930 (a), Title 28, United States Code; provided that the Carve Out shall not include any

022537-0132-08741-NY03.2567734.13

fees or expenses incurred in investigating or challenging the liens or superpriority claims of the

Collateral Agent (solely in such capacity), Administrative Agent (solely in such capacity) or

Lenders (solely in such capacity) granted under the Existing DIP Agreement or any of the

documents, instruments or agreement executed or delivered in connection therewith, or the DIP

Liens or the claims of the Collateral Agent, the Agent or the DIP Lenders under the DIP Credit

Agreement, the Security and Pledge Agreement or this Order but may include fees and expenses

incurred in investigating and/or challenging the liens and claims of any other pre-petition or

other post-petition creditor of the Debtors' estates (it being understood that, in the event of a

liquidation of the Borrower's and the other Debtor's estates, upon the effective date of a

Reorganization Plan for the Debtors or the consummation of the sale of all or substantially all of

the Borrower's or the Debtors' assets, an amount equal to the Carve-Out shall be reserved from

the proceeds of such liquidation, such Reorganization Plan, such sale or from cash held in the

estates at such time, and held in a segregated account prior to the making of the distributions).

For clarity, the Agent and DIP Lenders agree that so long as no Event of Default shall have

occurred and be continuing, the Debtors shall be permitted to pay compensation and

reimbursement of fees and expenses allowed and payable under 11 U.S.C. §§ 105(a), 330, and

331, as the same may be due and payable, and neither such amounts nor any retainers paid to the

professionals retained by the Debtors or any Committee, nor any fees, expenses, indemnities or

other amounts paid to the Collateral Agent, the Agent, any DIP Lender or their respective

attorneys and agents under the DIP Credit Agreement, shall reduce the Carve-Out, provided that

nothing herein shall be construed to impair the ability of any party to object to any of the fees,

expenses, reimbursement or compensation described in clauses (ii) and (iii) above, and provided

14

further, that cash or other amounts on deposit in the L/C Cash Collateral Account shall not be

subject to the Carve Out; and provided, further, that nothing herein shall be construed to waive or

modify the Debtors' obligations to satisfy in full all amounts allowed under Bankruptcy Code

sections 330 and 331 in connection with a confirmed Reorganization Plan..

6.      *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the Closing

Date (as defined in the DIP Credit Agreement) and without the necessity of the execution,

recordation of filings by the Debtors of mortgages, security agreements, control agreements,

pledge agreements, financing statements or other similar documents, the Debtors hereby grant

the following security interests and liens to the Collateral Agent for its own benefit and the

benefit of the Collateral Agent and DIP Lenders (all property identified in clauses (a), (b) and (c)

below being collectively referred to as the "**Collateral**"), subject, only in the event of the

occurrence and during the continuance of an Event of Default or a Default, to the payment of the

Carve Out (all such liens and security interests granted to the Collateral Agent, for its benefit and

for the benefit of the Agent and DIP Lenders, pursuant to this Order and the DIP Documents, the

"**DIP Liens**"):

(a)      First Lien on Cash Balances and Unencumbered Property.  Pursuant to

section 364(c)(2) of the Bankruptcy Code, the  Collateral Agent is hereby granted (for the benefit

of itself, the Agent and the DIP Lenders) a valid, binding, continuing, enforceable, fully-

perfected first priority senior security interest in and lien upon all pre- and post-petition property

of the Debtors, whether existing on December 20, 2005 (the "**Petition Date**") or thereafter

acquired, that, on or as of the Petition Date was not subject to valid, perfected and non-avoidable

liens or in respect of which the obligations secured by liens existing on the Petition Date have

15

been (or will be) satisfied (including, without limitation, upon the satisfaction in full thereof either by Final Order (as defined below) or under a Reorganization Plan, all property of the Debtors securing the CalGen Secured Debt as set forth in clause (e) of this paragraph 6) (collectively, "**Unencumbered Property**"), including without limitation, all cash and cash collateral of the Debtors (whether maintained with the Collateral Agent, the Agent or otherwise and including without limitation all cash in the Concentration Account (as defined in the DIP Credit Agreement) and any investment of such cash and cash collateral, inventory, accounts receivable (including, without limitation, any receivables payable to Calpine Energy Services L.P.), other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, all property purportedly assigned or pledged as collateral by any Debtor to secure any intercompany obligations to the extent any such assignment or pledge shall not have been duly perfected as of the Petition Date and the proceeds of all the foregoing *provided that* no Debtor shall be required to pledge to the Collateral Agent (i) in excess of 65% of the voting capital stock of its direct foreign subsidiaries or any of the capital stock or interests of its indirect foreign subsidiaries if adverse tax consequences would result to the Borrower from such pledge, (ii) the capital stock of Calpine Pasadena Cogeneration, Inc., and Calpine Texas Cogeneration, Inc., to the extent the pledge thereof is prohibited by the documents governing the leveraged-lease transaction under which Pasadena Cogeneration L.P., is the facility lessee, and such entities are not debtors or debtors-in-possession in these Cases, (iii) the Capital Stock of Androscoggin Energy, LLC, Bethpage Energy Center 3, LLC, Calpine Canada

16

Energy Finance ULC, Calpine Canada Energy Ltd., Calpine Merchant Services Company, Inc.,

Calpine Newark, LLC, Calpine Parlin, LLC and CPN Insurance Corporation, (iv) the stock of

any subsidiary that is not a Debtor owned by any subsidiary that becomes a Debtor after the

Closing Date to the extent such pledge would constitute a default under project documents, result

in a right of refusal, call or put options being activated, or to the extent such entity is a debtor in

another bankruptcy case in another jurisdiction, or insurance company or such grant of a security

interest is prohibited by, or constitutes a breach or default under or results in the termination of

or requires any consent not obtained under, any contract, license, agreement, instrument, other

document or any applicable shareholder or similar agreement relating thereto or conflicts with

any applicable law or (v) any of the assets of O.L.S. Energy-Agnews, Inc., Broad River Energy

LLC, South Point Energy Center LLC, Calpine Greenleaf Holdings, Inc., Calpine Greenleaf, Inc.

or Calpine Monterey Cogeneration, Inc.  Unencumbered Property shall exclude the Debtors'

claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the

Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively,

"**Avoidance Actions**"), and any proceeds or property recovered, unencumbered or otherwise the

subject of successful Avoidance Actions.

      (b)    <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the

Bankruptcy Code, the Collateral Agent (for the benefit of itself the Agent and the DIP Lenders)

is hereby granted valid, binding, continuing, enforceable, fully-perfected security interests in and

liens upon all pre-petition  and post-petition property of the Debtors (other than the property

described in clause (a) of this paragraph 6, to the extent such property is subject to senior liens

and security interests in favor of the Collateral Agent or to the extent such property is excluded

17

from such liens and security interests pursuant to sub-clause (ii) of clause (a) of this paragraph 6), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code or to Permitted Liens (as defined in the DIP Credit Agreement), which security interests and liens in favor of the Collateral Agent are junior to such valid, perfected and unavoidable liens.

(c)    <u>Liens Priming Certain Replacement Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, the Collateral Agent is hereby granted (for the benefit of itself, the Agent and the DIP Lenders) a valid, binding, continuing, enforceable fully-perfected priming security interest in and lien on all pre-petition and post-petition property of the Debtors whether now existing or hereafter acquired that is subject to the replacement liens granted pursuant to and under the Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection entered by the Bankruptcy Court on or about January 30, 2006 (as amended, the "**Cash Collateral Order**") in respect of the Calpine Second Lien Debt (as defined in the Cash Collateral Order), which security interests and liens in favor of the Collateral Agent shall be senior to such replacement liens.

(d)    <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date.

18

(e)    <u>Liens Securing the CalGen Secured Debt</u>.    Upon entry of this Order and the repayment of the CalGen Secured Debt, the DIP Obligations shall be secured by valid, binding, continuing, enforceable, fully perfected first priority senior security interests in, and liens on, all pre-petition and post-petition property of CalGen Holdings, Inc. and its subsidiaries, whether such property existed as of the Petition Date or was acquired thereafter, that secured the CalGen Secured Debt; <u>provided</u> that until the date of entry of a Final Order with respect to the Disputed CalGen Claims (as defined below) the liens granted to the Collateral Agent hereunder (for the benefit of itself, the Agent and the DIP Lenders) on such property shall rank junior to the liens related to the CalGen Secured Debt that secure any alleged (i) CalGen Makewhole Payment, (ii) entitlement to interest (whether default or otherwise) sought by or on account of CalGen Secured Debt, (iii) claims for fees and expenses that may ultimately be allowed, and (iv) any and all claims, including without limitation, contract damage claims (collectively, (i) though (iv) are the "**Disputed CalGen Claims**").    For purposes hereof, a "**Final Order**" means an order, judgment or decrees as to which the time to appeal, petition for certiorari, or move for reargument or rehearing, and any stay associated therewith, has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing by the entity possessing such right, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order, judgment or decree was appealed, or certiorari has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

19

7.    *Protection of DIP Lenders' Rights.*  The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary (i) to permit the Collateral Agent, the Agent and the DIP Lenders to exercise, upon the occurrence of an Event of Default, all rights and remedies under the DIP Documents other than those rights and remedies against the Collateral and (ii) to permit the Collateral Agent, the Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default and the giving of five (5) business days prior written notice to the Debtors, the United States Trustee for the Southern District of New York, the Committees appointed in the Cases and the Second Lien Committee, all rights and remedies against the Collateral provided for in the DIP Documents (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the Collateral Agent, any Agent or any DIP Lender).  In no event shall the Collateral Agent, the Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

8.    *Perfection of DIP Liens.*

(a)    The Collateral Agent and the DIP Lenders are hereby authorized, but not required, to file or record Uniform Commercial Code financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the Collateral Agent on behalf of the DIP Lenders shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed

022537-0132-08741-NY03.2567734.13

valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, as of the Petition Date. Upon the request of the Collateral Agent, each of the Debtors, without any further consent of any party, is authorized to take, execute and deliver such instruments to enable the Collateral Agent to further validate, perfect, preserve and enforce the DIP Liens.

(b)    A certified copy of this Order may, in the discretion of the Collateral Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

(c)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more lessors or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the transactions granting post-petition liens, in such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the Collateral Agent or the DIP Lenders in accordance with the terms of the DIP Credit Agreement or this Order.

(d)    Upon the request of the Collateral Agent, each of the Borrower and the Guarantors shall seek to enter into separate fee and leasehold mortgages in recordable form with respect to the Collateral, as applicable, on terms reasonably satisfactory to the Collateral Agent.

9.    *Preservation of Rights Granted Under the Order*.

21

(a)    Subject to the Carve-Out, no claim or lien having a priority superior to or

*pari passu* with those granted by this Order to the Collateral Agent, the Agent and the DIP

Lenders shall be granted or allowed while any portion of the Financing (or any refinancing

thereof) or the commitments thereunder or the DIP Obligations remain outstanding, and the DIP

Liens shall not be (i) subject or junior to any lien or security interest that is avoided and

preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii)

subordinated to or made pari passu with any other lien or security interest, whether under section

364(d) of the Bankruptcy Code or otherwise.

(b)    Unless all DIP Obligations shall have been paid in full (and, with respect to

outstanding letters of credit issued pursuant to the DIP Credit Agreement, cash collateralized in

accordance with the provisions of the DIP Credit Agreement), the Debtors shall not seek, and it

shall constitute an Event of Default if any of the Debtors seek, or if there is entered, (i) any

modifications or extensions of this Order without the prior written consent of the Agent, and no

such consent shall be implied by any other action, inaction or acquiescence by either or both

Agent, (ii) an order converting any of the Cases to a case under chapter 7 of the Bankruptcy

Code or (iii) an order dismissing any of the Cases.  If an order dismissing any of the Cases under

section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall

provide (in accordance with sections 105 and 349 of the Bankruptcy Code), to the fullest extent

permitted by law, that (x) the Superpriority Claims, priming liens, security interests and

replacement security interests granted to the Collateral Agent, the Agent and the DIP Lenders

pursuant to this Order shall continue in full force and effect and shall maintain their priorities as

provided in this Order until all DIP Obligations shall have been paid and satisfied in full in cash

22

(and that such Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (x) above.

(c)     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations incurred prior to the actual receipt of written notice by the Agent of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any DIP Obligations incurred by the Debtors to the Agent or the DIP Lenders, prior to the actual receipt of written notice by the Agent of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the Agent and DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents with respect to all DIP Obligations.

(d)     Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the Superpriority Claims and all other rights and remedies of the Collateral Agent, the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, or (ii) the entry of an order

23

confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the

Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations

and such waiver is hereby approved.  The terms and provisions of this Order and the DIP

Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly

administered, or in any superceding chapter 7 cases under the Bankruptcy Code, and the DIP

Liens, the Superpriority Claims and all other rights and remedies of the Collateral Agent, the

Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall

continue in full force and effect until the DIP Obligations are indefeasibly paid in full.

10.    *Payments to Existing Agents and Existing DIP Lenders.*  (a)  On the Closing Date, (i) the

Debtors are hereby authorized and directed to use the proceeds of borrowings under the DIP

Credit Agreement to irrevocably repay in full all outstanding obligations to the Existing Agents

and the Existing DIP Lenders under the Existing DIP Facility Documents and (ii) all letters of

credit issued and outstanding under the Existing DIP Facility Documents shall be deemed to be

letters of credit issued under the DIP Documents for all purposes thereunder.

(b)  Subsequent to the Closing Date, (x) the Debtors shall pay and/or reimburse the

Existing Agents and/or the Existing DIP Lenders for any and all fees, costs, expenses, losses and

damages (including, without limitation, any fees, costs, expenses, losses and damages

contemplated by Section 10.5 of the Existing DIP Agreement) incurred thereafter to the extent

that the Existing DIP Agreement or any other Existing DIP Facility Document entitles them to

such payment, indemnity or reimbursement after termination of such Existing DIP Facility

Document and (y) such amounts shall, until paid in full in cash, constitute superpriority

24

administrative expense claims under Section 507(b) of the Bankruptcy Code, subject and

subordinate in all respects to the Superpriority Claims granted in paragraph 5(a) above.

11.      *Limitation on Use of Financing Proceeds and Collateral.*  Notwithstanding anything

herein or in any other order by this Court to the contrary, no borrowings, letters of credit,

Collateral or the Carve Out may be used to (a) object, contest or raise any defense to, the

validity, perfection, priority, extent or enforceability of any amount due under the DIP

Documents, or the liens or claims granted under this Order or the DIP Documents, (b) assert any

claims or defenses or causes of action against the Collateral Agent (solely in such capacity), the

Agent (solely in such capacity) or the DIP Lenders (solely in such capacity) or their respective

agents, affiliates, representatives, attorneys or advisors (other than for fraud, gross negligence or

willful misconduct), (c) prevent, hinder or otherwise delay the Collateral Agent's assertion,

enforcement or realization on the Collateral in accordance with the DIP Documents or this

Order, (d) seek to modify any of the rights granted to the Collateral Agent, the Agent or the DIP

Lenders hereunder or under the DIP Documents, in each of the foregoing cases without such

parties' prior written consent, (e) pay any professional fees and disbursements incurred in

connection with any of the actions described in the foregoing clauses (a) through (d) and (f) pay

any amount on account of any claims arising prior to the Petition Date unless such payments are

(i) approved by an Order of this Court and (ii) approved by the Agent or otherwise in accordance

with the Budget (as defined in the DIP Credit Agreement) as the same has been approved by the

Agent in its sole discretion, provided that notwithstanding anything to the contrary contained

herein, any fees or expenses paid in respect of the assertion of any claims or defenses or causes

of action against the Agent or the DIP Lenders or their respective agents, affiliates,

25

representatives, attorneys or advisors for fraud, gross negligence or willful misconduct shall be disgorged and repaid to the Debtors by the respective recipients thereof if and to the extent the relevant court enters a final order resolving such claims, defenses or causes of action that does not find such alleged fraud, gross negligence or willful conduct actually occurred. For the avoidance of doubt, borrowings, letters of credit, Collateral and the Carve Out may be used to investigate and/or challenge the liens and claims of any pre-petition or post-petition creditor (other than those of the Collateral Agent (solely in such capacity), the Agent (solely in such capacity), and the DIP Lenders(solely in such capacity)) of the Debtors' estates or assert defenses against such parties.

12.     *Intercompany Claims.* Notwithstanding anything contained in the DIP Documents to the contrary, all outstanding intercompany indebtedness of any Subsidiary of the Borrower (as such term is defined in the DIP Documents) owing to the Borrower shall remain as is and shall not be converted to, nor contributed as, equity of such Subsidiary absent further order of this Court after notice and a hearing, provided that in no circumstances shall any such intercompany indebtedness of any Subsidiary of the Borrower owing to the Borrower be paid or otherwise satisfied at any time prior to the repayment in full of all DIP Obligations and the cancellation of the commitments under the DIP Credit Agreement, except that in connection with a sale of any asset pursuant to which the Borrower or any Subsidiary of the Borrower is required to contribute any asset to another Debtor to accomplish such sale the value of the asset contributed shall be repaid through the proceeds of the sale. All parties shall be deemed to have reserved their rights with respect to (i) any resulting intercompany balances as a result of intercompany transactions whether arising pre-petition or post-petition; (ii) the pricing under intercompany arrangements,

26

(iii) allocation of costs, fees and expenses incurred by the various Debtor entities in connection with intercompany transactions for both pre-petition and post-petition periods, (iv) characterization of any pre-petition intercompany claim as debt or equity, and (v) any intercompany subrogation or contribution claims arising as a result of the administration and operation of the DIP Documents. For the avoidance of doubt except as set forth in this paragraph 12, no provision of either the DIP Documents or this Order shall alter or impair any claim in respect of intercompany indebtedness owed by the Borrower or one of its Subsidiaries to any other Subsidiary of the Borrower and the rights (if any) of all parties with respect thereto shall be deemed to have been reserved in full. Nothing in this order shall affect, impact or address issues of substantive consolidation of any or all Debtors and the rights (if any) of all parties with respect thereto are hereby expressly preserved.

13.    *Order Governs*.  In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

14.    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the Collateral Agent, the Agent, the DIP Lenders, any Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any estate representative or any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the Collateral Agent, the Agent, the DIP Lenders, and the Debtors and their respective successors and assigns *provided*, *however*, that the Agent and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In

27

determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the Collateral Agent, the Agent and the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

15.     *Waiver of Claims Under 11 U.S.C. § 506(c)*.  Except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding or case that may result therefrom, including liquidation in bankruptcy or any other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Collateral Agent and no such consent shall be implied from any other action, inaction, or acquiescence by the Collateral Agent or the DIP Lenders.

16.     *Adequate Protection for Holders of Calpine Corp. Second Lien Debt*.  Without prejudice to their right to seek additional adequate protection or their rights under the Cash Collateral Order, the adequate protection granted to the Calpine Corp. Second Lien Holders under (i) the Cash Collateral Order (including, without limitation, the right to receive the 2006 Adequate Protection Payments and the 2007 Adequate Protection Payments as all such terms are defined in, and in accordance with the terms of, the Order Modifying the Cash Collateral Order, entered by the Bankruptcy Court on December 28, 2006, and (ii) pursuant to the Stipulation Regarding Objection of Second Lien Committee entered by the Bankruptcy Court on February 28, 2007

28

(Docket Number 3841)) (the "**AP Stipulation**") shall constitute sufficient adequate protection of their interests and no additional adequate protection shall be required as a result of the priming of any liens of the Calpine Corp. Second Lien Holders hereby or the entry of this Order.

17.    *Conversion to Exit Facility Agreement*.  (a)  Upon the satisfaction or waiver of the conditions precedent to effectiveness set forth in the Exit Facility Agreement (it being understood that any such conversion shall be at the Borrower's election) (the "**Conversion Date**"), automatically and without further order of this Court, (i) the Borrower, in its capacity as reorganized Calpine Corporation, shall be authorized to assume all obligations in respect of the loans and all other monetary obligations under the DIP Credit Agreement, (ii) each loan under the DIP Credit Agreement shall be deemed to have been continued as a loan under the Exit Facility Agreement, (iii) each DIP Lender shall be deemed to be an Exit Lender under the Exit Facility Agreement, (iv) the DIP Documents shall be deemed to have been superseded and replaced, and deemed amended and restated in the form of, the Exit Facility Agreement (with such changes satisfactory to the administrative agent under the Exit Facility Agreement and the Borrower deemed incorporated as necessary to make such technical changes necessary to effectuate the intent of this paragraph 17) and (v) the commitments under the DIP Credit Agreement shall be deemed to have been terminated.   Notwithstanding the foregoing, all obligations of the Borrower and the Guarantors to the Agents, Joint Lead Arrangers and the DIP Lenders under the DIP Credit Agreement or any other DIP Document which are expressly stated in the DIP Credit Agreement or such other DIP Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect as and to the extent set forth in paragraph 9(d) of this Order.

29

(b)     If the Debtors make an election to convert the DIP Facility to an Exit Facility in accordance with the terms of this Order and the DIP Documents, any order entered by this Court confirming a Reorganization Plan any of the Cases (a "**Confirmation Order**") shall provide that upon the Conversion Date (i) the Debtors and the reorganized Debtors are authorized to execute and deliver the Exit Facility Agreement, all mortgages, security documents and all other related agreements, documents or instruments to be executed or delivered in connection therewith (collectively, the "**Exit Facility Documents**") and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages or indemnities, (ii) the Exit Facility Documents shall constitute the legal, valid and binding obligations of the reorganized Debtors parties thereto, enforceable in accordance with their respective terms, (iii) the Liens granted hereunder shall continue to secure all obligations under the Exit Facility Documents (unless otherwise stated in the Exit Facility Documents) and shall not be altered, amended or discharged by confirmation of the Reorganization Plan and shall be, and shall remain, legal, valid, perfected, non-voidable and binding liens on, and security interests in, all property and assets of the reorganized Debtors having the priority granted to them hereunder and (iv) no obligation, payment, transfer or grant of security under the Exit Facility Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim.   Such Confirmation Order shall further provide that the Debtors and the reorganized Debtors, as applicable, and the other persons granting any liens and security interests to secure the obligations under the Exit Facility Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to

30

establish and further evidence of perfection of such liens and security interests under the provisions of any applicable federal, state, provincial or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of this Order and any such filings, recordings, approvals and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

18.    *Bethpage.* Notwithstanding anything to the contrary in this Order or in the DIP Credit Agreement, no funds or credit made available under the DIP Credit Agreement may be borrowed or otherwise used by Bethpage Energy Center 3, LLC ("**BEC3**"), and any amounts borrowed or otherwise used shall be immediately repaid by BEC3, and BEC3 shall not be a Guarantor under or otherwise party to the DIP Credit Agreement or any of the DIP Documents and shall not be liable in any respect for any of the DIP Obligations or subject to any of the DIP Liens or claims.

19.    *Westbrook.* Solely with respect to the Motion, based on the Debtors' representation, it is hereby found that the interests in real property located in Westbrook, Maine which are owned by Calpine Construction Finance Company, L.P. (as shown by documents now of record in the Registry of Deeds for Cumberland County, Maine), as well as personal property located thereon, is not owned by a Debtor as of the date hereof and accordingly such real or personal property shall not be subject to the terms of this Order, provided that such finding is without prejudice to the right of the Debtors to seek to obtain orders extending this Order to such real and personal property if Calpine Construction Finance Company, L.P., subsequently becomes a Debtor.

20.    *Adequate Protection for Debtors Jointly and Severally liable for Obligations under the DIP Documents.* The adequate protection provisions set forth in paragraphs 19 and 22 of the cash

31

collateral order entered by the Court contemporaneously with the entry of the order authorizing the Debtors to enter into the Existing DIP Facility Documents shall be deemed to remain in full force and effect.

21.    *Hedging Obligations.*  Subject to the terms of DIP Credit Agreement, the Debtors are hereby authorized to incur Hedging Obligations (as defined in the Motion), from time to time, as administrative expense obligations under section 503(b) of the Bankruptcy Code and to secure the Hedging Obligations with liens that are pari passu to the Liens granted to the Collateral Agent under the DIP Credit Agreement and this Order.

22.    *Committee Consent:*  Notwithstanding anything contained in this Order or the Loan Documents to the contrary, prior to the effective date of a Reorganization Plan, absent the prior written consent of the Creditors Committee or a further order of this Court (which may be the Confirmation Order), entered following appropriate notice, the Debtors shall not be authorized to (i) to extend the Commitment Expiration Date (as defined in the Commitment Letter) past March 30, 2007; (ii) incur any Incremental Term Loans under the DIP Credit Agreement; (iii) settle or satisfy any claims with respect to and/or pay any amount in respect of a CalGen Makewhole Payment; (iv) prior to entry into the Exit Facility Documents, refinance any subsidiary secured debt, secured lease obligations or existing preferred securities (other than the Calgen Secured Debt Obligations except for a CalGen Makewhole Payment); (v) elect to convert the Financing into an Exit Facility; or (vi) enter into the Exit Facility Documents.

23.    *Second Lien Committee:*  Nothing in paragraphs 4 or 21 hereof affect the obligations of the Debtors to comply with the AP Stipulation. Notwithstanding anything contained in this Order or the Loan Documents to the contrary, prior to the effective date of a Reorganization Plan,

absent the prior written consent of the Second Lien Committee or a further order of this Court

(which may be the Confirmation Order), entered following appropriate notice, the Debtors shall

not be authorized to (i) to extend the Commitment Expiration Date (as defined in the

Commitment Letter) past March 30, 2007; (ii) settle or satisfy any claims with respect to and/or

pay any amount in respect of a CalGen Makewhole Payment; (iii) elect to convert the Financing

into an Exit Facility; or (iv) enter into the Exit Facility Documents, except that the prior written

consent of the Second Lien Committee shall not be required under clauses (iii) and (iv) above to

the extent that the Exit Facility is a part of a Reorganization Plan pursuant to which the Second

Lien Debtholders will be paid in full in cash on the effective date of such Reorganization Plan.

24. '    The Court recognizes that included in the Collateral granted to the DIP Lenders herein

are certain oil and gas properties, leases and interests (collectively, the "**Disputed Properties**")

that are the subject of the July 7, 2005 Purchase and Sale Agreement by and between Calpine

Gas Holdings LLC and Calpine Fuels Corporation, as sellers, Calpine Corporation, as parent of

sellers, and Rosetta Resources Inc., as buyer and all interrelated agreements  thereto.

Notwithstanding anything herein to the contrary, nothing in this Order shall (i) affect, alter  or

otherwise impair any pre-existing valid, enforceable and non-voidable ownership rights or

interests (including any legal or equitable title) or lien interests, if any, that Rosetta Resources,

Inc. (together with its affiliated entities, "**Rosetta**") may have in or to the Disputed Properties

(the "**Rosetta Interest**") or any liens or encumbrances in any Rosetta Interest that Rosetta has

validly granted or may validly grant thereto; or (ii) prime or subordinate, in any way, any Rosetta

Interest, if any, which Rosetta Interest shall be senior and superior to any lien or security interest

granted herein to the DIP Lenders.

33

25.     To the extent not withdrawn on the record at the Hearing, all objections to the Motion are hereby overruled.

Dated:  New York, New York
        March 12, 2007

                                                    /s/Burton R. Lifland
                                                    UNITED STATES BANKRUPTCY JUDGE

34

## Schedule 1 [2]

Amelia Energy Center, LP
Anacapa Land Company, LLC
Anderson Springs Energy Company
Androscoggin Energy, Inc.
Auburndale Peaker Energy Center, LLC
Augusta Development Company, LLC
Aviation Funding Corp.
Baytown Energy Center, LP
Baytown Power GP, LLC
Baytown Power, LP
Bellingham Cogen, Inc.
Bethpage Fuel Management Inc.
Blue Heron Energy Center, LLC
Blue Spruce Holdings, LLC
Broad River Energy LLC
Broad River Holdings, LLC
CalGen Equipment Finance Company, LLC
CalGen Equipment Finance Holdings, LLC
CalGen Expansion Company, LLC
CalGen Finance Corp.
Calpine Geysers Company, L.P.
CalGen Project Equipment Finance Company One, LLC
CalGen Project Equipment Finance Company Three, LLC
CalGen Project Equipment Finance Company Two, LLC
Calpine Acadia Holdings, LLC
Calpine Administrative Services Company, Inc.
Calpine Agnews, Inc.
Calpine Amelia Energy Center GP, LLC
Calpine Amelia Energy Center LP, LLC
Calpine Auburndale Holdings, LLC
Calpine Baytown Energy Center GP, LLC
Calpine Baytown Energy Center LP, LLC
Calpine Bethpage 3 Pipeline Construction Company, Inc.
Calpine Bethpage 3, LLC
Calpine Power, Inc.
Calpine CalGen Holdings, Inc.
Calpine California Development Company, LLC
Calpine California Energy Finance, LLC
Calpine California Equipment Finance Company, LLC
Calpine Calistoga Holdings, LLC
Calpine Capital Trust

---

[2] With respect to this Schedule only, to the extent of any inconsistency with the DIP Documents, the DIP Documents shall prevail.

Calpine Capital Trust II
Calpine Capital Trust III
Calpine Capital Trust IV
Calpine Capital Trust V
Calpine Central Texas GP, Inc.
Calpine Central, Inc.
Calpine Central, L.P.
Calpine Central-Texas, Inc.
Calpine Channel Energy Center GP, LLC
Calpine Channel Energy Center LP, LLC
Calpine Clear Lake Energy GP, LLC
Calpine Clear Lake Energy, LP
Calpine Cogeneration Corporation
Calpine Construction Management Company, Inc.
Calpine Corporation
Calpine Corpus Christi Energy GP, LLC
Calpine Corpus Christi Energy, LP
Calpine Decatur Pipeline, Inc.
Calpine Decatur Pipeline, L.P.
Calpine Dighton, Inc.
Calpine East Fuels, Inc.
Calpine Eastern Corporation
Calpine Energy Services Holdings, Inc.
Calpine Energy Services, L.P.
Calpine Finance Company
Calpine Freestone Energy GP, LLC
Calpine Freestone Energy, LP
Calpine Freestone, LLC
Calpine Fuels Corporation
Calpine Gas Holdings LLC
Calpine Generating Company, LLC
Calpine Gilroy 1, Inc.
Calpine Gilroy 2, Inc.
Calpine Gilroy Cogen, L.P.
Calpine Global Services Company, Inc.
Calpine Gordonsville GP Holdings, LLC
Calpine Gordonsville LP Holdings, LLC
Calpine Gordonsville, LLC
Calpine Greenleaf Holdings, Inc.
Calpine Greenleaf, Inc.
Calpine Hidalgo Design, L.P.
Calpine Hidalgo Energy Center, L.P.
Calpine Hidalgo Holdings, Inc.
Calpine Hidalgo Inc.
Calpine Hidalgo Power GP, LLC
Calpine Hidalgo Power, LP

Calpine International Holdings, Inc.
Calpine International, LLC
Calpine Investment Holdings, LLC
Calpine Kennedy Airport, Inc.
Calpine Kennedy Operators Inc.
Calpine KIA, Inc.
Calpine Leasing Inc.
Calpine Long Island, Inc.
Calpine Lost Pines Operations, Inc.
Calpine Louisiana Pipeline Company
Calpine Magic Valley Pipeline, Inc.
Calpine Monterey Cogeneration, Inc.
Calpine MVP, Inc.
Calpine NCTP GP, LLC
Calpine NCTP, LP
Calpine Northbrook Corporation of Maine, Inc.
Calpine Northbrook Energy Holdings, LLC
Calpine Northbrook Energy, LLC
Calpine Northbrook Holdings Corporation
Calpine Northbrook Investors, LLC
Calpine Northbrook Project Holdings, LLC
Calpine Northbrook Services, LLC
Calpine Northbrook Southcoast Investors, LLC
Calpine NTC, LP
Calpine Oneta Power I, LLC
Calpine Oneta Power II, LLC
Calpine Oneta Power, L.P.
Calpine Operating Services Company, Inc.
Calpine Operations Management Company, Inc.
Calpine Pastoria Holdings, LLC
Calpine Philadelphia, Inc.
Calpine Pittsburg, LLC
Calpine Power Company
Calpine Power Equipment LP
Calpine Power Management, Inc.
Calpine Power Management, LP
Calpine Power Services, Inc.
Calpine Power, Inc.
Calpine PowerAmerica, Inc.
Calpine PowerAmerica, LP
Calpine PowerAmerica-CA, LLC
Calpine PowerAmerica-CT, LLC
Calpine PowerAmerica-MA, LLC
Calpine PowerAmerica-ME, LLC
Calpine PowerAmerica-NH, LLC
Calpine PowerAmerica-NY, LLC

Calpine PowerAmerica-OR, LLC
Calpine Producer Services, L.P.
Calpine Project Holdings, Inc.
Calpine Pryor, Inc.
Calpine Rumford I, Inc.
Calpine Rumford, Inc.
Calpine Schuylkill, Inc.
Calpine Siskiyou Geothermal Partners, L.P.
Calpine Sonoran Pipeline LLC
Calpine Stony Brook Operators, Inc.
Calpine Stony Brook Power Marketing, LLC
Calpine Stony Brook, Inc.
Calpine Sumas, Inc.
Calpine TCCL Holdings, Inc.
Calpine Texas Pipeline GP, Inc.
Calpine Texas Pipeline LP, Inc.
Calpine Texas Pipeline, L.P.
Calpine Tiverton I, Inc.
Calpine Tiverton, Inc.
Calpine ULC I Holding, LLC
Calpine University Power, Inc.
Calpine Unrestricted Funding, LLC
Calpine Unrestricted Holdings, LLC
Calpine Vapor, Inc.
Carville Energy LLC
CCFC Development Company, LLC
CCFC Equipment Finance Company, LLC
CCFC Project Equipment Finance Company One, LLC
CES GP, LLC
CGC Dighton, LLC
Channel Energy Center, LP
Channel Power GP, LLC
Channel Power, LP
Clear Lake Cogeneration Limited Partnership
CogenAmerica Asia Inc.
CogenAmerica Parlin Supply Corp.
Columbia Energy LLC
Corpus Christi Cogeneration L.P.
CPN 3rd Turbine, Inc.
CPN Acadia, Inc.
CPN Berks Generation, Inc.
CPN Berks, LLC
CPN Bethpage 3rd Turbine, Inc.
CPN Cascade, Inc.
CPN Clear Lake, Inc.
CPN Decatur Pipeline, Inc.

CPN East Fuels, LLC   (Calpine East Fuels, LLC)
CPN Energy Services GP, Inc.
CPN Energy Services LP, Inc.
CPN Freestone, LLC
CPN Funding, Inc.
CPN Morris, Inc.
CPN Oxford, Inc.
CPN Pipeline Company
CPN Pleasant Hill Operating, LLC
CPN Pleasant Hill, LLC
CPN Power Services GP, LLC
CPN Power Services, LP
CPN Pryor Funding Corporation
CPN Telephone Flat, Inc.
Decatur Energy Center, LLC
Deer Park Power GP, LLC
Deer Park Power, LP
Delta Energy Center, LLC
Dighton Power Associates, LP
East Altamont Energy Center, LLC
Fond du Lac Energy Center, LLC
Fontana Energy Center, LLC
Freestone Power Generation LP
GEC Bethpage Inc.
Geothermal Energy Partners, Ltd
Geysers Power Company, LLC
Geysers Power Company II, LLC
Geysers Power I Company
Goldendale Energy Center, LLC
Hammond Energy LLC
Hillabee Energy Center, LLC
Idlewild Fuel Management Corp.
JMC Bethpage, Inc.
KIAC Partners
Lake Wales Energy Center, LLC
Lawrence Energy Center, LLC
Lone Oak Energy Center, LLC
Los Esteros Critical Energy Facility, LLC
Los Medanos Energy Center LLC
Magic Valley Gas Pipeline GP, LLC
Magic Valley Gas Pipeline, LP
Magic Valley Pipeline, L.P.
MEP Pleasant Hill, LLC
Moapa Energy Center, LLC
Mobile Energy L L C
Modoc Power, Inc.

Morgan Energy Center, LLC
Mount Hoffman Geothermal Company, L.P.
Mt. Vernon Energy LLC
NewSouth Energy LLC
Nissequogue Cogen Partners
Northwest Cogeneration, Inc.
NTC Five, Inc.
NTC GP, LLC
Nueces Bay Energy LLC
O.L.S. Energy-Agnews, Inc.
Odyssey Land Acquisition Company
Pajaro Energy Center, LLC
Pastoria Energy Center, LLC
Pastoria Energy Facility L.L.C.
Philadelphia Biogas Supply, Inc.
Phipps Bend Energy Center, LLC
Pine Bluff Energy, LLC
Power Investors, L.L.C.
Power Systems MFG., LLC
Quintana Canada Holdings, LLC
RockGen Energy LLC
Rumford Power Associates Limited Partnership
Russell City Energy Center, LLC
San Joaquin Valley Energy Center, LLC
Silverado Geothermal Resources, Inc.
Skipanon Natural Gas, LLC
South Point Energy Center, LLC
South Point Holdings, LLC
Stony Brook Cogeneration, Inc.
Stony Brook Fuel Management Corp.
Sutter Dryers, Inc.
TBG Cogen Partners
Texas City Cogeneration, L.P.
Texas Cogeneration Company
Texas Cogeneration Five, Inc.
Texas Cogeneration One Company
Thermal Power Company
Thomassen Turbine Systems America, Inc.
Tiverton Power Associates Limited Partnership
Towantic Energy, L.L.C.
VEC Holdings, LLC
Venture Acquisition Company
Vineyard Energy Center, LLC
Wawayanda Energy Center, LLC
Whatcom Cogeneration Partners, L.P.
Zion Energy LLC