Hearing Date: February 27, 2007 at 10:00 a.m. (EST)
Objection Deadline: February 16, 2007 at 12:00 p.m. (EST)

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted pro hac vice)
Stephen E. Hessler (admitted pro hac vice)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| Calpine Corporation, et al., | ) |
| | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
| | ) |

**NOTICE OF DEBTORS' MOTION FOR ORDER (I) AUTHORIZING DEBTORS TO OBTAIN REPLACEMENT POSTPETITION FINANCING TO (A) REFINANCE EXISTING POSTPETITION FINANCING AND (B) REPAY PREPETITION DEBT; (II) ALLOWING DEBTORS' LIMITED OBJECTION TO CLAIMS; AND (III) DETERMINING VALUE OF SECURED CLAIMS**

PLEASE TAKE NOTICE that at **10:00 a.m. (EST)** on **February 27, 2007**, the

Debtors in the above-captioned chapter 11 cases, by their respective counsel, shall appear before the

Honorable Judge Burton R. Lifland, at the United States Bankruptcy Court for the Southern District

of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York

10004-1408, Room 623, or soon thereafter as counsel may be heard, and present Debtors' Motion

For Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance

Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited

Objection to Claims; and (III) Determining Value of Secured Claims.

PLEASE TAKE FURTHER NOTICE that the Hearing may be adjourned thereafter from time to time without further notice.

PLEASE TAKE FURTHER NOTICE that objections to the Motion, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court and shall be filed with the Bankruptcy Court electronically by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (in either case, with a hard copy delivered directly to Chambers) and shall be served upon:    (a) counsel to the Debtors, Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022, Attn.: Edward O. Sassower, Esq.; (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn.: Paul Schwartzberg, Esq., (c) counsel to the Unofficial Committee of Second Lien Debtholders, Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019-6064, Attn.: Alan W. Kornberg, Andrew N. Rosenberg, Elizabeth R. McColm; (d) counsel to the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022-2524, Attn.: Michael S. Stamer, Philip C. Dublin, and Alexis Freeman; and (e) counsel to the Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004, Attn.: Gary Kaplan; so as to be received no later than **February 16, 2007 at 12:00 p.m.**

Dated:  January 26, 2007    Respectfully submitted,
   New York, New York

            /s/ Richard. M. Cieri_____
            Richard M. Cieri (RC 6062)
            Marc Kieselstein (admitted pro hac vice)
            David R. Seligman (admitted pro hac vice)
            Edward O. Sassower (ES 5823)
            Jeffrey S. Powell (admitted pro hac vice)
            Stephen E. Hessler (admitted pro hac vice)
            KIRKLAND & ELLIS LLP
            Citigroup Center
            153 East 53rd Street
            New York, New York  10022-4611
            Telephone:  (212) 446-4800
            Facsimile:  (212) 446-4900

            Counsel for the Debtors

Hearing Date: February 27, 2007 at 10:00 a.m. (EST)
Objection Deadline: February 16, 2007 at 12:00 p.m. (EST)

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted pro hac vice)
Stephen E. Hessler (admitted pro hac vice)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Calpine Corporation, et al., | ) | |
| | ) | Case No. 05-60200 (BRL) |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DEBTORS' MOTION FOR ORDER (I) AUTHORIZING DEBTORS TO OBTAIN**
**REPLACEMENT POSTPETITION FINANCING TO (A) REFINANCE EXISTING**
**POSTPETITION FINANCING AND (B) REPAY PREPETITION DEBT;**
**(II) ALLOWING DEBTORS' LIMITED OBJECTION TO CLAIMS; AND**
**(III) DETERMINING VALUE OF SECURED CLAIMS**

Calpine Corporation ("Calpine") and its affiliated debtors and debtors in possession (the "Debtors") file this motion (the "Motion") seeking entry of orders, in substantially the form attached hereto as Exhibits A and B, (I) authorizing the Debtors to obtain replacement postpetition financing for the purposes of allowing the Debtors to (A) refinance their existing postpetition financing and (B) repay certain prepetition debt; (II) allowing the Debtors' limited objection to certain claims; and (III) determining the value of certain secured claims pursuant to Bankruptcy Rule 3012. In support of this Motion, the Debtors respectfully state as follows.

## **INTRODUCTION**

A critical focus of the Debtors has been to improve cash flow through their numerous restructuring efforts, which include (i) reducing overhead expenses, (ii) the divestiture of underperforming and unprofitable projects, and (iii) the renegotiation and/or rejection of out-of-market contracts.  Another effective method is to utilize presently favorable conditions within the credit markets to replace high interest-rate debt with lower interest-rate debt.  To that end, the Debtors have already obtained this Court's approval to use asset sale proceeds and funds from their debtor-in-possession financing to repay in full approximately $650 million of Calpine First Lien Notes (as defined in Section II of this Motion)—thus saving their estates almost $2 million per month.  Similarly, in the Chapter 11 proceedings of Delphi Corporation, also ongoing in the Southern District of New York, the Court very recently authorized approximately $4.5 billion in replacement debtor-in-possession financing that will be used to refinance, at lower rates, an existing $2.0 billion debtor-in-possession facility and approximately $2.5 billion of other prepetition facilities—thus allowing the Delphi debtors to save approximately $8 million per month.

By this Motion, the Debtors likewise seek approval for a $5.0 billion replacement debtor-in-possession financing facility (the "Replacement DIP Facility").  The Debtors seek to use these funds primarily for two purposes:  to refinance the Debtors' existing $2.0 billion debtor-in-possession financing (the "Existing DIP Facility"), and to repay approximately $2.516 billion of secured prepetition debt at one of the Debtors' largest operating subsidiaries, Calpine Generating Company, LLC (the "CalGen Secured Debt" and "CalGen").  In both instances, the Debtors' proposed refinancing (the "Proposed Refinancing") will replace higher interest-rate debt with lower interest-rate debt.  Given the large sums of principal at issue, the interest rate savings the Debtors intend to capture through the Proposed Refinancing are substantial:  approximately $100 million annually, or approximately $8 million per month.  Furthermore, the Debtors expect to save another

approximately $5 million annually by no longer having to pay the professionals' fees of the eleven trustees, law firms, and financial advisers retained by the holders of the CalGen Secured Debt (the "CalGen Lenders").

This Motion also asks the Court to allow the Debtors' limited objection to the claims filed by the CalGen Lenders—and, as needed, determine the value of these secured claims pursuant to Bankruptcy Rule 3012.  As an initial matter, the Debtors anticipate the CalGen Lenders will oppose the Proposed Refinancing on the ground that the Debtors are absolutely barred from repaying certain tranches of CalGen Secured Debt until specified "lockout" periods have concluded. These arguments cannot be sustained, however, as prepayment prohibition (or "no-call") provisions are unenforceable against Chapter 11 debtors.  The Debtors further anticipate the CalGen Lenders will claim the Proposed Refinancing obligates the Debtors to pay a "makewhole" premium as compensation for discontinued future interest payments.   But any such demand also is unsustainable, as the clear terms of the governing indentures plainly do not require a makewhole premium in these circumstances:  where repayment will occur before the makewhole period has begun or the accelerated debt (but not a makewhole obligation) is due and payable immediately. Accordingly, through the claims objection and/or valuation processes, the Debtors respectfully request that the Court disallow the CalGen Claims to the extent that they seek amounts in excess of outstanding principal, plus unpaid interest at the non-default contract rate, through the date of repayments.

Another significant benefit of the Proposed Refinancing is that it substantially enhances the Debtors' prospects for a successful emergence from Chapter 11 because of the "rollover" option that allows (but does not obligate) the Debtors to convert the Replacement DIP Facility into an exit financing.  This rollover option dramatically reduces exit financing risk and sets a capital structure "floor" for purposes of developing and negotiating a reorganization plan.  Further

to that end, by repaying the CalGen Secured Debt, there will be measurably fewer lenders (and advisers) with whom the Debtors will have to negotiate a reorganization plan.

Lastly, for multiple reasons, the timing of the Motion is of the essence. Most significantly, the commitments under the Proposed Refinancing expire on March 30, 2007, which means the Replacement DIP Facility, as well as the refinancing the Existing DIP Facility and the repayment of the CalGen Secured Debt, all must be approved and consummated by that date. Furthermore, it is impossible to know for certain that the low interest rates and favorable terms currently offered by the capital markets will continue into the near future—much less through the end of the Debtors' Chapter 11 Cases—or if debt capital will even be available to the Debtors in the amounts proposed herein.

In sum, for the following reasons, the Debtors respectfully request that this Court approve the Proposed Refinancing.

## JURISDICTION

This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND[1]

### 1.    Prepetition CalGen Secured Debt

As noted above, CalGen is one of the Debtors' largest operating subsidiaries, indirectly owning 14 natural gas-fired power plants that have an aggregated estimated peak capacity of 9,815 megawatts, or more than one-third of Calpine's 26,459 megawatts of aggregate estimated peak capacity in operation as of December 31, 2005. On March 23, 2004, CalGen issued $2.605

billion of secured debt through a series of first, second, and third-lien financings.[2]  Approximately

$2.516 billion of CalGen Secured Debt is currently outstanding, on which the weighted average

interest rate is 11.25%.[3]  In addition, there are approximately $40 million in letters of credit

outstanding against the CalGen First Lien Revolving Loans (as defined in note 2).

---

[1]  See generally the affidavit of Samuel M. Greene (attached as Exhibit C) for information supporting the factual assertions contained within this Background section.

[2]  More specifically, CalGen's first lien debt is comprised of (a) the $235,000,000 First Priority Secured Floating Rate Notes Due 2009, issued by CalGen and CalGen Finance pursuant to that certain first priority indenture, dated as of March 23, 2004, among CalGen, CalGen Finance and Wilmington Trust FSB, as first priority trustee (the "First Priority Indenture"); (b) the $600,000,000 First Priority Secured Institutional Terms Loans Due 2009 (together with the $235,000,000 First Priority Secured Floating Rate Notes Due 2009, the "First Lien Notes"), issued by CalGen pursuant to that certain Credit and Guarantee Agreement, dated as of March 23, 2004 among CalGen, the guarantor subsidiaries of CalGen listed therein, Morgan Stanley Senior Funding, Inc., as administrative agent, sole lead arranger and sole bookrunner, and the various lenders named therein (the "First Priority Credit and Guarantee Agreement"); and (c) the $200,000,000 First Priority Revolving Loans issued on or about March 23, 2004 (the "First Lien Revolving Loans") pursuant to that Amended and Restated Agreement, among CalGen, the guarantors party thereto, the lenders party thereto, The Bank of Nova Scotia, as administrative agent, L/C Bank, lead arranger and sole bookrunner, Bayerische Landesbank, Cayman Islands Branch, as arranger and co-syndication agent, Credit Lyonnais, New York Branch, as arranger and co-syndication agent, ING Capital LLC, as arranger and co-syndication agent, Toronto Dominion (Texas) Inc., as arranger and co-syndication agent, and Union Bank of California, N.A., as arranger and co-syndication agent (the "First Priority Amended and Restated Credit Agreement").

CalGen's second lien debt is comprised of (a) the $640,000,000 Second Priority Secured Floating Rate Notes Due 2010, issued by CalGen and CalGen Finance pursuant to that certain second priority indenture, dated as of March 23, 2004, among CalGen, CalGen Finance and Wilmington Trust FSB, as second priority trustee (the "Second Priority Indenture"); and (b) the $100,000,000 Second Priority Secured Term Loans Due 2010 (together with the $640,000,000 Second Priority Secured Floating Rate Notes Due 2010, the "Second Lien Notes"), issued by CalGen pursuant to that certain Credit and Guarantee Agreement, dated as of March 23, 2004, among CalGen, the guarantor subsidiaries of CalGen listed therein, Morgan Stanley Senior Funding, Inc., as administrative agent, sole lead arranger and sole bookrunner and the various lenders named therein (the "Second Priority Credit and Guarantee Agreement").

CalGen's third lien debt is comprised of (a) the $680,000,000 Third Priority Secured Floating Rate Notes Due 2011 and (b) the $150,000,000 11.5% Third Priority Secured Notes Due 2011 (together with the $680,000,000 Third Priority Secured Floating Rate Notes Due 2011, the "Third Lien Notes"), in each case issued by CalGen and CalGen Finance pursuant to that certain third priority indenture, dated as of March 23, 2004, among CalGen, CalGen Finance and Wilmington Trust Company FSB, as third priority trustee (the "Third Priority Indenture").

Copies of the relevant portions of each of these agreements are attached hereto as Exhibit D.

[3]  Based on the weighted average spread on the CalGen Secured Debt of approximately 5.89%, and current LIBOR of approximately 5.36%, the average interest rate on the CalGen Secured Debt is approximately 11.25%.

## 2. Postpetition Existing DIP Facility

On December 20, 2005, Calpine and certain direct and indirect subsidiaries, including CalGen, commenced their Chapter 11 Cases before this Court. On that same date, the Debtors filed an emergency motion seeking interim and final orders authorizing them to obtain postpetition financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e).[4]

The Court entered the interim financing order on December 20, 2005,[5] and the final order on January 26, 2006.[6] The latter authorized the Debtors to obtain secured postpetition financing up to the aggregate principal amount of $2 billion. The Existing DIP Facility consists of:

- A revolving commitment of up to $1,000,000,000, secured by a first priority security interest, on which the interest rate is LIBOR plus 2.25%. There are approximately $80 million in letters of credit outstanding against the revolver facility and no cash borrowings.

- A term loan commitment of up to $400,000,000, secured by a first priority security interest, on which the interest rate is LIBOR plus 2.25%. The amount outstanding under this facility is $396.5 million.

- A term loan commitment of up to $600,000,000, secured by a second priority security interest, on which the interest rate is LIBOR plus 4.00%. The amount outstanding under this facility is $600 million.

---

[4]  Emergency Motion for (I) Interim Orders (A) Authorizing the Debtors to (1) Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e), (2) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, and (3) Provide Adequate Protection to Certain Prepetition Lenders Pursuant to 11 U.S.C. §§ 361, 362 and 363 and (B) Scheduling Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) and (II) Final Orders (A) Authorizing the Debtors to (1) Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e), (2) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (3) Provide Adequate Protection to Certain Prepetition Lenders Pursuant to 11 U.S.C. §§ 361, 362 and 363, (3) Assume the Geysers Agreement Pursuant to 11 U.S.C. § 365(a) and Consummate the Transactions Contemplated Thereby Pursuant to § 363(b) and (4) Assume the Agnews Lease Documents Pursuant to 11 U.S.C. § 365(a), entered on December 20, 2005 [Docket No. 18].

[5]  Interim Order (I) Authorizing Debtors to Obtain Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) And (II) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) And (C) [Docket No. 38].

[6]  Final Order Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) [Docket No. 635] (the "Existing DIP Order").

In sum, the amount drawn on the Existing DIP Facility is $996.5 million, on which the weighted average interest rate is approximately 8.66%.[7]

The Existing DIP Facility is set to expire at the earliest of: (a) December 20, 2007, (b) the effective date of a plan or reorganization pursuant to a confirmation order of the Court, or (c) the acceleration of the loans in accordance with the Existing DIP Credit Agreement.

### 3.    Debtors' Adequate Protection Payments to CalGen Lenders

On February 26, 2006, the Court entered the Second Amended Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection [Docket No. 881] (the "Cash Collateral Order"). The Cash Collateral Order provides that the Debtors shall pay to the CalGen Lenders, as adequate protection, all accrued but unpaid interest and fees at the non-default contract rates (although no principal payments on the CalGen Secured Debt shall be paid pending further order of the court) on either a quarterly or semi-annual basis, and the reasonable fees and expenses of the CalGen Lenders' counsel and other consultants. Id. ¶ 17(a).

---

[7]    Based on the weighted average spread on the currently outstanding amounts under the Existing DIP Facility of approximately 3.30% and current LIBOR of approximately 5.36%, the weighted average interest rate on the Existing DIP Facility is approximately 8.66%.

Since their Chapter 11 filing, the Debtors have paid over $270 million in adequate protection to the CalGen Lenders.[8]  In addition, through January 4, 2007, the Debtors have paid more than $5 million in professional fees to nearly a dozen law firms, financial advisors, and other consultants retained by the CalGen Lenders.[9]

### 4.    CalGen Lenders' Proofs of Claim

On July 26, 2006, The Bank of Nova Scotia, as administrative agent for the CalGen First Lien Revolving Loans, filed a proof of claim ("Claim 2664") against CalGen for approximately $313 million.[10]  The claim includes certain "unliquidated" amounts.  Annex to Claim 2664 at 5-6.

---

[8]    To date, the Debtors have paid to the CalGen Lenders:  (a) $92,513,681.86 on all three tranches of debt on April 1, 2006; (b) $38,284,681.72 to holders of first and second priority debt on July 1, 2006; (c) $99,818,708.23 on all three tranches of debt on October 1, 2006; and (d) $43,247,813.48 to holders of first and second priority debt on January 2, 2007.

[9]    More specifically, the CalGen Lenders' multitude of professionals in these Chapter 11 Cases are as follows:

| | |
|---|---|
| CalGen Collateral Agent | |
| Nixon Peabody LLP | Counsel |
| Mesirow Financial | Financial Advisor |
| Peter J. Solomon Company | Financial Advisor |
| | |
| Morgan Stanley Senior Funding, Inc. (Administrative Agent for certain First and Second Priority Noteholders) | |
| Milbank, Tweed, Hadley & McCloy LLP | Counsel |
| | |
| CalGen First Priority Noteholders | |
| Wachtell Lipton Rosen & Katz | Counsel |
| | |
| CalGen Second Priority Noteholders | |
| HSBC Bank USA, N.A. | Trustee |
| Ropes & Gray LLP | Counsel |
| Giuliani Capital Advisors LLC | Financial Advisor |
| | |
| CalGen Third Priority Noteholders | |
| Weil Gotshal & Manges LLP | Counsel |
| Young Conaway Stargatt & Taylor LLP | Counsel |
| Capstone Advisory Group LLC | Financial Advisor |

[10]   The Bank of Nova Scotia, as administrative agent for the CalGen First Lien Revolving Loans, also filed proofs of claim against various other Debtors as guarantors of the CalGen First Lien Revolving Loans.  See Claim Nos. 2626 through 2663 (inclusive), 2665.

On July 28, 2006, Wilmington Trust FSB, as indenture trustee for the CalGen First Lien Notes, filed a proof of claim ("Claim 3396") against CalGen in the amount of $235 million.[11] Claim 3396 specifies that it includes additional unliquidated amounts.  Specifically, the indenture trustee is seeking "interest, charges, make whole amounts, penalties, premiums, and advances which may be due or become due under the Securities and the CalGen First Priority Indenture." Addendum to Claim 3396 at 4.

On July 28, 2006, HSBC Bank USA, National Association, as the successor indenture trustee for the CalGen Second Lien Notes, filed a proof of claim ("Claim 3731") against CalGen and various guarantors of the CalGen Second Lien Notes in the amount of $640 million, plus amounts due under the Second Priority Indenture.  Claim 3731 includes "any and all amounts due or to become due with respect to the Indenture," including "premiums" and "damages for breach of any covenant, representation, warranty or other provision of the Indenture, including, without limitation, for breach of section 3.07 of the Indenture."  Attachment to Claim 3731 ¶ 2(d). Section 3.07 of the Second Priority Indenture, entitled "Optional Redemption," provides that (a) the issuers may not redeem the Second Lien Notes prior to April 1, 2008, and (b) after April 1, 2008, the issuers may redeem at the redemption price.[12]

On July 31, 2006, Manufactures and Traders Company, as successor indenture trustee for the CalGen Third Lien Notes, filed a proof of claim ("Claim 4073") against CalGen and the various guarantors of the CalGen Third Lien Notes in the amount of $830 million, plus any and

---

[11]    Wilmington Trust FSB, as indenture trustee for the CalGen First Lien Notes, also filed proofs of claim against various other Debtors as guarantors of the CalGen First Lien Notes.  See Claim Nos. 3275, 3393 through 3421 (inclusive), 3546 through 3554 (inclusive), 3586 through 3588 (inclusive).

[12]    The redemption price is expressed at percentages of the outstanding principal.  For example, if the Second Lien Notes are redeemed at the option of the issuer during 2008, the redemption price is 103.5%.  If the Second Lien Notes are redeemed at the option of the issuer during 2009 or thereafter, the redemption price is 100%.

all amounts due under the Third Priority Indenture. Claim 4073 includes "amounts due or to become due with respect to the Third Priority Indenture, the Third Priority Secured Notes and/or pursuant to all related and ancillary CalGen Third Priority Indenture Documents," including "premiums" and "damages for breach of any covenant, representation, warranty or other provision of the Third Priority Indenture, including, without limitation for breach of Section 3.07 of the Third Priority Indenture." Attachment to Claim 4073 ¶ 9. Section 3.07 of the Third Priority Indenture, entitled "Optional Redemption," provides that the issuers may not redeem the Third Lien Notes at any time.

On August 1, 2006, Morgan Stanley Senior Funding, Inc., as administrative agent for the CalGen First Lien Term Loans and the administrative agent for the CalGen Second Lien Term Loans, filed proofs of claim against CalGen.[13] The proof of claim ("Claim 5691") filed against CalGen on account of the CalGen First Lien Term Loans asserts a claim in the amount of at least $610,277,751.67. The proof of claim ("Claim 5692") filed against CalGen on account of the CalGen Second Lien Term Loans asserts a claim in the amount of at least $102,151,847.50. Both claims assert the "Debtors are liable to the Claimants for any and all defaults and breaches of the representations, warranties, covenants, and other obligations and duties set forth in the Prepetition Loan Documents." Annex to Claim 5691 ¶ 18; Annex to Claim 5692 ¶ 18.

**5.    Solicitation and Negotiation of the Replacement DIP Facility**

On October 6, 2006, in light of the favorable conditions of the capital markets (as described further below), and the Debtors' continued desire to improve cash flow, Miller Buckfire & Co. ("Miller Buckfire") distributed, on the Debtors' behalf, a request for proposal (the "RFP") for

---

[13]   Morgan Stanley Senior Funding, Inc., as administrative agent, also filed proofs of claim against various other Debtors as guarantors of the CalGen First Lien Term Loans—see Claim Nos. 5653 through 5690 (inclusive), 5792—and CalGen Second Lien Term Loans. See Claim Nos. 5693 through 5730 (inclusive), 5791.

a possible refinancing to nine potential lenders:  Credit Suisse, Goldman Sachs, JP Morgan, Deutsche Bank, Citigroup, General Electric, Morgan Stanley, Barclays Capital and Merrill Lynch (collectively, the "Potential Replacement DIP Lenders").  The RFP specified that the Debtors were seeking proposals for a new debtor in possession financing facility to amend or replace their Existing DIP Facility.  The proposals had to include the following options:  (a) an extension of the maturity of the Existing DIP Facility beyond December 31, 2007; (b) the ability to convert the debtor in possession financing into an exit facility at the Debtors' option; and (c) the ability to expand the size of the facility at or subsequent to closing in order to refinance certain prepetition debt.

On or around October 16, 2006, the Debtors received initial responses to the RFP from each of the Potential Replacement DIP Lenders.  During the following week, the Debtors and Miller Buckfire held discussions with the Potential Replacement DIP Lenders to explore the proposals further.

Following the enthusiastic but varied reception to the RFP, the Debtors identified the most favorable terms from each of the Potential Replacement DIP Lenders' responses and drafted an indicative term sheet that set forth the key terms the Debtors required to pursue a refinancing transaction.  On October 24, 2006, Miller Buckfire distributed the indicative term sheet to each of the Potential Replacement DIP Lenders and requested final, binding commitment letters in return. More specifically, the Debtors' prerequisites included the following terms:  (a) a $5 billion replacement facility, comprised of a $1 billion revolver and $4 billion term loans, subject to expansion; (b) an initial term of two years and, if the Debtors opt to convert the proposed replacement facility into exit financing, a total term of seven years; and (c) authorization for the Debtors to use the proceeds of the proposed replacement facility to refinance the Existing DIP Facility, repay the CalGen Secured Debt, and for general corporate purposes.

Over the ensuing weeks, the Debtors provided due diligence information to the Potential Replacement DIP Lenders, including financial models and budgets. On or around November 13, 2006, the Debtors received final commitment letters from seven of the nine Potential Replacement DIP Lenders and began negotiations with each.

**6.     Terms of the Replacement DIP Facility**

On or around December 11, 2006, the Debtors selected Credit Suisse, Goldman Sachs, JP Morgan, and Deutsche Bank as the joint lead arrangers (the "Replacement DIP Joint Lead Arrangers") based on, inter alia, the Replacement DIP Joint Lead Arrangers' familiarity with Calpine and its subsidiaries, the attractiveness of the terms that they proposed, and the Debtors' confidence in the ability of the Replacement DIP Joint Lead Arrangers to execute a transaction of this size and complexity.

The key terms of the Replacement DIP Facility are summarized below.[14]

| Borrower | Calpine Corporation. |
|---|---|
| Guarantors | Debtors that are guarantors of the Existing DIP Facility, subject to certain exceptions. |
| Facilities | A $5.0 billion facility comprised of<br><br>(a)  a $4.0 billion secured first priority term loan facility (the "Term Facility"), and<br><br>(b)  a $1.0 billion secured first priority revolving credit facility (the "Revolving Facility"), including a letter of credit subfacility of up to $550 million. |
| Purpose | The proceeds shall be used |

---

[14]  Attached to this Motion are the relevant documents supporting the Proposed Refinancing: the Revolving Credit, Term Loan, and Guarantee Agreement (Exhibit E), and the Summary of Terms and Conditions (and attached Commitment Letter) (Exhibit F). The relevant Fee Letter will be filed with the Court shortly pursuant to a motion to seal. The summary of terms set forth in this Motion are intended as an overview—the terms of the Summary of Terms and Conditions govern in the event of a discrepancy. Also, defined terms used but not defined in the following table have the meaning ascribed to them in the Summary of Terms and Conditions.

| | |
|---|---|
| | (a)  to refinance the Existing DIP Facilities, |
| | (b)  to repay the CalGen Secured Debt, and |
| | (c)  for working capital and other general corporate purposes. |
| Maturity | The earlier of |
| | (a)  the effective date of a confirmed plan of reorganization (the "Effective Date"), and |
| | (b)  the second anniversary of the Closing Date. |
| | If the Facilities are converted to an exit facility, the final maturity will be seven (7) years from the Closing Date. |
| Amortization | 1% per year on the Term Facility, payable quarterly. |
| Voluntary Prepayment Penalty | None. |
| Interest Rates[15] | LIBOR plus the Applicable Margin, based on the ratings of the Replacement DIP Facility on the closing date: |

| S&P/Moody's Ratings | Applicable Margin |
|---|---|
| BB-/Ba3 (with stable outlook) | 2.00% |
| B+/B1 (with stable outlook) | 2.25% |
| B/B2 (with stable outlook) | 2.75% |
| B-/B3 or lower | 3.50% |

After the Conversion Date, the Applicable Margin will be determined based on Calpine's corporate credit rating and the Applicable Margin for the Revolving Facility shall be determined pursuant to a pricing grid to be agreed upon.

---

[15]  As is industry standard, pursuant to a confidential letter agreement between the Debtors and the Replacement DIP Joint Lead Arrangers, the latter may "flex" these or certain other terms of the Replacement DIP Facility in order to successfully syndicate the Replacement DIP Facility. "Flex" includes the ability, within a narrow band, to adjust pricing for the Replacement DIP Facility. Because of the extremely sensitive nature of this information, and to prevent any flex from becoming a self-fulfilling prophecy at the Debtors' expense, the confidential letter agreement will not be filed with this Motion.

| | |
|---|---|
| Revolver Commitment Fees | 0.50% per annum. |
| Default Interest | The applicable interest rate plus 2.0% per annum. |
| Financial Covenants | Prior to the Conversion Date, covenants generally consistent with the Existing DIP Facilities, subject to certain modifications as may be agreed upon.<br><br>After the Conversion Date, usual and customary financial covenants, including (a) minimum interest coverage ratios; (b) maximum ratios of the Facilities Debt to EBITDA; and (c) maximum ratios of Total Net Debt to EBITDA, in each case to be agreed upon. |
| Liens | Liens structure similar to that granted under the Existing DIP Facilities plus first priority liens on all property presently securing the CalGen Secured Debt, upon repayment thereof, subject to certain exceptions. |
| Ability to Secure Hedging Obligations | The Loan Parties shall be permitted to grant first priority liens in the property securing the obligations under the Facilities to secure obligations under "right way risk" transactions and/or commodity or interest rate hedging contracts (the "Hedging Obligations"). Such liens will rank *pari passu* with the first priority liens granted to secure the obligations under the Facilities. |
| Incremental Term Facility | Calpine may expand the Facilities by up to $2.0 billion in order to refinance secured project debt or project preferred securities, subject to certain restrictions, terms and conditions. |
| Exit Conditions | The following key conditions must be satisfied in order to convert to an exit facility:<br><br>(a)  the occurrence of the Effective Date,<br><br>(b)  the Borrower shall have obtained corporate credit ratings and ratings on the Facility from S&P and Moody's,<br><br>(c)  the Agent shall have received five-year projections from the Effective Date demonstrating *pro forma* covenant compliance and certain other *pro forma* financial statements and reports,<br><br>(d)  the Debtors shall have at least $250 million in liquidity, and<br><br>(e)  compliance with all financial covenants and no event of |

| | default on a *pro forma* basis after giving effect to the occurrence of the Effective Date. |
|---|---|

### 7.    Benefits of Proposed Refinancing

The advantages to the Debtors and their estates by executing the Proposed Refinancing are numerous.

(a)    <u>Savings and Liquidity</u>

The Debtors expect to realize approximately $100 million in annual savings as a result of using the lower interest rate Replacement DIP Facility funds to refinance the higher interest rate Existing DIP Facility and to repay the higher interest rate CalGen Secured Debt. More specifically, through the Replacement DIP Facility, the Debtors seek to borrow $5.0 billion at an interest rate of 7.61%.[16] Therefore:

- using 7.61% Replacement DIP Facility funds to refinance $2.0 billion of 8.66% Existing DIP Facility funds will save the Debtors approximately $11 million annually; and

- using 7.61% Replacement DIP Facility funds to repay $2.516 billion of 11.25% CalGen Secured Debt will save the Debtors approximately $92 million annually.

In addition, the Debtors expect to save another approximately $5 million per year by being released of the burden of payment of the CalGen Lenders' professionals fees.

Another attractive component of the Replacement DIP Facility is the ability to grant security in respect of Hedging Obligations (as described in the summary of terms above, "Hedging Liens"), an ability which is not permitted under the Existing DIP Facility. Currently, the Debtors are satisfying hedging collateral requirements by posting cash and, to a lesser degree, letters of

---

[16] This interest rate is based on current LIBOR of 5.36% and assumes Calpine obtains a B+/B1 rating on the Replacement DIP Facility in connection with the Proposed Refinancing. Note that the Existing DIP Facility is currently rated BB-/Ba3. In the event that the Replacement DIP Facility is also rated BB-/Ba3, the Debtors would realize approximately $10 million in additional annual interest savings from the Proposed Refinancing.

credit under the Existing DIP Facility, both of which reduce the Debtors' corporate liquidity. Given the significant collateral requirements of forward hedging, the Debtors' participation in the commodities market is constrained. The ability for the Debtors to grant Hedging Liens is expected to both mitigate the cash collateral requirements of forward hedging and increase the universe of counter-parties willing to transact with the Debtors. This should allow the Debtors to more actively participate in the commodities market and better manage the forward-risk profile of its assets without unduly constraining corporate liquidity. Further, the Hedging Liens are expected to allow the Debtors to reduce the expenses incurred when hedging forward. Currently, the Debtors are charged an additional fee on most multiple-month transactions, typically in the form of a sleeve cost. This additional fee can add $0.05 - $0.50/MWh onto the cost of a transaction. By utilizing the Hedging Liens, the Debtors expect that they would not be subject to such additional fee.

Accordingly, by this Motion, the Debtors also seek authority to incur Hedging Obligations, from time to time, as administration expense obligations under Section 503(b) and, subject to the terms of the Replacement DIP Facility, to secure the Hedging Obligations with liens that are pari passu to the liens under the Replacement DIP Facility. Although the Debtors believe that they currently have the authority under Section 363(b) to incur Hedging Obligations in the ordinary course of its business, including by posting cash collateral, the Debtors believe they would benefit in the ways mentioned by having express Court approval to incur Hedging Obligations as administrative expenses, and to collateralize them as described.

(b)    Exit Options

The Replacement DIP Facility will allow the Debtors flexibility as they begin to formulate a plan of reorganization because the size of the Replacement DIP Facility can be increased to allow for the repayment of other prepetition secured debt. Also, while the Debtors are not obligated to convert the Replacement DIP Facility into exit financing if circumstances change,

the existence of the option to convert the Replacement DIP Facility to an exit financing mitigates the time required to source exit financing and gives the Debtors a more stable basis from which to develop and negotiate a reorganization plan.  Also, by repaying the CalGen Secured Debt with Replacement DIP Facility funds, the Debtors are increasing their ability to effectuate their emergence from the Chapter 11 Cases, as they will have seven fewer tranches of debt (representing at least three separate classes for voting purposes) and significantly fewer constituents and professionals with whom to negotiate.

Another advantage to the Replacement DIP Facility is that it extends the Debtors' postpetition financing beyond December 31, 2007, the date on which the Existing DIP Facility terminates.  The Replacement DIP Facility therefore relieves pressure on the Debtors to refinance or amend the Existing DIP Facility to extend its maturity, something the Debtors would need to explore in the near future absent the Proposed Refinancing to prepare for the possibility they may not have emerged from Chapter 11 by the end of 2007.

(c)    Timeliness

Finally, described generally, the capital markets are currently ripe for the Proposed Refinancing.  New issuance volumes for leveraged loans are at record highs ($480 billion in 2006) while default rates are at record lows (0.48% by principal amount and 0.79% by number of loans in 2006).  As a result, interest rate spreads for B and BB-rated issuances also reached their lowest levels since 1998 during 2006 and remain near those lows today.  Moreover, the continued healthy demand for new issues allows borrowers to obtain key structural benefits within the governing covenants.

But there is no guarantee, of course, that these favorable conditions will continue indefinitely.  Unsurprisingly, lenders generally will not agree to underwrite financing deals based on current market factors and then hold those commitments in place without regard for evolving

17

circumstances. The Proposed Refinancing, which expires on March 30, 2007, allows the Debtors to capitalize on these presently-available benefits—and to do so at an ideal stage of their Chapter 11 Cases.

## RELIEF REQUESTED

The Debtors respectfully request that this Court: (I) approve the Replacement DIP Facility for the purposes of allowing the Debtors to (A) refinance their Existing DIP Facility and (B) repay the CalGen Secured Debt; (II) determine the value of the CalGen Claims[17] and (III) allow the Debtors' limited objection to the CalGen Claims.

## BASIS FOR RELIEF

### I.    The Replacement DIP Facility Should Be Approved.

Section 364 of the Bankruptcy Code "provides bankruptcy courts with the power to authorize post-petition financing for a Chapter 11 debtor-in-possession." In re Defender Drug Stores, Inc., 126 B.R. 76, 81 (Bankr. D. Ariz. 1991) (citing 11 U.S.C. § 364). "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend post-petition credit.'" Id. (citation omitted). The Existing DIP Facility was approved under section 364(c), and given that the Replacement DIP Facility provides the same security interests and liens, approval of the Replacement DIP Facility under section 364(c) likewise is merited. See In re Delphi Corp., No. 05-44481 (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 6461] (determining that the debtor is entitled to

---

[17]    For the purposes of this Motion, the "CalGen Claims" include claim numbers 2626 through 2665 (inclusive), 3275, 3393 through 3421 (inclusive), 3546 through 3554 (inclusive), 3586 through 3588 (inclusive), 3731, 4073, 5653 through 5730 (inclusive), 5791, and 5792. The CalGen Claims are listed on Exhibit H attached hereto. For the sake of convenience, the Debtors will refer to claims 2664, 3396, 3731, 4073, 5691 and 5692 that were filed against CalGen, rather than list all of the CalGen Claims in the Motion.

replacement postpetition financing under section 364(c) of the Bankruptcy Code because this provision applied when authorizing debtor's existing postpetition financing).

**A.    The Replacement DIP Facility Is Appropriate Under Section 364(c) of the Bankruptcy Code.**

Section 364(c) of the Bankruptcy Code establishes the conditions under which debtors may obtain certain types of secured credit.  More specifically, section 364(c) provides, in relevant part:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt--
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Bankruptcy Courts typically apply a three-part test to determine whether to approve a debtor's proposed secured financing under section 364(c).  The debtor must demonstrate that (1) it cannot obtain unsecured credit under section 364(b), (2) the credit transaction is necessary to preserve the assets of the estate, and (3) the terms of the transaction are fair, reasonable and adequate given the particular circumstances of the debtor and the proposed lender.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) ("[A]lthough a debtor is not required to seek credit from every possible source, a debtor must show that it has made reasonable efforts to seek other sources of credit available under section 364(a) & (b).").

In evaluating these factors, courts will look to the facts and circumstances of a debtor's case and accord considerable weight to the benefits that a postpetition financing will provide to the estate.  Id. at 39.  A debtor generally is permitted to exercise its business judgment in

making the decision to obtain financing.  See Group of Institutional Investors v. Chicago Milwaukee St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).  Bankruptcy Courts will defer to such business judgment, unless arbitrary or capricious, and will not second-guess decisions made within the scope of the debtor's authority under the Bankruptcy Code.  See In re Curlew Valley Assocs., 14 B.R. 506, 511-14 (Bankr. D. Utah 1981).

      1.      The Debtors Could Not Obtain Postpetition Financing on an Unsecured Basis.

As with the Existing DIP Facility, the Debtors could not obtain on an unsecured basis a replacement DIP facility with the terms and of the type and magnitude required in these Chapter 11 Cases.  As described above, the Debtors solicited replacement financing from nine major potential lenders and none was willing to make a postpetition loan on an unsecured basis.

To show that the postpetition financing required is not available on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded by section 364(c) of the Bankruptcy Code.  See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986).  The Debtors' efforts to obtain postpetition financing from a large group of sophisticated lending institutions satisfy the statutory requirement of section 364(c) of the Bankruptcy Code.  See, e.g., Ames Dep't Stores, 115 B.R. at 40 (finding that the debtors' discussions with four large lending institutions was a reasonable effort to seek other sources of credit).

      2.      The Replacement DIP Facility is Necessary to Preserve the Assets of the Debtors' Estates.

The Replacement DIP Facility will allow the Debtors to realize significant interest savings.  The weighted average interest rate of the currently outstanding amounts under the Existing DIP Facility is 8.66%.  The interest rate of the Replacement DIP Facility is approximately 7.61%;

thus, using "cheaper" Replacement DIP Facility funds to refinance the Existing DIP Facility will lower the Debtors' annual postpetition financing costs by approximately $11 million annually. Furthermore, the weighted average interest rate of the CalGen Secured Debt is 11.25%. If the Debtors are authorized to use 7.61% Replacement DIP Facility funds to repay the CalGen Secured Debt, the Proposed Refinancing will result in an additional $92 million of annual savings.

Furthermore, the pressure on the Debtors to secure exit financing is relieved because the Replacement DIP Facility's terms includes the ability to "rollover" the Facility into an exit financing at specified interest rates based upon Calpine's corporate credit rating. This key provision allows the Debtors to "lock in" favorable interest rates, but with no obligation to convert the Replacement DIP Facility into an exit financing if circumstances change. In addition, the Replacement DIP Facility extends the Debtors' postpetition financing beyond the December 20, 2007 maturity date of the Existing DIP Facility.

In sum, the Debtors believe the Replacement DIP Facility is necessary to preserve estate value because it provides substantial cost savings, as well long-term flexibility and security.

    3.    The Terms of the DIP Financing are Fair, Reasonable, and Adequate.

The Debtors, in the reasonable exercise of their business judgment, have determined that the Replacement DIP Facility is the best financing option available at this time. Negotiated at arms' length, the Replacement DIP Facility's pricing and other terms are fair, reasonable, and consistent with market practices. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364(c). See In re Delphi Corp., No. 05-44481 (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 6461]; In re Defender Drug Stores, 145 B.R. 312, 316 (9th Cir. B.A.P. 1992) (approving financing that included a lender "enhancement fee").

**B.    The Replacement DIP Facility Is Appropriate Under Section 364(d) of the Bankruptcy Code.**

Section 364(d)(1) of the Bankruptcy Code provides that a Bankruptcy Court may, after notice and a hearing, authorize a debtor to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if "(a) the trustee is unable to obtain credit otherwise" and "(b) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).

The Debtors do not believe the Replacement DIP Facility is subject to section 364(d)(1), as the Replacement DIP Facility—like the Existing DIP Facility—does not seek to "prime" any prepetition liens.  However, the Calpine Second Lien Holders may assert that the Replacement DIP Facility primes liens granted to them postpetition as adequate protection (the "Calpine Postpetition Liens").  If accepted, this argument would turn the Bankruptcy Code on its head because the Debtors would be forced to provide adequate protection on account of "priming" postpetition liens when "the purpose of adequate protection" is to ensure that a creditor "receives the value for which he bargained *prebankruptcy*."  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (quoting In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) (emphasis added)) and adequate protection is intended to preserve a creditor's "prepetition contractual financial interests."  In re Dunes Casino Hotel, 69 B.R. 784, 793-94 (Bankr. D.N.J. 1986) (noting that the adequate protection requirement was intended by Congress to preserve prepetition interests).  Furthermore, the Calpine Postpetition Liens were deliberately and expressly structured as "silent" junior liens on collateral, subordinate to the Debtors' DIP Lenders.  The proposed structured of the Replacement DIP Facility is meant to continue that arrangement.  The

bargained-for "silent" feature of the Calpine Postpetition Liens gives the Debtors the right to enter into the Replacement DIP Facility without providing further adequate protection.[18]  Nevertheless, out of an abundance of caution, the Debtors note that the Replacement DIP Facility satisfies section 364(d)(1).

1.    The Debtors Could Not Obtain Postpetition Financing on an Unsecured Basis.

The first requirement of section 364(d)(1) is met because, as discussed above, the Debtors could not obtain a replacement DIP facility of the type and magnitude required in this case on an unsecured basis. As to the second requirement, under the Replacement DIP Facility, the same non-priming security interests and liens that were granted to the Existing DIP Lenders will be granted to the Replacement DIP Lenders.   The Court has already determined that these security interests and liens do not prime any existing prepetition liens.  Existing DIP Order ¶ 3(c).

2.    The Calpine Lienholders are Adequately Protected.

Should the Debtors consummate the Proposed Refinancing, the Calpine Second Lien Holders will continue to remain adequately protected.  The determination of adequate protection is a case-specific inquiry to be decided on the facts and circumstances presented.  See In re Mosello, 195 B.R. at 288.  The focus of such an inquiry is protecting "the secured creditor from diminution in the value of its interest."  In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).   A creditor's secured position is adequately protected if, under section 364(d)(1), the proposed postpetition financing increases the value of the creditor's collateral.  See In re 495 Central Park Avenue Corp., 136 B.R. 631-32; In re Hubbard Power & Light, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

---

[18]  The issue of the Calpine Lienholders' adequate protection is very complex, and the Debtors raise it only briefly in this subsection to preview (without belaboring) the point for the Court and relevant parties.  Should this become a
(Continued...)

The Calpine Postpetition Liens were granted as adequate protection to safeguard the Calpine Second Lien Holders from a diminution in the value of their collateral. The Debtors' value has only increased since the Commencement Date as a result of their restructuring efforts, which include (i) reducing annual overhead expenses by an estimated $180 million, (ii) the divestiture of underperforming and unprofitable projects realizing cash flow benefits and gross proceeds (including debt reduction) of more than $1.0 billion, (iii) the renegotiation and/or rejection of out-of-market contracts expected to increase cash flow by more than $170 million, and (iv) almost $2 million per month of interest savings related to the repayment of the Calpine First Lien Notes (as defined in Section II of this Motion).

Moreover, the Proposed Refinancing will only increase the Debtors' value further as well as enhance the Debtors' liquidity, improving their ability to make future adequate protection payments to the Calpine Second Lien Holders. In addition, the Replacement DIP Facility is expected to decrease the amount of debt that is senior to the Calpine Second Lien Holders on a net debt basis after accounting for the interest savings obtained through the Proposed Refinancing.

Furthermore, the Calpine Second Lien Holders' access to its collateral will be improved if the Debtors are authorized to repay the CalGen Secured Debt with funds borrowed from the Replacement DIP Facility. The removal of the CalGen Secured Debt will eliminate the waterfalls, covenants, and cash traps in the current CalGen Secured Debt indentures that restrict Calpine Second Lien Holders' access to cash and value from the CalGen assets. Also, the CalGen assets will no longer be subject to the security interests and liens held by the CalGen Lenders; the Calpine Second Lien Holders will, therefore, be in a much better position vis-à-vis the CalGen assets.

---

contested issue, the Debtors will supplement the record as needed.

In sum, although the Debtors assert that the Replacement DIP Facility should be approved under section 364(c), the requirements of section 364(d)(1) are satisfied.

**C.    The Replacement DIP Facility's "Extraordinary Provisions" are Not Atypical.**

Per the directives of General Order No. M-274 of the United States Bankruptcy Court for the Southern District of New York (the "General Order"), the Debtors herein disclose the following Extraordinary Provisions (as defined in the General Order) within the Replacement DIP Facility Credit Agreement:

1.    The Debtors seek authority to waive the right to charge, pursuant to Section 506(c) of the Bankruptcy Code, any costs of administration of the Chapter 11 Cases against the collateral provided to the Replacement DIP Lenders.  This waiver is an "Extraordinary Provision" within the meaning of section (A)(5) of the General Order.

2.    The Replacement DIP Facility provides for the Replacement DIP Lenders to be provided a lien on proceeds of all causes of action, including those arising under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions").  Granting liens on Avoidance Actions is an "Extraordinary Provision" within the meaning of section (A)(6) of the General Order.

These Extraordinary Provisions are often found in debtor-in-possession financing agreements, and the Replacement DIP Lenders would have refused to provide financing to the Debtors absent such provisions.  Moreover, these Extraordinary Provisions were included in the Existing DIP Credit Agreement in substantially the same form and were approved by this Court. See Existing DIP Order at 2.

**D.    The Debtors' Request for Modification of Automatic Stay is Standard.**

Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The Replacement DIP Facility contemplates a modification of the automatic stay (to the extent applicable), to:  (1) authorize, but not require, the Replacement DIP Lenders to file financing statements, deeds of trust, mortgages, or other similar documents to evidence,

validate, and perfect the Replacement DIP Lenders' security interests granted to them under the Replacement DIP Facility; (2) give the Debtors any notices provided for in the Replacement DIP Facility; (3) execute upon their security interests or exercise other remedies under the operative loan documents upon the occurrence of an event of default (as defined therein), after giving five business days' notice in writing, served by hand or facsimile upon this Court, counsel to the Debtors, counsel for the Official Committee of Unsecured Creditors, counsel for the Official Committee of Equity Security Holders, and the United States Trustee; and (4) take such other actions required under the Replacement DIP Facility Credit Agreement.    Stay modifications of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

   **E.**  **The Replacement DIP Facility Should Be Accorded The Benefits Of Section 364(e) of the Bankruptcy Code.**

    No consideration is being provided to any party to, or guarantor of, obligations arising under the Replacement DIP Facility, other than as disclosed in the Term Sheet and Fee Letter.  The terms and conditions of the Replacement DIP Facility are fair and reasonable, and were negotiated by the parties in good faith and at arm's length.  Accordingly, the Replacement DIP Facility should be accorded the benefits of section 364(e).

**II.**  **The Debtors Should be Permitted to Use Replacement DIP Facility Funds to Refinance the Existing DIP Facility and to Repay CalGen Secured Debt.**

    As part of the Proposed Refinancing, the Debtors also seek approval to use those funds primarily for two purposes:  to refinance the Existing DIP Facility and to repay the CalGen Secured Debt.  For the following reasons, the Debtors assert that both contemplated actions are authorized by the Bankruptcy Code, controlling caselaw, and the parties' governing agreements.

A.    **Refinancing the Existing DIP Facility is an Appropriate Use of Replacement DIP Facility Funds.**

The refinancing of the Existing DIP Facility is permitted under the relevant transaction documents. Specifically, section 2.16 of the Existing DIP Credit Agreement allows the Debtors to repay the Existing DIP Facility, in whole or in part, at any time. Importantly, Credit Suisse and Deutsche Bank, joint administrative agents and joint syndication agents for the Existing DIP Facility, are Joint Lead Arrangers for the Replacement DIP Facility, and the Debtors do not anticipate that any of the Existing DIP Lenders will object to the Proposed Refinancing.

Moreover, the Debtors' request to refinance the Existing DIP Facility is not uncommon. Notably, in the Chapter 11 proceedings of Delphi Corporation, also ongoing in the Southern District of New York, the Court very recently approved the debtors' request to obtain a replacement DIP facility (of similar size, $4.5 billion) to be used in part to refinance an existing DIP facility (also of similar size, $2.0 billion). In re Delphi Corp., No. 05-44481 (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 6461]; see also In re EaglePicher Holdings, Inc., No. 05-12601 (Bankr. S.D. Ohio Nov. 29, 2005) [Docket No. 1238] (authorizing new secured postpetition financing and its use to refinance existing prepetition financing).

B.    **Repaying the CalGen Secured Debt is an Appropriate Use of Replacement DIP Facility Funds.**

1.    Repaying the CalGen Secured Debt is Demonstrably in the Debtors' Best Interests.

As described above, the Debtors are currently paying a weighted interest rate of 11.25% on approximately $2.516 billion of outstanding CalGen Secured Debt. Accordingly, the Debtors' annual interest payments on the CalGen Secured Debt are approximately $283 million, making the CalGen Secured Debt the largest interest obligation within the Debtors' entire organizational structure. By repaying the CalGen Secured Debt with Replacement DIP Facility funds—which have a significantly lower interest rate of 7.61%—the Debtors can reduce their

interest payments on CalGen's financing by approximately one-third, and save approximately $92 million annually.

In addition, since their Chapter 11 filing the Debtors have paid approximately $5 million in fees to the CalGen Lenders' professionals. Repayment of the CalGen Secured Debt will discontinue the Debtors' obligation to pay these expenses and reduce the administrative burden on the Debtors to track and process these bills on a regular basis.

Finally, by repaying the CalGen Secured Debt, the Debtors are increasing their ability to effectuate their emergence from the Chapter 11 Cases, as they will have seven fewer tranches of debt (representing at least three separate classes for voting purposes) and significantly fewer constituents (and their retinue of professional advisers) with whom to negotiate.

2.    Repaying the CalGen Secured Debt is Authorized by Sections 363(b) and 105(a) of the Bankruptcy Code.

Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Second Circuit has held that a judge "determining a § 363(b) application" must "expressly find from the evidence presented before him at the hearing *a good business reason* to grant such an application." In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992) (quoting In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983)) (emphasis added). Nonetheless, "[s]ection 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989); see also Lionel, 722 F.2d at 1071 (2d Cir. 1983) (noting the "various policy considerations" underlying section 363(b) include "the notion that a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code").

Under section 105(a), bankruptcy courts have the power to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "Thus, the Bankruptcy Court's equitable powers [under section 105] may be used to effectuate the purposes of Chapter 11, which include the 'restructuring of a business' finances to enable it to operate productively, provide jobs for its employees, pay its creditors and produce a return for its stockholders.'" Ionosphere Clubs, 98 B.R. at 177 (quoting H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977) U.S. Code Cong. & Admin. Code 1978, pp. 5787, 5963, 5977).

3.    Repaying the CalGen Secured Debt is Authorized by Controlling Precedent.

The proposed repayment of the CalGen Secured Debt is further supported by the Debtors' similar repayment of the outstanding principal and interest of their first lien prepetition secured debt, which this Court approved on May 10, 2006. See Order Authorizing Repayment of Principal of First Lien Debt [Docket No. 1542] (the "Repayment Order").

Described generally, the Debtors moved, pursuant to Sections 363(b) and 105(a), to repay approximately $646.11 million of 9.625% First Priority Senior Secured Notes Due 2014 (the "Calpine First Lien Notes") with funds from two sources: asset-sale proceeds that were being held in a control account and Existing DIP Facility funds. The asset-sale proceeds were earning interest in the control account at a rate of 4.42% while the Debtors were paying interest on the Calpine First Lien Notes at a rate of 9.625%. As a result of this differential, the Debtors were losing approximately $1.65 million per month. The interest rate on the Existing DIP Facility (approximately 7.9% at that time) also was lower than the interest rate on the Calpine First Lien Notes, costing the Debtors an additional $310,000 per month. Finally, the Debtors also sought to discontinue paying the professionals' fees of the holders of the Calpine First Lien Notes, which would save another approximately $350,000 per month.

On May 10, 2006, this Court entered the Repayment Order authorizing the Debtors to repay the outstanding principal and interest of the Calpine First Lien Notes. More specifically, the Court found that the repayment of prepetition secured debt was "highly appropriate" for the Debtors to stop "hemorrhaging" cash. 5/10/06 Tr. at 82. Continued losses due to the "interest rate differential and these administration expenses are somewhat, to put it charitably, not in the best interests of the estate and under Section 363, [repayment] offers the appropriate use of cash." Id. at 83. Furthermore, "to the extent [Section] 105 applies here, to back stop that, I do find it appropriate for the Debtor[s] and those creditors of the estate to receive those payments at this particular point in time." Id.

The indenture trustee for the Calpine First Lien Notes appealed the Repayment Order, but the Southern District of New York recently affirmed this Court's decision. Law Debenture Trust Co. of New York v. Calpine Corp. (In re Calpine Corp.), __ F. Supp. 2d __, 2007 WL 57879 (S.D.N.Y. Jan. 9, 2007). In fact, the District Court expressly endorsed the statutory framework and holding of the Repayment Order, concluding: "[i]t is undisputed that the repayment of the outstanding principal of the Notes stopped the unnecessary loss of funds from Debtors' estates. Accordingly, Judge Lifland's granting of Debtors' Repayment Motion was an appropriate use of cash under sections 363(b) and 105(a)." Id. at *8.

Yet additional support for the Debtors' proposed repayment of the CalGen Secured Debt is found in the Delphi Corporation Chapter 11 proceedings. As noted throughout this Motion, the Court recently authorized Delphi to obtain approximately $4.5 billion in replacement debtor-in-possession financing to be used, in part, to repay approximately $2.5 billion of prepetition secured debt with higher rates, thus allowing the Delphi debtors "to reduce their cost of financing.". See In re Delphi Corp., No. 05-44481, *5 (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 6461]

In sum, the Debtors' request to repay CalGen Secured Debt is no different (in any material respect) from the repayments at issue earlier in these Chapter 11 Cases or in Delphi's Chapter 11 case. It cannot seriously be disputed that the repayment of the CalGen Secured Debt will stop the unnecessary loss of funds from the Debtors' estates; therefore, using Replacement DIP Facility funds to do so is an appropriate use of cash under Sections 363(b) and 105(a).

       4.    <u>Any "No-Call" Objections Raised by the CalGen Lenders Cannot Be Sustained</u>.

As explained above, <u>see</u> <u>supra</u> note 2, there are seven tranches of CalGen Secured Debt. (Please note also that attached hereto as Exhibit G is a chart that summarizes the various series of the CalGen Secured Debt and relevant contractual language, and may be a particularly useful resource for the issues addressed in the remainder of this Motion.) Six of the seven tranches contain prepayment prohibitions, or so-called "no-call" clauses that purport to bar repayment of the debt within certain time periods.[19] More specifically:

- <u>$235,000,000 First Priority Secured Floating Rate Notes Due 2009</u>. Section 3.07 of the First Priority Indenture, entitled "Optional Redemption," states that the "Issuers may not redeem all or any part of the Notes prior to April 1, 2007."

- <u>$600,000,000 First Priority Secured Institutional Term Loans Due 2009</u>. Section 2.10 of the First Priority Credit and Guarantee Agreement, entitled "Voluntary Prepayments," states that the First Lien Term Loans "may not be voluntarily prepaid at any time on or prior to April 1, 2007."

- <u>$640,000,000 Second Priority Secured Floating Rate Notes Due 2010</u>. Section 3.07 of the Second Priority Indenture, entitled "Optional Redemption," states that the "Issuers may not redeem all or any part of the Notes prior to April 1, 2008."

- <u>$100,000,000 Second Priority Secured Institutional Term Loans Due 2010</u>. Section 2.10 of the Second Priority Credit and Guarantee Agreement, entitled "Voluntary

---

[19] For the seventh tranche, the $200,000,000 First Priority Secured Revolving Loans, Section 2.1.10 of the First Priority Amended and Restated Credit Agreement provides that "[t]he Borrower may voluntarily prepay (without premium or penalty) Revolving Loans on any Business Day, in whole or in part, in an aggregate minimum amount of $2,000,000 and integral multiples of $500,000 (or the remaining amount outstanding) in excess of that amount."

Prepayments," states that the Second Lien Term Loans "may not be voluntarily prepaid at any time on or prior to April 1, 2008."

- **$680,000,000 Third Priority Secured Floating Rate Notes Due 2011.** Section 3.07 of the Third Priority Indenture, entitled "Optional Redemption," states that the "Notes are not redeemable at the option of the Issuers."

- **$150,000,000 11.5% Third Priority Secured Notes Due 2011.** Section 3.07 of the Third Priority Indenture, entitled "Optional Redemption," states that the "Notes are not redeemable at the option of the Issuers."

Notwithstanding any arguments by the CalGen Lenders to the contrary, the above prepayment prohibitions do not preclude the Debtors from repaying the CalGen Secured Debt at this time. As the titles of the no-call clauses make clear, the provisions apply to an "optional redemption" or "voluntary prepayment" of the notes. But the Debtors' proposed repayment is neither optional nor voluntary, because, under the express terms of the same indentures that contain the no-call clauses, all of the outstanding CalGen Secured Debt is accelerated, which means it is due and payable immediately:

- **$235,000,000 First Priority Secured Floating Rate Notes Due 2009.** Section 6.01 of the First Priority Indenture, entitled "Events of Default," provides that commencing a voluntary bankruptcy case is an Event of Default. Section 6.02, entitled "Acceleration," provides that "[i]n the case of an Event of Default [due to bankruptcy] . . . . all outstanding Notes will become **due and payable immediately** without further action or notice." (Emphasis added).

- **$600,000,000 First Priority Secured Institutional Term Loans Due 2009.** Section 7.01 of the First Priority Credit and Guarantee Agreement, entitled "Events of Default," provides that commencing a voluntary bankruptcy case is an Event of Default. Section 7.02, entitled "Acceleration," provides that "[i]n the case of any Event of Default [due to bankruptcy] . . . with respect to the Borrower or any of its Subsidiaries, the outstanding First Priority Term Loans shall become **due and payable immediately** without further action or notice." (Emphasis added).

- **$640,000,000 Second Priority Secured Floating Rate Notes Due 2010.** Section 6.01 of the Second Priority Indenture, entitled "Events of Default," provides that commencing a voluntary bankruptcy case is an Event of Default. Section 6.02, entitled "Acceleration," provides that "[i]n the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes will become **due and payable immediately** without further action or notice." (Emphasis added).

- $100,000,000 Second Priority Secured Institutional Term Loans Due 2010. Section 7.01 of the Second Priority Credit and Guarantee Agreement, entitled "Events of Default," provides that commencing a voluntary bankruptcy case is an Event of Default. Section 7.02, entitled "Acceleration," provides that "[i]n the case of any Event of Default [due to bankruptcy] . . . with respect to the Borrower or any of its Subsidiaries, the outstanding Second Priority Term Loans shall become *due and payable immediately* without further action or notice." (Emphasis added).

- $680,000,000 Third Priority Secured Floating Rate Notes Due 2011. Section 6.01 of the Third Priority Indenture, entitled "Events of Default," provides that commencing a voluntary bankruptcy case is an Event of Default. Section 6.02, entitled "Acceleration," provides that "[i]n the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes will become *due and payable immediately* without further action or notice." (Emphasis added).

- $150,000,000 11.5% Third Priority Secured Notes Due 2011. Section 6.01 of the Third Priority Indenture, entitled "Events of Default," provides that commencing a voluntary bankruptcy case is an Event of Default. Section 6.02, entitled "Acceleration," provides that "[i]n the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes will become *due and payable immediately* without further action or notice." (Emphasis added).

Put simply, the Debtors' commencement of their Chapter 11 Cases constituted an Event of Default, thus all outstanding CalGen Secured Debt is due and payable immediately. When read together, the "optional repayment/voluntary redemption," "events of default," and "acceleration" clauses indicate that the no-call periods are inapplicable once an event of default has occurred and the notes have been accelerated. As a textual matter, none of the relevant acceleration clauses contains any sort of caveat for a no-call period; e.g., that in the case of an event of default all outstanding notes shall become due and payable immediately (but only after April 1, 2007). Likewise, a practical matter, it is manifestly illogical, to say the least, for notes to be "due and payable immediately" while at the same barred from repayment until a specified future date. Indeed, in the specific context of the Third Priority Indenture—which absolutely bars any repayment of the notes prior to their maturity date (2011)—to assume the prepayment prohibition applies even though the Debtors have commenced their Chapter 11 Cases results in an especially

33

absurd situation where the Third Priority Notes are due and payable immediately but the Debtors cannot repay them for another four years.

Not only is the Debtors' reading of the CalGen Secured Debt indentures—i.e., the repayment of accelerated debt is not optional or voluntary—the most commonsensical, it also is correct as a matter of law. It is axiomatic that debt is automatically accelerated upon the filing of a bankruptcy case. See, e.g., In re Manville Forest Products Corp., 43 B.R. 293, 297 (Bankr. S.D.N.Y. 1984). And "acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity." In re LHD Realty Corp., 726 F.2d 327, 330-31 (7th Cir. 1984). See also In re Ridgewood Apts. of DeKalb County. Ltd., 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) (noting that the "essence of a bankruptcy reorganization under Chapter 11 is to restructure debt" and it would be "anomalous for acceleration of an obligation to be construed as a prepayment . . . .").

Moreover, regardless of acceleration, no-call provisions that preclude the optional or voluntary repayment of debt are routinely held unenforceable against Chapter 11 debtors. See, e.g., Continental Secs. Corp. v. Shenandoah Nursing Home P'ship, 193 B.R. 769, 774 (W.D. Va. 1996) (affirming Bankruptcy Court's holding that "while there is a prepayment prohibition, [it] is not enforceable in this [Chapter 11] context"); In re Vest Assocs., 217 B.R. 696, 699 (Bankr. S.D.N.Y. 1998) (allowing repayment of loan although note provided it "cannot be prepaid without the prior written consent of the holder"); In re 360 Inns, Ltd., 76 B.R. 573, 575-76 (Bankr. N.D. Tex. 1987) (authorizing repayment of a note despite ten-year prohibition on repayment); In re Skyler Ridge, 80 B.R. 500, 502 (Bankr. C.D. Cal. 1987) (stating a prepayment prohibition "is not enforceable in a bankruptcy case"); LHD Realty Corp., 726 F.2d at 329 (allowing repayment of promissory note notwithstanding clause that states "no prepayment of principal may be made during the first ten (10) loan years").

III.    **Pursuant to Section 502 and Rule 3007, the Debtors' Limited Objection to the CalGen Claims Should Be Allowed.**

The Debtors object to the CalGen Claims to the extent they seek anything beyond the amount of outstanding principal, plus interest at the non-default contract rate through the date of repayments. Under Bankruptcy Code Section 502 and Bankruptcy Rule 3007, if an objection to a claim is made, the Court is authorized to determine the amount of the claim.

Most significantly, as explained above, the CalGen Lenders have filed proofs of claim that include demands for so-called "makewhole" premiums, or compensation for future interest payments they will not receive if the Debtors are permitted to repay the CalGen Secured Debt prior to its originally stated maturity date. The Debtors' proposed repayment of CalGen Secured Debt does not entitle the CalGen Lenders to a makewhole premium; thus, the Debtors object to the CalGen Claims on the following grounds.

A.    **The CalGen Secured Debt Indentures Do Not Require a Makewhole Premium For Repayment Prior to April 1, 2007.**

Put simply, the Debtors' repayment of CalGen Secured Debt must occur by March 30, 2007, and none of the seven tranches of CalGen Secured Debt explicitly imposes a makewhole obligation if repayment occurs on or before that date. More specifically,

- The indenture for the $200,000,000 First Priority Secured Revolving Loans states the Loans may be repaid at any time without penalty.[20]

- The indentures for the $235,000,000 First Priority Secured Floating Rate Notes Due 2009 and the $600,000,000 First Priority Secured Institutional Term Loans Due 2009 state the Notes and Loans may not be repaid prior to April 1, 2007. The indentures do not impose a makewhole premium for any repayment made during this no-call period.[21]

- The indentures for the $640,000,000 Second Priority Secured Floating Rate Notes Due 2010 and the $100,000,000 Second Priority Secured Institutional Term Loans Due 2010

---

[20]    First Priority Amended and Restated Credit Agreement § 2.1.10.

[21]    First Priority Indenture § 3.07; First Priority Credit and Guarantee Agreement § 2.10.

state the Notes and Loans may not be repaid prior to April 1, 2008. The indentures do not impose a makewhole premium for any repayment made during this no-call period.[22]

- The indenture for the $680,000,000 Third Priority Secured Floating Rate Notes Due 2011 and the $150,000,000 11.5% Third Priority Secured Notes Due 2011 state the Notes may not be repaid any time. The indentures do not impose any makewhole premium for any repayment during any period.[23]

Therefore, because none of the CalGen Secured Debt indentures provides for a makewhole premium if repayment occurs prior to April 1, 2007, to the extent the CalGen Lenders assert the Proposed Refinancing triggers a makewhole obligation, they must attempt to import it from different circumstances. Indeed, three of the six indentures do not provide for a makewhole premium upon repayment at *any* point in time. Furthermore, four of the CalGen Secured Debt indentures state that makewhole premiums are due if Debt is repaid after April 1, 2007 or April 1, 2008—i.e., *after* the Proposed Refinancing would be complete:

- $235,000,000 First Priority Secured Floating Rate Notes Due 2009. Section 3.07 of the First Priority Indenture, entitled "Optional Redemption," states that "*[o]n or after April 1, 2007*, the Issuers may redeem all or part of the Notes, upon not less than 30 nor more than 60 days prior notice, at the redemption prices (expressed at percentages of principal amount) set forth below plus accrued and unpaid interest and Special Interest, if any, on the notes redeemed . . . ." (Emphasis added).

- $600,000,000 First Priority Secured Institutional Term Loans Due 2009. Section 2.10 of the Credit and Guarantee Agreement, entitled "Voluntary Prepayments," states that "[t]he Borrower may . . . [prepay] the First Priority Term Loans, if such prepayment is *after April 1, 2007*, but on or before April 1, 2008, in an amount equal to 102.5% of the principal amount so prepaid . . . ." (Emphasis added).

- $640,000,000 Second Priority Secured Floating Rate Notes Due 2010. Section 3.07 of the Second Priority Indenture, entitled "Optional Redemption," states that "*[o]n or after April 1, 2008*, the Issuers may redeem all or part of the Notes, upon not less than 30 nor more than 60 days prior notice, at the redemption prices (expressed at percentages of principal amount) set forth below plus accrued and unpaid interest and Special Interest, if any, on the notes redeemed . . . ." (Emphasis added).

---

[22]   Second Priority Indenture § 3.07; Second Priority Credit and Guarantee Agreement § 2.10.

[23]   Third Priority Indenture § 3.07.

- $100,000,000 Second Priority Secured Institutional Term Loans Due 2010. Section 2.10 of the Credit and Guarantee Agreement, entitled "Voluntary Prepayments," states that "[t]he Borrower may . . . [prepay] the Second Priority Term Loans, if such prepayment is *after April 1, 2008*, but on or before April 1, 2009, in an amount equal to 103.5% of the principal amount so prepaid . . . ." (Emphasis added).

In sum, there is not a single provision within any of the indentures for the seven issuances of CalGen Secured Debt that states a repayment before April 1, 2007 triggers a makewhole obligation.

### B.    The CalGen Secured Debt Indentures Do Not Require a Makewhole Premium Upon the Repayment of Accelerated Debt.

Even beyond the fact that the terms of the CalGen Secured Debt indentures plainly do not require a makewhole premium for a pre-April 1, 2007 repayment, any makewhole demands by the CalGen Lenders would be legally unenforceable regardless of the date on which the Debtors effected repayment.  This is because the CalGen Secured Debt indentures do not require a makewhole premium upon the repayment of accelerated debt.

As explained above, the CalGen Secured Debt indentures uniformly provide that commencing a voluntary bankruptcy case is an Event of Default.[24]  All of the indentures also contain acceleration clauses, which uniformly provide that in the case of an Event of Default due to bankruptcy all outstanding Notes shall become *due and payable immediately* without further action or notice.[25]  It cannot be disputed that the Debtors' commencement of their Chapter 11 Cases constituted an Event of Default and, therefore, pursuant to the indentures' acceleration clauses, the CalGen Secured Debt is presently due and payable.

---

[24]  First Priority Amended and Restated Credit Agreement § 7.01; First Priority Indenture § 6.01; First Priority Credit and Guarantee Agreement § 7.01; Second Priority Indenture § 6.01; Second Priority Credit and Guarantee Agreement § 7.01; Third Priority Indenture § 6.01.

[25]  (Emphasis added).  First Priority Amended and Restated Credit Agreement § 7.02; First Priority Indenture § 6.02; First Priority Credit and Guarantee Agreement § 7.02; Second Priority Indenture § 6.02; Second Priority Credit and Guarantee Agreement § 7.02; Third Priority Indenture § 6.02.

The acceleration of the CalGen Secured Debt further nullifies any makewhole demand by the CalGen Lenders.  As an initial matter, the indenture provisions that do contain makewhole requirements expressly state they apply only in the case of an "optional redemption" or "voluntary repayment."[26]  As with the unenforceable no-call provisions, it is logically impossible for the repayment of debt that is "due and payable immediately without further action or notice" to be "optional" or "voluntary."

Furthermore, none of the CalGen Secured Debt indentures' acceleration clauses explicitly provides that the repayment of accelerated debt triggers a makewhole obligation—an dispositive omission when determining the enforceability of a makewhole demand.  Put differently, courts may enforce a makewhole demand in the context of a Chapter 11 event of default if the acceleration clause at issue specifically includes the makewhole obligation within its terms.  See, e.g., In re AE Hotel Venture, 321 B.R. 209, 219 (Bankr. N.D. Ill. 2005) (finding "[b]ecause the loan documents here expressly provide for a prepayment premium even when the debt is accelerated, the premium is 'provided for under the agreement'"); In re Vanderveer Estates Holdings, Inc., 283 B.R. 126 (Bankr. E.D.N.Y. 2002) (enforcing a makewhole payment where "[t]he Note contains a provision requiring the payment of a Yield Maintenance Premium in connection with any prepayment of the loan, 'whether the prepayment is voluntary or involuntary (in connection with holder hereof's acceleration of the unpaid principal balance of the Note)'"); In re Financial Center Assocs. of East Meadow, L.P., 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992) (noting "[i]t is not disputed that the agreement between the parties specifically provides for the pre-payment charge even in the event of acceleration").

---

[26]   First Priority Indenture § 3.07; First Priority Credit and Guarantee Agreement § 2.10; Second Priority Indenture § 3.07; Second Priority Credit and Guarantee Agreement § 2.10; Third Priority Indenture § 3.07.

Critically, however, what courts will not do (including courts within this District) is write a repayment premium requirement into an indenture provision that does not already so provide. See, e.g., In re Adelphia Commc'ns Corp., 342 B.R. 142, 150-54 (Bankr. S.D.N.Y. 2006) (denying an asserted premium demand because the agreement in question did not provide for such a remedy); Shenandoah Nursing Home, 193 B.R. at 774 (refusing to enforce a "lockout provision by simply supplying a prepayment penalty figure contained elsewhere in the note since no such figure exists. In essence, the lockout provision, completely uncoupled from some sort of damages provision, is not specific enough to be enforced by this court.").

In other words, if the CalGen Lenders—sophisticated parties who were ably represented by counsel—intended the Secured Debt indentures to require payment of a makewhole premium in the event of a default-induced acceleration, they could and should have included such a provision within the express terms of the acceleration clause. See, e.g., Adelphia, 342 B.R. at 153 (noting "if the bank lenders wished to contact for additional remedies (which likewise was their right, if their contract counterparty was agreeable to providing such), the bank lenders could have done so"). That the Lenders failed to bargain for this specific benefit, however, does not entitle them to petition the Court to redraft the terms of the parties' bargain on the eve of repayment. See, e.g., id. at 151 ("Needless to say, the contract's actual language trumps the paraphrase of it, and neither a party, nor the Court, is free to restate the contractual language used by the parties.").

## IV.    Pursuant to Rule 3012, the CalGen Claims Should Be Valued Not To Include Any Amounts in Excess of Outstanding Principal, Plus Unpaid Interest at the Non-Default Contract Rate, Through the Repayment Date.

In repaying the CalGen Secured Debt, the Debtors intend to satisfy all valid obligations to the CalGen Lenders. To that end, it is essential the Debtors confirm the exact amounts they owe on the CalGen Secured Debt. The Debtors have therefore attached a chart, attached hereto as Exhibit H, which indicates the outstanding principal due and owing to the

CalGen Lenders, according to the Debtors' books and records. The Debtors believe the CalGen Lenders' Proofs of Claim are limited only to such outstanding principal, plus interest at the non-default contract rate through the date of repayments. More specifically, the Debtors disagree their proposed repayment prompts any makewhole obligation and, therefore, herein move the Court to determine, pursuant to Bankruptcy Rule 3012, the value of the CalGen Claims in amounts that do not include any asserted makewhole obligations.

A.    **The Value of the CalGen Claims Can and Must Be Determined Through This Motion.**

It is proper for the Debtors to bring, and for this Court to decide, the instant Rule 3012 Motion at this time. Rule 3012 provides "[t]he court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct." As stated in the Advisory Committee Note to Rule 3012, the "valuation of secured claims may become important in different contexts" in Chapter 11 cases, and debtors and creditors alike may bring a motion to determine the value of a secured claim. See AE Hotel Venture, 321 B.R. at 212 n.1; In re F.B.F. Indus., Inc., 165 B.R. 544, 546 (Bankr. E.D. Pa. 1994).

Moreover, a prompt determination of the value of the CalGen Claims is critical: if the Debtors are required to satisfy a makewhole obligation on the full amount of outstanding CalGen Secured Debt, it may not be plausible to proceed with the Proposed Refinancing. Although the CalGen Lenders' Proofs of Claim assert unliquidated amounts related to the repayment of the CalGen Secured Debt, given the amount of principal at issue ($2.516 billion), it is conceivable that a makewhole payment could involve a sum larger than the expected interest rate savings to be gained through the Proposed Refinancing.

In addition, the Proposed Refinancing expires on March 30, 2007, and therefore the Debtors have reserved the right to abandon the Proposed Refinancing if they cannot obtain a

judicial determination by this date that the CalGen Lenders are not entitled to a makewhole payment. Accordingly, to close and execute the Proposed Refinancing, the issue of whether the value of the CalGen Claims properly includes a makewhole payment must be determined concurrently with the Debtors' request to authorize the Replacement DIP Facility.

**B.    The CalGen Claims Should Be Valued in the Following Amounts.**

Pursuant to Bankruptcy Rule 3012, the Debtors respectfully request that the Court determine the value of the CalGen Claims as the amount of outstanding principal, plus unpaid interest at the non-default contract rate through the date of repayments. The Debtors submit that the claim values reflected in the table attached hereto Exhibit H are appropriate values for the CalGen Claims. The Debtors calculated the value of the CalGen Claims based on the information contained in the CalGen Claims and the Debtors' books and records. For the purposes of this Motion only, the Debtors have assumed that, subject to the Court's approval, they will repay the CalGen Secured Debt on Friday, March 30, 2007 (the "Repayment Date").[27] Assuming the CalGen Secured Debt is repaid on the Repayment Date, the CalGen Claims would be appropriately valued as follows:

- With respect to the CalGen First Lien Revolving Loans, the Debtors' books and records do not reflect any liability for principal or interest.

- With respect to the CalGen First Lien Notes, the Debtors calculate the total amount of principal due is $235 million and the total amount of unpaid interest is $5,332,150.00, resulting in a total claim in the amount of $240,332,150.00.

- With respect to the CalGen Second Lien Notes, the Debtors calculate that the total amount of principal due is $640 million and the total amount of unpaid interest is $17,721,600.00, resulting in a total claim in the amount of $657,721,600.00.

- With respect to the CalGen Third Lien Notes, the Debtors calculate that the total amount of principal due is $830 million and the total amount of

---

[27]  The Debtors reserve the right to repay the CalGen Secured Debt before March 30, 2007. In the event the CalGen Claims are satisfied on an earlier date, the Debtor will adjust their calculations accordingly.

unpaid interest is $57,483,000.00, resulting in a total claim in the amount of $887,483,000.00.

- With respect to the CalGen First Lien Term Loans, the Debtors calculate that the total amount of principal due is $600,000,000.00 and the total amount of unpaid interest is $13,426,959.45, resulting in a total claim in the amount of $613,426,959.45.

- With respect to the CalGen Second Lien Term Loans, the Debtors calculate the total amount of principal due to be $100 million and the total amount of interest on principal due as $2,730,977.26, resulting in a total claim in the amount of $102,730,977.26.

In the weeks before the hearing on this Motion, the Debtors intend to work with the CalGen Lenders to agree on the Repayment Date and the appropriate value of the CalGen Claims. In the event the Debtors and the CalGen Lenders are unable to reach consensus on the value of the CalGen Claims, the Debtors respectfully request that the Court approve the Debtors' calculations of the CalGen Claims as an appropriate measure of those claims.

## MEMORANDUM OF LAW

This Motion includes citations to the applicable authorities and a discussion of their application to this Motion. Accordingly, the Debtors respectfully submit that such citations and discussion satisfy the requirement that the Debtors submit a separate memorandum of law in support of this Motion pursuant to Rule 9013-1 of the Local Rules.

## NOTICE

Notice of this Motion has been provided to: (a) the United States Trustee for the Southern District of New York; (b) counsel to the Creditors' Committee; (c) counsel to the administrative agents for the Debtors' prepetition secured lenders; (d) counsel to the ad hoc committees; (e) the indenture trustees pursuant to the Debtors' secured indentures; (f) counsel to the Debtors' postpetition lenders; (g) the Securities and Exchange Commission; (h) the Internal Revenue Service; (i) the United States Department of Justice; (j) counsel to the Equity Committee; and (k) all parties entitled who have requested notice pursuant to Bankruptcy Rule 2002. In light of

the nature of the relief requested herein, the Debtors submit that no other or further notice is required. A copy of the Motion is also available on the website of the Debtors' notice and claims agent, Kurtzman Carson Consultants LLC, at http://www.kccllc.net/calpine.

Except as otherwise noted herein, no prior application for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request an entry of an order, substantially in the form attached hereto as Exhibits A and B, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: January 26, 2007
      New York, New York

Respectfully submitted,

/s/ Richard. M. Cieri_____
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted pro hac vice)
Stephen E. Hessler (admitted pro hac vice)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Counsel for the Debtors