**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br><br>Calpine Corporation, et al.,<br><br>　　　　　　　　　　Debtors. | )<br>)<br>) Chapter 11<br>)<br>)<br>) Case No. 05-60200 (BRL)<br>) Jointly Administered<br>) |

**ORDER (I) GRANTING DEBTORS LIMITED OBJECTION TO CLAIM NUMBERS 2664, 2626 THROUGH 2665(INCLUSIVE), 3275, 3393 THROUGH 3421 (INCLUSIVE), 3546 THROUGH 3554 (INCLUSIVE), 3586 THROUGH 3588 (INCLUSIVE), 3731, 4073, 5653 THROUGH 5730 (INCLUSIVE), 5791, AND 5792; (II) DETERMINING THE VALUE OF THE CALGEN SECURED DEBT PURSUANT TO RULE 3012 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; AND (III) AUTHORIZING REPAYMENT OF CALGEN SECURED DEBT**

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") seeking entry of an Order (a) granting the Debtors' limited objection to the CalGen Lenders' Claims, (b) determining the value of the CalGen Lenders' Claims pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedures, and (c) authorizing the Debtors to repay the CalGen Secured Debt [Docket No. ____]; it appearing that the relief requested is in the best interest of the Debtors' estates, their creditors and other parties in interest; it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); it appearing that venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; notice of this Motion and the opportunity for a hearing on this Motion were appropriate under the particular circumstances and that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED

1. The Motion is granted in its entirety.

2. Claim numbers 2626 through 2665 (inclusive), 3275, 3393 through 3421 (inclusive), 3546 through 3554 (inclusive), 3586 through 3588 (inclusive), 3731, 4073, 5653 through 5730 (inclusive), 5791, and 5792 are hereby disallowed to the extent that such claims request amounts beyond the Repayment Amounts (as defined below).

3. Pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedures, the value of CalGen Lenders' Claims is hereby determined as the amount of outstanding principal, plus unpaid interest at the non-default contract rate under the CalGen Secured Debt through the date of repayments, as calculated by the Debtors (the "Repayment Amounts"). For the purposes of clarity, the Repayment Amounts shall not include any actual or potential claims, premiums or penalties related to (i) any "makewhole," repayment, prepayment or call provisions, (ii) any contract defaults or (iii) any contractual damages.

4. The Debtors are authorized to repay immediately all of the Repayment Amounts.

5. Upon payment of the Repayment Amounts, claim numbers 2626 through 2665 (inclusive), 3275, 3393 through 3421 (inclusive), 3546 through 3554 (inclusive), 3586 through 3588 (inclusive), 3731, 4073, 5653 through 5730 (inclusive), 5791, and 5792 shall be expunged and disallowed in their entirety.

6. The Debtors are authorized to discontinue all payments to the CalGen Lenders' professionals under the Cash Collateral Order as of the date of repayments.

7. Upon entry of this Order, the Debtors and the CalGen Lenders (including all trustees, depositary agents, or any other administrators of the CalGen Secured Debt) shall be authorized to take all appropriate steps or measures to cause or secure the distribution of the Repayment Amounts pursuant to the terms of this Order to the appropriate parties on a ratable basis. For the purposes of distribution of the Repayment Amounts, the record date shall be the

date that the Debtors transfer the Repayment Amounts. Any delays caused by, for instance, having to obtain subsequent orders to clarify any distribution mechanics, or any other issues that may be arise upon the Debtors transfer of the Repayment Amounts, shall not affect the record date, which shall remain the date the Debtors transfer the Repayment Amounts.

8. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

9. The terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

10. The requirement set forth in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Application.

11. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: February __, 2007

                                        Honorable Burton R. Lifland
                                        United States Bankruptcy Judge

**EXHIBIT C**

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted pro hac vice)
Stephen E. Hessler (admitted pro hac vice)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| Calpine Corporation, et al., | ) |
| | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
| | ) |

**AFFIDAVIT OF SAMUEL M. GREENE IN SUPPORT OF
DEBTORS' MOTION FOR ORDER (I) AUTHORIZING DEBTORS TO OBTAIN
REPLACEMENT POSTPETITION FINANCING TO (A) REFINANCE EXISTING
POSTPETITION FINANCING AND (B) REPAY PREPETITION DEBT;
(II) ALLOWING DEBTORS' LIMITED OBJECTION TO CLAIMS; AND
(III) DETERMINING VALUE OF SECURED CLAIMS**

STATE OF NEW YORK   )
                    ) ss:
COUNTY OF NEW YORK  )

Samuel M. Greene, being duly sworn, deposes and states:

1.  I am a Managing Director of Miller Buckfire & Co. LLC ("Miller Buckfire"), which is serving as Financial Advisor and Investment Banker to the debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors"). In my work on behalf of the Debtors, I am generally familiar with and have participated in the Debtors' efforts to obtain replacement

postpetition financing. I submit this Affidavit in support of the Debtors' Motion For Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims, filed January 26, 2007 (the "Motion").[1]

2. On March 23, 2004, CalGen issued $2.605 billion of secured debt through a series of first, second, and third-lien financings. Approximately $2.516 billion of CalGen Secured Debt is currently outstanding. Based on the weighted average spread on the CalGen Secured Debt of approximately 5.89%, and current LIBOR of approximately 5.36%,[2] the weighted average interest rate on the CalGen Secured Debt is approximately 11.25%. In addition, there are approximately $40 million in letters of credit outstanding against the CalGen First Lien Revolving Loans.

3. The Debtors' $2 billion Existing DIP Facility consists of:

    (a)    A revolving commitment of up to $1,000,000,000, secured by a first priority security interest, on which the interest rate is LIBOR plus 2.25%. There are approximately $80 million in letters of credit outstanding against the revolver facility and no cash borrowings.

    (b)    A term loan commitment of up to $400,000,000, secured by a first priority security interest, on which the interest rate is LIBOR plus 2.25%. The amount outstanding under this facility is $396.5 million.

    (c)    A term loan commitment of up to $600,000,000, secured by a second priority security interest, on which the interest rate is LIBOR plus 4.00%. The amount outstanding under this facility is $600 million.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

[2] Represents three-month LIBOR as of January 26, 2007, per Bloomberg.

2

In sum, the amount drawn on the Existing DIP Facility is $996.5 million. Based on the weighted average spread on the currently outstanding amounts under the Existing DIP Facility of approximately 3.30% and current LIBOR of approximately 5.36%, the weighted average interest rate on the Existing DIP Facility is approximately 8.66%. The Existing DIP Facility is set to expire at the earliest of: December 20, 2007, the effective date of a plan or reorganization pursuant to a confirmation order of the Court, or the acceleration of the loans in accordance with the Existing DIP Credit Agreement.

4. On October 6, 2006, in light of the favorable conditions of the capital markets, and the Debtors' continued desire to improve cash flow, Miller Buckfire distributed, on the Debtors' behalf, a RFP for a possible refinancing to the nine Potential Replacement DIP Lenders. The RFP specified that the Debtors were seeking proposals for a new debtor in possession financing facility to amend or replace their Existing DIP Facility. The proposals had to include the following options:

  (a) an extension of the maturity of the Existing DIP Facility beyond December 31, 2007;

  (b) the ability to convert the debtor in possession financing into an exit facility at the Debtors' option; and

  (c) the ability to expand the size of the facility at or subsequent to closing in order to refinance certain prepetition debt.

On or around October 16, 2006, the Debtors received initial responses to the RFP from each of the Potential Replacement DIP Lenders. During the following week, the Debtors and Miller Buckfire held discussions with the Potential Replacement DIP Lenders to explore the proposals further.

5. Upon receiving responses to the RFP, the Debtors identified the most favorable terms from each of the Potential Replacement DIP Lenders' responses and drafted an indicative

term sheet that set forth the key terms the Debtors required to pursue a refinancing transaction. On October 24, 2006, Miller Buckfire distributed the indicative term sheet to each of the Potential Replacement DIP Lenders and requested final, binding commitment letters in return. More specifically, the Debtors' prerequisites included the following terms:

    (a)    a $5 billion replacement facility, comprised of a $1 billion revolver and $4 billion term loans, subject to expansion;

    (b)    an initial term of two years, and if the Debtors opt to convert the proposed replacement facility into exit financing, a total term of seven years; and

    (c)    authorization for the Debtors to use the proceeds of the proposed replacement facility to refinance the Existing DIP Facility, repay the CalGen Secured Debt, and for general corporate purposes.

Over the ensuing weeks, the Debtors provided due diligence information to the Potential Replacement DIP Lenders, including financial models and budgets. On or around November 13, 2006, the Debtors received final commitment letters from seven of the eight Potential Replacement DIP Lenders and began negotiations with each.

    6.    On or around December 11, 2006, the Debtors selected Credit Suisse, Goldman Sachs, JP Morgan, and Deutsche Bank to be the Replacement DIP Joint Lead Arrangers based on, among other factors, the Replacement DIP Joint Lead Arrangers' familiarity with Calpine and its subsidiaries, the attractiveness of the terms that they proposed, and the Debtors' confidence in the ability of the Replacement DIP Joint Lead Arrangers to execute a transaction of this size and complexity.

    7.    As with the Existing DIP Facility, the Debtors could not obtain on an unsecured basis a replacement DIP facility with the terms and of the type and magnitude required in these Chapter 11 Cases. The Debtors solicited replacement financing from eight major potential lenders and none was willing to make a postpetition loan on an unsecured basis.

    8.    The key terms of the Replacement DIP Facility are summarized below.

| Borrower | Calpine Corporation. |
|---|---|
| Facilities | A $5.0 billion facility comprised of<br><br>(a) a $4.0 billion secured first priority term loan facility (the "Term Facility"), and<br><br>(b) a $1.0 billion secured first priority revolving credit facility (the "Revolving Facility"), including a letter of credit subfacility of up to $550 million. |
| Purpose | The proceeds shall be used<br><br>(a) to refinance the Existing DIP Facilities,<br><br>(b) to repay the CalGen Secured Debt, and<br><br>(c) for working capital and other general corporate purposes. |
| Maturity | The earlier of<br><br>(a) the effective date of a confirmed plan of reorganization (the "Effective Date"), and<br><br>(b) the second anniversary of the Closing Date.<br><br>If the Facilities are converted to an exit facility, the final maturity will be seven (7) years from the Closing Date. |
| Voluntary Prepayment Penalty | None. |
| Interest Rates | LIBOR plus the Applicable Margin, based on the following schedule:<br><br>| S&P/Moody's Ratings | Applicable Margin |<br>|---|---|<br>| BB-/Ba3 (with stable outlook) | 2.00% |<br>| B+/B1 (with stable outlook) | 2.25% |<br>| B/B2 (with stable outlook) | 2.75% |<br>| B-/B3 or lower | 3.50% |<br><br>After the Conversion Date, the Applicable Margin will be determined based on Calpine's corporate credit rating and the Applicable Margin for the Revolving Facility shall be |

5

| | |
|---|---|
| | determined pursuant to a pricing grid to be agreed upon. |
| Financial Covenants | Prior to the Conversion Date, covenants generally consistent with the Existing DIP Facilities, subject to certain modifications as may be agreed upon.<br><br>After the Conversion Date, usual and customary financial covenants, including (a) minimum interest coverage ratios; (b) maximum ratios of the Facilities Debt to EBITDA; and (c) maximum ratios of Total Net Debt to EBITDA, in each case to be agreed upon. |
| Ability to Secure Hedging Obligations | The Loan Parties shall be permitted to grant first priority liens in the property securing the obligations under the Facilities to secure obligations under "right way risk" transactions and/or commodity or interest rate hedging contracts (the "Hedging Obligations"). Such liens will rank *pari passu* with the first priority liens granted to secure the obligations under the Facilities. |
| Incremental Term Facility | Calpine may expand the Facilities by up to $2.0 billion in order to refinance secured project debt or project preferred securities, subject to certain restrictions, terms and conditions. |
| Exit Conditions | The following key conditions must be satisfied in order to convert to an exit facility:<br><br>(a) the occurrence of the Effective Date,<br><br>(b) the Borrower shall have obtained corporate credit ratings and ratings on the Facility from S&P and Moody's,<br><br>(c) the Agent shall have received five-year projections from the Effective Date demonstrating *pro forma* covenant compliance and certain other *pro forma* financial statements and reports,<br><br>(d) the Debtors shall have at least $250 million in liquidity, and<br><br>(e) compliance with all financial covenants and no event of default on a *pro forma* basis after giving effect to the occurrence of the Effective Date. |

9.    The Debtors expect to realize approximately $100 million in annual savings as a result of using the lower interest rate Replacement DIP Facility funds to refinance the higher

interest rate Existing DIP Facility and to repay the higher interest rate CalGen Secured Debt. More specifically, through the Replacement DIP Facility, the Debtors seek to borrow $5.0 billion at an interest rate of 7.61%—which is based on current LIBOR of 5.36% and assumes Calpine obtains a B+/B1 corporate rating in connection with the Proposed Refinancing. Therefore, using 7.61% Replacement DIP Facility funds to refinancing $2.0 billion of 8.66% Existing DIP Facility funds will save the Debtors approximately $11 million annually, and using 7.61% Replacement DIP Facility funds to repay $2.516 billion of 11.25% CalGen Secured Debt will save the Debtors approximately $92 million annually. In addition, the Debtors expect to save another approximately $5 million per year by being released of the burden of payment of the CalGen Lenders' professionals fees.

10. Another attractive component of the Replacement DIP Facility is the ability to grant security in respect of Hedging Obligations (as described in the summary of terms above, "Hedging Liens"), an ability which is not permitted under the Existing DIP Facility. Currently, the Debtors are satisfying hedging collateral requirements by posting cash and, to a lesser degree, letters of credit under the Existing DIP Facility, both of which reduce the Debtors' corporate liquidity. Given the significant collateral requirements of forward hedging, the Debtors' participation in the commodities market is constrained. The ability for the Debtors to grant Hedging Liens is expected to both mitigate the cash collateral requirements of forward hedging and increase the universe of counter-parties willing to transact with the Debtors. This should allow the Debtors to more actively participate in the commodities market and better manage the forward-risk profile of its assets without unduly constraining corporate liquidity.

11. The Replacement DIP Facility will allow the Debtors flexibility as they begin to formulate a plan of reorganization because the size of the Replacement DIP Facility can be

increased to allow for the repayment of other prepetition secured debt. Also, while the Debtors are not obligated to convert the Replacement DIP Facility into exit financing if circumstances change and the Debtors can obtain more favorable terms that those proposed in the Replacement DIP Agreement, the existence of the option to convert the Replacement DIP Facility to an exit financing mitigates the time required to source exit financing and gives the Debtors a more stable basis from which to develop and negotiate a reorganization plan. Another advantage to the Replacement DIP Facility is that it extends the Debtors' postpetition financing beyond December 31, 2007, the date on which the Existing DIP Facility terminates. The Replacement DIP Facility therefore relieves pressure on the Debtors to refinance or amend the Existing DIP Facility to extend its maturity, something the Debtors would need to explore in the near future absent the Proposed Refinancing to prepare for the possibility they may not have emerged from Chapter 11 by the end of 2007. Finally, by repaying the CalGen Secured Debt with Replacement DIP Facility funds, the Debtors are increasing their ability to effectuate their emergence from the Chapter 11 Cases, as they will have seven fewer tranches of debt (representing at least three separate classes for voting purposes) and significantly fewer constituents and professionals with whom to negotiate.

12.    The capital markets are currently ripe for the Proposed Refinancing. New issuance volumes for leveraged loans are at record highs ($480 billion in 2006) while default rates are at record lows (0.48% by principal amount and 0.79% by number of loans in 2006). As a result, interest rate spreads for B and BB-rated issuances also reached their lowest levels since 1998 during 2006 and remain near those lows today. Moreover, the continued healthy demand for new issues allows borrowers to obtain key structural benefits within the governing covenants. But there is no guarantee, of course, that these favorable conditions will continue indefinitely.

Lenders generally will not agree to underwrite financing deals based on current market factors and then hold those commitments in place without regard for evolving circumstances. The Proposed Refinancing, which expires on March 30, 2007, allows the Debtors to capitalize on these presently-available benefits—and to do so at this stage of their Chapter 11 Cases.

Dated: January 26, 2007

Respectfully submitted,

Samuel M. Greene
Managing Director
Miller Buckfire & Co. LLC
Financial Advisor and Investment Banker
to the Debtors

Sworn to and subscribed before
me this 26th day of January 2007.

Notary Public: Michelle Nunns

My Commission Expires: Nov 1 2008

MICHELLE NUNNS
Notary Public, State of New York
No. 01NU6117939
Qualified in New York County
Commission Expires November 1, 2008