**EXHIBIT E**

$5,000,000,000

REVOLVING CREDIT, TERM LOAN AND GUARANTEE AGREEMENT

among

**CALPINE CORPORATION,**
a Debtor-in-Possession,
as Borrower

and

THE SUBSIDIARIES OF
CALPINE CORPORATION NAMED HEREIN,
Debtors-in-Possession,
as Guarantors

and

THE LENDERS PARTY HERETO,

and

CREDIT SUISSE,
as Administrative Agent and Collateral Agent

Dated as of [March] __, 2007

**CREDIT SUISSE SECURITIES (USA), LLC,**          **DEUTSCHE BANK SECURITIES INC.,**
**GOLDMAN SACHS CREDIT PARTNERS L.P.**
**and**
**J.P. MORGAN SECURITIES, INC.,**
**As Joint Lead Arrangers and Bookrunners**          **As Joint Lead Arrangers and Bookrunners**

# TABLE OF CONTENTS

**Page**

SECTION 1 DEFINITIONS ................................................................................................ 2

1.1.    Defined Terms ..................................................................................................... 2
1.2.    Terms Generally ................................................................................................ 22
1.3.    Delivery of Notices or Receivables .................................................................. 23
1.4.    Exchange Rates.  For purposes of calculating (a) the aggregate Dollar Equivalent of Letters of Credit denominated in an Alternative Currency and of unreimbursed drawings under Letters of Credit denominated in Alternative Currency outstanding at any time during any period and (b) the Dollar Equivalent of any Letters of Credit denominated in an Alternative Currency at the time of the issuance of such Letter of Credit pursuant to Section 2.8, the Administrative Agent will at least once during each calendar month and at such other times as it in its sole discretion determines to be appropriate to do so (including on or prior to the date of any borrowing or issuance of a Letter of Credit and the last day of any Interest Period), determine the respective rate of exchange into Dollars of such Alternative Currency (which rate of exchange shall be based upon the Exchange Rate in effect on the date of such determination).  Such rates of exchange so determined on each such determination date shall, for purposes of the calculations described in the preceding sentence, be deemed to remain unchanged and in effect until the next such determination date. ...................................................................... 23

SECTION 2 AMOUNT AND TERMS OF COMMITMENT ........................................... 23

2.1.    First Priority Term Commitments ..................................................................... 23
2.2.    Procedure for Term Loan Borrowing ............................................................... 23
2.3.    Repayment of First Priority Term Loans .......................................................... 24
2.4.    Revolving Commitments ................................................................................... 24
2.5.    Procedure for Revolving Loan Borrowing ....................................................... 24
2.6.    Swingline Commitment ..................................................................................... 25
2.7.    Procedure for Swingline Borrowing; Refunding of Swingline Loans ............. 25
2.8.    Letters of Credit ................................................................................................ 26
2.9.    Issuance of Letters of Credit ............................................................................ 28
2.10.   Nature of Letter of Credit Obligations Absolute ............................................. 29
2.11.   Repayment of Loans; Evidence of Debt ........................................................... 29
2.12.   Interest Rates and Payment Dates ..................................................................... 30
2.13.   Computation of Interest and Fees ..................................................................... 30
2.14.   Inability to Determine Interest Rate .................................................................. 30
2.15.   Optional Termination or Reduction of Revolving Commitment ...................... 31
2.16.   Optional Prepayment of Loans ......................................................................... 31
2.17.   Mandatory Prepayment ..................................................................................... 32
2.18.   Conversion and Continuation Options .............................................................. 33
2.19.   Limitations on Eurodollar Tranches ................................................................. 33
2.20.   Pro Rata Treatment, etc .................................................................................... 34
2.21.   Requirements of Law ........................................................................................ 35

i

Page

2.22.  Taxes ................................................................................................. 36
2.23.  Indemnity .......................................................................................... 38
2.24.  Change of Lending Office ................................................................ 38
2.25.  Fees ................................................................................................... 38
2.26.  Letter of Credit Fees ........................................................................ 39
2.27.  Nature of Fees .................................................................................. 39
2.28.  Priority and Liens ............................................................................ 39
2.29.  Security Interest in L/C Cash Collateral Account ........................... 41
2.30.  Payment of Obligations .................................................................... 41
2.31.  No Discharge; Survival of Claims ................................................... 41
2.32.  Conversion to Exit Facility Agreement ........................................... 41
2.33.  Incremental Term Loans ................................................................... 41

SECTION 3 REPRESENTATIONS AND WARRANTIES ................................................. 43

3.1.   Organization and Authority .............................................................. 43
3.2.   Due Execution; Binding Obligation .................................................. 43
3.3.   Statements Made .............................................................................. 44
3.4.   Financial Statements ........................................................................ 44
3.5.   Loan Parties ...................................................................................... 45
3.6.   Title to Assets; Liens ....................................................................... 45
3.7.   No Default ........................................................................................ 45
3.8.   Approvals .......................................................................................... 45
3.9.   The DIP Refinancing Order .............................................................. 45
3.10.  Use of Proceeds ............................................................................... 45
3.11.  Disclosed Matters ............................................................................ 46
3.12.  Federal Regulations ......................................................................... 46
3.13.  Compliance with Law ...................................................................... 46
3.14.  Taxes ................................................................................................. 46
3.15.  ERISA ............................................................................................... 46
3.16.  Environmental Matters; Hazardous Material ................................... 47
3.17.  Investment Company Act; Other Regulations .................................. 47
3.18.  Intellectual Property ......................................................................... 48
3.19.  Insurance ........................................................................................... 48
3.20.  Labor Matters .................................................................................... 48
3.21.  Intercompany Balances ..................................................................... 48

SECTION 4 CONDITIONS PRECEDENT ........................................................................ 48

4.1.   Conditions to the Closing Date ........................................................ 48
4.2.   Conditions to Each Extension of Credit ........................................... 50

SECTION 5 AFFIRMATIVE COVENANTS ..................................................................... 50

5.1.   Financial Statements, Etc. ................................................................ 51
5.2.   Certificates; Other Information ......................................................... 52
5.3.   Payment of Obligations .................................................................... 53
5.4.   Maintenance of Existence; Compliance with Contractual Obligations and
       Requirements of Law ........................................................................ 53
5.5.   Maintenance of Property; Insurance ................................................. 53
5.6.   Inspection of Property; Books and Records; Discussions ................ 54

ii

Page

| | | |
|---|---|---|
| 5.7. | Notices | 54 |
| 5.8. | Environmental Laws | 55 |
| 5.9. | Obligations and Taxes | 55 |
| 5.10. | Employee Benefits | 55 |
| 5.11. | Further Assurances | 55 |
| 5.12. | Ratings | 56 |
| 5.13. | Post Closing Matters | 56 |

**SECTION 6 NEGATIVE COVENANTS** ............................................................................. 56

| | | |
|---|---|---|
| 6.1. | Limitation on Indebtedness | 57 |
| 6.2. | Limitation on Liens | 59 |
| 6.3. | Limitation on Guarantee Obligations | 60 |
| 6.4. | Prohibition on Fundamental Changes | 61 |
| 6.5. | Limitation on Sale of Assets | 62 |
| 6.6. | Limitation on Issuances of Capital Stock and Dividends | 63 |
| 6.7. | Limitation on Investments, Loans and Advances | 64 |
| 6.8. | Transactions with Affiliates | 65 |
| 6.9. | Lines of Business | 65 |
| 6.10. | Concentration Account | 66 |
| 6.11. | Chapter 11 Claims | 66 |
| 6.12. | Reclamation Claims; Bankruptcy Code Section 546(g) Agreements | 67 |
| 6.13. | Capital Expenditures | 67 |
| 6.14. | Use of Proceeds | 67 |
| 6.15. | Consolidated EBITDA | 67 |
| 6.16. | Minimum Liquidity | 68 |
| 6.17. | Amendments to Documents | 68 |
| 6.18. | Control Agreements | 68 |
| 6.19. | Adequate Protection Payments | 68 |

**SECTION 7 EVENTS OF DEFAULT** .................................................................................. 68

**SECTION 8 THE AGENTS** .............................................................................................. 72

| | | |
|---|---|---|
| 8.1. | Appointment | 72 |
| 8.2. | Delegation of Duties | 72 |
| 8.3. | Exculpatory Provisions | 72 |
| 8.4. | Reliance by the Administrative Agent | 73 |
| 8.5. | Notice of Default | 73 |
| 8.6. | Non-Reliance on Agents and Other Lenders | 73 |
| 8.7. | Indemnification | 74 |
| 8.8. | Agent in Its Individual Capacity | 74 |
| 8.9. | Successor Administrative Agent | 74 |
| 8.10. | The Syndication Agent and the Documentation Agent | 75 |
| 8.11. | Collateral Security | 75 |
| 8.12. | Enforcement by the Administrative Agent | 75 |

**SECTION 9 GUARANTEE** ............................................................................................... 75

| | | |
|---|---|---|
| 9.1. | Guarantee | 75 |
| 9.2. | Right of Contribution | 76 |

iii

9.3.    No Subrogation .................................................................................. 76
9.4.    Amendments, etc. with respect to the Obligations................................ 76
9.5.    Guarantee Absolute and Unconditional ............................................. 77
9.6.    Reinstatement...................................................................................... 77
9.7.    Payments ............................................................................................. 78

SECTION 10 MISCELLANEOUS ............................................................................. 78

10.1.    Amendments and Waivers ................................................................... 78
10.2.    Notices ................................................................................................ 79
10.3.    No Waiver; Cumulative Remedies ....................................................... 80
10.4.    Survival of Representations and Warranties ........................................ 80
10.5.    Payment of Expenses and Taxes .......................................................... 80
10.6.    Successors and Assigns; Participations; Purchasing Lenders .............. 81
10.7.    Adjustments; Set-off ............................................................................ 84
10.8.    Counterparts ........................................................................................ 84
10.9.    GOVERNING LAW ............................................................................ 84
10.10.   Submission To Jurisdiction; Waivers ................................................... 84
10.11.   Absence of Prejudice to the Lenders with Respect to Matters Before the
         Bankruptcy Court .............................................................................. 85
10.12.   Confidentiality .................................................................................... 85
10.13.   U.S.A. Patriot Act ............................................................................... 86
10.14.   Judgment Currency.  The Obligations of the Borrower and any other Loan Party
         in respect of any sum due to the Fronting Bank hereunder, or under or in
         respect of any other Loan Document shall, notwithstanding any judgment in
         a currency (the "Judgment Currency") other than the currency in which such
         sum was originally denominated (the "Original Currency"), be discharged
         only to the extent that on the Business Day following receipt by the Fronting
         Bank of any sum adjudged to be so due in the Judgment Currency, the
         Fronting Bank, in accordance with normal banking procedures, purchases the
         Original Currency with the Judgment Currency.  If the amount of Original
         Currency so purchased is less than the sum originally due to the Fronting
         Bank, the Borrower agrees as a separate obligation and notwithstanding any
         such judgment, to indemnify the Fronting Bank against such loss, and if the
         amount of Original Currency so purchased exceeds the sum originally due to
         the Fronting Bank, the Fronting Bank agrees to remit any excess to the
         applicable Loan Party.  If, for the purpose of obtaining judgment in any
         court, it is necessary to convert a sum due under any Loan Document in
         another currency into Dollars, the parties hereto agree, to the fullest extent
         that they may effectively do so, that the rate of exchange used shall be that at
         which, in accordance with normal banking procedures, the Fronting Bank
         could purchase such other currency with Dollars, in New York, at the close
         of business on the Business Day immediately preceding the day on which
         final judgment is given, together with any premiums and costs of exchange
         payable in connection with such purchase. ............................................. 86

iv

Schedules

| Schedule 1.1A | - | Commitment Amounts |
|---|---|---|
| Schedule 1.1B | - | Consolidated EBITDA |
| Schedule 1.1C | - | Consolidated EBITDA—Adjustments for Material Dispositions |
| Schedule 1.1D | - | Eligible Permitted Commodity Hedge Agreement |
| Schedule 1.1E | - | Existing Letters of Credit |
| Schedule 1.1F | - | Qualified Entity |
| Schedule 2.33 | - | Incremental Term Loans |
| Schedule 3.4 | - | Financial Statements |
| Schedule 3.5 | - | Loan Parties |
| Schedule 3.6 | - | Prepetition Liens |
| Schedule 3.10 | - | Use of Proceeds |
| Schedule 3.21 | - | Intercompany Balances |
| Schedule 5.11(b) | - | Excluded Debtor Subsidiary |
| Schedule 5.13 | - | Post-Closing Matters |
| Schedule 6.1(c) | - | Prepetition Indebtedness |
| Schedule 6.1(o) | - | Eligible Permitted Commodity Hedge Agreement Requirements |
| Schedule 6.2(p) | - | Eligible Permitted Commodity Hedge Agreement Lien Requirements |
| Schedule 6.3(a) | - | Prepetition Guarantee Obligations |
| Schedule 6.3(i) | - | Other Guarantee Obligations |
| Schedule 6.5(i) | - | Turbine Dispositions |
| Schedule 6.5(k) | - | Scheduled Dispositions |
| Schedule 6.7(c) | - | Prepetition Investments |
| Schedule 6.7(o) | - | Investment in Respect of Certain Letters of Credit |
| Schedule 6.7(p) | - | Investments in Subsidiaries |
| Schedule 6.8 | - | Affiliate Transactions |
| Schedule 6.13 | - | Additional Capital Expenditures |

Exhibits

| Exhibit A | - | Form of DIP Refinancing Order |
|---|---|---|
| Exhibit B | - | Form of Closing Certificate |
| Exhibit C | - | Form of Notice of Borrowing |
| Exhibit D | - | Form of Assignment and Acceptance |
| Exhibit E | - | Form of Legal Opinion |
| Exhibit F | - | Form of Letter of Credit Request |
| Exhibit G | - | Form of Security and Pledge Agreement |
| Exhibit H | - | Form of Joinder to Revolving Credit, Term Loan and Guarantee Agreement |
| Exhibit I | - | Exit Facility Agreement |
| Exhibit J | - | Form of Exemption Certificate |
| Exhibit K | - | Form of Notice of Continuation/Conversion |

v

**Page**

Exhibit L          -          Form of Incremental Commitment Supplement
Exhibit M          -          Prepayment Option Notice

vi

**REVOLVING CREDIT, TERM LOAN AND GUARANTEE AGREEMENT,** dated as of [March] __, 2007, among (i) CALPINE CORPORATION, a Delaware corporation (the "Borrower"), which is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (as defined below), (ii) each of the direct and indirect domestic Subsidiaries of the Borrower designated as a Guarantor on Schedule 3.5 hereto (collectively, the "Guarantors" and together with the Borrower, the "Debtors" and each a "Debtor"), each of which Guarantors is a debtor and a debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the cases of the Borrower and the Guarantors, each a "Case" and, collectively, the "Cases")), (iii) CREDIT SUISSE ("CS"), as administrative agent (in such capacity and including any successors, the "Administrative Agent") and as Collateral Agent (in such capacity and including any successors, the "Collateral Agent" and together with the Administrative Agent, the "Agents") and (iv) each of the financial institutions from time to time party hereto (collectively, the "Lenders").

<u>INTRODUCTORY STATEMENT</u>

On the applicable Petition Dates (as defined below) the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (such terms and other capitalized terms used in this Introductory Statement being used with the meanings given to such terms in Section 1.1) initiating the Cases (which are being jointly administered by the Bankruptcy Court under Case No. 05-60200 (BRL)) and have continued in the possession of their assets and in the management of their businesses pursuant to Bankruptcy Code Sections 1107 and 1108.

The Borrower and the Guarantors are party to the Amended and Restated Revolving Credit, Term Loan and Guarantee Agreement, dated as of February 23, 2006 (as amended, supplemented or otherwise modified, the "Existing DIP Agreement"), among the Borrower, the Guarantors, the lenders party thereto, CS Securities and Deutsche Bank Trust Company Americas, as joint syndication agents, Deutsche Bank Securities Inc. and CS Securities, as joint lead arrangers and joint bookrunners and CS and Deutsche Bank Trust Company Americas, as joint administrative agents, among others, providing for a revolving loan, term loan and letter of credit facility in an aggregate principal amount not to exceed $2,000,000,000.

The Borrower has requested that the Lenders provide a debtor-in-possession facility of up to $5,000,000,000 (subject to mandatory and optional reductions in accordance with Section 2.15 and 2.17 of this Agreement) that is automatically convertible to a secured exit facility upon the satisfaction (or waiver) of certain conditions, with the loans under such facility being allocated as follows: (i) a senior secured first lien term loan facility in an aggregate principal amount of $4,000,000,000 and (ii) senior secured first lien revolving credit and letter of credit facility in an aggregate principal amount of up to $1,000,000,000, all of the Borrower's obligations under each of which are guaranteed by the Guarantors.

The proceeds of the Loans and the Letters of Credit will be used (i) to refinance the obligations outstanding under the Existing DIP Agreement, (ii) to repay and redeem the CalGen Prepetition Secured Obligations, (iii) to refinance certain subsidiary secured debt, secured lease obligations and existing preferred securities, (iv) for working capital purposes and other general corporate purposes of the Borrower and the Guarantors and, to the extent permitted by this Agreement, their Subsidiaries, (v) at the Borrower's election, to pay and satisfy the CalGen Makewhole Payment, if any, and (vi) to fund distributions to holders of prepetition claims under a confirmed Reorganization Plan.

To provide guarantees and security for the repayment of the Loans, the reimbursement of any draft drawn under the Letters of Credit and the payment of the other Obligations of the Debtors hereunder and under the other Loan Documents, the Debtors are providing to the Collateral Agent, the

Administrative Agent and the Lenders, pursuant to this Agreement, the Security and Pledge Agreement and the DIP Refinancing Order, the following (each as more fully described herein and subject to the qualifications set forth herein):

(a)  a guarantee from each of the Guarantors of the due and punctual payment and performance of the Obligations of the Borrower hereunder and under the Notes;

(b)  with respect to the Obligations of the Loan Parties hereunder, an allowed administrative expense claim entitled to the benefits of Bankruptcy Code Section 364(c)(1) in each of the Cases, having a superpriority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) or 507(b);

(c)  pursuant to Bankruptcy Code Section 364(c)(2) a perfected first priority lien on, and security interest in, all present and after-acquired property of the Debtors not subject to a valid, perfected and non-avoidable lien or security interest in existence on the Petition Date or to a valid lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b) (but excluding the Borrower's and the Guarantors' rights in respect of avoidance actions under the Bankruptcy Code and the proceeds thereof);

(d)  pursuant to Bankruptcy Code Section 364(c)(3) a perfected junior lien on, and security interest in, all present and after-acquired property of the Debtors that is otherwise subject to a valid, perfected and non-avoidable lien or security interest in existence on the Petition Date or a valid lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b); and

(e)  to the extent applicable, pursuant to Bankruptcy Code Section 364(d), a perfected first priority priming lien on, and security interest in, all present and after-acquired property of the Debtors that is subject to the replacement liens granted pursuant to and under the Cash Collateral Order in respect of the Calpine Second Lien Debt (as defined in the Cash Collateral Order), which security interests and liens in favor of the Collateral Agent shall be senior to such replacement liens.

All of the claims and the Liens granted hereunder and pursuant to the Security and Pledge Agreement and the DIP Refinancing Order in the Cases to the Collateral Agent, the Administrative Agent and the Lenders shall be subject to the Carve-Out and the Permitted Liens, but in each case only to the extent provided in Section 2.28, the Security and Pledge Agreement and the DIP Refinancing Order.

Accordingly, the parties hereto hereby agree to as follows:

SECTION 1

DEFINITIONS

1.1.  Defined Terms.  As used in this Agreement, the following terms shall have the meanings specified below:

"Administrative Agent":  the meaning set forth in the preamble to this Agreement.

"Affiliate":  as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, to direct or cause the direction of the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

"Agents": the meaning set forth in the preamble to this Agreement.

"Aggregate Outstandings": as to any Lender at any time, an amount equal to (a) until the Closing Date, the aggregate amount of such Lender's Commitments at such time and (b) thereafter, the sum of (i) the aggregate then unpaid principal amount of such Lender's First Priority Term Loans and (ii) the amount of such Lender's Revolving Commitment then in effect or, if the Revolving Commitments have been terminated, the amount of such Lender's Revolving Extensions of Credit then outstanding.

"Aggregate Revolving Outstandings": at any time, the aggregate amount of the Revolving Extensions of Credit of the Revolving Lenders outstanding at such time.

"Agreement": this Revolving Credit, Term Loan and Guarantee Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"Alternative Currency": Canadian dollars.

"Applicable Margin": for each Loan, the rate per annum equal to (a) _____%, in the case of Eurodollar Loans, and (b) _____%, in the case of Base Rate Loans.

"Asset Sale": any Disposition of property or series of related Dispositions of property (excluding any such Disposition permitted by clauses (a), (b), (c), (d), (e), (f), (g) or (q) of Section 6.5 (or any Disposition of the type described in such clauses if undertaken by a Global Entity which is neither a Loan Party or a Material Subsidiary)), and including the entry by any Global Entity into any Contractual Obligation for the sale of any property when such contractual obligation has resulted in a payment for such property prior to the delivery thereof, that yields gross proceeds to any Global Entity (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $1,000,000.

"Assignment and Acceptance": an assignment and acceptance entered into by a Lender and an assignee and accepted by the Administrative Agent, substantially in the form of Exhibit D.

"Authorizations": all applications, filings, reports, documents, recordings and registrations with, and all validations, exemptions, franchises, waivers, approvals, orders or authorizations, consents, licenses, certificates and permits from Federal, state or local Governmental Authorities.

"Available Revolving Commitment": as to any Revolving Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Revolving Commitment then in effect over (b) such Lender's Revolving Extensions of Credit then outstanding; provided that in calculating any Lender's Revolving Extensions of Credit for the purpose of determining such Lender's Available Revolving Commitment pursuant to Section 2.25, the aggregate principal amount of Swingline Loans then outstanding shall be deemed to be zero (collectively, as to all Lenders the "Available Revolving Commitments").

"Bankruptcy Code": The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§101 et seq.

"Bankruptcy Court": the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Cases from time to time.

4

"Base Rate":  for any day, the higher of (a) the Federal Funds Effective Rate plus one half of one percent (½%) per annum or (b) the Prime Rate.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"Base Rate Loans":  Loans the rate of interest applicable to which is based upon the Base Rate.

"Benefited Lender":  the meaning set forth in Section 10.7(a).

"BLB Facility":  means the Letter of Credit Agreement, dated as of September 30, 2004, as amended, between Calpine Corporation, as the Borrower, and Bayerische Landesbank, acting through its Cayman Islands Branch, as Issuer.

"Board of Governors":  the Board of Governors of the Federal Reserve System or any Governmental Authority which succeeds to the powers and functions thereof.

"Borrower":  the meaning set forth in the preamble to this Agreement.

"Borrowing":  the making of Loans by the Lenders on a single Borrowing Date.

"Borrowing Date":  any Business Day specified in a notice pursuant to Section 2.5 as a date on which the Borrower requests a Loan hereunder.

"Budget":  the cash flow projections of the Loan Parties, showing anticipated cash receipts and disbursements on a weekly basis for the period from the Closing Date through the thirteen weeks following the Closing Date, in form and detail reasonably satisfactory to the Administrative Agent, and as thereafter updated in accordance with Section 5.1(d).

"Business":  as defined in Section 3.16(b).

"Business Day":  any day other than a Saturday, Sunday or other day on which commercial banks in New York City are required or permitted to close (and, for a Letter of Credit, other than a day on which the Fronting Bank issuing such Letter of Credit is closed), provided that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"CalGen Adequate Protection Stipulation":  the "Amended Agreed Order Modifying Cash Collateral Order to Effect Project Intercompany Loan Transfers" entered into among the Debtors, Wilmington Trust FSB, as indenture trustee, HSBC Bank USA, National Association, as indenture trustee, Manufacturers Traders & Trust Company, as indenture trustee, and Wilmington Trust Company, as collateral agent, and entered by the Bankruptcy Court on January 17, 2007 (as it may be amended in a manner reasonably satisfactory to the Administrative Agent), granting, inter alia, adequate protection to CalGen Holdings, Inc. and/or any of its Subsidiaries.

"CalGen Cash Collateral Account":  a segregated account of the Borrower or any of its Subsidiaries which is a Debtor into which Unrestricted Cash (as defined in the CalGen Adequate Protection Stipulation) distributed by the CalGen Parties pursuant to the Calgen Adequate Protection Stipulation is held pending the use of such Unrestricted Cash by the Borrower or such Subsidiary.

"CalGen Makewhole Payment":  the aggregate amount, if any, of any actual or potential claims, premiums or penalties related to (i) any "makewhole", repayment, prepayment or call provisions, (ii) any contract defaults or (iii) any contractual damages, in each case payable to the holders of the CalGen Prepetition Secured Obligations in connection with the repayment of the CalGen Prepetition Secured Obligations.

"CalGen Order":  an order entered by the Bankruptcy Court in the Cases authorizing the repayment of the CalGen Prepetition Secured Obligations and determining that no CalGen Makewhole Payment shall be payable in connection with the repayment of the CalGen Prepetition Secured Obligations.

"CalGen Parties":  collectively, CalGen Holdings, Inc. and its Subsidiaries.

"CalGen Prepetition Secured Obligations":  the obligations outstanding under the (a) the $235,000,000 First Priority Secured Floating Rate Notes Due 2009, issued by Calpine Generating Company, LLC ("CalGen") and CalGen Finance Corporation ("CalGen Finance") pursuant to that certain first priority indenture, dated as of March 23, 2004, among CalGen, CalGen Finance and Wilmington Trust FSB, as first priority trustee; (b) the $600,000,000 First Priority Secured Institutional Terms Loans Due 2009, issued by CalGen pursuant to that certain Credit and Guarantee Agreement, dated as of March 23, 2004 among CalGen, the guarantor subsidiaries of CalGen listed therein, Morgan Stanley Senior Funding, Inc., as administrative agent, sole lead arranger and sole bookrunner, and the various lenders named therein; (c) the $200,000,000 First Priority Revolving Loans issued on or about March 23, 2004 pursuant to that Amended and Restated Agreement, among CalGen, the guarantors party thereto, the lenders party thereto, The Bank of Nova Scotia, as administrative agent, L/C Bank, lead arranger and sole bookrunner, Bayerische Landesbank, Cayman Islands Branch, as arranger and co-syndication agent, Credit Lyonnais, New York Branch, as arranger and co-syndication agent, ING Capital LLC, as arranger and co-syndication agent, Toronto Dominion (Texas) Inc., as arranger and co-syndication agent, and Union Bank of California, N.A., as arranger and co-syndication agent; (d) the $640,000,000 Second Priority Secured Floating Rate Notes Due 2010, issued by CalGen and CalGen Finance pursuant to that certain second priority indenture, dated as of March 23, 2004, among CalGen, CalGen Finance and Wilmington Trust FSB, as second priority trustee; (e) the $100,000,000 Second Priority Secured Term Loans Due 2010, issued by CalGen pursuant to that certain Credit and Guarantee Agreement, dated as of March 23, 2004, among CalGen, the guarantor subsidiaries of CalGen listed therein, Morgan Stanley Senior Funding, Inc., as administrative agent, sole lead arranger and sole bookrunner and the various lenders named therein; (f) the $680,000,000 Third Priority Secured Floating Rate Notes Due 2011; and (g) the $150,000,000 11.5% Third Priority Secured Notes Due 2011, in each case issued by CalGen and CalGen Finance pursuant to that certain third priority indenture, dated as of March 23, 2004, among CalGen, CalGen Finance and Wilmington Trust Company FSB, as third priority trustee.

"Capital Expenditures":  for any period, with respect to any Person, the aggregate of all expenditures by such Person and its Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that should be capitalized under GAAP on a consolidated balance sheet of such Person and its Subsidiaries.

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

6

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Carve-Out":  the meaning set forth in Section 2.28(a).

"Cases":  the meaning set forth in the preamble to this Agreement.

"Cash Collateral":  the meaning set forth in Section 363(a) of the Bankruptcy Code.

"Cash Collateral Order":  the Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection entered in the Cases by the Bankruptcy Court on or about January 30, 2006, as it may be amended in a manner reasonably satisfactory to the Administrative Agent.

"Cash Equivalents":  (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by S&P or P-1 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than thirty (30) days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition or (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Cash Management Obligations":  all obligations of the Loan Parties to CS in its capacity as the principal concentration bank in the cash management system of the Loan Parties.

"Change of Control":  (i) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the date hereof) of shares representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding capital stock of the Borrower and (ii) the occupation of a majority of seats (other than vacant seats) on the Board of Directors of the Borrower by Persons who were neither nominated by the Board of Directors of the Borrower on the Closing Date or appointed or nominated by directors so nominated; provided that no Change of Control shall be deemed to have occurred as a result of the consummation of a Reorganization Plan.

"<u>Closing Date</u>":  [March] __, 2007.

"<u>Code</u>":  the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>":  all property of the Debtors now owned or hereafter acquired in which a security interest has been granted by the Debtors to the Collateral Agent, for the benefit of the Lenders, as more particularly described in the Security and Pledge Agreement and the DIP Refinancing Order. "Collateral" shall as of the Closing Date include, but not be limited to, substantially all property of the Debtors currently securing the Obligations under the Existing DIP Agreement and substantially all of the property of the CalGen Parties currently securing the CalGen Prepetition Secured Obligations.

"<u>Collateral Agent</u>":  the meaning set forth in the preamble to this Agreement.

"<u>Commitment</u>":  as to any Lender, the sum of the First Priority Term Commitment and the Revolving Commitment of such Lender.

"<u>Commitment Fee</u>":  the meaning set forth in Section 2.25.

"<u>Commitment Fee Rate</u>":  ½ of 1% per annum.

"<u>Commitment Percentages</u>":  the collective reference to the Revolving Commitment Percentages and the First Priority Term Percentages; individually, as to any Revolving Commitment Percentage or First Priority Term Percentage, a "<u>Commitment Percentage</u>".

"<u>Commonly Controlled Entity</u>":  an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a controlled group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"<u>Concentration Account</u>":  the account to be established by the Borrower, entitled "Calpine Corporation" maintained at the office of the Collateral Agent at Eleven Madison Avenue, New York, New York 10010, which account and all amounts deposited therein are subject to the exclusive dominion and control of the Collateral Agent, and which shall be used for the daily operation of the Borrower's business or otherwise.

"<u>Confirmation Order</u>":  an order of the Bankruptcy Court confirming a Reorganization Plan in any of the Cases.

"<u>Consolidated EBITDA</u>":  for any period, Consolidated Net Income for such period [plus, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of (a) income tax expense, (b) interest expense, amortization or writeoff of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including the Loans), (c) depreciation and amortization expense, (d) amortization of intangibles and organization costs, (e) any extraordinary or non-recurring non-cash expenses or losses, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, (f) non-cash losses on sales or impairments of assets, (g) unrealized gains or losses and any non-cash realized gains or losses on financial derivatives recognized in accordance with SFAS No. 133, (h) non-cash charges attributable to SFAS No. 150, (i) operating lease expense, (j) distributions received from unconsolidated investments, (k) non-cash losses attributable to translations of intercompany foreign currency transactions, (l) Restructuring Costs and (m) the items set forth on Schedule 1.1B, and minus, (a) to the extent included in the statement of such

Consolidated Net Income for such period, the sum of (i) interest income, (ii) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, gains on the sales of assets), (iii) income tax credits (to the extent not netted from income tax expense), (iv) any non-cash gain recorded on the repurchase or extinguishment of debt and (v) any other non-cash income, (b) any cash payments made during such period for operating lease expense, income taxes, and in respect of items described in clause (e) above subsequent to the fiscal quarter in which the relevant non-cash expenses or losses were reflected as a charge in the statement of Consolidated Net Income, all as determined on a consolidated basis, (c) income/loss from unconsolidated investments, (d) non-cash gains attributable to translations of intercompany foreign currency transaction and (e) the items set forth on Schedule 1.1B].  For the purposes of calculating Consolidated EBITDA for any period of twelve months (each, a "Reference Period"), the Consolidated EBITDA shall be adjusted as set forth on Schedule 1.1C annexed hereto if at any time during or prior to such Reference Period the Borrower or any of its Subsidiaries shall have made any Material Disposition.   As used in this definition, "Material Disposition" means any disposition of property or series of related Dispositions of property consummated after the Closing Date and permitted under this Agreement that yields gross proceeds to the Borrower or to any of its Subsidiaries in excess of $1,000,000.

"Consolidated Interest Expense":  for any period, total cash interest expense of the Borrower and its Subsidiaries for such period with respect to all Indebtedness outstanding under the Facilities, assuming all amounts are drawn under the Facilities.

"Consolidated Net Income":  for any period, the consolidated net income (or loss) of the Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of the Borrower or is merged into or consolidated with the Borrower or any of its Subsidiaries and (b) the undistributed earnings of any Subsidiary of the Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Contractual Obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Conversion Date":  the date upon which the conditions to effectiveness of the Exit Facility Agreement set forth therein shall have been satisfied or waived.

"Credit Parties":  the collective reference to the Loan Parties and the Material Subsidiaries.

"CS":  the meaning set forth in the preamble to this Agreement.

"DB":  Deutsche Bank Trust Company Americas.

"Debtors":  the meaning set forth in the preamble to this Agreement.

"Default":  any of the events specified in Section 7, whether or not any requirement for the giving of notice, the expiration of applicable cure or grace periods, or both, has been satisfied.

"DIP Refinancing Order":  an order of the Bankruptcy Court entered in the Cases granting approval of the transactions contemplated by this Agreement and the other Loan Documents (including, without limitation, the repayment of the obligations under the Existing DIP Agreement and the CalGen Prepetition Secured Obligations) and granting the Liens and Superpriority Claims described in the Introductory Statement in favor of the Administrative Agent, the Collateral Agent and the Lenders, substantially in the form of Exhibit A hereto, or otherwise in form and substance reasonably satisfactory to the Administrative Agent, and any Subsequent Interim Order or any Subsequent Final Order.

"DIP Refinancing Order Date":  the date of entry of the DIP Refinancing Order with respect to the Borrower which is [February] __, 2007.

"Disposition":  with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof.  The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollar Amount":  at any time (a) as to any amount in Dollars, such amount and (b) as to any amount in an Alternative Currency, the then Dollar Equivalent thereof.

"Dollar Equivalent":  with respect to any amount of an Alternative Currency on any date, the equivalent amount in Dollars of such amount of Alternative Currency as determined by the Administrative Agent in accordance with Section 1.4 using the applicable Exchange Rate.

"Dollars" and "$":  lawful money of the United States.

"Eligible Assignee":  the meaning set forth in Section 10.6(c).

"Eligible Permitted Commodity Hedge Agreement":  the meaning set forth on Schedule 1.1D.

"Environmental Laws":  any and all applicable foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, legally binding requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Eurocurrency Reserve Requirements":  for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board of Governors or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board of Governors) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a

period equal to such Interest Period commencing on the first day of such Interest Period appearing on Page 3750 of the Telerate screen as of 10:00 A.M., London time, two (2) Business Days prior to the beginning of such Interest Period.  In the event that such rate does not appear on Page 3750 of the Telerate screen (or otherwise on such screen), the "Eurodollar Base Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be reasonably selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered Dollar deposits at or about 10:00 A.M., New York City time, two (2) Business Days prior to such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurodollar Loans":  Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurodollar Tranche":  the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default":  the meaning set forth in Section 7.

"Exchange Rate":  on any day, with respect to any Alternative Currency, the rate at which such currency may be exchanged into Dollars, as set forth at approximately 11:00 A.M., New York time, on such date on the Reuters World Currency Page for such Alternative Currency.  In the event that such rate does not appear on any Reuters World Currency Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be selected by the Administrative Agent, or, in the event no such service is selected, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such Alternative Currency are then being conducted, at or about 10:00 A.M., local time, on such date for the purchase of the relevant currency for delivery two Business Days later; provided that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative Agent, after consultation with the Borrower, may use any reasonable method it deems appropriate to determine such rate, and such determination shall be presumed correct absent manifest error.

"Existing DIP Agreement":  the meaning set forth in the recitals hereto.

["Existing L/C Cash Collateral Account":  the account established by the Borrower pursuant to the Existing DIP Agreement under the sole and exclusive control of DB maintained at the office of DB, in its capacity as administrative agent under the Existing DIP Agreement, designated as the "Calpine Corporation Debtor-in-Possession Cash Collateral Account" or similar title which was used in connection with the cash collateralization of Letter of Credit Outstandings.]

"Existing Letters of Credit":  the collective reference to the Letters of Credit issued and outstanding under the Existing DIP Agreement as of the Closing Date for the account of the Borrower and identified on Schedule 1.1E and deemed to be made under this Agreement pursuant to Section 2.8(a).

"Exit Facility Agreement":  the Revolving Credit, Term Loan and Guarantee Agreement as such agreement becomes effective pursuant to Section 2.32, substantially in the form of Exhibit J hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"Extensions of Credit":  collectively, Loans and/or Letters of Credit hereunder; individually, as to any Loan or any Letter of Credit, an "Extension of Credit."

"Facility":  each of the First Priority Term Facility and the Revolving Facility.

"FDIC":  the Federal Deposit Insurance Corporation or any Governmental Authority that succeeds to the powers and functions thereof.

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by CS from three federal funds brokers of nationally recognized standing selected by it.

"Fee Payment Date":  (a) the last Business Day of each March, June, September and December and (b) the last day of the Revolving Commitment Period.

"Fees":  collectively, the Commitment Fees, Letter of Credit Fees, the fees payable to CS, Goldman Sachs, Goldman Securities, J.P. Morgan Securities and JPMorgan Chase Bank, N.A., as separately agreed by the Borrower, the fees referred to in Sections 2.25, 2.26, 2.27 or 10.5 and any other fees payable by any Loan Party pursuant to this Agreement or any other Loan Document.

"Final Order":  an order, judgment or decree as to which the time to appeal, petition for certiorari, or move for reargument or rehearing, and any stay associated therewith, has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing by the Person possessing such right, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order, judgment or decree shall have been affirmed by the highest court to which such order, judgment, or decree was appealed, or certiorari has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired.

"Financial Officer":  the Chief Financial Officer, Principal Accounting Officer, Controller or Treasurer of the Borrower.

"First Priority Term Facility":  the First Priority Term Commitments, the First Priority Term Loans made thereunder and the Incremental Term Loans.

"First Priority Term Commitment":  with respect to each First Priority Term Lender, the commitment of such First Priority Term Lender to make First Priority Term Loans in an aggregate principal amount not to exceed the amount set forth opposite its name on Schedule 1.1A under the

heading "First Priority Term Commitment Amounts" or as may subsequently be set forth in the Register from time to time, as the same may be reduced from time to time pursuant to Sections 2.15, 2.16 and 2.17. The aggregate First Priority Term Commitments of all Lenders on the Closing Date is $4,000,000,000.

"First Priority Term Lender": each Lender that has a First Priority Term Commitment or that holds a First Priority Term Loan or an Incremental Term Loan.

"First Priority Term Loan": as to any Lender, the collective reference to (a) the First Priority Term Loans made by such Lender and (b) the Incremental Term Loans made by such Lender pursuant to Section 2.33.

"First Priority Term Percentage": as to any First Priority Term Lender at any time, the percentage which such Lender's First Priority Term Commitment then constitutes of the aggregate First Priority Term Commitments of all First Priority Term Lenders (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's First Priority Term Loans and Incremental Term Loans then outstanding constitutes of the aggregate principal amount of the First Priority Term Loans and Incremental Term Loans then outstanding).

"Foreign Subsidiary": the meaning set forth in Section 6.4(c).

"Fronting Bank": CS or any Lender reasonably satisfactory to the Administrative Agent or the Borrower, or any of their respective affiliates, in their respective capacity as issuers of the Letters of Credit; provided that any Person that is not a Lender which issued any Existing Letter of Credit shall be a Fronting Bank solely with respect to such Existing Letter of Credit.

"Funding Office": the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP": generally accepted accounting principles in the United States of America applied on a consistent basis. In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made. Until such time as an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred. "Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

"Geysers Entities": the collective reference to the following Subsidiaries of the Borrower: Anderson Springs Energy Company, Thermal Power Company, Geysers Power I Company, Geysers Power Company II, LLC, Geysers Power Company, LLC, Calpine Calistoga Holdings, LLC and Silverado Geothermal Resources, Inc.

"Governmental Authority": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other

13

entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Global Entities": the collective reference to the Borrower and its consolidated Subsidiaries.

"Goldendale": Goldendale Energy Center, LLC.

"Goldendale Newco": a _____ limited liability company and a direct Subsidiary of Goldendale.

"Greenfield Project Partnership": means Greenfield Energy Centre LP, a limited partnership, the limited partners of which consist of Calpine Greenfield Commercial Trust, an indirect wholly-owned Non-Debtor Subsidiary of the Borrower, and MIT Power Canada LP Inc.

"Guarantee Obligation": as to any Person, any obligation, including a reimbursement, counterindemnity or similar obligation, of such Person guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including without limitation, any obligation of such Person, whether or not contingent (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided that notwithstanding the foregoing, the term Guarantee Obligation shall not include (x) endorsements of instruments for deposit or collection or contractual indemnities, in each case in the ordinary course of business or (y) indemnification by any Person of its directors and officers (or of the directors and officers of such Person's Subsidiaries) for actions taken on behalf of such Person (or such Subsidiaries, as applicable). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Guarantor": the meaning set forth in the preamble to this Agreement but shall not include RockGen and those entities set forth on Part B of Schedule 3.5.

"Incremental Term Loans": the meaning set forth in Section 2.33(a).

"Incremental Commitment Supplement": the meaning set forth in Section 2.33(a).

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety

14

bonds or similar arrangements, (g) the liquidation value of all redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (j) all obligations of such Person in respect of Swap Agreements. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Insolvency": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent": pertaining to a condition of Insolvency.

"Intellectual Property": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Payment Date": (a) as to any Base Rate Loan (other than any Swingline Loan), the last Business Day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period, (d) as to any Loan (other than any Revolving Loan that is a Base Rate Loan and any Swingline Loan), the date of any repayment or prepayment made in respect thereof and (e) as to any Swingline Loan, the day that such Loan is required to be repaid.

"Interest Period": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, three or six (or, if agreed to by all Lenders under a relevant Facility, nine or twelve) months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, three or six (or, if agreed to by all Lenders under a relevant Facility, nine or twelve) months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 10:00 A.M., New York City time, on the date that is three (3) Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)        if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)    the Borrower may not select an Interest Period under a particular Facility that would extend beyond the Termination Date or beyond the date final payment is due on the First Priority Term Loans;

(iii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

(iv)    the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan.

"Investment":  the meaning set forth in Section 6.7.

"ISP":  International Standby Practices 1998 (International Chamber of Commerce Publication Number 590) and any subsequent version thereof adhered to by the Fronting Bank.

"Joinder":  the meaning set forth in Section 5.11(b).

"Joint Lead Arrangers":  Credit Suisse Securities (USA) LLC, Goldman Sachs Credit Partners L.P., J.P. Morgan Securities Inc. and Deutsche Bank Securities Inc.

"L/C Application":  an application, in such form as the Fronting Bank may specify from time to time, requesting the Fronting Bank to issue a Letter of Credit.

"L/C Cash Collateral Account":  the account established by the Borrower under the sole and exclusive control of the Collateral Agent maintained at the office of the Collateral Agent at Eleven Madison Avenue, New York, New York 10010, designated as the "Calpine Corporation Debtor-in-Possession L/C Cash Collateral Account" or similar title, which shall be used solely for the purposes set forth in Sections 2.8(b), 2.17 and 2.28 and any other provision of this Agreement which requires the cash collateralization of Letter of Credit Outstandings.

"L/C Commitment":  $550,000,000.

"Lenders":  the meaning set forth in the preamble to this Agreement.

"Letter of Credit Fees":  the fees payable in respect of Letters of Credit pursuant to Section 2.26.

"Letter of Credit Outstandings":  at any time, an amount equal to the sum of (a) the then Dollar Amount of the aggregate undrawn and unexpired face amount of all Letters of Credit then outstanding plus (b) the then Dollar Amount of the aggregate amounts theretofore drawn under Letters of Credit and not then reimbursed.

"Letter of Credit Request":  the meaning set forth in Section 2.9.

"Letters of Credit":  any standby letter of credit issued pursuant to Section 2.9 which letter of credit shall be (a) for such purposes as are consistent with the terms hereof, (b) denominated in Dollars or any Alternative Currency and (c) otherwise in such form as may be reasonably approved from time to time by the Administrative Agent and the Fronting Bank.

"Lien": any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Loan": any loan made by any Lender pursuant to this Agreement.

"Loan Documents": this Agreement, the Notes, the Security and Pledge Agreement, the Letters of Credit, the L/C Applications, Exit Facility Agreement, the DIP Refinancing Order and any other document, instrument or agreement executed and delivered in connection herewith.

"Loan Parties": each Debtor that is a party to a Loan Document.

"Material Adverse Effect": a material adverse effect on (a) the business, condition (financial or otherwise), operations, assets or prospects of the Global Entities taken as a whole, in each case, other than such effects attributable to the commencement of the Cases or the existence of prepetition claims and of defaults under such prepetition claims, (b) the validity or enforceability of the DIP Refinancing Order or any of the Loan Documents, or (c) the rights and remedies of the Lenders, the Fronting Bank, the Administrative Agent and the Collateral Agent under the DIP Refinancing Order and the other Loan Documents.

"Material Environmental Amount": an amount payable by the Borrower and/or its Subsidiaries in excess of $1,000,000 for remedial costs, compliance costs, compensatory damages, punitive damages, fines, penalties or any combination thereof.

"Majority Facility Lenders": with respect to any Facility, the holders of more than 50% of the aggregate unpaid principal amount of the First Priority Term Loans or the Aggregate Revolving Outstandings, as the case may be, outstanding under such Facility (or, in the case of the Revolving Facility, prior to any termination of the Revolving Commitments, the holders of more than 50% of the Total Revolving Commitments).

"Material Intellectual Property": the meaning set forth in Section 3.18.

"Material Subsidiaries": the collective reference to the following Subsidiaries of the Borrower: the Geysers Entities, Calpine Energy Services Holdings, Inc., Calpine Calgen Holdings, Inc., Calpine CCFC Holdings, Inc., CPN Energy Services GP, Inc., CPN Energy Services LP, Inc. and Calpine Riverside Holdings, LLC, and all of their respective direct and indirect Subsidiaries; it being understood that any Subsidiary into which any Material Subsidiary merged or otherwise consolidated or any Subsidiary to which all or substantially all of the assets of any Material Subsidiary are transferred or otherwise disposed shall constitute a Material Subsidiary for all purposes under this Agreement.

"Materials of Environmental Concern": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"Minimum Liquidity": at any time, the sum of (a) all unrestricted cash and Cash Equivalents of the Global Entities at such time and (b) the Available Revolving Commitments of all Lenders at such time.

"Minority Banks": the meaning set forth in Section 10.1(b).

"Moody's": Moody's Investors Services, Inc.

"Multiemployer Plan": a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds": in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of attorneys' fees, accountants' fees, investment banking fees, commissions, foreign exchange charges to the extent such proceeds are paid in a currency other than Dollars, amounts required to be applied to the repayment of Indebtedness secured by a Lien permitted hereunder on any asset that is the subject of such Asset Sale or Recovery Event, amounts required to be applied to the repayment of mandatorily redeemable preferred Capital Stock permitted hereunder, amounts used in respect of any casualty payment to the extent used to pay actual liabilities or losses in respect of such casualty, and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements).

"New Lender": the meaning set forth in Section 2.33(a).

"New York UCC": the Uniform Commercial Code as from time to time in effect in the State of New York.

"Non-Excluded Taxes": the meaning set forth in Section 2.22(a).

"Non-Loan Parties": any Subsidiary of the Borrower that is not a Loan Party.

"Non-U.S. Lender": the meaning set forth in Section 2.22(d).

"Notes": the collective reference to any promissory note evidencing Loans.

"Notice": the giving of notice by the Administrative Agent to the Borrower and its counsel (as set forth in Section 10.2) that a Default or an Event of Default has occurred and is continuing.

"Obligations": (a) the principal of and interest on the Loans and the Notes and the Letter of Credit Outstandings, (b) the Fees and all other present and future, fixed or contingent, obligations and liabilities (monetary or otherwise) of the Loan Parties to the Lenders, the Fronting Bank, the Collateral Agent and the Administrative Agent under the Loan Documents, including without limitation, all costs and expenses payable pursuant to Section 10.5, (c) interest rate hedging agreements and Eligible Permitted Commodity Hedge Agreements entered into by the Borrower and any Lender or affiliate thereof or any Qualified Entity and (d) the Cash Management Obligations.

"Otay Mesa": Otay Mesa Energy Center, LLC.

"Otay Mesa Motion": the "Motion For Entry of an Order (A) Approving the PPA Reinstatement Agreement Between Certain of the Debtors, Otay Mesa Energy Center, LLC and San Diego Gas & Electric Company; (B) Authorizing Intercompany Transfers of Assets Comprising the Otay Mesa Project to Otay Mesa Energy Center, LLC Free and Clear of All Liens, Claims and Encumbrances and Other Interests; (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and

Unexpired Leases in Connection Therewith; (D) Authorizing Calpine Corporation to Make Capital Contributions to Otay Mesa Energy Center, LLC ; and (E) Granting Related Relief" filed by the Borrower and certain other Debtors in the Cases on October 23, 2006 (Docket No. 2922), seeking the approval of the Bankruptcy Court for the transactions described therein, together with the order granting such motion entered by the Bankruptcy Court in the Cases on November 15, 2006.

"Other Taxes":  any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Participants":  the meaning set forth in Section 10.6(b).

"Patriot Act":  the USA Patriot Act, Title III of Pub. L. 107-56, signed into law on October 26, 2001, as amended.

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted Liens":  Liens permitted to exist under Section 6.2.

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date":  as to any Loan Party, the date reflected on Schedule 3.5 on which such Loan Party filed with the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

"Plan":  at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Preferred Equity Documents":  the collective reference to the Second Amended and Restated Limited Liability Company Operating Agreement of CCFC Preferred Holdings, LLC, the Amended and Restated Certificate of Incorporation of Calpine CCFC GP, Inc. and the Amended and Restated Certificate of Incorporation of Calpine CCFC LP, Inc., as each of the foregoing has been amended, supplemented or otherwise modified from time to time.

"Prime Rate":  the rate of interest announced by CS from time to time as its prime rate. The Prime Rate is a reference rate and does not necessarily represent the lowest rate actually charged to any customer. CS may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"Projections":  the detailed consolidated annual budget for the years 2007 through 2012 as reflected in the business plan, including quarterly income projections for the eight quarters beginning with the first quarter of 2007 of the Borrower and its Subsidiaries (including a description of the material underlying assumptions applicable thereto), delivered to the Administrative Agent pursuant to Section 4.1(g).

"Properties":  the meaning set forth in Section 3.16(a).

"Purchasing Lender":  the meaning set forth in Section 10.6(c).

"Qualified Entity":  each Person described on Schedule 1.1F.

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset.

"Refunded Swingline Loans":  the meaning set forth in Section 2.7(b).

"Register":  the meaning set forth in Section 10.6(d).

"Regulation D":  Regulation D of the Board of Governors of the Federal Reserve System, comprising Part 204 of Title 12, Code of Federal Regulations, as amended, and any successor thereto.

"Reinvestment Deferred Amount":  with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by any Global Entity in connection therewith that are not applied to prepay the First Priority Term Loans pursuant to Section 2.17(a) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event":  any Asset Sale or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice":  a written notice executed by a Responsible Officer stating that no Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event to acquire or repair (or reimburse itself for amounts previously expended to acquire or repair) assets useful in its business.

"Reinvestment Prepayment Amount":  with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date, or an amount contracted to be expended prior to the relevant Reinvestment Prepayment Date to acquire or repair (or reimburse itself for amounts previously expended to acquire or repair) assets useful in the Borrower's business.

"Reinvestment Prepayment Date":  with respect to any Reinvestment Event, the earlier of (a) the date occurring six months after such Reinvestment Event and (b) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire or repair assets useful in the Borrower's business (or, in case of any amount contracted to be expended, such contract has expired or terminated) with all or any portion of the relevant Reinvestment Deferred Amount.

"Related Fund":  with respect to any Lender that is a fund that invests in bank loans, any other fund that invests in commercial loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Reorganization Plan":  a plan of reorganization of the Loan Parties in any of the Cases.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty (30) day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

20

"Required Lenders": at any time, Lenders holding more than 50% of (a) until the Closing Date, the Commitments then in effect and (b) thereafter, the sum of (i) the aggregate unpaid principal amount of the First Priority Term Loans then outstanding and (ii) the Total Revolving Commitments then in effect or, if the Revolving Commitments have been terminated, the Aggregate Revolving Outstandings then outstanding.

"Requirement of Law": as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer": the chief executive officer, president, any executive vice president or Financial Officer of the Borrower, but in any event, with respect to financial matters, a Financial Officer of the Borrower.

"Restructuring Costs": non-recurring and other one-time costs incurred by the Borrower or its Subsidiaries in connection with the reorganization of its and its Subsidiaries' business, operations and structure in respect of (a) the implementation of ongoing operational initiatives, (b) plant closures, plant "moth-balling" or consolidation, relocation or elimination of offices operations, (c) related severance costs and other costs incurred in connection with the termination, relocation and training of employees, (d) legal, consulting, employee retention and other advisor fees incurred in connection with the Cases and the related Reorganization Plan and (e) any adequate protection payments previously consented to by the Administrative Agent.

"Revolving Commitment": with respect to each Lender, the commitment of such Lender to make Revolving Loans and participate in Swingline Loans and Letters of Credit in an aggregate principal and/or face amount not to exceed the amount set forth opposite its name on Schedule 1.1A under the heading "Revolving Commitment Amounts" or as may subsequently be set forth in the Register from time to time, as the same may be reduced from time to time pursuant to Sections 2.15, 2.16 and 2.17.

"Revolving Commitment Percentage": at any time, with respect to each Lender, the percentage obtained by dividing its Revolving Commitment at such time by the Total Revolving Commitment at such time or, if no Revolving Commitments are then in effect, the percentage obtained by dividing the aggregate Revolving Loans outstanding of such Lender by the aggregate Revolving Loans outstanding of all the Lenders at such time; provided that, in the event that the Revolving Loans are paid in full prior to the reduction to zero of the total outstanding Revolving Extensions of Credit, the Revolving Commitment Percentages shall be determined in a manner designed to ensure that the other outstanding Revolving Extensions of Credit shall be held by the Lenders on a comparable basis.

"Revolving Commitment Period": the period from and including the Closing Date to but not including the Termination Date.

"Revolving Extensions of Credit": as to any Revolving Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Revolving Loans held by such Lender then outstanding, (b) such Lender's Revolving Commitment Percentage of the Letter of Credit Outstandings then outstanding and (c) such Lender's Revolving Commitment Percentage of the aggregate principal amount of Swingline Loans then outstanding.

"Revolving Facility": the Revolving Commitments and the extensions of credit made thereunder.