"Revolving Lender":  each Lender that has a Revolving Commitment or that holds Revolving Loans.

"Revolving Loans":  the meaning set forth in Section 2.4.

"RockGen": the meaning set forth in Section 6.10.

"RockGen Reserve Account": the meaning set forth in Section 6.10.

"S&P":  Standard & Poor's Ratings Services.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Security and Pledge Agreement":  the Security and Pledge Agreement, substantially in the form of Exhibit G hereto, among the Collateral Agent and the Grantors (as defined in the Security and Pledge Agreement) signatory thereto.

"Single Employer Plan":  any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"Stated Maturity":  [March] __, 2009, which is the date that is the second anniversary of the Closing Date.

"Subsequent Final Order":  the meaning set forth in Section 5.11(b).

"Subsequent Interim Order":  the meaning set forth in Section 5.11(b).

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Supermajority Lenders":  at any time, Lenders holding more than $66\text{-}^2/_3\%$ of (a) until the Closing Date, the Commitments then in effect and (b) thereafter, the sum of (i) the aggregate unpaid principal amount of the First Priority Term Loans then outstanding and (ii) the Total Revolving Commitments then in effect or, if the Revolving Commitments have been terminated, the Aggregate Revolving Outstandings then outstanding.

"Superpriority Claim":  a claim against any Loan Party in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code, including a claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

"Swap Agreement":  any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing

indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement".

"Swingline Commitment": the obligation of the Swingline Lender to make Swingline Loans pursuant to Section 2 in an aggregate principal amount at any one time outstanding not to exceed $10,000,000.

"Swingline Lender": _____, in its capacity as the lender of Swingline Loans.

"Swingline Loans": the meaning set forth in Section 2.6.

"Swingline Participation Amount": the meaning set forth in Section 2.7(c).

"Termination Date": the earliest to occur of (a) the Stated Maturity, (b) the acceleration of the Loans and the termination of the Total Commitment in accordance with the terms hereof and (c) if the Conversion Date does not occur simultaneously therewith, the effective date of a Reorganization Plan confirmed by the Bankruptcy Court pursuant to the Confirmation Order in any of the Cases.

"Total Commitment": at any time, the sum of the Commitments of all Lenders at such time.

"Total Revolving Commitments": at any time, the aggregate amount of the Revolving Commitments then in effect. The Total Revolving Commitments on the Closing Date are $1,000,000,000.

"Trading Order": the final order of the Bankruptcy Court entered on the docket in the Cases on February 9, 2006 (as amended), authorizing the Debtors to (i) continue to honor prepetition trading contracts, (ii) enter into new postpetition trading contracts, (iii) pledge collateral under prepetition and postpetition trading contracts and (iv) assume certain prepetition trading contracts.

"Transferee": the meaning set forth in Section 10.6(f).

"Turbine Dispositions": the Disposition of turbines or turbine parts by any Credit Party to the extent permitted under Section 6.5(i).

"Type": as to any Loan, its nature as a Base Rate Loan or a Eurodollar Loan.

"Uniform Customs": the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500 and any amendments or revisions thereof.

"United States": the United States of America.

1.2.    Terms Generally. The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections and subsections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. References to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or

Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time to the extent permitted herein. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided, however, that for purposes of determining compliance with any covenant set forth in Section 6, such terms shall be construed in accordance with GAAP as in effect on the date of this Agreement applied on a basis consistent with the application used in the Borrower's audited financial statements referred to in Section 5.1(a).

       1.3.  Delivery of Notices or Receivables.  Any reference to a delivery or notice date that is not a Business Day shall be deemed to mean the next succeeding day that is a Business Day.

       1.4.  Exchange Rates.  For purposes of calculating (a) the aggregate Dollar Equivalent of Letters of Credit denominated in an Alternative Currency and of unreimbursed drawings under Letters of Credit denominated in Alternative Currency outstanding at any time during any period and (b) the Dollar Equivalent of any Letters of Credit denominated in an Alternative Currency at the time of the issuance of such Letter of Credit pursuant to Section 2.8, the Administrative Agent will at least once during each calendar month and at such other times as it in its sole discretion determines to be appropriate to do so (including on or prior to the date of any borrowing or issuance of a Letter of Credit and the last day of any Interest Period), determine the respective rate of exchange into Dollars of such Alternative Currency (which rate of exchange shall be based upon the Exchange Rate in effect on the date of such determination).  Such rates of exchange so determined on each such determination date shall, for purposes of the calculations described in the preceding sentence, be deemed to remain unchanged and in effect until the next such determination date.

SECTION 2

AMOUNT AND TERMS OF COMMITMENT

       2.1.  First Priority Term Commitments.  Subject to the terms and conditions hereof, each First Priority Term Lender severally, and not jointly with the other First Priority Term Lenders, agrees to make a term loan (each, a "First Priority Term Loan" and collectively, the "First Priority Term Loans") to the Borrower on the Closing Date under the First Priority Term Commitment, provided that no First Priority Term Lender shall be required to make any First Priority Term Loan in excess of such First Priority Term Lender's First Priority Term Commitment then in effect .  The First Priority Term Loans may from time to time be Eurodollar Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.18.  Amounts prepaid on account of the First Priority Term Loans may not be reborrowed.

       2.2.  Procedure for Term Loan Borrowing.  The Borrower may borrow under the First Priority Term Commitments on the Closing Date, provided that such Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent prior to 12:00 Noon, New York City time, on the Closing Date), specifying the amount of First Priority Term Loans to be borrowed.  The First Priority Term Loans made on the Closing Date shall initially be Base Rate Loans and, unless otherwise agreed by the Administrative Agent in its respective sole discretion, no Term Loan may be converted into or continued (x) as a Eurodollar Loan prior to the date that is three Business Days after the Closing Date or (y) as a Eurodollar Loan having an Interest Period in excess of one week prior to the date that is the earlier of (A) 30 days after the Closing Date and (B) completion of the syndication process.  Each Borrowing under the First Priority Term Commitments shall be in an amount equal to (x) in the case of Base Rate Loans, $1,000,000 or a whole multiple of $1,000,000 in excess thereof (or, if the then aggregate applicable First Priority Term Commitments are less than $1,000,000, such lesser amount) or (y) in the case of Eurodollar Loans, $5,000,000 or a whole

multiple of $1,000,000 in excess thereof.  Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each applicable First Priority Term Lender thereof.  Each First Priority Term Lender will make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the applicable First Priority Term Loan to be made by such First Priority Term Lender prior to 2:00 P.M., New York City time, on the Closing Date.  Such Borrowing will then be made available to the Borrower by the Administrative Agent as directed by the Borrower in the aggregate amounts made available to the Administrative Agent by the Lenders in like funds as received by the Administrative Agent.

2.3.  Repayment of First Priority Term Loans.  The First Priority Term Loans of each First Priority Term Lender shall mature in eight consecutive quarterly installments, each of which shall be in an amount equal to such Lender's First Priority Term Percentage multiplied by the amount set forth below opposite such installment:

| Installment | Principal Amount |
|---|---|
| June 30, 2007 | $10,000,000 |
| September 30, 2007 | $10,000,000 |
| December 31, 2007 | $10,000,000 |
| March 31, 2008 | $10,000,000 |
| June 30, 2008 | $10,000,000 |
| September 30, 2008 | $10,000,000 |
| December 31, 2008 | $10,000,000 |
| Termination Date | Balance |

; provided that in the event that any Incremental Term Loans are made to the Borrower under Section 2.33, the principal amount to be paid by the Borrower for each quarterly installment remaining until the Termination Date shall be increased by an amount equal to the product of (x) the aggregate original principal amount of such Incremental Term Loans and (y) 0.25%.

2.4.  Revolving Commitments.  Subject to the terms and conditions hereof, each Revolving Lender, severally and not jointly with the other Revolving Lenders, agrees to make revolving credit loans (each, a "Revolving Loan" and, collectively, the "Revolving Loans") to the Borrower from time to time during the Revolving Commitment Period in an aggregate principal amount at any one time outstanding which, when added to such Lender's Revolving Commitment Percentage of the then Aggregate Revolving Outstandings, does not exceed the amount of such Lender's Revolving Commitment in effect at such time as at the date such Loan is to be made.  During the Revolving Commitment Period, the Borrower may use the Revolving Commitments by borrowing, prepaying the Revolving Loans in whole or in part, and reborrowing, all in the accordance with the terms and conditions hereof.  The Revolving Loans may from time to time be Eurodollar Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.5 and 2.18.

2.5.  Procedure for Revolving Loan Borrowing.  The Borrower may borrow under the Revolving Commitments during the Revolving Commitment Period on any Business Day, provided that the Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent prior to 12:00 Noon, New York City time (a) three (3) Business Days prior to the requested Borrowing Date, in the case of Eurodollar Loans or (b) on the same Business Day of the requested Borrowing Date, in the case of Base Rate Loans), specifying (i) the amount and Type of Revolving Loans to be borrowed, (ii) the requested Borrowing Date and (iii) in the case of Eurodollar Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest

Period therefor. Each Borrowing under the Revolving Commitments shall be in an amount equal to (x) in the case of Base Rate Loans, $1,000,000 or a whole multiple thereof (or, if the then Available Revolving Commitments are less than $1,000,000, such lesser amount) or (y) in the case of Eurodollar Loans, $5,000,000 or a multiple of $1,000,000 in excess thereof; provided that the Swingline Lender may request, on behalf of the Borrower, borrowings under the Revolving Commitments that are Base Rate Loans in other amounts pursuant to Section 2.7. Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Revolving Lender thereof. Each Revolving Lender will make the amount of its Revolving Commitment Percentage of each Borrowing available to the Administrative Agent at the Funding Office prior to 2:00 P.M., New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such Borrowing will then be made available to the Borrower by the Administrative Agent as directed by the Borrower in the aggregate amounts made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent.

2.6. <u>Swingline Commitment</u>.

(a)    Subject to the terms and conditions hereof, the Swingline Lender agrees to make a portion of the credit otherwise available to the Borrower under the Revolving Commitments from time to time during the Revolving Commitment Period by making swing line loans ("Swingline Loans") to the Borrower; provided that (i) the aggregate principal amount of Swingline Loans outstanding at any time shall not exceed the Swingline Commitment then in effect (notwithstanding that the Swingline Loans outstanding at any time, when aggregated with the Swingline Lender's other outstanding Revolving Loans, may exceed the Swingline Commitment then in effect) and (ii) the Borrower shall not request, and the Swingline Lender shall not make, any Swingline Loan if, after giving effect to the making of such Swingline Loan, the aggregate amount of the Available Revolving Commitments would be less than zero. During the Revolving Commitment Period, the Borrower may use the Swingline Commitment by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof. Swingline Loans shall be Base Rate Loans only.

(b)    The Borrower shall repay to the Swingline Lender the then unpaid principal amount of each Swingline Loan on the earlier of the Termination Date and the first date after such Swingline Loan is made that is the fifteenth (15th) or last day of a calendar month and is at least two (2) Business Days after such Swingline Loan is made; provided that on each date that a Revolving Loan is borrowed, the Borrower shall repay all Swingline Loans then outstanding.

2.7. <u>Procedure for Swingline Borrowing; Refunding of Swingline Loans</u>.

(a)    Whenever the Borrower desires that the Swingline Lender make Swingline Loans it shall give the Swingline Lender irrevocable telephonic notice confirmed promptly in writing (which telephonic notice must be received by the Swingline Lender not later than 2:00 P.M., New York City time, on the proposed Borrowing Date), specifying (i) the amount to be borrowed and (ii) the requested Borrowing Date (which shall be a Business Day during the Revolving Commitment Period). Each borrowing under the Swingline Commitment shall be in an amount equal to $1,000,000 or a whole multiple thereof. Not later than 5:00 P.M., New York City time, on the Borrowing Date specified in a notice in respect of Swingline Loans, the Swingline Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the amount of the Swingline Loan to be made by the Swingline Lender. The Administrative Agent shall make the proceeds of such Swingline Loan available to the Borrower on such Borrowing Date by depositing such proceeds in an account of the Borrower specified in writing to the Swingline Lender on such Borrowing Date in immediately available funds.

(b)      The Swingline Lender, at any time and from time to time in its sole and absolute discretion may, on behalf of the Borrower (which hereby irrevocably directs the Swingline Lender to act on its behalf), on one (1) Business Day's notice given by the Swingline Lender no later than 12:00 Noon, New York City time, request each Revolving Lender to make, and each Revolving Lender hereby agrees to make, a Revolving Loan, in an amount equal to such Revolving Lender's Revolving Commitment Percentage of the aggregate amount of the Swingline Loans (the "Refunded Swingline Loans") outstanding on the date of such notice, to repay the Swingline Lender.  Each Revolving Lender shall make the amount of such Revolving Loan available to the Administrative Agent at the Funding Office in immediately available funds, not later than 10:00 A.M., New York City time, one (1) Business Day after the date of such notice.  The proceeds of such Revolving Loans shall be immediately made available by the Administrative Agent to the Swingline Lender for application by the Swingline Lender to the repayment of the Refunded Swingline Loans.  The Borrower irrevocably authorizes the Swingline Lender to charge the Borrower's accounts with the Administrative Agent (up to the amount available in each such account) in order to immediately pay the amount of such Refunded Swingline Loans to the extent amounts received from the Revolving Lenders are not sufficient to repay in full such Refunded Swingline Loans.

(c)      If prior to the time a Revolving Loan would have otherwise been made pursuant to Section 2.7(b), if for any reason, as determined by the Swingline Lender in its sole discretion, Revolving Loans may not be made as contemplated by Section 2.7(b), each Revolving Lender shall, on the date such Revolving Loan was to have been made pursuant to the notice referred to in Section 2.7(b), purchase for cash an undivided participating interest in the then outstanding Swingline Loans by paying to the Swingline Lender an amount (the "Swingline Participation Amount") equal to (i) such Revolving Lender's Revolving Commitment Percentage times (ii) the sum of the aggregate principal amount of Swingline Loans then outstanding that were to have been repaid with such Revolving Loans.

(d)      Whenever, at any time after the Swingline Lender has received from any Revolving Lender such Lender's Swingline Participation Amount, the Swingline Lender receives any payment on account of the Swingline Loans, the Swingline Lender will distribute to such Lender its Swingline Participation Amount (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's participating interest was outstanding and funded and, in the case of principal and interest payments, to reflect such Lender's pro rata portion of such payment if such payment is not sufficient to pay the principal of and interest on all Swingline Loans then due); provided, however, that in the event that such payment received by the Swingline Lender is required to be returned, such Revolving Lender will return to the Swingline Lender any portion thereof previously distributed to it by the Swingline Lender.

(e)      Each Revolving Lender's obligation to make the Loans referred to in Section 2.7(b) shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such Revolving Lender or the Borrower may have against the Swingline Lender, the Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 4, (iii) any adverse change in the condition (financial or otherwise) of the Borrower, (iv) any breach of this Agreement or any other Loan Document by the Borrower, any other Loan Party or any other Revolving Lender or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

2.8.   Letters of Credit.

(a)      Pursuant to the Existing DIP Agreement, prior to the Closing Date, the Fronting Bank[s] issued the Existing Letters of Credit which shall be deemed to be Letters of Credit issued under

this Agreement for all purposes hereunder and under the Loan Documents; provided that nothing in this Section 2.8(a) shall extend, modify or otherwise affect the existing expiration date of any such Existing Letters of Credit.  Subject to the terms and conditions hereof, the Borrower may request the Fronting Bank, from time to time during the Revolving Commitment Period, to issue, and subject to the terms and conditions contained herein, the Fronting Bank agrees, in reliance on the agreements of the other Lenders set forth in Section 2.8(e), to issue, for the account of the Borrower, one or more Letters of Credit; provided that (i) no Letter of Credit shall be issued if after giving effect to such issuance, (A) the Letter of Credit Outstandings would exceed the L/C Commitment or (B) the Aggregate Revolving Outstandings would exceed the Total Revolving Commitment; and (ii) no Letter of Credit shall be issued if the Fronting Bank shall have received notice from the Administrative Agent or the Required Lenders (and a copy of such notice shall be delivered to the Borrower) that the conditions to such issuance have not been met.

(b)    Each Letter of Credit shall be denominated in Dollars or an Alternative Currency and expire no later than the earlier of (x) the first anniversary of its date of issuance and (y) the date that is five (5) Business Days prior to the Stated Maturity; provided that any Letter of Credit with a one year term may provide for the renewal thereof for additional one year periods (which, in no event, shall extend beyond the date described in the foregoing clause (y)); provided, further, that if the Termination Date occurs prior to the expiration of any Letter of Credit, and provisions satisfactory to the Fronting Bank for the treatment of such Letter of Credit as a letter of credit under a successor credit facility have not been agreed upon, the Borrower shall, on or prior to the Termination Date, cause all such Letters of Credit to be replaced and returned to the Fronting Bank undrawn and marked "cancelled" or to the extent that the Borrower is unable to so replace and return any Letter(s) of Credit, such Letter(s) of Credit shall be secured by a "back to back" letter of credit satisfactory to the Fronting Bank, or cash collateralized in an amount equal to 105% of the face amount of such Letter(s) of Credit by the deposit by the Borrower of cash in such percentage amount into the L/C Cash Collateral Account.  Such cash shall be remitted to the Borrower upon the expiration, cancellation or other termination or satisfaction of all Obligations hereunder.

(c)    Each Letter of Credit shall be subject to the ISP and, to the extent not inconsistent therewith, the laws of the state under whose laws each Letter of Credit is issued, as applicable.  The Fronting Bank shall not at any time be obligated to issue any Letter of Credit hereunder if such issuance would conflict with, or cause the Fronting Bank or any Lender to exceed any limits imposed by, any applicable Requirement of Law.  The Borrower shall pay to the Fronting Bank, in addition to such other fees and charges as are specifically provided for in Section 2.26, such fees and charges in connection with the issuance, amendment and processing of the Letters of Credit issued by the Fronting Bank as are customarily imposed by the Fronting Bank from time to time in connection with similar letter of credit transactions.

(d)    If any drawing shall be presented for payment under any Letter of Credit (which shall be pursuant to a sight drawing), the Fronting Bank shall promptly notify the Borrower of the date and amount thereof.  Drawings paid under each Letter of Credit shall be reimbursed by the Borrower not later than the date a drawing is paid (or the next Business Day if the Borrower receives notice of such drawing after 12:00 noon, New York City time) in immediately available funds in an amount equal to (i) if such draft shall be paid in Dollars, the amount so paid or (ii) if such draft shall be paid in an Alternative Currency, the Dollar Equivalent thereof using the Exchange Rate at the time such draft is so paid, on the date that the drawing is paid and shall bear interest from the date the drawing is paid until the drawing is reimbursed in full at a rate per annum equal to the Base Rate plus Applicable Margin for Revolving Loans; it being understood that no interest shall accrue to the extent the Fronting Bank receives payment prior to 2:00 p.m., New York City time, on the date the drawing is paid.  The Borrower shall effect such reimbursement (x) if such draw occurs prior to the Termination Date, in cash or through a Borrowing of

Base Rate Loans without the satisfaction of the conditions precedent set forth in Section 4.2 and which Borrowing shall be effected without the need for a request therefor from the Borrower or (y) if such draw occurs on or after the Termination Date, in cash. Each Lender agrees to make the Loans described in clause (x) of the preceding sentence notwithstanding a failure to satisfy the conditions precedent set forth in Section 4.2.

(e)       Immediately upon the issuance of any Letter of Credit by the Fronting Bank, the Fronting Bank shall be deemed to have sold to each Lender other than the Fronting Bank, and each such other Lender shall be deemed unconditionally and irrevocably to have purchased from the Fronting Bank, without recourse or warranty, an undivided interest and participation, to the extent of such Lender's Revolving Commitment Percentage, in such Letter of Credit, each drawing thereunder and the obligations of the Loan Parties under this Agreement with respect thereto. Upon any change in the Revolving Commitments pursuant to Section 10.6, it is hereby agreed that with respect to all Letter of Credit Outstandings, there shall be an automatic adjustment to the participations hereby created to reflect the new Revolving Commitment Percentages of the assigning and assignee Lenders. Any action taken or omitted by the Fronting Bank under or in connection with a Letter of Credit, if taken or omitted in the absence of gross negligence or willful misconduct as determined in a final and non-appealable decision of a court of competent jurisdiction, shall not create for the Fronting Bank any resulting liability to any other Lender.

(f)       In the event that the Fronting Bank makes any payment under any Letter of Credit and the Borrower shall not have reimbursed such amount in full to the Fronting Bank pursuant to Section 2.8(d), the Fronting Bank shall promptly notify the Administrative Agent, and the Administrative Agent shall promptly notify each Lender of such failure, and each Lender shall promptly and unconditionally pay to the Fronting Bank the amount of such Lender's Revolving Commitment Percentage of (i) the amount of such draft, or any part thereof, that is paid in Dollars and is not so reimbursed or (ii) the Dollar Equivalent, using the Exchange Rate at the time such draft is paid, of the amount of such draft, or any part thereof, that is paid in an Alternative Currency and is not so reimbursed. If the Fronting Bank so notifies the Administrative Agent, and the Administrative Agent so notifies the Lenders prior to 11:00 A.M., New York City time, on any Business Day, each Lender shall make available to the Fronting Bank such Lender's Revolving Commitment Percentage of the amount of such payment on such Business Day in same day funds and if such notice is received after such time period, each Lender shall make such payment on the next succeeding Business Day in same day funds). If and to the extent any such Lender shall not have so made its Revolving Commitment Percentage of the amount of such payment available to the Fronting Bank, such Lender agrees to pay to the Fronting Bank, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Fronting Bank at a rate equal to the effective rate for overnight funds in New York as reported by the Federal Reserve Bank of New York for such day (or, if such day is not a Business Day, the next preceding Business Day). The failure of any Lender to make available to the Fronting Bank its Revolving Commitment Percentage of any payment under any Letter of Credit shall not relieve any other Lender of its obligation hereunder to make available to the Fronting Bank its Revolving Commitment Percentage of any payment under any Letter of Credit on the date required, as specified above, but no Lender shall be responsible for the failure of any other Lender to make available to the Fronting Bank such other Lender's Revolving Commitment Percentage of any such payment. Whenever the Fronting Bank receives a payment of a reimbursement obligation as to which it has received any payments from the Lenders pursuant to this paragraph, the Fronting Bank shall pay to each Lender which has paid its Revolving Commitment Percentage thereof, in same day funds, an amount equal to such Lender's Revolving Commitment Percentage thereof.

2.9.    Issuance of Letters of Credit. The Borrower may from time to time request that the Fronting Bank issue or amend a Letter of Credit by delivering to the Fronting Bank and the

Administrative Agent a request substantially in the form of Exhibit F (a "Letter of Credit Request") and such other certificates, documents and other papers and information as the Fronting Bank may reasonably request. Upon receipt of a Letter of Credit Request, the Fronting Bank agrees to promptly process each such request and the certificates, documents, L/C Application and other papers and information delivered to it therewith in accordance with its customary procedures and shall issue the Letter of Credit requested thereby (but in no event shall the Fronting Bank be required to issue any Letter of Credit earlier than two (2) Business Days after its receipt of the Letter of Credit Request therefor and all such other certificates, documents, L/C Application and other papers and information relating thereto and unless such terms and conditions of the requested Letter of Credit are commercially customary) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by the Fronting Bank and the Borrower. Promptly after the issuance or amendment of a Letter of Credit, the Fronting Bank shall notify the Borrower and the Administrative Agent, in writing, of such issuance or amendment and such notice shall be accompanied by a copy of such Letter of Credit or amendment. Upon receipt of such notice, the Administrative Agent shall promptly notify each Lender, in writing, of such Letter of Credit or amendment and if so requested by a Lender, the Administrative Agent shall furnish such Lender with a copy of such Letter of Credit or amendment.

2.10. Nature of Letter of Credit Obligations Absolute. The Borrower's obligations in respect of the Letter of Credit Outstandings shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including without limitation: (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set-off, defense or other right which the Borrower may have at any time against a beneficiary of any Letter of Credit or against any of the Lenders, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction; (iii) any draft, demand, certificate or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by the Fronting Bank of any Letter of Credit against presentation of a demand, draft or certificate or other document which does not comply with the terms of the Letter of Credit, except payment resulting from the gross negligence or willful misconduct, as determined in a final and nonappealable decision of a court of competent jurisdiction, of the Fronting Bank; or (v) the fact that any Default or Event of Default shall have occurred and be continuing.

2.11. Repayment of Loans; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender on the Termination Date. The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.12.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing Indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall, in respect of the First Priority Term Facility and the Revolving Facility, record in the Register, with separate sub-accounts for each Lender, (i) the amount and Borrowing Date of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) both the amount of any payment received by the Administrative Agent hereunder from the Borrower and each Lender's Commitment Percentage thereof.

(d)     The entries made in the Register and the accounts of each Lender maintained pursuant to Sections 2.11(b) and (c) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded absent manifest error; provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

2.12. Interest Rates and Payment Dates.

(a)     Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b)     Each Base Rate Loan shall bear interest at a rate per annum equal to the Base Rate from time to time plus the Applicable Margin.

(c)     Notwithstanding the foregoing, at any time after the occurrence and during the continuance of an Event of Default, the outstanding Obligations shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% (or in the case of any such amounts that do not otherwise bear interest, the rate applicable to Base Rate Loans under the relevant Facility plus 2% or, in the case of any such amounts that do not relate to a particular Facility, the rate then applicable to Base Rate Loans under the Revolving Facility plus 2%).

(d)     Interest shall be payable in arrears on each Interest Payment Date; provided that interest accruing pursuant to paragraph (c) of this Section shall be payable from time to time on demand.

2.13. Computation of Interest and Fees.  (a)  Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to Base Rate Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of each determination of a Eurodollar Rate.  Any change in the interest rate on a Loan resulting from a change in the Base Rate or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective.  The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of the effective date and the amount of each such change in interest rate.

(b)     Each determination of an interest rate in respect of an applicable Facility by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.  The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate hereunder.

2.14. Inability to Determine Interest Rate.  If prior to the first day of any Interest Period:

(i)     the Administrative Agent shall have reasonably determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the

relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(ii)       the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period in good faith by such Required Lenders will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter.  If such notice is given (x) any Eurodollar Loans hereunder requested to be made on the first day of such Interest Period shall be made as Base Rate Loans, (y) any Loans hereunder that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as Base Rate Loans and (z) any outstanding Eurodollar Loans hereunder shall be converted, on the last day of the then-current Interest Period, to Base Rate Loans; provided that if the circumstances giving rise to such notice shall cease or otherwise become inapplicable to such Required Lenders, then such Required Lenders shall promptly give notice of such change in circumstances to the Administrative Agent and the Borrower.  Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans hereunder shall be made or continued as such, nor shall the Borrower have the right to convert Loans hereunder to Eurodollar Loans.

2.15. Optional Termination or Reduction of Revolving Commitment.  Upon not less than three (3) Business Days' prior written notice to the Administrative Agent, the Borrower may at any time, without premium or penalty, in whole permanently terminate, or from time to time in part permanently reduce, the Total Revolving Commitments; provided that no such termination or reduction of the Total Revolving Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Loans, the Aggregate Revolving Outstandings at such time would exceed the Total Revolving Commitments.  Each such partial reduction of the Total Revolving Commitments shall be in the principal amount of $1,000,000 or a whole multiple thereof.  Simultaneously with any termination or reduction of the Total Revolving Commitments, the Borrower shall pay to the Administrative Agent for the account of each Lender the Commitment Fee accrued on the amount of the Revolving Commitments of such Lender so terminated or reduced through the date thereof.  Any reduction of the Total Revolving Commitment pursuant to this Section 2.15 shall be applied pro rata in accordance with each Lender's Revolving Commitment Percentage to reduce the Revolving Commitment of each such Lender.  Partial prepayments of Swingline Loans shall be in an aggregate principal amount of $500,000 or a whole multiple thereof.

2.16. Optional Prepayment of Loans.  Subject to the provisos below, the Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent prior to 10:00 A.M., New York City time on the same Business Day, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or Base Rate Loans; provided that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.23.  Upon receipt of any such notice of prepayment the Administrative Agent shall notify each relevant Lender thereof on the date of receipt of such notice.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (except in the case of Base Rate Loans) accrued interest to such date on the amount prepaid.  Partial prepayments shall be in an aggregate principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof.  The application of any prepayment pursuant to this Section 2.16 shall be made, first, to Base Rate Loans and, second, to Eurodollar Loans.

2.17. Mandatory Prepayment.

(a)     If on any date any Global Entity shall receive Net Cash Proceeds from any Asset Sale or Recovery Event then, subject to the proviso below or unless a Reinvestment Notice shall be delivered in respect thereof, such Global Entity shall, or a Loan Party shall cause such Global Entity to, pay, subject to Section 2.17(d) below, within one (1) Business Day after receipt by such Global Entity such Net Cash Proceeds directly to the Administrative Agent to be applied toward the prepayment of the First Priority Term Loans as set forth in Section 2.17(b) or to repay any outstanding Revolving Loans as set forth in Section 2.17(d); provided that notwithstanding the foregoing, (i) the aggregate Net Cash Proceeds of Asset Sales that may be excluded from the foregoing requirement pursuant to a Reinvestment Notice shall not exceed $50,000,000 in the aggregate during the term of this Agreement, (ii) the aggregate Net Cash Proceeds of Recovery Events that may be excluded from the foregoing requirement pursuant to a Reinvestment Notice shall not exceed $175,000,000 in the aggregate during the term of this Agreement, (iii) on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the First Priority Term Loans and (iv) the Borrower shall not be required pursuant to this Section 2.17(a) to apply (x) Net Cash Proceeds of any Turbine Disposition of less than $150,000,000 in the aggregate during the term of this Agreement and (y) $200,000,000 in the aggregate during the term of this Agreement of Net Cash Proceeds of any other Asset Sale.

(b)     Amounts to be applied in connection with prepayments of the Loans and Commitment reductions made pursuant to Section 2.17(a) shall be applied to the prepayment of the First Priority Term Loans (in accordance with Section 2.20(b)) until the First Priority Term Loans are paid in full.  The application of any prepayment pursuant to Section 2.17 shall be made on a pro rata basis to the then outstanding First Priority Term Loans irrespective of whether such outstanding First Priority Term Loans are Base Rate Loans or Eurodollar Loans; provided that if all First Priority Term Lenders accept such prepayment pursuant to Section 2.17(d), then, with respect to such prepayment, the amount of such prepayment shall be applied first to First Priority Term Loans that are Base Rate Loans to the full extent thereof before application to First Priority Term Loans that are Eurodollar Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.23; [provided further that in the event any Lender rejects the offer in Section 2.17(d) in respect of a Prepayment Amount, the Borrower shall not be required to pay breakage amounts under Section 2.23 in any greater amount than would have been paid in accordance with the preceding proviso].  Each prepayment of the Loans under Section 2.17 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(c)     Upon the Termination Date, the Total Commitment shall automatically terminate in full and the Borrower shall pay the Loans in full (including all accrued and unpaid interest thereon, Fees and other Obligations in respect thereof) and, if there are any Letter of Credit Outstandings constituting undrawn Letters of Credit, the Borrower shall replace such Letter(s) of Credit, provide a "back-to-back" letter of credit acceptable to the Fronting Bank or collateralize such Letter of Credit Outstandings, in each case in the manner set forth in Section 2.8(b).

(d)     Notwithstanding anything to the contrary in this Section 2.17 or 2.20, with respect to the amount of any mandatory prepayment described in Section 2.17 (such amount, the "Prepayment Amount"), the Borrower will not be required to prepay such amounts until such time as the aggregate Net Cash Proceeds from Asset Sales or Recovery Events required to be so prepaid and not yet so prepaid or offered as prepayment under this Section 2.17 exceeds $25,000,000, and on the date specified in Section 2.17 for such prepayment in lieu of making such prepayment to the Administrative Agent, shall give the Administrative Agent telephonic notice (promptly confirmed in writing) requesting that the Administrative Agent prepare and provide to each First Priority Term Lender a notice (each, a

"Prepayment Option Notice") as described below.  As promptly as practicable after receiving such notice from the Borrower, the Administrative Agent will send to each First Priority Term Lender a Prepayment Option Notice, which shall be substantially in the form of Exhibit M, and shall include an offer ("Offer") by the Borrower to prepay on the date (each a "Mandatory Prepayment Date") that is ten (10) Business Days after the date of the Prepayment Option Notice, the relevant First Priority Term Loans of such First Priority Term Lender by an amount equal to the portion of the Prepayment Amount indicated in such Lender's Prepayment Option Notice.  Each First Priority Term Lender may accept or reject the Offer contained in the Prepayment Option Notice.  Unless the Offer is affirmatively accepted by a First Priority Term Lender as set forth below, the Offer shall be deemed rejected by such First Priority Term Lender. With respect to First Priority Term Lenders accepting such Offer, on the Mandatory Prepayment Date, the Borrower shall pay directly to the Administrative Agent; for payment to the relevant First Priority Term Lenders, the aggregate amount necessary to prepay that portion of the outstanding relevant First Priority Term Loans in respect of which such Lenders have accepted prepayment.  Any First Priority Term Lenders accepting such Offer must, as soon as practicable, but in no event later than five (5) Business Days after receipt of the Prepayment Option Notice, give the Administrative Agent telephonic notice (promptly confirmed in writing) of such acceptance and the Administrative Agent will give the Borrower corresponding telephonic notice (promptly confirmed in writing).  The amount equal to the portion of the Prepayment Amount for which no notification of acceptance of the Offer was received will be used by the Borrower on the Mandatory Prepayment Date to repay any outstanding Revolving Loans until such Revolving Loans are repaid; provided that such repayments of the Revolving Loans shall not reduce the Total Revolving Commitments.  Any amount of such Prepayment Amount remaining after repaying the Revolving Loans in full may be used by the Borrower as it elects in accordance with this Agreement.

2.18. Conversion and Continuation Options.  (a)  The Borrower may elect from time to time to convert Eurodollar Loans to Base Rate Loans by giving the Administrative Agent prior irrevocable notice, in substantially the form attached hereto as Exhibit K, of such election no later than 12:00 Noon, New York City time, on the Business Day preceding the proposed conversion date, provided that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto.  The Borrower may elect from time to time to convert Base Rate Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 12:00 Noon, New York City time, on the third (3rd) Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), provided that no Base Rate Loan under a particular Facility may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Administrative Agent or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such conversions.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)    Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, provided that no Eurodollar Loan under a particular Facility may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such continuations, and provided, further, that if the Borrower shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to Base Rate Loans on the last day of such then expiring Interest Period.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.19. Limitations on Eurodollar Tranches.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of

34

Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof and (b) no more than ten Eurodollar Tranches shall be outstanding at any one time.

2.20. Pro Rata Treatment, etc.

(a)     Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any commitment fee and any reduction of the Commitments of the Lenders shall be made pro rata according to the respective First Priority Term Percentages or Revolving Commitment Percentages, as the case may be, of the relevant Lenders.

(b)     Each payment (including each prepayment) by the Borrower on account of principal and interest on the First Priority Term Loans shall be made pro rata according to the respective outstanding principal amount of the First Priority Term Loans then held by the First Priority Term Lenders (except as otherwise provided in Section 2.17(d)).  The amount of each principal prepayment of the First Priority Term Loans shall be applied to reduce the then remaining scheduled installments of First Priority Term Loans pro rata based upon the respective then remaining principal amounts thereof; provided that, at the Borrower's option, any such prepayment of the First Priority Term Loans may be applied to the scheduled principal installments of the First Priority Term Loans occurring in the first 24 months following the date of such payment in direct order of maturity and then to ratably reduce all remaining scheduled installments thereof.  Amounts prepaid on account of the First Priority Term Loans may not be reborrowed.

(c)     Each payment (including each prepayment) by the Borrower on account of principal or interest on the Revolving Loans shall be made pro rata according to the respective outstanding principal amounts of the Revolving Loans then held by the Revolving Lenders.

(d)     All payments by the Borrower hereunder and under the Notes shall be made in Dollars in immediately available funds at the Funding Office of the Administrative Agent by 2:00 P.M., New York City time, on the date on which such payment shall be due, provided that if any payment hereunder would become due and payable on a day other than a Business Day such payment shall become due and payable on the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.  Interest in respect of any Loan hereunder shall accrue from and including the date of such Loan to but excluding the date on which such Loan is paid in full.

(e)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a Borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent  submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three (3) Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount

with interest thereon at the rate per annum applicable to Base Rate Loans under the relevant Facility, on demand, from the Borrower, such recovery to be without prejudice to the rights of the Borrower against any such Lender.

(f)    Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount.  If such payment is not made to the Administrative Agent by the Borrower within three (3) Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate.  Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

2.21. Requirements of Law.  (a)  If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority, in each case, made subsequent to the date hereof:

(i)    shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any Application or any Eurodollar Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.22 and changes in the rate of tax on the overall net income of such Lender);

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate; or

(iii)    shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount that such Lender deems to be material, of making, converting into, continuing or maintaining Eurodollar Loans or issuing or participating in Letters of Credit or Swingline Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender or such corporation could have achieved but for

such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)    A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error.  Notwithstanding anything to the contrary in this Section, the Borrower shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than 180 days prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such 180 days period shall be extended to include the period of such retroactive effect.  The obligations of the Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.22. Taxes.  (a)  All payments made by the Borrower under this Agreement and the other Loan Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes, gross receipt taxes (imposed in lieu of net income taxes) and franchise taxes (imposed in lieu of net income taxes) imposed on the Administrative Agent, the Fronting Bank or any Lender as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent, the Fronting Bank or such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document).  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") or Other Taxes are required to be withheld from any amounts payable to the Administrative Agent, the Fronting Bank or any Lender hereunder, the amounts so payable to the Administrative Agent, the Fronting Bank or such Lender shall be increased to the extent necessary to yield to the Administrative Agent, the Fronting Bank or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement, provided, however, that the Borrower shall not be required to increase any such amounts payable to any Lender with respect to any Non-Excluded Taxes (i) that are attributable to such Lender's failure to comply with the requirements of paragraph (d) or (e) of this Section or (ii) that are United States withholding taxes imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to this paragraph.

(b)    In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for its own account or for the account of the Fronting Bank or the relevant Lender, as the case may be, a certified copy of an original official receipt received, if any, by the Borrower or other documentary evidence showing payment thereof.  If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, the Borrower shall indemnify the Administrative Agent, the

Fronting Bank or the Lenders for any such taxes and for any incremental taxes, interest or penalties that may become payable by the Administrative Agent or the Fronting Bank or any Lender as a result of any such failure.

(d)    Each Lender (or Transferee) that is not a "U.S. Person" as defined in Section 7701(a)(30) of the Code (a "Non-U.S. Lender") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two copies of either U.S. Internal Revenue Service Form W-8BEN, Form W-8ECI or W-81MY (and all necessary attachments), or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit J and a Form W-8BEN, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Borrower under this Agreement and the other Loan Documents.  Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation).  In addition, each Non-U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender.  Each Non-U.S. Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose).  Notwithstanding any other provision of this paragraph, a Non-U.S. Lender shall not be required to deliver any form pursuant to this paragraph that such Non-U.S. Lender is not legally able to deliver.

(e)    A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, provided that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

(f)    If the Administrative Agent, the Fronting Bank or any Lender determines, in its sole discretion, that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.22, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.22 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent, the Fronting Bank or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent, the Fronting Bank or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent, the Fronting Bank or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent, the Fronting Bank or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

38

(g)      The agreements in this Section 2.22 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.23. <u>Indemnity</u>.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment or conversion of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market.  A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error.  Notwithstanding anything to the contrary in this Section, the Borrower shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than 180 days prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; <u>provided</u> that, if the circumstances giving rise to such claim have a retroactive effect, then such 180 days period shall be extended to include the period of such retroactive effect.  This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.24. <u>Change of Lending Office</u>.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.21 or 2.22(a) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; <u>provided</u> that such designation is made on terms that, in the good faith judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and <u>provided</u>, <u>further</u>, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.21 or 2.22(a).

2.25. <u>Fees</u>.

(a)      The Borrower shall pay to the Administrative Agent, for the account of each Revolving Lender, a commitment fee (the "<u>Commitment Fee</u>") for the period commencing on the Closing Date to the Termination Date, computed at the Commitment Fee Rate on the average daily amount of the Available Revolving Commitment of such Lender during the period for which payment is made, payable in arrears on each Fee Payment Date commencing on the first such date to occur after the Closing Date.

(b)      The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in any fee agreements with the Administrative Agent and to perform any other obligations contained therein.

39

2.26. <u>Letter of Credit Fees</u>.  The Borrower shall pay with respect to each Letter of Credit (a) to the Administrative Agent for the ratable benefit of the Revolving Lenders, a fee on all outstanding Letters of Credit calculated from and including the date of issuance of such Letter of Credit to the expiration or termination date of such Letter of Credit at a rate per annum equal to the Applicable Margin then in effect with respect to Eurodollar Loans under the Revolving Facility and (b) to the Fronting Bank for its own account a fronting fee of 0.25% per annum (or such lesser amount as may be agreed to by the applicable Fronting Bank) on the undrawn and unexpired amount of each Letter of Credit (calculated, in the case of any Letter of Credit denominated in an Alternative Currency, on the basis of the Exchange Rate in effect on the date payment of such fee is due).  Accrued fees described in the foregoing sentence of this Section in respect of each Letter of Credit shall be due and payable quarterly in arrears on each Fee Payment Date, commencing on the first such date to occur after the date hereof.

2.27. <u>Nature of Fees</u>.  All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent (for the respective accounts of the Administrative Agent, the Fronting Bank and the Lenders), as provided herein.  Once paid, none of the Fees shall be refundable under any circumstances.

2.28. <u>Priority and Liens</u>.

(a)    The Loan Parties hereby covenant, represent and warrant that, upon entry of the DIP Refinancing Order and the repayment of the obligations outstanding under the Existing DIP Agreement, the Obligations of the Loan Parties hereunder and under the other Loan Documents and the DIP Refinancing Order, (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed Superpriority Claims, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall be secured by a perfected first priority Lien on, and security interest in, all present and after-acquired property of the Debtors not subject to a valid, perfected and non-avoidable lien or security interest in existence on the Petition Date or to a valid lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b) (but excluding the Borrower's and the Guarantors' rights in respect of avoidance actions under the Bankruptcy Code and the proceeds thereof); (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected junior Lien on, and security interest in, all present and after-acquired property of the Debtors that is otherwise subject to a valid, perfected and non-avoidable lien or security interest in existence on the Petition Date or a valid lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b), and (iv) pursuant to Section 364(d) of the Bankruptcy Code, shall be secured by a perfected first priority priming lien on, and security interest in, all present and after-acquired property of the Debtors that is subject to replacement liens granted pursuant to and under the Cash Collateral Order in respect of the Calpine Second Lien Debt (as defined in the Cash Collateral Order), which security interests and liens in favor of the Collateral Agent shall be senior to such replacement liens , subject and subordinate in each case with respect to subclauses (i) through (iv) above, only to, in the event of the occurrence and during the continuance of an Event of Default, the payment of (A) unpaid fees and expenses of professionals retained by the Debtors or any official committee (each a "<u>Committee</u>") appointed in accordance with Section 1102 of the Bankruptcy Code and the reasonable expenses of members of any Committee or otherwise that are (I) incurred prior to the occurrence and continuance of such Event of Default and (II) allowed by the Bankruptcy Court, at any time, under sections 105(a), 330, 331 and 503(b)(3) of the Bankruptcy Code, (B) unpaid fees and expenses of professionals retained by the Debtors or any Committee and the reasonable expenses of members of any Committee up to an aggregate amount not to exceed $50,000,000 that (I) are incurred after the occurrence and during the continuance of such Event of Default and (II) allowed by the Bankruptcy Court, at any time, under Sections 105(a), 330, 331 and 503(b)(3) of the Bankruptcy Code or otherwise, (C) in the event of a conversion of the Cases, the reasonable fees and expenses of a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $2,000,000, and (D) fees

40

required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. §1930(a) (collectively, the "Carve-Out"), provided, however that the Carve-Out shall not include any fees or expenses incurred in challenging the Liens or Superpriority Claims of the Collateral Agent, Administrative Agent or Lenders granted under the Existing DIP Agreement or any of the documents, instruments or agreement executed or delivered in connection therewith, this Agreement, the Security and Pledge Agreement and the DIP Refinancing Order (it being understood that, in the event of (i) a liquidation of the Borrower's and the other Debtors' estates, (ii) the occurrence of the effective date of a Reorganization Plan or (iii) the consummation of the sale of all or substantially all of the Borrower's or the other Debtors' assets, an amount equal to the Carve-Out shall be reserved from the proceeds of such liquidation, such Reorganization Plan, such sale or from cash held in the estates at such time, and held in a segregated account prior to the making of the distributions); provided, further, however, no Loan Party shall be required to pledge to the Collateral Agent (i) in excess of 65% of the voting Capital Stock of its direct Foreign Subsidiaries or any of the Capital Stock or interests of its indirect Foreign Subsidiaries if adverse tax consequences would result to the Borrower from such pledge, (ii) the Capital Stock of Calpine Pasadena Cogeneration, Inc. and Calpine Texas Cogeneration, Inc., to the extent the pledge thereof is prohibited by the documents governing the leveraged lease transaction under which Pasadena Cogeneration L.P. is the facility lessee, and such entities are not Debtors, (iii) the Capital Stock of Androscoggin Energy, LLC, Bethpage Energy Center 3, LLC, Calpine Canada Energy Finance ULC, Calpine Canada Energy Ltd., Calpine Merchant Services Company, Inc., Calpine Newark, LLC, Calpine Parlin, LLC and CPN Insurance Corporation, (iv) the stock of any Subsidiary that is not a Debtor owned by any Subsidiary that becomes a Debtor after the Closing Date to the extent such pledge would constitute a default under project documents, result in a right of refusal, call or put options being activated, or to the extent such entity is a debtor in another bankruptcy case in another jurisdiction, or insurance company or such grant of a security interest is prohibited by, or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument, other document or any applicable shareholder or similar agreement relating thereto or conflicts with any applicable law and (v) any of the assets of O.L.S. Energy-Agnews, Inc., Broad River Energy LLC, South Point Energy Center LLC, Calpine Greenleaf Holdings, Inc., Calpine Greenleaf, Inc. or Calpine Monterey Cogeneration, Inc.  For clarity, the Administrative Agent and Lenders agree that so long as no Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay compensation and reimbursement of fees and expenses allowed and payable under Bankruptcy Code Sections 105(a), 330, and 331, as the same may be due and payable, and neither such amounts nor any retainers paid to the professionals retained by the Debtors or any Committee, nor any fees, expenses, indemnities or other amounts paid to any Agent, Lender or their respective attorneys and agents under this Agreement, shall reduce the Carve-Out, provided that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (ii) and (iii) above, and provided, further, that cash or other amounts on deposit in the L/C Cash Collateral Account shall not be subject to the Carve-Out.

> (b)    The Loan Parties hereby covenant, represent and warrant that, upon entry of the DIP Refinancing Order and the repayment of the CalGen Prepetition Secured Obligations, the Obligations of the Loan Parties hereunder and the other Loan Documents shall be secured by a perfected first priority Lien on, and security interest in, all present and hereafter acquired property of the CalGen Parties that secured the CalGen Prepetition Secured Obligations; provided that the Liens of the Collateral Agent and the Lenders hereunder on such property shall rank junior to the Liens of the holders of the CalGen Prepetition Secured Obligations that secure the CalGen Makewhole Payment until the earlier to occur of (x) the date that the CalGen Order shall have become a Final Order and (y) the CalGen Makewhole Payment shall have been satisfied in full.

> (c)    As to all Collateral, each Loan Party hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Collateral Agent all

of the right, title and interest of the Borrower and such Guarantor in all of such Collateral. The Borrower and each Guarantor acknowledges that, pursuant to the DIP Refinancing Order, the Liens granted in favor of the Collateral Agent (on behalf of the Lenders) in all of the Collateral shall be perfected without the recordation of any Uniform Commercial Code financing statements, notices of Lien or other instruments. The Borrower and each Guarantor further agrees that (a) the Collateral Agent shall have the rights and remedies set forth in the Security and Pledge Agreement in respect of the Collateral and (b) if requested by the Collateral Agent, the Borrower and each of the Guarantors shall enter into separate security agreements, pledge agreements and fee and leasehold mortgages with respect to such Collateral on terms reasonably satisfactory to the Collateral Agent.

      2.29. <u>Security Interest in L/C Cash Collateral Account</u>. Pursuant to Section 364(c)(2) of the Bankruptcy Code, the Loan Parties hereby assign and pledge to the Collateral Agent (for the ratable benefit of the Lenders and as security for the Obligations), and hereby grant to the Collateral Agent (for the ratable benefit of the Lenders) a first priority security interest, senior to all other Liens, if any, in all of the Loan Parties' right, title and interest in and to the L/C Cash Collateral Account and any direct investment of the funds contained therein.

      2.30. <u>Payment of Obligations</u>. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

      2.31. <u>No Discharge; Survival of Claims</u>. The Borrower and each Guarantor agrees that to the extent its Obligations hereunder are not satisfied in full, (a) its Obligations arising hereunder shall not be discharged by the entry of a Confirmation Order (and each Loan Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the DIP Refinancing Order and described in Section 2.28 and the Liens granted to the Collateral Agent pursuant to the DIP Refinancing Order and described in Section 2.28 shall not be affected in any manner by the entry of a Confirmation Order.

      2.32.    <u>Conversion to Exit Facility Agreement</u>. Upon the satisfaction or waiver of the conditions precedent to effectiveness set forth in the Exit Facility Agreement, automatically and without any further consent or action required by the Administrative Agent, the Collateral Agent, the Joint Lead Arrangers or any Lender, (i) the Borrower, in its capacity as reorganized Calpine Corporation, and each Guarantor, in its capacity as a reorganized Debtor, shall assume all obligations in respect of the Loans hereunder and all other monetary obligations in respect hereof, (ii) each Loan hereunder shall be continued as a Loan under the Exit Facility Agreement, (iii) each Lender hereunder shall be a Lender under the Exit Facility Agreement and (iv) this Agreement shall terminate and be superseded and replaced by, and deemed amended and restated in its entirety in the form of, the Exit Facility Agreement (with such changes reasonably satisfactory to the Administrative Agent and the Borrower thereto deemed incorporated as necessary to make such technical changes necessary to effectuate the intent of this Section 2.32), and the Commitments hereunder shall terminate. Notwithstanding the foregoing, all obligations of the Borrower and the Guarantors to the Agents, the Joint Lead Arrangers, the Fronting Bank and the Lenders under this Agreement and any other Loan Document (except the Exit Facility Agreement) which are expressly stated in this Agreement or such other Loan Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect.

      2.33.    <u>Incremental Term Loans</u>.

42

(a)    The Borrower may at any time and from time to time after the Closing Date, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request one or more additional tranches of term loans (the "Incremental Term Loans"); provided that (i) the proceeds of such Incremental Term Loans shall be applied to repay secured debt, secured lease obligations or preferred securities of any project level Subsidiary, so long as the assets of such Subsidiary (to the extent such Liens are not prohibited by contractual restrictions existing as of the Closing Date and then in effect), and the equity interests in such Subsidiary and each intermediate holding company between such Subsidiary and the Borrower (to the extent Liens on the equity interests of such intermediate holding company are not prohibited by contractual restrictions existing as of the Closing Date and then in effect) shall be, upon such repayment, included as Collateral, in each case except to the extent set forth on Schedule 2.33 annexed hereto (it being understood that to the extent that any such Liens on such assets are prohibited by contractual restrictions existing as of the Closing Date and then in effect, the Borrower shall not permit any additional consensual Liens on such assets), (ii) at the time that any such Incremental Term Loan is made (immediately after giving effect thereto), no Default or Event of Default shall have occurred and be continuing, (iii) the Borrower shall be in compliance with the covenants set forth in Section 6.15 determined on a pro forma basis as of the date of such Incremental Term Loan and the last day of the most recent fiscal period of the Borrower for which financial statements have been provided, in each case, as if such Incremental Term Loans had been outstanding on the last day of such fiscal quarter of the Borrower for testing compliance therewith and after giving effect to any other customary and appropriate pro forma adjustment events, including any acquisitions or dispositions after the beginning of the relevant fiscal quarter but prior to or simultaneous with the borrowing of such Incremental Term Loan, (iv) all fees and expenses owing in respect of such increase to the Agents and the Lenders shall have been paid, (v) if the Applicable Margin with respect to such Incremental Term Loans shall be higher than the Applicable Margin then in effect for the First Priority Term Loans plus 0.50%, such Applicable Margin with respect to the First Priority Term Loans shall be automatically adjusted to be equal to the relevant Applicable Margin relating to such Incremental Term Loans; (vi) S&P and Moody's shall have reaffirmed (with no negative outlook) the ratings then in effect for the Facilities, after taking into account the incurrence of such Incremental Term Loans; provided that no such rating affirmation shall be required with respect to any issuance of Incremental Term Loans unless such Incremental Term Loans would cause the aggregate amount of Incremental Term Loans incurred pursuant to this Section 2.33 to exceed $500,000,000 or each increment of $500,000,000 of Incremental Term Loans incurred pursuant to this Section 2.33 and (vii) the other terms and conditions in respect of such Incremental Term Loans (other than pricing and amortization), to the extent not consistent with the Facilities, shall otherwise be reasonably satisfactory to the Administrative Agent; provided that clauses (v) and (vi) shall not be applicable to Incremental Term Loans incurred to repay secured debt, secured lease obligations or preferred securities described on Schedule 2.33. Each tranche of Incremental Term Loans shall be in an aggregate principal amount that is not less than $25,000,000 (provided that such amount may be less than $25,000,000 if such amount represents all remaining availability under the limit set forth in paragraph (c) below). The Incremental Term Loans (a) shall rank pari passu in right of payment and of security with the First Priority Term Loans, (b) shall mature concurrently with the First Priority Term Loans and (c) for purposes of repayments shall be treated substantially the same as the First Priority Term Loans (including with respect to mandatory and voluntary prepayments and scheduled amortization). Each notice from the Borrower pursuant to this Section 2.33 shall set forth the requested amount and proposed terms of the relevant Incremental Term Loans. Incremental Term Loans may be made by any existing Lender (and each existing First Priority Term Lender will have the right, but not an obligation, to make a portion of any Incremental Term Loan or by any other bank or other financial institution (any such other bank or other financial institution being called a "New Lender"); provided that the Administrative Agent shall have consented (such consent not to be unreasonably withheld) to such Lender or New Lender making such Incremental Term Loans if such consent would be required under Section 10.6 for an assignment of First Priority Term Loans to such Lender or New Lender. Commitments in respect of Incremental Term Loans shall become Commitments

under this Agreement pursuant to an amendment (an "Incremental Commitment Supplement") substantially in the form of Exhibit L to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, the Guarantors, each Lender agreeing to provide such Commitment, if any, each New Lender, if any, and the Administrative Agent. An Incremental Commitment Supplement may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provision of this Section 2.33.

(b)    The effectiveness of any Incremental Term Loans permitted by this Section 2.33 shall be subject to the satisfaction of each of the conditions set forth in Section 4.2 and such other conditions as the parties thereto shall agree.

(c)    Notwithstanding anything to the contrary in this Section 2.33, (i) in no event shall the amount of the Incremental Term Loans permitted by this Section 2.33 exceed $2,000,000,000 in the aggregate and (ii) no Lender shall have any obligation to make an Incremental Term Loan unless it agrees to do so in its sole discretion.

## SECTION 3

## REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make Extensions of Credit hereunder, the Borrower and each of the Guarantors jointly and severally represent and warrant on each date required pursuant to Section 4 to each Lender as follows:

3.1.    <u>Organization and Authority</u>.  Each Loan Party (a) is duly organized and validly existing under the laws of the state of its organization or incorporation and is duly qualified as a foreign corporation and is in good standing in the jurisdiction of its organization and in each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except in each case, in which the failure to so qualify, could not reasonably be expected to have a Material Adverse Effect; (b) subject to the entry by the Bankruptcy Court of the DIP Refinancing Order, has the requisite corporate or limited liability company power and authority, as the case may be, to effect the transactions contemplated hereby and by the other Loan Documents, and (c) subject to the entry by the Bankruptcy Court of the DIP Refinancing Order, has all requisite corporate or limited liability company power and authority and the legal right to own and operate its properties, to lease the properties it operates as lessee and to conduct its business as now or currently proposed to be conducted and to pledge and mortgage its properties as required by the Loan Documents.

3.2.    <u>Due Execution; Binding Obligation</u>.  Upon entry by the Bankruptcy Court of the DIP Refinancing Order, the execution, delivery and performance by the Loan Parties of each of the Loan Documents to which it is a party, and the commencement of the Cases (i) are within the respective corporate or limited liability company powers of each Loan Party, as the case may be, have been duly authorized by all necessary corporate or limited liability company action, as the case may be, including the consent of shareholders or member(s) where required, and do not (A) contravene the charter, by-laws or other organizational documents of any Loan Party, (B) violate any applicable law (including without limitation, the Securities Exchange Act of 1934) or regulation (including without limitation, Regulation U or X of the Board of Governors), or any order or decree of any Governmental Authority binding on any such Loan Party, in each case, which could reasonably be expected to have a Material Adverse Effect, (C) conflict with or result in a breach of, or constitute a default under, any material Contractual Obligation of any Loan Party entered into on or after the Petition Date, including any material indenture, mortgage or deed of trust entered into on or after the Petition Date, any material provision of any security issued by

any Loan Party on or after the Petition Date or any material lease, agreement, instrument or other undertaking entered into on or after the Petition Date binding on any Loan Party or any of their properties, or (D) result in or require the creation or imposition of any Lien upon any of the property of any Loan Party other than the Liens permitted or granted pursuant to this Agreement, the other Loan Documents or the DIP Refinancing Order; and (ii) do not require the consent, authorization by or approval of or notice to or filing or registration with any Governmental Authority (other than the entry of the DIP Refinancing Order). Upon entry by the Bankruptcy Court of the DIP Refinancing Order, this Agreement has been duly executed and delivered by each Loan Party. This Agreement is, and each of the other Loan Documents to which each Loan Party is or will be a party, when delivered hereunder or thereunder, and upon entry and subject to the terms of the DIP Refinancing Order, will be, a legal, valid and binding obligation of each Loan Party enforceable against each Loan Party in accordance with its terms and the DIP Refinancing Order.

      3.3.  <u>Statements Made</u>.  The statements, written or oral, which have been made by any Loan Party to the Administrative Agent, any of the Lenders or to the Bankruptcy Court in connection with any Loan Document, and any financial statement delivered pursuant hereto or thereto (other than to the extent that any such statements constitute projections or other forward-looking statements), taken as a whole and in light of the circumstances in which made, contain no untrue statement of a material fact and do not omit to state a material fact necessary to make such statements not misleading in any case, which have not been, prior to the date hereof, corrected, supplemented, or remedied by subsequent documents furnished or statements made orally or in writing to the Administrative Agent, Lenders or the Bankruptcy Court (as appropriate); and, to the extent that any such written statements constitute projections or other forward-looking statements, such projections or other forward-looking statements were prepared in good faith on the basis of assumptions, methods, data, tests and information believed by such Loan Party to be valid and accurate in all material respects at the time such projections were furnished to the Administrative Agent, any Lender or the Bankruptcy Court; it being understood that (i) any such Projections and Budgets and other forward-looking statements furnished to the Administrative Agent and the Lenders is forward-looking information subject to significant uncertainties and contingencies, which may be beyond the Borrower's or Guarantors' control, (ii) no assurance is given by the Borrower or the Guarantors that such forecasts and projections and other forward-looking information furnished to the Administrative Agent or the Lenders will be realized, (iii) the actual results may differ from such Projections, Budgets and other forward-looking information furnished to the Lenders and (iv) such differences may be material.

      3.4.  <u>Financial Statements</u>.  The Borrower has furnished the Administrative Agent and the Lenders with copies of (i) consolidated audited financial statements of the Global Entities for the fiscal year ended [December 31, 2006], (ii) consolidated unaudited financial statements of the Global Entities for the fiscal quarter ended _____ __, 200_ and (iii) unaudited consolidating financial statements of the Material Subsidiaries for the fiscal quarter ended _____ __, 200_.  All such financial statements are complete and correct and fairly present in all material respects the financial condition of the Global Entities or Material Subsidiaries, as applicable, as at such dates and the results of their operations for the fiscal periods ended on such dates (in the case of any unaudited financial statement, subject to year-end audit adjustments and the absence of footnotes) all in accordance with GAAP applied on a consistent basis.  Except as set forth on Schedule 3.4 and as referred to or provided in the balance sheet referred to above, the Borrower and the Material Subsidiaries, as a whole, do not have on the date hereof any material liabilities or liabilities for taxes.  Since the Petition Date, there has not occurred, or become known, any event or condition that has had, or could reasonably be expected to have, a Material Adverse Effect, other than those events which customarily occur following the commencement of a case under Chapter 11 of the Bankruptcy Code.

3.5.  Loan Parties.  Except as disclosed to the Administrative Agent and the Lenders by the Borrower in writing from time to time after the Closing Date, (a) Schedule 3.5 sets forth the name, Petition Date, location of chief executive office, location of Inventory and Equipment (as each such term is defined in the New York UCC) (other than Inventory or Equipment that is temporarily absent for maintenance, repair, refurbishment or bona fide business purposes in the ordinary course of business or is in transit between locations set forth on Schedule 3.5) and jurisdiction of incorporation of each Loan Party and, as to each such Loan Party, the percentage of each class of Capital Stock owned by such Loan Party and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options or restricted stock granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of any Material Subsidiary, except as created by the Loan Documents or other Permitted Liens.

3.6.  Title to Assets; Liens.

(a)    As of the Closing Date, each of the Credit Parties has good and marketable title (subject only to Permitted Liens) to the material properties shown to be owned by the Credit Parties on the Borrower's balance sheet as of _____ __, 200_, except for properties subject to Dispositions which were permitted under the Existing DIP Agreement.  Each of the Credit Parties owns and has on the date hereof good and marketable title or subsisting leasehold interests subject to Permitted Liens to, and enjoys on the date hereof peaceful and undisturbed possession of, all such material properties that are necessary for the operation and conduct of its businesses.

(b)    There are no Liens of any nature whatsoever on any assets of any Credit Party other than: (i) Liens granted pursuant to the DIP Refinancing Order, this Agreement and the Security and Pledge Agreement and (ii) other Permitted Liens.  No Credit Party is party to any contract, agreement, lease or instrument entered into on or after the Petition Date the performance of which, either unconditionally or upon the happening of an event, will result in or require the creation of a Lien that is not a Permitted Lien on any assets of such Credit Party in violation of this Agreement, the DIP Refinancing Order or the Security and Pledge Agreement.

3.7.  No Default.  No "Voting Rights Trigger Event", defaults, events of default or similar events have occurred under the Preferred Equity Documents, except to the extent that (x) any such "Voting Rights Trigger Event" occurred solely as a result of the commencement of the Cases and has been stayed and not exercised or (y) any such "Voting Rights Trigger Event", default, event of default or similar event has not resulted in a change of control or similar event at CCFC Preferred Holdings, LLC or any of its Subsidiaries or in a foreclosure or acceleration action by lenders of Indebtedness of CCFC Preferred Holdings, LLC or any of its Subsidiaries.

3.8.  Approvals.  Except for the DIP Refinancing Order, no Authorizations of any Governmental Authority, or any applicable securities exchange, are necessary for the execution, delivery or performance by each Loan Party of the Loan Documents to which it is a party, or for the legality, validity or enforceability hereof or thereof.

3.9.  The DIP Refinancing Order.  As of the date of the making of any Extension of Credit hereunder, the DIP Refinancing Order has been entered and has not been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect (except in accordance with the terms hereof).

3.10.  Use of Proceeds.  The proceeds of the First Priority Term Loans shall be used (a) to refinance the obligations under the Existing DIP Agreement, (b) to repay and redeem the CalGen Prepetition Secured Obligations, (c) to refinance in full secured debt and secured lease obligations of any

Subsidiary of the Borrower and preferred securities existing on the Closing Date listed on Schedule 3.10 and (d) for working capital and other general corporate purposes of the Loan Parties and, to the extent permitted by this Agreement, their Subsidiaries. The proceeds of the Revolving Facility shall be used (a) for working capital and other general corporate purposes of the Loan Parties and, to the extent permitted by this Agreement, their Subsidiaries, (b) at the Borrower's election, to satisfy the CalGen Makewhole Payment, if any, and (c) to fund distributions to holders of claims payable pursuant to a Reorganization Plan confirmed by the Bankruptcy Court pursuant to the Confirmation Order in any of the Cases.

3.11. <u>Disclosed Matters</u>.  Except as disclosed in writing to the Administrative Agent and the Lenders prior to the date hereof, to each Loan Party's knowledge there are no unstayed legal or arbitral proceedings, or any proceedings or investigation by or before any governmental or regulatory authority or agency, pending or threatened in writing to any Loan Party, or (to the actual knowledge of the Borrower) threatened against any Loan Party which is reasonably likely to be determined adversely and if so determined would have a Material Adverse Effect or that seek to enjoin or delay any of the transactions contemplated hereby.

3.12. <u>Federal Regulations</u>.  No part of the proceeds of any Loans, and no other Extensions of Credit hereunder, will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board of Governors.  If requested by any Lender or the Administrative Agent in order to comply with any Requirement of Law, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

3.13. <u>Compliance with Law</u>.  No Credit Party is in violation of any applicable law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, the violation of which, or a default with respect to which, could reasonably be expected to have a Material Adverse Effect.

3.14. <u>Taxes</u>.  Each Credit Party has filed or caused to be filed all Federal and state income tax and other material tax returns that are required to be filed and subject to extension periods has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Credit Party); no tax Lien has been filed, and, to the knowledge of the Borrower, no claim is being asserted, with respect to any such tax, fee or other charge.

3.15. <u>ERISA</u>.  Except as, individually or in the aggregate, does not or could not reasonably be expected to result in a Material Adverse Effect:  neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Plan, and each Plan has complied in all respects with the applicable provisions of ERISA and the Code; no termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period; the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits; neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan; neither the Borrower nor any Commonly Controlled Entity would become subject to any liability under

ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made; and no such Multiemployer Plan is in ERISA Reorganization or Insolvent.

   3.16. <u>Environmental Matters; Hazardous Material</u>.  Except as in the aggregate, could not reasonably be expected to result in a Material Adverse Effect:

    (a) the facilities and properties owned, leased or operated by any Credit Party (the "<u>Properties</u>") do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute a violation of, or could give rise to liability under, any Environmental Law;

    (b) no Credit Party has received or is aware of any written notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters arising under or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Credit Party (the "<u>Business</u>"), nor does the Borrower have knowledge or reason to believe that any such notice will reasonably be expected to be received or is being threatened;

    (c) Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that would reasonably be expected to give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that would reasonably be expected to give rise to liability under, any applicable Environmental Law;

    (d) no judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Borrower, threatened, under any Environmental Law to which any Credit Party is or, to the knowledge of the Borrower, will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

    (e) there has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of any Credit Party in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws;

    (f) the Properties and all operations at the Properties are in compliance, and have in the last five years been in compliance, with all applicable Environmental Laws, and there is no Material of Environmental Concern at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the Business; and

    (g) no Credit Party has contractually assumed or, to the knowledge of the Borrower, assumed by operation of law any liability of any other Person under Environmental Laws.

   3.17. <u>Investment Company Act; Other Regulations</u>.  No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

3.18. Intellectual Property. Each Credit Party owns, or is licensed to use, all material Intellectual Property necessary for the conduct of its business as currently conducted ("Material Intellectual Property"). No claim has been asserted and is pending by any Person challenging or questioning the use of any Material Intellectual Property or the validity or effectiveness of any Material Intellectual Property, nor does the Borrower know of any valid basis for any such claim. The use of Intellectual Property by each Credit Party, to the knowledge of a Responsible Officer, does not infringe on the rights of any Person in any material respect.

3.19. Insurance. All policies of insurance of any kind or nature owned by or issued to each Credit Party, including without limitation, policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, employee health and welfare, title, property and liability insurance, are in full force and effect except to the extent commercially reasonably determined by the Borrower not to be necessary pursuant to the immediately succeeding clause or which is not material to the overall coverage and are of a nature and provide such coverage as in the reasonable opinion of the Borrower, is sufficient and as is customarily carried by companies of the size and character of the Credit Parties.

3.20. Labor Matters. Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Credit Party pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of each Credit Party have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from any Credit Party on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Credit Party.

3.21. Intercompany Balances. Set forth on Schedule 3.21 are the intercompany loans and other indebtedness of the Material Subsidiaries to the Borrower, including without limitation, the principal amount of any indebtedness shown on the consolidated books and records of the Borrower as being payable as of Petition Date of the Borrower by such Material Subsidiary without giving effect to any conversion of such indebtedness to an equity contribution by the Borrower and whether or not evidenced by a promissory note.

SECTION 4

CONDITIONS PRECEDENT

4.1. Conditions to the Closing Date. The occurrence of the Closing Date is subject to the satisfaction or waiver of the following conditions precedent:

(a)     Credit Agreement. The Administrative Agent shall have received this Agreement and the Security and Pledge Agreement, each executed and delivered by a duly authorized officer of each Loan Party.

49

(b)      Corporate Documents and Proceedings.  The Administrative Agent shall have received for each Loan Party on the Closing Date, a certificate of the Secretary or an Assistant Secretary or a duly authorized officer of each Loan Party dated the date of the initial Extension of Credit hereunder, in substantially the form attached hereto as Exhibit B, certifying (A) that attached thereto is a true and complete copy of resolutions adopted by the Board of Directors (or equivalent governing body) of such entity, authorizing the transactions contemplated hereby and (B) as to the incumbency and specimen signature of each officer (or other authorized signatory) of such entity executing this Agreement, the Notes to be executed by it and the Loan Documents or any other document delivered by it in connection herewith or therewith (such certificate to contain a certification by another officer (or other authorized representative) of such entity as to the incumbency and signature of the officer (or other authorized representative) signing the certificate referred to in this clause (b)).

(c)      DIP Refinancing Order.  The Administrative Agent and each of the Lenders shall have received a certified copy of the DIP Refinancing Order in respect of the Borrower, which shall authorize extensions of credit in amounts up to $7,000,000,000 and such DIP Refinancing Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, rescinded, modified or amended in any respect without the prior written consent of the Administrative Agent and the Required Lenders.  If such DIP Refinancing Order is the subject of a pending appeal in any respect, none of the making of any Extensions of Credit, the grant of Liens and Superpriority Claims pursuant to Sections 2.28 or 2.29 and the Security and Pledge Agreement (including, without limitation, Liens on the assets securing the CalGen Prepetition Secured Obligations) or the performance by the Borrower or any Guarantor subject to such DIP Refinancing Order of any of their respective obligations under any of the Loan Documents or under any instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(d)      Payment of Fees; Expenses.  The Borrower shall have paid or will pay contemporaneously with the making on the Closing Date of the Extensions of Credit by the Lenders to the Administrative Agent, each other Agent and each Lender, as applicable, the then unpaid balance of all accrued and unpaid Fees owed under and pursuant to this Agreement, or the DIP Refinancing Order and all amounts payable under Section 2.28(a) and all reasonable out-of-pocket expenses for which invoices have been presented to the Borrower and the official committee of unsecured creditors as required by the DIP Refinancing Order (including reasonable fees, disbursements and other charges of counsel and other advisors to the Administrative Agent, the other Agents and the Lenders on the Closing Date) on or before the Closing Date.  All such amounts will be paid with proceeds of Loans made on the Closing Date and will be reflected in the funding instructions given by the Borrower to the Administrative Agent on or before the Closing Date.

(e)      Legal Opinion.  The Administrative Agent shall have received the legal opinion of Kirkland & Ellis LLP, counsel to the Loan Parties, addressed to the Administrative Agent and the Lenders and otherwise substantially in the form of Exhibit E hereto.

(f)      Pledged Stock; Stock Powers; Pledged Notes.  The Collateral Agent shall have received (i) the certificates representing the shares of Capital Stock pledged pursuant to the Security and Pledge Agreement together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each promissory note (if any) pledged to the Collateral Agent pursuant to the Security and Pledge Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof, except in either case to the extent such certificates or promissory notes are in the possession of a collateral agent for the benefit of a pre-Petition Date obligation.

(g)    Projections. The Lenders shall have received the Projections, which shall be in form and substance reasonably satisfactory to the Joint Lead Arrangers.

(i)    Ratings. The Facilities shall have been rated by Moody's and S&P.

(j)    [Termination of Existing L/C Cash Collateral Account. The Existing L/C Cash Collateral Account shall have been terminated and the Collateral Agent shall have received all Collateral and the proceeds and product in the Existing L/C Cash Collateral Account and deposited such Collateral and the proceeds and product thereof in the L/C Cash Collateral Account.]

4.2.  Conditions to Each Extension of Credit. The obligation of the Lenders and the Fronting Bank to make each Extension of Credit, including the initial Extension of Credit, is subject to the following conditions precedent:

(a)    Notice. The Administrative Agent shall have received the applicable notice of borrowing, in substantially the form attached hereto as Exhibit C, from the Borrower or, in the case of a Letter of Credit, the Fronting Bank shall have received an L/C Application.

(b)    Representations and Warranties. All representations and warranties contained in or pursuant to this Agreement and the other Loan Documents, or otherwise made in writing in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of each Extension of Credit hereunder with the same effect as if made on and as of such date (unless stated to relate to a specific earlier date, in which case, such representations and warranties shall be true and correct in all material respects as of such earlier date) (it being understood that any representation or warranty that is qualified as to materiality or Material Adverse Effect shall be correct in all respects).

(c)    No Default or Event of Default. No Default or Event of Default shall have occurred and be continuing on such Borrowing Date or after giving effect to such Extension of Credit on such Borrowing Date.

(d)    Payment of Fees. The Borrower shall have paid or will simultaneously pay to the Administrative Agent and the Lenders the then unpaid balance of all accrued and unpaid Fees, expenses and other amounts then due and payable under and pursuant to this Agreement (including without limitation, amounts payable under Section 2.25(c)), or the DIP Refinancing Order for which invoices have been presented to the Borrower and the official committee of unsecured creditors as required by the DIP Refinancing Order.

The request by the Borrower for, and the acceptance by the Borrower of, each Extension of Credit and issuance of a Letter of Credit hereunder shall be deemed to be a representation and warranty by the Borrower that the conditions specified in this Section 4.2 have been satisfied or waived at that time.

SECTION 5

AFFIRMATIVE COVENANTS

Each of the Loan Parties hereby agrees that, so long as the Commitments remain in effect, any Extension of Credit remains outstanding and unpaid or any other Obligation is owing to any Lender or any Agent hereunder or under any other Loan Document (other than Letters of Credit, together with all fees that have accrued and will accrue thereon through the stated termination date of such Letters of Credit, which have been supported in the manner described in Section 2.8(b), contingent indemnification obligations for which no claim has been asserted, obligations with respect to interest rate