hedging agreements or Eligible Permitted Commodity Hedge Agreements or Cash Management Obligations), such Loan Party shall and the Borrower shall cause each of its Material Subsidiaries to:

       5.1.  <u>Financial Statements, Etc</u>.  In the case of the Borrower, deliver to the Administrative Agent:

       (a)    as soon as available and in any event within ninety (90) days (or, if agreed to by the Administrative Agent acting in its reasonable discretion, 105 days) after the end of each fiscal year commencing with the fiscal year ended December 31, 2006, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of operations, stockholders' equity and of cash flows for such year, setting forth in comparative form the corresponding consolidated figures for the preceding fiscal year, reported on without qualification arising out of the scope of the audit, by PricewaterhouseCoopers or another independent certified public accountants of nationally recognized standing; and

       (b)    as soon as available and in any event within forty-five (45) days (or if agreed to by the Administrative Agent acting in its reasonable discretion, sixty (60) days) after the end of each of the first three quarterly fiscal periods of each fiscal year, a copy of the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income in such quarter and of cash flows for the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the corresponding consolidated figures for the corresponding periods in the preceding fiscal year, accompanied by a certificate of a Responsible Officer, which certificate shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial condition and results of operations of the Borrower and its consolidated Subsidiaries, in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments and the absence of footnotes); and

       (c)    not later than thirty (30) days (or if agreed to by the Administrative Agent acting in its reasonable discretion, forty-five (45) days) after the end of each month, the unaudited consolidated balance sheet and the unaudited consolidated statement of income of the Borrower and its consolidated Subsidiaries for such fiscal month, together with a comparison to the relevant income projections contained in the Projections for the period through the end of such month, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal quarter-end and year-end audit adjustments and the absence of footnotes);

       (d)    as soon as available, but in any event on or prior to the last Business Day of each week (excluding the weeks in which the Thanksgiving or Christmas holiday occurs), an updated Budget for the succeeding 13-week period of the projected consolidated cash flows of the Borrower and its Subsidiaries (other than Foreign Subsidiaries), taken as a whole;

       (e)    no later than Wednesday of each week, a comparison of (i) actual net cash flows of the Borrower and its Subsidiaries (other than Foreign Subsidiaries) for the week most recently ended against (ii) projected net cash flows of the Borrower and its Subsidiaries (other than Foreign Subsidiaries) for such week most recently delivered pursuant to paragraph (d) above, in form and substance satisfactory to the Administrative Agent (including a detailed explanation of any material variances) certified (in the case of such actual net cash flows) by a Responsible Officer as being fairly stated in all material respects;

       (f)    on and after the DIP Refinancing Order Date, no later than 30 days after the end of each month, updated Projections reflecting any modifications made by management thereto since the delivery of any prior update thereof; and

       (g)      as soon as available, monthly statements for all bank accounts maintained by the Borrower with Union Bank of California and for all Investment accounts maintained by the Borrower with [Scudder Investments].

All such financial statements delivered pursuant to Sections 5.1(a), (b) and (c) shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods. The Borrower may provide the financial statements and other materials required to be furnished pursuant to this Section 5.1 by posting such financial statements and materials on a secure Intralinks site to which the Administrative Agent has access. If delivered to the Administrative Agent, the Administrative Agent will provide the financial statements and other materials required to be furnished pursuant to this Section 5.1 to the Lenders by posting such financial statements and materials on a secure Intralinks site.

       5.2.   <u>Certificates; Other Information</u>. In the case of the Borrower, deliver to the Administrative Agent and, in the case of clause (g) below, the applicable Lender:

       (a)      Concurrently with the delivery of the financial statements referred to in Section 5.1(a) for the 2006 fiscal year of the Borrower and thereafter, a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary thereof no knowledge was obtained of any Default or Event of Default pursuant to Sections 6.13, 6.15 or 6.16, except as specified in such certificate;

       (b)      concurrently with the delivery of the financial statements referred to in Sections 5.1(a), (b) and (c), a certificate of a Responsible Officer of the Borrower (i) stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default that has occurred and is continuing, except, in each case, as specified in such certificate and (ii) setting forth the calculations required to determine compliance with the covenants set forth in Section 6;

       (c)      promptly upon their becoming available, copies of all registration statements and regular periodic reports, if any, that any Loan Party shall have filed with the SEC (or any Governmental Authority which succeeds to the powers and functions thereof) or any national securities exchange;

       (d)      promptly following the delivery thereof to any Loan Party or to the Board of Directors or management of any Loan Party, a copy of any final management letter or report by independent public accountants with respect to the financial condition, operations or business of the Borrower and its Subsidiaries;

       (e)      to the Administrative Agent and counsel to the Administrative Agent, to the extent practicable at least one day prior to, and in any event no later than the day after, such filing or distribution, copies of all pleadings, motions, applications, judicial information, financial information and other documents to be filed by or on behalf of the Borrower or any of the Guarantors with the Bankruptcy Court or the United States Trustee in the Cases, or to be distributed by or on behalf of the Borrower or any of the Guarantors to any official committee appointed in the Cases (other than emergency pleadings, motions or other filings where, despite such Debtor's commercially reasonable efforts, such one-day notice is impracticable); <u>provided</u> that copies of pleadings, motions, applications, judicial information, financial information or other documents to be so filed by or on behalf of the Borrower or any of the Guarantors to the extent directly relating to this Agreement or any other Loan Documents, including, without limitation, any amendment, modification or supplement to this Agreement (or a waiver of the provisions thereof) or any other matter adversely affecting the liens, claims or rights of the Lenders under this Agreement or any other Loan Document in any material respect shall be delivered to the Administrative Agent and counsel to the Administrative Agent at least one day prior to such filing; and

53

    (f)     promptly upon request, such other material information (financial or otherwise, including without limitation, any Plan or Multiemployer Plan and any material reports or other material information required to be filed with any Governmental Authority by the Borrower or any Commonly Controlled Entity under ERISA) as may be reasonably requested by the Administrative Agent (on behalf of itself or any Lender).

The Borrower may provide the certificates and other information required to be furnished pursuant to this Section 5.2 by posting such certificates and information on a secure Intralinks site to which the Administrative Agent has access.  If delivered to the Administrative Agent, the Administrative Agent will provide the certificates and other information required to be furnished by the Borrower pursuant to this Section 5.2 (other than any information obtained by a Lender pursuant to paragraph (f)) to the Lenders by posting such certificates and other information on a secure Intralinks site.

    5.3.   Payment of Obligations.  In the case of any Loan Party, except in accordance with the Bankruptcy Code or by an applicable order of the Bankruptcy Court pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, (i) all its post-Petition Date taxes and other material obligations of whatever nature that constitute administrative expenses under Section 503(b) of the Bankruptcy Code in the Cases, except, so long as no material property (other than money for such obligation and the interest or penalty accruing thereon) of any Loan Party is in danger of being lost or forfeited as a result thereof, no such obligation need be paid if the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Loan Parties and (ii) all obligations arising prepetition permitted to be paid postpetition but prior to confirmation of a Reorganization Plan by order of the Bankruptcy Court that has been entered with the consent of (or non-objection by) the Administrative Agent.

    5.4.   Maintenance of Existence; Compliance with Contractual Obligations and Requirements of Law.  (a)  Preserve, renew and keep in full force and effect its legal existence, (b) take all reasonable action to maintain all rights, privileges and franchises reasonably necessary or desirable in the normal conduct of its business, except (i) as otherwise permitted pursuant to Section 6.4 and Section 6.5 or (ii) to the extent failure to do so could not reasonably be expected, in the aggregate, to have a Material Adverse Effect, and (c) subject to the effect of the Cases and the Bankruptcy Code, comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith could not reasonably be expected, in the aggregate, to have a Material Adverse Effect.

    5.5.   Maintenance of Property; Insurance.  Keep and maintain all of its property necessary to the conduct of its business in good working order and condition subject to ordinary wear and tear and obsolescence and from time to time make all needful and proper repairs, renewals, replacements, extensions, additions, betterments and improvements thereto, to the extent and in the manner useful or customary for companies in similar businesses, except where failure to do so could not reasonably be expected to have a Material Adverse Effect; maintain with financially sound and reputable insurance companies insurance policies (or, where appropriate, self-insurance) on all of its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are customarily insured against by companies of similar size engaged in the same or a similar business in the same geographic locale, which policies, in the case of any Loan Party, shall name the Collateral Agent as the loss payee or additional insured, as applicable, for the proceeds of any such first party policy, such as all risk property and business interruption coverage (other than workers' compensation, director and officer, automobile liability, health, medical and life insurance policies) except where failure to so maintain such insurance could not reasonably be expected to have a Material Adverse Effect; and furnish to the Collateral Agent, upon written request, full information as to the insurance carried.

5.6.  Inspection of Property; Books and Records; Discussions.  Keep proper books of records and accounts in which full, true and correct in all material respects entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities; and, upon reasonable prior notice to the Borrower through the Administrative Agent, permit representatives of either Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time or times during normal business hours and to discuss the business, operations, properties and financial and other condition of the Global Entities with officers and employees of the Global Entities and with their independent certified public accountants and with their financial advisors.

5.7.  Notices.  Promptly, and in any event within five (5) Business Days after a Responsible Officer becomes aware thereof (except as otherwise provided in (e) below), give notice to the Administrative Agent, with a copy for each Lender, of:

(a)     the occurrence of any Default or Event of Default;

(b)     any (i) default or event of default under any post-Petition Date Contractual Obligation of any Loan Party that could reasonably be expected to have a Material Adverse Effect; or (ii) litigation, investigation or proceeding which may exist at any time between a Credit Party and any Governmental Authority, which in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)     any post-Petition Date litigation (or in the case of any Material Subsidiary that is not a Debtor, any litigation) or proceeding affecting (i) any Credit Party an adverse determination in which could reasonably be expected to have a Material Adverse Effect, (ii) any Material Subsidiary an adverse determination in which could reasonably be expected to have a Material Adverse Effect or (iii) the ability of the Debtors to repay the CalGen Prepetition Secured Obligations, including with respect to any "makewhole", repayment, prepayment or call premiums or any contractual defaults or damages allegedly arising therefrom;

(d)     any adverse change, development or event, which could reasonably be expected to have a Material Adverse Effect;

(e)     the following events, as soon as practicable and in any event within thirty (30) days after any Credit Party knows or has reason to know thereof:  (i) the occurrence of any Reportable Event with respect to any Plan, a failure to make any required contribution to a Plan, the creation of any Lien in favor of the PBGC or a Plan or any withdrawal from, or the termination, ERISA Reorganization or Insolvency of, any Multiemployer Plan or (ii) the institution of proceedings or the taking of any other action by the PBGC or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, ERISA Reorganization or Insolvency of, any Plan in the case of each of the foregoing clauses (i) or (ii) where such event has had or could reasonably be expected to have a Material Adverse Effect; and

(f)     any written notices or other material indicating the presence or suspected presence of Materials of Environmental Concern on, at, or under any property of any Credit Party, or any part thereof, in violation of, or in a manner or condition that has resulted or is reasonably likely to result, in the reasonable judgment of a Responsible Officer of the Borrower, in the payment of a Material Environmental Amount.

55

Each notice pursuant to this subsection shall be accompanied or provided as soon as practicable thereafter by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower has taken or proposes to take with respect thereto.

5.8.  Environmental Laws.

(a)  Comply with, and take reasonable efforts to ensure compliance by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply with and maintain, and ensure that all tenants and subtenants obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws except where the failure to comply with the foregoing could not give rise to a Material Adverse Effect.

(b)  Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws except where the failure to comply with the foregoing could not give rise to a Material Adverse Effect and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities under applicable Environmental Laws; provided, however, the Borrower may use all lawful means to protest or challenge the imposition by any Governmental Authority of any requirements under any such lawful orders, directives or that otherwise arise under applicable Environmental Laws.

5.9.  Obligations and Taxes.  Pay all of their material obligations (or in the case of any Loan Party, any such obligations arising after the Petition Date) promptly and in accordance with their terms and pay and discharge promptly all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property (in the case of any Loan Party, such taxes, assessments and governmental charges and fines arising after the Petition Date) before the same shall become in default as well as all material lawful claims for labor, materials and supplies or otherwise (or in the case of any Loan Party, such claims arising after the Petition Date) which, if unpaid, would become a Lien or charge upon such properties or any part thereof; provided, however, that the Credit Parties shall not be required to pay and discharge or to cause to be paid and discharged any such obligation, tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings (if the Credit Parties shall have set aside on their books adequate reserves therefor in accordance with GAAP).

5.10. Employee Benefits.  Comply (and with respect to Plans covered by Title IV of ERISA, cause their respective Commonly Controlled Entities to comply) in all material respects with the applicable provisions of ERISA and the Code and other applicable laws, rules and regulations with respect to any Plan, the failure of which could reasonably be expected to result in a Material Adverse Effect.

5.11. Further Assurances.

(a)  In the case of any Loan Party, at the cost and expense of the Borrower, execute and file all such further documents and instruments, and perform such other acts, as the Administrative Agent or the Required Lenders may reasonably determine are necessary or advisable with respect to the Liens granted to the Collateral Agent in connection with this Agreement, the Security and Pledge Agreement and the DIP Refinancing Order (and with respect to the priority of such Liens purported to be granted pursuant to this Agreement and the DIP Refinancing Order).  Without limiting the generality of the foregoing, the Loan Parties shall assist the Administrative Agent, the Collateral Agent, and the Lenders in the preparation and filing of any Uniform Commercial Code financing statements or mortgages reasonably requested by the Collateral Agent, the Administrative Agent or the Required Lenders.

(b)    With respect to any Global Entity that is not a Foreign Subsidiary which becomes a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (other than the Subsidiaries of the Borrower listed on Schedule 5.11(b)), within 30 days after becoming a debtor, cause such Global Entity (i) to become a party to this Agreement, as a Guarantor, by executing a joinder to this Agreement in substantially the form attached hereto as Exhibit H (a "Joinder"); (ii) to execute and deliver to the Collateral Agent an assumption agreement to the Security and Pledge Agreement and such amendments to the Security and Pledge Agreement as the Collateral Agent deems necessary or advisable to grant to the Collateral Agent, for the benefit of the Lenders, a Lien on all of its assets of the type which would constitute Collateral; (iii) (A) as to any Global Entity which is a Material Subsidiary, (I) within 5 days after such Global Entity becomes a Debtor, the Administrative Agent shall have received satisfactory evidence of entry of an interim order, reasonably satisfactory to the Administrative Agent, granting the Superpriority Claim status and Liens described in Section 2.28 (such order, a "Subsequent Interim Order") in respect of such Global Entity and (II) within 40 days after such Global Entity becomes a Debtor, the Administrative Agent shall have received satisfactory evidence of entry a final non-appealable Bankruptcy Court order, reasonably satisfactory to the Administrative Agent, granting the Superpriority Claim status and Liens described in Section 2.28 which shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent (such order, a "Subsequent Final Order") in respect of such Global Entity; or (B) as to any Global Entity which is a not Material Subsidiary, (I) within 30 days after such Global Entity becomes a Debtor, the Administrative Agent shall have received satisfactory evidence of entry of a Subsequent Final Order in respect of such Global Entity and (II) within 55 days after such Global Entity becomes a Debtor, the Administrative Agent shall have received satisfactory evidence of entry a Subsequent Final Order in respect of such Global Entity; (iv) to take such actions necessary or advisable to grant to the Collateral Agent for the benefit of the Lenders a Lien on the Collateral described in the Security and Pledge Agreement with respect to such Global Entity, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security and Pledge Agreement or by law or as may be requested by the Administrative Agent or the Collateral Agent; (v) to deliver to the Administrative Agent a certificate of such Subsidiary, substantially in the form of Exhibit B, with appropriate insertions and attachments; provided, however, such Global Entity shall not be required pursuant to this Section 5.11(b) to pledge to the Collateral Agent in excess of 65% of the voting Capital Stock of its direct Foreign Subsidiaries or any of the Capital Stock or interests of its indirect Foreign Subsidiaries (if adverse tax consequences would result to such Global Entity); and (vi) if requested by the Administrative Agent or the Collateral Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

5.12. Ratings.  Use commercially reasonable efforts to obtain a rating for the Facilities by each of S&P and Moody's on or before the DIP Refinancing Order Date or as soon as practicable thereafter.

5.13. Post Closing Matters.  Within 60 days of the Closing Date, deliver to the Administrative Agent evidence of the actions specified on Schedule 5.13; provided that such date may be extended, or the obligation to deliver such evidence waived, by the Administrative Agent acting in its reasonable discretion and in each case upon terms and conditions reasonably satisfactory to the Administrative Agent.

SECTION 6

NEGATIVE COVENANTS

Each of the Loan Parties hereby agrees that, so long as the Commitments remain in effect, any Note or any Letter of Credit Outstandings remain outstanding and unpaid or any other amount is owing to any Lender or any Agent hereunder or under any other Loan Document (other than Letters of Credit together with all fees that have accrued and will accrue thereon through the stated termination date of such Letters of Credit, which have been supported in the manner described in Section 2.8(b), contingent indemnification obligations for which no claim has been asserted, obligations with respect to interest rate hedging agreements or Eligible Permitted Commodity Hedge Agreements or Cash Management Obligations), such Loan Party shall not, and shall not permit any Material Subsidiary to, directly or indirectly:

      6.1.   <u>Limitation on Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness, except:

      (a)    Indebtedness under this Agreement and the other Loan Documents;

      (b)    Indebtedness otherwise owed to (x) CS, any other financial institution that is a Lender under this Agreement or any of their respective banking affiliates in respect of overdrafts and related liabilities arising from treasury, depository or cash management services or in connection with any automated clearing house transfers of funds and (y) CS, any other financial institution that is a Lender under this Agreement or any of their respective Affiliates in respect of interest rate hedging transactions;

      (c)    Indebtedness outstanding on the Petition Date and listed on Schedule 6.1(c), but excluding the refinancing of any such Indebtedness of any Loan Party and including any refinancing of any such Indebtedness of any Credit Party which is not a Debtor without increasing, or shortening the maturity of, the principal amount thereof;

      (d)    Indebtedness of the Borrower to any Subsidiary and of any Guarantor to the Borrower or any other Guarantor;

      (e)    endorsements of instruments in the ordinary course of business and consistent with past practices of the Credit Parties;

      (f)    Indebtedness of any of the Credit Parties arising in the ordinary course of business (and consistent with past practice of the relevant Credit Parties) of such Credit Party and owing to a financial institution providing netting services to the Global Entities, <u>provided</u> that (i) such Indebtedness was incurred in respect of the provision of such netting services with respect to intercompany Indebtedness permitted to be incurred and outstanding pursuant to this Agreement and (ii) such Indebtedness does not remain outstanding for more than three (3) days from the date of its incurrence or longer if permitted under relevant netting contracts and consistent with past practices;

      (g)    Indebtedness of any of the Credit Parties consisting of the financing of insurance premiums in the ordinary course of business (and consistent with past practice of the Credit Parties);

      (h)    Indebtedness of any of the Credit Parties consisting of take-or-pay obligations contained in supply agreements entered into in the ordinary course of business (and consistent with past practices of the Credit Parties);

      (i)    Indebtedness of the Loan Parties incurred in connection with the rejection of leases and executory contracts in the Cases; <u>provided</u> that the obligation of any Loan Party in respect of such Indebtedness shall be determined, by a final non-appealable order of the Bankruptcy Court entered at the time of such rejection, to be a general, unsecured, non-priority claim;

58

(j)    Indebtedness represented by appeal, bid, performance, surety or similar bonds, workers' compensation claims, self-insurance obligations and bankers acceptances issued for the account of any Credit Party, in each case to the extent incurred in the ordinary course of business in accordance with customary industry practices in amounts customary in the Borrower's industry;

(k)    Indebtedness of any wholly-owned Non-Loan Party to any Loan Party, when added to Guarantee Obligations permitted under Section 6.3(e) and Investments permitted under Section 6.7(h), in an aggregate principal amount (for all of such Subsidiaries) not to exceed $100,000,000 at any one time outstanding;

(l)    post-Petition Date purchase money Indebtedness (including Capital Leases) and Indebtedness of (i) the Credit Parties to third parties, (ii) Material Subsidiaries which are not Loan Parties to Material Subsidiaries which are not Loan Parties or (iii) Material Subsidiaries which are not Loan Parties to other Subsidiaries or partially owned Affiliates of the Borrower which are not Material Subsidiaries, when added to Indebtedness permitted under Section 6.1(m), Guarantee Obligations permitted under Section 6.3(f) and Investments permitted under Sections 6.7(i) and (j), in an aggregate principal amount (for all of the Credit Parties) not to exceed $35,000,000 at any one time outstanding;

(m)    Indebtedness of any non-wholly owned Non-Loan Party to any Loan Party, when added to Indebtedness permitted under Section 6.1(l), Guarantee Obligations permitted under Section 6.3(f) and Investments permitted under Section 6.7(i) and (j), in an aggregate principal amount (for all of such Subsidiaries), not to exceed $35,000,000 at any one time outstanding;

(n)    Swap Agreements incurred in the ordinary course of business and consistent with applicable risk management guidelines established by the Borrower from time to time and delivered to the Administrative Agent and in connection with Swap Agreements entered into with VMAC Energy I, LLC, associated reimbursement obligations, including with respect to letters of credit, to providers of credit support for such Swap Agreements in amounts not exceeding the notional amount of the Indebtedness outstanding under such Swap Agreements;

(o)    Indebtedness in respect of any Eligible Permitted Commodity Hedge Agreements and interest rate hedging agreements, in each case with any Joint Lead Arranger, the Administrative Agent, any Lender or any Affiliate thereof or any Qualified Entity entered into after the Closing Date in the ordinary course of business for non-speculative purposes, subject to the requirements set forth on Schedule 6.1(o);

(p)    intercompany Indebtedness of any Subsidiary of the Borrower to the Borrower or any other Subsidiary of the Borrower not to exceed the amount of the Loans borrowed by the Borrower for the purpose of (i) repaying and redeeming the CalGen Prepetition Secured Obligations, (ii) refinancing in full secured debt and secured lease obligations of any Subsidiary of the Borrower and preferred securities existing on the Closing Date listed on Schedule 3.10, (iii) satisfying the CalGen Makewhole Payment, if any, or (iv) funding distributions to holders of claims payable pursuant to a Reorganization Plan confirmed by the Bankruptcy Court pursuant to the Confirmation Order in any of the Cases so long as (x) the proceeds of such Loans are used for such purposes and (y) in the case of clause (ii) above, the assets of such Subsidiary (to the extent such Liens are not prohibited by contractual restrictions existing as of the Closing Date and then in effect), and the equity interests in such Subsidiary and each intermediate holding company between such Subsidiary and the Borrower (to the extent Liens on the equity interests of such intermediate holding company are not prohibited by contractual restrictions existing as of the Closing Date and then in effect) shall be, upon such repayment, included as Collateral (in each case, except to the extent set forth on Schedule 2.33 annexed hereto); it being understood that to

59

the extent that any such Liens on such assets are prohibited by contractual restrictions existing as of the Closing Date and then in effect, the Borrower shall not permit any consensual Liens on such assets; and

(q)     intercompany Indebtedness of any Subsidiary of the Borrower to the Borrower or any other Subsidiary of the Borrower for the Investments permitted under Section 6.7(o) and (p) in amounts not to exceed the amount of such Investments.

6.2.  <u>Limitation on Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except for:

(a)     Liens existing on the Petition Date and listed on Schedule 3.6;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlords' or other similar Liens arising in the ordinary course of business which in the aggregate do not materially detract from the value of the property or assets or materially impair the use thereof in the operation of the business of the Borrower and its Subsidiaries are not overdue for a period of more than sixty (60) days or which are being contested in good faith by appropriate proceedings and for which adequate reserves with respect thereto are maintained on the books of the Borrower or the affected Credit Parties, as the case may be, in accordance with GAAP;

(c)     Liens imposed by any Governmental Authority for taxes, assessments or charges not yet due or that are being contested in good faith and by appropriate proceedings if, unless the amount thereof is not material with respect to its financial condition, adequate reserves with respect thereto are maintained on the books of the Borrower or the affected Credit Parties, as the case may be, in accordance with GAAP;

(d)     deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds, and other obligations of a like nature incurred in the ordinary course of business; <u>provided that</u>, for the avoidance of doubt, Liens on cash deposits provided as collateral for trading contracts pursuant to the terms of the Trading Order shall be first priority Liens in accordance with, and subject to the terms of, the Trading Order;

(e)     easements, rights-of-way, restrictions, zoning ordinances and other similar encumbrances incurred in the ordinary course of business which, are not substantial in amount and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Credit Parties;

(f)     Liens granted to the Collateral Agent, the Administrative Agent, and the Lenders pursuant to the Loan Documents;

(g)     Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, government contracts, performance and return-of-money bonds and other similar obligations incurred in the ordinary course of business (exclusive of obligations in respect of the payment for borrowed money);

(h)     Liens arising from precautionary Uniform Commercial Code financing statements regarding operating leases permitted by this Agreement;

60

     (i)     any interest or title of a licensor, lessor or sublessor under any lease permitted by this Agreement;

     (j)     Liens arising from judgments, decrees or attachments to the extent not constituting an Event of Default under Section 7(l);

     (k)     licenses, leases or subleases granted to third parties not interfering in any material respect with the business of any Credit Party;

     (l)     Liens of sellers of goods, gas or oil to any Credit Party arising under Article 2 of the Uniform Commercial Code or under other state statutes in the ordinary course of business, covering only the goods sold and covering only the unpaid purchase price for such goods and related expenses;

     (m)     other Liens securing Indebtedness or other obligations in an aggregate amount secured by all such Liens not to exceed $50,000,000 at any one time outstanding;

     (n)     first priority Liens on the Capital Stock of Otay Mesa to secure the obligations of Otay Mesa and its Subsidiaries under any Project Financing (as defined in the Otay Mesa Motion) entered into by Otay Mesa or any such Subsidiaries, as contemplated by the Otay Mesa Motion; it being understood that the Liens of the Administrative Agent, for the benefit of the Lenders, shall be released without any further action upon consummation of any such Project Financing in accordance with Section 21 of the Security and Pledge Agreement;

     (o)     Liens granted to the CalGen Parties pursuant to the CalGen Adequate Protection Stipulation;

     (p)     first priority Liens on the Collateral to secure obligations with respect to the agreements referred to in Section 6.1(o), subject to the requirements set forth on Schedule 6.2(p); and

     (q)     Liens securing the CalGen Makewhole Payment, if any.

     6.3.   <u>Limitation on Guarantee Obligations</u>.  Create, incur, assume or suffer to exist any Guarantee Obligation except for:

     (a)     Guarantee Obligations existing on the Petition Date and listed on Schedule 6.3(a);

     (b)     Guarantee Obligations incurred in the ordinary course of business and consistent with past practices of the Borrower in respect of the obligations of any Guarantor, or of any other Guarantor of the obligations of the Borrower or any Guarantor;

     (c)     Guarantees by the Borrower of Indebtedness and other obligations of Guarantors that are permitted to be incurred under this Agreement;

     (d)     Guarantee Obligations of the Guarantors under this Agreement and the DIP Refinancing Order;

     (e)     Guarantee Obligations of any Loan Party of obligations of any wholly owned Non-Loan Party, when added to Indebtedness permitted under Section 6.1(k) and Investments permitted under Section 6.7(h), in an aggregate principal amount (for all of such Loan Parties) not to exceed $100,000,000 at any one time outstanding;

(f)     Guarantee Obligations of any Loan Party of obligations of any non-wholly owned Non-Loan Party or of any non-wholly owned entity which is not a Subsidiary, when added to Indebtedness permitted under Section 6.1(l) and (m) and Investments permitted under Sections 6.7(i) and (j), in an aggregate principal amount (for all of such Loan Parties) not to exceed $35,000,000 at any one time outstanding; and

(g)     Guarantee Obligations as a result of the issuance of the replacement Letters of Credit issued in respect of the BLB Facility permitted under Section 6.7(m);

(h)     Guarantee Obligations of the Borrower of obligations of Greenfield Project Partnership under the contract described in Section 6.5(k); and

(i)     Guarantee Obligations set forth on Schedule 6.3(i) to the extent, for the purpose and up to the amount set forth on such Schedule.

6.4.  Prohibition on Fundamental Changes.  Enter into any acquisition, merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise dispose of, all or substantially all of its property, business or assets or make any material change in its present method of conducting business (it being acknowledged that (x) changes to the operating and internal management structure of the Borrower, such as the merger of certain business divisions or the consolidation of certain management functions within the Loan Parties and (y) rejection of contracts by any Loan Party pursuant to the Bankruptcy Code shall not constitute a material change in the method of conducting business) or create or acquire any new Subsidiaries, except that the following shall be permitted:

(a)     any Credit Party  other than the Borrower may be merged or consolidated with any other Guarantor so long as the surviving entity of such merger is a Guarantor or a new Subsidiary which, substantially concurrently with such merger or consolidation, becomes a Debtor and Guarantor in accordance with Section 5.11(b);

(b)     any Credit Party may be merged or consolidated with the Borrower if the surviving entity of such merger is the Borrower;

(c)     any of the Borrower's non-U.S. subsidiaries  (each a "Foreign Subsidiary") may be merged or consolidated with another Foreign Subsidiary;

(d)     any Credit Party (other than the Borrower) may dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any Guarantor or to any new Subsidiary which, substantially concurrently with such transfer, becomes a Debtor and Guarantor in accordance with Section 5.11(b);

(e)     any Material Subsidiary may be merged or consolidated with any Material Subsidiary;

(f)     the liquidation of the Philadelphia Biogas Supply, Inc., [Calpine Capital Trust I, Calpine Capital Trust II and Calpine Capital Trust III] to the extent such Subsidiaries do not own any assets or property or the assets or property of such Subsidiaries are distributed to a Loan Party;

(g)     any Disposition permitted under Section 6.5 or any transaction (including creation of any new Subsidiary) reasonably necessary to consummate any Disposition permitted under

62

Section 6.5 or to optimize the tax benefits or minimize the adverse tax consequences of any such Disposition;

        (h)      creation by Goldendale of Goldendale Newco; and

        (i)      with the prior written consent of the Administrative Agent, mergers, consolidations or liquidations not otherwise permitted above of Credit Parties or any of their Subsidiaries which are inactive or have de minimis assets.

        6.5.  <u>Limitation on Sale of Assets</u>.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of a Subsidiary of the Borrower, issue or sell any shares of such Subsidiary's Capital Stock to any Person except:

        (a)      (i) the sale, lease or other disposition of (A) inventory in the ordinary course of business, (B) uneconomical, obsolete, surplus or worn out property, (C) property that is no longer used or useful in the business, or (D) boilers, water lines and related property of Clear Lake Cogeneration, L.P., (ii) the rejection of contracts or leases determined by the Borrower in good faith to be unprofitable (other than (x) facility leases in respect of Material Subsidiaries and (y) leases described in clause (iii) below) or (iii) so long as no Event of Default shall have occurred and be continuing and the Loans have not become due and payable as a result thereof, the rejection of facility leases in respect of, or the surrender of (including the consensual foreclosure of), Designated Projects (as defined in the Cash Collateral Order) determined by the Borrower in good faith to be unprofitable;

        (b)      the consumption or use of fuel supplies, or other consumables, the conversion of fossil, geothermal or other assets to power or the distribution, sale or trading of power (including without limitation, steam or electrical power) and natural gas or other fuels or the sale or trading of emissions credits, in each case in the ordinary course of business and consistent with the past practices of the Credit Parties;

        (c)      exchange or trade-in, or sale and application of proceeds to or for replacement assets to be used in the business;

        (d)      liquidation, sale or disposition of Cash Equivalents or inventory in the ordinary course of business;

        (e)      the discount or write-off of accounts receivable overdue by more than ninety (90) days or the sale of any such accounts receivable for the purpose of collection, in each case in the ordinary course of business;

        (f)      termination of leases, surrender or sublease of real or personal property in the ordinary course of business;

        (g)      incurrence of Liens permitted under Section 6.2;

        (h)      transactions permitted under clauses (a) through (f) in Section 6.4;

        (i)      the Disposition of the turbines listed on Schedule 6.5(i) in arm's length transaction at fair market value or as approved by the Bankruptcy Court, and the Disposition to any Global Entity of turbine parts and components for use as spare or replacement parts;

(j)      the Disposition of property of any Credit Party in arm's length transactions at fair market value, provided that the Net Cash Proceeds thereof shall be applied to prepay the Loans to the extent required by Section 2.17(a);

(k)      the Disposition by the Borrower, directly or indirectly, to Greenfield Project Partnership of a purchase contract with Siemens Power Generation, Inc. relating to warranties on turbines transferred to Greenfield Project Partnership prior to the Closing Date;

(l)      the Disposition by the Borrower and Calpine Power Corporation of (i) the Facility Assets, the Contributed Assets, the Interconnection Agreements, the CCMCI Assigned Contracts and the Calpine Assigned Contracts (each as defined in the Otay Mesa Motion) to Otay Mesa pursuant to the CTA (as defined in the Otay Mesa Motion) and (ii) the Lease and Sublease (each as defined in the Otay Mesa Motion) to San Diego Gas & Electric Company pursuant to the Reinstatement Agreement (as defined in the Otay Mesa Motion);

(m)      (i) the Disposition by Goldendale of all of its assets and liabilities to Goldendale Newco substantially contemporaneously with the consummation of the Disposition of all of the equity of Goldendale Newco owned by Goldendale and (ii) the Disposition of all of the equity of Goldendale Newco owned by Goldendale;

(n)      the Disposition of all of the equity interests in Towantic Energy, LLC and CPN Oxford, Inc., and upon the consummation of such Disposition the release of the guaranty and other obligations hereunder, and a release of the Liens under the Loan Documents on the equity interests and assets, of Towantic Energy LLC and CPN Oxford, Inc.;

(o)      the Disposition of all of the equity interests in Skipanon Energy LLC, and upon the consummation of such Disposition the release of the guaranty and other obligations hereunder, and a release of the Liens under the Loan Documents on the equity interests and assets, of Skipanon Energy LLC;

(p)      the trading and sharing of parts and components for equipment, tools and non-material equipment, among (i) the Loan Parties, (ii) Material Subsidiaries which are not Loan Parties and (iii) Subsidiaries which are not Credit Parties and Subsidiaries which are not Loan Parties, consistent with past practices of the Credit Parties, including for purposes of spare or replacement parts; and

(q)      the Disposition of all or substantially all of the assets of RockGen in an arm's-length transaction.

6.6.  Limitation on Issuances of Capital Stock and Dividends.  Declare or pay, directly or indirectly, any dividends or make any other distribution or payment, whether in cash, property, securities or a combination thereof, with respect to (whether by reduction of capital or otherwise) any shares of Capital Stock, or set apart any sum for the aforesaid purposes, provided that (x) any Material Subsidiary of the Borrower may pay dividends to any Guarantor that is its direct parent or which is paid to a Guarantor through a non-Guarantor that is its direct parent, and any Foreign Subsidiary may pay dividends to any other Foreign Subsidiary, (y) any Material Subsidiary that is not a Debtor may pay dividends to any other Material Subsidiary that is not a Debtor and (z) any Material Subsidiary (including without limitation, Calpine CCFC Holdings, Inc.) (A) that is not a Debtor may pay dividends pursuant to the Preferred Equity Documents as in effect on the date hereof at any time so long as no Default or Event of Default shall have occurred and is continuing or (B) that is a Debtor may pay dividends not constituting a Default or an Event of Default under Section 7(i)(v).

6.7. <u>Limitation on Investments, Loans and Advances</u>.  Make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of, or make any other investment (each, an "<u>Investment</u>") in, any Person, except:

       (a)     Investments in Cash Equivalents;

       (b)     Indebtedness permitted pursuant to Section 6.1(c) and (m);

       (c)     intercompany Investments (i) by any Loan Party in the Borrower or another Loan Party that, prior and after giving effect to such investment, is a Guarantor or (ii) listed on Schedule 6.7(c) which may be expended at any time during the term of this Agreement;

       (d)     Investments (including debt obligations) received in connection with bankruptcy or reorganization of suppliers and customers in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

       (e)     deposits made in the ordinary course of business to secure the performance of bids, trade, contracts, (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business and Investments of such deposits;

       (f)     intercompany Investments among the Loan Parties or among Credit Parties which are not Loan Parties in the ordinary course;

       (g)     loans and advances by the Credit Parties to employees of the Credit Parties for moving and travel expenses and other similar expenses, in each case incurred in the ordinary course of business (and consistent with past practices of the relevant Credit Parties);

       (h)     Investments by any Loan Party in any wholly owned Non-Loan Party, when added to Indebtedness permitted under Section 6.1(k) and Guarantee Obligations permitted under Section 6.3(e), in an aggregate principal amount (for all of such Subsidiaries) not to exceed $100,000,000 at any one time outstanding;

       (i)     Investments by (i) Credit Parties in third parties, (ii) Material Subsidiaries which are not Loan Parties in Material Subsidiaries which are not Loan Parties, (iii) Material Subsidiaries which are not Loan Parties in other Subsidiaries which are not Material Subsidiaries or (iv) Material Subsidiaries which are not Loan Parties in partially-owned entities which are not Subsidiaries, when added to Indebtedness permitted under Section 6.1(l) and (m), Guarantee Obligations permitted under Section 6.3(f) and Investments permitted under Section 6.7(j), in an aggregate principal amount (for all of the Credit Parties) not to exceed $35,000,000 at any one time outstanding;

       (j)     Investments by any Loan Party in any non-wholly owned Non-Loan Party, when added to Indebtedness permitted under Section 6.1(l) and (m), Guarantee Obligations permitted under Section 6.3(f) and Investments permitted under Section 6.7(i), in an aggregate principal amount (for all of such Loan Parties) not to exceed $35,000,000 at any one time outstanding;

       (k)     Investments from and including February 23, 2006 to December 31, 2007 by the Borrower, either directly or indirectly, in Calpine Greenfield Commercial Trust solely to finance the Greenfield Project Partnership, <u>provided</u> that the aggregate amount of any such Investments shall not exceed $45,000,000;

(l)　　the Borrower may cause the Letters of Credit identified on Schedule 6.7(m) to be issued hereunder to support the obligations of Credit Parties that are not Loan Parties in an aggregate amount not to exceed $60,284,165.30; provided that, in each case, such Letters of Credit shall be for the sole purpose of replacing the letters of credit outstanding under the BLB Facility as of September 25, 2006;

(m)　　Investments by one Global Entity in another Global Entity constituting Dispositions permitted under Section 6.5;

(n)　　the Borrower may cause Letters of Credit in an aggregate amount not to exceed $25,000,000 to be issued hereunder in favor of San Diego Gas & Electric Company to support the obligations of Otay Mesa under the Amended PPA (as defined in the Otay Mesa Motion);

(o)　　Investments consisting of Letters of Credit issued for the account of Non-Loan Parties listed on Schedule 6.7(o) for the purpose and up to the amount for each such Letter of Credit described on such Schedule;

(p)　　Investments by one Global Entity into another Global Entity identified on Schedule 6.7(p) for the purposes and up to the amount for each such Investment described on such Schedule; and

(q)　　intercompany Investments by the Borrower in any Subsidiary of the Borrower or by any Subsidiary of the Borrower to another Subsidiary of the Borrower not to exceed the amount of the Loans borrowed by the Borrower for the purpose of (i) repaying and redeeming the CalGen Prepetition Secured Obligations, (ii) refinancing in full secured debt and secured lease obligations of any Subsidiary of the Borrower and preferred securities existing on the Closing Date listed on Schedule 3.10, (iii) satisfying the CalGen Makewhole Payment or (iv) funding distributions to holders of claims payable pursuant to a Reorganization Plan confirmed by the Bankruptcy Court pursuant to the Confirmation Order in any of the Cases so long as (x) the proceeds of such Loans are used for such purposes and (y) in the case of clause (ii) above, the assets of such Subsidiary (to the extent such Liens are not prohibited by contractual restrictions existing as of the Closing Date and then in effect), and the equity interests in such Subsidiary and each intermediate holding company between such Subsidiary and the Borrower (to the extent Liens on the equity interests of such intermediate holding company are not prohibited by contractual restrictions existing as of the Closing Date and then in effect) shall be, upon such repayment, included as Collateral (in each case, except to the extent set forth on Schedule 2.33 annexed hereto); it being understood that to the extent that any such Liens on such assets are prohibited by contractual restrictions existing as of the Closing Date and then in effect, the Borrower shall not permit any additional consensual Liens on such assets.

6.8.　　Transactions with Affiliates.　Sell or transfer any property or assets to, or otherwise engage in any other transactions with, any of its Affiliates, except that (i) any Loan Party may engage in transactions with any other Loan Party, (ii) any Global Entity that is not a Credit Party may engage in transactions with any other Global Entity that is not a Credit Party, (iii) any Credit Party may engage in (A) transactions set forth on Schedule 6.8 and (B) any transaction which is otherwise expressly permitted under this Agreement or otherwise in the ordinary course of business at prices and on terms and conditions not less favorable to such Credit Party than could be obtained in a comparable arm's-length transaction from unrelated third parties and (iv) any Material Subsidiary that is not a Loan Party may engage in transactions with any other Material Subsidiary that is not a Loan Party.

6.9.　　Lines of Business.　Engage to any substantial extent in any line or lines of business activity other than (i) businesses of the type as those in which the Credit Parties are engaged on

the Closing Date or which are related thereto and (ii) as required by the Bankruptcy Code, or modify or alter in any material manner the nature and type of the Credit Parties' businesses, except (x) such modifications disclosed to the Administrative Agent or as required by the Bankruptcy Code and (y) for sales permitted under Section 6.5.

6.10. Concentration Account.  (a) Fail to maintain a system of cash management that concentrates unrestricted cash in excess of $25,000,000 into the Concentration Account on a daily basis pursuant to arrangements reasonably satisfactory to the Collateral Agent, (b) fail to provide the Collateral Agent with an executed control or similar agreement relating to the investment account maintained by Borrower with Scudder Investments (or another affiliate of the Collateral Agent), in form and substance reasonably acceptable to the Collateral Agent and the Borrower.  All funds in the Concentration Account shall be invested by the Collateral Agent, as principal concentration bank, in overnight cash accounts or other money market funds as approved by the Collateral Agent.  In connection with the maintenance of the foregoing, the Borrower shall seek the entry of appropriate Bankruptcy Court orders, reasonably satisfactory to the Administrative Agent and the Borrower, providing for the implementation of such cash management system.  Subject to the DIP Refinancing Order, the Borrower may direct the transfer of available funds on deposit in the Concentration Account to its disbursement accounts and, subject to Sections 6.1 and 6.7, Subsidiaries of the Borrower; and (c) notwithstanding the preceding provisions of this Section 6.10 or the provisions of Section 6.20, (A) RockGen Energy LLC ("RockGen") may maintain one or more segregated reserve accounts (collectively, the "RockGen Reserve Account") (i) the only deposits into which shall be post-Petition Date revenues initially received by RockGen from operations in the ordinary course of business (including any such revenues which following their receipt may have been initially deposited into the Concentration Account) which RockGen is required or permitted to set aside as reserves under its existing or future agreements with its project lessors and such project lessors' debtholders and/or their representatives and (ii) from which amounts may be withdrawn from time to time (whether or not a Default or Event of Default hereunder has occurred and is continuing) to satisfy capital and operating expenses and other obligations owed by RockGen to its project lessors and such project lessors' debtholders and/or their representatives, (B) the RockGen Reserve Account and amounts deposited thereto shall not be subject to the cash management concentration requirements of this Section 6.10 or Section 6.20 and shall constitute "restricted cash" for purposes of such sections and (C) the lien and security interest of the Lenders, the Collateral Agent and the Administrative Agent in the RockGen Reserve Account and amounts deposited from time to time therein shall be junior to any lien and security interest in such account and such amounts that may exist from time to time in favor of RockGen's project lessors and project lenders.  For the purposes of Section 6.10 and Section 6.20, cash distributed by the CalGen Parties in accordance with the CalGen Cash Collateral Stipulation and on deposit in the CalGen Cash Collateral Account shall constitute "restricted cash" and the lien and security interest of the Lenders, the Collateral Agent and the Administrative Agent in the CalGen Cash Collateral Account and the amounts distributed by the CalGen Parties in accordance with the CalGen Cash Collateral Stipulation and deposited from time to time therein shall be junior to the liens granted to the CalGen Parties therein pursuant to the CalGen Adequate Protection Stipulation.

6.11. Chapter 11 Claims.  In respect of any Loan Party, incur, create, assume, suffer to exist or permit any other Superpriority Claim or Lien which is pari passu with or senior to the claims of the Collateral Agent, Administrative Agent and the Lenders granted pursuant to this Agreement, the Security and Pledge Agreement and the DIP Refinancing Order except for the Carve-Out and Permitted Liens (solely as to those Permitted Liens which are permitted under Section 6.2(p) or permitted under this Agreement to be pari passu with or senior to the Liens of the Collateral Agent) which, in accordance with the DIP Refinancing Order, are senior to such Liens and Liens granted on the CalGen Cash Collateral Account in favor of the CalGen Parties pursuant to the CalGen Adequate Protection Stipulation and Liens on cash deposits provided as collateral pursuant to the terms of the Trading Order.

6.12. Reclamation Claims; Bankruptcy Code Section 546(g) Agreements. (a) Make any payments or transfer any property on account of claims asserted by any vendors of any Loan Party for reclamation in accordance with Section 2-702 of the Uniform Commercial Code and Section 546(c)(1) of the Bankruptcy Code and are not otherwise entitled to administrative claim status under Section 503(b)(9) of the Bankruptcy Code or (b) enter into any agreements or file any motion seeking a Bankruptcy Court order for the return of property of any Loan Party to any vendor pursuant to Section 546(g) of the Bankruptcy Code in the aggregate for clauses (a) and (b) in excess of $12,000,000 in the aggregate.

6.13. Capital Expenditures. Make or commit to make (by way of the acquisition of securities of a Person or otherwise) any Capital Expenditure of the Loan Parties in the ordinary course of business exceeding (i) $_____ in fiscal year 2007 of the Borrower, (ii) $_____ in fiscal year 2008 of the Borrower and (iii) $_____ in fiscal year 2009 of the Borrower; provided that any such amount, if not so expended in the fiscal year for which it is permitted, may be carried over for expenditure in the next succeeding fiscal year. In addition, the Loan Parties shall be permitted to make the Capital Expenditures described on Schedule 6.13 and with Reinvestment Deferred Amounts to the extent permitted under Section 2.17(a), in each case without reducing the amount permitted for any fiscal year set forth in the immediately preceding sentence provided, that any such amount, if not so expended in the fiscal year for which it is permitted, may be carried over for expenditure in the next succeeding fiscal year.

6.14. Use of Proceeds. Use the proceeds of the Loans or the Letters of Credit for purposes other than those described in Section 3.10.

6.15. Consolidated EBITDA. Permit Consolidated EBITDA for the Global Entities for each rolling twelve (12) fiscal month period ending on the dates listed below to be less than the amount listed opposite such month:

| Month | Global Entities EBITDA ($) |
|---|---|
| March 31, 2007 | [$575,000,000] |
| April 30, 2007 | [$615,000,000] |
| May 31, 2007 | [$615,000,000] |
| June 30, 2007 | [$615,000,000] |
| July 31, 2007 | [$650,000,000] |
| August 31, 2007 | [$650,000,000] |
| September 30, 2007 | [$675,000,000] |
| October 31, 2007 | [$675,000,000] |
| November 30, 2007 | [$675,000,000] |
| December 31, 2007 | |
| January 31, 2008 | |
| February 29, 2008 | |
| March 31, 2008 | |
| April 30, 2008 | |
| May 31, 2008 | |
| June 30, 2008 | |
| July 31, 2008 | |
| August 31, 2008 | |
| September 30, 2008 | |
| October 31, 2008 | |
| November 30, 2008 | |

| Month | Global Entities EBITDA ($) |
|---|---|
| December 31, 2008 | |
| January 31, 2009 | |
| February 28, 2009 | |
| March 31, 2009 | |

6.16. <u>Minimum Liquidity</u>.  Permit Minimum Liquidity of the Loan Parties at the last day of each calendar month to be less than $250,000,000.

6.17. <u>Amendments to Documents</u>.  Amend, supplement or modify, without the consent of the Administrative Agent, in any material manner adverse to the interest of the Lenders any material project financing documents to which a Material Subsidiary is a party.

6.18. <u>Control Agreements</u>.  Within 90 days following the Closing Date, fail to provide the Collateral Agent with executed control, blocked account or similar agreements relating to all accounts maintained by the Borrower with the Union Bank of California, in form and substance reasonably acceptable to the Collateral Agent.  Any time upon 90 days' written notice to the Borrower, the Collateral Agent may require the Borrower to maintain, and the Borrower shall not fail to maintain, a cash management system that concentrates all unrestricted cash of the Borrower and its Subsidiaries on a daily basis in the Concentration Account or such other accounts as are reasonably acceptable to the Collateral Agent, in each case pursuant to arrangements and documentation reasonably satisfactory to the Collateral Agent.

6.19. <u>Adequate Protection Payments</u>.  Without the prior consent of the Required Lenders and the Administrative Agent, make any payments of adequate protection or otherwise with respect to any Calpine Second Lien Debt (as such term is defined in the Cash Collateral Order) other than the two Periodic Cash Payments (as such term is defined in the Cash Collateral Order) and other than the 2006 Adequate Protection Amount and the 2007 Adequate Protection Amount (as such terms are defined in the Agreed Order Further Modifying Order Authorizing Use of Cash Collateral and Granting Adequate Protection, entered by the Bankruptcy Court on or about December 28, 2006 (as entered on such date and as may be amended in a manner reasonably satisfactory to the Administrative Agent, the "<u>Agreed Order</u>")), so long as (v) each such payment is made in accordance with the Agreed Order, (w) at the time of any such payment no Default or Event of Default has occurred and is continuing, (x) the aggregate amount of all such payments made in respect of the 2006 Adequate Protection Amount pursuant to the Agreed Order shall not exceed $100,300,000, (y) the proceeds of the Revolving Loans or Swingline Loans shall not be used to make any such payment and (z) immediately after giving effect to each such payment no Revolving Loans or Swingline Loans shall be outstanding.

SECTION 7

EVENTS OF DEFAULT

If one or more of the following events (herein called "<u>Events of Default</u>") shall occur and be continuing:

(a)    The Borrower shall fail to (i) pay any principal under any Note or under this Agreement, including without limitation, pursuant to Section 2.17 hereof, when due in accordance with the terms thereof or hereof or to reimburse the Fronting Bank in accordance with Section 2.8(d) or (ii) pay any interest on any Note or under this Agreement, or any other amount payable hereunder or under any

other Loan Document, within three (3) Business Days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or

(b)      Any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or which is contained in any certificate, document or financial or other statement required to be furnished by a Loan Party at any time under or in connection with this Agreement or any other Loan Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c)      Any material provision of this Agreement (including without limitation, Section 9) or any other Loan Document shall cease to be valid and binding on the Loan Parties or cease to be in full force and effect, or any Credit Party shall so assert in any pleading filed in any court; or

(d)      Any Loan Party shall default in the observance or performance of any covenant or other agreement contained in Section 1.3, Section 5.4(a) (with respect to the Borrower), or Section 6 hereof or Section 5 of the Security and Pledge Agreement; or

(e)      Any Loan Party shall default in the observance or performance of any covenant or other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (d) of this Section 7), and such default shall continue unremedied for a period of fifteen (15) days; or

(f)      Any Loan Party shall (i) default in any payment of principal of or interest on any post-Petition Date Indebtedness permitted under Section 6.1 (other than as provided in Section 7(a)), or in the payment of any post-Petition Date Guarantee Obligation permitted under Section 6.3, in either case in an outstanding principal amount in excess of $10,000,000 beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness or Guarantee Obligation was created; or (ii) default in the observance or performance of any other agreement or condition relating to any such post-Petition Date Indebtedness or post-Petition Date Guarantee Obligation or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such indebtedness or beneficiary or beneficiaries of such Guarantee Obligation or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries to cause, with the giving of notice if required (but after the expiration of all grace periods applicable thereto), such Indebtedness to become due prior to its stated maturity or such Guarantee Obligation to become payable, provided, however, this clause (ii) shall not apply to Indebtedness that becomes due solely as a result of the voluntary sale or transfer of property or assets to the extent such sale or transfer is permitted by the terms of such Indebtedness; or

(g)      Any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code (except a dismissal of the Cases of Towanic Energy, LLC and CPN Oxford, Inc. substantially contemporaneously with the sale permitted under Section 6.5(o), a dismissal of the Case of Skipanon Natural Gas LLC substantially contemporaneously with the sale permitted under Section 6.5(p) or any dismissal of a Case substantially contemporaneously with a liquidation or a Disposition permitted under Sections 6.4 or 6.5); or

(h)      (i) An order of the Bankruptcy Court (other than (x) the CalGen Adequate Protection Stipulation with respect to the Lien granted to the CalGen Parties therein on the CalGen Cash Collateral Account and (y) the orders with respect to Liens permitted under Section 6.2(p)), shall be entered granting another Superpriority Claim or Lien pari passu with or senior to that granted to the Lenders and the Collateral Agent pursuant to this Agreement and the DIP Refinancing Order; or (ii) an order of the Bankruptcy Court shall be entered reversing, staying for a period in excess of ten (10) days,

70

vacating or otherwise amending, supplementing or modifying the DIP Refinancing Order without the written consent of the Administrative Agent; (iii) an order of a court of competent jurisdiction shall be entered terminating the use of Cash Collateral by the Borrower or any Material Subsidiary; or (iv) an order of the Bankruptcy Court shall be entered under Section 1106(b) of the Bankruptcy Code in any of the Cases appointing a trustee, a responsible officer or an examiner having enlarged powers relating to the operation of the business of the Loan Parties (i.e., powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) and such order shall not be reversed or vacated within thirty (30) days after the entry thereof; or

(i)     Any Global Entity shall make any payments (including any adequate protection payments) relating to pre-Petition Date obligations or interests, in each case of any Loan Party, other than (i) as permitted under the DIP Refinancing Order; (ii) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date; (iii) in accordance with, and to the extent authorized by, orders reasonably satisfactory to the Administrative Agent; (iv) as otherwise permitted under this Agreement; (v) paying dividends pursuant to the Preferred Equity Documents as in effect on the Petition Date at any time after Calpine CCFC Holdings, Inc. and its Subsidiaries (including without limitation, CCFC Preferred Holdings LLC and its Subsidiaries) have become Debtors and Loan Parties in accordance with Section 5.11(b) and have otherwise complied with the provisions thereof and so long as no Default or Event of Default shall have occurred and is continuing; (vi) payments by a Global Entity that is not a Debtor in respect of prepetition obligations of a Debtor for services and materials that were used solely in the construction or maintenance of a project that is not a Debtor and such payment is necessary to avoid the incurrence of a statutory lien against such project; and (vii) payments in respect of prepetition obligations of a Debtor by a Global Entity that is not a Debtor for common facilities or services to the extent necessary to ensure that such common facilities or services remain available to such Global Entity and such Debtor; or

(j)     Except in respect of the transactions permitted under Section 6.5(a)(iii) or as permitted under paragraph 2(g) of the Order Authorizing and Approving Settlement Procedures For Settling Certain Claims and Causes of Action Brought by or Against the Debtors in a Judicial, Administrative, Arbitral or Other Action or Proceeding [Docket No. 2469], the entry of an order or stipulation granting relief from the automatic stay without the affirmative consent of the Administrative Agent so as to allow a third party to proceed against any property of any Loan Party which has a value in excess of $10,000,000 in the aggregate; or

(k)     The filing of any pleading by any Global Entity seeking, or otherwise consenting to, any of the matters set forth in paragraphs (g), (h) or (i) above in this Section 7; or

(l)     (i) One or more judgments or decrees required to be satisfied as an administrative expense claim shall be entered after the Petition Date against any Credit Party involving in the aggregate a liability (to the extent not paid or fully covered by insurance) of $10,000,000 or more and all such judgments or decrees shall not have been vacated, stayed or bonded pending appeal within the time required by the terms of such judgment or applicable law; or (ii) there shall be rendered against any Loan Party a non-monetary judgment with respect to a post-Petition Date event which causes or would reasonably be expected to cause a Material Adverse Effect; or

(m)     It shall be determined (whether by the Bankruptcy Court or by any other judicial or administrative forum) that any Credit Party is liable for the payment of claims arising out of any failure to comply (or to have complied) with applicable Environmental Laws or regulations the payment of which could reasonably be expected to have a Material Adverse Effect; or

71

(n)     Any proceeding shall be commenced by any Loan Party seeking, or otherwise consenting to, (i) the invalidation, subordination or challenging in any respect the Superpriority Claims and Liens granted to secure the Obligations or (ii) any relief under Section 506(c) of the Bankruptcy Code with respect to any Collateral; or

(o)     Any Loan Party files a Reorganization Plan that does not provide for (x) the indefeasible payment in full in cash of the Obligations on the effective date of such Reorganization Plan or (y) the assumption of the Obligations by the reorganized Debtors in accordance with Section 2.33; or

(p)     (i) A default, event of default, acceleration event or similar event shall have occurred and be continuing under any project financing documentation of any Material Subsidiary, the lenders thereunder shall have taken foreclosure or acceleration action in respect thereof (including without limitation, any interruption of distributions to any Credit Party, and such foreclosure or acceleration action remains unstayed for a period of fifteen (15) days (or such Material Subsidiary shall not, within such fifteen (15) days, have become a Debtor and a Loan Party in accordance with Section 5.11(b) and otherwise complied with the provisions thereof) or (ii) a "Voting Rights Trigger Event", default, event of default or similar event shall have occurred under the Preferred Equity Documents except to the extent that (x) any such "Voting Rights Trigger Event" occurred solely as a result of the commencement of the Cases and has been stayed and not exercised or (y) any such "Voting Rights Trigger Event", default, event of default or similar event has not resulted in a change of control or similar event at CCFC Preferred Holdings, LLC or any of its Subsidiaries or in a foreclosure or acceleration action by lenders of Indebtedness of CCFC Preferred Holdings, LLC or any of its Subsidiaries; or

(q)     (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan; (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of any Global Entity or any Commonly Controlled Entity; (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is likely to result in the termination of such Plan for purposes of Title IV of ERISA; (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA; (v) any Global Entity or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or ERISA Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

(r)     There shall occur a Change of Control;

then, and in every such event and at any time thereafter during the continuance of such event, and without further order of or application to the Bankruptcy Court, the Administrative Agent may, and, at the request of the Required Lenders, the Administrative Agent or the Collateral Agent (subject to the terms of the Security and Pledge Agreement), shall, by notice to the Borrower (with a copy to counsel for any statutory committee appointed in the Cases and to the United States Trustee for the Southern District of New York), take one or more of the following actions, at the same or different times; provided that (a) with respect to clause (iv) below and the enforcement of Liens or other remedies with respect to the Collateral under clause (v) below, the Collateral Agent shall provide the Borrower (with a copy to counsel for any statutory committee appointed in the Cases and to the United States Trustee for the Southern District of New York) with five (5) Business Days' written notice prior to taking the action contemplated thereby: (i) terminate forthwith the Revolving Commitments; (ii) declare the Loans then outstanding to be

forthwith due and payable, whereupon the principal of the Loans, any Letter of Credit Outstandings constituting then drawn and unreimbursed Letters of Credit, together with accrued interest thereon and any unpaid accrued Fees and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Loan Parties, anything contained herein or in any other Loan Document to the contrary notwithstanding; (iii) require the Loan Parties upon demand to forthwith deposit in the L/C Cash Collateral Account cash in an amount such that the aggregate amount on deposit in the L/C Cash Collateral Account is equal to 105% of the face amount of each outstanding and undrawn Letter of Credit and, to the extent the Borrower shall fail to furnish such funds as demanded by the Collateral Agent, the Collateral Agent shall be authorized to debit the accounts of the Loan Parties maintained with the Collateral Agent in such amount for the deposit of such amounts in the L/C Cash Collateral Account; (iv) subject to the DIP Refinancing Order, set-off amounts in the L/C Cash Collateral Account, the Concentration Account or any other accounts of the Loan Parties and apply such amounts to the Obligations of the Loan Parties hereunder and under the other Loan Documents in accordance with the Security and Pledge Agreement; and (v) exercise, subject to the DIP Refinancing Order, any and all remedies under this Agreement, the Security and Pledge Agreement, the DIP Refinancing Order, and applicable law available to the Administrative Agent, the Collateral Agent and the Lenders.

## SECTION 8

## THE AGENTS

8.1.  Appointment.  Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Each Lender hereby irrevocably designates and appoints the Collateral Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, none of the Administrative Agent and the Collateral Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against such Agent.

8.2.  Delegation of Duties.  Each of the Administrative Agent and the Collateral Agent may execute any of their duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  None of the Administrative Agent and the Collateral Agent shall be responsible for the negligence or misconduct of any agents or attorneys in-fact selected by it with reasonable care.

8.3.  Exculpatory Provisions.  Neither any Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision

of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

       8.4.  <u>Reliance by the Administrative Agent</u>.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts reasonably selected by the Administrative Agent.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless the Administrative Agent shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement or any other Loan Document, the Majority Facility Lenders or all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

       8.5.  <u>Notice of Default</u>.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless it has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement or any other Loan Document, the Majority Facility Lenders or all Lenders); <u>provided</u> that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as the Administrative Agent shall deem advisable in the best interests of the Lenders.

       8.6.  <u>Non-Reliance on Agents and Other Lenders</u>.  Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and

creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

        8.7.  <u>Indemnification</u>.  The Lenders agree to indemnify the Agents in their capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Commitment Percentage in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Commitment Percentage immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; <u>provided</u> that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.  The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

        8.8.  <u>Agent in Its Individual Capacity</u>.  Each Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent.  With respect to its Loans made or renewed by it and with respect to any Letter of Credit issued or participated in by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

        8.9.  <u>Successor Administrative Agent</u>.  The Administrative Agent may resign as Administrative Agent upon ten (10) days' notice to the Lenders and the Borrower.  If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 7(a) shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as an Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans.  If no successor agent has accepted appointment as an Administrative Agent by the date that is ten (10) days following the retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's

resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  After the retiring Administrative Agent's resignation, the provisions of this Section 8 and Section 10.5 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

8.10. The Syndication Agent and the Documentation Agent.  [The Syndication Agent and the Documentation Agent shall not have any duties or responsibilities hereunder in its capacity as such or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Syndication Agent and the Documentation Agent].

8.11. Collateral Security.  The Collateral Agent will hold, administer and manage any Collateral pledged from time to time hereunder either in its own name or as Collateral Agent, but each Lender shall hold a direct, undivided pro-rata beneficial interest therein, on the basis of its proportionate interest in the secured obligations, by reason of and as evidenced by this Agreement and the other Loan Documents, subject to the priority of payments referenced in Section 15(g) of the Security and Pledge Agreement.

8.12. Enforcement by the Administrative Agent.  All rights of action under this Agreement and under the Notes and all rights to the Collateral hereunder may be enforced by the Administrative Agent and the Collateral Agent and any suit or proceeding instituted by the Administrative Agent or the Collateral Agent in furtherance of such enforcement shall be brought in its name as Administrative Agent or Collateral Agent without the necessity of joining as plaintiffs or defendants any other Lenders, and the recovery of any judgment shall be for the benefit of Lenders subject to the expenses of the Administrative Agent and the Collateral Agent.

SECTION 9

GUARANTEE

9.1.  Guarantee.

(a)    Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Collateral Agent, the Administrative Agent, for the ratable benefit of the Lenders and their respective successors, indorsees, transferees and assigns permitted hereunder, the prompt and complete payment and performance by the Borrower when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.

(b)    Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of each Guarantor under this Section 9.1 and under the other Loan Documents shall in no event exceed the amount which is permitted under applicable federal and state laws relating to the insolvency of debtors.

(c)    Each Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this Section 9 or affecting the rights and remedies of the Administrative Agent or any Lender hereunder.