**EXHIBIT F**

EXECUTION COPY

CONFIDENTIAL

January 26, 2007

Calpine Corporation
50 W. San Fernando Street
San Jose, CA 95113
Attention: Mr. Zamir Rauf
            Senior Vice President

### CALPINE CORPORATION

#### $5,000,000,000 Debtor-in-Possession and Exit Loan Facility
#### Commitment Letter

Ladies and Gentlemen:

You have advised Credit Suisse ("*CS*"), Credit Suisse Securities (USA) LLC ("*CS Securities*" and, together with CS and their respective affiliates, "*Credit Suisse*"), Goldman Sachs Credit Partners L.P. (together with its affiliates, "*Goldman*"), JPMorgan Chase Bank N.A. ("*JPMorgan Chase Bank*"), J.P. Morgan Securities Inc. ("*JPMorgan Securities*" and together with JPMorgan Chase Bank and their respective affiliates, "*JPMorgan*"), Deutsche Bank Securities Inc. ("*DBSI*") and Deutsche Bank Trust Company Americas ("*DBTCA*" and together with its affiliates, "*Deutsche*", and Deutsche together with Credit Suisse, Goldman and JPMorgan, the "*Commitment Parties*" or "*us*" or "*we*") that Calpine Corporation (the "*Company*" or "*you*") and certain of your direct and indirect domestic subsidiaries filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "*Cases*") in the Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*").

You have further advised us that the Company desires to establish a $5.0 billion secured superpriority debtor-in-possession facility that is convertible to a secured exit facility, with the loans under such facility being allocated as follows: (a) a senior secured first lien term loan facility in an aggregate principal amount of $4.0 billion (the "*First Priority Term Facility*"); and (b) a senior secured first lien revolving credit facility in an aggregate principal amount of up to $1.0 billion (the "*Revolving Facility*", and together with the First Priority Term Facility, the "*Facilities*"). The proceeds of the Facilities will be used (a) to refinance the Existing DIP Facilities (such term and each other capitalized term used but not defined herein having the meaning assigned to such terms in the Summary of Principal Terms and Conditions attached hereto as Exhibit A (the "*Term Sheet*"), (b) to repay and redeem the CalGen Prepetition Secured Obligations, (c) to refinance subsidiary secured debt, secured lease obligations and existing preferred securities issued Metcalf, CCFC, Gilroy, Auburndale and by other entities to be agreed upon, subject to certain limitations, and (d) for working capital and other general corporate purposes of the Borrower, the Guarantors and, to the extent permitted by the documentation for the Facilities, their subsidiaries (including, as relevant for each category and among other things, satisfaction of any potential claims, premiums or penalties related to (i) any "makewhole", repayment, prepayment or call provisions, (ii) any contract defaults, or (iii) any contract damages (collectively, the "Makewhole Claims")) (the transactions described in clauses (a) through (d) and the preceding parenthetical referred to herein, collectively, as the "*Transactions*").

*Calpine Commitment Letter*

1.    Commitments.

In connection with the foregoing, CS is pleased to advise you of its commitment to provide up to $2.2 billion of the First Priority Term Facility and $550 million of the Revolving Facility, Goldman is pleased to advise you of its commitment to provide up to $1.4 billion of the First Priority Term Facility and $350 million of the Revolving Facility and JPMorgan Chase Bank is pleased to advise you of its commitment to provide up to $400 million of the First Priority Term Facility and $100 million of the Revolving Facility, in each case, upon the terms and subject to the conditions set forth or referred to in this commitment letter, including the Term Sheet and other attachments hereto (collectively, this *"Commitment Letter"*).    The obligations of the Commitment Parties hereunder are several and not joint.

2.    Agency Roles.

You hereby appoint (a) CS Securities, Goldman, JPMorgan Securities and DBSI to act, and each hereby agrees to act, as joint bookrunners and joint lead arrangers for the Facilities (together in such capacities, the *"Joint Lead Arrangers"*) and (b) CS to act, and CS hereby agrees to act, as sole administrative agent and sole collateral agent for the Facilities, in each case on the terms and subject to the conditions set forth or referred to in this Commitment Letter.  Each of the Joint Lead Arrangers and CS, in such capacities, will perform the duties and exercise the authority customarily performed and exercised by it in such roles.  You agree that no other titles will be awarded and no compensation (other than that expressly contemplated by this Commitment Letter, the Fee Letter and other letters executed in connection with this Commitment Letter, (collectively, the *"Commitment Papers"*)) will be paid in connection with the Facilities unless you and we shall so agree. You agree that CS Securities shall be the sole party with "first-left" placement, with Goldman acting as "second-left" of CS Securities and JPMorgan acting as "third-left" of CS Securities, on all marketing and other materials or documentation used or distributed in connection with the Facilities.

3.    Syndication.

CS Securities reserves the right in its discretion to syndicate all or a portion of our commitments with respect to the Facilities to a group of banks, financial institutions and other institutional lenders (together with CS, Goldman, JPMorgan Chase Bank and DBTCA, the *"Lenders"*) identified by us in consultation with you (it being understood that our respective commitments hereunder are not conditioned upon the commencement or successful completion of any such syndication) at any time after the delivery by us of this Commitment Letter (and such syndication may, at its sole discretion, continue after the execution of definitive documentation for the Facilities), and you agree actively to assist us in completing a satisfactory syndication and to provide CS Securities with a period of at least 30 consecutive days following the formal launch at a meeting of potential Lenders of the general syndication of the Facilities and immediately prior to the Closing Date to syndicate the Facilities.  Such assistance shall include (a) your using commercially reasonable efforts to ensure that any syndication efforts benefit materially from your existing lending and investment banking relationships, (b) direct contact between senior management, representatives and advisors of the Company and the proposed Lenders, (c) assistance by the Company in the preparation of a Confidential Information Memorandum for each Facility and other marketing materials to be used in connection with the syndication as requested by us, (d) your providing an updated DIP budget, (e) your providing or causing to be provided a reasonably detailed business plan or projections of the Company and its subsidiaries for the years 2006 through 2012 and such fiscal quarters to be agreed upon, in each case in form and substance reasonably satisfactory to the Joint Lead Arrangers, (f) prior to the formal launch of the general syndications, the obtaining of ratings for each Facility from each of Standard & Poor's Ratings Service and Moody's Investors Service, Inc., and (g) the hosting, with CS Securities, of one or more meetings of prospective Lenders.  You agree, at the request of CS Securities, to assist in the preparation of a version of the Confidential Information Memorandum and

other marketing materials and presentations to be used in connection with the syndication of the Facilities, consisting exclusively of information and documentation that is either (i) publicly available or (ii) not material with respect to the Company or its subsidiaries or any of their respective securities for purposes of foreign, United States Federal and state securities laws (all such information and documentation being "*Public Lender Information*"). Any information and documentation that is not Public Lender Information is referred to herein as "*Private Lender Information*". You further agree that each document to be disseminated by CS Securities to any Lender in connection with the Facilities will, at the request of CS Securities, be identified by you as either (i) containing Private Lender Information or (ii) containing solely Public Lender Information.

CS Securities will manage all aspects of any syndication in consultation with you, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocation of the commitments among the Lenders, any naming rights and the amount and distribution of fees among the Lenders. To assist CS Securities in its syndication efforts, you agree promptly to prepare and provide to CS Securities all information with respect to the Company and its subsidiaries, and the Transactions, including all financial information and projections (the "*Projections*"), as CS Securities may reasonably request.

4.    Information.

You hereby represent and covenant (and it shall be a condition to each of CS's, Goldman's and JPMorgan Chase Bank's respective commitments hereunder and the agreements of the Commitment Parties to perform the services described herein) that (a) all information, other than the Projections (the "*Information*"), that has been or will be made available to any Commitment Party by or on behalf of you or any of your representatives is or will be, when furnished, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, when taken as a whole, not materially misleading in light of the circumstances under which such statements are made, and (b) the Projections that have been or will be made available to any Commitment Party by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon accounting principles consistent with the audited historical financial statements of the Company and upon assumptions that are reasonable at the time made and at the time the related Projections are first made available to such Commitment Party (it being acknowledged that no representation is made that the Projections will actually be realized). You agree that if at any time prior to the closing of the Facilities, any of the representations in the preceding sentence would be incorrect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information and the Projections so that such representations will be correct under those circumstances. In arranging and syndicating the Facilities, we will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof.

5.    Fees.

As consideration for CS's, Goldman's and JPMorgan Chase Bank's respective commitments hereunder and the agreements of the Commitment Parties to perform the services described herein, you agree to pay to Credit Suisse, Goldman and JPMorgan the fees set forth in the fee letter dated the date hereof and delivered herewith with respect to the Facilities (the "*Fee Letter*") in accordance with the terms set forth in the Fee Letter.

6.    Conditions Precedent.

CS's, Goldman's and JPMorgan Chase Bank's respective commitments hereunder and the agreements of the Commitment Parties to perform the services described herein, are subject to (a) our not having discovered or otherwise having become aware of any information not previously disclosed to us that is inconsistent in a material and adverse manner with our understanding, based on the information provided to us prior to the date hereof, of (i) the business, assets, liabilities, operations, financial condition, operating results or Projections of the Company and its subsidiaries, taken as a whole, or (ii) the Transactions; (b) there not having occurred any event, change or condition since December 31, 2005 (it being understood that the commencement, continuation and prosecution of the Cases do not constitute such a change) that, individually or in the aggregate, has had, or could reasonably be expected to have, a material adverse effect on the business, assets, liabilities, operations, financial condition, operating results or Projections of the Company and its subsidiaries, taken as a whole; (c) our satisfaction that, until the completion of a successful syndication (as defined below), there shall be no other issues of debt securities or commercial bank or other credit facilities of the Company or its subsidiaries being announced, offered, placed or arranged other than project level financing to be agreed upon (the "*Clear Market*"); (d) the negotiation, execution and delivery of a credit agreement substantially in the form of Exhibit B annexed hereto (with such modifications as may be mutually agreed upon) and other definitive documentation with respect to the Facilities reasonably satisfactory to Credit Suisse, Goldman, JPMorgan and their respective counsel generally consistent with the documentation for the Existing DIP Facilities; (e) your compliance in all material respects with the terms of the Commitment Letter and your compliance in all respects with any other Commitment Papers; and (f) the other conditions set forth or referred to in the Term Sheet.  For purposes hereof, a "*successful syndication*" shall be deemed to have occurred upon the earlier of (i) 30 days after the Closing Date and (ii) the Joint Lead Arrangers and their respective affiliates holding no more than $500,000,000 of the aggregate commitments under the Facilities (without affecting the foregoing definition, CS Securities, Goldman and JPMorgan shall agree among themselves that (x) the allocation thereof among them shall be ratable in accordance with their respective commitments hereunder and (y) any reduction of the commitments under the Facilities held by them pursuant to the syndication would ratably reduce their respective commitments hereunder).

7.    Indemnification.

You agree (a) to indemnify and hold harmless each Commitment Party and its officers, directors, employees, agents, advisors, controlling persons, members and successors and assigns (each, an "*Indemnified Person*") from and against any and all actual losses, claims, damages, liabilities and reasonable out-of-pocket expenses (in each case excluding lost profits), joint or several, to which any such Indemnified Person may become subject arising out of or in connection with the Commitment Papers the Transactions, the Facilities or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any such Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by the Company or any of its affiliates), and to reimburse within ten business (10) days after receipt of a summary statement with such supporting documentation as reasonably requested by the Borrower each such Indemnified Person for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to (A) losses, claims, damages, liabilities or related expenses to the extent they are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the bad faith, willful misconduct or gross negligence of such Indemnified Person or any of such Indemnified Person's affiliates or any of such Indemnified Person's (or such Indemnified Person's affiliates') officers, directors, employees, controlling persons or members, or (B) any settlement entered into by such Indemnified Person without your written consent, such consent not to be unreasonably withheld or delayed (*provided* that the foregoing indemnity will apply to any such settlement referred to in this clause (B) in the event

that you were offered the ability to assume the defense of the action that was the subject matter of such settlement and elected not to assume such defense), and (b) subject to Bankruptcy Court approval in the Cases (which you agree to use commercially reasonable efforts to try to obtain as part of the DIP Refinancing Order (as defined below)) to reimburse each Commitment Party from time to time, within ten business (10) days after presentation of a summary statement with such supporting documentation as reasonably requested by the Borrower, whether or not the Facilities are funded, for all reasonable out-of-pocket expenses (including but not limited to expenses of each Commitment Party's due diligence investigation, consultants' fees, syndication expenses, travel expenses and fees, disbursements and other charges of counsel (including, without limitation, the reasonable fees and expenses of Shearman & Sterling LLP, as initial counsel to CS)), in each case incurred in connection with the Facilities and the preparation, negotiation and enforcement of the Commitment Papers, the definitive documentation for the Facilities and any security arrangements in connection therewith.  Notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall be liable for any indirect, special, punitive or consequential damages in connection with its activities related to the Facilities.

You also agrees that neither any Indemnified Person nor any of such Indemnified Person's affiliates, partners, directors, employees, controlling persons or member shall have any liability to the Borrower or any person asserting claims on behalf of or in right of the Borrower or any other person in connection with or as a result of either this arrangement or any matter referred to in the Commitment Papers, except to the extent that any losses, claims, damages, liabilities or expenses incurred by the Borrower or its affiliates, stockholders, partners or other equity holders have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct  of such Indemnified Person or such affiliates, partners, directors, employees, controlling persons or members in performing the services that are the subject of the Commitment Papers.

8.    Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities.

You acknowledge that each Commitment Party may, independently, be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein or otherwise.  We will not furnish confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or our other relationships with you to other companies.  You also acknowledge that we do not have any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by us from other companies.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and any Commitment Party is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether such Commitment Party has advised or is advising you on other matters, (b) each Commitment Party, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of such Commitment Party, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that each Commitment Party is independently engaged in a broad range of transactions that may involve interests that differ from your interests and no Commitment Party has any obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship, and (e) you waive, to the fullest extent permitted by law, any claims you may have against any Commitment Party for breach of fiduciary duty or alleged breach of fiduciary duty and agree that no Commitment Party shall have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors.

You further acknowledge that each Commitment Party is a full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, each Commitment Party may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own account and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of the Company and other companies with which the Company may have commercial or other relationships. With respect to any securities and/or financial instruments so held by any Commitment Party or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

9.    Assignments; Amendments; Governing Law; Etc.

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto (and Indemnified Persons) and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and Indemnified Persons). CS, Goldman and JPMorgan Chase Bank may each assign its respective commitment hereunder to one or more prospective Lenders, whereupon, if you have approved such assignee (such approval not to be unreasonably withheld or delayed), such party shall be released from the portion of its commitment hereunder so assigned. Any and all obligations of, and services to be provided by any Commitment Party hereunder (including, without limitation, the commitments) may be performed and any and all rights of a Commitment Party hereunder may be exercised by or through any of their respective affiliates or branches so long as no material adverse tax consequences result therefrom. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of Credit Suisse, Goldman, JPMorgan, Deutsche (only in the case where any such amendment, waiver or modification would adversely affect Deutsche) and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic transmission of a pdf copy shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter. You acknowledge that information and documents relating to the Facilities may be transmitted through Syndtrak, Intralinks, the internet, e-mail, or similar electronic transmission systems, and that no Commitment Party shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner. Subject to the Company's prior review and approval (not to be unreasonably withheld or delayed) each Commitment Party may place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the internet or worldwide web as it may choose, and circulate similar promotional materials, after the closing of the Facilities in the form of a "tombstone" or otherwise describing the names of the Company and its affiliates (or any of them), and the amount, type and closing date of the Facilities, all at such Commitment Party's expense. The Commitment Papers supersede all prior understandings, whether written or oral, between us with respect to the Facilities. **THIS COMMITMENT LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

10.    Jurisdiction.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of the New York State courts and the Federal courts of the United

States of America (including the United States Bankruptcy Court for the Southern District of New York) sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to the Commitment Papers or the transactions contemplated hereby or thereby, and agrees that all claims in respect of any such action or proceeding shall be heard and determined only in such New York State courts or, to the extent permitted by law, in such Federal courts, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to the Commitment Papers or the transactions contemplated hereby or thereby in any New York State court or in any such Federal court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and (d) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law; *provided* that this clause (d) shall not be construed as a waiver by any party hereto of any appeal rights such party may have.

11.    <u>Waiver of Jury Trial</u>.

**EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THE COMMITMENT PAPERS OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.**

12.    <u>Confidentiality</u>.

This Commitment Letter is delivered to you with the understanding that none of the Commitment Papers or any of their terms or substance, or the activities of any Commitment Party pursuant hereto, shall be disclosed, directly or indirectly, to any other person, without the prior written consent of the Commitment Parties, except (a) to your officers, directors, employees, attorneys, accountants and advisors on a confidential and need-to-know basis or (b) as required by applicable law, including the Bankruptcy Code, an order of a court or an administrative agency or compulsory legal process (in which case you agree to the extent not prohibited by applicable law or such process, to inform us promptly thereof). Additionally, any of the parties hereto may make disclosures of (i) this Commitment Letter and of the Fee Letter to the Bankruptcy Court for approval of this Commitment Letter, the Fee Letter and the Facilities, and (ii) this Commitment Letter and the Fee Letter to any official committee appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code and their respective legal and financial advisors; *provided* that (x) such party will notify the other parties hereto of any such disclosure prior to making such disclosure and (y) you take commercial reasonable actions to prevent the Fee Letter from becoming publicly available, including without limitation, the filing of a motion or an ex parte request pursuant to Sections 105(a) and 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 seeking an order of the Bankruptcy Court authorizing you to file the Fee Letter under seal. Notwithstanding anything herein to the contrary, if the Bankruptcy Court directs you to disclose to the Bankruptcy Court any other Commitment Papers, you may make such disclosure so long as (x) you notify the other parties hereto prior to making such disclosure and (y) you take commercially reasonable actions to prevent such Commitment Papers from becoming publicly available, including without limitation, the filing of a motion or an ex parte request pursuant to Sections 105(a) and 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 seeking an order of the Bankruptcy Court authorizing you to file such Commitment Papers under seal.

Notwithstanding anything herein to the contrary, any party to this Commitment Letter (and any employee, representative or other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by the Commitment Papers  and all materials of any kind (including opinions or other tax analyses) that are

8

provided to it relating to such tax treatment and tax structure, except that (i) tax treatment and tax structure shall not include the identity of any existing or future party (or any affiliate of such party) to the Commitment Papers, and (ii) no party shall disclose any information relating to such tax treatment and tax structure to the extent nondisclosure is reasonably necessary in order to comply with applicable securities laws. For this purpose, the tax treatment of the transactions contemplated by the Commitment Papers is the purported or claimed U.S. Federal income tax and state tax treatment of such transactions and the tax structure of such transactions is any fact that may be relevant to understanding the purported or claimed U.S. Federal income tax and state tax treatment of such transactions.

13.    Surviving Provisions.

        The compensation, reimbursement, indemnification, confidentiality, syndication, jurisdiction, governing law and waiver of jury trial provisions contained in the Commitment Papers shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments and agreements of the Commitment Parties to perform the services described herein; provided that your obligations under this Commitment Letter, other than those relating to confidentiality, to the syndication of the Facilities and to the Clear Market (which shall remain in full force and effect), shall, to the extent covered by the definitive documentation relating to the Facilities, automatically terminate and be superseded by the applicable provisions in such definitive documentation upon the Closing Date.

14.    PATRIOT Act Notification.

        Each Commitment Party hereby notifies you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "*PATRIOT Act*"), it and each Lender are required to obtain, verify and record information that identifies the Borrower, which information includes the name, address, tax identification number and other information regarding the Borrower that will allow it or such Lender to identify the Borrower in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to each Commitment Party and each Lender.

15.    Acceptance and Termination.

        CS's, Goldman's and JPMorgan Chase Bank's respective offers (and once binding, commitments) hereunder and the agreements of each of CS and each Joint Lead Arranger shall expire automatically and without further action or notice on the earliest of (a) unless you have delivered to the Joint Lead Arrangers an executed copy of the Commitment Papers by the close of business on the business day immediately following the day of the entry by the Bankruptcy Court of the DIP Refinancing Order (as defined below), midnight on the business day immediately following the day on which the Bankruptcy Court enters such DIP Refinancing Order; provided that if such DIP Refinancing Order shall be stayed by any court of competent jurisdiction prior to the close of business on the business day following the entry of such order, the expiration of such offers and commitments of the Commitment Parties under this clause (a) shall be at the close of business on the business day following the day the DIP Refinancing Order is no longer subject to such stay if you have not delivered an executed copy of the Commitment Papers prior to such time, (b) any dismissal of the Cases or the appointment in any of the Cases of a trustee or examiner with expanded powers (unless the Closing Date shall have already occurred), (c) 5:00 p.m. New York City time, on March 30, 2007 (unless the Closing Date shall have already occurred), (d) the expiration of the "exclusivity period" (as it may be extended) in any of the Cases (unless the Closing Date shall have already occurred), (e) the conversion of any of the Cases to a chapter 7 case (unless the Closing Date shall have already occurred) or (f) the date which is sixteen (16) days after the DIP Refinancing Order shall have been entered by the Bankruptcy Court (so long as such

9

DIP Refinancing Order shall be in full force and effect and shall not be stayed, reversed, amended or modified) if you have not advised CS, Goldman and JPMorgan in writing by such date that you wish to proceed to consummate the Facilities in accordance with Section 1(iii) of the Fee Letter (unless the Closing Date shall have already occurred) (each, a "*Commitment Expiration Date*"). This Commitment Letter constitutes an irrevocable offer by the Commitment Parties, subject to the conditions set forth herein (it being understood that this Commitment Letter will become a binding commitment on each Commitment Party only after it has been duly executed and delivered by you in accordance with the first sentence of this Section 15). In the event that the Commitment Expiration Date occurs, then this Commitment Letter and the commitments hereunder, and each Joint Lead Arranger's agreement to perform the services described here, shall automatically terminate without further action or notice and without further obligation to you unless each Commitment Party shall, in its discretion, agree to an extension. If prior to the execution of the definitive documentation for the Facilities the DIP Refinancing Order shall at any time cease to be in full force and effect or shall be reversed, or modified in a manner that is material and adverse to CS, Goldman or JPMorgan (as reasonably determined collectively by CS, Goldman and JPMorgan), CS, Goldman and JPMorgan Chase may, in their sole discretion, collectively terminate the commitments hereunder and terminate the agreements to perform the services described herein without further obligation hereunder. For purposes hereof, a "*DIP Refinancing Order*" shall mean an order entered by the Bankruptcy Court (i) authorizing the Company and its applicable subsidiaries to enter into, and perform under, the Facilities (including, without limitation, authorizing the execution and delivery of the definitive documentation for the Facilities, the refinancing of the Existing DIP Facilities and the repayment of the CalGen Prepetition Secured Obligations including any allowed Makewhole Claims related thereto to the extent such determination has been made by the Bankruptcy Court), (ii) granting the liens and claims contemplated hereby and authorizing the Company to pay to each Commitment Party the fees and expenses set forth in the Commitment Papers, (iii) otherwise authorizing the Company and each of its applicable subsidiaries to accept, incur and perform their respective obligations under or contemplated by the Commitment Papers, (iv) specifically providing that each Commitment Party's right to receive the fees as outlined in the Commitment Papers, and reimbursement of all reasonable costs and out-of-pocket expenses incurred in connection with the financing outlined herein and as set forth therein shall be entitled to priority as administrative expense claims under Section 503(b)(1) of the United States Bankruptcy Code, whether or not the Facilities are consummated (and upon consummation of the Facilities shall be entitled to such superpriority claim status and liens as shall apply to the obligations under the Facilities) and (v) otherwise in form and substance reasonably satisfactory to each of Credit Suisse, Goldman, JPMorgan and their respective counsel (it being understood that (i) whether the Makewhole Claims are permitted to be repaid under such order shall not affect the determination of whether such order is reasonably satisfactory to each of Credit Suisse, Goldman, JPMorgan and their respective counsel and (ii) and an order entered by the Bankruptcy Court that satisfies each of the criteria set forth in this sentence shall be deemed to have been consented to by the Commitment Parties).

[Signature Page Follows]

We are pleased to have been given the opportunity to assist you in connection with the financing.

Very truly yours,

**CREDIT SUISSE SECURITIES (USA) LLC**

By_____

Name:
Title:

James S. Finch
Managing Director

**CREDIT SUISSE, CAYMAN ISLANDS
BRANCH**

By_____

Name:
Title:

JAMES MORAN
MANAGING DIRECTOR

By_____

Name:
Title:

NUPUR KUMAR
ASSOCIATE

GOLDMAN SACHS CREDIT PARTNERS, L.P.

By _____
    Name: Stephen P. Hickey
    Title: Authorized Signatory

022537-0132-08741-NY03 2567140

J.P. MORGAN SECURITIES INC.

By_____
Name: THOMAS M. CANNING
Title: MD

JPMORGAN CHASE BANK, N.A.

By_____
Name:
Title: THOMAS L. CASEY
       VICE PRESIDENT

*Calpine Commitment Letter Signature Page*

DEUTSCHE BANK SECURITIES INC.

By
Name: Thomas W. Cole
Title: Managing Director

By
Name: David J. Crescenzi
Title: Director

DEUTSCHE BANK TRUST COMPANY
AMERICAS

By
Name: Calli S. Hayes
Title: Managing Director

By
Name: Marcus M. Tarkington
Title: Director

*Calpine Commitment Letter Signature Page*

Accepted and agreed to as of
the date first above written:

**CALPINE CORPORATION**


By_____
     Name:
     Title:

INDICATIVE AND FOR DISCUSSION PURPOSES ONLY
CONFIDENTIAL
EXHIBIT A

### CALPINE CORPORATION

**Summary of Terms and Conditions
$5,000,000,000 Senior Secured Credit Facilities**

Borrower:

Calpine Corporation, as a debtor-in-possession in the jointly administered Chapter 11 cases having the caption "In re Calpine Corporation et al." (the "***Bankruptcy Cases***") that currently are pending under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"), and reorganized Calpine Corporation, as the context may require (the "***Borrower***").

Guarantors:

All obligations of the Borrower under the Facilities (as defined below) will be irrevocably and unconditionally guaranteed by (i) prior to the Conversion Date (as defined below), each of Calpine's direct and indirect subsidiaries that presently are debtors in the Bankruptcy Cases and guarantors (subject to certain exclusions reasonably acceptable to the Administrative Agent, the "***Existing DIP Guarantors***") under the $2,000,000,000 Amended and Restated Revolving Credit, Term Loan and Guarantee Agreement dated as of February 23, 2006 (the credit facilities under such agreement (as amended) being the "***Existing DIP Facilities***") and (ii) after the Conversion Date, the Existing DIP Guarantors, subject to additions and exceptions to be agreed upon. The foregoing entities, together with any of Calpine's direct or indirect subsidiaries whose secured debt is refinanced pursuant to the Additional Term Loans (as defined below), are collectively referred to as the "***Guarantors***," and together with the Borrower, the "***Loan Parties***."

Agent:

Credit Suisse, acting through one or more of its branches or affiliates ("***CS***"), will act as sole administrative agent and collateral agent (collectively, in such capacities, the "***Agent***") for a syndicate of banks, financial institutions and other institutional lenders (together with CS, Goldman, JPMorgan Chase Bank and DBTCA (each as defined in the Commitment Letter to which this Summary of Terms and Conditions is attached, the "***Commitment Letter***"), the "***Lenders***"), and will perform the duties customarily associated with such roles.

2

| Joint Bookrunners and Joint Lead Arrangers: | | Credit Suisse Securities (USA) LLC, Goldman Sachs Credit Partners L.P., J.P. Morgan Securities Inc. and Deutsche Bank Securities Inc. will act as joint bookrunners and joint lead arrangers for the Facilities (collectively, in such capacities, the "*Joint Lead Arrangers*"), and will perform the duties customarily associated with such roles. |

Issuing Banks:    Credit Suisse and/or such other Lenders acceptable to the Borrower and Credit Suisse.

Facilities:    $5,000,000,000 in the aggregate allocated as follows:

(A)    A Secured First Priority Term Loan Facility in an aggregate principal amount equal to $4,000,000,000 (the "*Term Facility*").

(B)    A Secured First Priority Revolving Credit Facility in an aggregate principal amount equal to $1,000,000,000 (the "*Revolving Facility*" and, together with the Term Facility, the "*Facilities*"), including a swingline subfacility of up to $10,000,000 and a letter of credit subfacility (the letters of credit issued thereunder, the "*Letters of Credit*") of up to $550,000,000.

Availability:    (A)    Loans under the Term Facility will be available pursuant to a single borrowing on the Closing Date (as defined below).

(B)    Loans and Letters of Credit under the Revolving Facility will be available beginning on the Closing Date on the same general terms and conditions as the Existing DIP Facilities.

Purpose:    (A)    The proceeds of the Term Facility shall be used (a) to refinance the Existing DIP Facilities, (b) to repay and redeem the Calpine Generating Company, LLC Secured Revolver, Term Loans, FRNs and Notes (collectively, the "*CalGen Prepetition Secured Obligations*"), (c) to refinance subsidiary secured debt. secured lease obligations and existing preferred securities issued by Metcalf, CCFC, Gilroy, Auburndale and by such other entities to be agreed upon, subject to certain limitations, and (d) for working capital and other general corporate purposes of the Loan Parties and, to the extent permitted by the documentation for the Facilities, their subsidiaries.

(B)    The proceeds of the Revolving Facility shall be used for working capital and other general corporate purposes of the Loan Parties and, to the extent permitted by the documentation for the Facilities, their

3

subsidiaries.

(C) The Revolving Facility may also be used, at the Borrower's election, to satisfy (a) any Makewhole Claims and (b) prepetition claims under a confirmed plan of reorganization of the Loan Parties (the "*Plan*").

Closing Date:

The date upon which all Conditions Precedent to Initial Extension of Credit have been satisfied or waived (the "*Closing Date*").

Final Maturity:

The Facilities will mature on the earlier of (i) the effective date of the Plan (the "*Effective Date*") and (ii) the second anniversary of the Closing Date; provided, however, that if the Conversion Date occurs on or before the second anniversary of the Closing Date, the Facilities will mature on the seventh anniversary of the Closing Date (such applicable date, the "*Final Maturity Date*").

Accordingly, subject to the timely satisfaction of the Exit Conditions (as defined below), Calpine has the option to convert the Facilities from debtor-in-possession financing to exit financing with a maturity date of the seventh anniversary of the Closing Date.

Exit Conditions[1]:

The "*Conversion Date*" shall be the date on which all of the following conditions (the "*Exit Conditions*") are satisfied: (a) the occurrence of the Effective Date; (b) the Borrower shall have obtained corporate credit ratings from Standard & Poor's Ratings Service ("*S&P*") and from Moody's Investors Service, Inc. ("*Moody's*"); (c) the Facilities shall be rated by S&P and Moody's; (d) the Agent shall have received projections in respect of the Borrower and its subsidiaries for the five-year period beginning the Effective Date, and such projections shall reflect *pro forma* compliance with the financial covenants throughout such five-year period; (e) the sum of cash, cash equivalents and unused availability under committed credit facilities (including the Facilities) immediately after giving effect to the Conversion Date shall not be less than $250 million; (f) the Agent shall have received a *pro forma* consolidated balance sheet as of the projected exit date, giving effect to the occurrence of the Effective Date; (g) all representations

---

[1] In terms of definitive documentation for the Facilities it is contemplated that the parties will enter into a DIP Credit Agreement on or prior to the Closing Date and that upon the Conversion Date, the provisions of the DIP Credit Agreement will cease to apply and the Facilities shall be governed by an Exit Credit Agreement, the form of which shall be attached as an exhibit to the DIP Credit Agreement.

4

and warranties are true and correct in all material respects as of the Effective Date (other than those which relate to an earlier date in which case they shall be true and correct in all material respects as of such date) (it being understood that any representation or warranty that is qualified as to materiality or material adverse effect shall be correct in all respects); (h) compliance with all financial covenants on a *pro forma* basis after giving effect to the occurrence of the Effective Date; and (i) no event of default or default exists or would exist after giving effect to the occurrence of the Effective Date, *provided* that defaults or events of default may exist under the Facilities if such defaults or events of default (x) shall have occurred and be continuing as a result of a default under material indebtedness which causes a default to occur under the Facilities, (y) arise in connection with the consummation of a Plan or (z) consist of defaults or events of default meeting criteria to be agreed upon or the adverse consequences of which would be rendered moot or otherwise negated by the effectiveness of the provisions of the Facilities after the Effective Date.

| | | |
|---|---|---|
| Amortization: | (A) | The Term Facility will amortize at 1% per year, payable in equal quarterly installments, with the balance to be paid on the Final Maturity Date. |
| | (B) | The Revolving Facility will mature and the commitments thereunder will terminate on the Final Maturity Date, with all outstanding amounts thereunder payable on such date. |
| Interest Rates and Fees: | | As set forth on Annex I hereto. |
| Default Rate: | | The applicable interest rate <u>plus</u> 2.0% per annum. |
| Letters of Credit: | | Each Letter of Credit shall expire not later than the earlier of (a) 12 months after its date of issuance and (b) the fifth business day prior to the Final Maturity Date; *provided* that any Letter of Credit may provide for renewal thereof for additional periods of up to 12 months (which in no event shall extend beyond the date referred to in clause (b) above). |
| | | Drawings under any Letter of Credit shall be reimbursed by the Borrower on the same business day (or next business day for drawings after noon, New York City time). To the extent that the Borrower does not reimburse the Issuing Bank on the same business day, the Lenders under the Revolving Facility shall be irrevocably obligated to reimburse the Issuing Bank pro rata based upon their respective Revolving Facility |

5

commitments.

The issuance of all letters of credit shall be subject to the customary procedures of the Issuing Bank.

**Ability to Secure Hedging Obligations:**

The Loan Parties shall be permitted to grant first priority liens in the Collateral to secure obligations under "right way risk" transactions and/or commodity or interest rate hedging contracts, in each case, with any Joint Lead Arranger, the Agent, any Lender or any affiliates thereof or any other person meeting reasonable criteria to be agreed upon entered into after the Closing Date in the ordinary course of business for non-speculative purposes (the "*Hedging Obligations*"). Such liens will rank *pari passu* with the first priority liens granted to secure the obligations under the Facilities.

**Ability to Satisfy Make-Whole Claims:**

The Loan Parties shall be permitted to satisfy any Makewhole Claims at any time, subject to covenant compliance. As described above, the proceeds of the Revolving Facility may be used to satisfy any such claims. Pending resolution of the Makewhole Claims asserted by holders of the CalGen Prepetition Secured Obligations, the existing liens on the property of the CalGen debtors securing such claims shall be senior to the liens on the property of the CalGen debtors granted to secure the obligations under the Facilities, as described below.

**Priority and Liens Prior to Conversion Date:**

(A)    All obligations in respect of the Facilities shall be entitled to super-priority administrative expense claim status against each Loan Party.

(B)    All obligations under the Facilities shall be secured by (i) the same liens granted under the Existing DIP Facilities, (ii) first priority liens on all property presently securing the CalGen Prepetition Secured Obligations, and (iii) in the event the proceeds of the Term Facility or of a borrowing under the Additional Term Loans (as defined below) are used to refinance in full secured debt of any subsidiary of the Borrower, first priority liens on all property previously securing the applicable subsidiary's refinanced debt, subject in each case to the carve-out and certain exceptions to be agreed upon.

Notwithstanding the foregoing, (i) all liens described above shall be *pari passu* with post-petition Hedging Obligations, and (ii) to the extent that the holders of CalGen Prepetition Secured Obligations retain a security interest in the property of the CalGen debtors to secure disputed claims (e.g., CalGen Makewhole

6

Claims), the liens described above granted on the property of the CalGen debtors to secure the Facilities shall be subject to such security interest (the "*CalGen Make-Whole Liens*"), pending allowance, disallowance and/or payment of any such claims.

**Liens From and After Conversion Date:**

All obligations under the Facilities shall be secured by first priority liens on all of the property of the Loan Parties, whether owned as of the Conversion Date or thereafter acquired (subject to customary and limited exceptions to be agreed upon) (including without limitation, all of the capital stock owned by the Loan Parties in their respective direct subsidiaries (limited, in the case of foreign subsidiaries, to 65% of the capital stock of first tier foreign subsidiaries to the extent a pledge of a greater percentage could reasonably be expected to result in adverse tax consequences)), shall be *pari passu* only with the Hedging Obligations, and shall be junior only to the CalGen Make-Whole Liens pending allowance, disallowance and/or payment of the corresponding Makewhole Claims.

The term "*Collateral*" means the property securing the obligations under the Facilities at any time.

**Incremental Term Facility:**

The Borrower shall be entitled on one or more occasions and subject to satisfaction of customary conditions to incur additional term loans (the "*Additional Term Loans*") under the Term Facility, or under a new term loan facility to be included in the Facilities in an aggregate principal amount of up to $2,000,000,000 and to have the same guarantees as, and be secured on a *pari passu* basis by the same collateral securing the Facilities; *provided* that (a) the proceeds of such Additional Term Loans are applied to repay secured debt, secured lease obligations or preferred securities of project level subsidiaries, so long as the assets of such subsidiary (to the extent such liens on assets of such subsidiary are not prohibited by existing contractual restrictions), and the equity interests in such subsidiary and each intermediate holding company between such subsidiary and the Borrower (to the extent such liens with respect to such intermediate holding company are not prohibited by existing contractual restrictions), are, upon such repayment, included as Collateral for the Facilities, except to the extent to be agreed upon; it being understood that to the extent that any such Liens on such assets are prohibited by existing contractual restrictions, the Borrower shall not permit any additional consensual Liens on such assets; (b) no event of default or default exists or would exist after giving effect thereto; (c) all financial covenants would

7

be satisfied on a *pro forma* basis on the date of incurrence and for the most recent determination period, after giving effect to any such Additional Term Loans and other customary and appropriate *pro forma* adjustment events, including any acquisitions or dispositions after the beginning of the relevant determination period but prior to or simultaneous with the borrowing of such Additional Term Loans; (d) all fees and expenses owing in respect of such increase to the Agent and the Lenders providing such Additional Term Loans shall have been paid; (e) the Applicable Margin with respect to such Incremental Facility shall not be higher than the then-Applicable Margin for the Term Facility plus 0.50%, *provided, however,* if the Applicable Margin with respect to such Incremental Facility would be higher than the then-Applicable Margin for the Term Facility plus 0.50%, then the Additional Term Loans shall be subject to a "most favored nation" pricing provision that ensures that the initial yield on the Additional Term Loans does not exceed the Applicable Margin on the Term Facility; (f) if such Additional Term Loans are incurred (i) prior to the Conversion Date, S&P and Moody's shall have reaffirmed (with no negative outlook) the Facilities ratings, after taking into account the incurrence of such Additional Term Loans and (ii) from and after the Conversion Date, S&P and Moody's shall have reaffirmed (with no negative outlook) the Borrower's corporate and the Facilities credit ratings after taking into account the incurrence of such Additional Term Loans; *provided, however,* in each case, no such rating affirmation will be required unless such Additional Term Loans exceed $500,000,000, or each increment of $500,000,000, of Additional Term Loans incurred under this clause (f) and (g) the other terms (except amortization or maturity) and documentation in the respect thereof, to the extent not consistent with the Facilities, shall otherwise be reasonably satisfactory to the Agent; *provided* that clauses (e) and (f) shall not be applicable to Additional Term Loans incurred to repay secured debt, secured lease obligations or preferred securities of certain subsidiaries to be agreed upon. The Borrower may seek commitments in respect of Additional Term Loans from existing Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and additional banks, financial institutions and other institutional lenders who will become Lenders in connection therewith.

**Ability to Refinance/Restructure Second Lien Corporate Debt:**

The Facilities will allow the Borrower, subject to the Exit Conditions described herein, flexibility in structuring a Plan, and to issue senior subordinated debt

8

|  | or equity either (a) to raise cash to satisfy second lien corporate bondholders or (b) to directly satisfy second lien corporate bondholders, as recovery consideration under the Plan. |
|---|---|
| Mandatory Prepayments Prior to <u>Conversion Date</u>: | Consistent with Existing DIP Facilities. |
| Mandatory Prepayments From and <u>After Conversion Date</u>: | Loans under the Facilities shall be prepaid with (a) a percentage of Excess Cash Flow (to be defined) to be agreed upon, which percentage shall be reduced at any time after the senior leverage ratio (to be defined) of the Borrower and its Subsidiaries is less than a level to be agreed upon, (b) 100% of the net cash proceeds of all asset sales or other dispositions of property of the Loan Parties (subject to exceptions and reinvestment provisions to be agreed upon), (c) 100% of the net cash proceeds of issuances, offerings or placements of debt obligations of the Loan Parties (subject to exceptions to be agreed upon), (d) 50% of the net cash proceeds of issuances of equity securities of the Loan Parties, and (e) 100% of tax refunds and pension plan reversions. |
| Voluntary Prepayments and <u>Reductions in Commitments</u>: | Voluntary reductions of the unutilized portion of the commitments under the Facilities and prepayments of the Facilities will be permitted at any time, in minimum principal amounts to be agreed upon, without premium or penalty. All voluntary prepayments will be applied pro rata to the remaining amortization payments under the Term Facility, <u>provided</u> that, at the Borrower's option, any such prepayment of the Term Facility may be applied to the first 24 months of scheduled amortization payments of the Term Facility following the applicable payment date in direct order of maturity and then to ratably reduce all remaining installments thereof.

Notwithstanding the foregoing, all voluntary prepayments shall be subject to reimbursement of the Lenders' redeployments costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period. |
| <u>Permitted Asset Sales</u>: | The Loan Parties may sell any assets, subject to compliance with the Mandatory Prepayments provisions. |

9

Representations and Warranties:

Prior to the Conversion Date, generally consistent with Existing DIP Facilities and will reflect the additional collateral and other terms set forth herein.

From and after the Conversion Date, usual and customary representations and warranties for a financing of this type with an issuer in the industry having a similar credit rating.

Affirmative and Negative Covenants:

Prior to the Conversion Date, generally consistent with Existing DIP Facilities and such other modifications as may be agreed upon (including removal of Geysers-specific obligations) and will reflect the additional collateral and other terms set forth herein.

From and after the Conversion Date, usual and customary affirmative and negative covenants for a financing of this type with an issuer in the industry having a similar credit rating, subject to permissions to be agreed upon.

Financial Covenants:

Prior to the Conversion Date, generally consistent with Existing DIP Facilities and such other modifications as may be agreed upon (including removal of Geysers-specific financial covenants) and will reflect the additional collateral and other terms set forth herein.

From and after the Conversion Date, usual and customary financial covenants for a financing of this type with an issuer in the industry having a similar credit rating, and to include (a) minimum interest coverage ratios; (b) maximum ratios of Facilities Debt to EBITDA; and (c) maximum ratios of Total Net Debt to EBITDA, in each case, with financial definitions, levels and test periods to be agreed upon.

Conditions Precedent to
Initial Extension of Credit:

Consistent with Existing DIP Facilities and will reflect the additional collateral and the other terms set forth herein, including:

(a)      Facilities rated by Moody's and S&P; and

(b)      the Bankruptcy Court shall have entered the DIP Refinancing Order (which shall not be stayed by the Bankruptcy Court or other court of competent jurisdiction), it being understood that absence of the filing or pendency of an appeal regarding the DIP Refinancing Order shall not be a condition precedent to the initial extension of credit under the Facilities.

Conditions Precedent to
All Extensions of Credit:

Prior to the Conversion Date, generally consistent with Existing DIP Facilities, to be modified to reflect the

10

additional collateral and other terms set forth herein.

From and after the Conversion Date, usual and customary conditions precedent.

Events of Default:

Prior to the Conversion Date, generally consistent with Existing DIP Facilities, and will reflect the additional collateral and other terms set forth herein.

From and after the Conversion Date, usual and customary events of default for a financing of this type with an issuer in the industry having a similar credit rating.

Voting and
Assignments and Participations:

Consistent with Existing DIP Facilities, to be modified to reflect the terms set forth herein.

Cost and Yield Protection:

Consistent with Existing DIP Facilities, to be modified to reflect the terms set forth herein.

Expenses and Indemnification:

The Borrower will indemnify the Joint Lead Arrangers, the Agent, the Lenders, the Issuing Bank, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each an "*Indemnified Person*") and hold them harmless from and against any and all actual losses, claims, damages, liabilities and reasonable out-of-pocket expenses (in each case excluding lost profits), joint or several, of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates) that relates to the financing contemplated hereby, or any transactions in connection therewith, *provided* that no Indemnified Person will be indemnified for (A) any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted from its bad faith, gross negligence or willful misconduct or the bad faith, gross negligence or willful misconduct of any of such Indemnified Person's affiliates or any of such Indemnified Person's (or such Indemnified Person's affiliates') officers, directors, employees, controlling persons or members, or (B) any settlement entered into by such Indemnified Person without the Borrower's written consent, such consent not be unreasonably withheld or delayed (*provided* that the foregoing indemnity will apply to any such settlement referred to in this clause (B) in the event that the Borrower was offered the ability to assume the defense of the action

11

that was the subject matter of such settlement and elected not to assume such defense). In addition, all documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of counsel) of the Joint Lead Arrangers, the Agent, the Issuing Bank, and the Lenders for enforcement costs and documentary taxes associated with the Facilities will be paid by the Borrower.

Governing Law and Forum:          New York.

Counsel to Agent and Joint Lead          Simpson Thacher & Bartlett LLP.
Arrangers:

ANNEX I

Interest Rates Prior to
Conversion Date:

At the option of the Borrower, Adjusted LIBOR plus the Applicable Margin or ABR plus the Applicable Margin.

The Applicable Margin with respect to Adjusted LIBOR loans shall be determined by reference to the Facilities' ratings by S&P and Moody's (or, in the event of a split rating, such rating by Moody's) on the Closing Date, as follows:

| S&P/Moody's Facilities Ratings | Applicable Margin |
|---|---|
| BB-/Ba3 (with stable outlook) | 2.00% |
| B+/B1 (with stable outlook) | 2.25% |
| B/B2 (with stable outlook) | 2.75% |
| B-/B3 or lower | 3.50% |

The Applicable Margin with respect to ABR loans shall be 1.00% per annum lower than the corresponding Applicable Margin for Adjusted LIBOR loans.

Interest Rates From and
After Conversion Date:

At the option of the Borrower, Adjusted LIBOR plus the Applicable Margin or ABR plus the Applicable Margin.

The Applicable Margin with respect to Adjusted LIBOR loans shall be determined by reference to the Borrower's corporate credit ratings by S&P and Moody's (or, in the event of a split rating, such rating by Moody's) on the Conversion Date, as follows:

| S&P/Moody's Corporate Ratings | Applicable Margin |
|---|---|
| BB-/Ba3 (with stable outlook) | 2.00% |
| B+/B1 (with stable outlook) | 2.25% |
| B/B2 (with stable outlook) | 2.75% |
| B-/B3 or lower | 3.50% |

The Applicable Margin with respect to ABR loans shall be 1.00% per annum lower than the corresponding Applicable Margin for Adjusted LIBOR loans. After the Conversion Date, the Applicable Margin with respect to the Revolving Facility shall be determined pursuant to a pricing grid to be agreed upon.

Interest:

The Borrower may elect interest periods of 1, 2, 3 or 6 months (if agreed to by all Lenders under the applicable Facility, 9 or 12 months) for Adjusted LIBOR borrowings. Interest periods in effect at the Conversion Date will continue under the Facilities after the Conversion Date.

2

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR loans based on the Prime Rate) and interest shall be payable at the end of each interest period and, in any event, at least every three months.

ABR is the Alternate Base Rate, which is the higher of (i) CS's Prime Rate and (ii) the Federal Funds Effective Rate plus 1/2 of 1.0%.

Adjusted LIBOR will at all times include statutory reserves.

Letter of Credit Fee:

A per annum fee equal to the interest rate margin applicable to Adjusted LIBOR loans under the Revolving Facility will accrue on the aggregate face amount of outstanding Letters of Credit, payable quarterly in arrears and upon the termination of the Revolving Facility.

In addition, the Borrower shall pay to the Issuing Bank, for its own account, (a) a fronting fee equal to 0.25% per annum (or such lesser percentage per annum to be agreed upon with the applicable Issuing Bank) of the aggregate face amount of outstanding Letters of Credit, payable quarterly in arrears and on the termination of the Revolving Facility, and (b) customary issuance and administration fees.

Commitment Fee:

Revolving Facility:  0.50% per annum.  The commitment fee shall be calculated on the unused commitments under the Revolving Facility and shall be payable quarterly in arrears and on termination of the Revolving Facility.

**EXHIBIT G**

**CalGen Secured Debt Summary**

| Issuance | Alleged No-Call Clause | Alleged Makewhole Clause | Acceleration Clause |
|---|---|---|---|
| • $200,000,000 First Priority Secured Revolving Loans Amended and Restated Credit Agreement | • None | • None | • Section 7.2 Acceleration: "In the case of an Event of Default [due to bankruptcy] . . . the outstanding Revolving Loans and Reimbursement Obligations shall become *due and payable immediately* without further action or notice. |
| • $235,000,000 First Priority Secured Floating Rate Notes Due 2009 First Priority Indenture | • Section 3.07 *Optional Redemption*: "The Issuers may not redeem all or any part of the Notes *prior to April 1, 2007*." | • Section 3.07 *Optional Redemption*: "*On or after April 1, 2007*, the Issuers may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days prior notice, at the redemption prices (expressed at percentages of principal amount) set forth below plus accrued and unpaid interest and Special Interest. . . ." <br><br> • If repayment occurs in 2007, the redemption price is 102.5%. | • Section 6.02 *Acceleration*: "In the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes will become *due and payable immediately* without further action or notice." |
| • $600,000,000 First Priority Secured Institutional Term Loans Due 2009 Credit And Guarantee Agreement | • Section 2.10 *Voluntary Prepayments*: "The First Priority Term Loans may not be voluntarily prepaid at any time *on or prior to April 1, 2007*." | • Section 2.10 *Voluntary Prepayments*: "The Borrower may . . . [prepay] the First Priority Term Loans, if such prepayment is *after April 1, 2007* but on or before April 1, 2008, in an amount equal to 102.5% of the principal so prepaid . . . ." | • Section 7.02 *Acceleration*: "In the case of any Event of Default [due to bankruptcy] . . . the outstanding First Priority Term Loans shall become *due and payable immediately* without further action or notice." |

| Issuance | Alleged No-Call Clause | Alleged Makewhole Clause | Acceleration Clause |
|---|---|---|---|
| • $640,000,000 Second Priority Secured Floating Rate Notes Due 2010 Second Priority Indenture | • <u>Section 3.07  Optional Redemption</u>: "The Issuers may not redeem all or any part of the Notes *prior to April 1, 2008*." | • <u>Section 3.07  Optional Redemption</u>: "*On or after April 1, 2008*, the Issuers may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days prior notice, at the redemption prices (expressed at percentages of principal amount) set forth below plus accrued and unpaid interest and Special Interest . . . ."<br><br>• If repayment occurs in 2008, the redemption price is 103.5%. | • <u>Section 6.02  Acceleration</u>: "In the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes will become *due and payable immediately* without further action or notice." |
| • $100,000,000 Second Priority Secured Institutional Term Loans Due 2010 Credit And Guarantee Agreement | • <u>Section 2.10  Voluntary Prepayments</u>: "The Second Priority Term Loans may not be voluntarily prepaid at any time *on or prior to April 1, 2008*." | • <u>Section 2.10  Voluntary Prepayments</u>: "The Borrower may . . . [prepay] the Second Priority Term Loans, if such prepayment is *after April 1, 2008* but on or before April 1, 2009, in an amount equal to 103.5% of the principal so prepaid . . . ." | • <u>Section 7.02  Acceleration</u>: "In the case of any Event of Default [due to bankruptcy] . . . the outstanding Second Priority Term Loans shall become *due and payable immediately* without further action or notice." |

2

| Issuance | Alleged No-Call Clause | Alleged Makewhole Clause | Acceleration Clause |
|---|---|---|---|
| • $680,000,00 Third Priority Secured Floating Rate Notes Due 2011 Third Priority Indenture | • *Section 3.07 Optional Redemption*: "*The Notes are not redeemable at the option of the Issuers.*" | • None | • *Section 6.02 Acceleration*: "In the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes will become *due and payable immediately* without further action or notice." |
| • $150,000,000 11⅛% Third Priority Secured Notes Due 2011 Third Priority Indenture | • *Section 3.07 Optional Redemption*: "*The Notes are not redeemable at the option of the Issuers.*" | • None | • *Section 6.02 Acceleration*: "In the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes will become *due and payable immediately* without further action or notice." |

**EXHIBIT H**

| Proof of Claim Number | Claimant | Debtor | Debt Issuance | Type of Claim | Total Principal Amount Due as of the Petition Date | Total Interest on Principal Due as of Repayment Date* | Total Principal and Interest Due as of Repayment Date* |
|---|---|---|---|---|---|---|---|
| 2664 | The Bank of Nova Scotia as Agent | Calpine Generating Company, LLC | CalGen First Lien Revolving Loans | Primary Obligor | $0.00 | $0.00 | $0.00 |
| 2626 | The Bank of Nova Scotia as Agent | Calpine Corpus Christi Energy LP | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2627 | The Bank of Nova Scotia as Agent | Corpus Christi Cogeneration, LP | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2628 | The Bank of Nova Scotia as Agent | Calpine Oneta Power, LP | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2629 | The Bank of Nova Scotia as Agent | Baytown Energy Center, LP | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2630 | The Bank of Nova Scotia as Agent | Baytown Power, LP | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2631 | The Bank of Nova Scotia as Agent | Channel Energy Center, LP | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2632 | The Bank of Nova Scotia as Agent | Calpine Power Equipment, LP | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2633 | The Bank of Nova Scotia as Agent | Channel Power LP | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2634 | The Bank of Nova Scotia as Agent | Calpine Freestone Energy, LP | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2635 | The Bank of Nova Scotia as Agent | Freestone Power Generation, LP | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2636 | The Bank of Nova Scotia as Agent | Calpine Pastoria Holdings, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2637 | The Bank of Nova Scotia as Agent | Pastoria Energy Facility, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2638 | The Bank of Nova Scotia as Agent | CalGen Project Equipment Finance Company Two, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2639 | The Bank of Nova Scotia as Agent | Columbia Energy LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2640 | The Bank of Nova Scotia as Agent | Delta Energy Center, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2641 | The Bank of Nova Scotia as Agent | Baytown Power GP, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2642 | The Bank of Nova Scotia as Agent | Calpine Baytown Energy Center GP, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2643 | The Bank of Nova Scotia as Agent | Calpine Baytown Energy Center LP, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2644 | The Bank of Nova Scotia as Agent | Calpine Oneta Power II, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2645 | The Bank of Nova Scotia as Agent | Decatur Energy Center, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2646 | The Bank of Nova Scotia as Agent | Calpine Oneta Power I, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2647 | The Bank of Nova Scotia as Agent | Carville Energy LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2648 | The Bank of Nova Scotia as Agent | Morgan Energy Center, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2649 | The Bank of Nova Scotia as Agent | Los Medanos Energy Center, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2650 | The Bank of Nova Scotia as Agent | Zion Energy LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2651 | The Bank of Nova Scotia as Agent | Calpine Corpus Christi Energy GP, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2652 | The Bank of Nova Scotia as Agent | Calpine Northbrook Southcoast Investors, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2653 | The Bank of Nova Scotia as Agent | Nueces Bay Energy, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2654 | The Bank of Nova Scotia as Agent | CalGen Equipment Finance Company, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2655 | The Bank of Nova Scotia as Agent | CalGen Project Equipment Finance Company Three, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2656 | The Bank of Nova Scotia as Agent | CalGen Project Equipment Finance Company One, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2657 | The Bank of Nova Scotia as Agent | CalGen Equipment Finance Holdings, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2658 | The Bank of Nova Scotia as Agent | Channel Power GP, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2659 | The Bank of Nova Scotia as Agent | Calpine Channel Energy Center GP, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2660 | The Bank of Nova Scotia as Agent | Calpine Channel Energy Center LP, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2661 | The Bank of Nova Scotia as Agent | Calpine Freestone Energy GP, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2662 | The Bank of Nova Scotia as Agent | Calpine Freestone, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2663 | The Bank of Nova Scotia as Agent | CPN Freestone, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 2665 | The Bank of Nova Scotia as Agent | CalGen Expansion Company, LLC | CalGen First Lien Revolving Loans | Guarantor | $0.00 | $0.00 | $0.00 |
| 3396 | Wilmington Trust FSB as Indenture Trustee | Calpine Generating Company, LLC | CalGen First Lien Notes | Primary Obligor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 |
| 3275 | Wilmington Trust FSB as Indenture Trustee | Calpine Oneta Power II, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 |

| Proof of Claim Number | Claimant | Debtor | Debt Issuance | Type of Claim | Total Principal Amount Due as of the Petition Date | Total Interest on Principal Due as of Repayment Date* | Total Principal and Interest Due as of Repayment Date* |
|---|---|---|---|---|---|---|---|
| 3393 | Wilmington Trust FSB as Indenture Trustee | Freestone Power Generation, LP | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3394 | Wilmington Trust FSB as Indenture Trustee | Calpine Northbrook Southcoast Investors, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3395 | Wilmington Trust FSB as Indenture Trustee | Delta Energy Center, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3397 | Wilmington Trust FSB as Indenture Trustee | Decatur Energy Center, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3398 | Wilmington Trust FSB as Indenture Trustee | Calpine Freestone, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3399 | Wilmington Trust FSB as Indenture Trustee | CPN Freestone, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3400 | Wilmington Trust FSB as Indenture Trustee | Calpine Freestone Energy, LP | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3401 | Wilmington Trust FSB as Indenture Trustee | Corpus Christi Cogeneration, LP | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3402 | Wilmington Trust FSB as Indenture Trustee | Calpine Freestone Energy GP, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3403 | Wilmington Trust FSB as Indenture Trustee | Columbia Energy LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3404 | Wilmington Trust FSB as Indenture Trustee | Corpus Christi Energy LP | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3405 | Wilmington Trust FSB as Indenture Trustee | Calpine Corpus Christi Energy GP, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3406 | Wilmington Trust FSB as Indenture Trustee | Channel Power LP | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3407 | Wilmington Trust FSB as Indenture Trustee | Calpine Channel Energy Center LP, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3408 | Wilmington Trust FSB as Indenture Trustee | Channel Power GP, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3409 | Wilmington Trust FSB as Indenture Trustee | Calpine Channel Energy Center GP, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3410 | Wilmington Trust FSB as Indenture Trustee | Calpine CalGen Holdings, Inc. | CalGen First Lien Notes | Pledgor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3411 | Wilmington Trust FSB as Indenture Trustee | Channel Energy Center, LP | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3412 | Wilmington Trust FSB as Indenture Trustee | Calpine Baytown Energy Center LP, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3413 | Wilmington Trust FSB as Indenture Trustee | Carville Energy LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3414 | Wilmington Trust FSB as Indenture Trustee | Calpine Baytown Energy Center GP, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3415 | Wilmington Trust FSB as Indenture Trustee | Calpine Project Equipment Finance Company Two, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3416 | Wilmington Trust FSB as Indenture Trustee | Calpine Power Equipment, LP | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3417 | Wilmington Trust FSB as Indenture Trustee | Calpine Project Equipment Finance Company Three, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3418 | Wilmington Trust FSB as Indenture Trustee | Calpine Project Equipment Finance Company One, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3419 | Wilmington Trust FSB as Indenture Trustee | CalGen Finance Corp. | CalGen First Lien Notes | Primary Obligor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3420 | Wilmington Trust FSB as Indenture Trustee | CalGen Expansion Company, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3421 | Wilmington Trust FSB as Indenture Trustee | CalGen Equipment Finance Holdings, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3546 | Wilmington Trust FSB as Indenture Trustee | Zion Energy LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3547 | Wilmington Trust FSB as Indenture Trustee | Pastoria Energy Facility, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3548 | Wilmington Trust FSB as Indenture Trustee | Nueces Bay Energy, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3549 | Wilmington Trust FSB as Indenture Trustee | Morgan Energy Center, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3550 | Wilmington Trust FSB as Indenture Trustee | Los Medanos Energy Center, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3551 | Wilmington Trust FSB as Indenture Trustee | Calpine Oneta Power I, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3552 | Wilmington Trust FSB as Indenture Trustee | Baytown Power, LP | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3553 | Wilmington Trust FSB as Indenture Trustee | Baytown Power GP, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3554 | Wilmington Trust FSB as Indenture Trustee | Baytown Energy Center, LP | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3586 | Wilmington Trust FSB as Indenture Trustee | Calpine Pastoria Holdings, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3587 | Wilmington Trust FSB as Indenture Trustee | Calpine Oneta Power, LP | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3588 | Wilmington Trust FSB as Indenture Trustee | CalGen Equipment Finance Company, LLC | CalGen First Lien Notes | Guarantor | $235,000,000.00 | $5,332,150.00 A | $240,332,150.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Generating Company, LLC | CalGen Second Lien Notes | Primary Obligor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | CalGen Finance Corp. | CalGen Second Lien Notes | Primary Obligor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |

| Proof of Claim Number | Claimant | Debtor | Debt Issuance | Type of Claim | Total Principal Amount Due as of the Petition Date | Total Interest on Principal Due as of Repayment Date* | Total Principal and Interest Due as of Repayment Date* |
|---|---|---|---|---|---|---|---|
| 3731 | HSBC Bank USA National Association | Calpine CalGen Holdings, Inc. | CalGen Second Lien Notes | Pledgor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | CalGen Expansion Company, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | CPN Freestone, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Freestone, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Freestone Power Generation, LP | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Freestone Energy GP, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Freestone Energy, LP | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Power Equipment, LP | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Channel Energy Center LP, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Channel Energy Center GP, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Channel Power GP, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Channel Power LP | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Channel Energy Center, LP | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | CalGen Equipment Finance Holdings, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | CalGen Project Equipment Finance Company One, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | CalGen Project Equipment Finance Company Three, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | CalGen Equipment Finance Company, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Northbrook Southcoast Investors, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Corpus Christi Energy GP, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Corpus Christi Energy LP | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Corpus Christi Cogeneration, LP | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Zion Energy LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Los Medanos Energy Center, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Morgan Energy Center, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Carville Energy LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Decatur Energy Center, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Oneta Power I, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Oneta Power II, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Oneta Power, LP | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Baytown Energy Center LP, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Baytown Energy Center GP, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Baytown Energy Center, LP | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Baytown Power GP, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Baytown Power, LP | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Columbia Energy LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Delta Energy Center, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | CalGen Project Equipment Finance Company Two, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Pastoria Energy Facility, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 3731 | HSBC Bank USA National Association | Calpine Pastoria Holdings, LLC | CalGen Second Lien Notes | Guarantor | $640,000,000.00 | $17,721,600.00 A | $657,721,600.00 A |
| 4073 | Manufacturers and Traders Company | Calpine Generating Company, LLC | CalGen Third Lien Notes | Primary Obligor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 B |
| 4073 | Manufacturers and Traders Company | Calpine Generating Company, LLC | CalGen Third Lien Notes | Primary Obligor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 B |
| 4073 | Manufacturers and Traders Company | CalGen Finance Corp. | CalGen Third Lien Notes | Primary Obligor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 B |

| Proof of Claim Number | Claimant | Debtor | Debt Issuance | Type of Claim | Total Principal Amount Due as of the Petition Date | Total Interest on Principal Due as of Repayment Date* | | Total Principal and Interest Due as of Repayment Date* |
|---|---|---|---|---|---|---|---|---|
| 4073 | Manufacturers and Traders Trust Company | CalGen Finance Corp. | CalGen Third Lien Notes | Primary Obligor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine CalGen Holdings, Inc. | CalGen Third Lien Notes | Pledgor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine CalGen Holdings, Inc. | CalGen Third Lien Notes | Pledgor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Expansion Company, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Expansion Company, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CPN Freestone, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CPN Freestone, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Freestone, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Freestone, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Freestone Power Generation, LP | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Freestone Power Generation, LP | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Freestone Energy GP, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Freestone Energy GP, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Freestone Energy, LP | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Freestone Energy, LP | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Power Equipment, LP | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Power Equipment, LP | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Channel Energy Center LP, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Channel Energy Center LP, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Channel Energy Center GP, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Channel Energy Center GP, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Channel Power GP, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Channel Power GP, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Channel Power LP | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Channel Power LP | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Channel Energy Center, LP | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Channel Energy Center, LP | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Equipment Finance Holdings, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Equipment Finance Holdings, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Project Equipment Finance Company One, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Project Equipment Finance Company One, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Project Equipment Finance Company Three, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Project Equipment Finance Company Three, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Equipment Finance Company, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Equipment Finance Company, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Nueces Bay Energy, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Nueces Bay Energy, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Northbrook Southcoast Investors, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Northbrook Southcoast Investors, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Corpus Christi Energy GP, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Corpus Christi Energy LP | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Corpus Christi Cogeneration, LP | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 | B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Corpus Christi Cogeneration, LP | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 | B | $158,625,000.00 |

| Proof of Claim Number | Claimant | Debtor | Debt Issuance | Type of Claim | Total Principal Amount Due as of the Petition Date | Total Interest on Principal Due as of Repayment Date* | Total Principal and Interest Due as of Repayment Date* |
|---|---|---|---|---|---|---|---|
| 4073 | Manufacturers and Traders Trust Company | Zion Energy LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Zion Energy LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Los Medanos Energy Center, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Los Medanos Energy Center, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Morgan Energy Center, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Morgan Energy Center, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Carville Energy LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Carville Energy LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Decatur Energy Center, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Decatur Energy Center, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Oneta Power I, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Oneta Power I, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Oneta Power II, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Oneta Power II, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Oneta Power, LP | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Oneta Power, LP | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Baytown Energy Center LP, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Baytown Energy Center LP, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Baytown Energy Center GP, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Baytown Energy Center GP, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Baytown Energy Center, LP | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Baytown Energy Center, LP | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Baytown Power GP, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Baytown Power GP, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Baytown Power, LP | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Baytown Power, LP | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Columbia Energy LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Columbia Energy LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Delta Energy Center, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Delta Energy Center, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Project Equipment Finance Company Two, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | CalGen Project Equipment Finance Company Two, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Pastoria Energy Facility, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $48,858,000.00 B | $728,858,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Pastoria Energy Facility, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $8,625,000.00 B | $158,625,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Pastoria Holdings, LLC | CalGen Third Lien Notes | Guarantor | $680,000,000.00 | $39,100,000.00 B | $719,100,000.00 |
| 4073 | Manufacturers and Traders Trust Company | Calpine Pastoria Holdings, LLC | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $10,777,500.00 B | $160,777,500.00 |
| 4073 | Manufacturers and Traders Trust Company | Baytown Power, LP | CalGen Third Lien Notes | Guarantor | $150,000,000.00 | $10,777,500.00 B | $160,777,500.00 |
| 5691 | Morgan Stanley Senior Funding Inc as Agent | Calpine Generating Company, LLC | CalGen First Lien Term Loans | Primary Obligor | $600,000,000.00 | $13,426,959.45 A | $613,426,959.45 |
| 5653 | Morgan Stanley Senior Funding Inc as Agent | Calpine Pastoria Holdings, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 A | $613,426,959.45 |
| 5654 | Morgan Stanley Senior Funding Inc as Agent | Pastoria Energy Facility, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 A | $613,426,959.45 |
| 5655 | Morgan Stanley Senior Funding Inc as Agent | CalGen Project Equipment Finance Company Two, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 A | $613,426,959.45 |
| 5656 | Morgan Stanley Senior Funding Inc as Agent | Delta Energy Center, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 A | $613,426,959.45 |
| 5657 | Morgan Stanley Senior Funding Inc as Agent | Columbia Energy LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 A | $613,426,959.45 |
| 5658 | Morgan Stanley Senior Funding Inc as Agent | Baytown Power, LP | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 A | $613,426,959.45 |

| Proof of Claim Number | Claimant | Debtor | Debt Issuance | Type of Claim | Total Principal Amount Due as of the Petition Date | Total Interest on Principal Due as of Repayment Date* | Total Principal and Interest Due as of Repayment Date* |
|---|---|---|---|---|---|---|---|
| 5659 | Morgan Stanley Senior Funding Inc as Agent | Baytown Power GP, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5660 | Morgan Stanley Senior Funding Inc as Agent | Calpine Baytown Energy Center GP, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5661 | Morgan Stanley Senior Funding Inc as Agent | Calpine Baytown Energy Center LP, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5662 | Morgan Stanley Senior Funding Inc as Agent | Calpine Oneta Power, LP | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5663 | Morgan Stanley Senior Funding Inc as Agent | Calpine Oneta Power II, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5664 | Morgan Stanley Senior Funding Inc as Agent | Calpine Oneta Power I, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5665 | Morgan Stanley Senior Funding Inc as Agent | Decatur Energy Center, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5666 | Morgan Stanley Senior Funding Inc as Agent | Carville Energy LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5667 | Morgan Stanley Senior Funding Inc as Agent | Morgan Energy Center, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5668 | Morgan Stanley Senior Funding Inc as Agent | Los Medanos Energy Center, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5669 | Morgan Stanley Senior Funding Inc as Agent | Zion Energy LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5670 | Morgan Stanley Senior Funding Inc as Agent | Corpus Christi Cogeneration, LP | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5671 | Morgan Stanley Senior Funding Inc as Agent | Calpine Corpus Christi Energy LP | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5672 | Morgan Stanley Senior Funding Inc as Agent | Calpine Corpus Christi Energy GP, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5673 | Morgan Stanley Senior Funding Inc as Agent | Calpine Northbrook Southcoast Investors, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5674 | Morgan Stanley Senior Funding Inc as Agent | Nueces Bay Energy, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5675 | Morgan Stanley Senior Funding Inc as Agent | CalGen Equipment Finance Company, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5676 | Morgan Stanley Senior Funding Inc as Agent | CalGen Project Equipment Finance Company Three, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5677 | Morgan Stanley Senior Funding Inc as Agent | CalGen Project Equipment Finance Company One, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5678 | Morgan Stanley Senior Funding Inc as Agent | CalGen Equipment Finance Holdings, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5679 | Morgan Stanley Senior Funding Inc as Agent | Channel Energy Center, LP | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5680 | Morgan Stanley Senior Funding Inc as Agent | Channel Power GP, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5681 | Morgan Stanley Senior Funding Inc as Agent | Channel Power LP | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5682 | Morgan Stanley Senior Funding Inc as Agent | Calpine Channel Energy Center GP LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5683 | Morgan Stanley Senior Funding Inc as Agent | Calpine Channel Energy Center LP LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5684 | Morgan Stanley Senior Funding Inc as Agent | Calpine Power Equipment, LP | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5685 | Morgan Stanley Senior Funding Inc as Agent | Calpine Freestone Energy GP, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5686 | Morgan Stanley Senior Funding Inc as Agent | Calpine Freestone Energy, LP | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5687 | Morgan Stanley Senior Funding Inc as Agent | Freestone Power Generation, LP | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5688 | Morgan Stanley Senior Funding Inc as Agent | Calpine Freestone, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5689 | Morgan Stanley Senior Funding Inc as Agent | CPN Freestone, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5690 | Morgan Stanley Senior Funding Inc as Agent | CalGen Expansion Company, LLC | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5792 | Morgan Stanley Senior Funding Inc as Agent | Baytown Energy Center, LP | CalGen First Lien Term Loans | Guarantor | $600,000,000.00 | $13,426,959.45 ▲ | $613,426,959.45 |
| 5692 | Morgan Stanley Senior Funding Inc as Agent | Calpine Generating Company, LLC | CalGen Second Lien Term Loans | Primary Obligor | $100,000,000.00 | $2,730,977.26 ▲ | $102,730,977.26 |
| 5693 | Morgan Stanley Senior Funding Inc as Agent | CalGen Expansion Company, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26 ▲ | $102,730,977.26 |
| 5694 | Morgan Stanley Senior Funding Inc as Agent | CPN Freestone, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26 ▲ | $102,730,977.26 |
| 5695 | Morgan Stanley Senior Funding Inc as Agent | Calpine Freestone, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26 ▲ | $102,730,977.26 |
| 5696 | Morgan Stanley Senior Funding Inc as Agent | Freestone Power Generation, LP | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26 ▲ | $102,730,977.26 |
| 5697 | Morgan Stanley Senior Funding Inc as Agent | Calpine Freestone Energy GP, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26 ▲ | $102,730,977.26 |
| 5698 | Morgan Stanley Senior Funding Inc as Agent | Calpine Freestone Energy, LP | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26 ▲ | $102,730,977.26 |
| 5699 | Morgan Stanley Senior Funding Inc as Agent | Calpine Power Equipment, LP | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26 ▲ | $102,730,977.26 |
| 5700 | Morgan Stanley Senior Funding Inc as Agent | Calpine Channel Energy Center LP, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26 ▲ | $102,730,977.26 |

| Proof of Claim Number | Claimant | Debtor | Debt Issuance | Type of Claim | Total Principal Amount Due as of the Petition Date | Total Interest on Principal Due as of Repayment Date* | Total Principal and Interest Due as of Repayment Date* |
|---|---|---|---|---|---|---|---|
| 5701 | Morgan Stanley Senior Funding Inc as Agent | Calpine Channel Energy Center GP, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5702 | Morgan Stanley Senior Funding Inc as Agent | Channel Power GP, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5703 | Morgan Stanley Senior Funding Inc as Agent | Channel Power LP | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5704 | Morgan Stanley Senior Funding Inc as Agent | Channel Energy Center, LP | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5705 | Morgan Stanley Senior Funding Inc as Agent | CalGen Equipment Finance Holdings, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5706 | Morgan Stanley Senior Funding Inc as Agent | CalGen Project Equipment Finance Company One, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5707 | Morgan Stanley Senior Funding Inc as Agent | CalGen Project Equipment Finance Company Three, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5708 | Morgan Stanley Senior Funding Inc as Agent | CalGen Equipment Finance Company, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5709 | Morgan Stanley Senior Funding Inc as Agent | Nueces Bay Energy, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5710 | Morgan Stanley Senior Funding Inc as Agent | Calpine Northbrook Southcoast Investors, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5711 | Morgan Stanley Senior Funding Inc as Agent | Calpine Corpus Christi Energy GP, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5712 | Morgan Stanley Senior Funding Inc as Agent | Calpine Corpus Christi Energy LP | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5713 | Morgan Stanley Senior Funding Inc as Agent | Corpus Christi Cogeneration, LP | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5714 | Morgan Stanley Senior Funding Inc as Agent | Zion Energy LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5715 | Morgan Stanley Senior Funding Inc as Agent | Los Medanos Energy Center, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5716 | Morgan Stanley Senior Funding Inc as Agent | Morgan Energy Center, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5717 | Morgan Stanley Senior Funding Inc as Agent | Carville Energy LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5718 | Morgan Stanley Senior Funding Inc as Agent | Decatur Energy Center, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5719 | Morgan Stanley Senior Funding Inc as Agent | Calpine Oneta Power I, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5720 | Morgan Stanley Senior Funding Inc as Agent | Calpine Oneta Power II, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5721 | Morgan Stanley Senior Funding Inc as Agent | Calpine Oneta Power, LP | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5722 | Morgan Stanley Senior Funding Inc as Agent | Calpine Baytown Energy Center LP, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5723 | Morgan Stanley Senior Funding Inc as Agent | Calpine Baytown Energy Center GP, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5724 | Morgan Stanley Senior Funding Inc as Agent | Baytown Power GP, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5725 | Morgan Stanley Senior Funding Inc as Agent | Baytown Power, LP | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5726 | Morgan Stanley Senior Funding Inc as Agent | Columbia Energy LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5727 | Morgan Stanley Senior Funding Inc as Agent | Delta Energy Center, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5728 | Morgan Stanley Senior Funding Inc as Agent | CalGen Project Equipment Finance Company Two, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5729 | Morgan Stanley Senior Funding Inc as Agent | Pastoria Energy Facility, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5730 | Morgan Stanley Senior Funding Inc as Agent | Calpine Pastoria Holdings, LLC | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |
| 5791 | Morgan Stanley Senior Funding Inc as Agent | Baytown Energy Center, LP | CalGen Second Lien Term Loans | Guarantor | $100,000,000.00 | $2,730,977.26  A | $102,730,977.26  A |

A    Notes and Loans pay interest quarterly at Jan 1, Apr 1, Jul 1 and Oct 1 based on 30 day LIBOR rates.  For the period Jan 2, 2006 to Mar 31, 2006, LIBOR rates for Jan are available and have been used to estimate Feb and Mar interest payable.

B    Notes pay interest semi-annually at Apr 1 and Oct 1 based on six month LIBOR rates

*    For the purposes of these calculations, the Debtors have assumed that they will repay the CalGen Secured Debt on March 30, 2007 (the "Repayment Date").  The Debtors reserve their rights to repay the CalGen Secured Debt on an earlier date in which case these calculations will be adjusted accordingly.