KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted pro hac vice)
Stephen E. Hessler (admitted pro hac vice)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Calpine Corporation, et al., | ) |
| | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
| | ) |

**DEBTORS' CONSOLIDATED REPLY TO OBJECTIONS TO**
**DEBTORS' MOTION FOR ORDER (I) AUTHORIZING DEBTORS TO OBTAIN**
**REPLACEMENT POSTPETITION FINANCING TO (A) REFINANCE EXISTING**
**POSTPETITION FINANCING AND (B) REPAY PREPETITION DEBT;**
**(II) ALLOWING DEBTORS' LIMITED OBJECTION TO CLAIMS; AND**
**(III) DETERMINING VALUE OF SECURED CLAIMS**

The Debtors have filed a Motion seeking approval for a Proposed Refinancing that would replace billions of dollars of higher interest-rate debt with lower interest rate-debt and, in doing so, save the Debtors' estates approximately $100 million per year.[1] Not surprisingly, no party has seriously disputed that for this and many other reasons, the Proposed Refinancing offers massive benefits to the Debtors' Chapter 11 Cases.

---

[1] Capitalized terms not defined herein shall have the meaning provided in the "Refinancing Motion"; i.e., the Debtors' Motion For Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims, filed January 26, 2007 [Docket No. 3481].

Nonetheless, a number of parties did file objections to the Proposed Refinancing, but the Debtors are pleased to apprise the Court that all of the objections—with the sole exception of those filed by the CalGen Secured Debt Lenders—have been resolved via consensual agreements.

The CalGen Lenders' voluminous pleadings attack the Proposed Refinancing as everything from "unprecedented" to "illegal." These objections are not well-founded.[2] The Lenders argue they are entitled to additional compensation (beyond outstanding principal and accrued interest, which the Debtors assert is the full amount due) in the form of "contract damages" for the "breach" of a no-call provision, "makewhole" payments, and default interest. The crux of the CalGen Lenders' arguments is that "the Debtors are attempting to do in bankruptcy what they could not do outside of Chapter 11," and thereby deprive the Lenders of the benefit of their bargain.[3] But this argument ignores, as a threshold matter, that Chapter 11 debtors-in-possession *do* have duties (such as to maximize the value of their estates for all creditors) and rights (such as to reject leases and executory contracts) that they would not possess outside of bankruptcy proceedings.

---

[2]    The Debtors note that when they previously filed a motion to repay the First Lien Debt of Calpine Corporation—also in the midst of their Chapter 11 Cases, and also for the express purpose of capturing available interest-rate savings—the First Lien Noteholders similarly objected that "the Debtors are seeking two items of extraordinary relief for which they cite no directly relevant case law or statutory authority, and none exists." Objection of Law Debenture Trust Company of New York, Solely in Its Capacity as First Lien Trustee, to the Debtors' Motion For Order Authorizing Repayment of Principal of First Lien Debt, filed on May 5, 2006 [Docket No. 1485], ¶ 3 (the "First Lien Trustee's Objection").

The Debtors rejected this characterization as well, but, in any event, both this Court and the Southern District of New York upheld the propriety of the Debtors' repayment of First Lien Debt. Law Debenture Trust Co. of New York v. Calpine Corp. (In re Calpine Corp.), __ B.R. __, 2007 WL 57879 (S.D.N.Y. Jan. 9, 2007), aff'g Order Authorizing Repayment of Principal of First Lien Debt, entered 5/10/06 [Docket No. 1542].

[3]    The Debtors note that this argument also was raised unsuccessfully by the First Lien Noteholders in objecting to the Debtors' repayment of First Lien Debt. See supra note 2, at First Lien Trustee's Objection, ¶ 1 ("Since filing these jointly administered chapter 11 cases, the Debtors have been attempting to use their status as bankruptcy debtors to accomplish what they twice were unable to do outside of bankruptcy . . . .").

More importantly, by limiting repayment to outstanding principal and accrued interest, it is the Debtors who are seeking to enforce the explicit terms of the parties' agreements. As explained further below, the Proposed Refinancing would honor the CalGen Secured Debt indentures as precisely written—whereas the objectors want to rewrite the agreements to provide for compensation rights that plainly are not included in the contracts.

The CalGen objectors ignore the fundamental analytical distinction that courts draw between lenders' rights to prevent repayment and lenders' rights to be compensated for repayment. Well-settled caselaw holds prepayment prohibitions may not be enforced against Chapter 11 debtors, solvent or insolvent. However, a *properly drafted* indenture may require debtors to compensate lenders (in the form of a premium) for repayment during a no-call period. With regard to the Proposed Refinancing, because the CalGen Secured Debt no-call clauses are unenforceable, the Debtors may repay the Debt. And because the indentures do not expressly require compensation for repayment during the no-call period, repayment of the CalGen Secured Debt before April 1, 2007 does not require the Debtors to pay the Lenders a premium.

The objectors could have demanded the CalGen Secured Debt indentures state that in the event of an "involuntary" repayment during the no-call period, CalGen still must pay damages to the Lenders. See, e.g., In re 360 Inns, Ltd., 76 B.R. 573, 575 (Bankr. N.D. Tex. 1987) (acknowledging "[t]he note prohibits voluntary prepayment during the first ten years of its term, and thereafter provides for a prepayment penalty on a declining scale as the note reaches maturity from 5% to a low of 1% of the amount prepaid. During the first ten loan years, however, the note does provide for an *involuntary prepayment penalty* in the sum of 10%.") (emphasis added). But having failed to bargain for such protection, the Lenders are attempting, impermissibly, to secure this remedy by judicial fiat.

In addition, because the CalGen Secured Debt indentures do not contain an involuntary prepayment premium provision, the Lenders are seeking common law breach of contract damages.  But this they cannot do, because, assuming this Court finds the no-call clauses are unenforceable, the Lenders cannot recover damages for the alleged "breach" of an unenforceable provision.[4]

Furthermore, the objectors claim the Debtors are manipulating the language of the CalGen indentures' acceleration clauses—which provide that, following an event of default, outstanding debt is accelerated and due and payable immediately (without any accompanying mention of a makewhole requirement)—to argue that repayment premiums are never enforceable against Chapter 11 debtors.  This too is readily disproved.  As noted in the Refinancing Motion, courts may enforce makewhole requirements against Chapter 11 debtors *where the acceleration clause expressly references such a premium payment*.  See, e.g., In re AE Hotel Venture, 321 B.R. 209, 219 (Bankr. N.D. Ill. 2005) (finding "[b]ecause the loan documents here expressly provide for a prepayment premium *even when the debt is accelerated*, the premium is 'provided for under the agreement'"); Financial Ctr. Assocs. of East Meadow v. The Funding Corp. (In re Financial Center Assocs. of East Meadow, L.P.), 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992) (noting "[i]t is not disputed that the agreement between the parties specifically provides for the pre-payment charge *even in the event of acceleration*") (emphasis added).

Moreover, the objectors overlook the fact that earlier in these Chapter 11 Cases the Debtors sold a power plant known as the "Aries Facility," whose relevant financing

---

[4]    See, e.g., In re R.H. Macy & Co., Inc., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) ("Under any set of facts, however, [lessor] could not demonstrate that the Debtor breached the Covenant to Stay Open because this covenant is unenforceable against the Debtor. . ."); In re Jamesway Corp., 201 B.R. 73, 79 (Bankr. S.D.N.Y. 1996) (finding that under section 365(f)(1), lease provisions were unenforceable and the lessors' claims were denied); Bankruptcy Receivables Mgmt. v. Lopez (In re Lopez), 345 F.3d 701, 710 (9th Cir. 2003) ("Because the agreement is invalid under federal bankruptcy law, there is no need to review the agreement pursuant to California contract law.").

agreement contained an acceleration clause that specifically required payment of a "Make-Whole Amount" if an event of default accelerated the outstanding loan amounts.[5] Given this unambiguous obligation, in seeking to sell the Aries Facility, the Debtors entered into a settlement that provided for payment of the makewhole premium.[6] Critically, the Aries loan documents closed on March 26, 2004—or on almost the exact same date that the CalGen Secured Debt indentures were executed (March 23, 2004). In other words, the Aries lenders negotiated for an acceleration clause that expressly provided for a makewhole payment following an event of default and acceleration of the debt—and the Debtors willingly paid this makewhole amount. The CalGen Lenders negotiated a contemporaneous agreement in which they could have demanded similar protection. The simple reality is that the CalGen Lenders failed to do so, and yet they are now demanding that the Debtors compensate them as though the agreement included such a requirement. But courts will not provide parties with contractual remedies they inexplicably failed to seek.

In sum, the same infirmity pervades all of the CalGen Lenders' objections; that is to say, the Lenders are demanding "damages" that could have been (but were not)

---

[5]    The relevant provision of the Project Aries loan agreement, attached hereto as Exhibit A, stated:

> Section 11.1(a). Remedies of the Security Agent: "*In the event that one or more Events of Default shall have occurred and be continuing*, upon receipt of written instructions from the Required Lenders, or Term Lenders whose principal amount of Term Loans then outstanding aggregate at least 25% or more of all Term Loans then outstanding so long as such Term Lenders include the Term Lender then serving as Administrative Agent, the Administrative Agent shall declare, by written notice to the Borrower, *the entire unpaid principal amount of all Term Loans, (together with all unpaid interest thereon and Make-Whole Amount*, if any, with respect to the Tranche B Term Loans), and all other amounts then due to the Term Lenders under this Agreement or any other Operative Document, to be forthwith due and payable, whereupon *such amounts shall immediately become due and payable* without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrower. Notwithstanding the foregoing, if any Event of Default referred to in Section 10(g) shall occur, automatically and without notice, the actions described in this Section 11.1(a) shall be deemed to have occurred."

(Emphasis added).

[6]    See Order Approving the Settlement Agreement Between Certain of the Debtors and the Aries Lenders, filed January 8, 2007 [Docket No. 3378].

provided for in their contracts.  As with the Aries settlement, this dispute could easily have been avoided had the objectors previously bargained for the provisions that they presently insist must be inferred among the actual language of the indentures.  To that end, through their Proposed Refinancing, the Debtors are seeking merely to enforce the express terms of the CalGen Secured Debt indentures.

More broadly, the Refinancing Motion set forth more than sufficient precedent justifying each stage of the Proposed Refinancing (i.e., entry into the Replacement DIP Facility, refinancing of the Existing DIP Facility, and repayment of the CalGen Secured Debt).  Unsurprisingly, however, given that the relevant jurisprudence involves complex financing arrangement with singular facts, the objectors took great pains to attempt to distinguish every case cited by the Debtors on some point or another.  Likewise, the Debtors can—and will, as needed—distinguish the objectors' cases.  But all the parsing of the caselaw merely confirms that the Proposed Refinancing—like many facets of the Debtors' Chapter 11 Cases—is *sui generis*.

As this Court is well aware, these proceedings are the first major Chapter 11 Cases to be administered under recently amended Section 1121(d)(2) of the Bankruptcy Code, which circumscribed debtors' exclusivity periods to only 18 months.[7]  This means the Debtors face the challenge of filing a plan that restructures approximately $18 billion of outstanding funded debt (as of the petition date) by June 20, 2007.[8]  Accordingly, the Debtors are operating under "unprecedented" time pressures and do not enjoy the luxury of waiting

---

[7] See Debtors' Second Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon, filed November 22, 2006 [Docket No. 3150], at 5-6.

[8] See Order Granting Debtors' Second Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon, entered December 6, 2006 [Docket No. 3223] (approving extension of the Debtors' exclusive periods to June 20, 2007 and August 20, 2007, respectively).

until the end of the Chapter 11 Cases to undertake their refinancing efforts. Indeed, because the Replacement DIP Facility allows (but does not require) the Debtors to convert the Facility into an exit financing at attractive rates, the Proposed Refinancing is a cornerstone of the Debtors' exit strategy.

Further to that end, the capital markets are especially conducive *right now* for a refinancing of the type and scale required by the Debtors. As explained in the Refinancing Motion, new issuance volumes for leveraged loans are at record highs while default rates are at record lows, which has resulted in interest rate spreads falling to their lowest levels in almost a decade. Like other huge debtors who are still in Chapter 11 proceedings (such as Delphi Corporation[9]), or who have recently emerged from the same (such as United Airlines[10]), the Debtors are seeking to capitalize on these extremely favorable conditions before interest rates again spike upward, which experts predict may be imminent.[11]

Likewise, investor interest in the power generation sector continues to be strong. Lenders and investors have been attracted to power investments due to rising power asset valuations versus historical levels. Regulatory changes, including the development of markets for the sale of capacity and renewable energy credits in a number of regions, are expected to have a positive cash flow impact on many power-generating assets. Similarly,

---

[9]    See Refinancing Motion at 2, 18-19, 21, 27, 30-31 (noting the Bankruptcy Court for the Southern District of New York very recently authorized Delphi Corporation to enter into an approximately $4.5 billion in replacement debtor-in-possession financing that will be used to refinance, at lower rates, an existing $2.0 billion debtor-in-possession facility and approximately $2.5 billion of other prepetition facilities—thus allowing the Delphi debtors to save approximately $8 million per month). See also In re Delphi Corp., No. 05-44481 (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 6461].

[10]   On February 2, 2007, only four months after entering into its exit financing, United Airlines refinanced that facility. As part of the refinancing, United paid down approximately $972 million of its existing $3 billion exit facility and entered into an amended and restated exit financing agreement to refinance the remaining $2.055 billion at lower rates. The refinancing allowed United to reduce its financing costs by 175 basis points, resulting in net pre-tax savings of approximately $70 million per annum. See UAL Corp., Current Report (Form 8-K), at 120 (Feb. 2, 2007).

[11]   See, e.g., Tiffany Kary, Experts Say 'Liquidity Bubble' Could Burst in 2007, Daily Bankruptcy Review, 1/2/07, at 9, 11.

projected growth in demand and the ongoing recovery of regional power markets have sparked significant investment in power-related assets and companies.

Thus, the confluence of multiple factors (of almost certainly finite duration) has created a "perfect storm" for the Proposed Refinancing, and the Debtors seek to take advantage of these opportunities while they remain available. For the reasons stated herein, the Debtors respectfully request that the objections to their Refinancing Motion be denied.

## I.    Repaying the CalGen Secured Debt is an Appropriate Use of Replacement DIP Facility Funds.

The objections filed by the CalGen Lenders largely advance the same argument:  (A) the no-call provisions in the CalGen Secured Debt indentures preclude repayment; assuming otherwise, the Lenders are entitled to (B) breach of contract damages or (C) makewhole premium payments, as well as (D) default interest.  None of these arguments is correct, and each will be addressed in turn below.

### A.    The Debtors May Repay CalGen Secured Debt.

As explained in the Refinancing Motion, prepayment prohibitions are not enforceable against Chapter 11 debtors.  It does not follow, however, that Chapter 11 debtors never have to compensate a lender for repaying secured debt during a no-call period.  Stated differently, lenders may not preclude Chapter 11 debtors from repaying debt during a no-call period, but a *properly drafted* indenture may require debtors to pay a premium to lenders as compensation for repayment during a no-call period.

The CalGen objectors uniformly conflate the two concepts—i.e., (1) lenders' rights to prevent repayment and (2) lenders' rights to be compensated for repayment—yet the distinction is critical to interpreting the relevant caselaw.  Applied here, as explained below, because the no-call provisions in the CalGen Secured Debt indentures are unenforceable, the Debtors may repay the CalGen Secured Debt.  But because the indentures do not provide for compensation in the event of repayment during the no-call period, repayment of the CalGen

8

Secured Debt before April 1, 2007 does not require the Debtors to pay the Lenders a premium.

### 1.    The No-Call Provisions in the CalGen Secured Debt Are Not Enforceable.

As the Debtors explained in their Refinancing Motion, it cannot seriously be disputed that courts routinely allow the repayment of debt despite a contractual no-call provision.[12]  Most courts simply hold prepayment prohibitions are unenforceable without explaining why, presumably because the reasons are so straightforward.  Nonetheless, they are as follows.  First, "[t]he automatic acceleration of a debt upon the filing of a bankruptcy case is well established."  Skyler Ridge, 80 B.R. at 507 (citing In re Manville Forest Prods. Corp., 43 B.R. 293, 297 (Bankr. S.D.N.Y. 1984); H.R. No. 95-595, 95th Cong., 1st Sess. 353 (1977), reprinted in 1978 U.S. Code Cong. & Admin. News 5963, 6309; Sen. Rep. No. 95-989, 95th Cong., 2d Sess. 63 (1978), reprinted in U.S. Code Cong. & Admin. News 5787, 5849).  Accordingly, "it is this automatic acceleration that prevents [lenders] from enforcing [a] 'lock-in' clause."  Id.

The second reason is even more basic:  enforcing no-call clauses could empower a lender to force a debtor to remain in Chapter 11 until after the lockout period expires.  For example, here, the CalGen Third Lien Debt absolutely provides that the notes may not be repaid before 2011.  Repayment Motion at 32.  This no-call provision, if valid, would permit the CalGen Third Lien Noteholders, who hold $830 million of high interest-rate

---

[12]   Refinancing Motion at 34 (citing In re Vest Assocs., 217 B.R. 696, 699 (Bankr. S.D.N.Y. 1998) (allowing repayment of loan although note provided it "cannot be prepaid without the prior written consent of the holder"); Continental Sec. Corp. v. Shenandoah Nursing Home P'ship, 193 B.R. 769, 774 (W.D. Va. 1996) (affirming Bankruptcy Court's holding that "while there is a prepayment prohibition, [it] is not enforceable in this [Chapter 11] context"); In re Skyler Ridge, 80 B.R. 500, 502 (Bankr. C.D. Cal. 1987) (stating a prepayment prohibition "is not enforceable in a bankruptcy case"); In re 360 Inns, Ltd., 76 B.R. 573, 575-76 (Bankr. N.D. Tex. 1987) (authorizing repayment of a note despite ten-year prohibition on repayment); In re LHD Realty Corp., 726 F.2d 327, 329 n.1 (7th Cir. 1984) (allowing repayment of promissory note notwithstanding clause that states "no prepayment of principal may be made during the first ten (10) loan years")).

debt, to mandate the Debtors either reinstate these obligations (if feasible) or remain in Chapter 11 for another four years. Surely creditors are not entitled to hijack debtors' proceedings in this fashion.

That said, repayment during a no-call period *may* give rise to a makewhole obligation, which is addressed below. Before doing so, however, it is necessary to respond briefly to a few of the objectors' arguments in favor of enforcing the CalGen Secured Debt no-call provisions.

Many of the objectors assert that courts will decline to enforce a no-call provision only upon finding the debtor attempting repayment is insolvent. This argument is flatly contradicted by precedent. See, e.g., Shenandoah Nursing Home P'ship, 193 B.R. at 769, 779 (affirming Bankruptcy Court's holding that prepayment prohibition is not enforceable in Chapter 11 case where the debtor "was solvent"); 360 Inns, Ltd., 76 B.R. at 576 (authorizing repayment during no-call period where "the debtor was solvent"); Vest Assocs., 217 B.R. at 699, 704 (allowing repayment of note despite prepayment prohibition where the debtor "may be insolvent").

Conversely, among all of the objectors' lengthy pleadings, only one case is cited where a court enforced a no-call provision against a Chapter 11 debtor, In re Premier Entertainment Biloxi LLC, Case No. 06-50975 (Bankr. S.D. Miss. Feb. 2, 2007) ("Premier Entertainment") (attached hereto as Exhibit B). This decision is neither controlling nor even persuasive. The court's "conclusions of law" consist almost entirely of block quotes from other cases and the parties' briefs. To that end, it appears that the parties did not argue (and the court definitely did not discuss) the substantial body of caselaw cited by the Debtors herein that holds no-call clauses cannot preclude the repayment of accelerated debt.

Premier Entertainment is further suspect insofar as it does discuss this Court's order authorizing the Debtors to repay the First Lien Debt of Calpine Corporation, but does

so incorrectly. Premier Entertainment distinguished this Court's decision to allow the Debtors to repay First Lien Debt on the ground that "there were no objections to the prepayment of the principal by the lenders or the indenture trustee" and "[t]he dispute dealt only with whether the prepayment should include a make-whole premium." Id. at 9. As this Court is well aware, the First Lien Debt Noteholders' objection was not so limited. See, e.g., First Lien Trustee Objection, supra note 2, at ¶ 3 (objecting that the Debtors' proposed repayment constituted an impermissible "unilateral treatment of a secured claim without the creditors' consent, outside of a reorganization plan").[13]

Put simply, the objectors have not asserted (nor is there) any persuasive reasons for this Court to follow Premier Entertainment—a single, unpublished, outlier decision—instead of the substantial and well-settled authority that has consistently held no-call provisions are unenforceable against Chapter 11 debtors. See supra note 12.

---

[13]  Notably, like the Calpine Corporation First Lien Debt Noteholders, some of the CalGen Lenders objectors also argued that the Debtors could only repay the CalGen Secured Debt pursuant to a reorganization plan, lest the Debtors' actions constitute unlawful impairment of their claims. The Southern District of New York rejected this argument as follows:

> [T]he Trustee's appeal boils down to the notion that because the bankruptcy court failed to order Debtors to pay Noteholders the Make-Whole Premium or make a determination that the Make-Whole Premium was not due, the bankruptcy court "violated the Noteholders' contractual rights and impaired their claims outside of a chapter 11 plan." *Nothing could be further from the truth* because the bankruptcy court merely ordered the payment of the outstanding principal of the Notes for now so Debtors' estates would stop losing money, and preserved all parties' rights to litigate the Trustee's Make-Whole Premium Demand later.

In re Calpine, 2007 WL 57879, at *7 (emphasis added). This reasoning applies here with even greater force. Not only are the Debtors proposing to repay the CalGen Lenders all outstanding principal and accrued interest, they are also asking that the Lenders' rights to any other payments be decided as soon as possible. Accordingly, the Proposed Refinancing in no way "impairs" the CalGen Lenders' claims.

Moreover, to the extent that the CalGen Lenders' premium demands are unenforceable as a matter of bankruptcy law, the Lenders are not "impaired" in the sense of plan impairment, but rather are statutorily impaired. See In re PPI Enterprises (U.S.), Inc., 324 F.3d 197 (3d Cir. 2003).

2.    **The No-Call Provisions in the CalGen Secured Debt Do Not Require A Premium Upon Repayment.**

As noted above, although no-call clauses may not preclude repayment by Chapter 11 debtors, courts will proceed to examine whether repayment during the ostensible no-call period triggers an obligation to satisfy a prepayment premium. See, e.g., Shenandoah, 193 B.R. at 774 (affirming Bankruptcy Court's holding "that [w]hile there is a prepayment prohibition, which is not enforceable in this context, there is no prepayment penalty provision provided for anywhere in the contract. Therefore, there can be no prepayment fees, costs, or charges allowed under the confirmed Plan as none are provided for in the note under § 506(b)."); Vest, 217 B.R. at 699 (finding "the note provides that it 'cannot be repaid without the prior written consent of the holder" yet the holders "conceded that because the note does not include a damage or penalty provision in the event of the Debtor's prepayment, they cannot recover damages for any lost interest opportunity or other damages resulting from the prepayment."). This principle is as straightforward as it is logical: lenders are not entitled to compensation for repayment during a no-call period unless the parties' contract explicitly so provides.

Again, all of the CalGen Secured Debt indentures prohibit repayment prior to April 1, 2007—yet none of these provisions provide for a premium if repayment is made during this no-call period. Repayment Motion at 31-32. Likewise, all of the CalGen Secured Debt indentures provide that commencing a bankruptcy case is an event of default which accelerates all outstanding debt so as to be due and payable immediately—yet none of these provisions imposes a premium for the repayment of accelerated debt. Id. at 32-33. Accordingly, the Debtors' commencement of their Chapter 11 Cases accelerated all of the outstanding CalGen Secured Debt, rendering it due and payable immediately, and the CalGen Secured Debt indentures do not provide for a premium if repayment is made before April 1, 2007.

The objectors cannot deny that the express language of the indentures does not require a premium for a pre-April 1, 2007 repayment, so instead they assert that the indentures' provisions do not operate according to their plain terms. More specifically, the objectors argue that although the indentures state an event of default accelerates all outstanding debt, which then becomes due and payable immediately, the acceleration clauses don't *really* mean "immediately" (if immediately would cause repayment to occur within the no-call period, before the indentures provide for a prepayment premium). In support of their claim that the parties' *actually* must have intended for two types of acceleration—notwithstanding that the acceleration clauses themselves do not contain even a hint of a dual definition—the objectors uniformly cite to <u>Skyler Ridge</u>, where the court stated "[t]he automatic acceleration of a debt upon the filing of a bankruptcy case is not the kind of acceleration that eliminates the right to a prepayment premium" because:

> If automatic acceleration of a debt defeats a prepayment premium clause, such a clause could never be enforced in a bankruptcy case. A debtor, under such a rule, could always avoid the effect of a prepayment premium clause by filing a bankruptcy case. Neither the Bankruptcy Code nor case law compels so drastic a result. No bankruptcy policy compels the invalidation of a ***properly drawn*** prepayment premium clause in ***all cases***.

80 B.R. at 507 (emphasis added).

The Debtors have no disagreement with <u>Skyler Ridge</u>; indeed, this portion of the opinion supports their position that the CalGen Secured Debt indentures must be enforced as written. To be clear, the Debtors do not argue that simply because debt is accelerated prepayment premiums are *per se* invalid. Rather, the Debtors fully concede that "properly drawn" prepayment premiums will be due even where the debt being repaid is accelerated (as the Debtors did so pay in the context of the Aries settlement, as described further below).

Furthermore, the acceleration at issue in <u>Skyler Ridge</u> occurred pursuant to the Bankruptcy Code—not an acceleration clause in the parties' contract, as is the case with the CalGen Secured Debt indentures. The difference between acceleration pursuant to the Code

and acceleration pursuant to a contract clause is significant because Skyler Ridge's admonition that a debtor "could always avoid the effect of a prepayment premium clause by filing a bankruptcy case" does not hold true if the parties' contract expressly provides, for example, that in the case of an event of default due to a bankruptcy filing by the borrower, all outstanding debt—including principal, accrued interest, and any premiums owed because of any repayment, whether voluntary or involuntary, during the no-call period or prior to maturity—shall be due and payable immediately without further action or notice.

Of course, the CalGen Secured Debt indentures do not contain any such language. Consequently, nothing in Skyler Ridge (or any other case that states acceleration alone does not defeat a prepayment premium) changes the fact that the CalGen Secured Debt indentures were not "properly drawn" to require a premium upon the repayment of accelerated debt during the no-call period. Again, there would be no dispute had the CalGen Lenders negotiated for contractual language providing a premium is due even if Chapter 11 debtors involuntarily repay accelerated debt during the no-call period. See, e.g., 360 Inns, 76 B.R. at 575 (finding "[t]he note prohibits voluntary prepayment during the first ten years of its term, and thereafter provides for a prepayment penalty on a declining scale as the note reaches maturity from 5% to a low of 1% of the amount prepaid. During the first ten loan years, however, the note does provide for an *involuntary prepayment penalty* in the sum of 10%.") (emphasis added).

None of the objectors disputes that "the loan agreement here at issue was entered into between sophisticated parties for a large sum of money, who where presumably represented by informed counsel." Skyler Ridge, 80 B.R. at 503. Thus, in these circumstances, the objectors cannot "supply any legal authority for the proposition that a bankruptcy court may read into a contract damage provisions which the parties themselves

have failed to insert regarding the liquidation or calculation of damages arising out of the prepayment of a loan or note." <u>Shenandoah</u>, 217 B.R. at 699.

**B.      Repayment Of CalGen Secured Debt Does Not Give Rise To Contract Damages.**

As an alternative to their argument that the no-call provision should be enforced, the CalGen Lenders object that they have an allowable unsecured claim under New York law for the "breach" of the no-call provision. This argument is unsupportable given that the no-call provision is unenforceable against the Debtors and no damages are provided for under the CalGen Secured Debt indentures in the event of an involuntary repayment during the no-call period. Because the CalGen Lenders cannot establish a breach of contract has occurred, these claims should be disallowed in their entirety.

**1.      The Debtors Cannot "Breach" An Unenforceable Contract Provision.**

To establish a claim for breach of contract under New York state law, the party asserting the breach must prove: (1) the existence of a valid contract; (2) the performance of the contract by the plaintiff; (3) a breach by the defendant; and (4) damages. <u>First Investors Corp. v. Liberty Mutual Ins. Co.</u>, 152 F.3d 162, 168 (2d. Cir. 1998). The burden of proof is on the CalGen Lenders to demonstrate these elements and they have failed. Specifically, none of the Lenders has established that a breach will occur as a result of the repayment of the CalGen Secured Debt. Curiously, only one of the eight objections filed by the CalGen Lenders even attempts to set forth the elements required to prove breach of contract under New York law. The objection of the Third Lien Holders contends that the first two elements of a breach of contract are met. As to the third element, the required "breach," the Third Lien Noteholders assert:

> New York law prohibits prepayment of a loan unless it is explicitly provided for in the loan agreement. <u>Arthur v. Burkich</u>, 520 N.Y.S.2d 638, 639 (N.Y. App. Div. 1987). Any prepayment by CalGen prior to the stated maturity of

the Notes in 2011 (other than through defeasance) breaches the No-Call Provision.[14]

Third Lien Holders' Memorandum at 24.

To be clear, a central element of the Debtors' Refinancing Motion and Reply is that no-call provisions are unenforceable *in bankruptcy*. Notwithstanding the Debtors' status as Chapter 11 debtors-in-possession, the Third Lien Holders have cited an opinion from a New York state court for the proposition that the prepayment of a loan is prohibited unless provided for in the loan document. This authority, while perhaps useful outside of bankruptcy, is wholly irrelevant under the circumstances. As the Debtors have made clear throughout their pleadings, it is *in bankruptcy* that no-call provisions are unenforceable. If a contract provision is unenforceable, it stands to reason that a party cannot "breach" that provision. See, e.g., In re R.H. Macy & Co., Inc., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) ("Under any set of facts, however, [lessor] could not demonstrate that the Debtor breached the Covenant to Stay Open because this Covenant is unenforceable against the Debtor. . ."); In re Jamesway Corp., 201 B.R. 73, 79 (Bankr. S.D.N.Y. 1996) (finding that under section 365(f)(1), lease provisions were unenforceable and the lessors' claims were denied); Bankruptcy Receivables Mgmt. v. Lopez (In re Lopez), 345 F.3d 701, 710 (9th Cir. 2003) ("Because the agreement is invalid under federal bankruptcy law, there is no need to review the agreement pursuant to California contract law.").

---

[14]  Memorandum of Law of Manufacturers & Traders Trust Company In Support of (A) Objection to Motion for Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (i) Refinance Existing Postpetition Financing and (ii) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims and (B) Response to Debtors' Seventh Omnibus Objection to Proofs of Claim, filed February 16, 2007 [Docket No. 3713] (the "Third Lien Holders' Memorandum").

2.    **Noncompliance With An Unenforceable Contract Provision Does Not Give Rise To Damages.**

In addition to the fact that the CalGen Lenders cannot establish a "breach," they likewise cannot establish a right to damages. It is undisputed that the CalGen Indentures do not provide for liquidated damages (i.e., a premium) in the event of an involuntary repayment during the no-call period. Instead, the CalGen Lenders argue they are entitled to common law damages under state law. However, they cite no case where noncompliance with an unenforceable contract provision entitled a party to damages. A breach of contract claim must include damages arising from the [Debtors'] failure to perform an enforceable agreement. Harsco v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). Because the CalGen Lenders have failed to demonstrate a right to damages flowing from the Debtors' noncompliance with an unenforceable indenture provision, they cannot establish a claim for breach of contract.

Given that the CalGen Lenders have not met their burden by proving either a breach or damages, the Court should disallow their claims for breach of contract and overrule their objections.

C.    **Any Argument The Debtors Should Defease The CalGen Secured Debt Is Spurious.**

Some of the CalGen Lenders have objected that because the CalGen Secured Debt is presently within the no-call period, the Debtors' only option to repay the Debt is through defeasance—a process that, according to the objectors, involves the Debtors using $270 million of estate assets to purchase and assign Treasury bonds to a CalGen indenture trustee. This suggestion is completely at odds with the realities of these Cases, including, especially, other provisions in the CalGen Secured Debt indentures and the Existing DIP Facility.

*First*, as an initial matter, defeasance is a feature designed to protect the borrower, not the lender, and has no place in the no-call debate. For example, defeasance

17

permits a borrower (in a non-bankruptcy setting) to take advantage of rising interest rates and avoid prepayment premiums[15] or make its balance sheet more attractive.[16]

    *Second*, the disingenuousness of the objectors' argument is further revealed when one considers that other indenture provisions preclude the Debtors from defeasing the Debt. More specifically, Section 8.04(4) of the Third Priority Indenture provides that the Debt cannot be defeased if a "Default or Event of Default shall have occurred and be continuing . . . ." Obviously, the Debtors' commencement of their Chapter 11 Cases constituted an Event of Default. This restriction alone precludes the Debtors from utilizing defeasance. Nonetheless, Section 8.04(5) also requires that defeasance must not "result in a breach or violation of, or constitute any default under, any material agreement or instrument to which the Company or any of its Subsidiaries is a party . . . ."

    *Finally*, defeasance may cause adverse tax consequences to the Debtors. Third Priority Indenture Section 8.04(2) requires that, as a precondition to defeasance, the Debtors must obtain an opinion of tax counsel that the Debtors will not recognize income, gain or loss as a result of defeasance. Yet as one commentator has pointed out, "[l]egal defeasance is generally not possible because the required legal opinion on tax consequences of the defeasance cannot be given."[17]

---

[15] See John C. Murray, *Defeasance Provisions in Securitized-Loan Documents*, 498 PLI/Real 203, 207 (2003) ("The overall cost to the borrower will be less with defeasance than a yield-maintenance prepayment obligation if the defeasance occurs at a time when interest rates have risen in relation to the stated loan rate, i.e., the borrower will be able to purchase treasury instruments (or certain other permitted 'government securities') with a face value less than the outstanding loan balance. The borrower can effectively 'hedge' its risk and will not pay any minimum prepayment premium regardless of the interest-rate environment.")

[16] Id. at 208 ("The [defeasance] transaction is treated for accounting purposes as an extinguishment of the debt in which, for reporting purposes, the issuer is entitled to remove both the debt and the Treasury obligations from its balance sheet.").

[17] David A. Brittenham & Gregory H. Woods, *Private Equity: Current Financing Issues*, 1573 PLI/Corp 7, (2006).

  **D.**  **Repayment Of CalGen Secured Debt Does Not Trigger A Makewhole Obligation.**

    The CalGen Lenders do not dispute that the Secured Debt indentures do not require satisfaction of a makewhole premium if Debt is repaid as a consequence of acceleration and prior to April 1, 2007. But because some of the indentures provide for makewhole premiums if Debt is voluntarily repaid after various later dates, the Lenders argue this Court should import those provisions as a damages measure for the Proposed Refinancing. This argument cannot be sustained. It is basic hornbook law that courts will not rewrite parties' contracts. More specifically, the Bankruptcy Code requires that any makewhole payments must expressly be provided for in the parties' contract. To that end, caselaw makes clear that the CalGen Lenders could have negotiated for an enforceable right to a makewhole premium in these circumstances. Indeed, other indentures *in this case* demonstrate that the CalGen Lenders could have done so. The Lenders did not, however, and their present claim for a makewhole premium constitutes an impermissible attempt to rewrite their contract after the consequences of their omissions are apparent.

  **1.**  **The CalGen Secured Debt Indentures Do Not Provide For A Makewhole Premium In These Circumstances.**

    The Debtors fully acknowledge that courts may enforce a makewhole demand in the context of a Chapter 11 event of default if the acceleration clause at issue specifically includes the makewhole obligation within its terms.[18] Accordingly, the Debtors' repayment

---

[18] Repayment Motion at 38 (citing e.g., In re AE Hotel Venture, 321 B.R. 209, 219 (Bankr. N.D. Ill. 2005) (finding "[b]ecause the loan documents here expressly provide for a prepayment premium *even when the debt is accelerated*, the premium is 'provided for under the agreement'"); In re Vanderveer Estates Holdings, Inc., 283 B.R. 126 (Bankr. E.D.N.Y. 2002) (enforcing a makewhole payment where "[t]he Note contains a provision requiring the payment of a Yield Maintenance Premium in connection with any prepayment of the loan, '*whether the prepayment is voluntary or involuntary* (in connection with holder hereof's acceleration of the unpaid principal balance of this Note)'"); In re Financial Center Assocs. of East Meadow, L.P., 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992) (noting "[i]t is not disputed that the agreement between the parties specifically provides for the pre-payment charge *even in the event of acceleration*") (emphasis added)).

19

of CalGen Secured Debt might give rise to a viable claim by the Lenders for a makewhole premium if the indentures provided for such an obligation where the debt is accelerated and repayment is voluntary.  The objectors claim that denying their demand for a makewhole premium because the indentures lack such specificity would be inequitable (as if specificity as to remedies is an esoteric quality in commercial contracts), but their argument is with the Bankruptcy Code, not the Proposed Refinancing.

The recent case of In re AE Hotel Venture, 321 B.R. 209 (Bankr. N.D. Ill. 2005) aptly illustrates how modern, state of the art indentures may be drafted to be both broadly applicable and compliant with the Bankruptcy Code.  AE Hotel notes that oversecured creditors may be entitled to a makewhole premium under 11 U.S.C. § 506(b) if the payment is "reasonable" and "provided for under the agreement."[19]  The second prong is most relevant here.  In AE Hotel, the note provided for a premium if the lender prepaid the notes following an event of default but prior to maturity.  321 B.R. at 218.  The debtor argued it was not "prepaying" the notes because the debt had been accelerated upon the bankruptcy filing.  Id.  The Court recognized the general rule that "acceleration 'advances the maturity date so that payment thereafter is not prepayment but instead is payment made after maturity of the debt," id. (quoting In re LHD Realty Corp., 726 F.2d 327, 331 (7th Cir. 1984)), but also noted the *exception* to the general rule "that usual effect of acceleration . . . on the enforceability of prepayment premiums can 'be modified by the parties through appropriate contractual provisions.'"  Id. (quoting LHD Realty, 726 F.2d at 331 n.5).

---

[19]  The full text of 11 U.S.C. § 506(b) states:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges *provided for under the agreement* or State statute under which such claim arose.

> (Emphasis added).

20

The upshot is that "[p]arties to loan agreements may therefore agree that prepayment premiums are due *even after acceleration*." Id. (citing, inter alia, In re Financial Center Assocs. of East Meadow, L.P., 140 B.R. 829, 34-35 (Bankr. E.D.N.Y. 1992) as "rejecting [the] argument that acceleration waived prepayment charge where agreement provided for charge after acceleration" and In re Schaumburg Hotel Owner Ltd. P'Ship, 97 B.R. 943, 953 (Bankr. N.D. Ill. 1989) for the same proposition) (emphasis added).  Notably, the loan documents at issue in AE Hotel contained such modifications, including an explicit statement that "payment of the debt even after default is a 'voluntary prepayment'." Id. at 219.  Accordingly, "[b]ecause the loan documents here expressly provide for a prepayment premium even when the debt is accelerated, the premium is 'provided for under the agreement[]'" and therefore enforceable under Section 506(b). Id.

Suffice to say, the CalGen Secured Debt indentures fall within the general rule, not the exception.  The indentures provide that an event of default accelerates all outstanding debt, but they do not contain any modifications that provide payment of the Debt even after default is a "voluntary prepayment," or that a makewhole premium is due even upon the repayment of accelerated Debt.

Finally, the drafting omissions that render the CalGen Secured Debt makewhole provisions unenforceable as a matter of law are in addition to the explicit terms of the indentures that provide no makewhole premiums are due for a repayment before April 1, 2007.

### 2. Other Calpine Indentures Demonstrate The CalGen Lenders Could Have (But Did Not) Bargain For A Makewhole Premium In The Event Of An Involuntary Repayment Of Accelerated Debt.

Yet further evidence that the CalGen Lenders negotiated antiquated indentures that fall within the general rule that accelerated debt cannot be "prepaid" (for the purpose of triggering a makewhole obligation) is found in the Aries settlement this Court approved on

21

January 3, 2007. See supra note 6. In stark contrast to the CalGen Secured Debt indentures, the Aries loan agreement is state of the art as to the borrower's makewhole obligations

*First*, the Aries loan agreement includes a distinct section dedicated to "Certain Indemnities—Makewhole Protection" and provides that in the event of prepayment of Tranche B Term Loans, "the Borrower agrees to pay such Tranche B Term Lender an amount equal to, with respect to the aggregate principal amount of the Tranche B Term Loans held by such Tranche B Term Lender which were so *prepaid or accelerated*, the applicable *Make-Whole Amount*." Ex. A § 2.12(b) (emphasis added).

*Second*, as to Events of Default, the Aries loan agreement provides that if the Borrower commences an bankruptcy case, "the entire unpaid principal amount of Term Loans, (together with all unpaid interest thereon and *Make-Whole Amount*, if any, with respect to the Tranche B Term Loans), and all other amounts then due to the Term Lenders under this Agreement or any other Operative Document, to be forthwith due and payable, whereupon *such amounts shall immediately become due and payable* . . . ." Id. § 11.1(a).

Thus the Aries loan agreement makes clear that a makewhole is due *even* if debt is repaid pursuant to a Chapter 11-prompted acceleration. For this reason (and others) the Debtors, as part of a sale of the Aries Facility, entered into a settlement that provided for payment of the makewhole premium.[20] Furthermore, the fact that the Aries loan agreement closed on almost the identical date (March 26, 2004) as did the CalGen Secured Debt indentures (March 23, 2004) indicates that diligent lenders were capable of negotiating sufficiently protective makewhole provisions with the Debtors if they so desired. In sum, had the CalGen Lenders bargained for the same contract (as to makewholes) as did the Aries

---

[20]   See supra note 6.

lenders, there would be no dispute as to whether the proposed repayment of the CalGen Secured Debt triggers a makewhole premium obligation. They didn't, and it does not.

**E.     Repayment Of CalGen Secured Debt Does Not Entitle The Lenders To Default Interest.**

The CalGen Lenders also object to the Debtors' Motion to the extent it requests disallowance of the Lenders' claims for default interest. The CalGen Lenders' objection should be overruled for two primary reasons. *First*, the CalGen Lenders' claims for default interest must be disallowed as a matter of law because the CalGen Debtors did not commit any prepetition defaults—payment or otherwise. *Second*, the equities of this case weigh in favor of disallowing the CalGen Lenders' claims for default interest.

**1.     Default Interest Is Inappropriate Because The CalGen Debtors Did Not Commit An Enforceable Prepetition or Payment Default.**

A close look at provisions relating to treatment of secured claims in bankruptcy demonstrates that the CalGen Lenders' claims for default interest must be disallowed. An oversecured creditor is entitled to postpetition pendency interest on its secured claim pursuant to Section 506(b) of the Bankruptcy Code. See In re Liberty Warehouse Assocs. Ltd. P'ship, 220 B.R. 546, 550 (Bankr. S.D.N.Y. 1998). However, even though there is a presumption in favor of enforcing the *contract rate* for postpetition interest, see United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989); Liberty Warehouse, 220 B.R. at 550, Section 506(b) does not provide that pendency interest must accrue at the *default* rate. Put another way, there is no *per se* rule that the "contract rate" in bankruptcy is the "default rate."

With one exception, the CalGen Lenders do not even attempt to point the Court to an enforceable prepetition default (payment or otherwise) of the CalGen Debtors. The Bank of Nova Scotia, as Administrative Agent ("BNS") under the Amended and Restated Credit Agreement, dated as of March 23, 2004, objects that the CalGen Debtors

23

have committed a payment default by failing repay within five days (as required by the Credit Agreement) amounts drawn under various letters of credit.  Notably, the Debtors and BNS have resolved this objection by agreeing that the Debtors shall pay BNS 50% of its default interest claims.[21]

As to the other CalGen Lenders, because the CalGen Debtors did not commit an enforceable prepetition or payment default, the CalGen Lenders have absolutely no legal entitlement to default interest.

### 2.    The Equities Dictate Against Awarding Default Interest To The CalGen Lenders.

Even if this Court determines the CalGen Debtors' commencement of their Chapter 11 Cases constituted an enforceable default for the purpose of implicating default interest obligations, the equities do not support awarding default interest to the CalGen Lenders.  "The appropriate rate of pendency interest is . . . within the limited discretion of the court."  Id. (quoting In re Milham, 141 F.3d 420, 422-23 (2d Cir. 1998)).  Courts consider various equitable factors in determining whether a debtor must pay default interest including: (a) whether the relative distribution rights of other creditors, and whether enforcement of the higher rate will do injustice to the concept of equitable distribution of the estate's assets; (b) the purpose of the higher interest rate; and (c) the reasonableness of the difference between the default and non-default rates. See, e.g., In re Kalian, 178 B.R. 308 (Bankr. D.R.I. 1995).

The CalGen Lenders argue that whether they are entitled to default interest turns on the CalGen Debtors' solvency.  The Debtors disagree.  Moreover, as discussed further below, it would be nearly impossible to determine with finality the solvency of the

---

[21] BNS also argues that in the event the Court does not force the CalGen Debtors to pay default interest, the Court should enforce the terms of an intercreditor agreement by and among the CalGen Lenders.  The CalGen Debtors have no stake in that intercreditor dispute and, therefore, do not take a position with respect to that dispute.

CalGen Debtors within the short window of time available to consummate the Proposed Refinancing. However, if the Court finds the issue is determinative, the Debtors respectfully request that the Court grant the relief requested in the Debtors' Refinancing Motion and defer the issue of default interest under the end of the case, when CalGen's solvency will be known. However, in light of the significant savings that the Proposed Refinancing offers the Debtors and their estates, the issue of whether the CalGen Lenders are entitled to default interest should not hold up consummation of that transaction. See, e.g., Vest, 217 B.R. at 703 (denying interest at the default rate but allowing the creditors to renew their request for default interest at confirmation if the debtor is solvent).

The latter two factors—the nature and purpose of the higher interest rate— weigh in the CalGen Debtors' favor. Default interest is "a means to compensate a lender for the administrative expenses and inconvenience in monitoring untimely payments." Vest, 217 B.R. at 703; see also In re Kalian, 178 B.R. at 315 ("parties demanding default interest usually justify their claim by urging that it is necessary to compensate the lender for the increased costs and risks attendant *defaulted* loans.") (emphasis added). Here, the CalGen Lenders have incurred zero administrative expenses. More specifically, the Debtors have paid in full the CalGen Lenders' accrued but unpaid interest and fees at the non-default contract (more than $270 million to date) and have paid in full the CalGen Lenders' professionals' fees (more than $5 million to date). Refinancing Motion at 7-8. Where, as here, there is no prepetition default and the debtors are making adequate protection payments, default interest, no matter how modest of an increase over the non-default rate, is inappropriate because the lenders have not incurred such expenses. Kalian, 178 B.R. at 315. Put simply, the CalGen Lenders already have been compensated for any administrative expenses and inconvenience associated with the Debtors' bankruptcy filings. See id. (denying default interest on account of increased administrative expenses and inconvenience

where the secured lender recovered reasonable fees, costs, and charges). "[T]o award default rate interest on account of such expenses would compensate [the CalGen Lenders] twice." Id. at 316.

Accordingly, for the foregoing legal and equitable reasons, the CalGen Lenders' claims for default interest must be disallowed in their entirety.

## II.    The CalGen Lenders Overstate The Relevance Of CalGen's Solvency, Which Is Not Known At This Time.

It is necessary for the Debtors to respond to the objecting CalGen Lenders' repeated invocations of CalGen's "solvency," as though this point alone were dispositive to deny the Proposed Refinancing. The objectors cite to numerous cases featuring hortatory quotes stating solvent debtors may not deny secured creditors their contractual rights. But the talismanic effect of "solvency" is not nearly so broad as the objectors intimate. Their proffered opinions merely address solvency to the extent it is a stated element in the legal standard courts apply to determine whether default interest is due. Despite the objectors' best efforts to extrapolate this analysis to every possible context, the caselaw demonstrates that solvency simply is not a factor in deciding whether no-call provisions are enforceable or whether makewhole premiums must be paid.

And even assuming solvency is (or should be) as broadly applicable as the objectors aver, the result is, at most, that the CalGen Lenders shall receive the benefits of their bargain. But as explained above, the CalGen Secured Debt indentures provide that the Debtors' repayment of accelerated debt entitles the Lenders to outstanding principal and accrued interest only. Furthermore, CalGen's solvency has no impact whatsoever on the axiomatic legal provision parties cannot receive damages for the "breach" of an unenforceable contract provision.

To the extent that the Court finds that solvency entitles the Lenders to the contract they should have bargained for, as opposed to the one they negotiated, the estate of

CalGen ultimately may turn out not to be solvent, due to the likely prospect of substantive consolidation. Further, to the extent CalGen is deemed solvent, it is almost certainly a function of modern corporate structuring, whereby virtually all of CalGen's operating needs are met by Calpine Corp. and other Calpine affiliates,[22] all of which are Debtors before this Court.[23]

As this Court well knows, substantive consolidation entails the pooling of assets and liabilities of related debtor entities into a unitary debtor estate from which all claims are paid. The controlling case in the Second Circuit is In re Augie/Restivo Baking, Co., 860 F.2d 515 (2d Cir. 1988). In Augie/Restivo, the Second Circuit stated that the focus of substantive consolidation should be on "the equitable treatment of *all* creditors," and the two critical inquiries are: "(i) whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit,' . . . or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." Id. at 518. Notably, the test is set forth in the disjunctive so the satisfaction of one prong of the analysis will satisfy the Augie/Restivo test. See In re Verestar, Inc., 343 B.R. 444, 463 (Bankr. S.D.N.Y. 2006) ("The Second Circuit set forth these tests in the disjunctive and the presence of either may justify an order of substantive consolidation."); see also In re Bonham, 229 F.3d 750, 766 (9th Cir. 2000) ("The presence of either [Augie/Restivo] factor is a sufficient

---

[22]  As part of the highly integrated corporate structure of Calpine, all of CalGen's employees are provided by either COSCI or CASCI. CASCI also provides administrative services to CalGen, including services associated with CalGen's accounting, financial reporting, budgeting and forecasting, tax, cash management, invoicing, IT, and CalGen's regulatory filings. CCMCI provides CalGen with construction services. Finally, CES purchases CalGen's gas and sells its power. CalGen could not independently operate for a single day without Calpine affiliates providing these services. In fact, in 2005, over 80% of CalGen's revenue ($2.184 billion) came from electricity sold to CES under CalGen's Index Based and Fixed Price Agreements with CES –agreements that allow CES to bear the market risk. In addition, almost 60% of CalGen's expenses in 2005 ($2.178 billion) were owed to related entities.

[23]  Indeed, CalGen and the CalGen Lenders have been the beneficiaries of more than the operational benefits provided by Calpine Corp. and its affiliates. As required by the CalGen Lenders at the time CalGen entered into its secured term loans and secured notes in 2004, Calpine agreed to forgive all debt owed by CalGen and its subsidiaries – an amount that totaled over $4 billion.

basis to order substantive consolidation".); In re Reider, 31 F.3d 1102, 1108 (11th Cir. 1994) (same). While the Debtors' analysis is ongoing, as set forth below, there are myriad issues involving the Debtors' intercompany claims that (i) cast severe doubt upon the accuracy of the books and records in regard to such claims, and (ii) inhibit the ability to test the validity of such claims in a time and cost effective manner, thereby threatening any future recovery to all creditors.

Historically, Calpine placed little importance upon the accounting and accuracy of intercompany claims on a legal entity basis. The prevailing view within Calpine was that intercompany accounting did not matter as all of the intercompany claims would ultimately balance at the ultimate parent level. The Debtors' explosive growth—between 1999 and 2005 the Company doubled its number of power plants, increased its generating capacity five-fold, and increased its revenue more than thirty-fold—strained back-office resources and further exacerbated the lack of attention paid to entity-by-entity accounting. While Calpine's approach mattered little outside of Chapter 11, this practice has created significant issues within the Chapter 11 Cases with respect to quantifying the liabilities of any particular Debtor. Simply put, the accuracy and validity of the intercompany claims themselves are suspect, at best.

During its investigation, AlixPartners, the Debtors' restructuring advisors, did not find appropriate accounting processes and procedures with respect to Calpine's intercompany accounting; rather, AlixPartners found numerous weaknesses and deficiencies, including the following:

- Calpine did not maintain comprehensive intercompany accounting policies and procedures to be applied across all entities, and there was no formal or periodic review process to validate or audit intercompany claims.

- Calpine's accounting systems allowed intercompany entries to be made without designating a corresponding affiliate.[24]

- In numerous instances, Calpine's intercompany accounts were balanced through "top side" adjustments that did not identify where an out of balance situation originated and, in many cases, the adjustments were not "pushed down" to the appropriate subsidiary.

- Calpine's accountants could post entries across business units and legal entities without informing or receiving input from an accountant responsible for the particular entity, and the corresponding entry could be made at any time.

- Calpine's accounting program could automatically (i.e., without human input or supervision) "balance" entries without identifying the entry as a correcting entry or alerting the accounting group to the entry.[25]

- Calpine's accountants would sometimes record "top-side" adjustments to intercompany accounts recharacterizing the nature of the intercompany balances as equity.

- Calpine's accounting group did not maintain a complete legal entity reporting tree. This led to the increased possibility that Calpine's primary accounting program, PeopleSoft, and its accountants would not identify out of balance entries, thereby potentially allowing out of balance entries to pass through to higher levels and affecting the integrity of the lower level legal entity balances.

The issues described above, and the general lack of attention and inconsistent accounting practices prevalent at Calpine, have led to an extraordinary number of errors and adjustments in the intercompany accounting. This is evidenced by the high rate of correcting entries found by AlixPartners. Over 75,000 journal entry line items (or almost 7% of the total population of intercompany line items) contain certain key words denoting correcting entries (e.g., "adj," "back out," "correct," "fix," etc.). Calpine's high rate of correcting entries and

---

[24] According to AlixPartners, as of October, 2006, over 274 intercompany balances exist without a corresponding affiliate, and that since December, 2005, approximately 6% of the monthly intercompany balances contained no corresponding affiliate code.

[25] In one of the more striking examples, AlixPartners discovered a $851 million receivable from CESHI to CES. This receivable, however, was made up of balancing entries automatically generated by PeopleSoft (based on Calpine's programming) and did not represent an actual receivable from CESHI to CES. The balancing entries were generated by PeopleSoft without any notice or approval by the Calpine accounting group and all of the balancing entries appear to be "real" intercompany transactions. Without analyzing all intercompany transactions, it is questionable whether the "real" intercompany payables/receivables could be distinguished from the "balancing" entries automatically made by PeopleSoft.

failure to install a standard procedure to review and validate its intercompany balances serves to erode any ability to rely upon the accuracy of those balances. Additionally, in many cases the "correcting" entries contain errors calling into question the "correcting" entries themselves.[26]

Other accounting programs initiated by Calpine (and designed to rectify the issues described above) actually exacerbated the inaccuracy of the intercompany claims reflected on the Debtors' books and records. For example, in October 2005, Calpine attempted to "clear" intercompany balances for each of its subsidiaries as such intercompany balances had grown to unmanageable levels. This clearance program was designed to simplify Calpine's intercompany accounting by consolidating with Calpine Corp. all outstanding legal balances across legal entities that did not settle in cash on a regular basis. Therefore, rather than having multiple payables/receivables with various Calpine entities, each subsidiary would have one payable/receivable with Calpine Corp. While this "clearing" program would necessarily have the effect of simplifying the intercompany accounting, the shifting of assets and liabilities across legal entities has added to the inaccuracy of the intercompany claims and increased the difficulty of disentangling claims that were suspect even before being aggregated.

The issues described above were pervasive and affected the intercompany claims of all Calpine entities. CalGen is no different. For example, as part of its preliminary analysis, AlixPartners reviewed over 40,000 line items related to CalGen's intercompany accounting. Based upon this analysis, AlixPartners made the following findings specific to CalGen, among others:

---

[26]  AlixPartners selected a sample of 187 manually recorded "journal" entries for review. These entries totaled $318 billion in absolute value. Of this population, 14% of the entries contained errors in recordation or failed to contain sufficient documentation to determine whether the transaction was recorded properly. These entries accounted for 15% of the total dollar value.

- Over 3,500 journal line items represented "reclassifications" of payables without detail or explanation. These line items have a net value of $1.2 billion.

- Over 400 journal line items were recorded without a corresponding Calpine affiliate.

- Over 3,700 journal line items represented "correcting" entries. This error rate represented more than 8% of the line items reviewed. Notably, this error rate is even higher than the inordinately high intercompany transaction error rate described above for the Company in general.

- Over 220 journal line items that transferred CalGen balances from other Calpine affiliates to Calpine Corp. On a net basis, these amounts totaled $69 million.

- Over 60 affiliates had their intercompany balances with CalGen eliminated in late 2005.

Indeed, the inherent weakness associated with CalGen's intercompany accounting were recognized in its last two, and only two, annual reports. These material weaknesses identified in the 2004 and 2005 annual reports led to restatements of amounts totaling over $35 million. Specifically, in 2004, CalGen identified an error made in its payments due from CES related to the sale of CalGen's energy. This error resulted in the overstatement of CalGen's revenues by $16.9 million over a six month period from March to September 2004. According to the 2004 annual report, CalGen intended to address the intercompany accounting weaknesses that led to this error. In 2005, however, CalGen again discovered that amounts related to its energy transactions with CES were incorrect based upon material weaknesses in its intercompany accounting. This time, CalGen determined that it overpaid for fuel expenses to CES by $4.2 million in 2004 and $18.6 million in 2005. While these material weaknesses may not seem significant in isolation, they actually call into question all of the intercompany accounting at CalGen when one considers that these accounting errors occurred with respect to CalGen's primary and most important source of revenue—the sale of energy to CES.

An ultimate conclusion with respect to the foregoing issues and substantive consolidation must follow the completion of the Debtors' investigation. Nevertheless, all of

the inherent weaknesses and deficiencies described above have led the Debtors' advisors to conclude preliminarily that the intercompany claims of the Debtors (and, as a consequence, the assets and liabilities related to the intercompany claims) cannot be relied upon without analyzing and validating the intercompany transactions themselves.   AlixPartners has determined, however, that this validation exercise likely cannot be completed in a time and cost effective manner—and, perhaps, not at all—due to (among other things) the number and age of the intercompany transactions,[27] the lack of documentary support for the intercompany accounting entries, the significant number of correcting entries, the various accounting programs employed by Calpine that failed to "correct" the issues related to Calpine's intercompany accounting, and the loss of institutional knowledge caused by the high turnover in the accounting group.  In other words, it is the Debtors' present belief that their affairs may be hopelessly entangled so as to justify substantive consolidation of all the Debtor entities, including CalGen, under Augie/Restivo.

Based upon the foregoing, the Debtors respectfully submit that the solvency of CalGen is far from clear, despite the claims to the contrary made by the objecting parties.

**III.    The Objection Of The Second Lien Committee Has Been Resolved.**

The Unofficial Committee of Second Lien Debtholders (the "Second Lien Committee") filed an objection to the Debtors' Repayment Motion on the ground that the Debtors failed to provide adequate protection to the Calpine Second Lien Holders.[28]  Upon receiving the objection, the Debtors contacted the Second Lien Committee in an attempt to

---

[27]  Over 1.1 million journal line items now comprise the intercompany balances between affiliates.  Of this amount, over 75% are more than two years old.

[28]  See Objection of Unofficial Committee of Second Lien Debtholders To Debtors' Motion For Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and Determining Value of Secured Claims, filed February 16, 2007 [Docket No. 3707] (the "Second Lien Objection").

resolve the objection consensually. The Debtors are pleased to apprise the Court that, after extensive negotiations, the parties have reached a settlement involving certain modifications to provisions in the Replacement DIP Agreement. Importantly, the Official Committee of Unsecured Creditors, the Official Equity Committee and the Replacement DIP Lenders have also agreed to this settlement. The parties' agreement is as follows:

- The incremental term facility will only be used to refinance debt and/or preferred stock at the following projects: Rocky Mountain, Riverside, Metcalf, Freeport, Mankato, Blue Spruce and Deer Park. It cannot be used absent (A) the consent of the Official Committee of Unsecured Creditors, the Official Equity Committee and the Second Lien Committee or (B) a further court order.

- The $484 million under the Replacement DIP Facility will only be used to (A) repay debt and/or preferred stock at the following projects: Rocky Mountain, Riverside, Metcalf, Freeport, Mankato, Blue Spruce and Deer Park and/or (B) make payments to the Calpine Second Lien Holders and/or the CalGen Lenders. It cannot be used absent (A) the consent of the Official Committee of Unsecured Creditors, the Official Equity Committee and the Second Lien Committee or (B) a further court order.

- The Calpine Corp. Second Replacement Liens (as defined in the Cash Collateral Order) will no longer be limited to diminution in value. However, such liens will remain junior and silent and will no longer be operative upon the effective date of a plan of reorganization. In addition, the Calpine Corp. Second Replacement Liens will not affect the projects and assets[29] that are carved out of the Replacement DIP Agreement. Furthermore, for purposes of clarity, the Debtors will not be required to pay down the Second Lien Debt with proceeds from any asset sale on account of the Calpine Corp. Second Replacement Liens.

- Indebtedness in respect of any Commodity Hedge Agreements of the Loan Parties to the extent that such Commodity Hedge Agreements can be entered into for hedging activities undertaken in compliance with the Company's Trading Protocol for ordinary course, non-speculative hedging transactions for "right way risk" activities, provided that they do not exceed the total of 80% of the notional available capacity of the assets

---

[29]  The projects and assets are as follows: (1) the capital stock of Calpine Pasadena Cogeneration, Inc. and Calpine Texas Cogeneration, Inc.; (2) the Capital Stock of Androscoggin Energy, LLC, Bethpage Energy Center 3, Calpine Canada Energy Finance ULC, Calpine Canada Energy, Ltd., Calpine Merchant Services Company, Inc., Calpine Newark, LLC, Calpine Parlin, LLC and CPN Insurance Corporation; (3) any of the assets of O.L.S. Energy-Agnews, Inc., Broad River Energy LLC, South Point Energy Center LLC, Calpine Greenleaf Holdings, Inc., Calpine Greenleaf, Inc., RockGen Energy, LLC or Calpine Monterey Cogeneration, Inc.

utilized for credit support for the remaining portion of the calendar year in which the transaction is effectuated; 80% of the notional available capacity for the first subsequent calendar year, 60% of the notional available capacity for the second subsequent year; 40% of the notional available capacity for the third subsequent year and 40% thereafter, all as calculated at the time that the agreement is effectuated; provided, however, that to the extent the Company agrees to trading restriction limitations with any counterparty to a Commodity Hedge Agreement that are more restrictive than those set out herein, then any such more restrictive hedging transaction limitations shall be substituted for the limitations in clause (B) above.

- The amount of the Calpine Second Lien Holders' claim will be increased by 1.5% of the non-cash portion of their distribution under a plan of reorganization. The 1.5% will be paid in kind.

- This settlement is contingent on the Debtors' Refinancing Motion being approved by the Court in all respects.

Pursuant to the terms of this agreement, the Second Lien Objection has been withdrawn. The Debtors respectfully request that the Court approve the Replacement DIP Facility as amended.

## IV.    Rosetta's Concerns With The Proposed Refinancing Have Been Resolved.

Rosetta Resources, Inc. ("Rosetta") informed the Debtors that it may have to object to the Proposed Refinancing on the ground that the Replacement DIP Facility could prejudice Rosetta's interests (if any) in disputed properties. More specifically, in July 2005, Calpine sold substantially all of its domestic oil and gas business to Rosetta. That disposition included a large portfolio of oil and gas leases. To transfer some of the oil and gas leases, government consent was required. As of the Petition Date, the Debtors had not obtained the requisite consents to transfer a number of the leases, thus the Debtors continue to hold record title to these leases. However, Rosetta believes that notwithstanding the lack of consents, they own the properties, or, at a minimum, hold equitable title to them. Rosetta was therefore concerned that if either (A) the Court finds that Rosetta does in fact hold title to the properties; or (B) the Debtors decide to assume the Rosetta sale agreement or otherwise agree to transfer the leases to Rosetta, the liens granted through the Replacement DIP Facility could

34

encumber the leases and somehow prejudice Rosetta's interest in those properties or prevent the Debtors transfer of the leases.

To resolve the issue (without Rosetta having to file an objection), the parties agreed to add the following language to the Proposed Refinancing Order:

> The Court recognizes that included in the Collateral granted to the DIP Lenders herein are certain oil and gas properties, leases and interests (collectively, the "Disputed Properties") that are the subject of the July 7, 2005 Purchase and Sale Agreement by and between Calpine Gas Holdings LLC and Calpine Fuels Corporation, as Sellers, Calpine Corporation, as Parent of Sellers, and Rosetta Resources Inc., as Buyer and all interrelated agreements thereto. Notwithstanding anything herein to the contrary, nothing in this Order shall (i) affect, alter or otherwise impair any pre-existing valid, enforceable and non-voidable rights or interests, including any legal or equitable title, lien or other right or interest, if any, that Rosetta Resources, Inc. (together with its affiliated entities, "Rosetta") may have in or to the Disputed Properties (the "Rosetta Interest") or any liens or encumbrances in any Rosetta Interest that Rosetta has validly granted or may validly grant thereto; or (ii) prime or subordinate, in any way, any Rosetta Interest, if any, which Rosetta Interest shall be senior and superior to any lien or security interest granted herein to the DIP Lenders.

### Conclusion

For the foregoing reasons, the Debtors respectfully request that this Court approve the Proposed Refinancing.

Dated: February 23, 2007
    New York, New York

Respectfully submitted,

_/s/ Richard. M. Cieri_____
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted pro hac vice)
Stephen E. Hessler (admitted pro hac vice)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Counsel for the Debtors

**EXHIBIT A**

**EXECUTION VERSION**

AMENDED AND RESTATED LOAN AGREEMENT

dated as of March 26, 2004

among

MEP PLEASANT HILL, LLC,
as Borrower,

DZ BANK AG, DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK,
FRANKFURT AM MAIN, NEW YORK BRANCH,
as Administrative Agent,

UNION BANK OF CALIFORNIA, N.A.,
as Security Agent,

and

THE TERM LENDERS PARTIES HERETO

MEP PLEASANT HILL
POWER PROJECT

## AMENDED AND RESTATED LOAN AGREEMENT

This **AMENDED AND RESTATED LOAN AGREEMENT**, dated as of March 26, 2004 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Agreement"), among MEP PLEASANT HILL, LLC, a Delaware limited liability company (the "Borrower"), the several banks and other financial institutions from time to time parties hereto (the "Term Lenders"), DZ BANK AG, DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK, FRANKFURT AM MAIN, NEW YORK BRANCH (f.k.a. DG Bank Deutsche Genossenschaftsbank AG), as Administrative Agent for the Term Lenders, (together with any successor administrative agent, in such capacity, the "Administrative Agent") and UNION BANK OF CALIFORNIA, N.A., as Security Agent (together with any successor security agent, in such capacity, the "Security Agent").

### W I T N E S S E T H:

WHEREAS, the Administrative Agent, the Security Agent, the Term Lenders and the Borrower are parties to that certain Construction Loan Agreement, dated as of September 8, 2000 (the "Construction Loan Agreement");

WHEREAS, the parties have agreed to revise the terms and conditions for the repayment of the loans outstanding under the Construction Loan Agreement and accordingly wish to amend and restate in full the Construction Loan Agreement as set forth in this Agreement;

NOW THEREFORE, in consideration of the foregoing premises, the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1.  DEFINITIONS

Capitalized terms used in this Agreement, including the recitals, and not otherwise defined herein shall have the respective meanings set forth in Exhibit A hereto.  The rules of interpretation set forth in Exhibit A shall apply to terms used in this Agreement and specifically defined herein.

## SECTION 2.  AMOUNTS AND TERMS OF THE TERM LOANS

2.1    Term Loans.

(a)    The Borrower requests and, subject to the terms and conditions hereof (including, without limitation, Section 5), (i) each Tranche A Term Lender agrees that on and as of the Term Closing Date, each Tranche A Construction Loan owed to such Tranche A Term Lender under the Construction Loan Agreement shall be converted to a term loan owed to such Tranche A Term Lender hereunder in the same principal amount (each, a "Tranche A Term Loan") and (ii) each Tranche B Term Lender agrees that on and as of the Term Closing Date, each Tranche B Construction Loan owed to such Tranche B Lender under the Construction Loan

Agreement shall be converted to a term loan owed to such Tranche B Lender hereunder in the same principal amount (each, a "Tranche B Term Loan" and together with the Tranche A Term Loans, collectively, the "Term Loans"). The principal amount of each Term Lender's Term Loan outstanding on and as of the Term Closing Date is shown on Schedule 2.1(a) hereto.

(b)    The Tranche A Term Loans may from time to time be (i) Eurodollar Loans, or (ii) Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Section 2.5.

(c)    The aggregate principal amount of the Tranche A Term Loans shall be due and payable in 52 installments on the respective dates and in the respective amounts as set forth in Schedule 2.1(c)(i) hereto and shall have a final Payment Date on the last Business Day of December, 2016 (the "Tranche A Term Loan Final Maturity Date"). The aggregate principal amount of the Tranche B Term Loans shall be due and payable in 64 installments on the respective dates and in the respective amounts as set forth in Schedule 2.1(c)(ii) hereto and shall have a final Payment Date on the last Business Day of December, 2019 (the "Tranche B Term Loan Final Maturity Date").

2.2    Term Notes.

(a)    The Tranche A Term Loans owed to each Tranche A Term Lender shall be evidenced by this Agreement and by promissory notes of the Borrower, delivered to the Administrative Agent on the Term Closing Date for distribution to each Tranche A Term Lender, substantially in the form of Exhibit B-1 with appropriate insertions (each, a "Tranche A Term Note"), each payable to the order of such Tranche A Term Lender. The Tranche A Term Note of each Tranche A Term Lender shall (i) be dated the Term Closing Date, (ii) represent the Borrower's obligation to pay the aggregate principal amount of the Tranche A Term Loans made by such Tranche A Term Lender, (iii) be stated to mature on the respective dates and in the respective amounts as set forth in Schedule 2.1(c)(i) hereto and have a final payment date of the Tranche A Term Loan Final Maturity Date, (iv) provide for the payment of interest in accordance with Section 2.6(a), and (v) provide that such Tranche A Term Lender is entitled to the benefits of this Agreement, the Security Documents and the Collateral. Each Tranche A Term Lender is hereby authorized to record the date, Type and amount of its Tranche A Term Loan on the Term Closing Date, each continuation thereof, each conversion thereof to another Type, the date and amount of each payment or prepayment of principal thereof and, in the case of Eurodollar Loans, the length of each Interest Period with respect thereto, on the schedules annexed to and constituting a part of its Tranche A Term Note or on other appropriate records of such Tranche A Term Lender, and any such recordation shall constitute *prima facie* evidence of the accuracy of the information so recorded in the absence of manifest error; provided, that failure by any Tranche A Term Lender to make any such recordation or any error therein shall not limit or otherwise affect the obligations of the Borrower hereunder or under the Tranche A Term Notes in respect of the Tranche A Term Loans.

(b)    The Tranche B Term Loans owed to each Tranche B Term Lender shall be evidenced by this Agreement and by promissory notes of the Borrower, delivered to the Administrative Agent on the Term Closing Date for distribution to each Tranche B Term Lender, substantially in the form of Exhibit B-2 with appropriate insertions (each a "Tranche B Term

with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect.

## SECTION 11. REMEDIES.

    11.1   Remedies of the Security Agent.

    (a)    In the event that one or more Events of Default shall have occurred and be continuing, upon receipt of written instructions from the Required Lenders, or Term Lenders whose principal amount of Term Loans then outstanding aggregate at least to 25% or more of all Term Loans then outstanding so long as such Term Lenders include the Term Lender then serving as Administrative Agent, the Administrative Agent shall declare, by written notice to the Borrower, the entire unpaid principal amount of all Term Loans, (together with all unpaid interest thereon and Make-Whole Amount, if any, with respect to the Tranche B Term Loans), and all other amounts then due to the Term Lenders under this Agreement or any other Operative Document, to be forthwith due and payable, whereupon such amounts shall immediately become due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrower. Notwithstanding the foregoing, if any Event of Default referred to in Section 10(g) shall occur, automatically and without notice, the actions described above in this Section 11.1(a) shall be deemed to have occurred.

    (b)    If an Event of Default shall have occurred and be continuing, then the Administrative Agent may, and where required by the Required Lenders shall, upon written notice to the Borrower and the Security Agent, cause the Security Agent to exercise any or all of the rights, privileges and powers and pursue any or all of the remedies pursuant to this Section 11, Article Eleven of the Deed of Trust and any other Security Document and may take possession of all or any part of the Collateral and may exclude therefrom the Borrower and all persons claiming under it, and may exercise all remedies available to a secured party under the UCC or any other provision of Applicable Law. The Security Agent (at the direction of the Administrative Agent) may proceed to enforce the rights of the Administrative Agent and of the Term Lenders by directing payment to it of all moneys payable under any agreement or undertaking constituting a part of the Collateral, by proceedings in any court of competent jurisdiction to recover damages for the breach hereof or for the appointment of a receiver or for sale of all or any part of the Collateral or for foreclosure of the Collateral, and by any other action, suit, remedy or proceeding authorized or permitted by this Agreement or the Deed of Trust, at law or in equity, or whether for the specific performance of any agreement contained

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF MS
FILED

2007 FEB -2  AM 11: 00

CHARLENE J KENNEDY
CLERK
BY_____DEPUTY

IN RE:

**PREMIER ENTERTAINMENT BILOXI**          CASE NO. 06-50975
**LLC (d/b/a HARD ROCK HOTEL &**
**CASINO BILOXI) AND PREMIER**            **CHAPTER 11**
**FINANCE BILOXI CORP.**
            **Debtors**                    **(Jointly Administered)**

## OPINION

The matter before the court is the Debtors' Motion for Authorization to Obtain

Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3),

364(d)(1) and 364(e). Having considered the pleadings and supporting memoranda submitted by

the parties, and having heard the evidentiary presentation at the hearing on the motion and

arguments of counsel, the court concludes that the Debtors' motion should be denied.

### I. FACTUAL BACKGROUND

1. Petitions for relief under Chapter 11 of Title 11 of the United States Code were filed

by Premier Entertainment Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) and by Premier

Finance Biloxi Corp., ("Debtors"), on September 19, 2006, in the United States Bankruptcy

Court for the Southern District of Mississippi. The cases were consolidated for procedural

purposes and are being jointly administered.

2. On the same date, the Debtors filed their Motion Pursuant to Section 363(c) of the

Bankruptcy Code and Bankruptcy Rule 4001(b) for Order Authorizing the Use of Cash Collateral

on an Interim and Final Basis, requesting use of cash collateral including insurance proceeds

collected for damages resulting from Hurricane Katrina. After notice and hearing, the court

entered its opinion and interim order on October 10, 2006, granting the Debtors' motion and allowing utilization of funds held by U.S. Bank in accordance with the Debtors' 13 week projected budget. An order was subsequently entered that extended the terms of the interim cash collateral order until January 20, 2007.[1]

3. On October 9, 2006, prior to the court's entry of the opinion and interim order on cash collateral, the Debtors filed their Motion for Authorization to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e). The Debtors request authorization to obtain $180 million of postpetition financing from BHR Holdings, Inc., "on a super-priority basis in order to repay the Debtors' prepetition secured bonds in an effort to repair, rebuild, and reopen the Hard Rock Hotel & Casino Biloxi by December 31, 2007". Debtors' Motion for Authorization to Obtain Postpetition Financing at 1. A limited opposition was filed by International Game Technology, a response was filed by the Official Committed of Unsecured Creditors and objections were filed by U.S. Bank National Association, as Indenture Trustee, and by the Majority Noteholders.

4. The matter was set for hearing along with a request for the court to further consider the Debtors' Motion for Order Authorizing the Use of Cash Collateral. A hearing was commenced on the matter on January 16, 2007, and evidence was presented over three days, with the Majority Noteholders and U.S. Bank National Association, as Indenture Trustee opposing the motion at

---

[1] The terms of the cash collateral order were extended by the court on the record at the hearing on the motion for post-petition financing until a decision on the current motion. Subsequently, the cash collateral order was agreed to be extended until April 2006, with an order providing such to be submitted by counsel.

the hearing.[2]  Counsel for the parties reconvened with the court on January 25, 2007, to conclude

the hearing.

## II.  CONCLUSIONS OF LAW

The matter before the court is a core proceeding pursuant to 28 U.S.C. § 157.  The court

has jurisdiction over the parties and subject matter pursuant to 28 U.S.C. §§ 1334 and 157.

The Debtors have requested the court for authorization to obtain postpetition financing

pursuant to Section 364 of the Bankruptcy Code.  That sections provides, in part, the following:

> **§ 364.  Obtaining credit**
> . . .
> (c) If the trustee is unable to obtain unsecured credit allowable under section
> 503(b)(1) of this title as an administrative expense, the court, after notice and a
> hearing, may authorize the obtaining of credit or the incurring of debt –
> > (1) with priority over any or all administrative expenses of the kind
> > specified in section 503(b) or 507(b) of this title;
> > (2) secured by a lien on property of the estate that is not otherwise
> > subject to a lien; or
> > (3) secured by a junior lien on property of the estate that is subject
> > to a lien.
> (d) (1) The court, after notice and a hearing, may authorize the obtaining of credit
> or the incurring of debt secured by a senior or equal lien on property of the estate
> that is subject to a lien only if –
> > (A) the trustee is unable to obtain such credit otherwise; and
> > (B) there is adequate protection of the interest of the holder of the
> > lien on the property of the estate on which such senior or equal lien
> > is proposed to be granted.
> > (2) In any hearing under this subsection, the trustee has the burden of proof on
> the issue of adequate protection.
> (e) The reversal or modification on appeal of an authorization under this section to
> obtain credit or incur debt, or of a grant under this section of a priority or a lien,

---

[2] As stated in the Debtors' Motion, U.S. Bank National Association serves as the
indenture trustee with respect to $160 million in aggregate outstanding 10 3/4 % First Mortgage
Notes due 2012, issued pursuant to indenture dated as of January 23, 2004, as amended.  The
bonds are beneficially held by investors.  Proceeds of the bonds have been utilized to design,
build, furnish and open the resort.  These obligations of the Debtors are secured by first priority
liens on the resort.

> does not affect the validity of any debt so incurred, or any priority or lien so
> granted, to an entity that extended such credit in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and the
> incurring of such debt, or the granting of such priority or lien, were stayed
> pending appeal.

11 U.S.C. § 364(c), (d), (e). The Debtors indicate in their brief that they have withdrawn their

request to prime liens pursuant to 11 U.S.C. § 364(d) and only seek relief pursuant to subsections

(c) and (e) of 11 U.S.C. § 364. Debtors' Brief in Support of Motion at n. 1. To meet the

requisites necessary for approval of postpetition financing pursuant to § 364, a debtor bears the

burden of proof to show the following:

> In order to secure approval of post-petition financing pursuant to 11 U.S.C. §§
> 364(c) and/or (d), the debtor-in-possession bears the burden of proving the following:
>
> first, that the proposed financing is an exercise of sound and reasonable business
> judgment; second, that no alternative financing is available on any other basis;
> third, that the financing is in the best interests of the estate and its creditors; and,
> as a corollary to the first three points, that no better offers, bids, or timely
> proposals are before the Court.
>
> *In re Western Pacific Airlines, Inc.,* 223 B.R. 567, 572 (Bankr.D.Colo.1997).
> Other iterations of these basic requirements include showing that 1) the financing
> arrangement is necessary to preserve assets of the estate, and 2) the arrangement is
> otherwise fair and reasonable. *In re Crouse Group, Inc.,* 71 B.R. 544, 546
> (Bankr.E.D.Pa.1987).

*In re Phase-I Molecular Toxicology Inc.,* 285 B.R. 494, 495-96 (Bankr. D.N.M. 2002). *See also,*

*In re Mid-State Raceway, Inc.,* 323 B.R. 40 (Bankr. N.D.N.Y. 2005).

The request that the Debtors have presented in their motion is not solely for the purpose

of obtaining post-petition financing, but also for the purpose of obtaining authorization to prepay

noteholders and extinguish liens. Therefore, rather than addressing the specific requisites for

obtaining authorization for postpetition financing pursuant to § 364, the court will address the

broader aspects of the Debtors' request.

The Debtors stated purposes in seeking to obtain the $180 million of postpetition

financing are to pay off the Bonds at 100% of par, plus accrued but unpaid interest through and

including the date of payoff, release insurance proceeds held by the bondholders, and to

extinguish liens, thereby giving the Debtors the ability to repair, rebuild and reopen the resort.

The Debtors state that insurance proceeds would be used as cash collateral to prepay a substantial

portion of the DIP Facility.

U.S. Bank National Association, as Indenture Trustee, made the following assertions in

its brief on the matter:

> Under applicable New York law Debtors have no right under the Indenture to
> prepay the Notes.  There is no authority under Section 364 or otherwise in the
> Bankruptcy Code authorizing the Court to impose an impaired plan treatment
> upon the Noteholders and U.S. Bank as an incident to an insider DIP Loan in
> order to save money for a solvent debtor.  The relief sought by Debtors can only
> be obtained, if at all, as a proposed restructuring of claims through the Chapter 11
> plan confirmation process.  Thus, the DIP Financing Motion must be denied as
> premature.
> . . .
> In their DIP Financing Motion, Debtors are asking this Court to restructure and
> impair the contractual rights of U.S. Bank and the Noteholders very substantially
> by, among other things, nullifying the Indenture's prohibition on prepayment.
> Debtors also apparently seek to impair, limit and restructure the claims of the
> Noteholders and U.S. Bank in other important ways that are not quite as obvious.
> In addition to prepayment, Debtors are expressly or implicitly asking the court to:
>
> 1.    Order that all of the prepetition and post-petition liens of U.S. Bank and
>       the Noteholders in all of the Debtors' property (except the liens in certain
>       limited escrowed funds) be released at the time of the Court ordered
>       "payoff" of the Notes;
> 2.    Determine the terms of an escrow arrangement among Debtors, U.S. Bank
>       and Noteholders, including the appropriate maximum amount to be held in
>       escrow by U.S. Bank to pay potential claims under Section 6.02, which
>       Debtors seek to cap at $12.9 million plus certain unspecified existing and
>       future fees and expenses of U.S. Bank, as indenture trustee; and

3.    Order that no reserve would be established to support U.S. Bank's potential claims for indemnification by Debtors, even though U.S. Bank would not be receiving any releases, exculpations or injunctive protections at the time of the payoff of the Notes.

Debtors' own Chapter 11 Plan filed after the DIP Financing Motion admits that Debtors are seeking to restructure, treat and impair the prepetition secured claims of the Noteholders and U.S. Bank in the DIP Financing Motion. It is written in the alternative to address the rights of the Noteholders and U.S. Bank if the DIP Financing Motion is granted and the "payoff" has occurred and if it has not occurred. Debtors openly concede that their Plan would "impair" Noteholders' claims if it were to do the same things that Debtors are asking for in the DIP Financing Motion. The filing of Debtors' Plan underscores the inappropriateness of Debtors seeking Plan relief incident to an insider DIP Loan transaction . . .

Debtors offer up no section of the Bankruptcy Code or other legal authority for the proposition that they are entitled to impair and restructure U.S. Bank and Noteholder prepetition and post petition secured claims in the ways they apparently seek. Nothing in Sections 364(c)(1), 364(c)(2), 364(c)(3) or 364(e) of the Bankruptcy Code permits a solvent debtor (or any other debtor) to violate a contractual prepayment prohibition to an oversecured lender just because it is using the proceeds of a DIP loan. While Debtors also request relief pursuant to the Court's general equitable powers under Section 105, such powers do not support Debtors' requests for claim impairment outside of a Chapter 11 plan.

. . .

In sum, Debtors have not asserted and cannot assert any basis under the Bankruptcy Code that supports their claim to a court order that would impair the Noteholders' rights and U.S. Bank's rights in the context of their DIP Financing Motion.

Memorandum of Law of U.S. Bank National Association, as Indenture Trustee, in Support of

Objection to Debtors' Motion for Authorization to Obtain Postpetition Financing Pursuant to 11

U.S.C. §§ 105, 361, 362, 364(C)(1), 364(c)(2), 364(c)(3) and 364(e) at 8-10, 13.

The Majority Noteholders also argue that the Debtors' requests are improper under § 364:

The Debtors seek to rely on Section 364 of the Bankruptcy Code as the statutory authority for their motion, but Section 364 does not grant any authority for a bankruptcy court to alter a secured creditors rights to be paid and satisfied pursuant to the terms of the Indenture. Rather, Section 364 merely outlines the conditions for postpetition financing, such as the strict conditions that must be met for a debtor to grant a priming lien.

-6-

A plain reading of Section 364 demonstrates that it is not intended to authorize impairment of secured creditors' rights as sought here . . .

The Debtors are improperly attempting to use Section 364 to achieve results that can be obtained, if at all, only through confirmation of a plan.  As explained by the court in *In re Chevy Devco*, 78 B.R. 585 (Bankr. D. Cal. 1987), this is expressly prohibited:

> [T]he scheme being requested by the debtor is essentially its plan of reorganization . . . [The existing secured creditor] is being denied the right to protect itself and the safeguards of Chapter 11 confirmation are being circumvented.  Therefore the Court finds that [the existing secured creditor]'s opposition to the priority lien should be viewed almost as if it were a cramdown situation.  Is a senior lienor being given less than full protection so that a junior creditor or interest can benefit from it?  If so, this subordination should not be allowed.

*Id.* at 589.  (denying approval of financing under Section 364 to rebuild and refurbish the debtor's main asset, a dilapidated shopping center; *citing In re Dunckle Associates, Inc.,* 19 B.R. 481 (Bankr. E.D.Pa. 1982). . .

Other courts have also refused to permit financings under Section 364 if they permanently altered creditors' rights without meeting plan confirmation standards.  "The bankruptcy court cannot, under the guise of section 364, approve financing arrangement that amount to a plan of reorganization but evade confirmation requirements." *In re Seth Co.,* 281 B.R. 150, 153 (Bankr. D.Conn. 2002) (denying approval of a proposed financing where secured creditors did not consent).  In *In re First South Savings Assoc.,* 820 F. 2d 700, 714 (5th Cir. 1987), the Fifth Circuit Court of Appeals granted a writ of mandamus preventing postpetition financing where it found that the financing was tantamount to a plan of reorganization, but the financing was untested by the confirmation standards of the Bankruptcy Code.  Here, the Debtors are trying to use Section 364 to permanently impair the Noteholders' rights without their consent.  This is not allowed" "[T]he limitation that benefits cannot flow from the senior to junior parties except by consent of the senior is very clearly expressed" in the case law. *Chevy Devco,* 78 B.R. at 590.  "In this case the secured creditor is being made to subordinate so that those with lower priority can potentially make a profit.  This is not to be allowed." *Id.*

Further, such a proposal would not meet the confirmation standards of Section 1129, unless the requisite Noteholders consented to such treatment.  The Debtors cannot be permitted to use Section 364 to accomplish a fundamental refinancing and restructuring.  The Debtors' own Plan highlights the fact that the Noteholders' consent is necessary for the partial prepayment of the Notes and lien release.  The Plan (which appears to be written in the alternative, anticipating either the approval or denial of the proposed "payout" under the DIP Motion) characterizes the Noteholders as ***impaired*** and provides that they must be given the opportunity

to vote on the Plan and, if they do not vote in favor of the Plan, the Bankruptcy Code's cramdown requirements must be met. Of course, this is the correct procedure: any creditor whose legal or equitable rights are impacted under a plan of reorganization must be entitled to vote on the plan and be protected by the Bankruptcy Code's confirmation requirements. These protections are a critical component of bankruptcy law. *E.g. WestPoint Stevens,* 333 B.R. at 54; *Seth Co.,* 281 B.R. at 153. No such protections exist in Section 364, and accordingly, no authorization for the Debtors to impair the Noteholders without their consent.

Majority Noteholders's Brief in Opposition to (1) Motion for Authorization to Obtain

Postpetition Financing and (2) Motion for Final Approval for Use of Cash Collateral at 27-29.

The Noteholders cited from the case of *Contrarian Funds, LLC v. WestPoint Stevens, Inc. (In re*

*WestPoint Stevens, Inc.*), 333 B.R. 30 (S.D.N.Y. 2005), in which the court declined to expand

interpretation § 363, to support its argument here against an expansive view of § 364:

> The court determined that "[n]o such expansive interpretation" of Section 363 was justified "particularly in light of the fact that the Bankruptcy Code provisions specifically providing for impairment of objecting creditors' rights" were already provided for under the Bankruptcy Code's Chapter 11 plan confirmation provisions, which provide for important "procedural and substantive protections for adversely affected creditors" not provided under Section 363. *Id.* At 50. The court stated:
>> [A] debtor in Chapter 11 cannot use §363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization ... [I]f a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditor's rights under, for example 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless. Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan ... The Sale Order ... clearly constituted an attempt to determine or preempt plan issues in the context of the Section 363(b) sale and was improper to that extent. This is a Chapter 11 case. Chapter 11 authorizes the alteration of objecting creditors' rights through the plan confirmation process.
> *WestPoint Stevens,* 333 B.R. at 52-54.

Majority Noteholders Brief at 27.

Debtors' counsel offered the recent case of *Law Debenture Trust Company of New York v. Calpine Corporation (In re Calpine Corporation)*, 2007 WL 57879 (S.D.N.Y. Jan. 9, 2007), in support of the Debtors' request for authorization to prepay the notes through utilization of the motion for post-petition financing. That court authorized notes to be prepaid from debtor-in-possession financing outside the context chapter 11 plan confirmation. A critical distinction with that case, however, is that the loan document there entitled the debtor to prepay and there were no objections to the prepayment of the principal by the lenders or the indenture trustee. The dispute dealt only with whether the prepayment should include a make-whole premium. Under the indenture now before the court in this case, there is no right to prepay the notes until February 1, 2008.

The Debtors have also cited § 105 of the Bankruptcy Code requesting the court to use the power provided by that section to grant the relief sought. Although the court does have powers vested by that section, there are limitations. The noteholders argued the following in their brief:

> Nor can the Debtors fall back on Section 105 for authority to abrogate the terms of the Indenture. "Section 105(a) does not create authority and rights that do not otherwise arise from the express provisions of the Bankruptcy Code." *In re The Colad Group*, 324 B.R. 208, 213 (Bankr. W.D.N.Y. 2005). "By its very terms, Section 105(a) limits the bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy Code[,] 'and cannot be used in a manner inconsistent with the commands of the Bankruptcy Code.'" *F.D.I.C. v. Colonial Realty Co.*, 966 F. 2d 57, 59 (2d Cir. 1992)(internal citations omitted); *see also Kmart Corp.*, 359 F. 3d 866, 871 (7th Cir. 2004) (Section 105(a) "does not create discretion to set aside the Code's rules about priority and distribution; the power conferred by § 105(a) is one to implement rather than to override"). In *WestPoint Stevens*, the court specifically found that Section 105 could not be used in a case such as this one where the debtor attempted to use Section 105 to authorize an act not otherwise permitted under the Bankruptcy Code, holding that Section 105 "does not authorize bankruptcy courts to ignore Code requirements simply because they might constitute barriers to otherwise desirable outcomes."

Majority Noteholders' Brief in Opposition to (1) Motion for Authorization to Obtain Postpetition

Financing and (2) Motion for Final Approval for Use of Cash Collateral at 29-30. Additionally,

the *Calpine* case also notes limitations on the court's equitable powers:

> "[I]t is axiomatic that bankruptcy courts are 'courts of equity, empowered to
> invoke equitable principles to achieve fairness and justice in the reorganization
> process.'" Nevertheless, the equitable powers of the bankruptcy courts derive
> from the statutory grant of such authority by Congress, and are limited thereby.
> The Second Circuit has held:
>> Section 105(a) of the Bankruptcy Code gives the court equitable
>> power to issue any order, process or judgment that is necessary or
>> appropriate to carry out the provisions of this title. This Court has
>> long recognized that Section 105(a) limits the bankruptcy court's
>> equitable powers, which must and can only be exercised within the
>> confines of the Bankruptcy Code. It does not authorize the
>> bankruptcy courts to create substantive rights that are otherwise
>> unavailable under applicable law, or constitute a roving
>> commission to do equity.
> Thus, the equitable powers of the bankruptcy court cannot be used to contravene
> the provisions of the Bankruptcy code. The Supreme Court has also ruled that a
> bankruptcy court may not invoke equity to modify rights or interests created by
> state law, except to "the extent of actual conflict with the system provided by the
> Bankruptcy [Code]."

2007 WL 57879 at 7.

Under the circumstances of this particular case, where the payment the Debtors seek

authorization to make would impair or modify rights under the indenture and loan documents and

where the noteholders and indenture trustee strongly object to the payment, the court concludes

that the appropriate course of action, and the one that would better protect the rights of all the

parties and the estate, would be to allow the case to proceed to the confirmation process and the

statutory scheme set out under the provisions of Chapter 11. Based on the arguments and

authorities outlined above, the court concludes that the Debtors' Motion for Authorization to

Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2),

364(c)(3), 364(d)(1) and 364(e) should be denied.  The remaining matter of the continuation of use of cash collateral is being handled separately in accordance with the court's conference with counsel for the parties, with an order to be presented to the court allowing the continuation of the use of cash collateral and insurance proceeds until a time set forth in the order to be presented.

An order will be entered consistent with these findings and conclusions pursuant to Federal Rule of Bankruptcy Procedure 9021 and Federal Rule of Civil Procedure 58.  This opinion shall constitute findings and conclusions pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.

DATED this the 2nd day of February, 2007.

Edward R. Gaines

EDWARD R. GAINES
UNITED STATES BANKRUPTCY JUDGE

**ATTORNEY FOR PREMIER ENTERTAINMENT BILOXI LLC (D/B/A HARD ROCK HOTEL & CASINO BILOXI ) AND PREMIER FINANCE BILOXI CORP.**
Robert Alan Byrd
Byrd & Wiser
P.O. Drawer 1939
Biloxi, MS   39533

**ATTORNEYS FOR U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE**
Henry. E. Chatham, Jr.
Wise Carter Child & Caraway
P.O. Box 651 Jackson, MS 39205

Clark T. Whitmore
Amy J. Swedberg
Maslon Edelman Borman & Brand, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MC   55402-4140

-11-

**ATTORNEYS FOR MAJORITY NOTEHOLDERS**
Sidney P. Levinson
Deborah J. Saltzman
Hennigan, Bennett & Dorman LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017

Richard Montague
Wells, Moore Simmons & Hubbard, PLLC
4450 Old Canton Road, Suite 200
Jackson, Mississippi 39215

**ATTORNEY FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
Omer F. Kuebel, III
C. Davin Boldissar
Victoria de Lisle
Pan American Life Center
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036

**ATTORNEY FOR INTERNATIONAL GAME TECHNOLOY**
Douglas S. Draper
Heller, Draper, Hayden, Patrick & Horn, LLC
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6103

-12-