**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
**In re**                                      :
                                               :        **Chapter 11**
                                               :
**CALPINE CORPORATION,** *et al.*,             :        **Case No. 05-60200 (BRL)**
                                               :
                                               :        **(Jointly Administered)**
                                               :
-------------------------------------------------------------x
**HSBC BANK USA, NATIONAL**                    :
**ASSOCIATION, AS INDENTURE**                  :
**TRUSTEE, THE BANK OF NEW YORK,**             :        **Case No. 1:07-cv-03088 (GBD)**
**AS ADMINISTRATIVE AGENT,**                   :
**WILMINGTON TRUST FSB, AS**                   :
**INDENTURE TRUSTEE, WILMINGTON**              :
**TRUST COMPANY, AS ADMINISTRATIVE**           :
**AGENT, AND MANUFACTURERS**                   :
**& TRADERS TRUST COMPANY,**                   :
**AS INDENTURE TRUSTEE,**                      :
                                               :
                    **Appellants,**            :
                                               :
                  **– against –**              :
                                               :
**CALPINE CORPORATION, THE OFFICIAL**          :
**COMMITTEE OF UNSECURED**                      :
**CREDITORS OF CALPINE CORPORATION,**          :
**AND THE OFFICIAL COMMITTEE OF**              :
**EQUITY SECURITY HOLDERS,**                   :
                                               :
                    **Appellees.**             :
-------------------------------------------------------------x    *caption continued on next page*

```
-------------------------------------------------------------x
```
CALPINE CORPORATION, THE OFFICIAL    :
COMMITTEE OF UNSECURED    :
CREDITORS OF CALPINE CORPORATION,  :
AND THE OFFICIAL COMMITTEE OF    :
EQUITY SECURITY HOLDERS,    :
    :
               **Appellants,**    :
    :
               **– against –**    :
    :
HSBC BANK USA, NATIONAL    :
ASSOCIATION, AS INDENTURE    :
TRUSTEE, THE BANK OF NEW YORK,  :
AS ADMINISTRATIVE AGENT,    :
WILMINGTON TRUST FSB, AS    :
INDENTURE TRUSTEE, WILMINGTON  :
TRUST COMPANY, AS ADMINISTRATIVE :
AGENT, AND MANUFACTURERS    :
& TRADERS TRUST COMPANY,    :
AS INDENTURE TRUSTEE,    :
    :
               **Appellees.**    :
```
-------------------------------------------------------------x
```

### OPENING BRIEF OF APPELLANT MANUFACTURERS & TRADERS TRUST COMPANY

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Martin J. Bienenstock, Esq. (MB 3001)
Judy G.Z. Liu, Esq. (JL 6449)
Penny P. Reid, Esq. (PR 5699)

ATTORNEYS FOR MANUFACTURERS & TRADERS
TRUST COMPANY, AS INDENTURE TRUSTEE
UNDER THE THIRD PRIORITY INDENTURE

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

BASIS OF APPELLATE JURISDICTION ......................................................................... 1

STATEMENT OF ISSUES PRESENTED ON APPEAL ................................................... 1

STANDARD OF APPELLATE REVIEW .......................................................................... 2

STATEMENT OF THE CASE ............................................................................................ 3

STATEMENT OF RELEVANT FACTS ............................................................................ 6

    A.    The CalGen Secured Debt ................................................................. 6

    B.    Key Provisions of the Third Priority Indenture and the Collateral Trust Agreement ........................................................................ 8

    C.    Postpetition Financing ...................................................................... 9

    D.    M&T Bank's Proof of Claim ........................................................... 10

    E.    The Prepayment Motion and the Seventh Omnibus Claims Objection .............. 12

    F.    M&T Bank's Opposition to the Prepayment Motion ......................................... 13

    G.    The Hearing on the Prepayment Motion ........................................... 15

    H.    The Bankruptcy Court's Decision and the Prepayment Order ........................... 16

SUMMARY OF ARGUMENT .......................................................................................... 18

ARGUMENT ...................................................................................................................... 22

I.    The Bankruptcy Court Correctly Held Calgen's Breach Of The Third Priority Indenture Gives Rise To A Valid Damage Claim Allowable In Bankruptcy .................. 22

    A.    M&T Bank's Damage Claim is a Valid Claim Under New York Law .............. 22

    B.    Damage Claims for Breach of a Prepayment Prohibition Can be Calculated Precisely Under New York Law ...................................................... 24

    C.    M&T Bank's Claim for Money Damages is a Valid Claim Allowable Under Section 502 of the Bankruptcy Code ..................................................... 25

II.    The Bankruptcy Court Erred as a Matter of Law in Calculating the Amount of M&T Bank's Damage Claim ............................................................................................. 26

    A.    The Bankruptcy Court Erred as a Matter of Law by Estimating M&T Bank's Damage Claim ......................................................................... 26

    B.    In Using Estimation to Determine the Amount of M&T Bank's Damage Claim, the Bankruptcy Court Erroneously Awarded the Same Damage Claim to Holders of Different Notes, with Different Maturities, and Different Interest Rates ......................................................................... 28

i

# TABLE OF CONTENTS
## (continued)

Page

C.   The Bankruptcy Court Erred as a Matter of Law in Determining that M&T Bank's Damage Claim was Not Susceptible to Calculation ............................... 30

D.   The Bankruptcy Court's Elimination of the Bulk of M&T Bank's Damage Claim is Contrary to Public Policy ...................................................... 35

III.   The Bankruptcy Court Erred as a Matter of Law In Determining M&T Bank's Damage Claim Is An Unsecured Claim.......................................................... 37

IV.   The Bankruptcy Court Erred as a Matter of Law By Expunging M&T Bank's Proof Of Claim............................................................................................... 39

A.   The Bankruptcy Court Erred as a Matter of Law in Expunging the Indemnification Claim ........................................................................ 39

B.   The Bankruptcy Court Erred as a Matter of Law in Expunging the Damage Claim, the Default Interest Claim, and the Guarantee Claim .............................. 42

V.   The Bankruptcy Court Erred By Authorizing Payment Of Over $830 Million Of The Third Priority Notes Outside A Chapter 11 Plan....................................................... 43

CONCLUSION.................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

### C<small>ASES</small>

*Addison v. Langston (In re Brint's Cotton Marketing, Inc.)*, 737 F.2d 1338 (5th Cir. 1984) ................................................................................................................ 28

*Arthur v. Burkich*, 520 N.Y.S. 2d 638 (N.Y. App. Div. 1987) ................................. 23, 38

*Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720 (2d Cir. 1992) .................................... 28

*Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134 (3d Cir. 1982)............................... 28

*Butner v. United States*, 440 U.S. 48 (1979)................................................................. 35

*Citibank, N.A. v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85 (2d Cir. 2003) .............. 3

*Cohen v. KB Mezzanine Fund II (In re SubMicron Systems Corp.)*, 432 F.3d 448 (3d Cir. 2006) ................................................................................................................ 39

*Contrarian Funds, LLC v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.)*, 333 B.R. 30 (S.D.N.Y. 2005)............................................................................... 43, 44

*Evans v. Ottimo*, 469 F.3d 278 (2d Cir. 2006) ............................................................... 3

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996)....................................... 23, 34, 35

*In re 360 Inns, Ltd.*, 76 B.R. 573 (Bankr. N.D. Tex. 1987)......................................... 25

*In re A.J. Lane & Co., Inc.*, 113 B.R. 821 (Bankr. D. Mass. 1990)............................. 31

*In re Adelphia Business Solutions, Inc.*, 341 B.R. 415 (Bankr. S.D.N.Y. 2003)......... 26

*In re All Media Properties, Inc.*, 5 B.R. 126 (Bankr. S.D. Tex. 1980)........................ 26

*In re Armstrong World Indus., Inc.*, 320 B.R. 523 (D. Del. 2005) .............................. 36

*In re Armstrong World Indus., Inc.*, 348 B.R. 111 (D. Del. 2006) .............................. 28

*In re Chateaugay Corp.*, 10 F.3d 944 (2d Cir. 1993) .................................................. 26

*In re Coltex Loop Central Three Partners, L.P.*, 138 F.3d 39 (2d Cir. 1998)............. 36

*In re Dow Corning*, 456 F.3d 668 (6th Cir. 2006) ...................................................... 35

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*In re Duralite Truck Body & Container Corp.*, 153 B.R. 708 (Bankr. D. Md. 1993) .................. 31

*In re GCO, LLC*, 324 B.R. 459 (Bankr. S.D.N.Y. 2005) ............................................................. 26

*In re Imperial Coronado Partners, Ltd.*, 96 B.R. 997 (B.A.P. 9th Cir. 1989) ............................ 31

*In re Knight*, 55 F.3d 231 (7th Cir. 1995) .................................................................................... 26

*In re Kroh Brothers Dev. Co.*, 88 B.R. 997  (Bankr. W.D. Mo. 1988) ........................................ 31

*In re Mazzeo*, 131 F.3d 295 (2d Cir. 1997) ............................................................................ 26, 27

*In re Premier Entm't Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) and Premier Finance Biloxi Corp.*, Case No. 06-50975 (Bankr. S.D. Miss. Feb. 2, 2007) ................................................................................................................................ 43

*In re Thomson McKinnon Sec., Inc.*, 191 B.R. 976 (Bankr. S.D.N.Y. 1996) .............................. 28

*Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc.* (*In re Cont'l Air Lines, Inc.*), 780 F.2d 1223 (5th Cir. 1986) ................................................................................... 44

*Mel Wood Prods., Inc. v. Kores*, 438 N.Y.S.2d 829 (N.Y. App. Div. 1981) ................................ 42

*Newman & Bisco, et al. v. Realty Assocs. Securities Corp.*, 173 F.2d 609 (2d Cir. 1949) ................................................................................................................ 17, 21, 41

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988) ........................................................ 35

*Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15 (2000) ............................................................ 22

*Seidenberg v. Ostojic*, 435 N.Y.S.2d 56 (N.Y. App. Div. 1981) .................................................. 42

*Teachers Ins. & Annuity Assoc. of America v. Butler*, 626 F. Supp. 1229 (S.D.N.Y. 1986) ................................................................................................................................... 23

*Teachers Ins. & Annuity Assoc. of America v. Ormesa Geothermal*, 791 F. Supp. 401 (S.D.N.Y. 1991) ........................................................................................ 24, 25, 30, 31, 38

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199 (2007) ............................. 22

*United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989) .............................................. 40

*United States v. Verdunn*, 89 F.3d 799 (11th Cir. 1996) ............................................................. 27

**TABLE OF AUTHORITIES**
(continued)

Page(s)

STATUTES

11 U.S.C. § 502 .................................................................................................................. 39

11 U.S.C. § 502(b)(1) ......................................................................................................... 25

11 U.S.C. § 502(c)(1) .......................................................................................................... 27

11 U.S.C. § 506 .................................................................................................................. 39

11 U.S.C. § 506(b) ........................................................................................................ 37, 41

RULES

Fed. R. Bankr. P. 3001(f) .................................................................................................. 40

TREATISES

4 COLLIER ON BANKRUPTCY ¶ 506.03[1] (15th ed. rev. 2006) ...................................... 39

## BASIS OF APPELLATE JURISDICTION

This appeal is taken from (i) the Memorandum Decision and Order, dated March 5, 2007 (the "**Memorandum Decision**"), granting, in part, the Debtors' motion, dated January 26, 2007 (the "**Prepayment Motion**"), and (ii) the Order and Amended Order, dated March 12, 2007 and March 26, 2007, respectively (together, the "**Prepayment Order**"),[1] (I) granting Debtors' limited objection to certain claims; (II) determining the value of the CalGen secured debt pursuant to Fed. R. Bankr. P. 3012; and (III) authorizing repayment of CalGen secured debt, each entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  The Memorandum Decision and Prepayment Order each constitute final appealable orders pursuant to 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES PRESENTED ON APPEAL

1.      Whether the Bankruptcy Court erred as a matter of law in the manner in which it determined the allowable claims of Manufacturers & Traders Trust Company ("**M&T Bank**"), as successor indenture trustee, arising from the breach of the third priority indenture, dated March 23, 2004 (the "**Third Priority Indenture**").

2.      Whether the Bankruptcy Court erred as a matter of law in determining that the allowable claims of M&T Bank on account of the prepayment of the Third Priority Secured Floating Rate Notes due 2011 in the original principal amount of $680,000,000 (the "**Third Priority Floating Rate Notes**") and the 11½% Third Priority Secured Notes due 2011 in the original principal amount of $150,000,000 (the "**Third Priority Fixed Rate Notes**" and, together with the Third Priority Floating Rate Notes, the "**Third Priority Notes**") could not be calculated.

---

[1] The Prepayment Order, as amended, contains an inadvertent clerical error that the parties are in the process of resolving.

3.      Whether the Bankruptcy Court erred as a matter of law by and in estimating M&T Bank's allowable claims.

4.      Whether the Bankruptcy Court erred as a matter of law in expunging M&T Bank's proof of claim against the Guarantors, which guaranteed all the obligations under the Third Priority Indenture and/or all documents, instruments, certificates or other writings executed or delivered in connection with the Third Priority Indenture and/or Third Priority Notes (collectively with the Third Priority Indenture and Third Priority Notes, the "**Third Priority Indenture Documents**").

5.      Whether the Bankruptcy Court erred as a matter of law in expunging M&T Bank's proof of claim against CalGen and the Guarantors to the extent M&T Bank asserts a claim in respect of all amounts due or that may become due under the Third Priority Indenture Documents on account of indemnification, fees (including attorneys' fees), and costs incurred or to be incurred, by M&T Bank in enforcing any and all rights of M&T Bank under the Third Priority Indenture Documents.

6.      Whether the Bankruptcy Court erred as a matter of law in determining that M&T Bank's allowable claim on account of the prepayment of the Third Priority Notes is unsecured pursuant to section 506 of title 11 of the United States Code (the "**Bankruptcy Code**").

7.      Whether the Bankruptcy Court erred as a matter of law in overruling M&T Bank's objection to the prepayment of the Third Priority Notes prior to confirmation of a chapter 11 plan.

## STANDARD OF APPELLATE REVIEW

A bankruptcy court's conclusions of law are reviewed *de novo* and findings of fact are reviewed for clear error.  Fed. R. Bankr. P. 8013; *Evans v. Ottimo*, 469 F.3d 278, 281 (2d

Cir. 2006). Mixed questions of law and fact are subject to *de novo* review. *Citibank, N.A. v.*

*Vebeliunas* (*In re Vebeliunas*), 332 F.3d 85, 90 (2d Cir. 2003).

### STATEMENT OF THE CASE

On December 20, 2005 (the "**Commencement Date**"), Calpine Corporation

("**Calpine**") and its direct and indirect subsidiaries, including Calpine Generating Company,

LLC ("**Calpine Generating**") and CalGen Finance Corp. ("**CalGen Finance**" and, together with

Calpine Generating, "**CalGen**") and each of the Guarantors (as defined in section 1.01 of the

Third Priority Indenture) (collectively, the "**Debtors**"), commenced voluntary cases under

chapter 11 of the Bankruptcy Code. (JA at 0001, CD-1 at 1, Memorandum Decision at 1.)[2]

On January 26, 2007, the Debtors filed the Prepayment Motion seeking

authorization to enter into a $5 billion replacement postpetition debtor in possession credit

facility (the "**Replacement DIP Facility**") and to prepay, among other debt, the Third Priority

Notes. (CD-5 at 18; Prepayment Motion at 18.) Simultaneously with the filing of the

Prepayment Motion, the Debtors filed an omnibus objection (the "**Seventh Omnibus**

**Objection**") seeking, among other things, to expunge a portion of the M&T Bank Proof of Claim

(as defined below). (CD-100 at Exhibit G; Seventh Omnibus Objection at Exhibit G.)

On February 16, 2007, M&T Bank filed an objection to the Prepayment Motion.[3]

On February 22, 2007, M&T Bank filed the amended affidavit of Christopher J. Kearns, sworn

to on such date, in his capacity as Executive Director and Managing Member of Capstone

Advisory Group, LLC, financial advisor to M&T Bank, in support of the objection (the

---

[2] References to documents in the consolidated designation of record will be cited as CD-__ at ___. For the Court's convenience, citations to documents also found in the Appellants' joint appendix will include parallel cites, JA at __. Citations may also include the identity of the document cited to and the page or paragraph referenced therein.

[3] Each of the other Indenture Trustees, among others, filed similar objections to the Prepayment Motion.

"**Amended Kearns Affidavit**").  (JA at 1222-23, CD-24 at 1-2, Amended Kearns Affidavit at 1-2.)

Also on February 16, 2007, the statutory creditors' committee (the "**Creditors Committee**") appointed in the Debtors' chapter 11 cases filed a statement in support of the Prepayment Motion (the "**Creditors' Committee Reply**").  (*See* CD-15.)  On the same day, the official committee of equity interest holders of Calpine (the "**Equity Committee**" and, collectively with the Debtors and the Creditors' Committee, the "**Appellees**") filed a statement in support of the Prepayment Motion.  (*See* CD-16.)

On February 27, 2007, the Bankruptcy Court conducted a hearing (the "**Hearing**") on the Prepayment Motion.[4]  On March 5, 2007, the Bankruptcy Court issued the Memorandum Decision granting, in part, the Prepayment Motion.  (*See* JA at 0001, CD-1, Memorandum Decision.)  The Memorandum Decision awards M&T Bank a damage claim arising from CalGen's and the Guarantors' breach of the prepayment prohibition in the Third Priority Indenture (the "**Damage Claim**").  (JA at 0010-11, CD-1 at 10-11, Memorandum Decision at 10-11.)  M&T Bank has appealed from the Memorandum Decision because the Bankruptcy Court erred (i) in the manner in which it calculated the amount of the Damage Claim, (ii) in concluding the Damage Claim was an unsecured claim, rather than a secured claim, and (iii) in expunging M&T Bank's proof of claim.

By letter dated March 9, 2007 (the "**Indenture Trustee Letter**"), attorneys for M&T Bank alerted the Bankruptcy Court that the order CalGen submitted to the Bankruptcy Court granted relief well beyond the scope of the matters addressed at the Hearing and determined in the Memorandum Decision.  (JA at 1343-44, CD-51 at 1-2, Indenture Trustee

---

[4] References to the transcript from the Hearing (the "**Transcript**") will be cited as "CD-50 at _, Tr. at __."

Letter at 1-2.)  Nevertheless, on March 12, 2007, the Bankruptcy Court issued CalGen's

proposed order as the Prepayment Order, which provided for the expungement of the claims

comprising M&T Bank's Proof of Claim (defined below), including the Indemnification Claim

(other than for future fees and expenses incurred litigating the Default Interest Claim), the

Guarantee Claim, the Default Interest Claim, and even the very Damage Claim the Bankruptcy

Court had awarded to M&T Bank in the Memorandum Decision.  (JA at 0017, CD-2. at 3,

Prepayment Order at 3.)  Accordingly, M&T Bank appealed the Prepayment Order.

On March 14, M&T Bank filed a notice of appeal from each of the Memorandum

Decision and the March 12, 2007 version of the Prepayment Order.  *See* Notice of Appeal, *In re*

*Calpine Corp*., No. 05-60200 (BRL).  On March 27, 2007, M&T Bank filed its notice of appeal

from the Prepayment Order, as amended on March 26, 2007.  *See* Notice of Appeal, *In re*

*Calpine Corp*., No. 05-60200 (BRL).  On May 2, 2007, this Court consolidated the parties'

appeals under one case number.  [Docket No. 5].

Thereafter, by stipulation, dated April 25, 2007, M&T Bank and each of the other

parties to this appeal agreed on a briefing schedule.  On May 2, 2007, this Court "so ordered" the

briefing stipulation.  *See* Stipulation and Order, *In re Calpine Corp.*, No. 1:07-cv-03088 (GBD)

[Docket No. 6].

## STATEMENT OF RELEVANT FACTS

**A.     The CalGen Secured Debt**

On March 23, 2004, CalGen, two of the largest operating subsidiaries of Calpine, issued or incurred $2.605 billion of secured debt through a series of first, second, and third-lien financings (the "**CalGen Secured Debt**").  (JAA at 0003, CD-1 at 3, Memorandum Decision at 3.)  The CalGen Secured Debt consisted of the following:

| Principal Amount | Description | Non-Default Interest Rate |
|---|---|---|
| $600 million | First Priority Secured Term Loans Due 2009 | The greater of (A) 2.75% plus the greater of (i) Prime Rate or (ii) Federal Funds Effective Rate plus .50%, and(B) LIBOR plus 3.75% |
| $235 million | First Priority Secured Floating Rate Notes Due 2009 | 3.75% plus the greater of 1.25% and 6-month LIBOR |
| $200 million | First Priority Revolving Loans | The greater of (A) 2.5% plus the greater of (i) Prime Rate or (ii) Federal Funds Effective Rate plus .50%, and (B) LIBOR plus 3.5% |
| $100 million | Second Priority Secured Term Loans Due 2010 | The greater of (A) 4.75% plus the greater of (i) Prime Rate or (ii) Federal Funds Effective Rate plus .50%, or (B) LIBOR plus 5.75% |
| $640 million | Second Priority Secured Floating Rate Notes Due 2010 | 5.75% plus the greater of 1.25% and 6-month LIBOR |
| $680 million | Third Priority Secured Floating Rate Notes Due 2011 | 9% plus the greater of 1.25% and 6-month LIBOR |
| $150 million | Third Priority Secured Notes Due 2011 | 11.5% |

(*Id.*)

To secure all CalGen's and the Guarantors' obligations on account of the CalGen Secured Debt, the parties entered into the Calpine Generating Pledge Agreement, the CalGen Holdings Pledge Agreement, and the Security Agreement.[5]  Pursuant to such agreements, CalGen and the Guarantors granted to the holders of the CalGen Secured Debt, liens and security interests in the Collateral (as defined in the Third Priority Indenture) to secure all Obligations (as defined in the Third Priority Indenture), including "**all** debt, financial liabilities and obligations . . . of whatsoever nature and howsoever evidenced (principal, **interest**, **fees**, reimbursement obligations, cash cover obligations, penalties, **indemnities** and **legal and other expenses**, whether due **after** acceleration or otherwise) . . . ."  (JA at 0512-13, CD-63 at § 1.01, Third Priority Indenture at § 1.01; *see* JA at 1050, CD-74 at § 3.1, Security Agreement at § 3.1.) (emphasis added).  CalGen concedes the Third Priority Notes are oversecured (i.e., the value of the collateral exceeds the amounts due under the Third Priority Indenture).  (JA at 1319-20, CR-40 at 202-03, Samuel Greene Deposition Transcript (the "**Greene Transcript**") at 202-03).

Simultaneously with the execution of the documents evidencing the CalGen Secured Debt, the parties also entered into the Collateral Trust Agreement, which governs the respective rights of the holders of the CalGen Secured Debt in the Collateral.[6]  (*See generally*, JA at 1098, CD-73, Collateral Trust Agreement.)

---

[5] The "**Calpine Generating Pledge Agreement**" is the Membership Interest Pledge Agreement, dated March 23, 2004, among Calpine Generating Company, LLC, as pledgor, CalGen Expansion Company, LLC, (the entity whose stock is pledged), and Wilmington Trust Company as collateral agent.  The "**CalGen Holdings Pledge Agreement**" is the Membership Interest Pledge Agreement, dated March 23, 2004, among Calpine CalGen Holdings, Inc., as pledgor, Calpine Generating Company, LLC, (the entity whose stock is pledged), and Wilmington Trust Company as collateral agent.  The "**Security Agreement**" is the Security Agreement, dated March 23, 2004, among CalGen, the Guarantors, and Wilmington Trust Company as collateral agent.

[6] The "**Collateral Trust Agreement**" (collectively with the Calpine Generating Pledge Agreement, CalGen Holdings Pledge Agreement, and Security Agreement, the "**Security Documents**") is the Collateral Trust and Intercreditor Agreement, dated March 23, 2004, among CalGen, the Guarantors, Wilmington Trust FSB, as trustee under the Indentures (as defined below), Wilmington Trust Company,

**B.    Key Provisions of the Third Priority**
    **Indenture and the Collateral Trust Agreement**

Pertinent provisions of the Third Priority Indenture are described below:

- **Maturity**.  The Third Priority Notes mature on April 1, 2011.  (JA at 0601, CD-63. at Exhibits A-1-3, Third Priority Indenture at Exhibits A-1-3.)

- **Interest Rates**.  The Third Priority Fixed Rate Notes bear interest at 11.5% per annum.  The Third Priority Floating Rate Notes bear interest at 900 basis points plus the greater of (i) 1.25% and (ii) 6-month LIBOR.  As of March 29, 2007 (the date of prepayment of the Third Priority Notes), the interest rate for the Third Priority Floating Rate Notes was 14.37%.  (JA at 0601; CD-63 at Exhibits A-1-3, Third Priority Indenture at Exhibits A-1-3; JA at 1251, CD-23 at Exhibit H, p. 5, Amended Kearns Affidavit at Exhibit H, p. 5.)

- **Compensation and Indemnity of M&T Bank**.  Section 7.07 of the Third Priority Indenture contains a broad indemnification of all fees, costs, and expenses incurred by M&T Bank and any of its professionals and advisors in, among other things, enforcing the Third Priority Indenture Documents. Section 7.07 of the Third Priority Indenture also provides that *CalGen's and the Guarantors' obligations to indemnify M&T Bank survive the satisfaction and discharge of the indenture*.  (JA at 0575, CD-63 at § 7.07, Third Priority Indenture at § 7.07.)

- **Guarantee**.  All CalGen's obligations under the Third Priority Indenture Documents are guaranteed by the Guarantors.  (JA at 0586-88, CD-63 at Art. 11, Third Priority Indenture at Art. 11.)

- **Governing Law**.  Pursuant to Section 13.08 of the Third Priority Indenture, the Third Priority Indenture Documents are governed by New York law.  (JA at 0592-93, CD-63 at § 13.08, Third Priority Indenture at § 13.08.)

- **No-Call Provision**.  "Optional Redemption" "*(t)he Notes are not redeemable at the option of the Issuers*."  (emphasis added).  This provision is referred to herein as the "**No-Call Provision**."  (JA at 0549, CD-63 at § 3.07, Third Priority Indenture at § 3.07.)

---

as collateral agent, Morgan Stanley Senior Funding, Inc., as term loan administrative agent, and the Bank of Nova Scotia, as revolving loan administrative agent.  (JA at 1101, CD-73 at preamble, Collateral Trust Agreement at preamble.)

The No-Call Provision evidences the Third Priority Noteholders' bargained-for protection under any and all circumstances against CalGen's prepayment of the Third Priority Notes prior to their stated maturity in 2011.  By contrast, the First Priority Indenture authorizes CalGen to prepay the First Priority Secured Floating Rate Notes due 2009 (the "**First Priority Notes**") at its option on or after April 1, 2007, subject to liquidated damages equal to a prepayment premium of 2.5% of the principal amount of the First Priority Notes.[7]  (JA at 0218, CD-60 at § 3.07, First Priority Indenture at § 3.07.)

Similarly, the Second Priority Indenture authorizes CalGen to prepay the Second Priority Secured Floating Rate Notes due 2010 (the "**Second Priority Notes**") at their option on or after April 1, 2008, subject to liquidated damages equal to a prepayment premium of 3.5% of the principal amount of the Second Priority Notes.[8]  (JA at 0363, CD-62 at § 3.07, Second Priority Indenture at § 3.07.)

Section 8.7 of the Collateral Trust Agreement includes an indemnity:

- **Compensation and Expenses**.  This section contains a broad indemnification of any fees, costs, or expenses incurred by M&T Bank or any of its professionals or advisors in, among other things, enforcing the Third Priority Indenture Documents.  (JA at 1164-65, CD-73 at § 8.7, Collateral Trust Agreement at § 8.7.)

## C.    Postpetition Financing

On the December 21, 2005, the Debtors filed an emergency motion seeking interim and final orders authorizing debtor in possession financing (the "**Initial DIP Facility**")

---

[7] The "**First Priority Indenture**" is the First Priority Indenture, dated as of March 23, 2004, among CalGen, the Guarantors, and Wilmington Trust FSB, as indenture trustee (the "**First Priority Indenture Trustee**").

[8] The "**Second Priority Indenture**" is the Second Priority Indenture, dated as of March 23, 2004, among CalGen, the Guarantors, and HSBC Bank, N.A., as successor indenture trustee (the "**Second Priority Indenture Trustee**" and, together with the First Priority Indenture Trustee and M&T Bank, the "**Indenture Trustees**").  The First, Second, and Third Priority Indentures are referred to collectively as the "**Indentures**").

pursuant to section 364 of the Bankruptcy Code.  (CD-5 at 6, Prepayment Motion at 6; *see* CD-76.)  On January 26, 2006, the Bankruptcy Court entered a final order approving the Initial DIP Facility.  (CD-5 at 6, Prepayment Motion at 6; *see* CD-79.)

        In addition, by order dated February 24, 2006 (the "**Cash Collateral Order**"), the Bankruptcy Court authorized the Debtors to use certain cash collateral and to grant, among others, the holders of the CalGen Secured Debt adequate protection (as defined in 11 U.S.C. § 361) with respect to such use.  (*See* CD-82, Cash Collateral Order.)  The Cash Collateral Order provided, among other things, adequate protection payments (i) as and when due, of all accrued interest and fees at the non-default rate under the Indenture, and (ii) to reimburse all reasonable fees and disbursements of, among others, M&T Bank, to the extent provided for under the Third Priority Indenture (CD-82 at ¶ 17(a), Cash Collateral Order at ¶ 17(a).)  Throughout the chapter 11 cases, CalGen paid without objection all the fees and expenses (including advisors' fees) of, among others, M&T Bank, in its capacity as Indenture Trustee under the Third Priority Indenture, through the date of prepayment of the Third Priority Notes.[9]

### D.    M&T Bank's Proof of Claim

        The Third Priority Indenture authorizes M&T Bank to file proofs of claim in any chapter 11 case on behalf of the Third Priority Noteholders.  (JA at 571, CD-63 at § 6.09, Third

---

[9] By agreed order dated January 17, 2007 (the "**Amended Cash Collateral Order**"), the Bankruptcy Court amended the Cash Collateral Order to enable CalGen to upstream to Calpine (i) $258 million of CalGen "Excess Cash Flow" (as defined in the Third Priority Indenture) and (ii) approximately $120 million of anticipated proceeds from the sale of CalGen's Goldendale Energy Center.  (CD-99 at ¶ 5, Amended Cash Collateral Order at ¶ 5.)  The Amended Cash Collateral Order further requires the collateral agent under the Collateral Trust Agreement "to honor all future borrowing certificates, draw-down or transfer requests or similar documents for Excess Cash Flow . . . ."  (CD-99 at ¶ 6, Amended Cash Collateral Order at ¶ 6.)

While it is very unusual for creditors of a debtor such as CalGen to allow the debtor to transfer $378 million to another debtor, this occurred here because the CalGen creditors and the Debtors recognize that the holders of the CalGen Secured Debt are all oversecured and CalGen is very solvent.  (JA at 1319-20, CD-40 at 202-03, Greene Transcript at 202-03.)

Priority Indenture at § 6.09.)  On July 27, 2006, by "so ordered" stipulation executed by the

Debtors and the Indenture Trustees, the Bankruptcy Court authorized M&T Bank to file a single

"master" proof of claim evidencing all its claims against each of the various Debtors.  On July

31, 2006, M&T Bank timely filed proof of claim number 4073 (the "**M&T Bank Proof of**

**Claim**") against, among others, CalGen and each of the Guarantors, asserting a secured claim in

the aggregate principal amount of at least $830 million, including M&T Bank's entitlement to,

among other things:

- **Principal and Contract Interest Claim**.  Principal owed as of the petition date in the aggregate amount of $830 million, together with accrued and unpaid postpetition interest from and after the Commencement Date at the contract rate of interest under the Third Priority Indenture; plus

- **Default Interest Claim**.  Incremental accrued and unpaid postpetition interest from and after the Commencement Date to provide M&T Bank aggregate interest at the default rate of interest under the Third Priority Indenture; plus

- **Indemnification Claim**.  Indemnification and reimbursement of costs and expenses as set forth in the Third Priority Indenture and Collateral Trust Agreement, whether due or to become due, incurred by M&T Bank and its advisors in enforcing M&T Bank's and the Third Priority Noteholders' rights under the Third Priority Indenture Documents; plus

- **Damage Claim**.  Claim for damages arising from the Debtors' violation of the prepayment prohibition set forth in Section 3.07 of the Third Priority Indenture (i.e., the No-Call Provision);[10] and

- **Guarantee Claims**.  Claim against each of the Guarantors for any amounts set forth above that are not paid in full by CalGen.

(*See generally*, JA at 1324, CD-337, Attachment to M&T Bank Proof of Claim.)[11]

---

[10] M&T Bank anticipated the possibility that CalGen might violate the No-Call Provision in the Third Priority Indenture given that Calpine had prepaid certain of its other outstanding prepetition secured debt earlier in the chapter 11 cases.  Accordingly, M&T Bank included the Damage Claim in the M&T Bank Proof of Claim.

**E.    The Prepayment Motion and the**
   <u>**Seventh Omnibus Claims Objection**</u>

In the Prepayment Motion, the Debtors sought to use the Replacement DIP Facility to refinance the Initial DIP Facility and prepay the CalGen Secured Debt, including prepayment of the Third Priority Notes in violation of the No-Call Provision.  (CD-5 at 2, Prepayment Motion at 2.)  The Debtors' objective was to prepay the CalGen Secured Debt on or prior to April 1, 2007, and thereby, ensure they prepaid the First Priority Notes prior to the date on which prepayment would trigger a liquidated damage clause in the First Priority Indenture setting the prepayment premium at 2.5% of the principal amount of such notes.  (CD-5 at 35, Prepayment Motion at 35.)  (CalGen wrongly assumed prepayment prior to that date would not trigger ordinary contract damages.)

The Debtors included in the Prepayment Motion a limited objection to the proofs of claim evidencing the CalGen Secured Debt, including the M&T Bank Proof of Claim, to the extent such proofs of claim demand amounts in excess of the aggregate outstanding principal, plus interest at the non-default rate through the date of prepayment.  (*Id.*)  The Debtors calculated M&T Bank's claim as of the prepayment date of March 29, 2007, in the aggregate amount of $887,483,000 ($830,000,000 in principal and $57,483,000 in unpaid non-default interest).  (CD-5 at 41-42, Prepayment Motion at 41-42.)  Thus, the Debtors were asserting M&T Bank has no allowable claim for breach of the No-Call Provision, default interest, or fee reimbursement after the prepayment date.

---

[11] The M&T Bank Proof of Claim also preserved M&T Bank's claims against other Debtors in the event that any Debtor received a fraudulent, preferential, or otherwise improper transfer from CalGen or a Guarantor and/or converted any of the Collateral securing the CalGen Secured Debt.  (JA at 1331-32, CD-337 at ¶ 13, Attachment to M&T Bank Proof of Claim at ¶ 13.)  The Indenture Trustees and the Debtors, among others, have entered into a stipulation expunging such portions of the M&T Bank Proof of Claim, subject to the terms and conditions of such stipulation.

Simultaneously with the filing of the Prepayment Motion, the Debtors filed the Seventh Omnibus Objection.  (CD-100 at Exhibit G, Seventh Omnibus Objection at Exhibit G.) The Seventh Omnibus Objection requested the expungement of, among other things, a portion of the M&T Bank Proof of Claim, based upon the Debtors' (i) request for the Bankruptcy Court's order capping M&T Bank's claims in an amount equal to principal plus accrued non-default rate interest through the prepayment date, consistent with the Prepayment Motion and (ii) prepayment of M&T Bank's claims pursuant to such order.[12]  (CD-100 at 9, Seventh Omnibus Objection at 9.)  In sum and substance, the Seventh Omnibus Objection requested expungement of all M&T Bank's other claims for amounts due, such as default interest, indemnification, reimbursement of fees, and guaranties from other Debtors.

## F.    M&T Bank's Opposition to the Prepayment Motion

M&T Bank objected to the Prepayment Motion, asserting that the refinancing should not be permitted in advance of a chapter 11 plan, particularly because the proposed terms of the prepayment deprived creditors of statutory protections set forth in the confirmation section of the Bankruptcy Code (section 1129).  (CD-21 at 13-20, Memorandum of Law at 13-20.) M&T Bank further contended that if the Bankruptcy Court were to grant the Prepayment Motion, M&T Bank must be awarded, in addition to principal and accrued and unpaid non-default rate interest through the date of prepayment: (i) a secured Damage Claim arising from the breach of the No-Call Provision (i.e., the Damage Claim set forth in the M&T Bank Proof of Claim); (ii) a secured claim for accrued and unpaid default rate interest (less the non-default rate interest

---

[12] The Seventh Omnibus Objection also requests the expungement of the portion of the M&T Bank Proof of Claim that relates to certain "improper transfer claims" against Debtors other than CalGen and the Guarantors.  (CD-100 at 10, Seventh Omnibus Objection at 10.)  As noted in footnote 11 above, M&T Bank and the Debtors have stipulated to the expungement of such portion of the M&T Bank Proof of Claim, subject to the terms and conditions set forth in such stipulation.

already paid) from the Commencement Date through the date of prepayment (i.e., the Default

Interest Claim set forth in the M&T Bank Proof of Claim); (iii) a secured claim for accrued and

unpaid fees and costs of M&T Bank and its advisors (a) incurred through the date of prepayment;

and (b) anticipated to be incurred following the date of prepayment in connection with M&T

Bank's enforcement of the Third Priority Indenture Documents (i.e., the Indemnification Claim

set forth in the M&T Bank Proof of Claim) through the date of a final confirmation order.  (CD-

21 at 3, Memorandum of Law at 3.)

        The Amended Kearns Affidavit, among other things, provided the Bankruptcy

Court with a step-by-step calculation of the Damage Claim, consistent with the mandate of New

York jurisprudence.  (*See generally* JA at 1222, CD-24, Amended Kearns Affidavit.)  To

determine the present value of the contractual future cash flow streams due under the Third

Priority Notes, Mr. Kearns calculated in his uncontroverted affidavit the difference between (i)

what the Third Priority Noteholders would have earned under the Third Priority Indenture had

CalGen fully performed their obligations under the Third Priority Indenture and (ii) the amount

the Third Priority Noteholders will receive by reinvesting the prepaid principal at a determined

interest rate for a company with a credit rating and profile similar to CalGen at the time of

prepayment.  (JA at 1233, CD-24 at ¶ 30, Amended Kearns Affidavit at ¶ 30.)  Mr. Kearns

concluded the Third Priority Noteholders will incur damages ranging from approximately $140.4

million to $264.2 million, depending on the reinvestment rate, arising from CalGen's

prepayment of the Third Priority Notes in violation of the No-Call Provision.  (JA at 1225, CD-

24 at ¶ 6, Amended Kearns Affidavit at ¶ 6.)  Mr. Kearns concluded the most appropriate

measure of damages within that range is approximately $179.5 million.  (*Id.*)  None of the

Appellees offered a contrary expert damage calculation.

G.     **The Hearing on the Prepayment Motion**

At the Hearing on the Prepayment Motion, the Debtors announced they were <u>not</u> moving forward with the Seventh Omnibus Objection with respect to the M&T Bank Proof of Claim (or any other proof of claim evidencing the CalGen Secured Debt that was the subject of the prepayment Motion.  (CD-50 at 25, Tr. at 25 ("we thought it made sense to put [the Seventh Omnibus Objection] off obviously until the events this morning are determined.".)  At the Hearing, the Bankruptcy Court admitted the Amended Kearns Affidavit into evidence and, without objection, qualified Mr. Kearns as an expert witness for M&T Bank.  (CD-50 at 50-51, Tr. at 50-51.)  Notably, the Debtors offered no direct testimony or other evidence to dispute the Amended Kearns Affidavit or Mr. Kearns's testimony.  (*See generally*, *id*.)  Rather, the Debtors cross-examined Mr. Kearns solely on the limited issue of Mr. Kearns' selection of LIBOR plus 225 basis points as the reinvestment rate used in his damage claim calculation.  (CD-50 at 110-123, Tr. at 110-123.)  The Debtors, however, did not offer an alternative reinvestment rate.  (*Id*.) Their cross examination focused only on whether the reinvestment rate should be pegged to CalGen's credit rating at the time of the original loan or at the time of prepayment (as Mr. Kearns did).  (*Id.*)  As shown below, this Court pegs it at the time of prepayment.  Importantly, neither the Appellees nor the Bankruptcy Court questioned the methodology Mr. Kearns applied in calculating M&T Bank's Damage Claim.  (*See generally*, *id*.)  Notably, Mr. Jason Jack, the expert witness for the Second Priority Indenture Trustee, applied the same methodology to calculate damages arising under the Second Priority Indenture.  (CD-50 at 125-29, Tr. at 125-29.)

**H.    The Bankruptcy Court's**
**Decision and the Prepayment Order**

On March 5, 2007, the Bankruptcy Court issued the Memorandum Decision

granting the Prepayment Motion in part, and denying it in part.  In the Memorandum Decision,

the Bankruptcy Court:

- Authorized the Debtors to enter into the Replacement DIP Facility and to prepay the CalGen Secured Debt;

- Held that each Indenture Trustee has an unsecured claim for damages arising from the prepayment of the applicable notes in violation of the No-Call Provisions, but inexplicably held that the such claims were "not measurable," notwithstanding that even the Appellees had not made that contention.  Indeed CalGen itself showed the damage claims are measurable by letting the Bankruptcy Court know how much it would save by refinancing at lower rates.  (CD-5 at 2 and 15-16; Prepayment Motion at 2 and 15-16.)

- Estimated M&T Bank's Damage Claim, notwithstanding that (i) actual damages are easily calculated without estimation and had been admitted into evidence in the uncontested Amended Kearns Affidavit and (ii) section 502(c) of the Bankruptcy Code does not provide for estimation unless liquidation of the claim would unduly delay administration of the estate;

- Failed to compute damages in accordance with applicable New York state law, and instead erroneously selected a 3.5% prepayment premium as a "proxy" for damages that bears no connection to the actual damages calculated;

- Estimated M&T Bank's Damage Claim arising under the Third Priority Indenture using the same 3.5% prepayment premium provided for in the Second Priority Indenture (i) despite the obvious difference in the contractual interest rates and maturity dates and the patent impossibility that the damage claims arising under the two indentures could be identical;

- Estimated M&T Bank's Damage Claim at 3.5% for the Third Priority Fixed Rate Notes and Third Priority Floating Rate Notes, despite the almost 300 basis point difference in their respective contractual interest rates and the patent impossibility that the Damage Claims arising for the two separate series of Third Priority Notes carrying different interest rates could be identical, and  erroneously concluding the 3.5% figure was "a reasonable proxy of damages" incurred by the Third Priority Noteholders;

- Held M&T Bank's Damage Claim is unsecured, notwithstanding that (i) section 506(b) of the Bankruptcy Code entitles oversecured creditors to add interest and other charges and fees to their secured claims, (ii) the Debtors conceded M&T Bank is oversecured, and (iii) New York law confirms M&T Bank's Damage Claim is comprised of the present value of lost interest. *See Newman & Bisco, et al. v. Realty Assocs. Securities Corp.*, 173 F.2d 609, 612 (2d Cir. 1949) ;

- <u>Did not address</u> CalGen's request to expunge M&T Bank's Indemnification Claim for fees and expenses that will be incurred in protecting the Third Priority Noteholders' rights under the Third Priority Indenture Documents (because CalGen elected not to pursue such expungement at the Hearing), yet signed the Prepayment Order that expunged such claim without explanation and in contravention of Second Circuit precedent;

- <u>Did not address</u> CalGen's request to expunge M&T Bank's Guarantee Claims against the Guarantors for all amounts due and owing under the Third Priority Indenture Documents (because CalGen elected not to pursue such expungement at the Hearing), yet signed the Prepayment Order that expunged such claims without explanation;

- Deferred decision on the allowance of the Default Interest Claim until a later date, yet signed the Prepayment Order that expunged the Default Interest Claim without explanation; and

- Granted the 3.5% Damage Claim to M&T Bank, yet signed the Prepayment Order that expunged the very same Damage Claim without explanation.

(JA at 0006-14, CD-1 at 6-14, Memorandum Decision at 6-14.)

Despite the fact the Memorandum Decision is itself an order entered in respect of the Prepayment Motion, the Debtors submitted to the Bankruptcy Court a separate proposed prepayment order,[13] the terms of which went far beyond the relief granted in the Memorandum Decision. The Debtors' proposed order purported to expunge M&T Bank's Indemnification Claim and the Guarantee Claims, notwithstanding that such claims were not the subject of the

---

[13] The Bankruptcy Court indicated it would entertain a separate order authorizing <u>the refinancing</u>. (JA at 0014, CD-1 at 14, Memorandum Decision at 14.) The Debtors submitted a proposed refinancing order, as to which, after some negotiation, all parties signed off. On March 12, 2007, the Bankruptcy Court entered the refinancing order authorizing the Debtors to enter into the Replacement DIP Facility.

Hearing, and Appellees offered no argument or evidence at the Hearing to challenge the validity of these claims. The proposed order also modified the Cash Collateral Order and authorized the Debtors to discontinue all payments to, among others, M&T Bank's advisors (other than fees and expenses that may be incurred in litigating the Default Interest Claim).

Pursuant to the Indenture Trustee Letter, attorneys for M&T Bank alerted the Bankruptcy Court to the numerous deficiencies in the Debtors' proposed order and attached a counter-proposed order reflecting the relief granted in the Memorandum Decision. (*See generally*, JA at 1343, CD-51, Indenture Trustee Letter.) Among other things, the Indenture Trustee Letter noted the Debtors' explicit representation at the Hearing that they had "put off" the relief sought in the Seventh Omnibus Objection as it related to the CalGen Secured Lenders' proofs of claim. (JA at 1343, CD-51 at 1; Indenture Trustee Letter at 1; CD-50 at 26, Tr. at 26.) The Indenture Trustee Letter further explained that the Indenture Trustees will continue to incur fees and costs in enforcing their rights under the Indentures, and that indemnification of those fees and costs is protected by the proofs of claim the Debtors sought to expunge in the proposed prepayment order. (JA at 1344, CD-51 at 2, Indenture Trustee Letter at 2.) Notwithstanding these obvious infirmities, the Bankruptcy Court entered on its docket the Debtors' proposed form of the Prepayment Order.

Significantly, the Refinancing Order allows for the fact that M&T Bank may prevail on appeal and provides M&T Bank a senior lien securing all additional amounts due as a result of this appeal. (CD-3 at 19, Refinancing Order at 19.)

## SUMMARY OF ARGUMENT

M&T Bank has appealed the Memorandum Decision and the Prepayment Order because the Bankruptcy Court erred (i) in its calculation of M&T Bank's Damage Claim in the amount of approximately $29 million, rather than approximately $179.5 million, by failing to

apply established state law, (ii) in ruling the Damage Claim is an unsecured, rather than secured

claim and (iii) in expunging M&T Bank's Proof of Claim (including reimbursement claims,

guarantee claims, indemnity claims, etc.) without explanation.

CalGen issued two series of secured notes under the Third Priority Indenture:

- Third Priority Secured Floating Rate Notes due 2011 in the original principal amount of $680,000,000 and

- 11½% Third Priority Secured Notes due 2011 in the original principal amount of $150,000,000.

All the Third Priority Notes are secured by a third lien against CalGen's and the Guarantors'

property.

The issues here arise because CalGen procured Bankruptcy Court authorization to

prepay, and on March 29, 2007 did prepay, the Third Priority Notes. On March 29, 2007, the

interest rate for the Third Priority Floating Rate Notes was 14.37% and the interest rate for the

Third Priority Fixed Rate Notes was 11.5%. On March 30, 2007, it was not possible for the

Third Priority Indenture Trustee to relend the prepaid principal to borrowers similar to CalGen at

14.37% (on a floating basis) or 11.5% (on a fixed basis) through 2011. Rather, market interest

rates were much lower. Therefore, in accordance with established New York law, M&T Bank

asserted an aggregate secured damage claim of approximately $179.5 million, representing the

present value of the difference between the contract interest rate the Third Priority Noteholders

would have received had CalGen not breached the Third Priority Indenture and the interest they

could receive in the current marketplace from a borrower similar to CalGen on the date of

prepayment, for obligations maturing in 2011. (JA at 1225, 34-35, CD-24 at 4, 12-13, Kearns

Affidavit at 4, 12-13.)

The Bankruptcy Court correctly ruled that M&T Bank has an allowable Damage

Claim arising from CalGen's prepayment of the Third Priority Notes in breach of the No-Call

Provision. But, the Bankruptcy Court committed a multitude of reversible errors in ruling M&T Bank's Damage Claim is unsecured, notwithstanding that all CalGen's obligations under the Third Priority Indenture are secured, and limited to 3.5% of the principal amount of the Third Priority Notes -- i.e., an unsecured Damage Claim of approximately $29 million -- rather than granting M&T Bank its actual damages of $179.5 million:

- The damage calculation presented in the Amended Kearns Affidavit is simple, consistent with New York law, and was admitted into evidence without objection. The Amended Kearns Affidavit computes damages according to classic hornbook law. It subtracts (A) the present value of the interest M&T Bank can earn on a new credit equivalent to CalGen at the time of prepayment from (B) the present value of the remaining interest M&T Bank would receive pursuant to the original credits. The Bankruptcy Court erred in failing to accept the computation of the Damage Claim in accordance with New York law;

- The Bankruptcy Court's estimation of M&T Bank's damages at 3.5% of the principal amount of the outstanding Third Priority Notes, is self-evidently erroneous, arbitrary, and capricious, in light of the following undisputed facts:

  (i)    the Bankruptcy Court fixed M&T Bank's Damage Claim under the Third Priority Indenture at the same 3.5% of principal as the damage claim it awarded to the Indenture Trustee under the Second Priority Indenture, which has a different contract interest rate and a different maturity. It is logically and legally impossible for a breach of the Second and Third Priority Indentures to give rise to the same damage claim;

  (ii)   the Third Priority Floating Rate Notes and the Third Priority Fixed Rate Notes bear interest at different rates (14.37% (as of March 30, 2007) and 11.5%, respectively) rendering it impossible for both series of Third Priority Notes to give rise to the same damages;

  (iii)  the Bankruptcy Court's estimation of the Damage Claim at 3.5% of principal of the Third Priority Notes bears no rational relationship to actual damages computed in accordance with New York law, and the Bankruptcy Court's Memorandum Decision provides no explanation for such estimation;

  (iv)   the Bankruptcy Court determined to estimate the Damage Claim, ruling that actual damages were "not measurable," but section 502(c) of the Bankruptcy Code does not provide for estimation

unless liquidation of the claim would unduly delay administration of the case.  Notably, no Appellee even requested the Bankruptcy Court to invoke estimation under section 502(c).  Here, the damages arising from prepayment of the Third Priority Notes are easily calculated, and the method for calculating such damages was admitted into evidence in the uncontroverted Amended Kearns Affidavit.  The Bankruptcy Court had no basis upon which to estimate the Damage Claim; and

(v)    even if estimation were authorized here, it is hornbook law that in estimating a claim, a bankruptcy court must estimate it in accordance with applicable law.  The Bankruptcy Court's "out-of-the-blue" estimation of damages in the amount of 3.5% of the principal amount of the Third Priority Notes has no connection to the application of New York law;

• The Bankruptcy Court erred in ruling the Damage Claim is an unsecured claim.  Section 506(b) of the Bankruptcy Code includes all entitlements to interest and other charges and fees as part of a lender's secured claim when there is sufficient collateral value securing such claim, a fact Debtors have conceded here (*see* JA at 1319-20, CD-40 at 202-03, Greene Transcript at 202-03.);

• The Third Priority Indenture obligates CalGen and the Guarantors to indemnify M&T Bank for its expenses, including attorneys' fees, incurred in enforcing the Third Priority Indenture.  Without any legal or factual basis, the Bankruptcy Court expunged the Indemnification Claim, thereby terminating M&T Banks' entitlement to recover its expenses in direct contravention of binding Second Circuit precedent in *Newman & Bisco, et al. v. Realty Assocs. Securities Corp.*, 173 F.2d 609, 612 (2d Cir. 1949); and

• M&T Bank also holds the Default Interest Claim, for default interest under the Third Priority Indenture, and a Guarantee Claim against each and every Guarantor for any and all amounts due and owing from CalGen.  After CalGen represented on the record it was <u>not</u> proceeding with its objection to M&T Bank's Proof of Claim, and after the Bankruptcy Court entered its Memorandum Decision, in which it expressly deferred its ruling on the Default Interest Claim and did not discuss the Guarantee Claims, the Bankruptcy Court nevertheless signed an order proposed by CalGen expunging the Default Interest Claim and Guarantee Claims without explanation (and, inexplicably, expunging the Damage Claim, notwithstanding that the Memorandum Decision grants M&T Bank the Damage Claim).  Although M&T Bank alerted the Bankruptcy Court in writing that CalGen's proposed order included overstated relief that the Bankruptcy Court did not discuss and did not grant, the Bankruptcy Court entered CalGen's order as the Prepayment Order.

Accordingly, M&T Bank hereby seeks (i) an affirmation of the Bankruptcy Court's ruling that M&T Bank is entitled to a damage claim arising from CalGen's prepayment of the Third Priority Notes, and (ii) a reversal of the Bankruptcy Court's numerous erroneous rulings in respect of wrongly expunged claims and the unsecured nature, method of calculation, and amount of M&T Bank's Damage Claim.

## ARGUMENT

## I.

## THE BANKRUPTCY COURT CORRECTLY HELD CALGEN'S BREACH OF THE THIRD PRIORITY INDENTURE GIVES RISE TO A VALID DAMAGE CLAIM ALLOWABLE IN BANKRUPTCY

### A.     M&T Bank's Damage Claim is a Valid Claim Under New York Law

The United States Supreme Court recently confirmed that allowance of a creditor's claim under section 502(b) of the Bankruptcy Code depends on whether the creditor holds a valid claim under applicable nonbankruptcy law. *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1204 (2007) ("'Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.'") (quoting *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000)); *Raleigh*, 530 U.S. at 24 (asserting that although "allowance" of a claim is a federal matter, the validity of a claim is determined by state law). Once a valid claim exists under nonbankruptcy law, it is allowable in bankruptcy unless otherwise proscribed by the Bankruptcy Code. *Travelers*, 127 S. Ct. at 1204. As *Travelers* (issued by the Supreme Court after entry of the Memorandum Decision) confirms, the Bankruptcy Court correctly recognized that M&T Bank has a damage claim under applicable New York law arising from

CalGen's prepayment of the Third Priority Notes in breach of the No-Call Provision contained in the Third Priority Indenture.  (JA at 0010, CD-1 at 10, Memorandum Decision at 10.)

To establish a claim arising from a breach of contract, in this case under New York law, M&T Bank must establish the following four elements: (i) the Third Priority Indenture is an enforceable agreement; (ii) M&T Bank performed its obligations under the Third Priority Indenture; (iii) CalGen and the Guarantors failed to perform in accordance with the terms of the Third Priority Indenture; and (iv) the Third Priority Noteholders suffered damages arising from CalGen's and the Guarantors' failure to perform.  *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  There was no challenge raised in the Bankruptcy Court as to the enforceability of the Third Priority Indenture or M&T Bank's performance of its obligations in accordance with the terms of the Third Priority Indenture Documents.  It cannot be disputed that by prepaying the Third Priority Notes, CalGen breached on its face the No-Call Provision contained in the Third Priority Indenture, and the Third Priority Noteholders suffered damages (in the form of lost interest) arising from such breach.

New York law prohibits prepayment of a loan unless the loan agreement expressly permits the borrower to prepay prior to maturity.  *Arthur v. Burkich*, 520 N.Y.S. 2d 638, 639 (N.Y. App. Div. 1987).  Here, not only does the Third Priority Indenture not expressly permit prepayment, it expressly prohibits prepayment.  In *Teachers Ins. & Annuity Assoc. of America v. Butler*, 626 F. Supp. 1229, 1235 (S.D.N.Y. 1986) , this Court observed that the purpose of prepayment prohibitions is to protect the lender against a drop in market interest rates that would induce a borrower to breach its agreement to obtain financing at a lower rate.  That is exactly what happened here.  Where a loan is prepaid in violation of a prepayment prohibition, New York courts routinely find the borrower in breach of the loan agreement, giving rise to a

damage claim.  *See*, *e.g.*, *Teachers Ins. & Annuity Assoc. of America v. Ormesa Geothermal*, 791 F. Supp. 401, 415-16 (S.D.N.Y. 1991).

**B.**    **Damage Claims for Breach of a Prepayment Prohibition**
         **Can be Calculated Precisely Under New York Law**

         Significantly, New York courts have provided guidance as to the precise methodology for calculating a lender's damage claim arising from the borrowers' breach of a loan agreement containing a prepayment prohibition.  *Id.*   In *Teachers v. Ormesa*, this Court considered a lender's breach of contract claim arising from a borrower's repudiation of a loan agreement, which precluded prepayment, to take advantage of falling interest rates.  In that case, the parties entered into a binding commitment that provided for a future advance of $50 million at a certain time and interest rate.  *Id.* at 404.  The terms of the agreement prohibited the borrower from prepaying the loan.  *Id.*  After the parties executed the agreement but before the loan was funded, interest rates dropped by close to 2%.  *Id.* at 405.  As a result, the loan would have cost the borrower approximately $1 million more in interest than if the borrower obtained a new loan commitment at prevailing rates.  *Id.*  The borrower repudiated the agreement.  *Id.*

         This Court found that, because the commitment was binding on the parties, the borrower's repudiation of the agreement to avoid the prepayment prohibition amounted to a breach.  *Id.* at 415.  Based on the breach, this Court granted the lender damages:

> [The lender] is thus entitled to damages equal to the discounted present value of the incremental interest income [it] would be expected to lose as a result of the breach.  Specifically, the lost interest income is measured as the difference between (a) the interest income [the lender] would have earned had the contract been performed, and (b) the interest income [the lender] would be deemed to have earned by timely mitigating its damages -- i.e. by making an investment with similar characteristics at the time of the breach.

*Id.* at 415-16.  The well-settled, precise formula for the calculation of the claim that this Court applied in *Teachers v. Ormesa* is identical to the methodology Mr. Kearns applied in calculating M&T Bank's Damage Claim arising from CalGen's prepayment of the Third Priority Notes.

**C.     M&T Bank's Claim for Money Damages is a Valid**
**        Claim Allowable Under Section 502 of the Bankruptcy Code**

Pursuant to section 502(b)(1) of the Bankruptcy Code, a claim is allowed except to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . . ."  11 U.S.C. § 502(b)(1).  The Damage Claim is allowable under section 502(b)(1) of the Bankruptcy Code because it is a valid claim for money damages under state law.  *Travelers*, 127 S. Ct. at 1204; *Teachers v. Ormesa*, 791 F. Supp. at 415-16.

The fact that a bankruptcy court may decline to enforce a lender's equitable remedy, i.e., the debtor's specific performance of an agreement prohibiting prepayment of a loan, does not eliminate the lender's remedy at law for money damages arising from the debtor's prepayment (and breach) under such agreement.  In *In re 360 Inns, Ltd.*, the bankruptcy court refused to require the debtor's specific performance of a credit agreement that prohibited prepayment, but granted the lender a damage claim arising from the debtor's prepayment in violation of such provision.  76 B.R. 573, 576-77 (Bankr. N.D. Tex. 1987).  Here, the Bankruptcy Court authorized the prepayment of, among other things, the Third Priority Notes but correctly concluded that, because the "CalGen Secured Lenders' expectation of an uninterrupted payment stream has been dashed," the CalGen Secured Lenders have an enforceable claim for damages arising from the prepayment in violation of the prepayment prohibitions.  (JA at 0010, CD-1 at 10-11, Memorandum Decision at 10-11.)

## II.

### THE BANKRUPTCY COURT ERRED
### AS A MATTER OF LAW IN CALCULATING
### THE AMOUNT OF M&T BANK'S DAMAGE CLAIM

**A.    The Bankruptcy Court Erred as a Matter of
        Law by Estimating M&T Bank's Damage Claim**

M&T Bank's Damage Claim was fixed and calculable in accordance with New York law.  As such, the Bankruptcy Court's determination to estimate the Damage Claim was wrong as a matter of law.   A bankruptcy court's ability to estimate a claim under section 502(c) of the Bankruptcy Code is subject to two requirements: (i) the claim must be contingent or unliquidated, 11 U.S.C. § 502(c)(1), and (ii) the estimation must be necessary to avoid any undue delay in the administration of a debtor's case.  *In re Chateaugay Corp.*, 10 F.3d 944, 957 (2d Cir. 1993); *In re Adelphia Business Solutions, Inc.*, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003).  The Bankruptcy Court erred in the first instance by estimating M&T Bank's Damage Claim, which was neither contingent nor unliquidated.  The Bankruptcy Court also erred in that the record is devoid of any evidence that adjudication of the Damage Claim would have unduly delayed the administration of these chapter 11 cases.  Indeed, the damage calculation was admitted into evidence.

It is well settled that "'contingent' denotes a debt for which liability depends upon the occurrence of some future event or condition which may never be fulfilled."  *In re Mazzeo*, 131 F.3d 295, 300 (2d Cir. 1997); *see also In re Knight*, 55 F.3d 231, 236 (7th Cir. 1995) ; *In re GCO, LLC*, 324 B.R. 459, 466 (Bankr. S.D.N.Y. 2005); *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. 1981).  Here, the event giving rise to liability was the prepayment.  Once it occurred, M&T Bank's Damage Claim was no longer contingent, because no other events needed to transpire for the Third Priority Noteholders

to incur damages.  *In re Mazzeo*, 131 F.3d 295, 303 (2d Cir. 1997).  Because the Prepayment

Motion <u>requested</u> the Bankruptcy Court to determine the amount of M&T Bank's Damage Claim

based on an assumed prepayment date, *see* (CD-5 at 40, Prepayment Motion at 40.), the

Bankruptcy Court was constrained to determine the actual claim amount as of such date.

Nor was M&T Bank's Damage Claim unliquidated; its value was ascertainable

and readily calculable.  *Mazzeo*, 131 F.3d at 304; *United States v. Verdunn*, 89 F.3d 799, 802

(11th Cir. 1996).  As the United States Court of Appeals for the Seventh Circuit stated in

*Mazzeo*, "'liquidated' denotes the ability to readily and precisely compute the amount due; the

test is whether the amount 'is capable of ascertainment by . . . simple computation.'"  131 F.3d at

300, *quoting In re Sylvester*, 19 B.R. 671, 673 (9th Cir. B.A.P. 1982).  M&T Bank provided the

Bankruptcy Court with the applicable New York jurisprudence setting forth the precise method

of calculating M&T Bank's Damage Claim.  In addition, in the Amended Kearns Affidavit, Mr.

Kearns provided the actual calculation of M&T Bank's Damage Claim consistent with applicable

New York law.  Accordingly, all the evidence in the record demonstrates not only that M&T

Bank's Damage Claim was readily calculable, but that the calculation had in fact been set forth

in the Amended Kearns Affidavit and was available to the Bankruptcy Court.

Most significantly, the record below is devoid of any evidence that the "fixing or

liquidation" of the Damage Claim would somehow have unduly delayed administration of the

chapter 11 cases.  11 U.S.C. § 502(c)(1).  To the contrary, all the evidence necessary to

determine the Damage Claim was already in the record before the Bankruptcy Court.

Specifically, the record below contains the (i) memorandum of law M&T Bank filed, which

includes citations to all of the jurisprudence germane to calculating M&T Bank's Damage Claim

under New York law and (ii) the Amended Kearns Affidavit, as well as Mr. Kearns's testimony

at the Hearing regarding the methodology and calculation of M&T Bank's Damages Claim. The record does not support any inference of "undue delay" in the administration of the chapter 11 cases, and accordingly, the Bankruptcy Court erred as a matter of law by estimating M&T Bank's Damage Claim.

Put differently, when the Hearing occurred in February 2007 the Debtors had not even filed a proposed chapter 11 plan. They still have not done so. Thus, the determination of M&T Bank's Damage Claim could not possibly delay administration of the CalGen cases, let alone "unduly delay" them.

**B.     In Using Estimation to Determine the Amount of
M&T Bank's Damage Claim, the Bankruptcy Court
Erroneously Awarded the Same Damage Claim to Holders
of Different Notes, with Different Maturities, and Different Interest Rates**

Estimation must be performed in accordance with the legal rules that govern calculation of the claim. *Addison v. Langston* (*In re Brint's Cotton Mktg., Inc.*), 737 F.2d 1338, 1341 (5th Cir. 1984)*(; Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135-36 (3d Cir. 1982); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 123 (D. Del. 2006); *In re Thomson McKinnon Sec., Inc.*, 191 B.R. 976, 979 (Bankr. S.D.N.Y. 1996). The Bankruptcy Court compounded its error in estimating M&T Bank's Damage Claim by failing to use the applicable legal rules that govern the calculation of the Damage Claim.

The Damage Claim the Bankruptcy Court awarded M&T Bank is inherently erroneous because it was based upon the amount the holders of the <u>Second</u> Priority Notes would have received if CalGen repaid those notes <u>one year from now</u>. (JA at 0011, CD-1 at 11, Memorandum Decision at 11.) A damage claim should put the aggrieved party in the same economic position it would have been in had both parties fully performed. *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728-29 (2d Cir. 1992). Given the different economic terms contained

in the different Indentures, it would simply be impossible -- regardless of whether CalGen fully performed under the Third Priority Indenture Documents -- for <u>Third</u> Priority Noteholders ever to be in an economic position approximating that of the <u>Second</u> Priority Noteholders following a prepayment under the Second Priority Indenture.

The Third Priority Notes mature one year later than the Second Priority Notes. (JA at 0488, 0600, 0611, CD-63 at Preamble, Exhibits A-1-2, A-2-2, Third Priority Indenture at Preamble, Exhibits A-1-2, A-2-2; JA at 0321, 0435, CD-62 at Preamble, Exhibits A-1, Second Priority Indenture at Preamble, Exhibit A-1.)  In addition, the Third Priority Fixed Rate Notes and Third Priority Floating Rate Notes bear interest at rates that are significantly higher than the rates at which the Second Priority Fixed Rate Notes and Second Priority Floating Rate Notes bear interest.[14]  (JA at 0600, 11, CD-63 at Exhibits A-1-2, A-2-2, Third Priority Indenture at Exhibits A-1-2, A-2-2; JA at 1247, CD-24 at Exhibit H, Amended Kearns Affidavit at Exhibit H; JA at 0435, CD-62 at Exhibit A-1, Second Priority Indenture at Exhibit A-1.)  Had CalGen fully performed under the Third Priority Indenture, the holders of the Third Priority Notes would have received more interest over a longer period of time than the holders of the Second Priority Notes. Nevertheless, without explanation or rationale of any kind, the Bankruptcy Court awarded M&T Bank a damage claim that put the holders of the Third Priority Notes in exactly the same economic position as the holders of the Second Priority Notes.  (JA at 0011, CD-1 at 11, Memorandum Decision at 11.)

---

[14] Specifically, the interest rate applicable to the Third Priority Fixed Rate Notes is 11.5%, which is higher than the 11% interest rate of the Second Priority Fixed Rate Notes, and the interest rate applicable to the Third Priority Floating Rate Notes is 14.37% while the rate applicable to the Second Priority Floating Rate Notes is approximately 11.12%.  (JA at 0600-11, CD-63 at Exhibit A-1-2, A-2-2, Third Priority Indenture at Exhibit A-1-2, A-2-2; JA at 1247, CD-24 at Ex. H, Kearns Affidavit at Exhibit H; JA at 0435, CD-52 at Exhibit A-1, Second Priority Indenture at Exhibit A-1.)

Similarly, when they loaned money to CalGen, the holders of the Third Priority Floating Rate Notes and the holders of the Third Priority Fixed Rate Notes invested in different risk profiles and bargained for different rates of return on their investment. Third Priority Fixed Rate Notes bear interest at 11.5% per annum, while the Third Priority Floating Rate Notes bear interest at a floating rate, which, as of the date of prepayment, was 14.37%. (JA at 1251, CD-24 at Exhibit H, p. 5, Amended Kearns Affidavit at Exhibit H, p. 5.) The record is devoid of any evidence that the interest rate applicable to the Third Priority Floating Rate Notes would "float" to a constant rate equal to the interest rate applicable to the Third Priority Fixed Rate Notes. Nevertheless, without explanation, the Bankruptcy Court's generic "proxy" for the Damage Claim puts the holders of the Third Priority Fixed Rate Notes in exactly the same economic position as the holders of the Third Priority Floating Rate Notes.

The Bankruptcy Court's use of a "proxy" for damages was itself an error of law. As noted above, if estimation is appropriate, the Bankruptcy Court is required to estimate a claim in accordance with the legal rules governing the calculation of the claim. This Court, in *Teachers v. Ormesa*, articulated clearly the legal rules governing calculation of a lender's damage claim arising from the borrower's breach of a loan agreement containing a prepayment prohibition. 791 F. Supp. at 415-16. In the Memorandum Decision, the Bankruptcy Court provides no explanation for ignoring the governing case law.

**C.     The Bankruptcy Court Erred as a Matter of Law in Determining that M&T Bank's Damage Claim was Not Susceptible to Calculation**

The Bankruptcy Court's determination that the CalGen Secured Lender's damages claims are "not measurable" is wrong and contrary to established case law. (JA at 0010, CD-1 at 10, Memorandum Decision at 10.) Appellees did not even make this contention before the Bankruptcy Court.

In *Teachers v. Ormesa*, this Court held that a lender's damages arising from the breach of a loan agreement are calculated by determining the present value of the lender's lost interest income as a result of the breach.[15]  *Teachers v. Ormesa*, 791 F. Supp. at 415-16.  Lost interest income is measured as the present value of the difference between (i) the interest income the lender would have earned under the contract had the borrower fully performed and (ii) the interest income the lender would earn in mitigation by reinvesting the principal in an investment with characteristics similar to the original investment at the time of the breach.  *Id*. at 416.  The reinvestment calculation should be based upon the same economic characteristics as the original investment at the time of the breach, including the principal amount, interest rate, credit quality, and term.  *Id.*

This method of calculating damages is well established and also used in other jurisdictions.  *See*, *e.g.*, *In re Imperial Coronado Partners, Ltd.*, 96 B.R. 997, 1001 (B.A.P. 9th Cir. 1989) (determining that, under bankruptcy law, recovery of actual damages is calculated in this manner); *In re A.J. Lane & Co., Inc.*, 113 B.R. 821, 829 (Bankr. D. Mass. 1990) (noting that this formula for calculating actual damages is "simple and well established"); *In re Duralite Truck Body & Container Corp.*, 153 B.R. 708, 714 (Bankr. D. Md. 1993) (using this formula to calculate actual damages for prepayment); *In re Kroh Brothers Dev. Co.*, 88 B.R. 997, 1001 (Bankr. W.D. Mo. 1988) (prepayment premium unreasonable which did not (i) provide for appropriate adjustment based on interest rate fluctuation or (ii) discount the lost interest to present value).

---

[15] Under New York law, damages may also include, for example, costs incurred procuring substitute borrowers with related risks of delay.  *See In re Duralite Truck Body & Container Corp.*, 153 B.R. 708, 711-12 (Bankr. D. Md. 1993) (citing *Walter E. Heller & Co. v. Am. Flyers Airline Corp.*, 459 F.2d 896, 899-900 (2d Cir. 1972).

Exhibit H of the Amended Kearns Affidavit reflects that Mr. Kearns relied on interest rates derived from Bloomberg's LIBOR Forwards in calculating the interest payments the holders of the Third Priority Floating Rate Notes would have received on each of the remaining eight interest payment due dates, assuming CalGen had not prepaid the Third Priority Floating Rate Notes.  (JA at 1251, CD-24 at Exhibit H, p. 5, Amended Kearns Affidavit at Exhibit H, p. 5.)[16]  The Bloomberg LIBOR Forwards is a well known, standard report relied on in the global finance community reflecting the LIBOR interest rates at which a willing lender and a willing borrower, as of the date one day prior to the filing of the Amended Kearns Affidavit, would enter into loan transactions at future dates.  Moreover, the floating rate formula is 9% plus the greater of 1.25% and 6-month LIBOR.  Therefore, the interest rate would always be 10.25% or greater.  Thus, damages are very measurable, and far more measurable and precise than the damages from torts (i.e., future earnings, pain and suffering) calculated everyday.  Here, Mr. Kearns applied the Bloomberg LIBOR Forward rate applicable to each of the eight remaining interest payment due dates under the Third Priority Floating Rate Notes.  Neither the Appellees nor the Bankruptcy Court questioned Mr. Kearns's use of Bloomberg LIBOR Forwards in calculating the future interest rates applicable to the Third Priority Floating Rate Notes on each of the remaining interest payment dates.  (*See generally*, CD-50 at 111-23, Tr. at 111-23.)  The expert witnesses for the First and Second Priority Indenture Trustees also relied on the Bloomberg LIBOR forwards in deriving the future LIBOR interest rates applicable to the First and Second Priority Secured Floating Rate Notes, respectively.  (CD-30. at Exhibits E and F, Supplemental Darr Affidavit at Exhibits E and F; JA at 1196, CD-26 at Exhibit A at 4, Supplemental Jack Affidavit at Exhibit A at 4.)  CalGen argued it would save $100 million of

---

[16] Exhibit H also shows that for the Third Priority Fixed Rate Notes, Mr. Kearns simply used the fixed rate of 11.5% per year.

interest <u>annually</u> by refinancing its debt, showing it also did a calculation of future interest rate savings.  (CD-5 at 15, Prepayment Motion at 15.)

   In his uncontroverted affidavit, entered into the evidentiary record, Mr. Kearns applied a damage calculation to the Third Priority Notes consistent with the methodology established in *Teachers v. Ormesa*.  (JA at 1233-34, CD-24 at 12-13, Amended Kearns Affidavit at 12-13.)  Mr. Kearns first calculated the interest income the Third Priority Noteholders would have earned under the Third Priority Indenture Documents had CalGen and the Guarantors fully performed through maturity.  (*Id*.)  As an expert witness,[17] he opined as to the kinds of reinvestments appropriate to use in calculating the Damage Claim within the guidelines established in *Teachers v. Ormesa* (i.e., investments sharing the same characteristics as the original investment at the time of the breach, including the principal amount, interest rate, credit quality, and term).  (*Id*.)  Using these appropriate reinvestments to determine the present value of the contractual future cash flow streams of the Third Priority Notes, Mr. Kearns calculated the difference between (i) what the Third Priority Noteholders would have earned under the Third Priority Indenture had CalGen fully performed their obligations under the Third Priority Indenture and (ii) the amount the Third Priority Noteholders will receive by reinvesting the prepaid principal at the determined interest rate for a company with a credit rating and profile similar to CalGen.  (*Id*.)  Mr. Kearns concluded that M&T Bank's Damage Claim was within a range of $140.4-$264.2 million, with the most appropriate measure of damages being $179.5 million.  (JA at 1225, 34, CD-24 at 4, 13, Amended Kearns Affidavit at 4, 13.)

---

[17] The Bankruptcy Court qualified Mr. Kearns as an expert witness without objection (CD-50 at 50, 104-109, Tr. at 50, 104-109.)

Importantly, neither the Appellees nor the Bankruptcy Court questioned Mr. Kearns' methodology for calculating M&T Bank's Damage Claim.[18]  The Debtors cross-examined Mr. Kearns solely with regard to the reinvestment rate he applied in this calculation insofar as which credit rating should be used:  CalGen's credit rating at the time of origination or prepayment.  (CD-50 at 111-122, Tr. at 111-122.)  Notably, however, the Debtors offered no evidence of what rate they considered to be a more appropriate reinvestment rate.

The Bankruptcy Court's arbitrary and erroneous <u>estimate</u> of M&T Bank's Damage Claim using a 3.5% prepayment premium derived from the <u>Second</u> Priority Indenture resulted in (a) error as a matter of law, and (b) a Damage Claim award in the amount of $29,050,000, which is approximately 15% of the midpoint Damage Claim calculated by Mr. Kearns.  (JA at 1234, CD-24 at 13, Amended Kearns Affidavit at 13.)  On its face, the Damage Claim the Bankruptcy Court awarded fails to put the Third Priority Noteholders in the same economic position they would have enjoyed had CalGen and the Guarantors not breached the No-Call Provision.

The Memorandum Decision brushes aside the wealth of case law, the Amended Kearns Affidavit, and Mr. Kearns's testimony on the calculation of damages with absolutely no explanation.  (JA at 0010-11, CD-1 at 10-11, Memorandum Decision at 10-11.)  Nowhere in the Memorandum Decision does the Bankruptcy Court explain why M&T Bank's Damage Claim was "not measurable" or why the jurisprudence discussed herein is not directly applicable to the calculation of M&T Bank's damage claim.  The Memorandum Decision cites just a single decision, *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996), without analysis, for the

---

[18] Mr. Jack, the expert witness for the Second Priority Indenture Trustee, utilized the same methodology as Mr. Kearns, although Mr. Jack also appropriately considered CalGen's right to prepay the Second Priority Notes on or after April 1, 2008 under the Second Priority Indenture.  (CD-50 at 27, Tr. at 27.)

proposition that the CalGen Lenders' damages are "not measurable." (JA at 0010, CD-1 at 10, Memorandum Decision at 10.) *Harsco*, however, affirms the dismissal of a claim for breach of contract on the ground the federal court lacked supplemental jurisdiction to decide it. *Harsco*, 91 F.3d at 348. Although *Harsco* quite correctly lays out the four factors required to establish a breach of contract claim, *Harsco* has nothing whatsoever to do with the methodology for calculating a damage claim arising from a breach of a prepayment prohibition under New York law. *Id*. at 348. The Bankruptcy Court erred as a matter of law by (i) relying on *Harsco* and concluding M&T Bank's Damage Claim is "not measurable," (ii) using a proxy for damages, i.e., using the 3.5% prepayment premium derived from the <u>Second</u> Priority Indenture as the proxy for the Third Priority Noteholders' damages, (iii) and by ignoring the well-settled jurisprudence and evidentiary record regarding the methodology for, and calculation of, M&T Bank's Damage Claim.

**D.    The Bankruptcy Court's Elimination of the Bulk of**
**      M&T Bank's Damage Claim is Contrary to Public Policy**

The United States Supreme Court has ruled, and other courts routinely conclude, that bankruptcy law should not distort commercial parties' contract rights absent express direction from Congress. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) (holding that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"); *Butner v. United States*, 440 U.S. 48, 54 (1979) (concluding that when "Congress has not chosen to exercise its power to fashion any [ ] rule . . . [it generally leaves] the determination of property rights in the assets of the bankrupt's estate to state law"); *In re Dow Corning*, 456 F.3d 668, 679 (6th Cir. 2006) (finding that in the context of chapter 11 cases involving solvent debtors a "bankruptcy judge does not have free-floating discretion to redistribute rights in accordance with his personal views of justice and

fairness . . . [in this context] it is the role of the bankruptcy court to enforce creditors' contractual rights" (citations omitted)).

Bankruptcy Courts are without the power to frustrate Congress' intentions as set forth in the Bankruptcy Code. Here, the Bankruptcy Court's orders effectively transfer value from M&T Bank as a creditor to CalGen's shareholder (Calpine) for the benefit of Calpine's creditors. (*See* JA at 1321-22, CD-40 at 204-205, Greene Transcript at 204-205.) Indeed, that is why the Creditors' Committee (protecting Calpine's unsecured claimholders) and Calpine's Equity Committee (protecting Calpines' shareholders) both supported the Debtors at the Hearing. To affirm the Bankruptcy Court's orders would be to approve contrived bankruptcy voodoo and to distort commercial creditors' contract rights and expectations for no reason. In fact, the Bankruptcy Court gave no reasons for its numerous erroneous rulings. Bankruptcy courts are not empowered to play Robin Hood without statutory authority. The courts routinely hold that creditors such as M&T Bank are entitled to full satisfaction of their damage claims before value maybe given to shareholders and creditors of shareholders. *In re Coltex Loop Central Three Partners, L.P.*, 138 F.3d 39, 42 (2d Cir. 1998) (citing 11 U.S.C. § 1129(b)(2)(B)(ii) for the proposition that "[o]ne of the attributes of a fair and equitable plan is that if an unsecured creditor is not paid in full, the holder of any claim or interest that is junior to the claims of [the unsecured creditor] class will not receive or retain under the plan on account of such junior claim or interest any property."); *In re Armstrong World Indus., Inc.*, 320 B.R. 523, 533 (D. Del. 2005) (reaching the same conclusion and citing *N. Pac. Ry. v. Boyd*, 228 U.S. 482, 504 (1913)).

**III.**

**THE BANKRUPTCY COURT ERRED
AS A MATTER OF LAW IN DETERMINING
M&T BANK'S DAMAGE CLAIM IS AN UNSECURED CLAIM**

Section 506(b) of the Bankruptcy Code allows an oversecured creditor to add to its secured claim "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."  11 U.S.C. § 506(b).  The Third Priority Indenture and the Security Documents very clearly secure <u>all</u> obligations due to the holders of the Third Priority Notes.  (*See* JA at 583-584, CD-63 at § 10.01, Third Priority Indenture at § 10.01; JA at 1050, CD-74 at § 3.1, Security Agreement at § 3.1.)  Notably, Debtors concede M&T Bank is oversecured.  (CD-50 at 64-73, Tr. at 64-73.)  It is therefore impossible for any portion of M&T Bank's Damage Claim to be unsecured.  Nevertheless, the Bankruptcy Court erroneously and inexplicably concluded that "[a]bsent a provision in the underlying agreement authorizing the payment of fees, costs or charges, [M&T Bank] is prohibited from incorporating [the Damage Claim] into its allowed secured claim."  (JA at 0003, CD-1 at 9, Memorandum Decision at 9.)

The Bankruptcy Court's conclusion that the Damage Claim is unsecured completely ignores that (a) the Security Documents secure <u>everything</u> due under the Third Priority Notes and (b) M&T Bank's Damage Claim is only for the unpaid portion of such amounts due, less the amount M&T Bank can mitigate by reinvesting the prepayment proceeds. The flaw in the Bankruptcy Court's conclusion is its determination that the Damage Claim somehow had to be shoehorned into section 506(b) as a "cost" or a "charge" under the Third Priority Indenture to qualify as a secured claim.  The Damage Claim, however, need not be a "cost" or a "charge."  As New York state law confirms, the Damage Claim is a claim for the lost interest that would have been paid (less mitigation) had CalGen and the Guarantors not breached

the Third Priority Indenture by prepaying.  *See Teachers v. Ormesa*, 791 F. Supp. at 415-16

(damage claim for breach of the loan agreement was "lost interest income").  Notably, "interest,"

among other things, is provided for quite clearly in the Third Priority Indenture as being part of

CalGen's secured obligations.[19]  (JA at 0512-13, CD-63 at § 1.01, Third Priority Indenture at

§ 1.01.)

Indeed, as an oversecured creditor entitled to include interest in its secured claim,

it is simply not plausible that, following CalGen's breach of the Third Priority Indenture, M&T

Bank is somehow precluded from including in its secured claim its damage claim for lost interest

to which it is entitled under the Third Priority Indenture.  It defies logic and the basic precepts of

secured lending that M&T Bank's oversecured lien on the Collateral, which protects M&T

Bank's right to full payment of principal and interest through natural maturity under the Third

Priority Indenture Documents, could somehow leave M&T Bank with an unsecured bankruptcy

damage claim for lost interest by virtue of <u>CalGen's</u> breach of the loan agreement.  Yet this is

precisely the Bankruptcy Court's holding.

Given that under New York law the No-Call Provision is fully enforceable, *see*

*Arthur v. Burkich*, 520 N.Y.S. 2d 638, 639 (N.Y. App. Div. 1987), CalGen's breach of such

provision in its chapter 11 case does not transform an otherwise secured, state law damage claim

for lost interest (present valued to the date of prepayment) into an unsecured damage claim under

chapter 11.  The Bankruptcy Court's erroneous legal conclusion in the Memorandum Decision

that, despite M&T Bank's valid liens and security interests and oversecured claim, section

---

[19] The definition for "Obligations" under the Third Priority Indenture provides that CalGen's obligations include the repayment of all "debt, financial liabilities and obligations . . . (including principal, interest, fees, reimbursement obligations, cash cover obligations, penalties, indemnities and legal and other expenses, whether due after acceleration or otherwise) to the providers of holders of such Indebtedness…"  (JA at 512-13, CD-63 at § 1.01, Third Priority Indenture at § 1.01.)

506(b) of the Bankruptcy Code renders M&T Bank's Damage Claim unsecured as a result of

CalGen's and the Guarantors' violation of the No-Call Provision is contradictory to the language

of the Third Priority Indenture Documents and well-settled New York jurisprudence, and

misapplies section 506 of the Bankruptcy Code.[20]

**IV.**

**THE BANKRUPTCY COURT ERRED AS A MATTER
OF LAW BY EXPUNGING M&T BANK'S PROOF OF CLAIM**

A.    T**he Bankruptcy Court Erred as a Matter of
Law in Expunging the Indemnification Claim**

Section 7.07(b) of the Third Priority Indenture requires CalGen and the

Guarantors to indemnify M&T Bank for, among other things, "costs and expenses of enforcing

th[e] Indenture and any other Note Documents to which it is a party against the Company and the

Guarantors . . . ."  (JA at 575, CD-63 at § 7.07(b), Third Priority Indenture at § 7.07(b).)  Section

---

[20] Alternatively, under state law, the Damage Claim is a secured claim.  State law determines whether the a claim is secured.  *Cohen v. KB Mezzanine Fund II* (*In re SubMicron Systems Corp.*), 432 F.3d 448, 458 (3d Cir. 2006) ("[i]n determining whether claims asserted by creditors in bankruptcy are secured, state law applies").  As such, for a claim to be secured for the purposes of 506(a), there must be a valid claim under the applicable state law and a valid lien, which secures the claim on some specific property in which the estate has an interest.  4 COLLIER ON BANKRUPTCY ¶ 506.03[1] (15th ed. rev. 2006).  Further, the collateral must be sufficient to satisfy the claim.  *Id.*  Notably, section 506 does not provide for the allowance or disallowance of a claim.  *Id.* at ¶ 506.01.  Allowance of the claim is determined under section 502 of the Bankruptcy Code.  11 U.S.C. § 502.  Moreover, other than certain exceptions set forth in section 506(d), none of which are applicable here, section 506 of the Bankruptcy Code does not invalidate an otherwise valid enforceable lien.  *Id.* at § 506; 4 COLLIER ON BANKRUPTCY ¶ 506.03[1] (15th ed. rev. 2006).  The parties do not dispute the lien granted to M&T Bank to secure its claims.  Further, the Debtors concede the collateral is sufficient to satisfy the claim.  (JA 1319-1320, CD-50 at 202-03, Tr at 202-03.)  As a result, M&T Bank's claims are secured claims under section 506(a)(1) of the Bankruptcy Code.  This comports with language of the Security Agreement, which defines "Secured Obligations" under Section 3.1 of the Security Agreement to include all "Obligations" under the Third Priority Indenture Documents.  (JA at 1048-49, CD-74 at § 1.2, Security Agreement at § 1.2; JA at 1118-19, 27, CD-73 at §§ 1.1, 1.2, Collateral Trust Agreement at §§ 1.1, 1.2.)  "Obligations" are defined in the Third Priority Indenture to include "all debt, financial liabilities and obligations . . . of whatsoever nature and however so evidenced . . . under or pursuant to each agreement, document or instrument evidencing, securing, guaranteeing or relating to such Indebtedness . . . arising out of or relating to any such agreement, document or instrument."  (JA at 0512-13, CD-63 at § 1.01, Third Priority Indenture at § 1.01.)  The definition of Obligations could hardly be more broad and certainly includes the debt and obligations arising as a result of the breach of the Third Priority Indenture Documents.

7.07(c) of the Third Priority Indenture provides the obligations of CalGen and the Guarantors under Section 7.07 survive satisfaction and discharge of the Third Priority Indenture.  (JA at 0575, CD-63 at § 7.07(c), Third Priority Indenture at § 7.07(c).)  Section 8.7 of the Collateral Trust Agreement entitles M&T Bank to reimbursement of "all reasonable fees, expenses, and disbursements of legal counsel . . . or other professional advisors and agents" that are "incurred in connection with . . . the enforcement of this Agreement and the other Security Documents." (JA at 1164-65, CD-73 at § 8.7, Collateral Trust Agreement at § 8.7.)  Collectively, these provisions obligate CalGen and the Guarantors to indemnify and reimburse M&T Bank for its efforts in protecting the rights of the Third Priority Noteholders under the Third Priority Indenture Documents -- including efforts undertaken in prosecuting this appeal and protecting the Damage Claim to the fullest extent necessary in connection with confirmation of a chapter 11 plan for CalGen, the Guarantors, and/or the other Debtors.

The M&T Bank Proof of Claim is *prima facie* evidence of the validity of the Indemnification Claim.[21]  Section 506(b) of the Bankruptcy Code specifically entitles M&T Bank to include in its secured claim all amounts due <u>or that become due</u> under the Third Priority Indenture Documents for fees and expenses incurred, or to be incurred, by M&T Bank and its advisors in enforcing the Third Priority Indenture Documents.  *United States v. Ron Pair Enterprises, Inc*., 489 U.S. 235, 241 (1989) (determining that "a natural reading" of section 506(b) entitles the holder of an oversecured claim created pursuant to an agreement "the right to

---

[21] Section 502(a) of the Bankruptcy Code mandates that a proof of claim is allowed unless a party in interest objects.  11 U.S.C. § 502(a).  A properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and amount of the claim.  *See* Fed. R. Bankr. P. 3001(f).  "To overcome this prima facie evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim."  *Reilly v. Novak*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000).

reasonable fees, costs, and charges provided for under that agreement," even if they arise post-petition); 11 U.S.C. § 506(b).

Inexplicably, by entering the Prepayment Order, the Bankruptcy Court expunged the Indemnification Claim without offering any explanation. In fact, the Bankruptcy Court did not even mention the Indemnification Claim in the Memorandum Decision. Controlling precedent of the United States Court of Appeals for the Second Circuit provides, and has established for more than 50 years, that an indenture trustee is entitled to reimbursement of reasonable attorneys' fees and expenses incurred in protecting its rights and the rights of the noteholders under the indenture. *Newman & Bisco, et al. v. Realty Assocs. Securities Corp.*, 173 F.2d 609, 612 (2d Cir. 1949). It is indisputable that fees and costs incurred in this appeal constitute valid secured claims against CalGen and the Guarantors in accordance with the terms of the Third Priority Indenture, regardless of the outcome of this appeal. *Id.*

In *Newman & Bisco*, the Second Circuit considered, among other things, whether the indenture trustee was entitled to reimbursement of its attorneys' fees and expenses in connection with its unsuccessful attempt to require the debtor to pay increased interest on the noteholders' claims. *Id.* The indenture in *Newman & Bisco*, like the Third Priority Indenture in this case, provided for reasonable compensation for all services rendered in service of the trusts. *Id.* The court held that, even where an indenture trustee does not prevail in its claims, the trustee is entitled to reimbursement for reasonable counsel fees and expenses incurred in the litigation, stating that "the indenture trustee's decision to make claim for the additional interest from the debtor can hardly be considered an abuse of discretion . . . . It necessarily follows under the provision that the trustee is entitled to reimbursement for reasonable counsel fees and expenses incurred in this litigation." *Id.* This principle has remained undisturbed for nearly 60 years.

Nowhere in the record underlying this appeal will this Court find a single legal or factual basis upon which to disallow the Indemnification Claim.  The Bankruptcy Court simply ignored *Newman & Bisco* and the express language of the Third Priority Indenture Documents, and expunged the Indemnification Claim without any basis.  The Bankruptcy Court's determination to expunge such claim was clear legal error.

**B.    The Bankruptcy Court Erred as a Matter of
Law in Expunging the Damage Claim, the
<u>Default Interest Claim, and the Guarantee Claim</u>**

Having granted M&T Bank a Damage Claim for CalGen's breach of the No-Call Provision, and having made no ruling at all with regard to the Guarantee Claim or the Default Interest Claim (other than to defer its consideration of the Default Interest Claim to a subsequent date) the Bankruptcy Court somehow determined to sign an order the Debtors crafted which effectuated an expungement of such claims.  To the extent the Prepayment Order expunged such claims, it should be reversed and such claims reinstated.

The Bankruptcy Court had no basis in law or fact to expunge the Default Interest Claim, which has not yet been adjudicated, and certainly had no basis in law or fact to expunge the Damage Claim, as the Bankruptcy Court <u>overruled</u> the Debtors' objection to that claim.  The Bankruptcy Court similarly had no basis in law or fact to expunge the Guarantee Claim. Pursuant to Section 11.01 of the Third Priority Indenture Documents, the Guarantors unconditionally guaranteed all of CalGen's obligations under the Third Priority Indenture. Under New York law, the Guarantors' liability under the Third Priority Indenture Documents is not affected by CalGen's chapter 11 case.  *Mel Wood Prods., Inc. v. Kores*, 438 N.Y.S.2d 829, 830 (N.Y. App. Div. 1981) (holding that the liability of a guarantor of a corporate debt is not affected by the institution of bankruptcy proceedings involving the primary obligor); *Seidenberg v. Ostojic*, 435 N.Y.S.2d 56, 56 (N.Y. App. Div. 1981) (awarding the plaintiff judgment against

the guarantor of a series of notes, notwithstanding the bankruptcy petition of the primary obligor).

Each of the Guarantors is a separate corporate entity, each has its own chapter 11 case and its own estate, and each is jointly and severally liable for the payment in full of (i) the Indemnification Claim, (ii) the Damage Claim, and (iii) the Default Interest Claim (to the extent the Bankruptcy Court determines the Default Interest Claim is a valid claim).  M&T Bank's Proof of Claim with respect to the Guarantee Claim must be reinstated against each and every Guarantor because, in the event the Damages Claim (or any other claim that M&T Bank has under the Third Priority Indenture Documents) is not paid in full by CalGen, M&T Bank has the right to look to each and every Guarantor for any deficiency.

## V.

### THE BANKRUPTCY COURT ERRED BY AUTHORIZING PAYMENT OF OVER $830 MILLION OF THE THIRD PRIORITY NOTES OUTSIDE A CHAPTER 11 PLAN

The Bankruptcy Court erred in permitting, under section 363(b) of the Bankruptcy Code, CalGen's prepayment of the Third Priority Notes over M&T Bank's objection.  "[I]t is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures."  *Contrarian Funds, LLC v. WestPoint Stevens, Inc.* (*In re WestPoint Stevens, Inc.*), 333 B.R. 30, 52 (S.D.N.Y. 2005); *see also In re Premier Entm't Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) and Premier Finance Biloxi Corp.*, Case No. 06-50975 (Bankr. S.D. Miss. Feb. 2, 2007)  (denying a debtor's request to prepay notes in violation of a no-call provision in an indenture in advance of a plan).  In *WestPoint Stevens*, this Court declined to expand an interpretation of section 363 of the Bankruptcy Code to permit prepayment of secured debt outside a chapter 11 plan, noting that "[n]o such expansive interpretation" of section 363 was justified "particularly in light of the fact that the Bankruptcy Code provision

specifically providing for impairment of objecting creditors' rights" was already encompassed in the confirmation provisions of the Bankruptcy Code, which provide for important "procedural and substantive protections for adversely affected creditors" not provided for under section 363. *Id*. at 50.

> As noted by the United States Court of Appeals for the Fifth Circuit:
>
> [A] debtor in Chapter 11 cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization . . . if a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditor's rights . . . might become meaningless. Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan.

*Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc*. (*In re Cont'l Air Lines, Inc.*), 780 F.2d 1223, 1227-28 (5th Cir. 1986).

Paying creditors is the essence of the bankruptcy process. Here, the Bankruptcy Court erred by allowing CalGen to prepay less than the full amount outstanding under the Third Priority Indenture without having to file a disclosure statement, which would discuss inter-Debtor issues and whether CalGen's reorganization should be effectuated through a stand-alone chapter 11 plan or a plan dependent on other Debtors. Instead, M&T Bank's claims are being impaired without any ability for M&T Bank to invoke the protections available in the confirmation process by, for instance, (a) voting against a chapter 11 plan, (b) objecting to such plan on the basis, among other things, that it violates the best interests test and the absolute priority rule, or (c) proposing its own competing chapter 11 plan. If M&T Bank is deprived of the protections Congress afforded creditors under section 1129 of the Bankruptcy Code, this Court should remand this matter to the Bankruptcy Court and direct the Bankruptcy Court to require CalGen to pay all M&T Bank's claims under the Third Priority Indenture in full, including the Damage Claim, the Indemnification Claim, and the Default Interest Claim.

Additionally, as M&T Bank pointed out at the Hearing, CalGen is refinancing its debt in a package that borrows money for CalGen and other Debtors by pledging many Debtors' assets as collateral. This new loan makes it difficult or impossible for a creditor of CalGen to propose a competing plan for CalGen because the new loan necessitates repayment by CalGen and other Debtors. This type of multi-Debtor transaction altered the playing field without any confirmation protections. For example, no disclosure statement exists explaining the implications to each Debtor and creditors of the new loan.

## CONCLUSION

M&T Bank respectfully requests that the Court (i) affirm the Memorandum Decision to the extent it grants M&T Bank the Damage Claim; (ii) reverse the Memorandum Decision to the extent the Bankruptcy Court estimated M&T Bank's Damage Claim in an amount equal to 3.5% of the principal amount of the Third Priority Notes and (A) allow M&T Bank's Damage Claim in the amount of $179.5 million as set forth in the uncontroverted Amended Kearns Affidavit or (B) in the alternative, remand the calculation of the Damage Claim to the Bankruptcy Court to be recalculated and allowed in accordance with governing New York law and the uncontroverted evidence in the record; (iii) reverse the Memorandum Decision to the extent it holds M&T Bank's Damage Claim is unsecured and hold that such claim is a secured claim; (iv) reverse the Prepayment Order and reinstate (W) M&T Bank's secured Damage Claim, (X) M&T Bank's secured Indemnification Claim, (Y) M&T Bank's secured Guarantee Claim against each of the Guarantors, and (Z) M&T Bank's secured Default Interest Claim, pending the Bankruptcy Court's determination of the allowance of such claim; (v) direct the Bankruptcy Court to order CalGen to pay all M&T Bank's claims in full; and (vi) grant M&T Bank such other and further relief as is just and proper.

Dated: June 1, 2007
      New York, New York

                              /s/ Martin J. Bienenstock
                     WEIL, GOTSHAL & MANGES LLP
                     767 Fifth Avenue
                     New York, New York 10153-0119
                     Telephone: (212) 310-8000
                     Facsimile: (212) 310-8007
                     Martin J. Bienenstock, Esq. (MB 3001)
                     Judy G.Z. Liu, Esq. (JL 6449)
                     Penny P. Reid, Esq. (PR 5699)

                     Attorneys for Manufacturers & Traders
                     Trust Company, as Indenture Trustee
                     Under the Third Priority Indenture