AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, NY 10022-2524
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002
Michael S. Stamer (MS 4900)
Fred S. Hodara (FH 7947)
Robert A. Johnson (RJ 6553)

Counsel to the Official Committee of Unsecured
Creditors of Calpine Corporation, et al.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re<br>CALPINE CORPORATION, et al.,<br><div align=right>Debtors.</div> | Chapter 11<br>Case No. 05-60200 (BRL)<br>(Jointly Administered) |
| HSBC BANK USA, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE, THE BANK OF NEW YORK, AS ADMINISTRATIVE AGENT, WILMINGTON TRUST FSB, AS INDENTURE TRUSTEE, WILMINGTON TRUST COMPANY, AS ADMINISTRATIVE AGENT, WILMINGTON TRUST COMPANY, AS COLLATERAL AGENT, AND MANUFACTURERS & TRADERS TRUST COMPANY, AS INDENTURE TRUSTEE,<br><div align=center>Appellants,</div><div align=center>v.</div>CALPINE CORPORATION, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CALPINE CORPORATION, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS,<br><div align=center>Appellees.</div> | Case No. 1:07-cv-3088 (GBD)<br><br><br>BRIEF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AS APPELLEE |
| CALPINE CORPORATION, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CALPINE CORPORATION, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS,<br><div align=center>Appellants,</div><div align=center>v.</div>HSBC BANK USA, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE, THE BANK OF NEW YORK, AS ADMINISTRATIVE AGENT, WILMINGTON TRUST FSB, AS INDENTURE TRUSTEE, WILMINGTON TRUST COMPANY, AS ADMINISTRATIVE AGENT, WILMINGTON TRUST COMPANY, AS COLLATERAL AGENT, AND MANUFACTURERS & TRADE TRUST COMPANY, AS INDENTURE TRUSTEE,<br><div align=center>Appellees.</div> | |

July 9, 2007

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

COUNTER-STATEMENT OF ISSUES PRESENTED .......................................... 2

ARGUMENT ............................................................................... 3

I.  THE CALGEN SECURED LENDERS' CONTRACTUAL ARGUMENTS ACTUALLY SUPPORT THE PROPOSITION THAT NO DAMAGES SHOULD HAVE BEEN AWARDED BECAUSE THE LOAN DOCUMENTS DO NOT PROVIDE FOR PAYMENT OF A PREMIUM, PENALTY OR DAMAGES UPON AN ACCELERATION DUE TO BANKRUPTCY ................................................................. 4

    A.  The Bankruptcy Court Properly Held That Payment After Acceleration Is Payment After Maturity, for Which the Contracts Provided No Premium or Penalty, and that No-Call Provisions Are Unenforceable in Chapter 11 Proceedings. ........................................... 5

        1.  The CalGen Secured Debt was Accelerated to Maturity Upon Commencement of the Debtors' Chapter 11 Cases ............... 6

        2.  No-call Provisions Are Unenforceable in Bankruptcy. ................. 8

        3.  The CalGen Secured Lenders Failed to Contract for Payment of Premiums, Penalties or Damages Upon Repayment Following Acceleration ........................................ 9

    B.  Repayment of the CalGen Secured Debt Was Not "Voluntary" ............... 13

II.  THE BANKRUPTCY COURT PROPERLY DID NOT AWARD A SECURED CLAIM FOR BREACH OF CONTRACT DAMAGES. .................. 16

III.  THE BANKRUPTCY COURT DID NOT DENY THE CALGEN SECURED LENDERS ANY OF THEIR PROCEDURAL OR DUE PROCESS RIGHTS. ......................................................... 21

    A.  Determining Claims Outside Plan of Reorganization ........................... 21

    B.  Stopping Payment of Professional Fees ................................................. 23

    C.  Expunging Claims Against CalGen Guarantors ................................... 25

    D.  Granting Replacement DIP Liens Senior to the CalGen Secured Lenders' Liens. ................................................................ 26

IV.    THE BANKRUPTCY COURT PROPERLY REJECTED THE DAMAGES CALCULATIONS OFFERED BY THE CALGEN SECURED LENDERS ......................................................................................26

CONCLUSION....................................................................................................27

## TABLE OF AUTHORITIES

### CASES              Page

*Continental Sec. Corp. v. Shenandoah Nursing Home P'ship*,
193 B.R. 769 (W.D. Va. 1996), *aff'd*, 104 F. 3d 359 (4th Cir. 1996) ..............................*passim*

*Continental Sec. Corp. v. Shenandoah Nursing Home P'ship*,
188 B.R. 205 (W.D. Va. 1995) .................................................................................11, 19

*In re 360 Inns, Ltd.*, 76 B.R. 573 (Bankr. N.D. Tex. 1987).................................................8, 18, 19

*In re Adelphia Communications Corp.*, 342 B.R. 142 (Bankr. S.D.N.Y. 2006) .........................10

*In re Anchor Resolution Corp.*, 221 B.R. 330 (Bankr. D. Del. 1998) ..........................................8

*In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) ...............................................22

*In re Family Showtime Theatres, Inc.*, 67 B.R. 542 (Bankr. E.D.N.Y. 1986) ........................20, 21

*In re Imperial Coronado Partners, Ltd.*, 96 B.R. 997 (B.A.P. 9th Cir. 1989) ...........................15

*In re LHD Realty Corp.*, 726 F.2d 327 (7th Cir. 1984) ........................................................*passim*

*In re Liberty Warehouse Assocs. Ltd. P'ship*,
220 B.R. 546 (Bankr. S.D.N.Y. 1998).....................................................................................14

*In re Manville Forest Products Corp.*, 43 B.R. 293 (Bankr. S.D.N.Y. 1984),
*aff'd in part, rev'd in part on other grounds*, 60 B.R. 403 (S.D.N.Y. 1986) ...........................7

*In re OPM Leasing Services, Inc.*, 21 B.R. 993 (S.D.N.Y. 1982) ...........................................20, 21

*In re Premier Entm't Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) and Premier
Finance Biloxi Corp.*, Case No. 06-50975 (Bankr. S.D. Miss. Feb. 2, 2007) ........................22

*In re Ridgewood Apts. of Dekalb County, Ltd.*,
174 B.R. 712 (Bankr. S.D. Ohio 1994)..................................................................................7, 11

*In re Skyler Ridge*, 80 B.R. 500 (Bankr. C.D. Cal. 1987).........................................................8, 11

*In re Taddeo*, 685 F.2d 24 (2d Cir. 1982) ...................................................................................14

*In re Vest Assocs.*, 217 B.R. 696 (Bankr. S.D.N.Y. 1998) ......................................................17, 20

*In re Westpoint Stevens, Inc.*, 333 B.R. 30 (S.D.N.Y. 2005).......................................................22

*Kothe v. R.C. Taylor Trust*, 280 U.S. 224 (1930) ..........................................................................7

*Sound Stage Studios, Inc. v. Life Investors Ins. Co. of Am.*,
No. 88-204-II, 1998 WL 138827 (Tenn. Ct. App. Dec. 30, 1988) ........................ .....8

## STATUTES

11 U.S.C. § 365(b)(1) ............................................................................................ ...14

11 U.S.C. § 502(a) ................................................................................................. ...21

11 U.S.C. § 502(b) ................................................................................................. 7, 21

11 U.S.C. § 503(b)(3) ............................................................................................ ..24

11 U.S.C. § 503(b)(4) ............................................................................................ ..24

11 U.S.C. § 503(b)(5) ............................................................................................ ..24

11 U.S.C. § 506(b) .........................................................................................16, 17, 19, 20

11 U.S.C. § 1110(a) ............................................................................................... ...14

11 U.S.C. § 1112(b) ............................................................................................... ...12

11 U.S.C. § 1124(2)(A)..........................................................................................14, 15

11 U.S.C. § 1129(a)(7) ........................................................................................... ..19

11 U.S.C. § 1168(a) ............................................................................................... ..14

## OTHER AUTHORITIES

4-502 COLLIER ON BANKRUPTCY ¶ 502.03 (15th rev. ed. 2007) ................................... ...7

7-1124 COLLIER ON BANKRUPTCY ¶ 1124.03 [2] (15th rev. ed. 2007) ......................... ...15

7-1129 COLLIER ON BANKRUPTCY ¶ 1124.03[3] (15th rev. ed. 2007) ......................... ...14

George Lefcoe, *Yield Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Prepayment*, 28 REAL EST. L.J. 202 (Winter 2000) ............................................ 8-9

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Calpine

Corporation, *et al.* (collectively, "Calpine" or the "Debtors"), as Appellee, files this brief in

opposition to the four Appellants' Briefs submitted by the CalGen Secured Lenders[1] in these

consolidated appeals.  (The Creditors' Committee filed a brief as Appellant on June 1, 2007, on

separate issues).  The four Appellants' Briefs to which this brief responds are:

(i) "Joint Opening Brief of Appellants, Wilmington Trust FSB as Indenture Trustee and

Wilmington Trust Company as Administrative Agent," filed by Nixon Peabody on behalf of the

First Priority CalGen Secured Lenders (the "First Priority Appellants' Brief");

(ii) "Brief of Appellants HSBC Bank USA, National Association, as Indenture Trustee,

and the Bank of New York, as Administrative Agent," filed by Ropes & Gray on behalf of the

Second Priority CalGen Secured Lenders (the "Second Priority Appellants' Brief");

(iii) "Opening Brief of Appellant Manufacturers & Traders Trust Company," filed by

Weil Gotshal & Manges on behalf of the Third Priority CalGen Secured Lenders (the "Third

Priority Appellants' Brief"); and

(iv) "Opening Brief of Appellant Wilmington Trust Company as Collateral Agent," filed

by Nixon Peabody on behalf of the Collateral Agent for all three tiers of the CalGen Secured

Debt (the "Collateral Agent Appellant's Brief") (collectively, "Appellants' Briefs").

---

[1] The "CalGen Secured Lenders," has the same meaning defined in the "Brief of the Official Committee of
Unsecured Creditors in Support of Its Appeal" (*filed* June 1, 2007) (the "Creditors' Committee's Brief"), namely the
holders of approximately $2.516 billion of secured prepetition debt (the "CalGen Secured Debt") of Calpine
Generating Company LLC ("CalGen"), which was repaid on March 29, 2007.

## COUNTER-STATEMENT OF ISSUES PRESENTED

The CalGen Secured Lenders submitted 18 issues on appeal in connection with the Appellants' Briefs. There is substantial overlap among many of these issues, however, which can be summarized as follows:

1.     Whether the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") properly found that the repayment of the CalGen Secured Debt, which took place on March 29, 2007, constituted a breach of contract giving rise to a valid claim for damages by the CalGen Secured Lenders, allowable in bankruptcy. (Third Priority Appellants' Brief issue 1 and argument point I.) Here, the Creditors' Committee contends that the answer is "no," and that this argument actually supports the appeal of the Debtors, the Creditors' Committee and the Official Committee of Equity Security Holders: There was a *re*payment, not a prepayment, on March 29, 2007 and, thus, there was no valid breach of contract claim recognizable in bankruptcy.

2.     Whether the Bankruptcy Court erred in holding that to the extent the CalGen Secured Lenders have a claim for breach, that claim is unsecured. (First Priority Appellants' Brief issue 1; Second Priority Appellants' Brief issue 3; Third Priority Appellants' Brief issue 6.) Here, the Creditors' Committee contends that the answer is "no"; while there was no breach and, thus, there is no valid claim for damages at all, there certainly could not be a valid *secured* claim for damages.

3.     Whether the CalGen Secured Lenders were denied any of their procedural or due process rights:

            (a)     by reason of the Bankruptcy Court determining the CalGen Secured Lenders' claims outside of a chapter 11 plan of reorganization (First Priority Appellants' Brief issue 3; Third Priority Appellants' Brief issue 7);

(b)    by reason of the Bankruptcy Court expunging the CalGen Secured

Lenders' claims and terminating the Debtors' obligations to pay the fees and expenses

incurred by the attorneys and financial advisors for the CalGen Secured Lenders

following repayment of the CalGen Secured Debt (First Priority Appellants' Brief issue 4;

Second Priority Appellants' Brief issue 4; Third Priority Appellants' Brief issue 5;

Collateral Agent Appellant's Brief issue 2);

(c)    by reason of the Bankruptcy Court's expunging of claims against certain

Debtors that guaranteed the CalGen Secured Debt (the "CalGen Guarantors") (First

Priority Appellants' Brief issue 2; Second Priority Appellants' Brief issue 5; Third

Priority Appellants' Brief issue 4); or

(d)    by reason of the replacement debtor in possession ("DIP") financing

approved by the Bankruptcy Court as of March 12, 2007 (the "Replacement DIP") being

granted liens superior to the liens of the CalGen Secured Lenders, with certain exceptions

(Collateral Agent Appellant's Brief issue 1);

The Creditors' Committee contends that the answer is "no"; there was no denial of

procedural or due process rights, and the Bankruptcy Court's process was quite ordinary.

4.    Whether the Bankruptcy Court erred in not adopting the damages calculations

urged by the CalGen Secured Lenders (Second Priority Appellants' Brief issues 1 and 2; Third

Priority Appellants' Brief issues 2 and 3).  The Creditors' Committee contends that the answer is

"no": The Bankruptcy Court properly refused to adopt these damages calculations.

## **ARGUMENT**

The CalGen Secured Lenders' appeals should be denied.  The Bankruptcy Court correctly

ruled that the no-call provisions in the CalGen Secured Debt Agreements were unenforceable,

and that the CalGen Secured Debt Agreements did not provide for any premium to be paid

following an acceleration of the loans due to a bankruptcy filing. While the Creditors'

Committee continues to pursue its own appeal regarding the quantum of damages awarded –

because the Bankruptcy Court should not have awarded any damages for "dashed expectations,"

as set forth in the Creditors' Committee brief as Appellant – the decision of the Bankruptcy Court

need not be disturbed to the extent it determined that (i) the no-call provisions were

unenforceable in bankruptcy; (ii) no prepayment premium was due because the payment was

made after maturity, following acceleration in accordance with the CalGen Secured Debt

Agreements and applicable law; (iii) there was no basis for a secured claim for damages; and (iv)

the expunging of guarantee and other claims was appropriate. Furthermore, the CalGen Secured

Lenders' appeals should be rejected because their due process arguments are unfounded.

## I.   THE CALGEN SECURED LENDERS' CONTRACTUAL ARGUMENTS ACTUALLY SUPPORT THE PROPOSITION THAT NO DAMAGES SHOULD HAVE BEEN AWARDED BECAUSE THE LOAN DOCUMENTS DO NOT PROVIDE FOR PAYMENT OF A PREMIUM, PENALTY OR DAMAGES UPON AN ACCELERATION DUE TO BANKRUPTCY

The CalGen Secured Lenders incorrectly argue that they have valid claims for

"prepayment" of the CalGen Secured Debt during the no-call period, despite the Bankruptcy

Court's correct rulings that (a) no-call provisions are unenforceable in bankruptcy, and (b)

*re*payment after acceleration is payment after maturity – and thus cannot be *pre*payment. *See*

Second Priority Appellants' Brief at 23-27; Third Priority Appellants' Brief at 22-24. The

CalGen Secured Lenders also imply that the repayment was "voluntary" and that the Debtors

could have "de-accelerated" the accelerated debt, or "reinstated" it in a plan of reorganization.

*See* First Priority Appellants' Brief at 24-28; Second Priority Appellants' Brief at 23-27. These

arguments are meritless, and each is discussed in turn below.

**A.    The Bankruptcy Court Properly Held That Payment After Acceleration Is Payment After Maturity, For Which The Contracts Provided No Premium or Penalty, And That No-Call Provisions Are Unenforceable In Chapter 11 Proceedings**

The CalGen Secured Debt Agreements[2] make clear that, absent acceleration of the underlying debt, CalGen and the CalGen Secured Lenders contracted for no-call provisions, some forbidding repayment before April 1, 2007, some forbidding repayment before April 1, 2008, and some forbidding repayment before the originally-stated maturity date. The parties did not, however, contract for such provisions to remain effective following acceleration or for premiums, penalties or damages to be due in connection with repayment of the CalGen Secured Debt following acceleration and deemed maturity. Under the CalGen Secured Debt Agreements, a prepayment premium is due *only* where there has been an "Optional Redemption," as defined in section 3.07 of the First and Second Priority Indentures, or a "Voluntary Prepayment," as defined in section 2.10 of the Term Loan Agreements. DA Tab E at Exh. D.[3] There were no Optional Redemptions or Voluntary Prepayments in this case, however. Indeed, the repayment of the CalGen Secured Debt followed the acceleration and deemed maturity of such debt as required by the provisions of the CalGen Secured Debt Agreements and applicable law.

---

[2] The "CalGen Secured Debt Agreements" are comprised of:

    (i) $235,000,000 First Priority Secured Floating Rate Notes Due 2009 (the "First Priority Indenture");

    (ii) $640,000,000 Second Priority Secured Floating Rate Notes Due 2010 (the "Second Priority Indenture") (together with (i) the "First and Second Priority Indentures");

    (iii) $680,000,000 Third Priority Secured Floating Rate Notes Due 2011 and $150,000,000 11½% Third Priority Secured Notes Due 2011 (the "Third Priority Indenture") (together with (i) and (ii) the "Indentures")

    (iv) $600,000,000 First Priority Secured Institutional Term Loans Due 2009; and

    (v) $100,000,000 Second Priority Secured Institutional Term Loans Due 2010 (together with (iv) the "Term Loan Agreements").

[3] To avoid unnecessary duplication, the Creditors' Committee's citations to the record refer to the opening appendix filed by the Debtors on June 1, 2007, using the format "DA Tab __," and to the supplemental appendix filed by the Debtors on July 9, 2007, using the format "DSA Tab __."

### 1. The CalGen Secured Debt Was Accelerated to Maturity
### Upon Commencement of the Debtors' Chapter 11 Cases

The CalGen Secured Debt matured upon the filing of the Debtors' chapter 11 petitions in

December 2005, by operation of the express terms of the CalGen Secured Debt Agreements and

by operation of law.  Accordingly, repayment in March 2007 was not prepayment at all, but

repayment after maturity.  Because the CalGen Secured Debt Agreements do not provide for a

premium, penalty or damages to be due in connection with the repayment of such debt following

acceleration but before the original stated maturity dates, no premiums, penalties or damages are

payable here.

The acceleration provisions contained in the Indentures are entitled "Defaults and

Remedies," and provide that: "[i]n the case of an Event of Default [due to bankruptcy] . . . all

outstanding Notes will become *due and payable immediately without further action or notice*."

DA Tab E at Exh. D (Indentures § 6.02) (emphasis added).  The Term Loan Agreements contain

substantively equivalent language.[4]

Construing the express terms of the CalGen Secured Debt Agreements, the Bankruptcy

Court properly determined that the CalGen Secured Debt had been accelerated due to the

bankruptcy filings, thus advancing the debt's maturity date to the date of the petition: "It should

be noted that the Secured Debt is now matured by the occurrence of an Event of Default, i.e., the

filing of the chapter 11 petitions."  DA Tab A at 5-6; *In re LHD Realty Corp.*, 726 F.2d 327, 330-

31 (7th Cir. 1984).  The Bankruptcy Court stated further:

> In addition, each of the CalGen Secured Debt agreements provides
> that a bankruptcy filing by CalGen is an event of default resulting

---

[4] DA Tab E at Exh. D (Term Loan Agreements § 7.02) ("In the case of an Event of Default [due to
Bankruptcy] . . . the outstanding . . . Term Loans shall become *due and payable immediately without further action
or notice*.") (emphasis added).

in an automatic acceleration of debt. As such, the CalGen Secured
Debt has been accelerated by virtue of the Debtors' bankruptcy
filing and thus is "due and payable immediately."

DA Tab A at 8.

Furthermore, the Bankruptcy Court also properly held that, even absent the foregoing
contractual provisions, a bankruptcy filing on its own accelerates all of a debtor's debt
obligations. *Id.* at 8-9. Automatic acceleration in bankruptcy is a key feature to the bankruptcy
system, because it makes possible the calculation of various allowable claims against a debtor.
11 U.S.C. § 502(b); 4-502 COLLIER ON BANKRUPTCY ¶ 502.03 (15th rev. ed. 2007). Indeed,
acceleration allows the relative rights of creditors to be equitably adjudicated in accordance with
the purposes of the Bankruptcy Code and thus enables the debtor, with court intervention where
necessary, to quantify the claims against it and other creditors to determine their rights in relation
to one another (e.g., creditors subject to intercreditor and/or subordination agreements as well as
among general unsecured creditors). *Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 227 (1930)
(purpose to bring about equitable distribution of estate among creditors).

Accordingly, based on the plain language of the CalGen Secured Debt Agreements and
applicable law, CalGen did not "prepay" the CalGen Secured Debt before maturity, but in fact
repaid the debt after acceleration and maturity both by operation of law and by contract. As the
Bankruptcy Court correctly stated:

> [T]he CalGen Secured Debt has been accelerated by virtue of the
> Debtors' bankruptcy filing and thus is "due and payable
> immediately."[] *See, i.e., In re LHD Realty Corp.*, 726 F.2d at 330-
> 31 ("acceleration, by definition, advances the maturity date of the
> debt so that payment thereafter is not prepayment but instead is
> payment made after maturity."); *In re Ridgewood Apts. of Dekalb
> County, Ltd.*, 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) ("Even
> without specific contractual language, a bankruptcy filing acts as
> an acceleration of all a debtor's obligations."); *In re Manville
> Forest Products Corp.*, 43 B.R. 293, 297 (Bankr. S.D.N.Y. 1984),

> *aff'd in part, rev'd in part on other grounds*, 60 B.R. 403
> (S.D.N.Y. 1986) (debt is automatically accelerated upon filing
> bankruptcy); *cf. In re Anchor Resolution Corp.*, 221 B.R. 330, 333
> (Bankr. D. Del. 1998) (agreement included an express provision
> that entitled the holders of the notes to a make-whole amount in the
> event of a prepayment of principal or an event of default; one such
> specified event of default was the commencement of a voluntary
> bankruptcy case).

DA Tab A at 8-9 (footnote omitted); *see also Sound Stage Studios, Inc. v. Life Investors Ins. Co. of Am.*, No. 88-204-II, 1988 WL 138827 *2-*3 (Tenn. Ct. App. Dec. 30, 1988) (no prepayment penalty can be collected when the debt is accelerated by contract, and not by election of the debtor).

As payment upon maturity is not prepayment but, rather, repayment, the Bankruptcy Court property held that prepayment penalties do not apply to CalGen's repayment of the CalGen Secured Debt.

### 2. No-Call Provisions Are Unenforceable in Bankruptcy

The Bankruptcy Court's holding that no-call provisions are unenforceable in bankruptcy proceedings is consistent with well-established caselaw. DA Tab A at 6-7 (citing *In re LHD Realty Corp.*, 726 F.2d at 329 (allowing repayment despite ten-year no-call period in underlying agreement); *Continental Sec. Corp. v. Shenandoah Nursing Home P'ship*, 193 B.R. 769, 774 (W.D. Va. 1996) (affirming bankruptcy court's determination that prepayment prohibitions are unenforceable in bankruptcy), *aff'd*, 104 F. 3d 359 (4th Cir. 1996); *In re Skyler Ridge*, 80 B.R. 500, 502 (Bankr. C.D. Cal. 1987) (noting that no-call provisions are "not enforceable in a bankruptcy case"); *In re 360 Inns, Ltd.*, 76 B.R. 573, 575-76 (Bankr. N.D. Tex. 1987) (approving of modified plan of reorganization allowing repayment despite ten-year no-call provision in underlying agreement); *cf.* George Lefcoe, *Yield Maintenance and Defeasance: Two Distinct*

*Paths to Commercial Mortgage Prepayment*, 28 REAL EST. L.J. 202 (Winter 2000) (courts uphold no-call provisions "except in bankruptcy")).

Notably, the Second Priority Appellants admit that CalGen was entitled to repay the CalGen Secured Debt despite the no-call provisions. Second Priority Appellants' Brief at 23 ("the Debtors may have been entitled under the Bankruptcy Code to prepay the debt notwithstanding the contractual prohibition on doing so [. . . .]"). Nevertheless, the Second Priority Appellants insist that the relevant Agreements did not allow repayment "at all" before April 2008, even after conceding that the no-call provisions are unenforceable. *Id.* at 32. Yet as the Bankruptcy Court held, no-call clause is unenforceable, and therefore the Debtors payments on the CalGen Secured Debt prior to April 1, 2007 were simply repayment after maturity and not violative of any contractual provisions. DA Tab A at 6-7.

### 3. The CalGen Secured Lenders Failed to Contract For Payment of Premiums, Penalties or Damages Upon Repayment Following Acceleration

While Appellants could have contracted for the inclusion of a penalty, a premium or damages to be assessed upon the occurrence of an event of a default and subsequent acceleration and repayment of the CalGen Secured Debt, they failed to do so. Analyzing the plain language of the CalGen Secured Debt Agreements, the Bankruptcy Court correctly determined that no premiums or penalties were due in connection with the repayment of the CalGen Secured Debt. The Bankruptcy Court stated:

> With respect to the purported prepayment premiums, none of the agreements governing the CalGen Secured Debt require a prepayment premium for repayment prior to April 1, 2007. **Thus, pursuant to the terms of the agreements, so long as the refinancing is completed prior to April 1, 2007, no prepayment premium is due.** *See, e.g., Continental Sec. Corp. v. Shenandoah Nursing Home P'ship*, 193 B.R. at 774 (loan had two-year lockout but no prepayment penalty provision). Apparently the CalGen Secured indentures were somewhat "antiquated" or, as one party

> described "Model T" indentures, because they fail to contain some
> up-to-date commonly found bondholder protective provisions.
> Modern indentures generally provide for prepayment provisions or
> penalties even during a no-call period or if the facility is
> accelerated.

*Id.* at 7-8 (emphasis added).

The CalGen Secured Lenders' failure to use language that would permit the recovery they seek here is starkly shown by juxtaposing the Aries Loan Document, a loan agreement executed by a CalGen affiliate and discussed in the Bankruptcy Court's Memorandum Decision. *See* Creditors' Committee's Brief at 8-9, 11, 13; *see also* DA Tab F at Exh. A. As observed by the Bankruptcy Court, the Aries Loan Document, executed within days of the CalGen Secured Debt Agreements, explicitly required penalties to be paid where an event of default accelerated the debt and the debt was repaid. DA Tab A at 8, n.6; DA Tab F at Exh. A. Unlike the CalGen Secured Debt Agreements, the Aries Loan Document specifically provides that in the event of an Event of Default caused by a chapter 11 filing, automatically and without notice,

> the entire principal amount of all Term Loans, (together with all
> unpaid interest thereon *and Make-Whole Amount*, if any, . . . ) . . .
> shall immediately become due and payable without presentment,
> demand, protest or notice of any kind, all of which are hereby
> expressly waived by the Borrower.

DA Tab F at Exh. A (emphasis added). Accordingly, the Debtors entered into a settlement with the Aries Facility lenders that included an amount for a make-whole premium. DA Tab A at 8, n.6. The Aries Loan Document underscores the availability of such provisions in debt instruments created contemporaneously with the CalGen Secured Debt Agreements. Had the CalGen Secured Lenders bargained for the payment of a premium, a penalty or damages in the event of payment post-acceleration, then such premium, penalty or damages would have been available in this context. *See In re Adelphia Communications Corp.*, 342 B.R. 142, 153 (Bankr. S.D.N.Y. 2006) ("[I]f the bank lenders wished to contract for additional remedies . . . the bank

lenders could have done so."); *In re Ridgewood Apts. of Dekalb County, Ltd.*, 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) ("Had [the lender] intended the penalty to be payable upon acceleration, the Addendum [governing prepayment] should have stated that specifically.").

The CalGen Secured Lenders must be held to their bargain. Perhaps the CalGen Secured Lenders should be complaining to their prior indenture counsel for this "trust indenture drafting omission" (*see* DA Tab A at 1), but they cannot ask this Court to relieve them of their own explicit, unambiguous language. As explained in *Continental Securities*, where an agreement prohibits prepayment but no remedy for prepayment is included in that agreement, the "perhaps anomalous result is the product of sloppy draftsmanship – it is not a creation of the bankruptcy court." The court must then rightfully enforce the precise terms of the contract. *Continental Sec. Corp. v. Shenandoah Nursing Home P'ship*, 188 B.R. 205, 218 (W.D. Va. 1995). Hence the Bankruptcy Court correctly held that, pursuant to the terms of the CalGen Secured Debt Agreements, CalGen's payment prior to April 1, 2007 resulted in no prepayment premium or other contractual penalty being due and payable. DA Tab A at 7-8. The Bankruptcy Court, however, erred in awarding damages for breach of contract in connection with the repayment of the CalGen Secured Debt, as there are no provisions contained in the CalGen Secured Debt Agreements warranting such award.

There are two related points made by the CalGen Secured Lenders that merit further discussion. First, Appellants argue that if this Court were to acknowledge that automatic acceleration of the CalGen Secured Debt rendered the Debtors' payment a *re*payment, and not a voluntary *pre*payment subject to a premium, borrowers could evade such a premium simply by filing for bankruptcy. First Priority Appellants' Brief at 27-28; Second Priority Appellants' Brief at 24-25; *In re Skyler Ridge*, 80 B.R. at 507. Appellants' public policy argument is overblown.

Various tools of the legal process and the Bankruptcy Code ensure that the courts need not take the drastic step of applying a prepayment premium where none is applicable in order to avoid such a consequence. Where a debtor files for bankruptcy merely to avoid the payment of a prepayment premium, a creditor harmed by the filing remains free to file a motion to dismiss and assert that the debtor filed the chapter 11 petition in bad faith. *See* 11 U.S.C. § 1112(b). Furthermore, it seems unlikely that borrowers would rush to the courthouse to file bankruptcy petitions to avoid valid prepayment premium clauses. As the Seventh Circuit wisely stated in *LHD Realty*:

> [T]his scenario seems implausible given the ramifications of default for a borrower's credit rating and the ability of the lender to sidestep the ploy by suing only for overdue payments as they mature, together with attorney's fees . . . . Should such intentional defaults become a problem, however, we believe courts could deal with the difficulty by denying the acceleration exception in appropriate cases. In any event, [the creditor] does not suggest that [the debtor] implemented such a strategy in the case before us.

726 F.2d at 33. Appellants have never alleged that Calpine Corporation and its subsidiaries, including CalGen, filed their bankruptcy petitions solely to evade prepayment penalties in the CalGen Secured Debt. Appellants never moved to dismiss the chapter 11 petitions. Thus, for Appellants to insinuate that the Debtors are in bankruptcy solely to evade the assessment of a prepayment premium is disingenuous.

Second, the CalGen Secured Lenders cite *LHD Realty* for the proposition that acceleration did not defeat the prepayment premium, asserting that it is the "actions of the respective parties" in question, and not acceleration itself, which determines whether a prepayment premium should apply to a given payment. *See* First Priority Appellants' Brief at 27. However, the court in *LHD Realty* said precisely the opposite. The case involved an attempt by a lender to accelerate a debt and foreclose on a mortgaged property. *LHD Realty*, 726 F.2d at 329-

30.  The court held that the case fell within the "acceleration exception" to prepayment premium assessment, under which a lender that elects to accelerate a debt loses its right to a prepayment premium, *not* because it was the lender who caused the acceleration, but because the *acceleration itself* rendered any prepayment premium inapplicable.  *Id.* at 331.  The court stated that "acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity."  *Id.* at 330-31.  In fact, the court explicitly refuted the lender's argument against "a *per se* rule that acceleration precludes a claim for a prepayment provision."  *Id.* at 331.  Just as acceleration of the debt in question led the court in *LHD Realty* to reject the lender's claim to a prepayment premium, so too should Appellants' attempt to recover a premium, a penalty or damages be denied.

**B.    Repayment Of The CalGen Secured Debt Was Not "Voluntary"**

The CalGen Secured Lenders posit that the repayment of the CalGen Secured Debt was "voluntary" because the Debtors could have de-accelerated or reinstated the CalGen Secured Debt.  First Priority Appellants' Brief at 27; Second Priority Appellants' Brief at 24.  To support this argument, however, Appellants misconstrue both the law and the facts.  Indeed, it was not possible for the Debtors to have de-accelerated or reinstated the CalGen Secured Debt.

First, de-acceleration is solely a *lender's* remedy under the CalGen Secured Debt Agreements, whereas a debtor can only de-accelerate debt under a plan of reorganization (*see* reinstatement discussion below).  Section 6.02 of the Indentures and Section 7.04 of the Term Loan Agreements enable a majority of the holders of outstanding notes to "rescind an acceleration and its consequences," provided that the rescission conflicts with no judgment or decree and that all defaults are cured or waived.  DA Tab E at Exh. D.  Accordingly, the CalGen Secured Lenders' argument that CalGen could de-accelerate the debt is nonsensical.  Furthermore, there is no evidence that Appellants have made any attempt to de-accelerate the

CalGen Secured Debt. Indeed, any such effort to de-accelerate would violate the automatic stay provided for in Bankruptcy Code section 362 because it would amount to a group of creditors engaging in "self-help" in contravention of the automatic acceleration of the underlying debt upon the commencement of the Debtors' chapter 11 cases.

Similarly, the CalGen Secured Lenders' argument regarding reinstatement is unavailing. To de-accelerate an accelerated debt under the Bankruptcy Code and, thus, reinstate such debt, a plan of reorganization must cure any pre-petition or post-petition defaults under agreements governing the debt to be reinstated, with certain specified exceptions. 11 U.S.C. § 1124(2)(A). The concept of "cure" is well known, and although "cure" for purposes of Bankruptcy Code section 1124 is not defined, it has been held to require "reversal" of the event that triggered the default and a return to the pre-default status quo. *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982); *In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546, 548 (Bankr. S.D.N.Y. 1998); *see also* 7-1129 COLLIER ON BANKRUPTCY ¶ 1124.03[3] (15th rev. ed. 2007).[5]

In these cases, myriad covenants contained in the CalGen Secured Debt Agreements are in default and cannot be cured. The most obvious is the "incurrence of indebtedness" covenant, which provides that CalGen "will not . . . directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable . . . with respect to . . . any Indebtedness . . . ." DSA Tab K (Indentures § 4.09; Term Loan Agreements § 5.06). CalGen was a guarantor of the original DIP facility, and it is a guarantor of the Replacement DIP. These are incurable breaches of this covenant. Likewise, the covenants that prohibited liens on certain

---

[5] The concept of cure also occurs in other places throughout the Bankruptcy Code, with a similar definition. *See* 11 U.S.C. §§ 365(b)(1); 1110(a)(1)(B); 1168(a)(1)(B).

of the Debtors' assets are incurable, following the lien on the Geysers Power Facility included in the DIP Facility Agreement. DSA Tab K (Indentures § 4.12, Term Loan Agreements § 5.09).

Further, technical covenants contained in the CalGen Secured Debt Agreements establishing financial targets would have to be cured by the date a plan of reorganization became effective if such a plan were to be confirmed and the CalGen Secured Debt reinstated. *See, e.g.,* DSA Tab K (First and Second Priority Indentures § 4.22 (EBITDA targets); Term Loan Agreements § 5.18); 11 U.S.C. § 1124(2)(A) (requiring "compliance with such covenants on the date the plan becomes effective or else, as of such date, the obligation whose maturity has been reinstated will again be in default and the holders of the obligation will have the right to accelerate"); 7-1124 COLLIER ON BANKRUPTCY ¶ 1124.03 [2] (15th rev. ed. 2007). Absolutely no evidence appears in the record suggesting that the Debtors would be capable of curing the defaults as required to reinstate the CalGen Secured Debt Agreements. In fact, as outlined above, during the chapter 11 proceedings various obligations have been irreversibly restructured such that reinstatement is impossible.

Appellants primarily cite *In re Imperial Coronado Partners,* a single-asset real estate bankruptcy case, for the proposition that where a debtor retains the right to de-accelerate or reinstate a loan, a decision to repay the loan may result in a prepayment premium. First Priority Appellants' Brief at 26-27; Second Priority Appellants' Brief at 24, 25 n.15. However, in *Imperial Coronado,* payment of the debt was not the debtor's only option, since, unlike here, the court found that it could have reinstated the loan. Under California state law, a debtor may reinstate a loan until five days prior to a foreclosure sale simply by paying any arrearages. *In re Imperial Coronado Partners, Ltd.,* 96 BR 997, 1000 (B.A.P. 9th Cir. 1989). Accordingly, the court in *Imperial Coronado* held that the debtor could have reinstated the loan under state law or

pursuant to a bankruptcy plan. The Appellants' efforts to compare *Imperial Coronado* to *Calpine*

evidences the inherent dangers of trying to extrapolate sweeping principles regarding

reinstatement from a relatively simple case involving a single-asset debtor and an ordinary

mortgage foreclosure to a jointly administered case involving hundreds of interrelated entities

which, in the aggregate, constitute one of the largest chapter 11 cases in history, in which

reinstatement would require the cure of multiple and interrelated defaults and cross-defaults.

## II.    THE BANKRUPTCY COURT PROPERLY DID NOT AWARD A
SECURED CLAIM FOR BREACH OF CONTRACT DAMAGES

The CalGen Secured Lenders argue that to the extent that they were awarded damages,

they should have received a secured claim rather than an unsecured claim. *See* First Priority

Appellants' Brief at 29-31; Second Priority Appellants' Brief at 30-37; Third Priority Appellants'

Brief at 37-39. This argument is meritless because a secured claim for breach of contract

damages could exist only if the underlying contract provided for such and, as shown above, the

CalGen Secured Debt Agreements do not provide for such damages.

Secured claims are governed by Bankruptcy Code section 506, which provides in

pertinent part:

> To the extent that an allowed secured claim is secured by property the
> value of which . . . is greater than the amount of such claim, there shall be
> allowed to the holder of such claim, interest on such claim, and any
> reasonable fees, costs or charges provided for under the agreement . . . .

11 U.S.C. § 506(b). Thus, for the CalGen Secured Lenders to obtain a secured claim for breach

of contract damages, the CalGen Secured Debt Agreements would have to provide for such

damages on account of repayment following acceleration. Because the CalGen Secured Debt

Agreements do not provide for such damages, the argument cannot be sustained.

The law is well-settled that where, as here, an agreement does not include a premium,

penalty or liquidated damages clause, a secured party is prohibited from incorporating such

amounts into its allowed claim. *See In re Vest Assocs.*, 217 B.R. 696, 699-700 (Bankr. S.D.N.Y. 1998) (holding that the Bankruptcy Court cannot "read into a contract damage provisions which the parties themselves have failed to insert regarding the liquidation or calculation of damages arising out of the prepayment of a loan"); *Continental Sec. Corp*, 193 B.R. at 778 (affirming bankruptcy court's holding that although the contract contained a prepayment prohibition, the oversecured creditor was not entitled to a prepayment penalty since there was no prepayment penalty provision in the contract).

Where the parties have not included an applicable premium, penalty or damage provision, Bankruptcy Code section 506(b) is simply not relevant. DA Tab A at 9 (citing authority). Section 506(b) allows only claims for payment due *under the contract.* 11 U.S.C. § 506(b). It does not allow the lenders to invent "charges," or to rewrite the contract unilaterally, and with the benefit of hindsight, to achieve results not previously contemplated. Hence, the Bankruptcy Court properly held that the CalGen Secured Lenders may not include purported premiums, penalties or damages not contained in the underlying agreement in the calculation of their secured claims. DA Tab A at 9.

An alternative argument made by the CalGen Secured Lenders is that they should be allowed to borrow the prepayment premium provisions found in Article 3 of the First and Second Priority Indentures and Article II of the Term Loan Agreements, which govern "Optional Redemption" or "Voluntary Prepayment" in a non-accelerated context, and graft that premium into Articles 6 and VII, which set forth the remedy of acceleration upon default. *See* DA Tab E at Exh. D (First and Second Priority Indentures §§ 3.07, 6.02; Term Loan Agreements §§ 2.10; 7.02). This Court should not countenance this effort to rewrite the contracts. CalGen and the

CalGen Secured Lenders contracted for acceleration in the event of default, and not for the payment of any premium following acceleration.

As purported support for their theory that the law allows a party unilaterally to "borrow" remedies from one part of a contract to gain additional remedies for another part, long after the time of contracting, the CalGen Secured Lenders improperly mischaracterize *In re 360 Inns, Ltd.* *See* First Priority Appellants' Brief at 17-19; Second Priority Appellants' Brief at 33. This mischaracterization merits discussion and clarification. In *360 Inns*, the debtor was a limited partnership that constructed, owned and operated a hotel in Texas. 76 B.R. at 575. The debtor had executed a promissory note in connection with its construction financing. *Id.* The note provided for a prepayment penalty of 10 percent if the loan was repaid involuntarily during the first 10 years of the loan term. *Id.* (The note also provided for prepayment penalties for voluntary repayments between years 10 and 20 of the term.) *Id.* The debtor defaulted by filing a bankruptcy petition in the fifth year of the loan term. *Id.* Thus, the facts of *360 Inns* already distinguish it from the CalGen case, because the note in *360 Inns* provided that the premium would be paid in an involuntary payment situation following acceleration, and the CalGen Secured Debt Agreements do not contain any such provision for a premium upon payment following acceleration. *See* DA Tab A at 8-9.

Additionally, the CalGen Secured Lenders overstate the significance of *360 Inns* with respect to their argument for a secured claim under section 506(b) of the Bankruptcy Code. In *360 Inns*, the court explicitly side-stepped any analysis of section 506(b). 76 B.R. at 576. The procedural context of the case was that the debtors proposed a plan of reorganization that did not provide for any payment of the involuntary prepayment premium. The court held that the plan

was not confirmable under section 1129(a)(7), and explicitly did not discuss section 506(b). The

court said:

> Since the original plan provided for no treatment of the
> prepayment penalty, it could not survive the test of § 1129(a)(7),
> which mandates that each holder of a claim or interest receive as
> much as would be received if the debtor were liquidated in a
> Chapter 7 case. Although the prepayment penalty may well have
> been an allowed secured claim under § 506(b), the resolution of
> this issue was not necessary because the plan was simply not
> confirmable as initially presented.

*Id.*

Indeed, *360 Inns* was criticized ten years later for this side-stepping of section 506(b) in

*Continental Sec. Corp.*, 193 B.R. at 776 (analyzing *360 Inns*). The court in *Continental*

*Securities* said that "by not engaging in the threshold analysis of whether the creditor belonged to

an impaired class," the *360 Inns* conclusion that section 506(b) need not be reached was a "non-

sequitur." *Id.* at 776-77. *Continental Securities* explains that the "best interests of creditors" test

– whether the creditor would have received as much under the plan as it would have received in a

liquidation – does not apply where the creditor is unimpaired under Bankruptcy Code

section 1124. *Id.* at 776. If the court in *360 Inns* had engaged in a section 506(b) analysis, it

would have found the prepayment penalty to be an allowable part of a secured claim because the

penalty was expressly contained in the underlying contract. *Id; see also* 11 U.S.C. § 506(b).

Conversely, as is the case here, such amount would not be an allowable part of a secured claim

because the amount was not expressly contained in the underlying contract. DA Tab A at 9

(citing *Continental Sec.*, 188 B.R. at 216-17 (denying motion for stay pending appeal and finding

oversecured creditor not entitled to prepayment penalty under § 506(b) where there was no

prepayment penalty in the contract)); *see also Continental Sec.*, 193 B.R. at 777 (affirming the

bankruptcy court on the merits, and affirming reasoning that section 506(b) requires the

prepayment penalty to be expressly in the underlying agreement to be part of an allowable secured claim); *In re Vest Assocs.*, 217 B.R. at 699-700 (courts cannot "read into a contract damage provisions which the parties themselves had failed to insert regarding the liquidation or calculation of damages arising out of the prepayment of a loan"); *see also, In re Family Showtime Theatres, Inc.*, 67 B.R. 542 (Bankr. E.D.N.Y. 1986) (holding under New York law (the law governing the CalGen Secured Debt Agreements) that a court is bound to enforce explicit remedies contained in a contract and cannot create additional remedies not provided for therein).

In *Family Showtime Theatres*, a party to a commercial lease breached its covenants, which triggered an "Event of Default" under the lease. *Id.* at 550. Following failure to cure, per the agreement, the landlord exercised its right to terminate the lease. *Id.* Notice of termination was sent before the lessee filed for chapter 11. *Id.* Despite the law's "abhorrence of the forfeiture of a lease," the court enforced the plain language of the agreement. *Id.* (citations omitted). The court held:

> [I]n commercial fairness the parties, especially if represented by counsel, should be held to their bargain, if plainly expressed. Both law and equity may indeed abhor forfeiture, but neither requires or even permits an adjudicating court to re-draft a contract, particularly one that resulted from an arms length transaction.

*Id.* (citations omitted).

Likewise, the bankruptcy court in *In re O.P.M. Leasing Services, Inc.* enforced a "hell or high water" clause in a computer lease which required the non-debtor lessee to make all payments unconditionally, despite the debtor's default in complying with the terms of maintenance agreements. 21 B.R. 993, 1006 (S.D.N.Y. 1982). The bankruptcy court said that the parties to the agreement were "well aware of this unconditional right to payment of rentals" when they executed the relevant documents. *Id.* The court also emphasized that it was not permitted to disregard contract provisions, holding that "[t]o deny this clause its full force and

effect would effectively reconstruct the contract contrary to the intent of the parties, which reconstruction would be impermissible." *Id.*

The same principle applies here. The CalGen Secured Lenders entered into the CalGen Secured Debt Agreements represented by sophisticated counsel. They had a meeting of the minds with the Debtors that an Event of Default would accelerate the debt and render it due and payable, with the effect that prepayment penalties would no longer be relevant. As in *Family Showtime Theatres* and *OPM Leasing*, the Court here must uphold the terms agreed to by the parties. To do otherwise would be an impermissible exercise in re-imagining the intent of the Debtors and the CalGen Secured Lenders.

## III.    THE BANKRUPTCY COURT DID NOT DENY THE CALGEN SECURED LENDERS ANY OF THEIR PROCEDURAL OR DUE PROCESS RIGHTS

The CalGen Secured Lenders make a series of short arguments regarding the Bankruptcy Court's decision and Orders, in which they complain of various purported denials of procedural or due process rights. These arguments are all without merit and can dispensed with quickly.

### A.    Determining Claims Outside Plan of Reorganization

The CalGen Secured Lenders argue that it was error for the Bankruptcy Court to determine their claims outside a plan of reorganization. *See* First Priority Appellants' Brief at 31-35; Third Priority Appellants' Brief at 43-45. This argument is specious. The Bankruptcy Code explicitly sets forth the claims adjudication process in section 502: Claims are deemed allowed unless a party objects, as the Debtors did here. *See* 11 U.S.C. § 502(a). Then, "if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that" any of nine enumerated exceptions applies. 11 U.S.C. § 502(b). There is no requirement that a claim be determined in a

plan of reorganization. Indeed, a plan sets forth how allowed claims will be treated; any provisions contained in a plan detailing how claims are to be reconciled relate only to those claims that were not already determined during the pendency of the case.

Appellants' argument that the Order impermissibly evades the Bankruptcy Code's plan confirmation process is wholly unsupported by law, and the cases they cite for support are completely inapposite. Unlike the case at bar, *In re Westpoint Stevens* involved an attempt by a debtor to sell "substantially all of [its] assets" outside of a bankruptcy plan. 333 B.R. 30, 33 (S.D.N.Y. 2005). In *In re Continental Air Lines*, the court merely remanded the case for the district court to consider for the first time whether a creditor would be denied adequate protection if a lease were approved under Bankruptcy Code section 363. 780 F.2d 1223, 1228 (5th Cir. 1986). In doing so, the court noted that while a debtor may not reorganize its estate "in some fundamental fashion" outside the plan process, "we fully appreciate that post-petition, pre-confirmation transactions outside the ordinary course of business may be required." *Id.* at 1227-28. In addition, *In re Premier Entertainment Biloxi* involved a refinancing in which "Debtors openly concede that their Plan would 'impair' Noteholders' claims if it were to do the same things that Debtors are asking for in the DIP Financing Motion." *In re Premier Entm't Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) and Premier Finance Biloxi Corp.*, Case No. 06-50975 (Bankr. S.D. Miss. Feb. 2, 2007) at 6. With respect to the CalGen Secured Lenders, there has been no such concession.

Nevertheless, the Appellants would not be in any better position if the CalGen Secured Debt were to be paid through the plan confirmation process. Indeed, the terms of the CalGen Secured Debt Agreements and the law remain the same: (1) the CalGen Secured Lenders would have been paid the full amount of their principal and accrued interest under the terms of any

plan; and (2) in the unlikely event this Court were to uphold the Bankruptcy Court's damages award, the claims on account of such damages will be treated under the plan. Indeed, under the terms of the Debtors' proposed plan of reorganization filed with the Bankruptcy Court on June 20, 2007 (of which this Court may take judicial notice), Appellants are deemed paid in full on account of their secured claims and will be entitled to vote on their unsecured damages claim to the extent this Court does not overturn the Bankruptcy Court's decision and deny such damages.

Moreover, it must be noted that the CalGen Secured Lenders fully participated in every aspect of the determination of their secured claims. The Debtors made a motion, on notice to all affected parties, to obtain the Replacement DIP Financing and objected to the Appellants' claims. All three tranches of the CalGen Secured Lenders formally responded. They filed briefs, they submitted affidavits, they put on testimony and they argued at length in a full-day evidentiary hearing before the Bankruptcy Court. The CalGen Secured Lenders received and enjoyed every aspect of their due process.

**B.    Stopping Payment of Professional Fees**

The CalGen Secured Lenders similarly complain that the Bankruptcy Court has terminated the Debtors' obligations to pay the fees and expenses incurred by the CalGen Secured Lenders' legal and financial advisors. Here, the CalGen Secured Lenders exaggerate the extent of the ruling and the implications of the ruling upon them.

First, the CalGen Secured Lenders imply that all professional fees have been cut off, and they argue that because the default interest issue was expressly reserved, their work is not yet done. *See* Second Priority Appellants' Brief at 38-41; Third Priority Appellants' Brief at 39-43. The CalGen Secured Lenders conveniently fail to point out that the Repayment Order expressly carves out a procedure by which they may obtain payment of their attorneys' fees on the default interest issue. The Repayment Order states:

> [T]he Debtors are authorized to discontinue all payments to the
> CalGen Lenders' professionals under the Cash Collateral Order as
> of the date the Repayment Amounts are paid; provided, however,
> that any reasonable professionals' fees incurred with respect to the
> litigation of default interest (before the Bankruptcy Court only)
> will be paid pursuant to the Cash Collateral Order.

DA Tab E at Exh. B (emphasis in original).

Second, with the exception made for the default interest issue, there is nothing further for the CalGen Secured Lenders to do. The Bankruptcy Court has determined their claims. Thus, it is entirely appropriate for the Bankruptcy Court to have stopped the Debtors' obligations to pay four sets of counsel and financial advisors who continue to work for the sole purposes of litigating with the Debtors.

Third, the CalGen Secured Lenders also conveniently fail to remind this Court that they always retain the right to petition the Bankruptcy Court for further fees if they make a "substantial contribution" to the case. Bankruptcy Code sections 503(b)(3), (4) and (5) all explicitly set forth provisions for allowance of administrative expenses for attorneys, accountants, indenture trustees, and other necessary expenses "in making a substantial contribution in a case under chapter . . . 11 of this title . . . ." 11 U.S.C. §§ 503(b)(3),(4),(5). With these protections in place, the CalGen Secured Lenders cannot seriously argue that they have been denied due process.

### C.    Expunging Claims Against CalGen Guarantors

The CalGen Secured Lenders complain that the Bankruptcy Court should not have expunged their claims against the CalGen Guarantors, and that the Bankruptcy Court should have conducted a separate analysis with respect to each CalGen Guarantor. *See* First Priority Appellants' Brief at 29-31; Second Priority Appellants' Brief at 41-42; Third Priority Appellants' Brief at 42-43.

The CalGen Secured Lenders can point to no provision in the CalGen Secured Debt Agreements, or to any legal authority, that would support why the analysis with respect to the applicability of no-call provisions and the impact of acceleration clauses would be any different for the CalGen Guarantors, each of which is also a chapter 11 debtor. The Bankruptcy Court's analysis of the CalGen Secured Debt Agreements and the applicable caselaw would have been identical.

Furthermore, since the CalGen Secured Lenders have already been paid their principal and accrued interest in full, and since a mechanism is in place with respect to the remaining default interest issue, the claims against the CalGen Guarantors are superfluous.

Finally, the CalGen Secured Lenders are now complaining about language specifically contained in the Debtors' proposed form of order submitted with their motion to approve the Replacement Dip. DA Tab E at Exh. B. The CalGen Secured Lenders objected to expunging the claims against the CalGen Guarantors, and it is implicit in the Bankruptcy Court's approval of the order that the CalGen Secured Lenders' objections were overruled. Yet, overruling these objections certainly is not tantamount to a denial of due process. Accordingly, the CalGen Secured Lenders' appeal of this point on due process grounds is unfounded.

### D. Granting Replacement DIP Liens Senior to the CalGen Secured Lenders' Liens

The CalGen Secured Lenders assert that the implementing Orders provided that the liens securing the Replacement DIP are senior to the CalGen Secured Lenders' liens and, thus, that the Bankruptcy Court improperly diminished the value of the CalGen Secured Lenders' liens. *See* Collateral Agent Appellant's Brief at 26. Here again the CalGen Secured Lenders exaggerate the Bankruptcy Court's Orders. The Financing Order expressly provides that the Replacement DIP

liens are junior to the liens of the CalGen Secured Lenders for Disputed CalGen Claims. The Order provides:

> (e)    Liens Securing the CalGen Secured Debt.  Upon entry of this Order and the repayment of the CalGen Secured Debt, the DIP Obligations shall be secured by valid, binding, continuing, enforceable, fully perfected first priority senior security interests in, and liens on, all pre-petition and post-petition property of CalGen Holdings, Inc. and its subsidiaries, whether such property existed as of the Petition Date or was acquired thereafter, that secured the CalGen Secured Debt; provided that **until the date of entry of a Final Order with respect to the Disputed CalGen Claims** (as defined below) **the liens granted to the Collateral Agent** hereunder (for the benefit of itself, the Agent and the DIP Lenders) on such property **shall rank junior to the liens related to the CalGen Secured Debt that secure any alleged (i) CalGen Makewhole Payment, (ii) entitlement to interest (whether default or otherwise) sought by or on account of CalGen Secured Debt, (iii) claims for fees and expenses that may ultimately be allowed, and (iv) any and all claims, including without limitation, contract damage claims** (collectively, (i) through (iv) are the "Disputed CalGen Claims").

DA Tab E at Exh. A (emphasis added).

Thus, the CalGen Secured Lenders remain well-protected with respect to the Disputed CalGen Claims, and so their purported denial of due process is non-existent.

## IV.    THE BANKRUPTCY COURT PROPERLY REJECTED THE DAMAGES CALCULATIONS OFFERED BY THE CALGEN SECURED LENDERS

The CalGen Secured Lenders argue that the Bankruptcy Court improperly refused to adopt the calculation of damages that they offered.  Second Priority Appellants' Brief at 23-30; Third Priority Appellants' Brief at 26-36.  The Third Priority Appellants in particular set up a "straw man" by characterizing the Bankruptcy Court as having decided that the CalGen Secured Lenders' damages claims were "not measurable."  Third Priority Appellants brief at 30 *et seq*. This is an unfair mischaracterization.  In fact, the Bankruptcy Court wrote that "[t]he CalGen Secured Lenders' expectation of an uninterrupted payment stream has been dashed giving rise to damages, albeit *not measurable as the Lenders would wish*."  DA Tab A at 10 (emphasis added). Thus, the Bankruptcy Court did not hold that it made its damages award in the quantum that it

did because the damages claim was "not measurable". It appears that the Bankruptcy Court considered the CalGen Secured Lenders' damages calculations and merely declined to follow them, in the exercise of its discretion.

Of course, the Creditors' Committee contends that the Bankruptcy Court's damages award should have been zero, because the Bankruptcy Court had already correctly determined that the "no call" provisions in the CalGen Secured Debt Agreements were unenforceable, that payment following acceleration was payment after maturity and not prepayment, and that these agreements did not provide for any premium for payment after maturity. If for any reason this Court determines to reverse the Bankruptcy Court's damages finding and holds that damages should be something other than zero, the Creditors' Committee contends that the Court should remand the issue for further proceedings.

## CONCLUSION

For the foregoing reasons, the Creditors' Committee respectfully submits that the appellate arguments of the CalGen Secured Lenders should be rejected and the decisions of the Bankruptcy Court should be affirmed to the extent that the Bankruptcy Court held that the no-call provisions of the CalGen Secured Debt Agreements are unenforceable, and that payment on a debt following acceleration due to a bankruptcy filing did not require payment of any prepayment premium. The damages award of the Bankruptcy Court should be reversed and an

award of zero damages should be entered.  In all other respects, the decision of the Bankruptcy Court should be affirmed.

Dated:  July 9, 2007
New York, New York

Respectfully submitted,

/s/ Robert A. Johnson
Robert A. Johnson (RJ 6553)
Michael S. Stamer (MS 4900)
Fred S. Hodara (FH 7947)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York  10022-2524
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

Counsel to the Official Committee of Unsecured Creditors of Calpine Corporation, *et al.*