Appellants Brief Appendix Part 3

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (THE "BANKRUPTCY CODE"). ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THE "PLAN") MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK HAVING JURISDICTION OVER THE BELOW-CAPTIONED CHAPTER 11 CASES. THE DISCLOSURE STATEMENT CONTAINS MATERIAL NON-PUBLIC INFORMATION ABOUT A PUBLIC COMPANY AND, THEREFORE, IS SUBJECT TO ALL APPLICABLE FEDERAL AND STATE SECURITIES LAWS.

THE DISCLOSURE STATEMENT IS PROVIDED IN CONFIDENCE AND MAY BE DISTRIBUTED ONLY WITH THE EXPRESS WRITTEN CONSENT OF THE BELOW-REFERENCED CHAPTER 11 DEBTORS. THE DISCLOSURE STATEMENT IS PROVIDED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THE DISCLOSURE STATEMENT IS ENTITLED TO THE PROTECTIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS. NOTHING IN THE DISCLOSURE STATEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON THE DEBTORS.

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward Sassower (ES 5823)
James J. Mazza, Jr. (admitted pro hac vice)
Alexandra S. Kelly (AK 2021)

Counsel for the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Calpine Corporation, et al., | ) Case No. 05-60200 (BRL) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |

**DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

- Record Date: [_____], 2007
- Voting Deadline: [_____], 2007 at [____] p.m. prevailing Eastern time
- Date by which objections to Confirmation of the Plan must be filed and served: [_____], 2007 at [____] p.m. prevailing Eastern time
- Hearing on Confirmation of the Plan: [_____], 2007 at [____] a.m. prevailing Eastern time

JA 1465

## TABLE OF CONTENTS

Page

**ARTICLE I. SUMMARY** ............................................................................................................ 1
   A.     Rules of Interpretation ................................................................................. 1
   B.     The Purpose of the Plan ............................................................................... 2
   C.     Treatment of Claims and Interests ............................................................... 3
   D.     Substantive Consolidation .......................................................................... 6
   E.     Claims Estimates ........................................................................................ 6
   F.     Reorganized Debtors and the Post-Confirmation Estate ............................ 7
   G.     Restructuring Transactions Contemplated by the Plan ................................ 8
   H.     Permanent Injunction .................................................................................. 8
   I.     Consummation ............................................................................................ 8
   J.     Liquidation and Valuation Analyses............................................................ 9
   K.     Certain Factors to Be Considered Prior to Voting ...................................... 9
   L.     Voting and Confirmation ........................................................................... 10

**ARTICLE II. GENERAL INFORMATION**............................................................................ 12
   A.     Description of Calpine's Business and Assets ............................................ 13
   B.     The Debtors' Prepetition Capital Structure................................................. 41
   C.     Management of the Debtors ....................................................................... 50

**ARTICLE III. THE CHAPTER 11 CASES**............................................................................ 52
   A.     Events Leading to the Chapter 11 Cases and Related Postpetition Events........ 52
   B.     Stabilization of Operations ........................................................................ 53
   C.     Appointment of the Committees ................................................................ 60
   D.     Debtors' Restructuring Initiatives............................................................... 61

**ARTICLE IV. SUMMARY OF THE PLAN OF REORGANIZATION**................................ 91
   A.     Overview of Chapter 11 ............................................................................ 92
   B.     Overall Structure of the Plan..................................................................... 93
   C.     Substantive Consolidation ......................................................................... 93
   D.     Assumptions Regarding Claims Estimates ................................................ 94
   E.     DIP Facility, Administrative and Priority Tax Claims Against All of the Debtors ......... 95
   F.     Classification and Treatment of Claims and Interests Against the Debtors...................... 95
   G.     Implementation of the Plan...................................................................... 106
   H.     Treatment Of Executory Contracts And Unexpired Leases..................... 118
   I.     Procedures for Treatment of Disputed, Contingent, and Unliquidated Claims
        Pursuant to the Plan ................................................................................ 122
   J.     Provisions Governing Distributions.......................................................... 124
   K.     Effect of Confirmation of the Plan........................................................... 131
   L.     Allowance and Payment of Certain Administrative Claims ..................... 135
   M.     Conditions Precedent to Confirmation and Consummation ..................... 137
   N.     Modification, Revocation Or Withdrawal Of The Plan ........................... 138
   O.     Retention Of Jurisdiction ......................................................................... 139
   P.     Miscellaneous Provisions ......................................................................... 141

JA 1466

**ARTICLE V. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ......... 145**
   A.    The Confirmation Hearing.............................................................................. 145
   B.    Confirmation Standards ................................................................................ 146
   C.    Best Interests of Creditors Test/Liquidation Analysis and Valuation Analysis............. 147
   D.    Financial Feasibility ..................................................................................... 153
   E.    Acceptance By Impaired Classes................................................................... 155
   F.    Confirmation Without Acceptance By All Impaired Classes .......................... 156

**ARTICLE VI. CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING ................... 157**
   A.    Certain Bankruptcy Considerations .............................................................. 157
   B.    Factors Affecting the Value of the Securities to be Issued Under the Plan .................. 159
   C.    Risks Related to the Reorganized Debtors' Business and Financial Condition.............. 161

**ARTICLE VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES..................................172**
   A.    Certain U.S. Federal Income Tax Consequences to the Holders of Allowed
        Claims and Interests..................................................................................... 173
   B.    Certain U.S. Federal Income Tax Consequences to Reorganized Debtors.................... 178

**ARTICLE VIII. VOTING PROCEDURES .......................................................................... 180**
   A.    Confirmation Generally ................................................................................ 181
   B.    Who Can Vote .............................................................................................. 181
   C.    Classes Impaired Under the Plan ................................................................... 182
   D.    Contents of Solicitation Package ................................................................... 183
   E.    Distribution of Solicitation Package .............................................................. 184
   F.    Temporary Allowance of Disputed Claims for Voting Purposes ................... 184
   G.    Voting .......................................................................................................... 184
   H.    Releases Under the Plan ................................................................................ 185

**ARTICLE IX. PLAN SUPPLEMENT.................................................................................. 186**

**ARTICLE X. RECOMMENDATION.................................................................................... 187**

JA 1467

Calpine Corporation and the other debtors in the above-captioned chapter 11 cases (collectively, the "Debtors") submit the following disclosure statement (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") for purposes of soliciting votes to accept or reject the Debtors' joint plan of reorganization (the "Plan"), a copy of which is attached to the Disclosure Statement as Exhibit A. Capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in Article I.A. of the Plan. The Disclosure Statement describes certain aspects of the Plan, including the treatment of Holders of Claims and Interests, and also describes certain aspects of the Debtors' operations, financial projections, and other related matters. On and after the Effective Date, the Debtors shall be referred to collectively as the "Reorganized Debtors" and each individually as a "Reorganized Debtor."

\* \* \* \* \*

THE DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THE DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THE DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THE DISCLOSURE STATEMENT SINCE THE DATE OF THE DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO ONE IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT,

THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE SECURITIES DESCRIBED IN THE DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, AS AMENDED, OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW, GENERALLY IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.

THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.

ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THE DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE.

THE PROJECTIONS PROVIDED IN THE DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH ITS ADVISORS. THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT AND THEIR ADVISORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THESE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

PLEASE REFER TO ARTICLE VI OF THE DISCLOSURE STATEMENT, ENTITLED "CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM OR INTEREST TO ACCEPT THE PLAN.

THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON [_____], 2007, AT [__] A.M. PREVAILING EASTERN TIME BEFORE THE HONORABLE BURTON R. LIFLAND, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, LOCATED AT THE ALEXANDER HAMILTON CUSTOM HOUSE, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004-1408. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT OF THE CONFIRMATION HEARING.

TO BE COUNTED, THE BALLOT (OR MASTER BALLOT OF A NOMINEE'S HOLDER, AS APPLICABLE) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS, LLC, THE DEBTORS' CLAIMS AND SOLICITATION AGENT ("KCC"), OR FINANCIAL BALLOTING GROUP, LLC, THE DEBTORS' SPECIAL VOTING AGENT ("FBG"), AS APPLICABLE, NO LATER THAN [____] P.M. PREVAILING PACIFIC TIME, ON [_____], 2007. SUCH BALLOTS (OR MASTER BALLOTS, AS APPLICABLE) SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE VIII OF THE DISCLOSURE STATEMENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED.

OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [_____], 2007, IN ACCORDANCE WITH THE SOLICITATION NOTICE AND SOLICITATION PROCEDURES ORDER, WHICH IS DESCRIBED IN FURTHER DETAIL IN ARTICLE VIII OF THE DISCLOSURE STATEMENT. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES AND SOLICITATION PROCEDURES ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## ARTICLE I.
## SUMMARY

The following summary of the Disclosure Statement is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in the Disclosure Statement.

Calpine Corporation (together with its direct and indirect subsidiaries and affiliates, but excluding the Canadian Debtors, "Calpine") is involved in the ownership, operation, development, and construction of power generation facilities and the sale of electricity and its by-product, thermal energy, primarily in the form of steam. Calpine operates one of the largest fleets of natural gas-fired power plants in North America and has ownership interests in, and operates, gas-fired power generation and cogeneration facilities, geothermal steam fields, and geothermal power generation facilities. Calpine also has interests in three power plants under active construction or advanced development. Calpine markets electricity produced by its generating facilities to utilities and other third-party purchasers, while thermal energy produced by its gas-fired power cogeneration facilities is sold primarily to industrial users. Calpine also offers energy procurement, liquidation and risk management services, and repair and maintenance services to third parties.

Beginning on December 20, 2005, Calpine Corporation and 273 other direct and indirect wholly owned subsidiaries Filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

A.    Rules of Interpretation

The following rules for interpretation and construction shall apply to the Disclosure Statement: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in the Disclosure Statement to Articles are references to Articles of the Disclosure Statement or to the Disclosure Statement; (6) unless otherwise specified, all references in the Disclosure Statement to exhibits are references to exhibits in the Plan Supplement; (7) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (h) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (8) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form in the Disclosure Statement that is nor otherwise defined in the Disclosure Statement or Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (10) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (11) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (12) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead

occur on the next succeeding Business Day; (13) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America; and (14) unless otherwise specified, references in the Disclosure Statement to the Debtors or to the Reorganized Debtors shall mean the Debtors and Reorganized Debtors, as applicable, to the extent the context requires.

B.      The Purpose of the Plan

After careful review of their current business operations and various liquidation and recovery scenarios, the Debtors have concluded that the recovery for Holders of Allowed Claims and Interests will be maximized by the Debtors' continued operation as a going concern pursuant to the restructuring described in the Plan. The Debtors believe that their business and assets have significant value that would not be realized in a liquidation scenario, either in whole or in substantial part.

In general, under the Plan, the New Calpine Common Stock to be issued pursuant to the Plan, after accounting for stock reserved for the Management Equity Incentive Plan and Director Equity Incentive Plan, will be distributed on a pro rata basis to Holders of Allowed Unsecured Claims until such Claims have been paid in full in accordance with the terms of the Plan. In general, the New Calpine Common Stock, if any, remaining after all Holders of Allowed Claims have been paid in full will be distributed on a pro rata basis to Holders of Allowed Interests. Distributions of the New Calpine Common Stock will be made through the distribution provisions in the Plan, as described in greater detail below.

The Debtors believe that the Plan provides the best recoveries possible for Holders of Allowed Claims and Interests and strongly recommend that, if such Holders are entitled to vote, they vote to accept the Plan. As discussed in further detail in the Disclosure Statement, the Debtors believe that any alternative to Confirmation, such as liquidation or attempts by another Entity to File a plan of reorganization, could result in significant delays, litigation, and additional costs.

Several documents that are included in the Plan Supplement are described in the Disclosure Statement, but these summaries are not a substitute for a complete understanding of the underlying documents. Please review the full text of all such documents in the Plan Supplement.

2

JA 1472

C.     Treatment of Claims and Interests

    1.     Classification

The Plan divides all Claims, except DIP Facility Claims, Administrative Claims, and Priority Tax Claims, and all Interests into various Classes. Listed below is a summary of the Classes of Claims and Interests under the Plan.

| Class | Claim or Interest Type |
|-------|------------------------|
| A-1 | First Lien Debt Claims |
| A-2 | Second Lien Debt Claims |
| A-3 | Other Secured Claims |
| B | Other Priority Claims |
| C-1 | Senior Note Claims |
| C-2 | General Note Claims |
| C-3 | Subordinated Note Claims |
| C-4 | ULCI Settlement Claims |
| C-5 | Canadian Guarantee Claims |
| C-6 | Canadian Intercompany Claims |
| C-7 | Rejection Damages Claims |
| C-8 | General Unsecured Claims |
| C-9 | Unsecured Makewhole Claims |
| C-10 | Unsecured Convenience Class Claims |
| C-11 | Intercompany Claims |
| D | Subordinated Debt Securities Claims |
| E-1 | Interests |
| E-2 | Subordinated Equity Securities Claims |
| E-3 | Intercompany Interests |

The following tables summarize the Classes of Claims and Interests under the Plan, the treatment of such Classes, the voting rights of such Classes, and the projected recovery under the Plan, if any, for such Classes. To the extent of any inconsistency between the summary below and the more detailed summary in Article IV, the more detailed summary shall govern; to the extent of any inconsistency between the summaries contained in the Disclosure Statement and that set forth in the Plan, the Plan shall govern. The projected recoveries are based upon certain assumptions contained in the valuation analysis prepared by the Debtors and their advisors, as described in further detail in Article V. As more fully described in the Disclosure Statement, the Debtors' assumed reorganization value of the New Calpine Common Stock was derived from commonly accepted valuation techniques and is not an estimate of the trading value for such securities. The ranges of recoveries listed below are based on various assumptions, including assumptions regarding the total amount of Allowed Unsecured Claims and assumptions concerning the New Calpine Total Enterprise Value.

Notwithstanding the ranges of Claims estimates set forth below, and based on an individualized assessment of each material Disputed Claim, the Debtors believe that the litigation-risk adjusted outcome under the Plan is that Allowed Unsecured Claims (other than Allowed Subordinated Debt Securities Claims and Allowed Subordinated Equity Securities Claims) will receive New Calpine Common Stock sufficient to be satisfied in full and that Holders of Allowed Interests will receive New Calpine Common Stock valued at approximately $835 million, or $1.80 per share of Old Calpine Common Stock. Because Disputed Claims have not yet been finally adjudicated, no assurances can be given that actual recoveries of Holders of Allowed Claims and Interests will not be materially higher or lower. The Creditors' Committee believes that the Debtors' assumed New Calpine Total Enterprise Value may be greater than the actual enterprise value of the Reorganized Debtors as may be determined by the Bankruptcy Court

3

and believes that the Debtors' Claims estimates may be lower than the actual amount of Allowed Claims upon completion of the Claims reconciliation process, each of which may have a material impact on the recoveries to Holders of Allowed Claims and Interests. The Equity Committee believes that the Debtors' assumed New Calpine Total Enterprise Value may be lower than the actual enterprise value of the Reorganized Debtors as may be determined by the Bankruptcy Court, and that this may have a material impact on the recoveries to Holders of Allowed Claims and Interests.

2.    Unclassified Claims

| Claim | Plan Treatment | Estimated Range of Claims | Projected Recovery Under the Plan |
|---|---|---|---|
| DIP Facility Claims | Paid in full in Cash. | $4.00 billion | 100.0% |
| Administrative Claims | Paid in full in Cash. | $1.49 million (does not include Professionals' Claims) | 100.0% |
| Priority Tax Claims | Paid in full in Cash. | $73.19 million - $83.89 million | 100.0% |

3.    Summary of Classification, Treatment and Voting Rights of Claims and Interests

The classification, treatment, and voting rights of Claims and Interests are described in summary form below for illustrative purposes only, and are subject to the more detailed and complete descriptions contained in Article IV of the Disclosure Statement.

| Classes | Claim | Plan Treatment of Class | Estimated Range of Claims | Projected Recovery Under the Plan | Status | Voting Rights |
|---|---|---|---|---|---|---|
| 1A-1 through 273A-1 | First Lien Debt Claims | Paid in full in Cash. | $0 - $124.80 million | 100.0% | Unimpaired | Deemed to Accept |
| 1A-2 through 273A-2 | Second Lien Debt Claims | Paid in full in Cash. | $3.77 billion - $4.42 billion | 100.0% | Unimpaired | Deemed to Accept |
| 1A-3 through 273A-3 | Other Secured Claims | Reinstated; paid in full in Cash; or satisfied in full by a return of the collateral. | $153.32 million - $600.60 million | 100.0% | Unimpaired | Deemed to Accept |
| 1B through 273B | Other Priority Claims | Paid in full in Cash. | $2.07 million | 100.0% | Unimpaired | Deemed to Accept |
| 1C-1 | Senior Note Claims | Pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full. | $809.10 million- $950.75 million | 100.0% | Impaired | Entitled to Vote |

4

| Classes | Claim | Plan Treatment of Class | Estimated Range of Claims | Projected Recovery Under the Plan | Status | Voting Rights |
|---|---|---|---|---|---|---|
| 1C-2 | General Note Claims | Pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full. | $2.42 billion-$2.68 billion | 91% - 100.0% | Impaired | Entitled to Vote |
| 1C-3 | Subordinated Note Claims | Pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full. | $652.80 million - $761.75 million | 80% - 100.0% | Impaired | Entitled to Vote |
| 1C-4 | ULC1 Settlement Claims | Pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full. | $3.65 billion | 100.0% | Impaired | Entitled to Vote |
| 1C-5 and 248C-5 | Canadian Guarantee Claims | Pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full. | $0 - $741.04 million | 91% - 100.0% | Impaired | Entitled to Vote |
| 1C-6 through 273C-6 | Canadian Intercompany Claims | Pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full. | $335.04 million | 100.0% | Impaired | Entitled to Vote |
| 1C-7 through 273C-7 | Rejection Damages Claims | Pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full. | $707.84 million - $1.42 billion | 91% - 100.0% | Impaired | Entitled to Vote |
| 1C-8 through 273C-8 | General Unsecured Claims | Pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full. | $160.45 million - $257.10 million | 91% -100.0% | Impaired | Entitled to Vote |
| 1C-9 through 273C-9 | Unsecured Makewhole Claims | Pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full. | $0 - $981.08 million | 91% - 100.0% | Impaired | Entitled to Vote |
| 1C-10 through 273C-10 | Unsecured Convenience Class Claims | Paid in full (without postpetition interest) in Cash. | $22.35 million | 100.0% | Impaired | Entitled to Vote |
| 1C-11 through 273C-11 | Intercompany Claims | Reinstated or receive no distribution. | N/A | 100.0% | Unimpaired | Deemed to Accept |

5

| Classes | Claim | Plan Treatment of Class | Estimated Range of Claims | Projected Recovery Under the Plan | Status | Voting Rights |
|---|---|---|---|---|---|---|
| 1D through 273D | Subordinated Debt Securities Claims | Pro rata distribution of the New Calpine Common Stock Pool For Subordinated Debt Securities Claimants until paid in full. | $0 | N/A | Impaired | Entitled to Vote |
| 1E-1 through 273E-1 | Interests | Pro rata share of the New Calpine Common Stock Pool For Shareholders until paid in full. | N/A | $0.00 - $3.53 per share | Impaired | Entitled to Vote |
| 1E-2 through 273E-2 | Subordinated Equity Securities Claims | Pro rata share of the New Calpine Common Stock Pool For Shareholders until paid in full. | $0 | N/A | Impaired | Entitled to Vote |
| 1E-3 through 273E-3 | Intercompany Interests | Reinstated. | N/A | 100.0% | Unimpaired | Deemed to Accept |

D.      Substantive Consolidation

        The Plan provides for the substantive consolidation of the Estates into a single Estate for all purposes associated with Confirmation and Consummation. If the Bankruptcy Court authorizes the Debtors to substantively consolidate the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate identification of the Debtors.

        If the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Estates, the Debtors may, in accordance with the Plan, proceed with separate Plans for any such non-consolidated Debtor, and each Class of Claims and Interests shall be treated as against each individual non-consolidated Debtor for voting and distribution purposes. The number following each Debtor in Article I.A of the Plan has been assigned to such Debtor for purposes of identifying each separate Plan to the extent the Bankruptcy Court does not authorize the Debtors to substantively consolidate any or all of the Estates.

E.      Claims Estimates

        As of June 13, 2007, KCC had received approximately 18,089 Proofs of Claim. As of June 13, 2007, the total amounts of Claims remaining on the Claims Register against one or more of the Debtors were as follows: 1431 Secured Claims in the total amount of $51.5 billion; 79 Administrative Claims in the total amount of $13.2 million; 156 Priority Tax Claims in the total amount of $370.5 million; 6,672 Other Priority Claims in the total amount of $1.1 billion; and 12,570 Unsecured Claims in the total amount of $25.3 billion. The Debtors believe that many of the Filed Proofs of Claim are invalid, untimely, duplicative, or overstated, and, therefore, the Debtors are in the process of objecting to such Claims.

6

The Debtors estimate that at the conclusion of the Claims objection, reconciliation and resolution process, Allowed Secured Claims will range from approximately $7.9 - $9.1 billion, Allowed Priority Tax Claims will range from approximately $73.2 - $83.9 million, Allowed Other Priority Claims will be approximately $2.1 million, and Allowed Unsecured Claims will range from approximately $8.0 - $8.9 billion. These estimates are based upon a number of assumptions, including applicable interest rates, and there is no guarantee that the ultimate total amount of Allowed Claims in each category will conform to the Debtors' estimates. The assumptions regarding Claims estimates are described in further detail in Article IV.D.

The Debtors estimate that at the conclusion of the Claims objection, reconciliation, and resolution process, estimated Allowed Administrative Claims will be approximately $1.5 million. The estimate of Allowed Administrative Claims includes obligations to pay Cure, Claims arising from a right of reclamation, and certain Administrative Claim requests reflected on the Claims Register and docket for which the Debtors reasonably expect there to be a recovery. The estimate of Allowed Administrative Claims does not include ordinary course obligations incurred post-petition such as trade payables, the Debtors' employee bonuses, or Professional Claims.

The Creditors' Committee believes that the Debtors' assumed New Calpine Total Enterprise Value may be greater than the actual enterprise value of the Reorganized Debtors as may be determined by the Bankruptcy Court and believes that the Debtors' Claims estimates may be lower than the actual amount of Allowed Claims upon completion of the Claims reconciliation process, each of which may have a material impact on the recoveries to Holders of Allowed Claims and Interests. The Equity Committee believes that the Debtors' assumed New Calpine Total Enterprise Value may be lower than the actual enterprise value of the Reorganized Debtors as may be determined by the Bankruptcy Court, and that this may have a material impact on the recoveries to Holders of Allowed Claims and Interests.

F.    Reorganized Debtors and the Post-Confirmation Estate

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the New Credit Facility and Claims pursuant to the DIP Facility that by their terms survive termination of the DIP Facility). On and after the Effective Date, and unless otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

7

G.    Restructuring Transactions Contemplated by the Plan

On the Effective Date, the Reorganized Debtors will enter into the New Credit Facility as described in the Disclosure Statement and the Plan. The Reorganized Debtors may use the proceeds of this transaction to, among other things, satisfy the outstanding Second Lien Debt Claims and to effectuate their business plan.

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; (4) the Roll-Up Transactions; and (5) all other actions that the Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Roll-Up Transactions. The form of each Roll-Up Transaction shall be determined by the Reorganized Debtor that is party to such Roll-Up Transaction. Implementation of the Roll-Up Transactions shall not affect any distributions, discharges, exculpations, releases, or injunctions set forth in the Plan.

H.    Permanent Injunction

**Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, from and after the Effective Date, all Entities who have held, hold, or may hold Claims against the Released Parties and Exculpated Parties, and all Entities holding Interests, are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against those such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

I.    Consummation

Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is a Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect, and all conditions to Consummation have been satisfied or waived. Unless otherwise provided in the Plan, distributions to Holders of Claims Allowed as of the Effective

8

Date will be made on the Distribution Date, in accordance with the Plan. All other distributions under the Plan will be made in accordance with the distribution provisions contained in the Plan.

J.    Liquidation and Valuation Analyses

The Debtors believe that the Plan will produce a greater recovery for Holders of Allowed Claims and Interests than would be achieved in a liquidation pursuant to chapter 7 of the Bankruptcy Code because of, among other things, the additional Administrative Claims generated by conversion to a chapter 7 case, the administrative costs of liquidation and associated delays in connection with a chapter 7 liquidation, and the negative impact on the market for the Debtors' assets of attempting to sell a large number of power generating assets and contracts in a short time frame, each of which likely would diminish the value of the Debtors' assets available for distributions.

The Debtors have prepared a liquidation analysis (the "Liquidation Analysis") and a valuation analysis (the "Valuation Analysis") to assist Holders of Claims and Interests in determining whether to accept or reject the Plan. The Liquidation Analysis and Valuation Analysis compare the proceeds to be realized if the Debtors were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code with the distributions to Holders of Allowed Claims and Interests under the Plan. The analyses are based upon the value of the Debtors' assets and liabilities as of a certain date, and incorporate various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Each analysis is subject to potentially material changes including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided in the Liquidation Analysis, and the actual total enterprise value and reorganization equity value of the Reorganized Debtors could vary materially from the estimates contained in the Valuation Analysis.

K.    Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims and Interests entitled to vote on the Plan should consider prior to accepting or rejecting the Plan. Some of these factors, which are described in more detail in Article VI, are as follows and may impact recoveries under the Plan:

1.    Unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and Disclosure Statement.

2.    Article VII describes certain significant federal tax consequences of the transactions contemplated by the Plan that may affect the Debtors, including the realization of cancellation of indebtedness income and the reduction of net operating loss ("NOL") carryforwards and unrealized built-in losses. Article VII also describes the federal tax consequences of the transactions contemplated by the Plan that may affect Holders of Claims and Interests, including the recognition of taxable income by such Holders. The Valuation Analysis concludes that a material portion of the Debtors' value is derived from the Debtors' NOLs. Article VII discusses the limitations that may apply to the Debtors' usage of those NOLs, as well as certain restrictions under the Plan and under Calpine Corporation's restated certificate of incorporation on the transfer of New Calpine Common Stock to preserve the Debtors' NOLs. Holders of Claims and Interests are urged to consult with their own tax advisors regarding the federal, state, local, and foreign tax consequences of the Plan.

3.    Although the Debtors believe that the Plan complies with all applicable provisions of the

9

Bankruptcy Code, the Debtors cannot assure such compliance or that the Bankruptcy Court will confirm the Plan.

4.    The Debtors may be required to request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code.

5.    Any delays of either Confirmation or Consummation could result in, among other things, increased Professional Claims and the expiration of the New Credit Facility financing commitments.

6.    The Plan provides for substantive consolidation of the Estates into a single Estate for purposes of Confirmation and Consummation. The Debtors can provide no assurance, however, that the Bankruptcy Court will authorize the Debtors to substantively consolidate any or all of the Estates. The Debtors reserve the right to request Confirmation and Consummation, even if the Bankruptcy Court does not authorize the Debtors to substantively consolidate the Estates, or approves substantive consolidation of less than all of the Estates. In the event that the Bankruptcy Court does not authorize the Debtors to substantively consolidate any or all of the Estates, the Plan may constitute a separate plan of reorganization for each Debtor that is not substantively consolidated with any other Debtor.

The occurrence or non-occurrence of any or all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

L.    Voting and Confirmation

Each Holder of a Claim or Interest in the following Classes is entitled to vote either to accept or reject the Plan.

| Classes |
| --- |
| 1C-1 |
| 1C-2 |
| 1C-3 |
| 1C-4 |
| 1C-5 and 248C-5 |
| 1C-6 through 273C-6 |
| 1C-7 through 273C-7 |
| 1C-8 through 273C-8 |
| 1C-9 through 273C-9 |
| 1C-10 through 273C-10 |
| 1D |
| 1E-1 |
| 1E-2 |

10

The following Classes are Unimpaired and deemed to accept the Plan. Therefore, such Classes are not entitled to vote on the Plan and the vote of such Holders of Claims and Interests shall not be solicited.

| Classes |
| --- |
| 1A-1 through 273A-1 |
| 1A-2 through 273A-2 |
| 1A-3 through 273A-3 |
| 1B through 273B |
| 1C-11 through 273C-11 |
| 2E-3 through 273E-3 |

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code: (1) an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan; and (2) an Impaired Class of Interests has accepted the Plan if the Holders of at least two-thirds in amount of the Allowed Interests of such Class actually voting have voted to accept the Plan. The Debtors will tabulate all votes on the Plan on both a consolidated and non-consolidated basis for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and (10) of the Bankruptcy Code. In a consolidated tabulation, all votes shall be counted as if Filed against a single consolidated Estate. In a non-consolidated or partially consolidated tabulation, all votes shall be counted as actually Filed against each applicable Debtor. In neither event shall the Debtors be required to re-solicit votes on the Plan, and the Debtors shall have the right to proceed with Confirmation and Consummation as set forth in the Plan.

Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation at the Confirmation Hearing scheduled to commence on [_____], 2007, at [__] _.m. prevailing Eastern time, before the Bankruptcy Court. Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by a single Impaired Class on a consolidated basis or by an Impaired Class for each Debtor on a non-consolidated basis. The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors also reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.

The Bankruptcy Court has established the date that is two Business Days after entry of the Solicitation Procedures Order on the docket in these Chapter 11 Cases as the Record Date for determining which Holders of Claims and Interests are eligible to vote on the Plan. Ballots, along with the Disclosure Statement, the Plan, and the Solicitation Procedures Order, will be mailed to all registered Holders of Claims or Interests as of the Record Date that are entitled to vote to accept or reject the Plan. An appropriate return envelope will be included with each Ballot, if necessary. Beneficial Holders of Claims or Interests who receive a return envelope addressed to their bank, brokerage firm, or other Nominee (or its agent) should allow sufficient time for their votes to be received by the Nominee and processed on a Master Ballot before the Voting Deadline.

The Debtors have engaged KCC and FBG to assist in the voting process. For Holders of Claims on account of publicly-traded securities, FBG will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation. For Holders of all other Claims or Interests, KCC will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation.

11

BALLOTS CAST BY HOLDERS AND MASTER BALLOTS CAST ON BEHALF OF BENEFICIAL HOLDERS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY KCC OR FBG, AS APPLICABLE, BY THE VOTING DEADLINE, AT THE ADDRESS LISTED ON THE APPLICABLE BALLOT, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER OR PERSONAL DELIVERY. THE BALLOTS AND THE PRE-ADDRESSED POSTAGE PRE-PAID ENVELOPES ACCOMPANYING THE BALLOTS WILL CLEARLY INDICATE WHETHER THE BALLOT MUST BE RETURNED TO FBG OR KCC, AND WILL CLEARLY INDICATE THE APPROPRIATE RETURN ADDRESS. THE ADDRESS FOR BALLOTS RETURNABLE TO KCC IS: CALPINE CORPORATION, C/O KURTZMAN CARSON CONSULTANTS LLC, 2335 ALASKA AVENUE, EL SEGUNDO, CA 90245, ATTN: BALLOT PROCESSING DEPARTMENT. THE ADDRESS FOR BALLOTS RETURNABLE TO FBG IS CALPINE CORPORATION C/O FINANCIAL BALLOTING GROUP LLC, 757 THIRD AVENUE - THIRD FLOOR, NEW YORK, NEW YORK 10017, ATTN: BALLOTING PROCESSING DEPARTMENT.

FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL KCC TOLL FREE AT (888) 249-2792. THOSE HOLDERS OF CLAIMS AND INTERESTS BASED ON PUBLICLY-TRADED SECURITIES MAY CONTACT THE DEBTORS' SPECIAL VOTING AGENT DIRECTLY, TOLL FREE AT (866) 433-0896, WITH ANY QUESTIONS RELATED TO THE SOLICITATION PROCEDURES APPLICABLE TO SECURITY-BASED CLAIMS AND INTERESTS.

TO BE COUNTED, THE BALLOTS CAST BY HOLDERS, AND MASTER BALLOTS CAST ON BEHALF OF BENEFICIAL HOLDERS, INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY KCC OR FBG, AS APPLICABLE, NO LATER THAN THE VOTING DEADLINE. SUCH BALLOTS (OR MASTER BALLOTS, AS APPLICABLE) SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE VIII OF THE DISCLOSURE STATEMENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED.

To obtain an additional copy of the Plan, the Disclosure Statement, the Plan Supplement, or other solicitation package materials (except Ballots), please refer to KCC's website at http://www.kccllc.net/calpine or request a copy from KCC, by writing to Kurtzman Carson Consultants, LLC, 2335 Alaska Avenue, El Segundo, California 90245, Attn: Calpine Balloting; calling (888) 249-2792; or sending an email to calpineinfo@kccllc.com.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF HOLDERS OF CLAIMS AND INTERESTS AND RECOMMEND THAT ALL SUCH HOLDERS WHOSE VOTES ARE BEING SOLICITED VOTE TO ACCEPT THE PLAN.

### ARTICLE II.
### GENERAL INFORMATION

The Debtors listed in Article I.A of the Plan submit the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes to accept the Plan.

The Disclosure Statement sets forth certain information regarding the Debtors' history before the Petition Date, significant events that have occurred during the Chapter 11 Cases, and the anticipated reorganization and post-reorganization operations and financing of the Reorganized Debtors. The Disclosure Statement also describes the terms and provisions of the Plan, including certain alternatives to

the Plan, certain effects of Confirmation, certain risk factors associated with the Plan and the New Calpine Common Stock to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, the Disclosure Statement discusses the Confirmation process and the voting procedures that Holders of Claims and Interests must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS FACTORS TO BE CONSIDERED IN CONNECTION WITH THE PLAN, PLEASE SEE ARTICLE IV AND ARTICLE VI OF THE DISCLOSURE STATEMENT.

THE DISCLOSURE STATEMENT INCLUDES SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS TAKING PLACE DURING THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

A.    Description of Calpine's Business and Assets

    1.    Introduction

Calpine is a wholesale power company that operates and develops clean, reliable, and cost-competitive power generation facilities in North America. Calpine's primary business is generating and selling electricity and electricity-related products and services to wholesale and industrial customers through the operation of its portfolio of power generation assets. Calpine protects and enhances the value of its assets with sophisticated commercial risk management and asset optimization organizations, which optimize the dispatch, utilization, and maintenance of Calpine's plants.

Upon completion of its asset rationalization process described in Article III, Calpine expects to operate a fleet of power generation assets with 22,511 megawatts ("MW") of generating capacity,[1] making Calpine one of the largest wholesale power producers in the country. The figure below depicts Calpine's regional domestic asset portfolio in terms of MW capacity, excluding facilities that have been divested, are under construction, or are "mothballed" and are non-operating. "Mothballed" plants have been shut down, but are minimally maintained to preserve the option to return to operations if economic conditions improve.

---

[1]    The figures for number of operating facilities and capacity in this Article II are based on modeled average annual operating capacity and generally exclude plants that are mothballed, in development, or expected to be divested.

13

JA 1483



Calpine's portfolio of plants is comprised of two fuel-efficient and clean power generation technologies: natural gas-fired combustion (primarily combined-cycle) and renewable geothermal facilities. Geothermal plants are low-variable-cost facilities that harness the earth's naturally occurring steam to generate electricity. Geothermal energy is considered a renewable energy (like wind, solar, and biomass generation) because the fuel supply is not depleted during electricity production. After taking into account its planned asset rationalizations, Calpine expects to own or lease a portfolio of fifty-seven natural gas-fired power plants in sixteen states plus fifteen geothermal facilities at "The Geysers" in northern California. Calpine's natural gas-fired portfolio is equipped with state-of-the-art power generation technologies and is an example of Calpine's commitment to "clean" energy production. Additionally, Calpine's renewable energy portfolio, The Geysers, is one of the largest producing geothermal resources in the world.

Calpine's business is carried out in four regions (West; Texas; Southeast; and Northeast/Midwest) by the power operations and commercial operations groups. These activities are discussed in detail below.

a.    Company History

Calpine was established in 1984 as an energy services provider to the newly emerging independent power industry. In October of 1988, Calpine became an owner/developer of power generating plants with the acquisition of a 5% interest in the twenty MW Aidlin geothermal plant at The Geysers. By 2001, Calpine had developed or acquired a portfolio of nearly 10,000 MW of clean and reliable power plants in North America and was undergoing further expansion, through both construction and acquisitions. Between 2001 and 2004, Calpine's expansion program accelerated, more than doubling its installed power generation capacity. Calpine's revenues also grew significantly, increasing from approximately $300 million to $10 billion between 1997 and 2005. By 2005, Calpine's generation fleet had grown to more than 26,000 MW of generating capacity, making Calpine one of the largest independent power producers in the United States. As of December 2006, Calpine operated 24,839 MW of generation capacity, of which 2,328 MW has been or is expected to be divested in 2007 through Calpine's asset rationalization process, excluding mothballed facilities and facilities under construction.

14

b.     Corporate Structure

As of the Petition Date, Calpine's corporate structure consisted of 416 legal Entities, which serve as vehicles for management of its plant and commercial operations, its power asset ownership, and its financing structures. Of these Entities, the Debtors consist of Calpine Corporation, a Delaware corporation, and the 273 direct and indirect, wholly owned subsidiaries listed in Article I.A of the Plan. In addition, the following nine of Calpine's Canadian subsidiaries commenced proceedings under the CCAA in the Canadian Court: Calpine Canada Energy Ltd. ("CCEL"); Calpine Canada Power Ltd.; Calpine Canada Energy Finance ULC ("ULC1"); Calpine Energy Services Canada Ltd.; Calpine Canada Resources Company ("CCRC"); Calpine Canada Power Services Ltd.; Calpine Canada Energy Finance II ULC ("ULC2"); Calpine Natural Gas Services Limited; and 3094479 Nova Scotia Company. In addition, because under the CCAA partnerships cannot be debtors, the stay of proceedings under the CCAA was extended to three Calpine affiliates: Calpine Energy Services Canada Partnership; Calpine Canada Natural Gas Partnership; and Calpine Canadian Saltend Limited Partnership. Other direct and indirect, wholly owned subsidiaries of Calpine Corporation were not included in the Chapter 11 Cases or in the CCAA Proceedings. Like the Debtors, each non-Debtor is continuing normal business operations. The Debtors also have minority equity interests in a number of non-wholly owned subsidiaries, none of which have Filed for chapter 11 relief.

JA 1485

The chart below depicts a "summary" corporate structure of Calpine and certain of its principal subsidiaries (*i.e.*, the chart does not include every single corporate entity in the Calpine Corporation "family").



### c.    Employees

As of December 31, 2005, Calpine employed 3,265 full-time employees, of whom sixty-three were represented under collective bargaining agreements. Shortly after the Petition Date, the Debtors began to implement staff reductions with a goal of reducing approximately 1,100 positions, or over one-third of its prepetition workforce. As of March 31, 2007, the Debtors had reduced their workforce by

16

1,096 employees, resulting in an annualized cost savings of approximately $180 million. The Debtors' workforce now consists of approximately 2,200 employees.

        d.    Market Drivers

There are four key market "drivers" affecting Calpine's financial performance: the regional supply and demand environment for electricity; regional generation technology and fuel mix; natural gas prices; and environmental regulations.

        (i)    Regional Supply and Demand

Regional supply and demand affect the pricing for electricity that results from wholesale market competition, and, consequently, are key drivers of Calpine's financial performance. For much of the 1990s, utilities invested relatively sparingly in new generation capacity. As a result, by the late 1990s, many regional markets were in need of new capacity to meet growing electricity demand. Prices rose due to capacity shortages, and the emerging merchant power industry responded by constructing significant amounts of new capacity. Between 2000 and 2003, more than 175,000 MW of new generating capacity came "on line" in the United States. In most regions, these new capacity additions far outpaced the growth of demand, resulting in "overbuilt" markets, *i.e.*, markets with excess capacity. In the West, for example, approximately 24,000 MW of new generation capacity was added between 2000 and 2003, while demand only increased by approximately 8,000 MW.

The significant increase in generation capacity relative to demand has contributed to the financial distress encountered by Calpine and other merchant generators in the past several years. For example, most of this new generation capacity consisted of gas-fired combined-cycle plants which use a gas turbine to create electricity, then capture, or recycle, the waste heat to create steam, which is then used to create additional electricity through a steam turbine. Natural gas-fired combined-cycle units tend to have higher variable costs in the current natural gas price climate and generally cannot compete effectively with nuclear- and coal-fired units, which can more efficiently produce power at lower costs.

This surge of generation investment has subsided since 2003. During 2005, for example, only 17,000 MW of new supply was added nationwide. As a result, growing demand for electricity has begun to reduce the level of excess supply, leading to the current predictions of decreasing "reserve margins" for many regional markets through the end of the decade. "Reserve margins" are a measure of the balance between supply and demand in a regional electricity market. For example, a reserve margin of 15% indicates that supply exceeds expected peak electricity demand by 15%. Holding other factors constant, lower reserve margins typically lead to higher power prices, because the less efficient (more expensive) capacity in the region is needed to satisfy electricity demand. Currently, supply exceeds demand in most regional markets.

        (ii)    Regional Generation Technology and Fuel Mix

In a competitive market, the price of electricity typically is related to the operating costs of the marginal, or price-setting, generator. Assuming economic behavior by market participants, generating units generally are dispatched in order of their variable costs. In other words, units with lower costs are dispatched first and higher-cost units are dispatched as demand (sometimes referred to as "load") grows. Accordingly, the variable costs of the last (or marginal) unit needed to satisfy demand typically drives the regional power price. This market dynamic makes regional generation technology and fuel mix the second key driver of Calpine's financial performance.

17

There are three general classifications of generation capacity: baseload; intermediate; and peaking. Baseload units, fueled by cheaper fuels such as hydro, geothermal, coal, or nuclear fuels, are the least expensive and generally serve electricity demand during most hours. Intermediate units, such as combined-cycle plants fueled by natural gas, are more expensive and generally are required to serve electricity demand during on-peak or weekday daylight hours. Lastly, peaking units are the most expensive units to dispatch are generally less able to compete with nuclear and coal-fired units, which can more efficiently produce power at lower costs.

Much of Calpine's generating capacity is in California and Texas, which are regional markets in which gas-fired units set prices during most hours. Because natural gas prices generally are higher than most other input fuels, these regions generally have higher power prices than regions in which coal-fired units set prices. Outside of the West and Texas regions, however, other generating technologies, such as coal-fired plants, tend to set prices more often, reducing average prices and "spark spreads," which is the term used to describe the margin between realized power prices and fuel costs. These conditions, particularly in overbuilt markets, often make it difficult for gas-fired generation to compete.

In addition to earning margins from the sale of electricity, Calpine's geothermal assets benefit from regulations that promote renewable or "green" energy sources. For example, regardless of the dominant technology types for the generation of electricity in California, the current shortage of renewable generation sources creates a premium for power from the geothermal facilities.

### (iii)    Natural Gas Prices

Since natural gas is often the price-setting fuel in Calpine's major regional markets, natural gas prices are a third key driver of Calpine's financial performance. Natural gas price variability is widely acknowledged. During 2005, daily (or "spot") natural gas prices reached historic highs before trending downward in 2007. Natural gas contracts for delivery beyond 2007 continue to trade at high prices, suggesting that a historically high natural gas price environment will persist for some time. Beyond the near-term, long-term natural gas forecasts suggest that prices will fall below recent levels but will remain higher than historical averages. Holding other factors constant—namely, the supply and demand balance and the regional generation technology and fuel mix—higher natural gas prices tend to increase Calpine's margins. This is because Calpine's combined-cycle plants are more fuel-efficient than many other older gas-fired technologies, so units with higher operating costs often set power prices in California and Texas, creating positive margins for Calpine. The positive relationship between natural gas prices and Calpine's margins ignores the effects of contracts and assumes today's historically high natural gas pricing climate. If natural gas prices were to decline to much lower levels (*e.g.*, below $3 per MMBtu), this relationship may change.

### (iv)    Environmental Regulations

Environmental regulations are a fourth key driver of Calpine's performance. Environmental regulations force generators to incur costs to comply with limits on emissions of certain pollutants. Higher operating costs for fossil fuel-fired generators implicitly favor low-emissions generating technologies such as Calpine's geothermal and gas-fired capacity. Further, to the extent that price-setting units experience higher variable costs due to environmental regulations, market prices tend to increase.

**JA 1488**

In addition to those environmental laws and regulations described in further detail below, Calpine's regional markets are, or will be, affected by several current and pending environmental regulations, including:

- Regulation of sulfur dioxide ("SO₂") and nitrogen oxides ("NOₓ") emissions under the Clean Air Interstate Rule ("CAIR"). When they become effective, CAIR regulations will affect Calpine's Texas, Southeast, and Northeast assets. CAIR will cap $NO_x$ and $SO_2$ emissions in twenty-nine of the easternmost states starting in 2009. With the exception of the Oneta facility in the Southwest Power Pool of the Southeast, all Calpine Southeast and Northeast plants will be subject to CAIR. Calpine's assets in California, Oregon, Arizona, and Colorado will not be regulated under the CAIR program.

- Regulation of mercury emissions under the Clean Air Mercury Rule ("CAMR"). CAMR regulations primarily penalize coal-fired generators. CAMR will tighten mercury emissions limits in 2010 and again in 2018, ultimately requiring the reduction of coal plant mercury emissions by almost 70%.   CAMR could benefit Calpine by reducing the attractiveness of coal generation investments, and outdated existing coal-fired plants may ultimately be forced to make costly capital improvements or retire.   When they become effective, CAMR regulations likely will affect Calpine's assets in the Midwest and eastern United States.   Calpine's assets in Texas, California, Oregon, and Arizona are not expected to be affected by CAMR regulations because, as discussed below, natural gas tends to be "on the margin" in these regions.

- Renewable Portfolio Standards. Renewable Portfolio Standards ("RPS") mandate that utilities and other load-serving entities ("LSEs") purchase a portion of their electricity from renewable sources.   This creates a premium for power sold from The Geysers.

- Carbon (greenhouse gas) regulations.   Carbon regulations are still pending in the United States and may come into effect in the Northeast in 2009 and California in 2012. The United States Supreme Court recently issued a decision holding that the Federal Clear Air Act of 1970 requires the Environmental Protection Agency to regulate greenhouse gases from new motor vehicle once it concludes that such emissions contribute to climate change. Calpine believes the Supreme Court's ruling could effectively determine the Environmental Protection Agency's authority to regulate air pollution associated with climate change from all sources, including power plants. In addition, carbon regulation could affect all fossil-fired generators depending on the means by which carbon emissions allowance credits are allocated.   Several national carbon regulation programs have been proposed, and the approaches to allowance allocations vary widely. California recently passed legislation to reduce carbon emissions levels.

19

2.    Asset Portfolio

    a.    Overview

      Calpine's asset portfolio can be divided into four primary regions: the West; Texas; the Southeast; and the Northeast/Midwest.

### Calpine Generation Capacity by Region



| Region | # of Plants | Capacity[1] (MW) |
|---|---|---|
| **West** | **40** | **7,200** |
|   California | 36 | 5,122 |
|   Arizona | 1 | 553 |
|   Oregon | 1 | 614 |
|   Colorado | 2 | 911 |
| **Texas[2]** | **13** | **7,180** |
| **Southeast** | **10** | **5,635** |
|   SERC | 6 | 3,680 |
|   FRCC | 3 | 868 |
|   SPP | 1 | 1,087 |
| **Northeast and Midwest** | **9** | **2,296** |
|   New England | 1 | 531 |
|   New York | 5 | 338 |
|   PJM | 1 | 492 |
|   Midwest | 2 | 935 |
| **Totals** | **72** | **22,511** |

[1] Average annual modeled operating capacity.
[2] Includes Freeport plant, due online in December 2006.

### Calpine Generation Capacity by Technology



| Technology | # of Plants | Capacity[1] (MW) |
|---|---|---|
| Intermediate | 20 | 11,831 |
| Intermediate (cogeneration) | 22 | 7,434 |
| Peaking | 15 | 2,529 |
| Baseload (geothermal) | 15 | 717 |
| **Totals** | **72** | **22,511** |

[1] Modeled average annual operating capacity.

20

JA 1490

The following is a summary of Calpine's operating assets by region.

b.    **West Region**

(i)    West Assets

(a)    Plants

Calpine operates forty plants in the West region (California, Oregon, Arizona, and Colorado) with a total capacity of 7,200 MW, which includes 717 MW from baseload geothermal units, 5,479 MW from intermediate gas-fired units, and 1,003 MW from peaking gas-fired units. Calpine's California assets are concentrated in the northern half of the state, with the exception of the Pastoria facility north of Los Angeles and the Otay Mesa facility in San Diego county. Calpine's West plant locations and technology types are illustrated below.



(b)    The Geysers

Located seventy-five miles north of San Francisco, Calpine's fifteen operating geothermal facilities produce renewable energy and benefit from revenues over and above market electricity prices through the sale of Renewable Energy Credits ("RECs").

K&E 11469876.47

Operations at The Geysers began in 1960, when Pacific Gas & Electric Company ("PG&E") completed construction of the first geothermal electric generating station run by a utility in the United States. Calpine's involvement began in October of 1988, with the acquisition of a 5% interest in the twenty MW Aidlin Power Plant. Subsequent acquisitions led to Calpine's current majority position of 717 MW from fifteen operating facilities, which includes 339 production wells and forty-eight injection wells, making The Geysers the largest operating geothermal facilities in the world.

The Geysers' operational area encompasses forty square miles in Lake and Sonoma Counties. This location, which has access to five transmission lines, positions The Geysers to sell power into the Northern California market. The Geysers are critical for transmission grid support, which attracts additional revenues from contracts to provide system support and capacity.

The Geysers' low variable costs and continual fuel access drive its nominal capacity factors toward 100%, meaning plants run during nearly all hours unless they are down for maintenance. With one REC for every megawatt hour ("MWh") of electricity generated, The Geysers create approximately six million RECs each year, which can be sold to satisfy the renewable energy requirements or preferences of LSEs throughout the United States.

(c)     Contracts

While market prices are significant drivers of Calpine's projected earnings, some of the uncertainty is reduced by the presence of contracts, which dictate the payments Calpine receives for energy and capacity sold from certain West region plants. Much of the capacity of the geothermal assets is subject to power sales contracts with PG&E, Sacramento Municipal Utility District, and Southern California Edison. The contracts obligate Calpine to sell electricity at a market index price, plus fixed adders for RECs, as well as resource adequacy under the PG&E contract. In addition, the bulk of Calpine's West peaking assets are subject to tolling agreements with PG&E through 2011. Under these agreements, Calpine receives fixed and variable payments and converts natural gas into power for PG&E. Calpine's Qualifying Facilities ("QFs") also are subject to contracts with PG&E, as well as steam sales agreements with nearby industrial customers. To receive QF status under the 1978 Public Utility Regulatory Policies Act ("PURPA"), a generating facility must produce electricity and "another form of useful thermal energy through sequential use of energy" while also meeting other ownership, operational, and efficiency criteria. Subject to recent modifications resulting from the Energy Policy Act of 2005 ("EPAct 2005"), discussed below, once a generator attains QF status, utilities are then required by FERC to purchase the facility's energy at avoided cost rates (which tend to be favorable to the QF). Lastly, the non-QF cogeneration facilities are subject to power and steam sales agreements with industrial companies.

(ii)     West Supply and Demand

(a)     California

California is less overbuilt than many other United States markets, and natural gas is often the price-setting fuel in the state. Demand growth and relatively little investment in generation over the past few years have improved the balance between supply and demand. California's reserve margin is projected to decrease by 2011 due to continued load growth and relatively few currently planned capacity additions. California's current generation supply is dominated by natural gas-fired technologies, but includes significant levels of hydroelectric and nuclear capacity.

California's regional supply base fosters a market in which higher-variable-cost gas units are "on the margin" during most hours, leading to higher prices than typically seen in coal- and nuclear-

22

dominated markets. Despite expected renewable generation capacity additions over the coming years, the tendency for gas-fired units to set market prices is not expected to change, although a downward trend in natural gas prices is expected to compress spark spreads from 2008 to 2010.

        (b)    Arizona, Oregon, and Colorado

Calpine's South Point facility is located in the Arizona-New Mexico region of the Western Electricity Coordinating Council. This region currently suffers from higher levels of excess capacity than California. The reserve margin is expected to decline as load grows and fewer new units arc added to regional supply.

The Northwest (Oregon) region of the Western Electricity Coordinating Council has a generating supply mix that includes high levels of low-cost capacity, with hydro and coal together representing almost 80% of the installed generation base. Nevertheless, akin to other Western Electricity Coordinating Council sub-regions, power prices in the Northwest region are driven higher by the need for gas-fired facilities during most hours.

Calpine's capacity in Colorado is fully contracted. Excess supply conditions are expected to persist in the Colorado/Wyoming region, where approximately 1,600 MW of new coal-fired capacity is slated to come on line.

        (iii)    West Region Regulatory Issues

        (a)    California Market Structure

California began restructuring its energy markets in March 1998 under the oversight of the California Independent System Operator ("CAISO"). CAISO is responsible for most regional transmission and power market activities. Multiple factors contributed to the period of price spikes, rolling blackouts, and utility bankruptcies during the California energy crisis.

Since the California energy crisis, California utilities have shown some tendency to return to the traditional vertically integrated business model by moving to build generation to satisfy their own electricity demand, and relying on rate-based recovery to increase their supply and grow their revenues. This could create additional competition for Calpine.

In addition, the process of allowing consumers to choose among alternate electric suppliers has been put on hold in California. Because retail choice often increases the number of LSEs and boosts competition, this trend likely will limit the number of counterparties to whom Calpine can market power in California.

A kcy market structure change for 2007 is the introduction of a formal capacity or "resource adequacy" ("RA") requirement, which creates payments to generators for providing capacity to ensure system reliability, in addition to variable payments for providing energy. RA is unique among capacity market mechanisms in at least two respects. First, RA is bifurcated into local RA and system RA. Local RA requirements create payments to generators in load-constrained areas, much like traditional Reliability Must Run ("RMR") payments, which compensate otherwise uneconomic generators to remain available to ensure system reliability in transmission constrained areas. Eventually, local RA is expected to replace RMR, with 2007 deemed as a transition year. System RA provides fixed payments for capacity in addition to the variable payments for energy received in the market. Second, RA is an "all or nothing" arrangement. Unlike other installed capacity markets, in which all available generators are awarded payments based on the system-wide supply/demand balance, a generator's ability to collect RA payments

23

depends on its success in securing RA contracts with LSEs. Unlike in some Eastern markets such as New York and New England, the CAISO does not currently have an installed capacity requirement. For 2007, the California Public Utilities Commission ("CPUC") has mandated that LSEs contract with generators to secure adequate capacity to meet planned reserve targets.

(b)    Arizona, Oregon, and Colorado Market Structure

The Arizona and Oregon markets are based purely on bilateral transactions, with local regulated utilities responsible for balancing the hourly market. Neither market has announced plans for major market redesigns.

In Colorado, Calpine's power is currently sold exclusively through long-term bilateral arrangements with Xcel Energy, the incumbent utility. Colorado lacks an Independent System Operator ("ISO"), and has not announced any major market redesigns.

(c)    Environmental Issues

In the West, two major environmental issues affect power production and pricing: RPS and greenhouse gas regulations. RPS create pricing premiums for power generated by renewable generation capacity such as The Geysers, because such forms of energy do not deplete the fuel supply during electricity production and thus are environmentally friendly. As of December 2006, more than twenty states have adopted RPS, including California and Arizona. RPS are designed to reduce greenhouse gas emissions, and generally require that renewable energy sources—which typically include zero or near-zero emission technologies such as geothermal, wind, solar, and biomass—generate a share of a state's energy production. Typically, this requirement is placed on retail sellers of electricity.

The California RPS, which came into effect on January 1, 2003, originally set a mandatory target of 20% renewable resources by December 31, 2017. Pursuant to the Energy Action Plan and the 2005 Integrated Energy Policy Report, legislators have now accelerated the timeline for achieving this target to December 31, 2010. The new plan will force retail sellers to increase their procurement of eligible renewable energy resources such that 20% of all retail sales comes from renewable energy by 2010.

Future investment in renewable capacity will be driven in part by the status of the Production Tax Credit. The Production Tax Credit is a federal incentive program offering $20/MWh, over a ten-year duration, for electricity produced by new renewable energy plants brought on line before 2008. The Production Tax Credit, which includes geothermal in its list of eligible technologies, is set to expire on December 31, 2007, though it has been extended several times in the past and appears likely to be extended into 2008.

Greenhouse gas regulations also have a significant impact on power production in the West region. In September 2006, California lawmakers approved the most aggressive greenhouse gas legislation in United States history. The plan, which will likely have to overcome several legal challenges before its implementation in 2012, calls for a reduction in greenhouse gas emissions to 1990 levels by 2020, a reduction of approximately 25% versus current levels. Many of the details have yet to be finalized, but it appears the new law will include both mandatory controls and market-based solutions, including a program that permits participants to buy and sell carbon emission allowances.

24

c.    Texas Region

(i)    Texas Region Assets

(a)    Plants

Calpine operates one of the largest, most efficient gas-fired fleet in the Electric Reliability Council of Texas ("ERCOT") area. ERCOT spans 75% of Texas, serves twenty million customers, and is isolated from the neighboring regional markets because of limited import capabilities. The ERCOT market consists of four market zones: the North, South, West, and Houston. Much of Calpine's fleet is concentrated in the Houston zone, where prices and spark spreads are often higher than in other ERCOT zones.

Calpine's thirteen plants in ERCOT provide 7,180 MW of capacity, representing nearly 10% of the region's total installed generation supply and more than 25% of installed combined-cycle capacity, making Calpine the third largest generator in ERCOT. Calpine's combined-cycle fleet has the advantage of operational flexibility which allows units to ramp up or ramp down in response to fluctuating electricity demand and enables Calpine to market ancillary services in addition to scheduled electricity.

Calpine's Texas region plant locations and technology types are illustrated below.



| Plant | Location | In Service Year | Capacity[1] | Contract Status |
|---|---|---|---|---|
| Operating | | | 7,180 | |
| Texas Region | | | 7,180 | |
| Intermediate | | | 3,252 | |
| 1 Brazos Valley | Richmond, TX | 2003 | 594 | None |
| 2 Freestone 1 & 2 | Fairfield, TX | 2002 | 1,018 | None |
| 3 Hidalgo[2] | Edinburg, TX | 2000 | 381 | None |
| 4 Magic Valley | Edinburg, TX | 2002 | 723 | Partial |
| 5 Pasadena II | Pasadena, TX | 2000 | 536 | None |
| Intermediate - Cogen | | | 3,928 | |
| 6 Baytown | Baytown, TX | 2002 | 833 | Partial |
| 7 Channel | Pasadena, TX | 2001/2002 | 592 | Partial |
| 8 Clear Lake | Pasadena, TX | 1985 | 205 | Partial |
| 9 Corpus Christi | Corpus Christi, TX | 2002 | 491 | Partial |
| 10 Deer Park | Deer Park, TX | 2003 | 686 | Partial |
| 11 Freeport | Freeport, TX | Jun-05 | 250 | Partial |
| 12 Pasadena I | Pasadena, TX | 1998 | 240 | Partial |
| 13 Texas City | Texas City, TX | 1987 | 430 | Partial |

[1] Modeled average annual operating capacity in MW.
[2] Calpine owns 78.5% of the 485 MW Hidalgo plant.

(b)    Contracts

Certain of Calpine's Texas region plants are subject to contracts, which dictate the payments Calpine receives for energy and capacity sold from such plants. Calpine's cogeneration facilities are subject to power and steam sales agreements with industrial companies. Total steam contract obligations in Texas create "must-run" obligations for approximately 1,200 MW. In addition, significant power sales agreements and financial swaps reduce the market price risk of Calpine's Magic Valley and Deer Park facilities.