Appellants Brief Appendix Part 5

associated with AlixPartners since February 1998, will remain a Managing Director of each of AlixPartners and AP Services while serving as Calpine's Chief Financial Officer. Since joining AlixPartners, Ms. Donahue has also served as an executive officer of several public companies, including most recently as Chief Executive Officer of New World Pasta Company from June 2004 through December 2005, and as Chief Financial Officer and Chief Restructuring Officer of Exide Technologies from October 2001 through February 2003. Ms. Donahue joined AlixPartners from The Recovery Group, a Boston based consulting firm, which she joined in 1994, and prior to that she was a senior vice president with the Boston Financial & Equity Corporation, a specialty lending institution, since 1988. Ms. Donahue received a Bachelor of Arts degree in Finance and Accounting from Florida State University in 1988.

*Gregory L. Doody* joined Calpine in July 2006 as Executive Vice President, General Counsel and Secretary. He oversees all of Calpine's legal affairs. Prior to joining Calpine, Mr. Doody held different positions at HealthSouth Corporation from July 2003 through July 2006, including Executive Vice President, General Counsel and Secretary. From August 2000 through March 2004, Mr. Doody was a Partner at Balch & Bingham LLP, a regional law firm based in Birmingham, Alabama, while he also acted as Interim Corporate Counsel and Secretary of HealthSouth Corporation from September 2003 until March 2004. He earned a Bachelor of Science, Management degree from Tulane University in 1987 and a Juris Doctor degree from Emory University's School of Law in 1994. He is a member of the Alabama State Bar, Birmingham Bar Association and the American Bar Association. Mr. Doody also is a member of the Executive Committee of The Federalist Society's Corporations and Securities and Antitrust Practice Group.

*Robert E. Fishman* has served as Executive Vice President, Power Operations since February 2006. Dr. Fishman is responsible for managing Calpine's portfolio of natural gas-fired and geothermal power plants and its development and construction activities. Dr. Fishman served as Executive Vice President, Development from September 2005 to February 2006, Senior Vice President, Business Development from July 2004 to August 2005, as Senior Vice President, Engineering from October 2002 to June 2004 and Senior Vice President, California Peaker Program from September 2001 to September 2002. Dr. Fishman was president of PB Power, Inc. from 1997 to 2001 and Senior Vice President from 1991 to 1996. During his nearly 30-year career, he has managed power project engineering services for more than 5,000 MW of gas turbine combined-cycle, cogeneration and peaking plants. He also has power plant operations experience as a chief engineer in the U.S. Navy. Dr. Fishman obtained a Bachelor of Science degree in Mechanical Engineering from the U.S. Naval Academy in 1973, a Master's and Engineer's degree in Mechanical Engineering from Massachusetts Institute of Technology in 1977, and a Ph.D. in Mechanical Engineering from the University of Maryland in 1980. He also serves as a director of Century Aluminum Company.

*Gary Germeroth* joined Calpine in June 2007 as Executive Vice President, Chief Risk Officer, as is responsible for ensuring compliance with Calpine's risk management policy and procedures, evaluating the complex generating and transactional portfolio, improving senior management and board level reporting of commodity risks and providing an independent assessment of Calpine's risks. Prior to his employment with Calpine, Mr. Germeroth was a member of the Global Energy Practice of PA Consulting Group and its predecessor firm, Hagler Bailly Risk Advisors, since 1999. Mr. Germeroth's expertise was within Energy Strategy and Risk Management, where he directed a variety of commercial strategy, enterprise risk management and corporate restructuring engagements. Prior to joining PA Consulting Group in 1999, Mr. Germeroth held controllership, risk control, and treasury positions at various entities in his 26 year energy career, including: QST Energy, Inc., a subsidiary of CILCO, Inc., Aquila Energy Corporation, and Reliance Pipeline Company, a subsidiary of NICOR, Inc. Mr. Germeroth holds a BSBA in Finance from the University of Denver.

*Thomas N. May* joined Calpine in May 2006 as Executive Vice President, Commercial Operations and is responsible for leading all of Calpine's commodity price risk management activities. He leads Calpine's marketing and sales, trading, plant optimization, origination and transmission activities. Prior to joining Calpine, Mr. May served as Vice President of Commercial Operations for NRG Energy. He was responsible for the overall direction and management of NRG's commodity risk management activities, including power, natural gas, oil, coal and emissions. Prior to joining NRG in 2004, he was Vice President, West Coast Power for Dynegy Marketing and Trade, and responsible for its West Coast commercial operations. In total, Mr. May has more than 23 years of experience in every aspect of the power industry, including trading, marketing, origination, transmission, asset management and power generation. Thomas N. May is of no relation to Robert P. May, Calpine's Chief Executive Officer.

## ARTICLE III.
## THE CHAPTER 11 CASES

Beginning on December 20, 2005, the Debtors Filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to conduct their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The following is a general summary of the Chapter 11 Cases, including certain events preceding the Chapter 11 Cases, the stabilization of the Debtors' operations, and the Debtors' restructuring initiatives implemented since the Petition Date.

A.    Events Leading to the Chapter 11 Cases and Related Postpetition Events

Calpine was established in 1984 as an energy services provider to the newly emerging independent power industry. By 2001, Calpine had developed or acquired a portfolio of nearly 10,000 MW of clean and reliable power plants in North America and was undergoing further expansion through both construction and acquisitions. Between 2001 and 2004, this expansion effort led Calpine to more than double its installed power generation capacity. By December 2006, Calpine owned 24,465 MW of operating generation capacity, making it one of the largest independent power producers in the United States.

This rapid expansion was funded primarily by incurring corporate debt and project financing. Consequently, Calpine's consolidated funded debt exceeded $17.0 billion as of December 31, 2004. Of this, approximately $7.0 billion was non-recourse, project-level financing. The cost of servicing this debt was significant, and, by the end of 2005, debt-service, together with other events, including certain market factors, precipitated a liquidity crisis culminating in Calpine's eventual need to commence the Chapter 11 Cases.

First, between 2002 and 2005, the cost of natural gas, which is needed to fuel Calpine's fleet of mostly natural gas-fired combustion plants, rose to a historically high level while the cost of alternate fuels for power generation such as coal remained relatively much lower. This persisting imbalance placed Calpine at a severe disadvantage compared to competitors operating coal-fired facilities. The higher natural gas prices also led to increased working capital requirements for Calpine, as its declining corporate credit rating often required it to prepay for fuel.

Second, while Calpine selectively benefited from higher natural gas prices in its key markets because of the efficiency of its fleet, many of Calpine's legacy contracts, which required it to sell power at fixed prices, were unprofitable in the commodity price market that prevailed in the period leading up to the filing of the Chapter 11 Cases. This problem was exacerbated in July 2005, following the sale of Calpine's natural gas business, Calpine Natural Gas, L.P. ("CNG"), to Rosetta Resources, Inc.

52

("Rosetta"). The sale of those assets eliminated one of Calpine's significant hedges against natural gas price volatility impairing its ability to mitigate exposure under the fixed-price power contracts.

Third, although the overall consumption rate of electricity grew in the period leading up to the filing of the Chapter 11 Cases, between 2000 and 2003 more than 175,000 MW of new generating capacity came on line in the United States. This new capacity far outpaced the growth of demand in most markets. Excess capacity caused power prices to drop and resulted in low utilization levels for power generators. During 2005, Calpine operated at an average baseload "capacity factor" of less than 50%, resulting in a negative impact on Calpine's revenues. A plant's "capacity factor" reflects the actual amount of energy generated during a given period of time as a percentage of the total amount of energy that could have been generated had the plant run continuously over the period at the plant's full capacity rating.

Together, these market factors, among others, severely constrained Calpine's ability to operate profitably and service its debt. Additionally, many of Calpine's debt agreements contained restrictive covenants that limited its ability to respond to its liquidity crisis. Among other things, these debt covenant restrictions limited Calpine's ability to incur additional debt, retire high interest rate debt, shut down underperforming facilities, and use the proceeds from certain asset sales without constraint, including the proceeds from its divestiture of CNG.

Calpine's liquidity crisis culminated after an adverse decision from the Delaware Chancery Court regarding Calpine's use of approximately $308.2 million in sale proceeds from its July 2005 sale of CNG to purchase fuel contracts. The trustees representing the Holders of the First Lien Debt and the Second Lien Debt alleged that Calpine's use of sale proceeds violated the terms of the relevant indentures. On December 5, 2005, the Delaware Chancery Court ruled that Calpine's fuel purchases violated the First Lien Indenture and ordered Calpine to repay the funds plus interest into a collateral account by January 22, 2006. Calpine appealed this decision, but on December 16, 2005, the Delaware Supreme Court affirmed the decision of the Chancery Court.

The Court's ruling, coupled with other challenges the company faced, Calpine's already-sizable debt obligations and the prevailing adverse market conditions led to the determination that it was necessary for Calpine to commence the Chapter 11 Cases. Accordingly, beginning on December 20, 2005, the Debtors Filed petitions for relief under chapter 11 of the Bankruptcy Code.

B.    Stabilization of Operations

Upon commencing the Chapter 11 Cases, the Debtors sought and obtained a number of orders from the Bankruptcy Court to minimize disruption to their operations and facilitate the administration of the Chapter 11 Cases. Several of these orders are briefly summarized below.

1.    Motion for Authority to Obtain Postpetition Financing

To address their immediate liquidity issues and ensure a seamless transition into chapter 11, the Debtors negotiated term sheets and commitment letters for a debtor-in-possession credit agreement for up to $2.0 billion in postpetition financing just prior to the Petition Date. The Bankruptcy Court authorized the Debtors' entry into this debtor-in-possession credit facility, in the form of revolving and term loans up to an aggregate principal amount of $2.0 billion from Credit Suisse First Boston, Deutsche Bank Securities, Inc., and a syndicate of lenders (collectively, the "Original DIP Lenders") on an interim basis on December 21, 2005 and on a final basis on January 26, 2006 (as further amended, supplemented, or otherwise modified, the "Original DIP Facility"). As discussed in further detail in Article III.D.3, the

Original DIP Facility was replaced by a replacement debtor-in-possession credit facility (the "Replacement DIP Facility") in March 2007.

a.    The Geysers Transaction

The Debtors were required to post sufficient collateral to secure the Original DIP Facility. The Geysers, a group of fifteen geothermal electric generating facilities, related geothermal assets and sites, and other real estate located in Northern California, represented a significant group of assets valued in excess of $2.5 billion that the Debtors considered pledging as collateral under the Original DIP Facility. At the time the Original DIP Facility was negotiated, however, The Geysers was already encumbered by other debt. Thus, the Debtors engaged in a series of transactions to unencumber The Geysers and pledge it as collateral under the Original DIP Facility.

To utilize The Geysers as collateral, the Debtors had to "unwind" certain sale-leaseback transactions involving The Geysers that had occurred between 1999 and 2001, which are described in further detail in Article II.B.3. To unwind the Geysers sale-leaseback transactions, the Debtors reacquired ownership of The Geysers through the purchase of Steam Heat, LLC's beneficial interest in the Geysers Statutory Trust for approximately $165.0 million. The Debtors also repaid approximately $114.0 million in principal, accrued interest, and make-whole amounts to the Geysers lenders to release the Geysers Lenders' Liens on The Geysers. Through these transactions, The Geysers became unencumbered for use as collateral for the Original DIP Facility.

b.    Terms of the Original DIP Facility

The Original DIP Facility consisted of a $1.0 billion revolving commitment and two term loan commitments in the amounts of $350.0 million and $650.0 million respectively. Under the interim order approving the Original DIP Facility, however, the Debtors were prohibited from drawing more than $500.0 million until entry of a final order approving the Original DIP Facility.

After a final hearing on the Original DIP Facility and substantial negotiations among the various parties, the Bankruptcy Court approved the Original DIP Facility by a final order entered on January 26, 2006, as amended further on February 6, 2006 and February 22, 2006. Certain terms of the Original DIP Facility, as approved in its final form by the Bankruptcy Court, differed from those facilities previously approved by the Bankruptcy Court on an interim basis. Chief among these differences were changes to the available funding under the two term commitments that were intended to repay Calpine's outstanding prepetition revolving loans and be used to consummate the repurchase of The Geysers and the repayment to the Geysers lenders. The first term loan increased from a $350.0 million commitment to a $400.0 million commitment, secured by a first priority security interest with an interest rate of LIBOR plus 2.25%. The second term loan decreased from a $650.0 million commitment to a $600.0 million commitment, secured by a second priority security interest with an interest rate of LIBOR plus 4.00%.

Under the terms of the Original DIP Facility, the Original DIP Lenders received the following: a superpriority Administrative Claim, subject to a carve-out for Professional fees; a perfected first priority Lien on, and security interest in, all property of the Estates, not already encumbered as of the Petition Date; and a perfected junior Lien on, and security interest in, all property of the Estates already subject to a valid, perfected and non-avoidable Lien or security interest as of the Petition Date. The Liens granted to the Original DIP Lenders encompassed proceeds from all Estate property and all Causes of Action, including any avoidance actions commenced pursuant to the Bankruptcy Code. The Original DIP Facility was scheduled to expire at the earliest of: December 20, 2007; the Effective Date; or the acceleration of the Original DIP Facility loans in accordance with its terms.

54

The Original DIP Facility allowed the Debtors to pay certain permitted prepetition Claims, fulfill working capital needs, obtain letters of credit, and fund other general corporate matters. Moreover, the funds available to the Debtors under the Original DIP Facility provided the Debtors' vendors with sufficient comfort to continue to do business with the Debtors, thus minimizing disruptions to the Debtors' operations.

2.      Motion for Authority to Use Cash Collateral

To further address their liquidity issues, the Debtors sought and obtained approval from the Bankruptcy Court to use certain of their cash collateral in accordance with the terms of their prepetition financing agreements under an order originally entered on January 30, 2006, and amended several times during the Chapter 11 Cases (the "Cash Collateral Order"). The Cash Collateral Order has been the product of extensive negotiations between and among the Debtors and their prepetition lenders.

a.      Adequate Protection Terms for the Debtors' Use of the First Lien Debt Noteholders' Cash Collateral

In exchange for allowing the Debtors to use their cash collateral for ordinary and necessary business expenses, the Cash Collateral Order provided the First Lien Debt noteholders with the following adequate protection: immediate Cash payment of all accrued and unpaid interest due on the First Lien Debt; payment of the First Lien Trustee's Professional fees; first priority replacement security interests in and replacement Liens on certain of the Debtors' assets; and junior priority security interests in and replacement Liens on all other property of the Debtors, excluding avoidance actions. These replacement Liens were limited to securing the aggregate diminution in value of the First Lien Debt noteholders' collateral. The adequate protection terms provided to the First Lien Debt noteholders remained in effect until June 21, 2006, when the Debtors completed the repayment of the outstanding principal of the First Lien Debt. *See* Article III.D.2 below for further information regarding the Debtors' repayment of the First Lien Debt.

b.      Adequate Protection Terms for the Debtors' Use of the Second Lien Debt Noteholders' Cash Collateral

In exchange for the use of the Second Lien Debt noteholders' cash collateral for ordinary and necessary business expenses, the Debtors agreed to provide as adequate protection to the Second Lien Debt noteholders: two payments in the amount of $78 million each; payment of the Second Lien Debt noteholders' Professional fees; second priority replacement Liens on certain of the Debtors' assets; and junior replacement Liens on all other property of the Debtors, excluding avoidance actions. In return, the Second Lien Debt noteholders waived any Claim for interest at the default rate that they may have accrued during the period from January 1, 2006 through and including June 30, 2006. The Cash Collateral Order further provided that any adequate protection payments beyond December 31, 2006 had to be mutually agreed upon by the Debtors, the Second Lien Ad Hoc Committee, and the Creditors' Committee, subject to the Bankruptcy Court's approval after notice and a hearing.

Subsequently, on January 12, 2007, the Bankruptcy Court modified the Cash Collateral Order to provide the Second Lien Debt noteholders with additional adequate protection. Subject to certain liquidity requirements, the Debtors agreed to pay $100.3 million to the Second Lien Debt noteholders in four quarterly installments of $25.1 million on March 31, June 30, September 30, and December 31, 2007.

In addition, provided there has been no default or event of default under the Original DIP Facility and subject to certain liquidity requirements, Calpine is further required to pay to the Second Lien Debt

55

noteholders (a) on account of the Second Priority Senior Secured Term Loan Due 2007, the amount of interest due under each of the loan and note documents at the base rate plus 4.75%; and (b) on account of the 8.5% Second Priority Senior Secured Notes Due 2010, the 8.75% Second Priority Senior Secured Notes Due 2013, Second Priority Senior Secured Floating Rate Notes due 2007 and the 9.875% Second Priority Senior Secured Notes Due 2011, $88.25 million on January 15, 2007, $19.75 million on June 1, 2007, $88.25 million on July 15, 2007, and $19.75 million on December 1, 2007. The January and June payments have been made pursuant to the modified Cash Collateral Order. In exchange for these payments, the Second Lien Debt noteholders agreed to waive any Claims for or entitlement to default interest or interest on interest from January 1, 2006 through and including the last applicable date on Schedule A of the modified Cash Collateral Order. The holders of the Second Priority Senior Secured Term Loans Due 2007, however, reserved their rights to assert fifty percent of any Claim for default interest that they may have accrued during that time period.

e.    Adequate Protection Terms for the Debtors' Use of the Project Lenders' Cash Collateral

The Debtors also negotiated adequate protection terms under the Cash Collateral Order with certain lenders (the "Project Lenders") with rights in cash collateral generated by the Project Debtors pursuant to certain project financing agreements entered into by the Project Debtors with various Project Lenders (the "Project Financing Agreements"). These Project Debtors include: CalGen, LLC; KIAC Partners; Nissequogue Cogen Partners; Calpine Gilroy Cogen, L.P.; Geysers Power Company, LLC; Silverado Geothermal Resources, Inc.; O.L.S. Energy-Agnews, Inc.; Calpine Hidalgo Power GP, LLC; Calpine Hidalgo Energy Center, L.P.; Calpine Hidalgo Power, LP; Calpine Hidalgo Inc.; Calpine Hidalgo Holdings; MEP Pleasant Hill, LLC; and CPN Pleasant Hill, LLC, with the affiliates that comprise the project groups of each of the foregoing.

The Project Financing Agreements imposed restrictions on the Project Debtors' ability to upstream revenues to their parent entities. To ensure the continued upstreaming of such revenues, the Debtors provided the Project Lenders with certain adequate protection terms. First, each Project Debtor received payment of all accrued but unpaid interest and fees due under the Project Financing Agreements at non-default contract rates. Second, the Debtors agreed to pay the reasonable fees of the Project Lenders' Professionals. Third, the Project Lenders were granted replacement security interests in and replacement Liens on all prepetition and postpetition property of the Debtors of whom each such Project Lender is a Creditor as a result of postpetition upstreaming of monies, equal to the extent of the aggregate diminution in value, if any, after the Petition Date of a Project Lender's particular collateral. Finally, in addition to the replacement Liens, the Project Lenders were granted Administrative Claims in an amount equal to any diminution in value of their collateral against the respective Estates as to which they were granted replacement Liens.

In addition, as adequate protection to any Debtor that, following the Petition Date, transferred property (including Cash) to or for the benefit of any other Debtor having a fair value in excess of the fair value of the property or benefit received, such Debtor that transferred such property was granted (i) an Allowed Administrative Claim against the Debtor that received the property and (ii) a Lien on all property of the Estate of the Debtor that received the property securing such Administrative Claim.

3.    Motion to Continue Using Existing Cash Management System, Bank Accounts, Business Forms, and Investment Practices and to Continue Intercompany Transactions

Upon the Debtors' filing of the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to continue using their cash management systems and their respective bank accounts, business forms, and investment practices by an interim order dated December 21, 2005 and a final order dated January 25,

56

2006 (as modified, the "Cash Management Order"). The Cash Management Order also approved the Debtors' continued practice of transferring funds between and among the Debtors and certain affiliates pursuant to their cash management system and certain intercompany agreements. These intercompany transactions include the payment of funds necessary for the working capital requirements of the various entities, as well as reimbursement of costs related to administrative and operational services provided by Calpine to their Project Debtors and other non-Debtor affiliates of Calpine. The relief provided in the Cash Management Order, including the transfer of funds and the treatment of Claims arising from such intercompany transactions, remain specifically subject to the terms of the Original DIP Facility and Cash Collateral Order.

      4.     Motion to Pay Employee Wages and Associated Compensation

Upon filing the Chapter 11 Cases, the Debtors were aware that any delay in paying prepetition or postpetition compensation benefits to their employees could have irreparably harmed employee morale at a time when dedication, confidence, and cooperation of their employees was most critical. Therefore, on the Petition Date, the Debtors sought and obtained authorization from the Bankruptcy Court to pay their employees for wages, benefits, reimbursements, and other obligations due and owing as of the Petition Date, and to continue those compensation practices with regard to obligations accruing after the Petition Date that related to the prepetition period. The Debtors were further authorized to continue their employee benefits programs in the postpetition period in the ordinary course of business.

      5.     Motion to Continue to Honor Prepetition Trading Contracts and Enter into New Postpetition Trading Contracts

The Debtors rely on third-party transactions to acquire the natural gas that fuels their power plants. As discussed previously, to reduce the risk associated with fluctuations in energy and energy-related commodities prices, the Debtors regularly enter into derivative contracts with values based on the price of a traditional security, an asset such as a commodity, or a market index. The Debtors use derivative contracts to hedge and optimize their electricity generating assets and to take proprietary commodity positions.

It was the Debtors' view that most, if not all, of their trading partners would refuse to continue trading relationships with them absent authorization from the Bankruptcy Court to continue their trading activities. Any substantial interruption in the Debtors' trading relationships likely would have negatively affected the Debtors' businesses. As a result, on the Petition Date, the Debtors sought and obtained interim and final orders from the Bankruptcy Court granting the Debtors the authority to continue to honor their prepetition trading contracts, thereby enabling the Debtors to further stabilize their business operations.

      6.     Motion to Pay Critical Trade Vendors

The Debtors purchase goods and services from over 10,000 outside vendors, some of whom provide the Debtors with goods and services that cannot be obtained elsewhere or cannot be obtained except at exorbitant cost. These "critical vendors" include: vendors who assist the Debtors in complying with applicable governmental laws and regulations, such as disposal companies who remove regulated waste and chemicals from the Debtors' facilities and companies who perform emissions testing; vendors who provide certain essential raw materials, specialized parts and supplies, operations consumables, and other goods and services; and vendors who provide specialized equipment maintenance and repair services to the Debtors.

To prevent disruption in service from such critical vendors, on the Petition Date, the Debtors sought, and the Bankruptcy Court granted, authority to pay in the ordinary course of business the prepetition Claims of certain critical vendors from available funds up to the aggregate amount of $20.0 million.

      7.     Motion to Establish Notification and Hearing Procedures for Trading in Equity Securities

As of the Petition Date, the Debtors' NOLs were estimated to be approximately $3.8 billion. Under the Internal Revenue Code, NOLs that accumulate prior to emergence from bankruptcy may be used to offset post-emergence taxable income. Under the applicable federal tax laws, however, the Debtors would lose the ability to utilize a significant portion of their NOLs if an "ownership change" were to occur prior to completion of the Chapter 11 Cases. Consequently, trading in the equity securities of the Debtors could have jeopardized the Debtors' ability to use those NOLs. To protect these valuable NOL carryforwards for future use to offset taxable income, the Debtors sought and obtained an order from the Bankruptcy Court restricting trading of their equity securities on December 21, 2005. In particular, the Debtors sought to institute restrictions on trading by shareholders who own, or would own, at least 25,600,000 shares, including options to acquire shares of Calpine stock during the pendency of the Chapter 11 Cases, so that the Debtors would be able to monitor trading and prevent the loss of these NOLs.

In addition, the Debtors' ability to use their NOLs and limit certain federal income tax consequences upon emergence could have been significantly restricted as a result of trading of Claims against the Debtors. This was particularly a concern in light of the increasing value of the Debtors' publicly traded debt and the likelihood of Creditors being granted stock under the Plan, potentially triggering a change in ownership upon emergence. Thus, in December 2006, the Debtors Filed an emergency motion seeking to establish notice and sell-down procedures for the trading of Claims in the Chapter 11 Cases. On December 6, 2006, the Bankruptcy Court entered an interim order establishing the date upon which any notice and sell-down procedures subsequently approved by a final order would become effective. A final hearing on the matter is currently scheduled for August 2007.

      8.     Motion to Prohibit Utilities from Terminating Service

By interim order granted on December 21, 2005, and final order granted on January 18, 2006, the Bankruptcy Court established procedures for determining adequate assurance of payment for future utility service. In recognition of the severe impact even a brief disruption of utility services would have on the Debtors' business operations, customer relationships, revenue and profits, these orders enjoined more than 350 utility companies providing gas, electric, water, telephone, sewer, and other related services from terminating those services or requiring additional deposits without first complying with the procedures proposed by the Debtors. The procedures approved by the Bankruptcy Court permitted utilities to request adequate assurance of payment from the Debtors, and provided for an expedited dispute resolution process before the Bankruptcy Court in the event the Debtors and the requesting utility provider were unable to agree on appropriate assurances of future payment.

      9.     Motion to Continue Insurance Programs

Prior to the Petition Date, the Debtors utilized a wholly owned non-Debtor captive insurance company subsidiary as its primary insurer. Separately, Calpine also purchased insurance policies from third parties. The Debtors and the captive insurer were parties to a loanback agreement under which the Debtors' captive insurer advanced to the Debtors premiums in excess of the amounts necessary for reserves or as required by law. In exchange, the Debtors were obligated to repay the principal amount of

any such advances on demand. As of the Petition Date, the Debtors owed their captive insurer approximately $81.0 million under the loanback agreement.

On the Petition Date, the Debtors sought and obtained authorization from the Bankruptcy Court to maintain their prepetition insurance programs, including their existing relationship with their captive insurer. The Bankruptcy Court further authorized the Debtors to obtain new insurance policies as needed and pay outstanding prepetition amounts, including premiums and retrospective adjustments owing under the insurance policies. Finally, the Bankruptcy Court approved the payment of up to $18.0 million to the Debtors' captive insurer for amounts owing under the loanback agreement on an interim basis on January 4, 2006, as extended by a bridge order granted on January 25, 2006. On April 11, 2006, the Bankruptcy Court entered a final order increasing such authority to $35.0 million.

10.    Motion to Pay Prepetition Sales, Use and Franchise Taxes

On December 27, 2005, the Bankruptcy Court authorized the Debtors to pay up to $8.0 million in certain taxes and fees to the relevant taxing authorities. The Bankruptcy Court increased the $8.0 million cap to $17.8 million on January 25, 2006. As of June 1, 2007, the Debtors have paid approximately $15.0 million in these taxes.

11.    Motion to Pay Prepetition Property Taxes

On December 27, 2005, the Bankruptcy Court authorized the Debtors to pay up to $25.0 million in undisputed prepetition real and personal property taxes due postpetition. The Debtors sought such authority to eliminate interest expenses and other potential penalties that would otherwise accrue. On March 22, 2006, the Debtors sought and obtained the Bankruptcy Court's approval to increase the $25.0 million cap to $37.0 million. Later, on December 6, 2006, the Debtors sought and obtained the Bankruptcy Court's approval of a further increase in the original $25.0 million cap to $60.0 million. As of June 1, 2007, the Debtors have paid approximately $37.0 million in these taxes.

12.    Applications for Retention of Debtors' Professionals

Throughout the Chapter 11 Cases, the Bankruptcy Court has approved the retention of certain Professionals to represent and assist the Debtors in connection with the Chapter 11 Cases. These Professionals include, among others: (a) Kirkland & Ellis LLP as counsel for the Debtors (final order granted January 25, 2006); (b) AP Services as crisis managers for the Debtors (final order granted January 17, 2006); (c) Miller Buckfire & Co., LLC ("Miller Buckfire") as financial advisors and investment bankers for the Debtors (final order granted April 26, 2006 and amended on October 25, 2006 and March 7, 2007); (d) PA Consulting Group, Inc. as energy industry consultants to the Debtors (final order granted January 25, 2006); (e) Kurtzman Carson Consultants LLC as notice, claims, and balloting agent for the Debtors (final order granted January 25, 2006); (f) Curtis, Mallet-Prevost, Colt & Mosle LLP as conflicts counsel for the Debtors (final order granted January 25, 2006); (g) Covington & Burling LLP as special counsel for the Debtors with respect to certain litigation, corporate finance and securities law compliance matters (final order granted January 31, 2006); and (h) Thelen Reid & Priest LLP as special counsel for the Debtors for certain financing, securities law reporting and disclosure, and labor and employment matters (final order granted March 22, 2006).

The Debtors subsequently amended their retention agreements with AP Services and Miller Buckfire. On January 17, 2007, the Bankruptcy Court approved an amendment to the AP Services agreement, which provided that, among other things, AP Services would be employed as section 363 Professionals nunc pro tunc to November 3, 2006 and would be eligible for an emergence incentive bonus upon confirmation of a plan. Additionally, on March 7, 2007, the Bankruptcy Court approved an

59

amendment to the Miller Buckfire agreement, which authorized Miller Buckfire to procure debt or equity financing to fund a plan of reorganization. Under the terms of its amended retention agreement, Miller Buckfire will be entitled to earn an additional fee of $4.5 million if it is successful in raising incremental debt or equity capital and the related plan of reorganization becomes effective.

The Bankruptcy Court subsequently approved additional requests by the Debtors to retain other Professionals. On February 15, 2006, the Bankruptcy Court approved the retention of PricewaterhouseCoopers LLP as auditors for the Debtors and Davis Wright Tremaine LLP as special energy regulatory and human resources counsel for the Debtors. The retention of Davis Wright was later expanded on August 15, 2006 to include human resources-related immigration matters. On March 1, 2006, the Bankruptcy Court approved the retention of Cornerstone Management, LLC as management consultants to the Debtors. On March 28, 2006, the Bankruptcy Court approved the retention of KPMG LLP as tax and risk advisory consultants to the Debtors and Deloitte Tax LLP as tax service providers for the Debtors. On April 26, 2006, the Bankruptcy Court approved the retention of Bracewell & Giuliani LLP as special counsel for the Debtors. On June 21, 2006, the Bankruptcy Court approved the retention of Sirius Solutions, L.L.P. as consultants to the Debtors on Sarbanes-Oxley and certain other financial and management reporting matters. On August 15, 2006, the Bankruptcy Court approved the retention of Lenczner Slaught Royce Smith Griffin, LLP as special Canadian counsel. On September 13, 2006 and September 14, 2006, respectively, the Bankruptcy Court approved the retention of Hilco, Inc. to provide asset disposition services to the Debtors, and Watson Wyatt & Company as human resources consultants to the Debtors. On January 17, 2007, the Bankruptcy Court approved the retention of Holland & Hart, LLP as special energy counsel. On January 31, 2007, the Bankruptcy Court approved the retention of Sutherland, Asbill and Brennan LLP as special energy counsel for the Debtors. On March 7, 2007, the Bankruptcy Court approved the retention of Dickstein Shapiro as special energy and FERC counsel for the Debtors. Finally, on May 30, 2007, the Bankruptcy Court approved the retention of Deloitte Financial Advisory Services LLP as fresh start accounting consultants for the Debtors.

C.    Appointment of the Committees

Since their formation, the Creditors' Committee, the Equity Committee, and the Second Lien Ad Hoc Committee (as described below, and, collectively, the "Committees"), have played an active and important role in the Chapter 11 Cases.

*Appointment of the Creditors' Committee.* On January 9, 2006, the United States Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code. The original members of the Creditors' Committee were: Wilmington Trust, as Indenture Trustee; HSBC Bank, as Indenture Trustee; Franklin Advisors; SPO Partners; Hess Corporation (f/k/a Amerada Hess Corporation); TransCanada Pipelines; and Acadia Power Partners, L.P. ("APP"). Dominion Cogan replaced APP on January 27, 2006. The current members of the Creditors' Committee are: Wilmington Trust, as Indenture Trustee; HSBC Bank, as Indenture Trustee; Franklin Advisors; SPO Partners; Hess Corporation; and TransCanada Pipelines.

The Creditors' Committee has retained the following Professionals: (a) Akin Gump Strauss Hauer & Feld LLP as its legal advisors (final order granted on February 15, 2006); (b) Lazard Freres & Co. LLP as its financial advisors (final order granted on May 2, 2006); (c) FTI Consulting, Inc. as its accounting advisors (final order granted on May 2, 2006); (d) ICF Resources, LLC as its energy markets advisors (final order granted on May 2, 2006); (e) Morgenstern Jacobs & Blue, LLC as its special conflicts counsel (final order granted on April 18, 2006); (f) Garden City Group, Inc. as its communications agent (final order granted on June 21, 2006); and (g) Fasken Martineau Dumoulin, LLP as its Canadian counsel (final order granted on June 28, 2006).

*Appointment of the Equity Committee.* On May 9, 2006, the United States Trustee appointed the Equity Committee pursuant to section 1102 of the Bankruptcy Code. The Equity Committee consists of the following equity security holders: Steelhead Partners, LLC; Paul Leikert; John Thomas Dolan, III; Alan Ku; and Michael Willingham. The Equity Committee has retained the following Professionals: (a) Fried, Frank, Harris, Shriver & Jacobson LLP as its legal advisors (final order granted on July 12, 2006); (b) Perella Weinberg Partners L.P. as its financial advisors (final order granted on June 13, 2007); and (c) Altos Management Partners Inc. as its energy industry consultant (final order granted on June 13, 2007).

*Second Lien Ad Hoc Committee.* While not appointed by the United States Trustee, the Second Lien Ad Hoc Committee has played a significant role in the Chapter 11 Cases. The Second Lien Ad Hoc Committee is currently composed of: AIG Global Investment Group, Angelo, Gordon & Co. L.P., Avenue Capital Group, Bank of New York, Contrarian Capital Management LLC, Halcyon Asset Management LLC, Highland Capital Management L.P., MacKay Shields LLC, Oaktree Capital Management, LLC, Satellite Asset Management, L.P., Strategic Value Partners, LLC and Wilmington Trust Company, as Indenture Trustee (ex officio member). The Second Lien Ad Hoc Committee has retained Paul, Weiss, Rifkind, Wharton & Garrison LLP as its legal advisors, Houlihan Lokey Howard & Zukin as its financial advisors, and R.W. Beck, Inc. as its energy advisors.

D.  Debtors' Restructuring Initiatives

After the commencement of the Chapter 11 Cases and the initial stabilization of their operations, the Debtors focused on pursuing a number of restructuring initiatives to prepare for their successful emergence from chapter 11. Several of these initiatives are described in further detail below.

1.  Asset Rationalization Restructuring Initiatives

A central component of the Debtors' restructuring efforts has been to review and take steps to rationalize their diverse portfolio of assets. During the Chapter 11 Cases, the Debtors have implemented an asset rationalization strategy to strengthen their core North American business operations (generating power and selling electricity and related products and services), while exiting non-core businesses, such as third-party operating and maintenance services and combustion turbine parts and services. Since the Petition Date, the Debtors have sold, made arrangements to sell, or otherwise restructured a number of consolidated businesses, equity investments, and other miscellaneous assets to reduce their debt, raise capital, and dispose of idle or non-core assets.

Certain of these dispositions and pending dispositions as of June 1, 2007 are summarized in the chart below.

| Asset (Location) | Transaction Description | Estimated or Actual Closing Date | Net Proceeds (millions) | Amount of Debt Retired (including leases) |
|---|---|---|---|---|
| Valladolid Project (Mexico) | Sale of 45% indirect equity interest | April 18, 2006 | $43 | $88 |
| Rumford/Tiverton Projects (ME/RI) | Turnover of projects to lenders | June 23, 2006 | N/A | (see below) |

61

JA 1531

| Asset (Location) | Transaction Description | Estimated or Actual Closing Date | Net Proceeds (millions) | Amount of Debt Retired (including leases) |
|---|---|---|---|---|
| Thomassen Turbine Systems, B.V. (Netherlands) | Sale of entire equity interest | September 27, 2006 | €18 | N/A |
| Dighton Project (MA) | Sale of assets | October 2, 2006 | $89 | N/A |
| Fox Project (WI) | Sale of leasehold interest | October 11, 2006 | $16 | $352 |
| GE Model PG7241 FA Turbine (various) | Sale of asset | October 17, 2006 | $16 | N/A |
| SPG 501F Turbines (various) | Sale of assets | November 15, 2006 | $48 | N/A |
| Hilco Auction (various) | Sale of assets | November 16, 2006 | $48 | N/A |
| Aries Project (MO) | Sale of assets | January 16, 2007 | $30 | $159 |
| Goldendale Project (WA) | Sale of assets | February 21, 2007 | $120 | N/A |
| Power Systems Mfg. (FL) | Sale of assets | March 22, 2007 | $238 | N/A |
| Acadia Project (LA) | 363 Sale of 50% indirect equity interest | (Estimated) August 15, 2007 | (Estimated) $60 | N/A |
| RockGen Project (WI) | Forbearance/ Potential sale of assets | (Unknown) | (Unknown) | (Unknown) |

Generally, the assets the Debtors sought to rationalize fell into two general categories: the Designated Projects (as defined below) and other dispositions of plants and non-core or idle assets.

a.    The Designated Projects

Pursuant to procedures established in the Cash Collateral Order, the Debtors and their advisors, in consultation with the Committees and their advisors, undertook an expedited process to identify certain projects (the "Designated Projects") that the Debtors determined would not maximize or contribute to the Debtors' overall enterprise value. Shortly after the Petition Date and later in 2006, the Debtors identified a total of fourteen Designated Projects to sell, turnover, or restructure. Except for limited amounts agreed to by the Debtors and the Committees, the Debtors became prohibited from directly or indirectly providing any funding or payments to or for the benefit of any Designated Project, and the Debtors agreed to take steps to restructure or divest themselves of such assets on a expedited basis. On May 7, 2007, Calpine and the Committees agreed to modify the list of Designated Projects. As of June 1, 2007, only seven Designated Projects remained on the Designated Projects list.

K&E 11469876.47

(i)    Dispositions of Designated Projects

The dispositions of the Designated Projects were analyzed and prioritized giving consideration to, among other things, the cash burn of the facility/subsidiary, the availability of a stalking horse bidder and other demonstrated interest, and other external factors, such as requirements under third-party contracts. The proceeds of such dispositions were generally utilized to pay down debt or for other working capital needs.

*Rumford and Tiverton Projects.* As discussed previously, prior to the Petition Date, Rumford and Tiverton, each indirect, wholly owned subsidiaries of Calpine Corporation, leased from PMCC New England Investments LLC certain power plants pursuant to leveraged lease transactions. In February 2006, to stem continuing losses at these facilities, the Debtors sought to reject the facility leases and site subleases related to the Rumford and Tiverton power plants and further notified the owner-lessor of the Rumford and Tiverton facilities of their intent to surrender the facilities. The owner-lessor declined to take possession and control of the plants at that time, and Filed objections to the Debtors' rejection notices. Other opposing pleadings were Filed by related interested parties. After several months of negotiations with the indenture trustee related to the two leasehold properties, on May 18, 2006, the Debtors Filed a motion seeking approval of the terms and conditions of a transition agreement to be entered into by the Debtors, the indenture trustee, and the receiver for certain assets of the owner-lessor. The receiver was appointed by the District Court on June 6, 2006. On June 9, 2006, the Bankruptcy Court approved the transition agreement and effective date of the rejection of the leases. The transaction closed on June 23, 2006, and effective as of the closing date, the Rumford and Tiverton power facilities, along with ancillary assets related to the power plants, were transferred to the receiver. As a result of the successful turnover of the facilities, the Debtors are relieved of the obligation to pay over $400 million in lease payments over the life of the leases.

In May 2007, the Debtors entered into a settlement agreement with the indenture trustee, owner-participant, and owner-lessor of the Rumford and Tiverton facilities regarding the rejection damages resulting from the rejection of the Rumford and Tiverton leases and other Claims related to the turnover of the facilities. The indenture trustee had Filed Proofs of Claim totaling in excess of $2.2 billion arising out of the lease rejections and the owner-participant Filed Proofs of Claim in excess of $200 million arising out of the rejection of other related agreements. The settlement agreement resolved such Claims by allowing the indenture trustee a single, consolidated, General Unsecured Claim in the amount of $174 million against Calpine Corporation and the owner-participant and owner-lessor together a single, consolidated, General Unsecured Claim in the amount of $16 million against Calpine Corporation. The settlement agreement was approved by the Bankruptcy Court on June 13, 2007.

*Fox Project.* Calpine Fox LLC ("CPN Fox"), a non-Debtor, indirect, wholly owned subsidiary of Calpine Corporation, leased and operated the Fox Energy Center, a 560 MW, natural gas-fired power plant located in Kaukauna, Wisconsin. CPN Fox leased the facility from Fox Energy Company LLC and Fox Energy OP, L.P., which are affiliates of GE Energy Financial Services, the equity-owners of the facility. Due to negative near term cash flows, CPN Fox, in conjunction with the Debtors, negotiated the sale of, among other things, CPN Fox's leasehold interest in the project, to the equity owners for approximately $16 million. The sale closed on October 11, 2006 and resulted in the extinguishment of financing obligations of approximately $352 million plus accrued interest.

*Dighton Project.* Dighton Power Associates Limited Partnership ("Dighton"), an indirect, wholly-owned Debtor subsidiary of Calpine Corporation, owned a 170 MW (nominal output) gas-fired combined cycle electric generating facility located in Dighton, Massachusetts. The Dighton project began commercial operations in July 1999, and was purchased by Dighton in December 2000 from Energy Management Incorporated. After an extensive marketing process, the Debtors chose BG North America

63

LLC as the stalking horse bidder. After no qualified overbids were received, the Debtors sold substantially all of the property and assets of Dighton to BG North America LLC for approximately $90.2 million, which included, among other things, a Cash payment at closing of $89.8 million, as well as the payment by BG North America LLC of approximately $0.4 million in cure costs associated with certain assigned contracts. The sale closed on October 1, 2006.

*Aries Project.* As previously discussed, MEPPH, an indirect, wholly owned Debtor subsidiary of Calpine Corporation, owned a 590 MW natural gas-fired, combined cycle, generating facility in Cass County, Missouri. Calpine Corporation jointly developed the Aries facility with Aquila, Inc., and the project began commercial operations in 2001. On March 26, 2004, Calpine acquired the remaining 50% interest in the Aries facility from a subsidiary of Aquila, Inc. After a marketing process, the Debtors entered into an asset purchase agreement on September 22, 2006 with Aquila, Inc. to sell the Aries facility for approximately $159 million, subject to higher and better bids at a Bankruptcy Court approved auction on December 4, 2006. Kelson Aries Holdings LLC won the auction with a sale price of approximately $234 million and as a result, Aquila, Inc. was paid a Bankruptcy Court approved break-up fee in the amount of $3.2 million. As part of the transaction, approximately $200 million of debt and debt related costs was paid. The sale to Kelson Aries Holdings LLC was approved by the Bankruptcy Court on December 6, 2006 and the transaction closed on January 16, 2007.

*Acadia Project.* As of the Petition Date, APP owned a nominally rated 1,000 MW natural gas-fire generating facility located in Acadia Parish, Louisiana. APP is owned 50% by Calpine Acadia Holdings, LLC ("Calpine Acadia"), an indirect, wholly owned subsidiary of Calpine Corporation, and 50% by Acadia Power Holdings, LLC ("Acadia Power"), a non-Debtor non-affiliated third party subsidiary of Cleco Corporation. Under certain agreements related to the Acadia project, Acadia Power is entitled to priority distributions through June 2022 or longer if balances are accrued, prior to Calpine Acadia receiving distributions from the revenues of the Acadia facility. Because of this priority distribution scheme, Calpine Acadia was not expected to realize cash flow from the Acadia facility in the medium to long term. In addition, the partnership agreement related to the Acadia facility provides Acadia Power with a right of first refusal, together with other consent rights, over any sale by Calpine Acadia of its ownership interests in the Acadia facility. Due to these contractual issues, Calpine Acadia entered into negotiations with Acadia Power for the purchase of its interest in APP. On April 23, 2007, Calpine Acadia entered into a purchase agreement with Acadia Power, pursuant to which Acadia Power agreed to purchase Calpine Acadia's 50% interest in APP for approximately $60 million (plus the waiver of certain Claims), subject to higher and better offers at a Bankruptcy Court-approved auction. At the same time, Calpine Acadia and Acadia Power entered into a settlement agreement and a release agreement, which together serve to globally resolve the Claims between the parties, allow Calpine Acadia to opt to make a payment in exchange for Acadia Power's waiver of the priority distributions, and waive Acadia Power's right of first refusal on a sale of Calpine Acadia's interest in APP. The Bankruptcy Court approved the bidding procedures on May 9, 2007, and the auction is scheduled to be held on July 30, 2007.

         (ii)     Designated Project Restructurings

The Debtors also determined that certain of the Designated Projects could be successfully restructured and brought to positive cash flow through the renegotiation of significant contracts or leases at the facilities, through technical repairs or through other appropriate action.

*Texas City Project.* In May 2006, the Bankruptcy Court approved the assumption of an amended steam agreement and related ground lease between Texas City Cogeneration, L.P. and Union Carbide Corporation and the assumption of an amended gas refinery agreement between Texas City and BP Products North America Inc. related to the Debtors' Texas City, Texas facility (a 457 MW combined

64

cycle cogeneration facility). The amendment and assumption of the steam agreement, ground lease, and the gas refinery agreement resulted in the conversion of the facility from negative to positive cash flow.

*Clear Lake Project.* In May 2006, the Bankruptcy Court approved the assumption of a restructured ground lease and steam agreement, and global settlement related to the Debtors' Clear Lake facility (a 344 MW combined cycle cogeneration facility located in Pasadena, Texas), resulting in the conversion of the facility from negative to positive cash flow. The settlement agreement addressed several issues, including allowing the Debtors to run the facility only when power sales would be profitable, increasing the price paid to the Debtors for steam, and permitting the Debtors to use transmission and distribution equipment on the property.

*Pine Bluff Project.* Through a reconfiguration of the operating capability of the Pine Bluff facility (a 184 MW natural gas-fired, combined-cycle cogeneration facility located in Pine Bluff, Arkansas) as a result of the installation of new equipment, the Debtors were able to increase the profitability of the facility and convert it from negative to positive cash flow.

      b.    Other Plant or Non-Core Sales

In addition to the dispositions of the Designated Projects, the Debtors also determined it was appropriate to sell or otherwise dispose of certain other assets to stabilize, improve, and strengthen their core power generation business.

*Valladolid Project.* On April 18, 2006, Compañía de Operacion y Mantenimiento Valladolid, S. de R.L. de C.V., an indirect, non-Debtor subsidiary of Calpine Corporation, sold its 45% indirect equity interest in the Valladolid project, a 525 MW natural gas-fired power plant located in Valladolid, Mexico, to Mitsui & Co., Ltd. and Chubu Electric Power Company International B.V. for approximately $43 million, less a 10% holdback and transaction fees. Under the terms of the purchase and sale agreement, the Debtors received Cash proceeds of approximately $38.6 million at closing. The 10% holdback, plus interest, was returned to the Debtors in April 2007. This sale allowed the Debtors to eliminate approximately $88 million non-recourse unconsolidated project debt.

*Thomassen Turbine Systems, B.V.* Calpine European Finance, LLC ("CEURF") purchased Thomassen Turbine Systems, B.V. ("TTS"), a Dutch company, in 2003. Both TTS and CEURF are non-Debtor Calpine affiliates. TTS and Power Systems Mfg., LLC ("PSM"), one of the Debtors, were parties to two agreements, a license agreement and an exclusive development and supply agreement. Under the license agreement, PSM had granted TTS a perpetual exclusive world-wide license agreement for certain proprietary reverse-flow venturi combustor technology (a Low Emissions Combustions system featuring low $NO_x$ emissions). Pursuant to the development and supply agreement, PSM had agreed to design and manufacture airfoils and combustion system parts for certain turbines, and in return TTS was granted an exclusive right to purchase those parts, so long as TTS ordered certain minimum quantities from PSM. Because TTS was substantially underperforming and engaged in a non-core business, CEURF decided to divest itself of TTS. Deloitte Accounting and Consulting managed a bidding process for the TTS assets, and, after negotiations, CEURF agreed to sell its entire equity interest in TTS to Ansaldo Energia S.p.A. of Genoa, Italy for approximately €18.5 million (subject to certain adjustments). The Canadian Bankruptcy Court approved the sale of TTS on August 17, 2006. On September 13, 2006, the Bankruptcy Court approved the rejection of the license agreement and the development and supply agreement between TTS and PSM, and authorized the entry into new contracts between TTS and PSM to address the change in ownership of TTS. The closing of the transaction took place on September 28, 2006 after certain conditions, including receipt of required regulatory approvals, were satisfied. Proceeds from the sale of TTS were placed in an escrow account at Union Bank of California pending allocation between the U.S. Debtors and Canadian Debtors. Pursuant to the terms of the CCAA Settlement

(described more fully in Section III.D.6), the net amount of these proceeds (after payment of the escrow agent's fees) will be equally distributed between the U.S. and Canadian Debtors.

**Goldendale Project.** Goldendale Energy Center, LLC, an indirect, wholly owned subsidiary of Calpine Corporation, owned a 247 MW natural gas-fired, combined cycle generating facility in Goldendale, Washington. Calpine acquired the development rights to the Goldendale facility in April 2001. To minimize future cash losses and monetize the estimated value of future operations, the Debtors marketed the Goldendale facility for sale. Puget Sound Energy, Inc. ("Puget") was the winning bidder in the marketing process, and the Debtors entered into a purchase agreement with Puget to purchase the facility in exchange for, among other things, the payment of approximately $100 million subject to higher and better bids at a Bankruptcy Court approved auction to be held on February 5, 2007. Puget was the successful bidder at the auction with a sale price of approximately $120 million. To effectuate the sale, the Debtors sought approval of certain transfers of real and personal property, free and clear of all Liens, from Goldendale Energy Center, LLC to a limited liability company that was formed immediately prior to the consummation of the sale. At closing, all of the Debtors' membership interests in the new limited liability company were transferred to Puget. The sale was approved by the Bankruptcy Court on February 7, 2007 and closed on February 21, 2007.

**Power Systems Manufacturing, LLC.** PSM is a Florida-based subsidiary that designs, manufactures, and sells highly engineered turbine and combustion aftermarket components. The Debtors decided to sell PSM because PSM was not within the Debtors' core power-generating business and was worth more to the Debtors if owned and operated by a third party with whom the Debtors might do business in the future. After an extensive marketing process, on January 18, 2007, the Debtors entered into an asset purchase agreement with Marubeni Corporation to sell PSM for approximately $200 million, subject to higher and better bids at a Bankruptcy Court-approved auction on March 5, 2007. Alstom Power Inc. won the auction with a sale price of approximately $242 million plus the assumption of certain liabilities and, as a result, Marubeni was paid a Bankruptcy Court-approved break-up fee in the amount of $5 million. The sale to Alstom Power Inc. was approved by the Bankruptcy Court on March 7, 2007 and closed on March 22, 2007. As part of the sale transaction, the Debtors sought approval to enter into the Capital Parts Supply and Parts Development Agreement between Calpine and PSM to assign that agreement from PSM to Alstom Power Inc. Under the agreement, Calpine is required to purchase an annual minimum amount of turbine parts and services from PSM under certain favorable pricing terms over a five-year period.

**RockGen Project.** As set forth above, RockGen leases a 460 MW gas-fired simple cycle power plant located in Christiana, Wisconsin pursuant to a leveraged lease transaction with CIT, as equity owners, and U.S. Bank National Association, as trustee. RockGen was in default under the leveraged lease documents, and on June 1, 2006, the trustee served an enforcement notice on the Debtors and CIT but did not institute foreclosure proceedings against either the Debtors or CIT. On November 2, 2006, the Debtors entered into a forbearance agreement and settlement agreement with CIT and the trustee, pursuant to which the trustee agreed to forbear from exercising remedies against the Debtors and CIT through July 18, 2007. During the forbearance period, CIT agreed to market the RockGen facility in an attempt to maximize the value of the RockGen facility through a sale. During this time, RockGen agreed to continue to operate the RockGen facility and to pay administrative rent up to the amount of net cash flow received by RockGen between December 20, 2005 through the forbearance period, subject to certain cash reserves and holdbacks. On November 15, 2006, the Bankruptcy Court approved the forbearance agreement. CIT is currently marketing the asset for sale.

c.    Turbine and Industrial Equipment Sales

(i)    *GE Model PG7241 FA 60 Hz Turbine*. The Debtors sold this single surplus turbine, along with certain related equipment, to Invenergy Thermal LLC, the stalking horse bidder, for approximately $16 million on October 17, 2006 after no other bidders were qualified to participate in a Bankruptcy Court-approved auction.

(ii)    *SPG 501F Turbines*. The Debtors sold four surplus Siemens Power Generation Model 501FD2 Econopac combustion turbines, along with certain intellectual property rights, equipment and materials related thereto, to Consorcio Pacific Rim Energy Yucal Placer HTE ("Pacific Rim"). After marketing the turbines, the Debtors executed an asset purchase agreement with Pacific Rim on October 13, 2006 to sell the turbines for approximately $48 million. After no higher or better offers for the turbines were received in a Bankruptcy Court-approved auction, the sale to Pacific Rim was approved by the Bankruptcy Court, and subsequently consummated, on November 15, 2006.

(iii)    *Hilco Auction*. As previously discussed, on September 13, 2006, the Bankruptcy Court entered an order approving the retention of Hilco Industrial, LLC as the Debtors' marketing and sales agent and authorizing the sale of certain assets free and clear of Liens. Specifically, the order established procedures for the sale of certain turbines and other industrial assets at an auction to be conducted by Hilco on November 16, 2006 in Las Vegas, Nevada. At the auction, the Debtors successfully sold seven full turbine sets and other miscellaneous industrial assets for total sale proceeds of approximately $48 million. All sales relating to the auction were closed by December 31, 2006.

d.    Post-Confirmation Sales

The Debtors continue to evaluate their holdings to determine if additional assets should be marketed for divestiture. The Debtors are in discussions regarding the ultimate disposition or restructuring of the following Designated Projects: Newark (a fifty MW natural gas-fired, combined-cycle cogeneration power plant located in Newark, New Jersey); Parlin (a ninety-eight MW natural gas-fired, combined-cycle cogeneration facility located in Parlin, New Jersey); Pryor (a thirty-eight MW natural gas-fired, combined-cycle cogeneration facility located in Pryor, Oklahoma); Santa Rosa (a 250 MW natural gas-fired, combined-cycle cogeneration facility located in Pace, Florida); and Hog Bayou (a 235 MW natural gas-fired, combined-cycle facility located in Mobile, Alabama).

In addition, the Debtors are actively marketing two projects under construction: the Fremont project, a 700 MW facility located in Fremont, Ohio; and the Hillabee project, a 770 MW facility located in Alexander City, Alabama. The Debtors are also evaluating a marketing process for Washington Parish, a 565 MW facility located in Washington Parish, Louisiana.

The Debtors or Reorganized Debtors, as applicable, may determine to sell or otherwise divest themselves of these facilities or other property after Confirmation. To the extent the Debtors or Reorganized Debtors, as applicable, sell or divest the property described above or any other property within one year of Confirmation, the Debtors or Reorganized Debtors, as applicable, may elect to sell such property pursuant to sections 363, 1123, and 1146(a) of the Bankruptcy Code and in accordance with the Bankruptcy Court's retention of jurisdiction under the Plan.

67

JA 1537

e.    De Minimis/Non-Debtor Asset Transfers

On March 1, 2006, the Bankruptcy Court entered an order approving procedures for the expedited sale, transfer or abandonment of de minimis assets, and procedures for the sale or transfer of assets of the Debtors' non-Debtor affiliates. The procedures generally permitted the sale, transfer, or abandonment of assets with a value of less than $15 million or, in the case of non-Debtor assets, without any limitation as to value. As of June 1, 2007, the Debtors have generated proceeds of $94 million from asset transfers pursuant to these procedures.

2.    Debt Restructuring Initiatives

a.    Repayment of First Lien Debt

To capture significant savings available by using lower interest-rate funds to repay higher interest-rate debt, on April 19, 2006, the Debtors moved to repay approximately $646.11 million of First Lien Debt using (i) asset-sale proceeds that were being held in a designated control account and (ii) proceeds from the Original DIP Facility. The approximately $412 million of asset-sale proceeds were earning interest in the control account at a rate of approximately 4.42% while the Debtors were paying interest on the First Lien Debt at a rate of 9.625%. As a result of this differential, the Debtors were losing approximately $1.65 million per month. Moreover, the interest rate on the Original DIP Facility (approximately 7.9% at that time) was lower than the 9.625% interest rate on the First Lien Debt, costing the Debtors an additional $310,000 per month. Finally, the Debtors sought to discontinue paying the Professionals' fees of the First Lien Debt noteholders, which would save another approximately $350,000 per month. By order dated May 10, 2006, the Bankruptcy Court approved the Debtors' motion (the "First Lien Repayment Order"), and the Debtors completed the repayment of the First Lien Debt in June 2006. The First Lien Trustee appealed this decision and on January 9, 2007, the District Court affirmed the First Lien Repayment Order. The First Lien Trustee then appealed the District Court's affirmance to the Second Circuit, but on April 11, 2007, voluntarily withdrew its appeal with the consent of the Debtors and the Creditors' Committee.

Prior to the hearing on the Debtors' repayment motion, the First Lien Trustee Filed an adversary proceeding seeking a "makewhole" premium (to compensate the First Lien Debt noteholders for allegedly "lost" future interest payments) in connection with the proposed repayment (the "First Lien Adversary Proceeding"). The Bankruptcy Court specifically provided in the First Lien Repayment Order that its ruling was without prejudice to the rights of the First Lien Debt noteholders to pursue this litigation. On May 23, 2006, the Creditors' Committee intervened in the First Lien Adversary Proceeding, and on June 13, 2007 the Equity Committee intervened in the First Lien Adversary Proceeding. The First Lien Adversary Proceeding is discussed more fully below.

b.    Lien Challenges

Pursuant to the Cash Collateral Order, the Debtors and the Creditors' Committee had until July 30, 2006 to assert (or waive) any claims and defenses related to the Debtors' obligations to the First Lien Debt noteholders and Second Lien Debt noteholders (the "Investigation Termination Date"). The Cash Collateral Order also provided that the Bankruptcy Court could grant extensions to the Investigation Termination Date for "cause shown, after notice and a hearing."

On July 12, 2006, the Bankruptcy Court granted the joint motion of the Debtors and the Creditors' Committee to extend the Investigation Termination Date to October 31, 2006 to allow the Debtors and the Creditors' Committee more time in which to complete their assessments of the Liens securing the First and Second Lien Debt. Likewise, on October 25, 2006, the Bankruptcy Court granted

the Debtors' and Creditors' Committee's joint request to extend further the Investigation Termination Date to November 15, 2006.

On November 3, 2006, the Creditors' Committee Filed a motion for authorization to pursue claims against the First Lien Trustee on behalf of the Estates (the "Standing Motion"). On the same day, the Creditors' Committee also Filed a motion to extend the Investigation Termination Date as it pertained to the alleged security interests granted to the First Lien Debt noteholders through and including the date on which the Debtors and the Creditors' Committee were required to answer or otherwise plead in response to the First Lien Adversary Proceeding. On November 14, 2006, the Creditors' Committee Filed a proposed form of complaint, asserting claims allegedly held by the Debtors' Estates challenging the secured status of the First Lien Debt (the "Lien Challenge Claims"). The Debtors and the First Lien Trustee each objected to the Standing Motion on the basis that the Lien Challenge Claims were not colorable.

On November 15, 2006, the Bankruptcy Court entered an agreed order pursuant to which the Investigation Termination Date, as it pertained to the potential claims against the First Lien Debt, was extended to the earlier of May 15, 2007 or twenty days after the date on which the Debtors and the Creditors' Committee were required to answer or otherwise plead in the First Lien Adversary Proceeding. The agreed order also extended the Investigation Termination Date to May 15, 2007 as it pertained to potential claims that Liens on the Debtors' fixtures were not properly perfected. Also, the Standing Motion was adjourned until the earlier of April 13, 2007 or five days before the Debtors and the Creditors' Committee were required to answer or otherwise plead in the First Lien Adversary Proceeding.

On May 9, 2007, the Bankruptcy Court entered two stipulations governing the proposed Lien Challenge Claims litigation. In the first stipulation, although the Debtors' position on the merits of their objection to the Creditors' Committee's Standing Motion had not changed, to address the Bankruptcy Court's previously-stated admonition that the parties should resolve the Standing Motion in a manner that avoided litigation between the Debtors and the Creditors' Committee, the Debtors agreed to stipulate to the Creditors' Committee's standing to prosecute the Lien Challenge Claims, subject to the Debtors' rights to (1) propose a compromise or settlement of such Lien Challenge Claims, (2) oppose any amendments to the Lien Challenge Claims complaint, and (3) intervene and participate in the litigation as necessary. The second stipulation memorialized an agreement between the Debtors, the Creditors' Committee, and the First Lien Trustee regarding the Creditors' Committee's prosecution of the Lien Challenge Claims. Furthermore, the First Lien Trustee agreed not to object to the Creditors' Committee's standing to pursue the Lien Challenge Claims on the Debtors' behalf, provided the Creditors' Committee asserted such claims on or before May 21, 2007 in the form of an answer and counterclaim in the First Lien Adversary Proceeding. The stipulation also established May 21, 2007 as the deadline for the Debtors to answer or otherwise respond to the complaint in the First Lien Adversary Proceeding.

On May 21, 2007, the Debtors Filed an answer in the First Lien Adversary Proceeding asserting that the First Lien Debt noteholders were not entitled to any makewhole premium as a result of the repayment. The Creditors' Committee also Filed an answer in the First Lien Adversary Proceeding stating its position that the First Lien Debt noteholders should not receive a makewhole premium and further alleging that the First Lien Debt noteholders' Liens are invalid and, therefore, do not have first-priority, secured status. The First Lien Debt noteholders have filed a motion to dismiss the Creditors' Committee's counterclaims.

3.    The Global Refinancing

On January 26, 2007, the Debtors moved for Bankruptcy Court approval of a $5.0 billion replacement debtor-in-possession financing facility (the "Replacement DIP Facility"). The Replacement

69

DIP Facility consists of a $4.0 billion senior secured term loan and a $1.0 billion senior secured revolving credit facility and letter of credit facility, together with an uncommitted term loan facility that permits the Debtors to raise up to $2.0 billion of incremental term loan funding on a senior secured basis. In addition, the Debtors have the ability to provide Liens to counterparties to secure indebtedness in respect of certain hedging agreements with the same priority as the current Replacement DIP Facility debt. At the Debtors' option, the loans under the Replacement DIP Facility bear interest at the Eurodollar rate based on LIBOR (as set forth in the DIP credit agreement) plus 2.25%, or the base rate plus 1.25%. The base rate is the higher of the federal funds rate plus one half of one percent per annum or the prime rate as established by Credit Suisse from time to time.

The Debtors sought authorization to obtain the Replacement DIP Facility to, among other things, repay prepetition debt. Specifically, Calpine sought to repay the CalGen Secured Debt. To effectuate the repayment, the Debtors also asked the Bankruptcy Court to allow their limited objection to the Claims Filed in connection with the CalGen Secured Debt (the "CalGen Claims") and determine the value of those Claims. The basis for the Debtors' objection was that the CalGen Lenders were only entitled to outstanding principal and accrued interest at the non-default rate, *i.e.*, not a prepayment premium.

By satisfying the CalGen Secured Debt and refinancing the Original DIP Facility, the Debtors sought to save approximately $100 million annually, or $8 million per month by replacing higher interest-rate debt with lower interest-rate debt. Additionally, because the Cash Collateral Order required the Debtors to pay the Professional fees of the CalGen Lenders, repayment of the CalGen Secured Debt would reduce the Debtors' administrative costs. On March 5, 2007, the Bankruptcy Court issued a memorandum decision and order (the "DIP Refinancing Order") approving in part the Debtors' request for approval of the Replacement DIP Facility. In the DIP Refinancing Order, the Bankruptcy Court held that provisions in the CalGen loan documents prohibiting repayment prior to a certain date (the "no-call provisions") were unenforceable in the Chapter 11 Cases. Although the CalGen Lenders were prohibited from incorporating prepayment premiums into their Secured Claims, the Bankruptcy Court held that the CalGen Lenders had an Unsecured Claim for damages for the Debtors' "breach" of the no-call provisions. The Bankruptcy Court concluded that the 2.5% prepayment premium for the CalGen first priority notes and the 3.5% prepayment premium for the CalGen second priority notes were reasonable proxies for measures of damages to be awarded to those Creditors. The CalGen third priority notes did not provide for any premium, but the Bankruptcy Court found that a 3.5% premium was also a reasonable proxy for damages awarded. In the aggregate, the DIP Refinancing Order awarded the CalGen Lenders General Unsecured Claims for approximately $76 million. Lastly, the DIP Refinancing Order stated that a decision regarding the CalGen Lenders' entitlement to default interest would be premature. A ruling on this issue is expected later in the Chapter 11 Cases.

The DIP Refinancing Order, as well as three related orders, have been appealed by the CalGen Lenders, the Debtors, the Creditors' Committee, and the Equity Committee to the District Court. Notwithstanding these appeals, the Replacement DIP Facility closed on March 29, 2007. The proceeds of the $4.0 billion senior secured term loan were applied on the closing date to repay approximately $1.0 billion of outstanding loans under the Original DIP Facility and approximately $2.5 billion of the CalGen Secured Debt. The remaining term loan proceeds may be used to repay secured debt, secured lease obligations, or preferred securities of any project level subsidiary, or for working capital and other general corporate purposes. The proceeds of the revolving credit facility may be used for working capital and other general corporate purposes, to satisfy additional payments, if any, in connection with the repayment of the CalGen Secured Debt, and to fund distributions under the Plan.

The maturity date of the Replacement DIP Facility is March 29, 2009. The Replacement DIP Facility, however, contains a "rollover" feature under which Calpine has the option to convert outstanding loans and other extensions of credit, as well as the revolving loan and letter of credit commitments, of the

70

Replacement DIP Facility (and any unused portion of the uncommitted term loan facility) into senior secured exit financing upon the satisfaction of certain conditions.

    4.    Executory Contracts and Unexpired Leases

In conjunction with their overall asset rationalization efforts, the Debtors have engaged in a comprehensive evaluation of their thousands of executory contracts and unexpired leases. The Bankruptcy Code authorizes a debtor, subject to the approval of the Bankruptcy Court, to assume, assume and assign, or reject executory contracts and unexpired leases.

On the Petition Date, the Debtors sought to reject certain of their executory contracts and unexpired leases. The Debtors also sought and received approval of streamlined procedures to reject additional executory contracts and unexpired leases that were unnecessary or burdensome.

During the course of the Chapter 11 Cases, the Debtors and their Professionals have spent a significant amount of time identifying executory contracts and unexpired leases (which were located at the Debtors' various offices and power plants throughout the United States) and creating a central database of the Debtors' contract- and lease-related documents. For each of these executory contracts and unexpired leases, the Debtors determined, based on the economics of the specific contract, whether the contract was a candidate for assumption, rejection, or restructuring.

Pursuant to various notices Filed by the Debtors or other orders entered by the Bankruptcy Court, as of June 1, 2007, the Debtors have rejected approximately fifty-seven executory contracts and approximately twenty-nine unexpired leases. The Debtors' decisions to reject these leases and contracts in some cases resulted from internal business judgments to discontinue or consolidate certain business operations or sell or otherwise divest the Debtors of certain facilities. In other cases, the Debtors sought to reject these leases and contracts due to unfavorable economic terms or other burdensome provisions.

The Debtors also have assumed certain executory contracts and unexpired leases that the Debtors determined, based on the economics of the specific contract or lease, were essential for the Debtors' ongoing business operations. The following is a nonexhaustive discussion of some of the more significant executory contracts and unexpired leases, which the Debtors determined to reject, assume, or restructure, as the case may be, during the Chapter 11 Cases.

    a.    Executory Contracts

        (i)    Power Purchase and Sale Agreement Rejections

On December 21, 2005, the Debtors Filed a motion in the Bankruptcy Court to reject eight power purchase and sale agreements ("PPAs") with the State of California Department of Water Resources ("CDWR"), Southern California Edison Company, APP (counterparty to two of the PPAs), PG&E, Reliant Electrical Solutions, LLC, Northern California Power Agency, and Strategic Energy, L.L.C. (the "PPA Rejection Motion"). PPAs are contracts to transmit or sell electric energy and are governed by certain federal laws, including the FPA and the EPAct 2005, which generally grant FERC jurisdiction over certain issues regarding PPAs. Under the PPAs that were the subject of the PPA Rejection Motion, the Debtors were obligated to sell power to the counterparties at prices that were significantly lower than prevailing market rates.

Simultaneously with their filing of the PPA Rejection Motion, the Debtors initiated an adversary proceeding in the Chapter 11 Cases seeking to permanently enjoin FERC from asserting jurisdiction over the rejection of the PPAs. The Bankruptcy Court issued a temporary restraining order enjoining FERC

71

JA 1541

from asserting jurisdiction and setting the matter for further hearing on January 5, 2006. Meanwhile, on December 29, 2005, certain counterparties to the PPAs filed an action in the District Court. On January 5, 2006, the District Court withdrew the reference of the PPA Rejection Motion and the Debtors' related request for an injunction against FERC.

Earlier, however, on December 19, 2005, CDWR had filed a complaint with FERC seeking to obtain injunctive relief to prevent the Debtors from rejecting the PPA with CDWR (one of the eight PPAs subject to the PPA Rejection Motion) and contending that FERC had exclusive jurisdiction over the matter. On January 3, 2006, FERC determined that it did not have exclusive jurisdiction, and that the matter could be heard by the Bankruptcy Court. Despite the FERC ruling, on January 27, 2006, the District Court determined that FERC had exclusive jurisdiction over whether the PPAs could be rejected by the Debtors. The Debtors appealed the District Court's decision to the United States Court of Appeals for the Second Circuit. The appeal has been fully briefed and oral argument was heard on April 10, 2006. A decision from the Second Circuit is pending.

Following the District Court's decision and during the pendency of the appeals, the PPAs with Strategic Energy, L.L.C., APP, Northern California Power Agency, PG&E, and Reliant Electrical Solutions, LLC have been terminated, either by notice of termination from the counterparty to the Debtors or by negotiated settlement between the parties. In addition, the Debtors have successfully renegotiated the PPA with Southern California Edison Company. The Debtors continue to perform under the sole remaining PPA with CDWR subject to any modifications agreed to by the parties.

        (ii)     Natural Gas Transportation and Power Transmission Contract Repudiations

During the Chapter 11 Cases, the Debtors determined that certain natural gas transportation and power transmission contracts were unprofitable. Due to the uncertainty regarding the Debtors' ability to reject these contracts, the Debtors implemented a process to repudiate these contracts and in certain instances, gave notice to the counterparties that the Debtors would no longer accept or pay for service under such contracts. Since the Petition Date, the Debtors have repudiated approximately fourteen natural gas transportation and power transmission contracts.

        (iii)     Assumption of PPA with CCFC

On October 25, 2006, the Bankruptcy Court authorized CES to enter into a settlement agreement with Calpine Construction Finance Company, L.P., providing for the assumption of a PPA by CES (thereby allowing CES to reduce potential Cure and Administrative Claims against its Estate in the amount of approximately $250 million). The settlement agreement also allows Calpine Construction Finance Company, L.P., and CCFC Preferred Holdings, LLC to secure a substantial majority of the cash flow from Calpine Construction Finance Company, L.P. necessary to service their debt and redeemable preferred shares. Finally, the settlement agreement allows Calpine to maintain control of and preserve its equity value in Calpine Construction Finance Company, L.P. and its subsidiaries.

      b.     Unexpired Leases

As of the Petition Date, the Debtors were parties to hundreds of unexpired leases of non-residential real property. By order dated April 11, 2006, the Bankruptcy Court extended the time within which most of the Debtors had to assume or reject unexpired leases of non-residential real property pursuant to section 365(d)(4) of the Bankruptcy Code through and including July 18, 2006. As a result of the 2005 amendments to the Bankruptcy Code, the Debtors were not permitted to seek further extensions of the section 365(d)(4) deadline beyond July 18, 2006, unless the Debtors obtained consent of the

counterparty to the applicable unexpired lease of nonresidential real property. Thus, to the extent the Debtors were not prepared to assume or reject an unexpired lease of nonresidential real property by the applicable section 365(d)(4) deadline, the Debtors sought specific lessor consent to extend further the time within which the Debtors had to assume or reject such lease. In addition, by order dated July 12, 2006, the Bankruptcy Court extended the time within which the Debtors must assume or reject intercompany unexpired leases of non-residential real property pursuant to section 365(d)(4) of the Bankruptcy Code through the date of confirmation of a plan in each of the respective Debtors' Chapter 11 Cases.

(i)    Plant-Related Ground and Facility Leases

As of the Petition Date, the Debtors were parties to many site and other leases associated with their power plant operations. On June 7, 2006, the Debtors Filed two omnibus assumption motions enabling them to assume fifty-nine power plant associated leases and thus maintain such plants in their fleet. Although these assumption motions were met with numerous formal and informal objections, the Debtors worked to negotiate extensions of time pursuant to section 365(d)(4) of the Bankruptcy Code for leases associated with seventeen of the Debtors' power plants and resolved all other objections. These efforts provided the Debtors with additional time to assess the various leases and to negotiate with the lessors regarding the disposition of such leases on a plant by plant basis.

The assumption or rejection of significant, specific plant associated leases are described below:

*Broad River and South Point Projects.* As discussed, Broad River and South Point lease, respectively, the Broad River and the South Point facilities pursuant to leveraged lease transactions with affiliates of CIT, as equity owners, and U.S. Bank National Association, as trustee. As of the Petition Date, Broad River and South Point were in alleged default under the leveraged lease documents. In June 2006, the Debtors negotiated a settlement agreement with CIT to permit Broad River and South Point to assume the facility leases at the plants notwithstanding the alleged existing defaults and cross-defaults under the agreements. The settlement between the Debtors and CIT also provided for the assignment by Broad River of certain PPAs as security for obligations under the lease documents, after consent for such assignment was obtained from the DIP Lenders. The settlement agreement and the assumption of the facility leases was approved by the Bankruptcy Court on June 27, 2006, and FERC approved the assignment of the PPAs on August 11, 2006. After assumption of such agreements, these facilities represent a pre-tax combined equity value of approximately $148 million to $231 million and are expected to generate pre-tax positive cash flows of over $260 million through the year 2015.

*Channel Project.* In October 2006, the Debtors successfully assumed five critical agreements, including the ground lease, at the Channel Energy Center (a 531 MW gas-fired combined cycle cogeneration plant located near Houston, Texas), which is expected to produce over $224 million in positive cash flows on a pre-tax basis through the year 2016.

*Corpus Christi Project.* In December 2006, the Debtors successfully assumed the facility lease and energy services agreement related to the Debtors' Corpus Christi facility (a 426 MW gas-fired combined cycle cogeneration plant located in Corpus Christi, Texas) and obtained Bankruptcy Court approval of a settlement agreement with the lessor, CITGO Refining, Inc., along with amendments to the facility lease and energy services agreement. The settlement agreement and amendments are expected to increase the profitability of the facility between $2 to $3 million annually.

*Baytown Project.* In January 2007, the Debtors obtained approval of the assumption of a restructured ground lease and energy services agreement, as well as other agreements, with Bayer MaterialScience, LLC, and a global settlement related to the Debtors' Baytown Energy Center, LP (a 753

73

MW natural gas-fired, combined-cycle cogeneration power plant located near Baytown, Texas). The global settlement and assumption is expected to increase the profitability of the Baytown facility by approximately $3 million annually.

**Bethpage Projects.** In January 2007, the Debtors successfully assumed several critical agreements, including site leases, relating to the Debtors' BEC3 facility and CPN Bethpage 3rd Turbine, Inc. facility.

**Greenleaf Project.** In April 2007, the Debtors successfully assumed certain critical contracts relating to the Debtors' Greenleaf plant and certain related equipment. As part of the assumption of the agreements, the Debtors entered into a settlement agreement with the owner-lessor and owner-participant of the facility, which among other things, provided for the waiver of defaults under the assumed agreements and improved terms.

**KIAC Project.** In May 2007, the Debtors successfully assumed certain critical contracts, including a ground lease and an energy purchase agreement, relating to the construction and operation of the Debtors' KIAC facility. Due to certain fluctuations in energy prices under the energy purchase agreement and decreases in long-term natural gas prices, the KIAC facility is expected to generate positive cash flows over the near term.

**Columbia Project.** The Debtors are currently engaged in negotiations over the terms of the ground lease and energy services agreement, each with Eastman Chemical Company, governing the operation of the Debtors' Columbia facility (a 455 MW natural gas-fired, combined-cycle cogeneration plant located in Calhoun County, South Carolina). The Debtors are also engaged in negotiations with Calhoun County, South Carolina regarding the interpretation of a "fees-in-lieu-of-property-taxes" agreement that provides certain property tax benefits to the Debtors in the form of a sale-leaseback transaction. The Debtors expect to resolve the outstanding disputes with Eastman and Calhoun County in the second half of 2007.

**Watsonville Project.** The Debtors are currently engaged in discussions regarding the ultimate disposition of the Debtors' Watsonville facility, a twenty-nine MW natural gas-fired, combined-cycle cogeneration plant located in Watsonville, California, with U.S. Bank National Association, in its capacity as owner-trustee and lessor of the facility, and Ford Motor Credit Company as the owner-participant of the facility. The Debtors expect to resolve the outstanding disputes with U.S. Bank National Association and Ford Motor Credit Company in the second half of 2007.

**Gilroy Cogen Project.** The Debtors are currently engaged in negotiations over the terms of a steam purchase and sale agreement, a lease agreement, and certain related agreements, each with ConAgra, Inc., governing the operation of the Debtors' Gilroy Cogen facility, a 120 MW gas-fired, combined-cycle cogeneration power plant located in Gilroy, California. The Debtors expect to resolve the outstanding disputes with ConAgra in the second half of 2007.

**Pittsburg Projects.** The Debtors are currently engaged in negotiations with The Dow Chemical Company related to the Debtors' Pittsburg Power Plant (a sixty-four MW natural gas-fired, simple-cycle cogeneration facility located in Pittsburg, California), Delta Energy Center (a 818 MW natural gas-fired, combined-cycle cogeneration facility located in Pittsburg, California), and Los Medanos Energy Center (a 521 MW natural gas-fired combined-cycle cogeneration facility located in Pittsburg, California), regarding the terms of two energy sales agreements, a lease agreement, and certain related agreements. The Debtors expect to resolve the outstanding disputes with The Dow Chemical Company in the second half of 2007.

74

*Morgan Energy Center.* The Debtors are currently engaged in negotiations with BP Amoco Chemical Company regarding certain contracts related to the Morgan Energy Center (a 720 MW natural gas-fired, combined-cycle cogeneration facility located in Decatur, Alabama). The Debtors expect to resolve the outstanding disputes with BP Amoco Chemical Company in the second half of 2007. However, to the extent that the Debtors are unable to resolve such disputes, the Debtors will commence an arbitration against BP Amoco Chemical Company.

*Decatur Energy Center.* The Debtors are currently engaged in negotiations with Solutia, Inc. regarding the possible assumption or rejection of a lease agreement and certain related agreements related to the Decatur Energy Center (a 734 MW natural gas-fired, combined-cycle cogeneration facility located in Decatur, Alabama). The Debtors expect to resolve the outstanding disputes regarding assumption or rejection of executory contracts with Solutia, Inc. in the second half of 2007. Unrelated to the assumption or rejection of executory contracts and unexpired leases with Solutia, Inc., Calpine Central, L.P. and Decatur Energy Center, LLC are significant creditors in Solutia, Inc.'s chapter 11 cases, asserting two claims in a total amount in excess of $380 million; such claims are subject to an arbitration proceeding scheduled to take place in August and September of 2007. The arbitration concerns damages relating to the rejection by Solutia, Inc. of the facility lease, the steam sales contract, and the operating and management agreement.

(ii)     Office Leases

As of the Petition Date, the Debtors were lessees to over twenty office leases and subleases. Since the Petition Date, the Debtors have successfully rejected fourteen office leases and subleases, thereby reducing their total office space by 40% and annual overhead costs by approximately $9 million. The Debtors also Filed an omnibus motion to assume the Debtors' remaining eight office leases, located in Folsom, California; Houston, Texas; Pasadena, California; San Jose, California; Boca Raton, Florida; Jupiter, Florida; and Washington, D.C. The omnibus motion to assume was granted by the Bankruptcy Court on July 12, 2006. In November 2006, the Debtors began transitioning certain corporate functions from San Jose, California to Houston, Texas. The Debtors' decisions regarding office space were due, in part, to this transition.

(iii)     Geothermal Leases

The Debtors own certain geothermal electric generating facilities located in Sonoma and Lake Counties, California, as well as mineral and other real estate rights in Siskiyou County, California, where the Debtors are exploring for possible development of new geothermal electric generating facilities. On May 24, 2006, the Debtors Filed an omnibus motion to assume 191 geothermal leases and over 100 associated executory contracts to harness the natural geothermal resources that produce steam for the operation of their geothermal electric generating facilities. The motion was approved by the Bankruptcy Court on June 6, 2006.

(iv)     Pipeline Leases

The Debtors operate multiple natural gas pipeline systems, including over 350 miles of both gathering and transmission pipelines. The pipelines cross numerous parcels of land and waterways, both public and private, and are necessary to allow for gas transportation to the Debtors' customers, including certain of the Debtors' affiliates. To maintain the rights to cross the land under which the pipelines are located, the Debtors previously had entered into leases and personal or revocable real property licenses with various counterparties. On June 7, 2006 and June 28, 2006, respectively, the Debtors Filed omnibus motions to assume eighty-five pipeline related leases and real property licenses to preserve the operation

75