**Appellants Brief Appendix Part 6**

of their network of pipelines. These motions were approved by the Bankruptcy Court on June 21, 2006 and July 12, 2006, respectively.

(v)    Oil and Gas Leases

On July 7, 2005, Calpine and certain affiliates entered into a purchase and sale agreement to sell substantially all of their remaining domestic oil and gas assets (other than certain gas pipeline assets) to Rosetta. This sale included Calpine's interests, as lessee, in certain oil and gas leases located in various jurisdictions in the United States and offshore in the Gulf of Mexico. As of the Petition Date, however, Calpine had not transferred all of its oil and gas lease interests to Rosetta because, among other things, certain conditions to the transfer of certain leases had not been satisfied after the closing of the sale, including obtaining the necessary governmental and regulatory consents required for the transfer of those leases. In addition, certain leases were specifically excluded from the schedule of transferred properties under the purchase agreement with Rosetta. As a result, Rosetta held back approximately $75 million on account of the oil and gas properties that were not transferred to Rosetta under the purchase agreement.

Thus, because the Debtors retained title to a number of oil and gas leases as of the Petition Date, the Debtors began to conduct an analysis of whether such leases would be subject to section 365(d)(4) of the Bankruptcy Code. As stated above, the Debtors faced an absolute deadline of July 18, 2006 to assume or reject unexpired leases of nonresidential real property absent further lessor consent to an extension. Because of the relevant time constraints and the lack of uniformity of state and federal law on this matter, the Debtors could not be sure as to whether such leases were subject to the assumption deadline set forth in section 365(d)(4). To avoid potential forfeiture of the oil and gas leases, the Debtors moved to assume approximately 150 oil and gas leases, only to the extent such leases were subject to section 365(d)(4), and set final Cure amounts with respect thereto notwithstanding any counterparty's purported audit rights on June 29, 2006. Certain counterparties to the oil and gas leases objected, and the Debtors subsequently entered into stipulations to extend the time to assume or reject such leases. On July 12, 2006, the Bankruptcy Court entered an order approving the assumption of the oil and gas leases not subject to separate stipulations to extend the time, only to the extent such leases were unexpired leases subject to section 365(d)(4). On November 15, 2006, the Bankruptcy Court later entered an order assuming certain of the oil and gas leases for which the deadline to assume had been extended, but only to the extent such leases were unexpired leases subject to section 365(d)(4).

5.    Entity Simplification Process

The Debtors, along with their legal and tax advisors, are in the process of analyzing their corporate structure in an effort to streamline and simplify their corporate organization. The Debtors have identified corporate Entities which no longer serve the purpose for which they were acquired or formed or Entities that can be logically merged into other affiliated Entities without negative impact on the assets or operations of either Entity. The Debtors anticipate they will be able to eliminate a number of Entities from the corporate organization after emergence from chapter 11.

The Debtors have undertaken a comprehensive review and analysis of all affiliated Entities that included, among other considerations, an evaluation of assets and liabilities, contractual or financing arrangements, governmental approvals required to merge Entities, tax implications, pending litigation, and the existence of Liens and Claims Filed against each Entity, as well as the benefits or issues of merging and eliminating an Entity. To date, through the evaluation process, the Debtors have identified approximately 193 Debtor and non-Debtor Entities, or approximately 45% of the total Entities in the Debtors' corporate structure, which could be merged into Entities in the same direct ownership chain. The targeted Entities are expected to be eliminated predominantly through merger into the Entity directly

76

above the merging Entity in the ownership chain. A list of the targeted Entities is included in the Plan Supplement.

The Debtors will continue the evaluation process for the duration of the Chapter 11 Cases and could reduce or increase the number of Entities identified as merger candidates near the conclusion of the Chapter 11 Cases. Entities will be excluded from the simplification process if any consideration arises which indicates a merger is inappropriate or not beneficial to the Debtors.

6.    The CCAA Proceedings

In 2000 and 2001, Calpine made a series of foreign acquisitions, which included oil and natural gas producing assets and interests in power generating plants. The bulk of these assets was located in Canada, with the exception of the Saltend Energy Centre, which was located in the United Kingdom, but was owned by Calpine's Canadian subsidiaries. Beginning in the second half of 2001 and continuing through 2005, Calpine began to deemphasize the operational contributions of its Canadian business and to focus instead on raising Cash from its Canadian assets.

In September and October of 2001, Calpine raised in excess of $2 billion through the issuance of the ULC Notes. In 2002, Calpine transferred its Canadian power plants to the Calpine Power Income Fund (the "Income Fund"), an open-ended trust that enjoyed favorable tax treatment under Canadian law. Ownership "units" of the Income Fund were owned and traded by the public. The Income Fund contracted with Calpine's Canadian subsidiaries to manage the Fund's business and to operate the plants. Although Calpine originally retained a 50% ownership interest in the Income Fund, in early 2003 Calpine conducted a secondary offering to the public of its remaining interest in the Income Fund, after which it only retained certain subordinated interests. The Income Fund was acquired by a third party during the pendency of the CCAA Proceedings. In 2002, Calpine began divesting its Canadian-based oil and natural gas producing assets, and the last such asset was sold in September 2004. Finally, in July 2005, Calpine sold the Saltend Energy Centre. Thus, Calpine was in the process of winding down its Canadian operations prior to the commencement of the CCAA Proceedings.

On the same day the Debtors Filed the Chapter 11 Cases, the Canadian Debtors commenced the CCAA Proceedings. Ernst & Young, Inc. was appointed by the December 20, 2005 Initial Order of the Canadian Court as the Monitor (the "Monitor") in the CCAA Proceedings.

The Canadian Debtors' principal assets when the CCAA Proceedings were initiated were alleged Intercompany Claims against the Debtors, Cash, and certain subordinated interests in the Income Fund. In addition, the Canadian Debtors' assets include proceeds "repatriated" to Canada from the sale of the Saltend Energy Centre (discussed further below), as well as certain proceeds from the sale of TTS (as further discussed in Section III.D.1.b.). Finally, pursuant to the terms of the proposed global settlement between the Canadian Debtors and the Debtors discussed below (the "CCAA Settlement"), the Canadian Debtors' assets will also include proceeds from the sale of certain ULC1 Notes held by CCRC, one of the Canadian Debtors. The expected outcome of the CCAA Proceedings is an orderly liquidation, rather than the restructuring of an ongoing business. At present, the Canadian Debtors only have a handful of employees remaining. As far as the Debtors are aware, the Canadian Debtors intend to file a plan of arrangement to facilitate their liquidation.

a.    The Canadian Claims

(i)    ULC1 Note Claims

As discussed, in 2001, Calpine issued the ULC1 Notes. Calpine issued the notes through their Canadian unlimited liability companies (rather than through U.S. subsidiaries) to obtain certain favorable tax treatment in multiple jurisdictions. Calpine Corporation allegedly guaranteed these ULC1 Notes. ULC1, as a non-operating Canadian unlimited liability company, never had its own funding sources.

The corporate and financing structure underlying the ULC1 Notes issuance was extremely complex and has resulted in multiple multi-billion dollar Claims being asserted in the Chapter 11 Cases. In connection with the ULC1 Note issuance, a "hybrid note structure" was created that added two additional contractual layers to facilitate the payment of interest and principal on the ULC1 Notes. These contractual layers included "subscription agreements" and a "share purchase agreement," under which QCH agreed to purchase shares of CCEL. Both the subscription agreements and the share purchase agreement were also allegedly guaranteed by Calpine Corporation.

This "hybrid note structure" was further supplemented by certain related debentures between CCEL and ULC1, a subordinated debenture between CCRC and CCEL, and certain related promissory notes between CCRC and CCEL. This tax-driven "hybrid note structure" ultimately caused the filing of multiple multi-billion dollar Claims by multiple parties in the Chapter 11 Cases on account of ULC1 Notes. In particular, CCEL and ULC1 Filed identical Claims against QCH for $2.56 billion based on the Subscription Agreements, and against Calpine Corporation for $2.56 billion based on Calpine Corporation's guarantee of the Subscription Agreements. HSBC, the indenture trustee for the ULC1 Notes also filed Claims in both the CCAA Proceedings and the Chapter 11 Cases arising out of the note issuance, and further Filed a contingent, unliquidated Claim against Calpine based on, *inter alia*, an "oppression" theory under Canadian law, and on various theories of recovery under U.S. law.

In July 2005, in connection with the repayment of certain intercompany loans associated with a preferred stock offering triggered by the sale of the Saltend Energy Centre in the United Kingdom, Calpine Corporation and certain of its Affiliates transferred approximately $360 million of repurchased ULC1 Notes to CCRC, thus creating claims of CCRC against ULC1 for the underlying obligations and against Calpine Corporation for the alleged guarantees.

Because these repurchased ULC1 Notes represented one of the Canadian Debtors' single largest assets, the Canadian Debtors desired to sell and monetize them. However, the Debtors believed that the transfer of the ULC1 Notes to CCRC may have been avoidable under the Bankruptcy Code. In July 2006, the Canadian Debtors instituted a process to have the Canadian Court determine CCRC's rights in the repurchased ULC1 Notes. In late 2006, the Canadian Debtors and the Debtors attempted to negotiate an arrangement whereby the ULC1 Notes held by CCRC could be sold while preserving any rights of the Debtors to the proceeds. The ULC1 Notes were not, however, ultimately sold.

As part of the Claims reconciliation process, the Debtors Filed a partial objection to the Claims Filed by the indenture trustee for the ULC1 Notes. This objection is still pending, and, *inter alia*, asserts defenses under section 502(d) of the Bankruptcy Code based on the transfer of the ULC1 Notes by CCRC.

(ii)    ULC2 Claims

Calpine also raised funds in 2001 through the issuance of the ULC2 Notes, which bonds are also allegedly guaranteed by Calpine Corporation. Though the ULC2 Notes lacked the complex "hybrid note"

78

structure of the ULC1 Notes, the indenture trustee of the ULC2 Notes filed claims in both the CCAA Proceedings and in the Chapter 11 Cases. Specifically, the indenture trustee Filed a Claim against Calpine Corporation for $213 million arising out of Calpine's alleged guarantee of the Euro-denominated ULC2 Notes, and a Claim against Calpine Corporation for $357 million arising out of Calpine's alleged guarantee of the pound sterling-denominated ULC2 Notes. In addition, the indenture trustee filed claims against ULC2 in the CCAA Proceedings for the underlying ULC2 Note obligations. Finally, the indenture trustee Filed identical Claims against Calpine Corporation and QCH, each for $549 million, based on, *inter alia*, an "oppression" theory under Canadian law, and various theories of recovery under U.S. law. Judicial resolutions of these claims were complicated by the presence of claims in both jurisdictions.

(iii)    Claims of Calpine Power, L.P.

As part of the 2002 transaction that created the Income Fund, Calpine Corporation allegedly guaranteed certain obligations of its Canadian subsidiaries to the Income Fund, related to the Income Fund's operation of the Canadian power plants. The Income Fund, through its operating unit, Calpine Power, L.P. ("CLP"), filed claims in both the CCAA Proceedings and the Chapter 11 Cases related to the breach of these agreements, based both on the underlying contractual obligations and Calpine Corporation's alleged guarantees of those obligations.

CLP also has Filed a contingent, unliquidated Claim for a fee payable by CLP to British Columbia Hydro and Power Authority, the sole customer of the Island Cogeneration plant, in the event of a specifically-defined transaction causing a change of control of the Island Cogeneration plant. CCPL agreed to indemnify and hold harmless CLP and the Income Fund against all Claims by British Columbia Hydro and Power Authority on account of this fee, and Calpine Corporation allegedly guaranteed this obligation. There is currently a dispute between CPL and British Columbia Hydro and Power Authority about whether the acquisition of the Income Fund constituted a change in control such that any fee became due.

(iv)    Intercompany Claims and Resolution Process

The Canadian Debtors have Filed approximately $1.1 billion of Claims against the Debtors, and the Debtors have filed approximately $250 million of claims against the Canadian Debtors, both based on intercompany amounts shown on their respective books and records. Prior to the Bar Date, the Canadian Debtors and the Debtors negotiated the terms of a Memorandum of Understanding that allowed certain placeholder, or "marker" claims to be filed in both the CCAA Proceedings and Chapter 11 Cases. The Memorandum provided that claims would not be objected to on grounds such as the naming of an incorrect debtor, or the absence of a specific claim amount. The Canadian Debtors and the Debtors also agreed in the Memorandum to negotiate a claims resolution protocol, the terms of which are described in further detail below.

(v)    Resolution of Other Canadian Claims

The proposed CCAA Settlement contemplates the resolution of nearly all the intercompany cross-border claims, as well as most of the third-party claims. The remaining intercompany claims consist of a group of forty-eight protective directors' & officers' indemnity claims filed on behalf of Canadian Debtor Entities or officers and directors of such Entities. The proposed CCAA Settlement contemplates that these Claims will be accorded the same treatment as other similar Claims in the Plan.

The third-party Claims that are not addressed in the CCAA Settlement arise out of Calpine Corporation's alleged guarantees of certain Canadian-related obligations, and fall into four groups. First,

79

as discussed above, certain Claims were Filed by CLP in connection with guarantees by Calpine Corporation of obligations of certain of its Canadian subsidiaries, relating to the Income Fund. Second, Alliance Pipeline Limited Partnership, NOVA Gas Transmission Ltd. and TransCanada Pipelines Limited were counterparties to certain gas transportation contracts with certain of the Canadian subsidiaries, which contracts were repudiated by the Canadian Debtors in the course of the CCAA Proceedings. Calpine Corporation allegedly has partially guaranteed the obligations under these contracts up to a certain capped amount. A process for resolving these two categories of Claims has been included in the proposed CCAA Settlement, which consists of these Claims being heard and adjudicated by the Canadian Court, with full participation rights of the Debtors and the Creditors Committee and Equity Committee. Third, Calpine Corporation also allegedly has guaranteed obligations in connection with the Greenfield Energy Centre, for which guarantee claims were filed in both the Chapter 11 Cases and the CCAA Proceedings. These Claims will be resolved as part of the proposed CCAA Settlement. Fourth, the indenture trustees for the ULC1 and ULC2 Notes have filed "marker" claims in the CCAA Proceedings in both the Chapter 11 Cases and the Canadian Proceedings. These claims will also be resolved as part of the proposed CCAA Settlement.

### b.   Sale of Interest in the Income Fund

As part of the acquisition of the King City (California) facility, a loan was made by Calpine Commercial Trust, a partnership indirectly owned by a unit of the Income Fund, to CCPL in the amount of C$48 million (the "Manager Loan"). Repayment of the loan was guaranteed by Calpine King City Cogen, LLC, a non-Debtor subsidiary of Calpine Corporation, and revenue generated by the facility that otherwise would have been upstreamed to Calpine was instead held in a dedicated "guarantee account" as security for repayment of the Manager Loan. In February 2007, the Canadian Court approved the sale of CCPL's interest in the Income Fund to HCP Acquisition, Inc. In connection with that transaction, the Manager Loan was repaid, therefore freeing up the funds in the "guarantee account" and paving the way for future upstreaming of revenue from the King City facility to Calpine.

### c.   Repatriation of the Saltend Proceeds and the Debtors' Potential Saltend Avoidance Action

As referenced above, in 2005, Calpine sold the Saltend Energy Centre. On the Petition Date, the net proceeds from the sale were held in the bank account of a wholly-owned indirect subsidiary of CCRC. The Canadian Debtors desired to "repatriate" the Saltend proceeds to CCRC to advance the liquidation of the CCAA Estates.

However, the Debtors believe that they also may have claims to the Saltend proceeds, based on avoidance actions stemming from the transfer of the repurchased ULC1 Notes to CCRC. Thus, in 2006, the Debtors and the Canadian Debtors cooperated to "repatriate" the Saltend proceeds to CCRC, on condition that the proceeds would be held by CCRC subject to the claims and structural priorities of the Debtors. The disposition of the Saltend proceeds is incorporated into the proposed CCAA Settlement.

### d.   The Greenfield Energy Centre and the Greenfield Avoidance Action

As previously discussed, Greenfield Energy Centre is a project under construction in Courtright, Ontario, Canada that is owned by Greenfield Energy Centre LP (the "Greenfield Partnership"), a limited partnership between an indirect wholly owned, non-Debtor subsidiary of Calpine and a subsidiary of Mitsui & Co., Ltd. Initial construction of the Greenfield project was financed through capital and equipment contributions. To this end, the Debtors contributed more than $100 million in Cash and equipment to the Greenfield Partnership during 2006 and 2007. After several months of good faith, arm's-length negotiations, in November 2006, the Greenfield Partnership reached an agreement with

certain lenders to obtain non-recourse project debt to finance the remainder of the Greenfield Project construction. In January 2007, the Debtors obtained authority from the Bankruptcy Court to take any and all actions necessary to effectuate the project financing. Nevertheless, financial close was delayed because Calpine Canada Natural Gas Partnership, a Canadian Debtor, filed a fraudulent conveyance and preference action in the Canadian Court (Action No. 0601-14198, the "Greenfield Avoidance Action") against Calpine Energy Services Canada Partnership, a Canadian Debtor, and the trustee of Calpine Greenfield Commercial Trust, a wholly-owned, indirect, non-Debtor Calpine Affiliate, seeking to avoid a prepetition transfer of Calpine's 49.995% partnership interest in the Greenfield Partnership to the Calpine Greenfield Commercial Trust for less than reasonably equivalent value.

In April 2007, the Canadian Debtors and the Debtors reached an interim resolution of the Greenfield Avoidance Action whereby the Canadian Debtors agreed, among other things, to waive any right to recover the transferred 49.995% partnership interest and, in exchange, the Debtors granted the Canadian Debtors an Allowed Administrative Claim against the Calpine bankruptcy estate in the liquidated amount of any favorable judgment obtained in the Greenfield Avoidance Action. As a result of this interim settlement, the Debtors were able to complete the steps necessary to close a non-recourse project finance facility of $650 million.

> e.    Negotiation of Global Resolution

After struggling with these complex cross-border issues for almost a year, the Canadian Debtors and the Debtors realized that the only way to break the various intertwining logjams and unlock the values of the estates on both sides of the border was by investing time and effort in intense serial negotiations, focusing on the goal of a consensual resolution. The Canadian Debtors and the Debtors and their advisors worked intensely with the Monitor over a period of months to reconcile these claims and reduce them to agreed amounts.

At first, the Canadian Debtors and the Debtors focused their efforts on negotiating a cross-border court-to-court protocol, which was approved by the Bankruptcy Court on April 12, 2007. The Canadian Debtors and the Debtors then began to negotiate a protocol structuring the resolution of all cross-border claims. However, the Canadian Debtors and the Debtors soon realized that absent a global consensual resolution, the two estates could be litigating for years, exacerbated by the fact that at least two jurisdictions were involved. Therefore, the Canadian Debtors and the Debtors engaged in intensive settlement discussions over a period of more than five months, involving their legal, financial, and other advisors.

On May 13, 2007 the Canadian Debtors and the Debtors announced the CCAA Settlement, which is a comprehensive consensual and global resolution of virtually all major cross-border issues. In addition to the Canadian Debtors and the Debtors and their financial and legal professionals, the Monitor participated in the negotiation of the CCAA Settlement, and will recommend approval of the CCAA Settlement to the Canadian Court. The CCAA Settlement resolves, among other things, all the major issues discussed above, and addresses how the remaining unresolved issues will be handled. The CCAA Settlement allows the Canadian Debtors to move forward with a plan of arrangement in the CCAA Proceedings, and allows the Debtors to resolve Canadian-related claims and other pending litigation and focus their attention on Confirmation and the exit process.

The CCAA Settlement was first embodied in a Global Settlement Outline for Certain Claims Between and Relating to Calpine U.S. and Calpine Canada (the "Settlement Outline"), which was filed as an exhibit to Calpine's Form 8-K filed with the SEC on May 13, 2007. The Canadian Debtors and the Debtors are currently drafting a set of definitive documents memorializing the CCAA Settlement (the "CCAA Settlement Agreement"). The CCAA Settlement will resolve virtually all major cross-border

issues, allow the removal of a large number of Claims from the Claims Register, and allow the dismissal of all currently-pending cross-border litigation.

The highlights of the CCAA Settlement include:

(i)     All cross-border intercompany claims based on the books and records of the Canadian Debtors and the Debtors will be resolved and the amounts fixed – this will eliminate more than $841 million of Unsecured Claims from the Claims Register.

(ii)    The Greenfield Avoidance Action against the Debtors will be dismissed with prejudice.

(iii)   Calpine's objection with respect to the ULC1 Notes will be withdrawn with prejudice. As discussed above, the ULC1 Notes held by CCRC will be sold and the proceeds will flow to the Canadian Debtors to be distributed in accordance with the CCAA Settlement, thereby allowing the CCAA Proceedings to move forward.

(iv)    The Canadian Debtors and the Debtors have agreed on a procedure by which certain third-party claims filed in the CCAA Proceedings and the related guarantee Claims Filed in the Chapter 11 Cases will be resolved. The interests of the Debtors and their Estates will be protected by allowing the Debtors, the Creditors' Committee, and the Equity Committee the right to fully participate in any settlement or adjudication of these claims in the CCAA Proceedings.

(v)     Over $10.5 billion in claims filed by third parties in both the CCAA Proceedings and the Chapter 11 Cases will be withdrawn or deemed to have no value.

(vi)    Approximately $15 million in proceeds from the 2006 sale of TTS which have resided in an escrow account since the sale, will be split evenly among the Canadian Debtors and the Debtors, thereby avoiding lengthy separate negotiations or possible litigation.

(vii)   The CCAA Settlement calls for the withdrawal of 3,547 contingent, unliquidated Claims Filed by each of the Canadian Debtors against each of the Debtors, based on, *inter alia*, an "oppression" theory under Canadian law, and various theories of recovery under U.S. law.

The CCAA Settlement also incorporates a previously-announced settlement between the Debtors and an ad hoc group of holders of ULC1 Notes (the "ULC1 Settlement"). An executed preliminary outline of the ULC1 Settlement was filed as an exhibit to Calpine's Form 8-K, filed with the Securities and Exchange Commission on April 19, 2007. The ULC1 Settlement essentially replaces approximately $12 billion of Claims Filed in the Chapter 11 Cases with a single Claim of approximately $3.5 billion (provided that the ULC1 bondholders' Claims will essentially be capped at principal and interest, plus certain costs and fees). The success of the ULC1 Settlement relies on the resolution and finalization of the CCAA Settlement with the Canadian Debtors, because the ULC1 Settlement is based on the Debtors obtaining certain agreed treatment of Claims held by Canadian Debtor Entities related to the ULC1 Notes and other agreements in the "hybrid note structure." An ad hoc committee of ULC1 bondholders – which

82

is the single largest bondholder group in the Chapter 11 Cases – has endorsed the larger global CCAA Settlement with the Canadian Debtors.

The CCAA Settlement calls for the distributions, funds and asset transfers, and claims resolutions flowing from the CCAA Settlement to be structured as tax-efficiently as possible. To that end, the Canadian Debtors and the Debtors have agreed to modify the distributions, funds and asset transfers, and claims resolutions as necessary (even if different from the terms of the CCAA Settlement) to achieve the greatest tax benefits.

The Canadian Debtors and the Debtors will file motions seeking the approval of the Canadian Court and Bankruptcy Court, respectively, of the CCAA Settlement (including the ULC1 Settlement). The Canadian Debtors and the Debtors intend to execute the CCAA Settlement Agreement in July 2007 after which it will be posted at http://www.kccllc.net/calpine/canadasettlement. The motions are scheduled to be heard by both courts in a joint videoconferenced hearing on July 24, 2007.

    7.    Employee Matters

        a.    Headcount Reductions

As stated previously, shortly after the Petition Date, the Debtors began to implement staff reductions with a goal of reducing approximately 1,100 positions, or over one-third of its prepetition workforce. As of March 31, 2007, the Debtors had reduced their workforce by 1,096 employees, resulting in an annualized cost savings of approximately $180 million. The Debtors' workforce now consists of approximately 2,200 employees.

        b.    Calpine Incentive Plan

Prior to the Petition Date, the Debtors maintained, in the ordinary course of their business, certain annual performance-based cash incentive plans both on a company-wide and business-unit basis, each with its own eligibility criteria and method for calculating awards. The Debtors, however, did not seek authority to continue these bonus programs after the Petition Date, nor did the Debtors seek to make any payments to employees for the 2005 calendar year under the prepetition bonus programs. Rather, after commencing the Chapter 11 Cases, the Debtors sought to develop a new incentive program intended to provide awards to employees commensurate with the value that each employee contributed to the Debtors' ongoing operations and the success of the Debtors' reorganization. The Debtors analyzed the need for and merits of a new incentive program and designed it with three principles in mind: that it be market-based; performance-linked; and cost-effective.

After significant negotiations with the various constituencies in the Chapter 11 Cases, the Debtors proposed a new incentive program, which was approved by the Bankruptcy Court on May 15, 2006. The incentive program has four major components, the Emergence Incentive Program, the Management Incentive Program, the Supplemental Bonus Plan and the Discretionary Bonus Plan, each of which is described in general below:

        (i)    The Emergence Incentive Plan

The Emergence Incentive Plan provides variable Cash awards, contingent upon the achievement of certain performance metrics, to approximately twenty select senior employees, primarily including executive vice presidents and a select group of senior vice presidents. The Emergence Incentive Plan consists of an incentive pool created according to certain metrics related to the valuation of Calpine both under the Plan and based on market value six months after the Effective Date. The Emergence Incentive

Plan begins with an incentive pool of $5.45 million, and increases in correspondence with Calpine's valuation. Once created, the incentive pool will be distributed according to the terms of the Emergence Incentive Program to eligible employees at the discretion of Calpine's chief executive officer after the Debtors' emergence from chapter 11.

(ii)     The Management Incentive Plan

The Management Incentive Plan (later renamed the Calpine Incentive Program) establishes bonus awards for performance for the calendar year 2006 and beyond, for approximately 600 of the Debtors' employees who occupy positions critical to Calpine's ongoing business. The Debtors paid approximately $26 million in bonuses for the 2006 bonus periods.

Under the Management Incentive Plan, performance is measured relative to goals established by the Debtors in consultation with the Committees. Payments under the Management Incentive Plan have been made only where such stated performance objectives were achieved.

(iii)     The Supplemental Bonus Plan

Under the Supplemental Bonus Plan, which is applicable only to 2006, persons identified by the Debtors as performing a critical function and being at significant risk of being hired away from Calpine were provided with a supplemental Cash award. Only employees at the level of vice president and below were eligible for participation in the Supplemental Bonus Plan. Payment of the Supplemental Bonus Plan award was made in two equal installments, the first installment upon Bankruptcy Court approval of the Calpine Incentive Program and the second at the end of 2006. Employees selected for participation must have been employed on the date of payment to receive the award. The Debtors paid approximately $6 million under the Supplemental Bonus Program.

(iv)     The Discretionary Bonus Plan

Under the Discretionary Bonus Plan, a pool in the amount of $500,000 is created annually from which individual bonus payments of no more than $25,000 per employee, per year, may be awarded at the sole discretion of Calpine's chief executive officer. Only employees at the level of director and below are eligible for discretionary bonus payments. The Debtors paid $250,000 in discretionary bonus payments in 2006, and expect to pay $500,000 in discretionary bonus payments in 2007.

c.     Severance Program

Prior to the Petition Date, and in the ordinary course of their business, the Debtors administered two severance programs: a formal severance program for employees at the director level and below; and an ad hoc program for certain employees at the vice president level and higher. On the Petition Date, the Bankruptcy Court entered an order authorizing the Debtors to pay up to $300,000 in severance payments to certain employees under Calpine's prepetition severance programs, all of which was paid out shortly after the Petition Date.

Subsequently, the Debtors began to develop a new broad-based severance program to replace their prepetition programs. The Debtors thus sought to create a severance program that was structured to avoid unnecessary or excessive benefits and was narrowly tailored to provide severance benefits that were within the norm of benefits provided to employees in similar chapter 11 cases and commensurate with the contribution that each employee made to the Debtors' ongoing operations. Watson Wyatt & Company, the Debtors' employee benefits advisor, conducted a comprehensive review of severance programs implemented in other large chapter 11 cases to ensure that the proposed program was consistent with

84

programs implemented in comparable cases. After negotiations with the various constituencies in the Chapter 11 Cases, the Debtors proposed a new severance program (the "Severance Program") which was approved by the Bankruptcy Court on March 1, 2006. On October 25, 2006, the Bankruptcy Court subsequently approved a modification to the program, adding approximately ten employees to the Severance Program.

The Severance Program, as approved, provides severanee benefits to all full-time employees without written employment agreements and whose employment is terminated involuntarily and without cause. To be eligible for any benefits, the employee must execute a release of all claims and a written agreement containing non-solicitation, non-competition, non-disclosure, and non-disparagement provisions. Under the Severance Program, the employee receives a Cash payment in the form of salary continuation, based upon the number of weeks of salary provided to eligible employees and varying based on employee level and, in certain instances, years of service. The number of weeks ranges from two weeks per year of service for lower level employees to a maximum of thirty-nine weeks for the most senior employees. Each employee also may receive a maximum of one year's worth of accrued vacation time as a severance benefit. Finally, most employees may elect to receive twelve weeks of either benefits continuation or outplacement services at the time of their termination. Certain employees only receive such services for the period of time equal to the period of that employee's salary continuation under the Severance Program. For employees at the executive vice president and senior vice president level who obtain alternate employment within the period of time that they are entitled to receive salary continuation and other benefits under the Severance Program, such severance payments and other benefits will be terminated after twenty-six weeks or the day on which the employee commences alternate employment, whichever is later. Since its approval, the Debtors have spent approximately $17.3 million under the Severance Program.

d.    Executive Employment Agreements

Just prior to and during the course of the Debtors' Chapter 11 Cases, the Debtors found it necessary to enter into employment agreements with certain members of Calpine's executive management team. Specifically, the Debtors sought and received Bankruptcy Court authorization to assume the employment agreement with Robert P. May, Calpine's chief executive officer, and enter into an employment agreement with Scott J. Davido, Calpine's former chief restructuring officer, on May 25, 2006. At the time his employment agreement was approved, Mr. Davido was also the chief financial officer of Calpine. In November 2006, Calpine named Lisa J. Donahue of AlixPartners as interim chief financial officer to allow Mr. Davido to focus on matters related to the business plan. Mr. Davido's employment agreement was amended to reflect this change in title and duties in December 2006. Subsequently, effective as of February 16, 2007, Mr. Davido resigned from his position.

The Bankruptcy Court also entered an order approving the employment agreements of Gregory L. Doody, General Counsel, Thomas N. May, President of Calpine Merchant Services Company, Inc., and Robert E. Fishman, the executive vice president of the Power Operations division of Calpine, on July 26, 2006.

e.    ERISA Plans

As of the Petition Date, Calpine sponsored the following material employee benefit plans, each of which is governed by provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 et seq. ("ERISA") and the Internal Revenue Code:

(i)    Retirement Plans

Calpine sponsors and maintains two defined contribution plans that are intended to meet the tax-qualification requirements of Internal Revenue Code section 401(a).  Both plans include a Cash or deferred arrangement described in Internal Revenue Code section 401(k) pursuant to which participants may elect to defer a portion of their income on a pre-tax and post-tax basis.  Contributions to the plans, and earnings to such contributions, are held in trust for the exclusive purpose of providing benefits and defraying reasonable costs of administering the plans.  Neither of the plans have been included on the Debtors' Schedules as Creditors in the Chapter 11 Cases.

The Calpine Union 401(k) Retirement Savings Plan (the "Union Plan"), was established and maintained pursuant to Calpine's CBAs.  The Union Plan requires Calpine to contribute amounts to the Plan based on employee elective deferrals (i.e., "matching contributions") in the amount of 50% of an employee's elective deferral up to 6% of that employee's compensation.  In addition, the Union Plan requires Calpine to pay, each plan year, a non-elective employer contribution in the amount of 6% of each active participant's annual compensation.  As of December 31, 2006, the Union Plan held in trust approximately $6.1 million.  The Union Plan has not been amended since the Petition Date.

The Calpine Corporation Retirement Plan ("Non-Union Plan") was established and maintained for the benefit of Calpine's non-unionized workforce.  Prior to the Petition Date, the Non-Union Plan required Calpine to pay, each year, a non-elective employer contribution in the amount of 4% of total compensation paid to each active participant of the Plan.  Beginning with the plan year starting on January 1, 2007, the Non-Union Plan requires Calpine to pay, each plan year, a non-elective employer contribution in the amount of 3% of each active participant's annual compensation, plus a matching contribution of 50% of each participant's elective deferral up to 4% of that participant's total annual compensation. As of December 31, 2006, the Non-Union Plan held in trust $156.3 million.

As of the Petition Date, Calpine operated and continues to operate the Union Plan and the Non-Union Plan in accordance with the terms of the respective plan documents, ERISA, the Internal Revenue Code, and other applicable laws in all material respects.  In particular, Calpine has contributed amounts to the Union Plan and the Non-Union Plan as required by the plan documents, and has timely remitted to each plan's respective trust all participant contributions made through elective salary reductions in accordance with section 2510.3-102 of the Department of Labor's Regulations.  The Union Plan and the Non-Union Plan have paid and will continue to pay all claims for benefits in accordance with the terms of the plans and applicable law.  While Calpine intends the Union Plan and the Non-Union Plan to continue, it reserves the sole and absolute discretion to amend, modify, freeze, or terminate such plans at any time.

Prior to the Petition Date, Calpine offered a non-qualified deferred compensation plan to certain employees.  This plan was frozen as a result of the filing of the Chapter 11 Cases.  The non-qualified deferred compensation plan is listed on the Debtors' Schedules as a Creditor in the Chapter 11 Cases, and any such Claims held by the non-qualified deferred compensation plan will be treated in accordance with the Plan.

(ii)    Welfare Plans

Calpine sponsors the Calpine Corporation Employee Benefit Plan, which offers health and welfare plans for the benefit of its employees including medical, dental, vision and prescription drug benefits, life, supplemental life and dependent life insurance benefits, accidental death and dismemberment insurance benefits, disability insurance benefits (both short-term and long-term), and an employee assistance program.

Medical, prescription drug, and dental benefits are self-insured by Calpine. Vision and employee assistance program benefits are fully insured. With the exception of the employee assistance program, employees contribute towards the cost of these benefits by paying a portion of the premium. Life, supplemental life, dependent life, long-term disability, and accidental death and dismemberment insurance benefits are also fully insured. Employee contributions are only required if the employee elects additional, voluntary life insurance coverage for the employee or for his or her spouse. All employee and employer contributions and premium payments, including payment of self-insured claims, are current and claims are being timely paid.

Calpine offers a flexible spending account plan, which is funded primarily by salary deferrals elected by employees, and is used to pay for certain qualified expenses related to the provision of health, vision, and dental benefits. In addition, employees can elect to pay for qualified dependent day care expenses on a pre-tax basis.

As discussed previously, Calpine offers the Severance Program to its full-time employees. The Severance Program is intended to be an "employee welfare benefit plan" as defined in ERISA. The Program is not intended to be a pension plan under section 3(2)(A) of ERISA and shall be maintained and administered so as not to be such a plan.

Since the Petition Date, Calpine has operated and continues to operate each of these employee welfare programs in all material respects in accordance with the terms of the respective plan documents and applicable provisions of ERISA, the Internal Revenue Code, and other applicable laws. Other than the Severance Program (as discussed previously in Article III.D.7.c), Calpine has not amended any of the employee welfare programs since the Petition Date. The employee welfare programs have processed claims for benefits in accordance with the terms of the respective plan documents and applicable law, and has and will continue to pay all eligible benefits. While Calpine intends to continue these programs, it reserves the sole and absolute discretion to amend, modify, freeze, or terminate the employee welfare programs at any time.

      f.    Labor Relations

Calpine has approximately fifty employees whose employment is governed by a CBA. Calpine is party to three CBAs with the following unions: the International Union of Operating Engineers; Local Union Nos. 30 and 30-A, Communications, Energy and Paperworkers Union of Canada Local 1123; and United Brotherhood of Carpenters and Joiners of America (the "Unions").

Due to the small number of Union employees and the lack of significant liabilities arising under the CBAs, the Debtors have not faced large-scale labor issues in the Chapter 11 Cases.

On January 16, 2006, Calpine executed amended CBAs with the Unions after months of negotiations during which the union employees operated under expired CBAs. Under these amended CBAs, the Debtors were required to, among other things, pay certain prepetition, retroactive wage increases to the union employees for the period under which they were working under the expired CBAs (January 2005 through December 2005). To comply with the CBAs and avoid potential liability for, among other things, an alleged unfair labor practices action under the National Labor Relations Act, the Debtors sought and received approval to pay approximately $110,000 in retroactive, prepetition wages to the union employees. The Bankruptcy Court entered an order approving the payment to the Union employees on March 1, 2006.

87

g.     Stock Incentive Plan

Since 1996, the Debtors maintained a stock incentive plan (the "SIP"). Under the SIP, Calpine granted stock options to directors, certain employees, consultants and other independent advisors at an exercise price that generally equaled the stock's fair market value on the date of grant. In accordance with its terms, the SIP expired on July 16, 2006. All outstanding stock issuances remain in effect in accordance with the Calpine Incentive Program, and vest ratably over a four year period. Such equity interests will be treated in accordance with the terms of the Plan.

8.     Automatic Stay

Upon the Debtors' filing of the Chapter 11 Cases, the automatic stay went into effect. As a result, all actions to enforce or otherwise effect repayment of liabilities preceding the Petition Date as well as pending litigation against the Debtors are stayed while the Debtors continue their business operations as debtors-in-possession.   The automatic stay remains in effect until the Debtors' emergence from bankruptcy protection. While most litigation against the Debtors remains stayed, the Debtors have Filed a number of stipulations with the Bankruptcy Court modifying the automatic stay to allow certain plaintiffs to proceed for the limited purpose of establishing liability or recovering from available insurance proceeds. To the extent that there are any judgments against the Debtors in the Chapter 11 Cases or any affiliates in the CCAA Proceedings during the pendency of the bankruptcy proceedings, Calpine expects that such judgments would be classified as Unsecured Claims. Finally, in certain instances, the Debtors also have sought to extend the automatic stay or enjoin litigation against certain parties when judgments against those parties would be tantamount to judgments against the Debtors.

9.     Avoidance Actions

a.     Possible Actions Arising out of the Rosetta Transaction

(i)     The Rosetta Sale

As previously discussed, in July 7, 2005, Calpine, along with its subsidiaries Calpine Gas Holdings LLC and Calpine Fuels Corporation, entered into a purchase and sale agreement (the "Rosetta PSA") to sell substantially all of its remaining domestic oil and gas assets (other than certain gas pipeline assets) (the "Rosetta Transaction") to Rosetta, a wholly-owned subsidiary of Calpine Corporation. As of the Petition Date, Calpine and Rosetta each had material obligations under the Rosetta PSA which remained unperformed. Thus, the Rosetta PSA is an executory contract subject to the provisions of section 365 of the Bankruptcy Code. The Debtors continue to analyze the Rosetta PSA, but have not yet determined whether to assume or reject the Rosetta PSA.

Calpine's domestic oil and gas assets included hundreds of thousands of developed and undeveloped acreage in the southwest United States, billions of cubic feet of proved and unproved natural gas reserves and hundreds of land leases and wells. The sales price was approximately $1.06 billion, subject to certain adjustments. Rosetta funded its acquisition via a 144A equity placement in which it raised approximately $725 million in private equity financing through the issuance of about forty-five million shares to roughly sixty institutional investors, and $325 million from a new line of credit to fund the closing, after which Calpine ceased to hold any ownership stake in Rosetta. In February 2006, Rosetta announced that its registration statement on Form S-1 had been declared effective by the SEC, and that up to 50,000,000 shares of Rosetta's common stock would begin trading on NASDAQ. Thus, with this disposition of assets in July 2005, the Debtors ceased to operate a domestic oil and gas production business.

(ii)    Investigation of the Rosetta Sale

Upon the commencement of the Chapter 11 Cases, the Debtors, along with their stakeholders, expressed concern regarding the Rosetta Transaction in light of its magnitude, its proximity to the Debtors' chapter 11 filings, and the fact that the buyers were Calpine Insiders. As a result of these concerns, the Debtors, along with their advisors, conducted an in-depth analysis of the value of the assets conveyed in the Rosetta Transaction, as well as the facts and circumstances surrounding the transaction. Specifically, because the Rosetta Transaction occurred within the statutory window for fraudulent transfer actions, the Debtors investigated whether the Rosetta Transaction was actually or constructively fraudulent. Furthermore, although Calpine's board obtained a fairness opinion at the time, it disclaimed that it was a fair market value opinion and appears to have been based upon limited or incomplete data.

The Debtors' investigation has revealed a number of factors indicating that the transaction did not result in Calpine receiving fair market value for the assets: Rosetta, the buyer, was controlled at all times, including prior to its spin-off from Calpine, by the former executive management team of CNG, the Calpine subsidiary responsible for assembling and managing the assets that were sold to Rosetta; the Insiders participated in the private equity placement and received equity in the new, spun-off Entity; the assets were not actively marketed by Calpine to other potential buyers before their sale to Rosetta; Calpine faced severe liquidity problems and looming debt payments that resulted in a "forced sale," as the buyers characterized the transaction to their investors at the time; and Calpine was insolvent within the meaning of fraudulent transfer laws. As a result of these and other factors, the Debtors have concluded that the Rosetta Transaction was not arms length and the price obtained was substantially below fair market value.

Therefore, the Debtors have concluded that they have a valid claim under sections 548 and 550 of the Bankruptcy Code to avoid the Rosetta Transaction and, as their remedy, obtain from Rosetta return of the assets conveyed or their equivalent value. Based on extensive analysis of the assets transferred and the prevailing market conditions in June and July 2005, the Debtors have also concluded that the fair market value of the assets was in the range of hundreds of millions dollars in excess of the price paid in the Rosetta Transaction.

b.    Other Avoidance Actions

The Debtors are in the process of analyzing the potential avoidance of prepetition transfers under sections 547 and 550 of the Bankruptcy Code. A workplan has been established to be in the position to commence preference actions in the third and fourth quarters of 2007. Subsequent to filing any preference complaints, the Debtors intend to make efforts to consensually resolve the avoidance actions rather than engage in protracted litigation.

10.    Claims

The Debtors' Schedules provide information pertaining to the Claims against the Estates. On April 16, 2006, the Debtors Filed their Schedules with the Bankruptcy Court. On May 15, 2006, and July 21, 2006, the Debtors Filed amended Schedules. Interested parties may review the Schedules and amended Schedules at the office of the Clerk of the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408 or online at http://www.kccllc.net/calpine.

a.    Bar Date Orders

On April 26, 2006, the Bankruptcy Court entered an order (the "Bar Date Order") setting the Claims bar date (the "Bar Date") and approving the form and manner of the bar date notice for all Debtors except for Calpine Geysers Company, L.P. Pursuant to the Bar Date Order and the Bar Date notice, the general Bar Date for filing Proofs of Claim in the Chapter 11 Cases against all Debtors except for Calpine Geysers Company, L.P. was August 1, 2006 at 5:00 p.m. prevailing Eastern time. The Debtors served the Bar Date notice as required by the Bar Date Order.

On September 13, 2006, the Bankruptcy Court entered an order setting the Claims bar date for Calpine Geysers Company, L.P. (the "CGC Bar Date") and approving the form and manner of the bar date notice (the "CGC Bar Date Order"). Pursuant to the CGC Bar Date Order and the CGC Bar Date notice, the bar date for filing Proofs of Claim in the Chapter 11 Cases against Calpine Geysers Company, L.P. was October 31, 2006, at 5:00 p.m. prevailing Eastern time. The Debtors served copies of the CGC Bar Date notice as required by the CGC Bar Date Order.

b.    De Minimis Settlement Procedures

On August 15, 2006, the Bankruptcy Court approved the Debtors' motion seeking approval of certain procedures for settling de minimis Claims. Under the de minimis settlement procedures, Calpine may settle Claims for $250,000 or less without further notice or order of the Bankruptcy Court, provided that the Debtors give the Creditors' Committee a monthly summary of Claims settled against the Debtors and claims settled by one or more of the Debtors against third parties for $250,000 or less, subject to certain requirements. The Debtors have sought separate Bankruptcy Court authority for settlements that fell outside the authority granted in the de minimis settlement procedures.

c.    Claims Estimates

As of June 13, 2007, KCC had received approximately 18,089 Proofs of Claim. As of June 13, 2007, the total amounts of Claims remaining on the Claims Register against one or more of the Debtors were as follows: 1431 Secured Claims in the total amount of $51.5 billion; 79 Administrative Claims in the total amount of $13.2 million; 156 Priority Tax Claims in the total amount of $370.5 million; 6,672 Other Priority Claims in the total amount of $1.1 billion; and 12,570 Unsecured Claims in the total amount of $25.3 billion. The Debtors believe that many of the Filed Proofs of Claim are invalid, untimely, duplicative, or overstated, and, therefore, the Debtors are in the process of objecting to such Claims.

The Debtors estimate that at the conclusion of the Claims objection, reconciliation and resolution process, Allowed Secured Claims will range from approximately $7.9 - $9.1 billion, Allowed Priority Tax Claims will range from approximately $73.2 - $83.9 million, Allowed Other Priority Claims will be approximately $2.1 million, and Allowed Unsecured Claims will range from approximately $8.0 - $8.9 billion. These estimates are based upon a number of assumptions, including applicable interest rates, and there is no guarantee that the ultimate total amount of Allowed Claims in each category will conform to the Debtors' estimates. The assumptions regarding Claims estimates are described in further detail in Article IV.D.

The Debtors estimate that at the conclusion of the Claims objection, reconciliation, and resolution process, estimated Allowed Administrative Claims will be approximately $1.5 million. The estimate of Allowed Administrative Claims includes obligations to pay Cure, Claims arising from a right of reclamation, and certain Administrative Claim requests reflected on the Claims Register and docket for which the Debtors reasonably expect there to be a recovery. The estimate of Allowed Administrative

90

Claims does not include ordinary course obligations incurred post-petition such as trade payables, the Debtors' employee bonuses, or Professional Claims.

The Creditors' Committee believes that the Debtors' assumed New Calpine Total Enterprise Value may be greater than the actual enterprise value of the Reorganized Debtors as may be determined by the Bankruptcy Court and believes that the Debtors' Claims estimates may be lower than the actual amount of Allowed Claims upon completion of the Claims reconciliation process, each of which may have a material impact on the recoveries to Holders of Allowed Claims and Interests. The Equity Committee believes that the Debtors' assumed New Calpine Total Enterprise Value may be lower than the actual enterprise value of the Reorganized Debtors as may be determined by the Bankruptcy Court, and that this may have a material impact on the recoveries to Holders of Allowed Claims and Interests.

11.    Exclusivity

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code during which only the debtor may File a plan. If the debtor Files a plan within this 120-day period, section 1121(c)(3) extends the exclusivity period by an additional sixty days to permit the debtor to seek acceptances of such plan. While section 1121(d) permits the Bankruptcy Court to extend these exclusivity periods "for cause," BAPCPA now places a limit on any extensions. In particular, section 1121(d)(2) sets a limit of eighteen months after the date of the order for relief on the period during which only the debtor may File a plan and a limit of twenty months after the date of the order for relief on the period during which the debtor may seek acceptances of a plan Filed within the initial eighteen months of a chapter 11 case.

Without further order of the Bankruptcy Court, the Debtors' initial exclusivity period to File a plan would have expired on April 20, 2006. By order dated April 11, 2006, the Bankruptcy Court extended the Debtors' exclusivity periods through and including December 31, 2006 (to File a plan) and through and including March 31, 2007 (to solicit acceptances). The order authorizing this extension reserved the Debtors' right to seek additional extensions of these exclusivity periods. By order dated December 6, 2006, the Bankruptcy Court again extended the Debtors' exclusivity periods through and including June 20, 2007 (to File a plan) and through and including August 20, 2007 (to solicit acceptances). The December 6, 2006 order extended the Debtors' exclusivity periods to the maximum length allowed pursuant to the eighteen-month and twenty-month limitations, respectively, of section 1121(d)(2). Thus, the Debtors' exclusivity periods expire after June 20, 2007 (to File a plan) and August 20, 2007 (to solicit acceptances).

## ARTICLE IV.
## SUMMARY OF THE PLAN OF REORGANIZATION

The purpose of the Plan is to implement the Debtors' restructuring based on a capital structure that can be supported by cash flows from operations. The Debtors believe that the reorganization contemplated by the Plan is in the best interests of the Holders of Allowed Claims and Interests. If the Plan is not confirmed, the Debtors believe that they will be forced to either File an alternate plan of reorganization or liquidate under chapter 7 of the Bankruptcy Code. In either event, the Debtors believe that the Holders of Allowed Claims and Interests would realize a less favorable distribution of value, or, in certain cases, none at all, for their Claims and Interests. *See* Article V and the Liquidation Analysis in the Plan Supplement.

A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors, and interest holders.  Chapter 11 also strives to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 ease creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 ease.  A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor.  Confirmation of a plan of reorganization makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor or of equity holder in the debtor, whether or not such creditor or equity holder is impaired under or has accepted the plan, or receives or retains any property under the plan.  Subject to certain limited exceptions, and except as otherwise provided in the plan or the confirmation order itself, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for those debts the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, a debtor need not solicit votes from the holders of claims or equity interests in such unimpaired classes.  A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor.  Such classes are deemed to reject the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders.  In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class.  A debtor is also required, as discussed above, under section 1122 of the Bankruptcy Code, to classify claims and interests into classes that contain claims and interests that are substantially similar to the other claims and interests in such classes.  The Debtors believe that the Plan has classified all Claims and Interests in compliance with section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS

92

ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT, AND THE EXHIBITS AND DEFINITIONS CONTAINED IN EACH DOCUMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON, AMONG OTHER ENTITIES, ALL HOLDERS OF CLAIMS AND INTERESTS, THE REORGANIZED DEBTORS, ALL ENTITIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

B.    Overall Structure of the Plan

The Plan contemplates substantive consolidation of the Estates for all purposes associated with Confirmation and Consummation. If the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Estates, the Plan may constitute a separate plan of reorganization for any such non-consolidated Debtor, and each Class of Claims and Interests shall be treated as against each individual non-consolidated Debtor for voting and distribution purposes. The number following each Debtor in Article I.A of the Plan has been assigned to such Debtor for purposes of identifying each separate Plan to the extent the Bankruptcy Court authorizes the Debtors to substantively consolidate of less than all of the Estates.

The Debtors believe that the Plan provides the best and most prompt possible recovery to Holders of Claims and Interests. Under the Plan, Claims and Interests, except DIP Facility Claims, Administrative Claims, and Priority Tax Claims, are divided into different Classes. Under the Bankruptcy Code, claims and equity interests are classified beyond mere "creditors" or "shareholders" because such entities may hold claims or equity interests in more than one class. For purposes of the Disclosure Statement, the term "Holder" refers to the holder of a Claim or Interest in a particular Class under the Plan. If the Plan is confirmed by the Bankruptcy Court and consummated, then on or as soon as reasonably practicable after the Distribution Date, the Debtors will make distributions to Holders of certain Allowed Claims and Interests as provided in the Plan.

C.    Substantive Consolidation

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order substantively consolidating the Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation.

If the Bankruptcy Court authorizes the Debtors to substantively consolidate the Estates, then on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into the Estate of Calpine for all purposes associated with Confirmation and Consummation, and all guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor shall be treated as one collective obligation of the Debtors.    Substantive consolidation shall not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases. Any alleged defaults under any applicable agreement with the Debtors, the Reorganized Debtors, or the Affiliates arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

In the event that the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Estates, the Debtors may, in consultation with the Creditors' Committee: (1) proceed with no or partial substantive consolidation of the Estates; (2) propose one or more separate Plans with respect to one or more of the Debtors for whose Estates substantive consolidation has not been authorized; (3) proceed with the Confirmation of one or more separate Plans to the exclusion of other separate Plans; and (4) to withdraw some or all of the separate Plans; provided, however, that the Debtors' inability to confirm any separate Plan, or the Debtors' election to withdraw any separate Plan, shall not impair the Confirmation or Consummation of any other separate Plan.

D.      Assumptions Regarding Claims Estimates

The range of estimates for Claims in each Class provided below are based upon a number of assumptions. Among other things, the "low-end" estimates for Claims in the various Classes assume that Allowed Claims include interest accruing from the Petition Date to the projected Effective Date at the non-default contract rate or the Federal Judgment Rate effective as of the Petition Date (4.34%), as applicable, subject to the primary principal claim being satisfied in full. The low-end estimates further assume that no Makewhole Claims will be Allowed. In contrast, the "high-end" estimates for Claims in each Class assume that Allowed Claims will include interest accruing from the Petition Date to the projected Effective Date at the default contract rate, where applicable, subject to the primary principal claim being satisfied in full and will further include compound interest (*i.e.*, interest-on-interest). The high-end estimates also assume that the Debtors' estimates for maximum Makewhole Claims will be Allowed, and will include accrued interest at the default rate, where applicable. Should the Bankruptcy Court determine that different interest rates are applicable to Claims in each Class or that some or all of the asserted Makewhole Claims are Allowed, the total amount of Allowed Claims in each Class may vary materially from the estimates provided below.

In addition, as stated above, notwithstanding the ranges of Claims estimates set forth below, and based on an individualized assessment of each material Disputed Claim, the Debtors believe that the litigation-risk adjusted outcome under the Plan is that Allowed Unsecured Claims (other than Allowed Subordinated Debt Securities Claims and Allowed Subordinated Equity Securities Claims) will receive New Calpine Common Stock sufficient to be satisfied in full and that Holders of Allowed Interests will receive New Calpine Common Stock valued at approximately $835 million, or $1.80 per share of Old Calpine Common Stock. Because Disputed Claims have not yet been finally adjudicated, no assurances can be given that actual recoveries of Holders of Allowed Claims and Interests will not be materially higher or lower. The Creditors' Committee believes that the Debtors' assumed New Calpine Total Enterprise Value may be greater than the actual enterprise value of the Reorganized Debtors as may be determined by the Bankruptcy Court and believes that the Debtors' Claims estimates may be lower than

94

the actual amount of Allowed Claims upon completion of the Claims reconciliation process, each of which may have a material impact on the recoveries to Holders of Allowed Claims and Interests. The Equity Committee believes that the Debtors' assumed New Calpine Total Enterprise Value may be lower than the actual enterprise value of the Reorganized Debtors as may be determined by the Bankruptcy Court, and that this may have a material impact on the recoveries to Holders of Allowed Claims and Interests.

Due to the unique complexity of the estimated Allowed Claims in these Chapter 11 Cases and the very nature of estimating Claims on a Class-by-Class basis, the high-end estimates of Allowed Claims in the Classes set forth below may include Claims that are also included in the high-end estimates of Allowed Claims in certain other Classes. Thus, a simple aggregation of the high-end Claims estimates in the Classes listed below likely will result in a higher total aggregate amount of Allowed Claims as compared to the Debtors' estimates of total Allowed Claims contained in the discussion in Article V of the distributions under the Plan to Holders of Allowed Claims and Interests.

E.    DIP Facility, Administrative and Priority Tax Claims Against All of the Debtors

1.    DIP Facility Claims. In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Debtors shall either convert the DIP Facility into the Existing Exit Facility or pay the DIP Facility Claims in full in Cash.

**Estimated Amount of Claims:**        **$4.00 billion**

**Projected Percentage Recovery:**      **100.0%**

2.    Administrative Claims. Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder thereof shall be paid in full in Cash.

**Estimated Amount of Claims:**        **$1.49 million (does not include Professionals' Claims)**

**Projected Percentage Recovery:**      **100.0%**

3.    Priority Tax Claims. In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, unless otherwise agreed each Holder thereof shall be paid in full in Cash pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

**Estimated Amount of Claims:**        **$73.19 million - $83.89 million**

**Projected Percentage Recovery:**      **100.0%**

F.    Classification and Treatment of Claims and Interests Against the Debtors

All Claims and Interests, except DIP Facility Claims, Administrative Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the

95

purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

To the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below.

      a.      <u>Classes 1A-1 through 273A-1—First Lien Debt Claims</u>

          (i)     <u>Classification</u>:  Classes 1A-1 through 273A-1 consist of all First Lien Debt Claims, against the applicable Debtor.

          (ii)    <u>Treatment</u>:  Each Allowed First Lien Debt Claim (not including any First Lien Secured Makewhole Claims), already has been paid in full in Cash pursuant to the First Lien Repayment Order.  In satisfaction of each Allowed First Lien Secured Makewhole Claim (excluding any Claims for postpetition interest), each Holder thereof shall be paid in full in Cash.

          (iii)   <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Classes 1A-1 through 273A-1 (including Allowed First Lien Secured Makewhole Claims) shall not include any interest.

**Estimated Amount of Claims:**        **$0 - $124.80 million**

**Projected Percentage Recovery:**      **100.0%**

      b.      <u>Classes 1A-2 through 273A-2—Second Lien Debt Claims</u>

          (i)     <u>Classification</u>:  Classes 1A-2 through 273A-2 consist of all Second Lien Debt Claims, against the applicable Debtor.

          (ii)    <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Classes 1A-2 through 273A-2, each Allowed Second Lien Debt Claim shall be paid in full in Cash.

          (iii)   <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Classes 1A-2 through 273A-2 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by the Bankruptcy Court to the extent not already paid or waived pursuant to the Cash Collateral Order.  Any portion of the Claims in Classes 1A-2 through 273A-2 consisting of Allowed Second Lien Secured Makewhole Claims shall not include interest.

**Estimated Amount of Claims:**        **$3.77 billion - $4.42 billion**

**Projected Percentage Recovery:**      **100.0%**

c.  Classes 1A-3 through 273A-3—Other Secured Claims

  (i)  Classification:  Classes 1A-3 through 273A-3 consist of all Other Secured Claims, against the applicable Debtor.

  (ii)  Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Classes 1A-3 through 273A-3, each such Allowed Claim shall be: (i) Reinstated; (ii) paid in full in Cash; or (iii) satisfied in full by a return to such Holder of the collateral securing such Allowed Claim.

  (iii)  Interest Accrued After the Petition Date:  Allowed Claims in Classes 1A-3 through 273A-3 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by the Bankruptcy Court or, if there is no contract, then at the Federal Judgment Rate; provided, however, that Allowed CalGen Secured Makewhole Claims shall not include interest.

**Estimated Amount of Claims:**  **$153.32 million – $600.60 million**

**Projected Percentage Recovery:**  **100.0%**

d.  Classes 1B through 273B—Other Priority Claims

  (i)  Classification:  Classes 1B through 273B consist of all Other Priority Claims, against the applicable Debtor.

  (ii)  Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Classes 1B through 273B, each Holder thereof shall be paid in full in Cash.

  (iii)  Interest Accrued After the Petition Date:  Allowed Claims in Classes 1B through 273B shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate.

**Estimated Amount of Claims:**  **$2.07 million**

**Projected Percentage Recovery:**  **100.0%**

e.  Class 1C-1—Senior Note Claims

  (i)  Classification:  Class 1C-1 consists of all Senior Note Claims against Calpine.

  (ii)  Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class 1C-1 (including any Allowed Senior Note Makewhole Claims), each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

97

           (iii)     Interest Accrued After the Petition Date: Allowed Claims in Class 1C-1 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by the Bankruptcy Court; provided, however, that Allowed Senior Note Makewhole Claims shall not include interest.

**Estimated Amount of Claims:**        **$809.10 million- $950.75 million**

        **Projected Percentage Recovery:**     **100%.** The projected percentage recovery for Holders of Allowed Senior Note Claims may exceed the projected percentage recovery for other Unsecured Claims because the Holders of Allowed Senior Note Claims are beneficiaries of certain contractual subordination provisions with respect to the Subordinated Notes.

        f.     Class 1C-2—General Note Claims

           (i)     Classification: Class 1C-2 consists of all General Note Claims against Calpine.

           (ii)     Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class 1C-2 (including any Allowed General Note Makewhole Claims), each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

           (iii)     Interest Accrued After the Petition Date: Allowed Claims in Class 1C-2 shall include unpaid interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by the Bankruptcy Court; provided, however, that Allowed General Note Makewhole Claims shall not include interest.

**Estimated Amount of Claims:**        **$2.42 billion- $2.68 billion**

**Projected Percentage Recovery:**     **91% to 100%**

        g.     Class 1C-3—Subordinated Note Claims

           (i)     Classification: Class 1C-3 consists of all Subordinated Note Claims against Calpine.

           (ii)     Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class 1C-3, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full; provided, however, that the Holders of Allowed Subordinated Note Claims shall be deemed to consent to the distribution of any portion of their pro rata share of the New Calpine Common Stock to Holders of Allowed Senior Note Claims necessary to satisfy such Allowed Claims in full.

           (iii)     Interest Accrued After the Petition Date: Allowed Claims in Class 1C-3 shall include interest accrued after the Petition Date through the Interest

98

Accrual Limitation Date at the contract rate determined by the Bankruptcy Court.

**Estimated Amount of Claims:**      **$652.80 million - $761.75 million**

**Projected Percentage Recovery:**      **80% to 100%.** The projected percentage recovery for Holders of Allowed Subordinated Note Claims may be less than the projected percentage recovery for other Unsecured Claims because the Holders of Allowed Senior Note Claims are beneficiaries of certain contractual subordination provisions with respect to the Subordinated Notes.

h.      Class 1C-4—ULC1 Settlement Claims

(i)      Classification: Class 1C-4 consists of all ULC1 Settlement Claims against Calpine.

(ii)      Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class 1C-4 (including any Claims for associated reasonable fees, costs, and expenses), each Holder thereof shall receive a pro rata distribution of the New Calpine Common Stock Pool For Creditors until paid in full, based upon the formula contained in the ULC1 Settlement, with the total amount of the ULC1 Settlement Claims not to exceed US $3,505,187,751.61 and the total distribution amount on account of ULC1 Settlement Claims not to exceed an amount equal to (i) the principal amount outstanding on the ULC1 Notes (including any unpaid interest accrued prior to the Petition Date), plus (ii) postpetition interest accrued until the Interest Accrual Limitation Date at the contract rate, plus (iii) reasonable fees up to $8 million, all as set forth in the ULC1 Settlement, which the Debtors currently estimate to be approximately $2.31 billion (or approximately $2.47 billion after including ULC1 Settlement Claims held by the Debtors as of the Petition Date).

(iii)      Interest Accrued After the Petition Date: Allowed ULC1 Settlement Claims shall include interest accrued at the contract rate (including interest on interest at the contract rate) from the Petition Date through the Interest Accrual Limitation Date, all as set forth in the ULC1 Settlement; provided, however, that such inclusion of interest shall not increase the total distribution limitation contained in the ULC1 Settlement.

**Estimated Amount of Claims:**      **$3.51 billion (or approximately $3.65 billion after including ULC1 Settlement Claims held by the Debtors as of the Petition Date)**

**Projected Percentage Recovery:**      **100.0%.** The projected percentage recovery of Holders of ULC1 Settlement Claims is based on distributions to such Holders under the Plan as a percentage of (i) the principal amount outstanding on the ULC1 Notes (including any unpaid interest accrued prior to the Petition Date), plus  (ii) postpetition interest accrued until the Interest Accrual Limitation Date at the contract rate, plus (iii) reasonable fees up to $8 million, all as set forth in and pursuant to the CCAA Settlement and the ULC1 Settlement.

i.   Class 1C-5 and 248C-5—Canadian Guarantee Claims

  (i)   Classification:   Classes 1C-5 and 248C-5 consist of all Canadian Guarantee Claims against Calpine and QCH, as applicable.

  (ii)  Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Classes 1C-5 and 248C-5, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full after subtracting any payments received on account of the underlying obligation in the CCAA Proceedings.

  (iii) Interest Accrued After the Petition Date:  Allowed Claims in Classes 1C-5 and 248C-5 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the default rate provided in the applicable indenture or, if there is no indenture, then at the Federal Judgment Rate.

**Estimated Amount of Claims:**        **$0 - $741.04 million**

**Projected Percentage Recovery:**        **100.0%.**  The projected percentage recovery of Holders of Allowed Canadian Guarantee Claims is based on total distributions to such Holders in the CCAA Proceedings and under the Plan as a percentage of such Allowed Claims in the Chapter 11 Cases.

j.   Classes 1C-6 through 273C-6—Canadian Intercompany Claims

  (i)   Classification:  Classes 1C-6 through 273C-6 consist of all Canadian Intercompany Claims, against the applicable Debtor.

  (ii)  Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Classes 1C-6 through 273C-6, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full, subject to the approximately $258.6 million cap contained in CCAA Settlement.

  (iii) Interest Accrued After the Petition Date:  Allowed Claims in Classes 1C-6 through 273C-6 shall not include interest.

**Estimated Amount of Claims:**        **$335.04 million**

**Projected Percentage Recovery:**        **100.0%.**  The projected percentage recovery of Holders of Allowed Canadian Intercompany Claims is based on total distributions to such Holders under the Plan as a percentage of such Allowed Claims, all pursuant to the terms of the CCAA Settlement.

k.   Classes 1C-7 through 273C-7—Rejection Damages Claims

  (i)   Classification:  Classes 1C-7 through 273C-7 consist of all Rejection Damages Claims, against the applicable Debtor.

  (ii)  Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Classes 1C-7 through

100