Appellants Brief Appendix Part 7

273C-7, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

(iii)  Interest Accrued After the Petition Date: Allowed Claims in Classes 1C-7 through 273C-7 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate.

**Estimated Amount of Claims:**       **$707.84 million - $1.42 billion**

**Projected Percentage Recovery:**     **91% to 100.0%**

l.    Classes 1C-8 through 273C-8—General Unsecured Claims

(i)   Classification: Classes 1C-8 through 273C-8 consist of all General Unsecured Claims, against the applicable Debtor.

(ii)  Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Classes 1C-8 through 273C-8, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock For Creditors until paid in full.

(iii)  Interest Accrued After the Petition Date:  Unless otherwise agreed, Allowed Claims in Classes 1C-8 through 273C-8 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate unless otherwise ordered by the Bankruptcy Court before the Confirmation Hearing upon application by the Holder of such Claim.

(iv)  Election Rights: Each Holder of an Allowed Claim in Classes 1C-8 through 273C-8 may elect to be treated as a Holder of an Allowed Unsecured Convenience Class Claim in Classes 1C-10 through 273C-10, as applicable, by electing to reduce its Allowed Claim to $50,000 in complete satisfaction of such Allowed Claim. Any such election must be made on the Ballot, and except as may be agreed to by the Debtors or the Reorganized Debtors, no Holder of a Claim can elect the treatment described below after the Voting Deadline. Upon such election, the Claim of such Holder shall be automatically reduced to $50,000.

**Estimated Amount of Claims:**       **$160.45 million - $257.10 million**

**Projected Percentage Recovery:**     **91% to 100.0%**

m.    Classes 1C-9 through 273C-9—Unsecured Makewhole Claims

(i)   Classification:  Classes 1C-9 through 273C-9 consist of all Unsecured Makewhole Claims, against the applicable Debtor.

(ii)  Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Classes 1C-9 through

101

273C-9, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

(iii)     Interest Accrued After the Petition Date: Allowed Claims in Classes 1C-9 through 273C-9 shall not include any interest.

**Estimated Amount of Claims:**          **$0 - $981.08 million**

**Projected Percentage Recovery:**        **91% to 100.0%**

n.     Classes 1C-10 through 273C-10—Unsecured Convenience Class Claims

(i)     Classification: Classes 1C-10 through 273C-10 consist of all Unsecured Convenience Class Claims, against the applicable Debtor.

(ii)     Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Classes 1C-10 through 273C-10, each Holder thereof shall be paid in full in Cash.

(iii)     Interest Accrued After the Petition Date: Allowed Claims in Classes 1C-10 through 273C-10 shall not include any interest accrued after the Petition Date.

**Estimated Amount of Claims:**          **$22.35 million**

**Projected Percentage Recovery:**        **100.0%**

o.     Class 1C-11 through 273C-11—Intercompany Claims

(i)     Classification:     Classes 1C-11 through 273C-11 consist of all Intercompany Claims, against the applicable Debtor.

(ii)     Treatment: At the Debtors' option, in consultation with the Creditors' Committee, and except as otherwise provided in the Plan, Holders of Claims in Classes 1C-11 through 273C-11 shall have such Claims Reinstated or receive no distribution on account of such Claims.

**Estimated Amount of Claims:**          **N/A**

**Projected Percentage Recovery:**        **100.0%**

p.     Class 1D—Subordinated Debt Securities Claims

(i)     Classification:  Class 1D consists of all Subordinated Debt Securities Claims against Calpine.

(ii)     Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class 1D, to the extent all Holders of Allowed Claims (other than Subordinated Debt Securities Claims and Subordinated Equity Securities Claims) have been paid in full, each Holder of an Allowed Class 1D Claim shall receive a pro rata

102

distribution of the New Calpine Common Stock Pool For Subordinated Debt Securities Claimants until paid in full.

(iii)    Interest Accrued After the Petition Date: Allowed Claims in Class 1D shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate.

**Estimated Amount of Claims:**    $0

**Projected Percentage Recovery:**    N/A

q.    Class 1E-1—Interests

(i)    Classification: Class 1E-1 consists of all Interests in Calpine.

(ii)    Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Interest in Class 1E-1, to the extent all Holders of Allowed Claims (other than Subordinated Equity Securities Claims) have been paid in full, the Holders of Interests in Class 1E-1 shall receive a pro rata share of the New Calpine Common Stock Pool For Shareholders.

**Estimated Amount of Claims:**    N/A

**Projected Percentage Recovery:**    $0.00 to $3.53 per share

r.    Class 1E-2—Subordinated Equity Securities Claims

(i)    Classification: Class 1E-2 consists of all Subordinated Equity Securities Claims against Calpine.

(ii)    Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Claim in Class 1E-2, to the extent all Holders of Allowed Claims (other than Subordinated Equity Securities Claims) have been paid in full, the Holders of Claims in Class 1E-2 shall receive a pro rata share of the New Calpine Common Stock Pool For Shareholders until paid in full.

(iii)    Interest Accrued After the Petition Date: Allowed Claims in Class 1E-2 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate.

**Estimated Amount of Claims:**    $0

**Projected Percentage Recovery:**    N/A

K&E 11469876.47

s.    <u>Classes 2E-3 through 273E-3—Intercompany Interests</u>

(i)    <u>Classification</u>: Classes 2E-2 through 273E-2 consist of all Intercompany Interests, in the applicable Debtor.

(ii)    <u>Treatment</u>: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Interest in Classes 2E-3 through 273E-3, Iuterests iu Classes 2E-3 through 273E-3 shall be Reinstated for the benefit of the Holders thereof in exehange for Reorganized Debtors' agreement to make certain distributions to the Holders of Allowed Unsecured Claims and Interests under the Plan, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors.

**Estimated Amount of Claims:**        **N/A**

**Projected Percentage Recovery:**        **100.0%**

2.    Classification and Voting of Consolidated Classes. The Plan contemplates approval of the Debtors' request to substantively eonsolidate the Debtors into a consolidated Estate. The provisions related to substantive consolidation are described in the Disclosure Statement and in the Plan. The categories of Claims and Interests listed below classify Claims and Interests for voting purposcs if the Bankruptcy Court authorizes the Debtors to substantively consolidate of the Debtors is ordered. If the Bankruptcy Court does not authorize the Debtors to substantively consolidate any or all of the Estates pursuant to thc Plan, then the Claims and Interests in or against those Debtors that are not substantively consolidatcd shall be classificd, treated, and vote as classified in the Plan.

| Class | Claim or Interest Type |
|---|---|
| A-l | First Lien Debt Claims |
| A-2 | Second Lien Debt Claims |
| A-3 | Other Secured Claims |
| B | Other Priority Claims |
| C-1 | Senior Note Claims |
| C-2 | General Note Claims |
| C-3 | Subordinated Note Claims |
| C-4 | ULCl Settlement Claims |
| C-5 | Canadian Guarantee Claims |
| C-6 | Canadian Intercompany Claims |
| C-7 | Rejection Damages Claims |
| C-8 | General Unsecured Claims |
| C-9 | Unsecured Makewhole Claims |
| C-10 | Unsecured Convenience Class Claims |
| C-11 | Intercompany Claims |
| D | Subordinated Debt Securities Claims |
| E-1 | Interests |
| E-2 | Subordinate Equity Securities Claims |

104

3.    Acceptance or Rejection of the Plan

    a.    <u>Acceptance by Impaired Classes of Claims.</u>  Pursuant to section 1126(e) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, if the Bankruptcy Court authorizes the Debtors to substantively consolidate all of the Estates, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan. If the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Estates, then an Impaired Class of Claims for each non-substantively consolidated Debtor and an Impaired Class of Claims from the consolidated Debtor group, respectively, has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

    b.    <u>Acceptance by Impaired Classes of Interests.</u>  Pursuant to section 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, if the Bankruptcy Court authorizes the Debtors to substantively consolidate all of the Estates, an Impaired Class of Interests has accepted the Plan if the Holders of at least two-thirds in amount of the Allowed Interests of such Class actually voting have voted to accept the Plan. If the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Estates, then an Impaired Class of Interests for each non-substantively consolidated Debtor and an Impaired Class of Interests from the consolidated Debtor group, respectively, has accepted the Plan if the Holders of at least two-thirds in amount of the Allowed Interests of such Class actually voting have voted to accept the Plan.

    c.    <u>Tabulation of Votes on a Consolidated and Non-Consolidated Basis.</u>  The Debtors will tabulate all votes on the Plan on both a consolidated and non-consolidated basis for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and (10) of the Bankruptcy Code. In a consolidated tabulation, all votes on account of Allowed Claims and Interests shall be counted as if Filed against a single consolidated Estate. In a non-consolidated or partially consolidated tabulation, all votes on account of Allowed Claims and Interests shall be counted as actually Filed against each respective Estate. In neither event shall the Debtors be required to re-solicit votes on the Plan and shall have the right to proceed with Confirmation and Consummation as set forth in the Plan.

    d.    <u>Confirmation pursuant to sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.</u>  Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class. In the event the Bankruptcy Court does not authorize the Debtors to substantively consolidate of the Estates, section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation with respect to a given Debtor by acceptance of the Plan by an Impaired Class against such Debtor. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors also reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.

K&E 11469876.47

    e.    <u>Controversy Concerning Impairment.</u> If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

G.    <u>Implementation of the Plan</u>

    1.    Substantive Consolidation

        a.    <u>Discussion of Substantive Consolidation Generally</u>

The Plan contemplates substantive consolidation of the Estates into one Estate. In bankruptcy cases with affiliated debtors, a bankruptcy court may exercise its equitable powers to authorize the "substantive consolidation" of the estates of the debtor affiliates for purposes of the plan of reorganization. Substantive consolidation involves the pooling of assets and liabilities of the affected debtors. All of the debtors in the substantively consolidated group are treated as if they were a single corporate entity and economic entity. In that circumstance, a creditor of one of the substantively consolidated debtors will be treated as a creditor of the substantively consolidated group of debtors, and issues of individual corporate ownership or property and individual corporate liability or obligation are ignored.

Substantive consolidation usually results in: pooling the assets of, and claims against, the debtor entities; satisfying liabilities from the resultant common fund; eliminating intercompany claims; and combining the creditors of the affiliated companies for purposes of voting on reorganization plans. *See In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988). Notably, however, substantive consolidation does not and will not affect the relative priority of validly perfected Liens attaching to assets.

A bankruptcy court's ability to authorize substantive consolidation derives from its general equitable powers under section 105(a) of the Bankruptcy Code, which allows a bankruptcy court to issue orders necessary to carry out the provisions of the Bankruptcy Code. Because the authority to authorize substantive consolidation arises from the bankruptcy court's general equitable powers, the propriety of substantive consolidation must be made on a case-by-case basis. *See, e.g., FDIC v. Colonial Realty Co.*, 966 F.2d 57 (2d Cir. 1992). In *Augie/Restivo*, the Second Circuit articulated a test for evaluating whether substantive consolidation is appropriate. In *Augie/Restivo*, the Second Circuit stated that the decision to substantively consolidate depends upon two critical factors: "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit . . . or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *In re Augie/Restivo*, 860 F.2d at 518 (internal quotations omitted). Notably, given *Augie/Restivo*'s explicit use of the conjunction "or," satisfaction of either prong could result in substantive consolidation.

The decision to seek substantive consolidation of the Estates was made after arduous analysis of the financial and legal underpinnings of substantive consolidation of the Estates. This section summarizes the due diligence performed by the Debtors' legal and financial advisors, the legal framework of substantive consolidation and the conclusions reached by the Debtors.

        b.    <u>Analysis and Investigation of Calpine's Affairs</u>

Following the Petition Date, through their involvement in various projects related to the Chapter 11 Cases, the Debtors' advisors recognized that Calpine's integrated and complex corporate structure, the heavy volume of intercompany transactions necessitated thereby, and the scarcity of accounting resources

K&E 11409876.47

that could be dedicated to intercompany bookkeeping during periods of substantial growth, appeared to result in convoluted and often inaccurate methods of accounting for intercompany claims. This preliminary assessment made it necessary for the Debtors and their advisors to conduct an in-depth investigation of the appropriateness of substantive consolidation of the Estates. Therefore, the Debtors' advisors undertook a focused analysis of issues related to intercompany claim accounting over the past eighteen months, including a comprehensive review of the Debtors' journal line items comprising specific intercompany balances. A line item represents one part of an intercompany transaction. By way of illustration, a transaction between two affiliates is recorded in the books and records through a "journal entry." This journal entry is comprised of at least two "line items" (*i.e.*, a payable/receivable between the two affiliates). Intercompany balances represent the accumulated outstanding line items of the transaction between affiliates at a given point in time.

Specifically, the Debtors' advisors reviewed and classified over 128,000 journal line items with an aggregate absolute value in excess of $300 billion, segregating such line items by age, nature of the transaction, and issues associated with the transaction. The Debtors' advisors further analyzed certain accounting programs instituted by Calpine that affected the accuracy of Calpine's intercompany balances. The Debtors' advisors reviewed myriad financial records of Calpine (*e.g.*, financial statements, loan documents, credit ratings and other accounting ledger summaries), annual reports, prospectuses, SEC filings, cash management systems, relevant corporate transactions, internal and external presentations, contracts (both internal and with third parties) and third party claim information. In addition, the Debtors' advisors interviewed a significant number of Calpine's former and present personnel from the accounting, tax, and legal departments, and informally discussed matters relevant to the substantive consolidation analysis with countless others. Finally, throughout this process, the Debtors endeavored to keep the Committees apprised of their progress and findings. To this end, the Debtors met multiple times with the Committees, produced over 15,000 pages of documents, and provided access to the Debtors' intercompany balances.

     c.     Issues Associated With Substantive Consolidation

          (i)     Calpine's Highly Integrated Business

Generally, Calpine's business model is highly integrated. As set forth above, Calpine's primary operations consisted of the development, ownership, and operation of power generating facilities and the sale of electricity and thermal energy in North America. As of the Petition Date, Calpine owned and operated over ninety plants throughout North America. Many of these power plants were operated as a "fleet" (*i.e.*, one collective asset) to generate the energy sold and consume the gas purchased by Calpine, through CES. Calpine, through CES, would decide whether certain plants would operate, and the decision to order a plant to remain idle or operate on any given day depended on the demand for power in the regional regulated grid markets and was decided centrally, and for the "collective good" regardless of legal Entity affiliation.

Further demonstrating the integrated nature of Calpine's operations is the fact that none of the power plants can function independent of Calpine's support and infrastructure. Rather, all of Calpine's plants are almost entirely reliant upon Calpine's integrated structure in one way or another. For example, all of the plants rely upon other Calpine Entities for operating personnel, administrative services, and parts and maintenance. Thus, the integrated structure of Calpine precludes its power plants and other subsidiaries from operating as businesses independent from Calpine.

Like its fleet of power plants, many of Calpine's departments also operated on a centralized basis, primarily following a series of internal restructurings that occurred in the late 1990s and early 2000s. For example, the human resources, legal, tax, and IT departments are all centralized at the Calpine

Corporation level. In addition, certain internal restructurings undertaken from time to time attempted to centralize other operations and services that provide fleet-wide services such as construction (Calpine Construction Management Company, Inc. ("CCMCI")), operations and maintenance (Calpine Operating Services Company, Inc. ("COSCI")), and administrative services, including employment (Calpine Administrative Services Company, Inc. ("CASCI")).

Historically, Calpine viewed its organizational structure as a series of business units (often grouped by region) that happened to encompass a number of legal Entities. Neither Calpine itself nor its financial groups (with the exception of the tax group and its unique responsibility to minimize tax liabilities), including treasury and accounting, ever focused on Calpine as a group of separate legal Entities. Rather, Calpine's primary financial focus was on its consolidated results where intercompany transactions were of little consequence because such transactions were completely eliminated at the consolidated level. Indeed, until 2005, Calpine did not have the ability to assess intercompany claims between affiliates unless that information was manually produced by Calpine to prepare a standalone financial statement required under one of its lending agreements. Another manifestation of Calpine's focus on integration is the highly centralized nature of the cash management system. A significant number of Calpine subsidiaries did not maintain any Cash at all, as Cash is swept to Calpine Corporation on a daily basis. These Cash sweeps to and from Calpine Corporation resulted in intercompany claims between the affiliates without any apparent corporate formality regarding repayment terms. Indeed, a number of Calpine's subsidiaries, including some with substantial operations and hundreds of millions of dollars in assets, do not maintain bank accounts; rather, such Entities rely upon Calpine Corporation or other affiliates to satisfy their day to day obligations.

Calpine's public filings also confirm the integrated nature of the company. In each of its annual reports, Calpine described itself as one, vertically integrated economic unit. Many times, Calpine would cite to the integrated nature of its operations to support its significant growth during the early 2000s, and to support its attempts to weather the economic downturn in 2004 and 2005.

Prior to the Petition Date, Calpine bore a number of other indicia that are common among highly integrated companies. For example, with few exceptions, Calpine and its subsidiaries shared common officers and directors. Also, with few exceptions, Calpine's public filings are consolidated, as are its federal tax returns. In addition, there are instances of asset transfers between and among Entities for purposes of convenience.

This integrated corporate structure allowed the company to streamline operations, but it also forced the subsidiaries to rely increasingly upon heavy volume of often convoluted intercompany transactions. For example, gas purchases and power sales went through CES, operations & maintenance requests and operations personnel went through COSCI, all administrative services came from CASCI. Moreover, because many of the subsidiaries did not maintain Cash accounts and/or all Cash was swept to Calpine Corporation on a daily basis, the subsidiaries utilized intercompany transactions to account for services performed/received from other affiliate Entities. This proliferation of intercompany transactions, coupled with the rapid expansion of Calpine's operations, overwhelmed the accounting group's ability to "keep pace" and led to a number of embedded accounting issues. Those issues were not particularly problematic, except in the context of the Chapter 11 Cases. Indeed, it is not unusual for a non-debtor company to maintain less focus on intercompany transactions as transactions between and among subsidiary affiliates may have no effect on the consolidated solvency or operating results of that corporation. Integrity of the separate and distinct identity of a legal entity, however, is critically important in a chapter 11 case as intercompany assets and liabilities may have a material effect on the recovery to potential creditors of individual subsidiaries.

KAB 11469876.47

(ii)    Hopeless Entanglement

As stated above, Calpine's accounting group placed little emphasis on the accuracy of intercompany accounting entries so long as the balances eliminated at the Calpine consolidated level. Once again, outside the chapter 11 context, this issue was a benign one, because the accuracy of such intercompany balances did not have had an affect on the consolidated solvency of the operating results of the Debtors. Given the company's view, there was a significant lack of internal controls concerning intercompany accounting -- controls that help ensure that intercompany transactions are recorded accurately and can be adequately reconciled between affiliates. Foremost among the lack of controls is the absence of a comprehensive intercompany accounting policy, a formal review process, and consistent accounting practices between Entities. By virtue of this lack of control the Debtors' accountants could make entries on a legal Entity's books without the input of the accountant responsible for that Entity's accounting; Calpine's accounting program, PeopleSoft, was programmed to automatically balance entries and Calpine's accounting group would not properly review such balancing entries (resulting in one instance in a $900 million affiliate receivable on the books of CES appeared to have no financial or legal basis); there were a significant number of errors and inaccuracies that required manual correcting entries throughout the Calpine accounting structure, including at the consolidated level, but notably these correcting entries did not correct the "out-of-balance" position at the subsidiary level, and, in many instances, the "correcting" entries were actually erroneous; numerous transactions were recorded without a corresponding affiliate, leading to out-of-balance situations between legal Entities; many intercompany balances were never settled or cleared and continued to accumulate over the course of approximately six years; and given the age of most of the intercompany transactions, there is a general lack of knowledge and documentary support for the many intercompany accounting entries, further inhibiting the validation of these entries.

The issues described above, the higher priorities for accounting staff attention and inconsistent accounting practices prevalent at Calpine with respect to intercompany accounts, have led to a significant number of errors and adjustments in the intercompany accounting. This is evidenced by the high rate of correcting entries found by the Debtors' advisors. Over 75,000 journal entry line items in the intercompany receivable and payable accounts (or almost 7% of the total population of intercompany receivable and payable line items) contain certain key words denoting correcting entries (e.g., "adj," "back out," "correct," "fix," etc.). These correcting line items alone have an aggregate absolute transaction value in excess of $200 billion. The number of correcting entries is significantly higher than what should occur in the normal course of operations. Additionally, in many cases the "correcting" entries contain errors calling into question the "correcting" entries themselves.

Further compounding these accounting issues was the use of two intercompany accounting projects, Note 17 and the Intercompany Balance Clearance Program. "Note 17" refers to an intercompany note dated as of May 17, 2002, that was conceived to formalize purported loans made by Calpine Corporation to its subsidiaries to fund plant development and other project costs, thereby supporting intercompany interest expense deductions on state income tax returns. The implementation of Note 17 was flawed. Specifically, the scope of Note 17 was applied to Entities outside the terms of the agreement, and reached transactions that related to working capital rather than project development costs. This flawed implementation of Note 17 has contributed to the number and complexity of the intercompany transactions, and the general inability to reconcile the same in a time and cost effective manner. At least 48,000 journal line items have been recorded as part of Note 17 affecting over 190 legal Entities. These Note 17 journal line items have an aggregate absolute value of over $9 billion.

The "Intercompany Balance Clearance Program" was designed to simplify intercompany accounting by consolidating with Calpine Corporation all outstanding intercompany balances across legal Entities that did not settle in Cash, and then converting these consolidated balances to equity. Starting in

109

JA 1579

October 2005, Calpine attempted to correct and "clear" intercompany balances for each of its subsidiaries. Over the next three months, Calpine consolidated essentially all of its subsidiaries' outstanding intercompany balances with Calpine Corporation. In general terms, this program had the effect of shifting intercompany assets and liabilities across legal Entities with Calpine Corporation. While the consolidation of intercompany balances was, for the most part, completed, there is no evidence that Calpine took the further step of converting such balances to equity. Nor is it clear what the legal basis was for converting intercompany payables and receivables to equity on a wholesale basis. At least 21,000 journal line items were entered as part of this "clearing" program, affecting the intercompany balances of at least 205 Entities. These journal line items have an aggregate absolute value in excess of $70 billion across all of the legal Entities identified that were affected by this program. By shifting and reclassifying assets and liabilities without an articulated legal justification, the Intercompany Balance Clearance Program has added to the inaccuracy of the intercompany claims. Further, due to the scope of the program, and lack of centralized documentation, Calpine's advisors are unable to accurately confirm the actual number of transactions actually entered to "clear" the intercompany balances. Thus, it is uncertain just how many intercompany accounts were "cleared" during the fourth quarter of 2005, and it is unlikely that these transactions actually could be "reversed" in any event to determine the true nature of intercompany claims in a time and cost effective manner.

On their face, the intercompany claims comprise a significant percentage of the various Debtors' assets and unsecured liabilities. There are over 900,000 journal line items recorded in the intercompany asset and liability accounts with an aggregate absolute value in excess of $900 billion between and among the affiliate Debtors—an amount of intercompany claims that dwarfs all third party claims against the Debtors. Their treatment, therefore, would have a significant distorting effect on the holders of legitimate third party claims. The errors, inconsistencies, and defects referenced above, however, make an accurate picture of the intercompany claims extremely difficult to discern. Importantly, based upon the analysis to date, it is unlikely that the intercompany balances could be reconciled in a time and cost effective manner, and it is unclear whether such balances could be validated at all.

    (iii)  Creditor Reliance

The analysis performed by Calpine's advisors also uncovered a general lack of Creditor reliance on the separate credit of the Debtors. Calpine Corporation made it clear to trade Creditors that Calpine was a single, integrated business unit. By way of example only, Calpine Corporation has "Continuing Service Agreements" ("CSAs") with approximately 350 different third-party vendors who are repeat providers to Calpine Corporation's various subsidiaries. These CSAs are between the third-party vendor and Calpine Corporation, not an individual subsidiary. For those trade Creditors that are not covered by a CSA, Calpine Corporation and its subsidiaries typically use a stock purchase order that contains the seal of Calpine Corporation and which provides that "Calpine's general terms and conditions are attached and by reference are part of this Order."

The Calpine Entities also held themselves out to Creditors as a single, integrated unit. With limited exceptions, Calpine submitted consolidated public filings, including consolidated tax returns and SEC filings. Any potential Creditor who requested copies of tax returns or SEC filings received a picture of one vertically integrated economic unit, not a group of separate Entities with separate filings. Further, to the extent any Creditor had questions about the payment of invoices, Calpine used a centralized customer service contact number for Calpine's accounts payable department. All inquiries were handled by the same customer service personnel regardless of the specific Entity involved. Finally, Calpine used standard letterhead and business cards that contain the Calpine "C" logo or in some manner refer to Calpine Corporation, further illustrating that Creditors would have been aware of the vertical integration of the Calpine Entities.

d.    Conclusion

Based upon the foregoing, the Debtors believe that substantive consolidation is not only appropriate, but is in the best interests of Creditors. The analysis performed by the Debtors' advisors has uncovered myriad systematic and endemic weaknesses in Calpine's intercompany accounts that has led to a high rate of errors and inaccuracies. These weaknesses, errors, and inaccuracies, while not an issue outside of the Chapter 11 Cases, have forced the Debtors' advisors to conclude that the accuracy of the intercompany claims as recorded cannot be presumed and that such claims would have to be reconciled if any modicum of accuracy and validity is to be preserved. However, based upon the age and sheer number of transactions, coupled with the scope of the related accounting issues, the Debtors' advisors cannot say with any confidence that the intercompany claims could be reconciled in a time and cost effective manner, or even with unlimited funds and unlimited time to do so. Therefore, the separate administration of the Estates and the segregation of the commingled assets and liabilities would entail prohibitive costs and resultant delays with no assurance that such disentanglement could even be accomplished.

e.    Effect of Substantive Consolidation

Under a substantive consolidation scheme, the result for distributions and voting on and confirming the Plan will be as follows:

(i)    the assets and liabilities of all consolidated Debtors will be pooled;

(ii)    for all purposes associated with Confirmation and Consummation, Intercompany Claims and Interests will be ignored;

(iii)    for all purposes associated with Confirmation and Consummation, the Estates of the consolidated Debtors will be deemed to be one consolidated Estate;

(iv)    all guarantees of any consolidated Debtor of the obligations of any other consolidated Debtor will be eliminated for all purposes associated with Confirmation and Consummation, so that any Claim against a consolidated Debtor and any guarantee thereof will be a Claim against the consolidated Estate; and

(v)    each and every Claim will be deemed Filed against the consolidated Estate.

Substantive consolidation, however, will not affect a transfer or commingling of any assets of any of the Debtors, and all assets will continue to be owned by the respective Reorganized Debtors. Substantive consolidation also will not affect the legal and organizational structure of the Debtors or any pre- and post-Petition Date guarantees, Liens, and security interests that are required to be maintained.

f.    The Creditors' Committee's Substantive Consolidation Analysis

Throughout the Chapter 11 Cases, the Creditors' Committee and its Professionals have expended substantial resources analyzing the Debtors' corporate structure to determine if substantive consolidation is appropriate and necessary. Specifically, as discussed above, the Professionals for the Creditors' Committee met with the Debtors' Professionals on numerous occasions and the Creditors' Committee is in the process of performing its own investigation of the Debtors' books and records. The Creditors' Committee has not completed its analysis as of the date of this Disclosure Statement.

111

2.    Sources of Consideration for the Plan

All consideration necessary for the Reorganized Debtors to make any payments pursuant to the Plan shall be obtained from existing assets, the operations of the Debtors or the Reorganized Debtors, post-Confirmation borrowings pursuant to other facilities available to the Debtors or the Reorganized Debtors, or the consideration described in the following paragraphs. The Reorganized Debtors also may make such payments using Cash received from their direct and indirect subsidiaries through their consolidated cash management system and from advances or dividends from such subsidiaries in the ordinary course of business.

The Reorganized Debtors shall fund distributions under the Plan with Cash on hand, existing assets, the post-Confirmation borrowings described below, and the issuance of New Calpine Common Stock.

a.    New Credit Facility

On the Effective Date, the Reorganized Debtors shall enter into the New Credit Facility. Confirmation shall be deemed approval of the New Credit Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the New Credit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the New Credit Facility documents and such other documents as the New Credit Facility Lenders may reasonably require to effectuate the treatment afforded to such lenders pursuant to the New Credit Facility, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary. The Reorganized Debtors may use the New Credit Facility for any purpose permitted thereunder, including the funding of obligations under the Plan, such as the payment of Administrative Claims, and satisfaction of ongoing working capital needs.

b.    New Calpine Common Stock

On the Effective Date, Reorganized Calpine shall issue New Calpine Common Stock (based upon the New Calpine Total Enterprise Value) for distribution as follows: (a) all New Calpine Common Stock to be issued under the Plan shall be distributed to the New Calpine Common Stock Pool For Creditors (after setting aside sufficient New Calpine Common Stock to fund the Management and Director Equity Incentive Plans); (b) after all Allowed Claims (excluding Subordinated Debt Securities Claims and Subordinated Equity Securities Claims) are satisfied in full, any remaining New Calpine Common Stock to be issued under the Plan shall be distributed to the New Calpine Common Stock Pool For Subordinated Debt Securities Claimants; and (c) after all Allowed Subordinated Debt Securities Claims are satisfied in full, any remaining New Calpine Common Stock to be issued under the Plan shall be distributed to the New Calpine Common Stock Pool For Shareholders.

The Debtors believe that junior capital, in the form of a rights offering or other public or private equity offering, may provide additional capacity to enable the Reorganized Debtors to implement their post-reorganization business plan. The Debtors believe that a rights offering could deliver new equity into the Reorganized Debtors, provide investor validation of the Plan and business plan, increase the liquidity of the New Calpine Common Stock, and broaden the Reorganized Debtors' investor base. Thus, at a future date, the Debtors may decide to proceed with the offering of subscription rights to purchase New Calpine Common Stock on a pro rata basis to certain Holders of Allowed Claims and Interests.

(i)    Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any securities contemplated by the Plan and any and all settlement agreements incorporated therein, including the New Calpine Common Stock, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code any securities contemplated by the Plan, including the New Calpine Common Stock, will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (b) the restrictions, if any, on the transferability of such securities and instruments; and (c) applicable regulatory approval.

(ii)    Listing Rights

Reorganized Calpine shall use reasonable efforts to list the New Calpine Common Stock on a national securities exchange or for quotation on a national automated interdealer quotation system on the Effective Date, but shall have no liability if it is unable to do so. Entities receiving distributions of New Calpine Common Stock, by accepting such distributions, shall be deemed to have agreed to cooperate with the Reorganized Debtors' reasonable requests to assist them in their efforts to list the New Calpine Common Stock on a national securities exchange or quotation system.

(iii)    Restrictions on Resale of Securities to Protect Net Operating Losses

The Debtors will negotiate in good faith with the Creditors' Committee and the Equity Committee reasonable and customary restrictions on the transfer of New Calpine Common Stock to the extent necessary to avoid any adverse federal income tax consequences resulting from an ownership change (as defined in section 382 of the Internal Revenue Code) in Reorganized Calpine.

(iv)    Issuance and Distribution of the New Calpine Common Stock

The New Calpine Common Stock, when issued or distributed as provided in the Plan, will be duly authorized, validly issued, and, if applicable, fully paid and nonassessable. Each distribution and issuance referred to in Article III of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

3.    Corporate Existence

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

113

**JA 1583**

4.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the New Credit Facility and Claims pursuant to the DIP Facility that by their terms survive termination of the DIP Facility). On and after the Effective Date, except as otherwise provided under the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.    Cancellation of Debt and Equity Securities and Related Obligations

On the Effective Date, except as otherwise specifically provided for in the Plan: (a) the Old Calpine Common Stock and any other Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, other instruments or documents evidencing indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old Calpine Common Stock and any other Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements or Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, that notwithstanding Confirmation, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (w) allowing Holders to receive distributions under the Plan; (x) allowing a Servicer to make distributions on account of such Claims or Interests as provided in Article VII of the Plan; (y) permitting such Servicer to maintain any rights and Liens it may have against property other than the Reorganized Debtors' property for fees, costs, and expenses pursuant to such indenture or other agreement; and (z) governing the rights and obligations of non-Debtor parties to such agreements vis-à-vis each other; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors. The Reorganized Debtors shall not have any obligations to any Servicer for any fees, costs, or expenses, except as expressly otherwise provided in the Plan.

6.    Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; (d) the Roll-Up Transactions; and (e) all other

114

JA 1584

actions that the Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Roll-Up Transactions. The form of each Roll-Up Transaction shall be determined by the Reorganized Debtor that is party to such Roll-Up Transaction. Implementation of the Roll-Up Transactions shall not affect any distributions, discharges, exculpations, releases, or injunctions set forth in the Plan. Prior to the Effective Date, the Debtors shall have consulted with the Creditors' Committee regarding their intentions with respect to the Roll-Up Transactions.

7.    Post-Confirmation Property Sales

To the extent the Debtors or Reorganized Debtors, as applicable, sell any of their property prior to or including the date that is one year after Confirmation, the Debtors or Reorganized Debtors, as applicable, may elect to sell such property pursuant to sections 363, 1123, and 1146(a) of the Bankruptcy Code.

8.    Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors, or any other Entity. Without limiting the foregoing, such actions may include: the adoption and filing of the Reorganized Calpine Charter and Reorganized Calpine Bylaws; the appointment of directors and officers for the Reorganized Debtors; the adoption, implementation, and amendment of the Management Equity Incentive Plan and the Director Equity Incentive Plan; and consummation or implementation of the New Credit Facility.

9.    Certificate of Incorporation, Charter, and Bylaws

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies) of the Debtors shall be amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code and the form and substance of the Reorganized Calpine Charter and Reorganized Calpine Bylaws shall be included in the Plan Supplement not less than fourteen days before the Voting Deadline. The certificate of incorporation of Reorganized Calpine shall be amended to, among other things: (a) authorize issuance of the shares of New Calpine Common Stock; and (b) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends. On or as soon as reasonably practicable after the Effective Date, to the extent required, each of the Reorganized Debtors shall file new certificates of incorporation (or other formation documents relating to limited liability companies) with the secretary (or equivalent state officer or entity) of the state under which each such Reorganized Debtor is or is to be incorporated or organized. After the Effective Date, each Reorganized Debtor may amend and restate its new certificate of incorporation and other constituent documents as permitted by the relevant state corporate law.

**JA 1585**

K&E 11469976.47

10.     Annual Meeting

Pursuant to the bylaws, no annual meeting of shareholders will be held in 2007 or 2008. The first annual meeting of shareholders of the Reorganized Debtors following the Effective Date will be held in 2009 following the completion of the Reorganized Debtors' 2008 fiscal year.

11.     Effectuating Documents, Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

12.     Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FERC filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

13.     Directors and Officers of Reorganized Calpine

The existing officers of Calpine shall serve initially in their current capacities on and after the Effective Date. On the Effective Date, the term of the current members of the board of directors of Calpine shall expire, and the initial board of directors of Reorganized Calpine shall consist of the Persons identified by the Debtors at or before the Confirmation Hearing. In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of any Person proposed to serve as a board member of Reorganized Calpine shall have been disclosed at or before the Confirmation Hearing. To the extent any Person proposed to serve as a board member of Reorganized Calpine is an Insider, the nature of any compensation for such Person shall have been disclosed at or before the Confirmation Hearing. The classification and composition of the board of directors of Reorganized Calpine shall be consistent with the Reorganized Calpine Charter and the Reorganized Calpine Bylaws. Each director or officer of Reorganized Calpine shall serve from and after the Effective Date pursuant to the terms of the Reorganized Calpine Charter, the Reorganized Calpine Bylaws, or other constituent documents, and applicable state corporation law.

116

14.    Directors and Officers of Reorganized Debtors Other Than Calpine

The existing officers and members of the boards of directors of each of the Debtors other than Calpine shall continue to serve in their current capacities after the Effective Date. The classification and composition of the boards of directors of the Reorganized Debtors other than Reorganized Calpine shall be consistent with their respective new certificates of incorporation and bylaws. Each such director or officer shall serve from and after the Effective Date pursuant to the terms of such new certificate of incorporation, bylaws, other constituent documents, and applicable state corporation law. In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of any Person proposed to serve as a board member shall have been disclosed at or before the Confirmation Hearing.

15.    Employee and Retiree Benefits

Except with respect to Employment Agreements and except as otherwise specifically provided in the Plan or the Plan Supplement, on and after the Effective Date, the Reorganized Debtors may: (a) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (b) distribute or reallocate any unused designated employee success fee and bonus funds related to Confirmation and Consummation in the ordinary course of their business. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

16.    Management and Director Equity Incentive Plans

On the Effective Date, the Reorganized Debtors will adopt and implement the Calpine Management Equity Incentive Plan and the Director Equity Incentive Plan, descriptions of which are contained in the Plan Supplement. These type of equity programs are customary as companies exit chapter 11 protection. The Debtors, with the assistance of their executive compensation advisors, Towers Perrin, are in the process of developing the Management and Director Equity Incentive Plans to provide the Reorganized Debtors' management and directors with incentives to maximize future stockholder value, align their interests with the interests of stockholders, and otherwise contribute to the success of the Reorganized Debtors, as well as to attract, retain, and reward the best available persons for positions of responsibility. The Management and Director Equity Incentive Plans will consist of one-time emergence equity grants as well as ongoing annual equity grants and will provide for a combination of stock options and restricted stock that will vest over a three-year period. It is currently anticipated that there will be reserved up to approximately 3.0% of the New Calpine Common Stock for distribution in accordance with the Management and Director Equity Incentive Plans.

17.    Creation of Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall establish the Professional Fee Escrow Account and reserve an amount necessary to pay all of the Accrued Professional Compensation.

K&E 11469876.47

18.    Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

H.    Treatment Of Executory Contracts And Unexpired Leases

1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, the Debtors' executory contracts or unexpired leases not assumed or rejected pursuant to a Bankruptcy Court order prior to the Effective Date shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those executory contracts or unexpired leases: (a) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; (b) listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement; (c) that are Intercompany Contracts, in which case such Intercompany Contracts are deemed automatically assumed by the applicable Debtor as of the Effective Date, unless such Intercompany Contract previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement; (d) that are the subject of a motion to assume or reject pending on the Effective Date (in which case the such assumption or rejection and the effective date thereof shall remain subject to a Bankruptcy Court order); (e) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; or (f) that are otherwise expressly assumed or rejected pursuant to the Plan (including Article V of the Plan). Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of

118

such executory contracts and unexpired leases in the Plan are effective as of the Effective Date. Each such executory contract and unexpired lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors reserve the right to alter, amend, modify, or supplement the schedules of executory contracts or unexpired leases identified in Article V of the Plan and in the Plan Supplement at any time through and including fifteen days after the Effective Date.

     2.     Indemnification Obligations

Each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such Indemnification Obligation is executory, unless such Indemnification Obligation previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Indemnification Obligations for Former Employees" in the Plan Supplement. Notwithstanding the foregoing, an Indemnification Obligation to any Person who as of the Petition Date no longer was a director, officer, or employee of a Debtor, shall terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise, as of the Effective Date; provided, however, that the Reorganized Debtors reserve the right to honor or reaffirm Indemnification Obligations other than those terminated by this Article, whether or not executory, in which case such honoring or reaffirmation shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation. Each Indemnification Obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

     3.     Repudiation of FERC Jurisdictional Contracts

Each FERC Jurisdictional Contract shall be deemed automatically assumed as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such FERC Jurisdictional Contract was previously repudiated by the Debtors by written notice, a Bankruptcy Court order, or is listed on the schedule of "Repudiated FERC Jurisdictional Contracts" in the Plan Supplement (in which list all such listed FERC Jurisdictional Contracts shall be deemed repudiated as of the Effective Date); provided, however, that if a Final Order in the PPA Litigation authorizes the Debtors or Reorganized Debtors, as applicable, to reject any FERC Jurisdictional Contracts, then all FERC Jurisdictional Contracts listed on the schedule of "Repudiated FERC Jurisdictional Contracts" shall be deemed automatically rejected as of the Effective Date.

     4.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

With respect to each of the Debtors' executory contracts or unexpired leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure, and the assumption of such executory contract or unexpired lease may be conditioned upon the disposition of all issues with respect to Cure. Any provisions or terms of the Debtors' executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure. Except with respect to executory contracts and unexpired leases in which the Debtors and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with KCC on or before the Cure Bar Date. Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from

KAE 11469876.47

assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the amounts listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If the Reorganized Debtors object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Reorganized Debtors and the counterparty to the executory contract or unexpired lease. Any counterparty to an executory contract and unexpired lease that fails to object timely to the proposed assumption of any executory contract or unexpired lease will be deemed to have consented to such assumption. The Reorganized Debtors reserve the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any Proofs of Claim Filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

　　　　5.　　　Executory Contracts and Unexpired Leases Relating to Projects to be Sold or Surrendered

Each of the Debtors' executory contracts and unexpired leases listed on the schedule of "Conditionally Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement shall be deemed assumed by the contracting Debtors or Reorganized Debtor, as applicable, on a conditional basis pursuant to sections 365 and 1123 of the Bankruptcy Code, provided that the Debtors or Reorganized Debtors, as applicable, may alter the treatment of such listed executory contracts and unexpired leases through a date that is sixty days after the Effective Date, at which time the executory contracts and unexpired leases remaining on such list are unconditionally assumed so that the Cure provisions of Article V.B of the Plan shall apply, and the executory contracts and unexpired leases no longer remaining on such list are unconditionally rejected or repudiated all pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise.

　　　　6.　　　Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases.　In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods

previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated executory contracts.

     7.     Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases pursuant to the Plan or otherwise must be Filed with KCC no later than thirty days after the later of the Effective Date or the effective date of rejection or repudiation. Any Proofs of Claim arising from the rejection or repudiation of the Debtors' executory contracts or unexpired leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases shall be classified as Rejection Damages Claims and shall be treated in accordance with Article III.B of the Plan.

     8.     Intercompany Contracts, Contracts, and Leases Entered Into After the Petition Date

Intercompany Contracts, contracts, and leases entered into after the Petition Date by any Debtor, and any executory contracts and unexpired leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

     9.     Guarantees Issued or Reinstated After the Petition Date

Those guarantee obligations of any Debtor listed in the Plan Supplement shall be deemed Reinstated on the Effective Date, and such obligations, as well as any other guarantee obligations of any Debtor incurred after the Petition Date, shall be performed by the applicable Reorganized Debtor in the ordinary course of business pursuant to the terms thereof.

     10.     Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions

All executory contracts and unexpired leases to be assumed, or conditionally assumed, under the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code shall be deemed so assumed, or so conditionally assumed, without giving effect to any provisions contained in such executory contracts or unexpired leases restricting the change in control or ownership interest composition of any or all of the Debtors, and upon the Effective Date (a) any such restrictions shall be deemed of no further force and effect, and (b) any breaches that may arise thereunder as a result of Confirmation or Consummation shall be deemed waived by the applicable non-Debtor counterparty.

     11.     Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

12.    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

13.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.    Procedures for Treatment of Disputed, Contingent, and Unliquidated Claims Pursuant to the Plan

1.    Allowance of Claims and Interests

After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action referenced in Article IV.Q of the Plan.

2.    Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (a) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (b) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

3.    Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim or Interest pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(e) of the Bankruptcy Code or otherwise be

122

entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty days after the date on which such Claim is estimated.

4.    Adjustment to Claims Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. Beginning on the end of the first full calendar quarter that is at least ninety days after the Effective Date, the Reorganized Debtors shall publish every calendar quarter a list of all Claims or Interests that have been paid, satisfied, amended, or superseded during such prior calendar quarter.

5.    Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the later of (a) the date that is one year after the Effective Date and (b) such date as may be fixed by the Bankruptcy Court, after notice and a hearing, whether fixed before or after the date that is one year after the Effective Date.

6.    Disallowance of Claims

Any and all Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an Indemnification Obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. All Claims Filed on account of an employee benefit referenced in Article IV.N of the Plan shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM (INCLUDING SUBORDINATED DEBT AND EQUITY SECURITIES CLAIMS) FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER.**

7.    Offer of Judgment

The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014,

123

Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

        8.      Amendments to Claims

On or after the Effective Date, except as provided in the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

J.      Provisions Governing Distributions

        1.      Total Enterprise Value for Purposes of Distributions Under the Plan and the New Calpine Stock Reserve

Distributions of New Calpine Common Stock to Holders of Allowed Claims and Interests, and the establishment and maintenance of the New Calpine Stock Reserve, both as described below, shall be based upon the New Calpine Total Enterprise Value. For purposes of distribution, the New Calpine Common Stock shall be deemed to have the value assigned to it based upon, among other things, the New Calpine Total Enterprise Value regardless of the date of distribution.

        2.      Distributions on Account of Claims and Interests Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties and subject to the establishment of the New Calpine Stock Reserve, initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Distribution Date; provided, however, that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in full in Cash on the Distribution Date or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

        3.      Distributions on Account of Claims and Interests Allowed After the Effective Date

                a.      Payments and Distributions on Disputed Claims and Interests: Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, and subject to the establishment of the New Calpine Stock Reserve, distributions under the Plan on account of Disputed Claims and Interests that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty days after the Disputed Claim or Interest becomes an Allowed Claim or Interest; provided, however, that (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (ii) Disputed Priority Tax Claims that

124

become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

b.      Special Rules for Distributions to Holders of Disputed Claims and Interests: Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (i) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order and (ii) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order and the Claims or Interests have been Allowed; provided, however, that the Reorganized Debtors shall make distributions to Holders of Allowed First Lien Debt Claims, Allowed Second Lien Debt Claims, and Allowed Other Secured Claims on account of the Allowed portion of such Holders' Claims. In the event that there are Disputed Claims or Interests requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims or Interests. Subject to Article IX.A.6 of the Plan, all distributions made pursuant to the Plan on account of an Allowed Claim or Interest shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim or Interest had been an Allowed Claim or Interest on the dates distributions were previously made to Holders of Allowed Claims or Interests included in the applicable Class.

c.      Reserve of New Calpine Common Stock:    On the Effective Date, the Reorganized Debtors shall maintain in reserve shares of New Calpine Common Stock as the New Calpine Stock Reserve to pay Holders of Allowed Claims and Interests pursuant to the terms of the Plan. The amount of New Calpine Common Stock withheld as a part of the New Calpine Stock Reserve shall be equal to the number of shares necessary to satisfy the distributions required to be made pursuant to the Plan when each Disputed Claim or Interest is ultimately determined to be an Allowed Claim or Interest or is disallowed. As Disputed Claims and Interests are Allowed, the Distribution Agent shall distribute, in accordance with the terms of the Plan, New Calpine Common Stock to Holders of Allowed Claims and Interests, and the New Calpine Stock Reserve shall be adjusted. The Distribution Agent shall withhold in the New Calpine Stock Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the New Calpine Common Stock initially withheld in the New Calpine Stock Reserve, to the extent that such New Calpine Common Stock continues to be withheld in the New Calpine Stock Reserve at the time such distributions are made or such obligations arise, and such dividends, payments, or other distributions shall be held for the benefit of Holders of Disputed Claims and Interests whose Claims and Interests, if Allowed, are entitled to distributions under the Plan. Nothing in the Plan shall require the Reorganized Debtors to reserve New Calpine Common Stock on account of agreements, programs, and plans the Debtors may continue to honor

125