**Appellants Brief Appendix Part 9**

market conditions as of the Effective Date will not differ materially from those conditions prevailing as of the date of the Disclosure Statement.

>    b.    Total Enterprise Value

Miller Buckfire used two methodologies to derive the total enterprise value ("TEV") of the Debtors based on the Projections: (1) a calculation of the present value of free cash flows, added to a terminal value, using a range of discount rates (the "DCF Analysis"); and (2) a comparison of the Debtors' projected performance to that of other public companies (the "Selected Companies") with lines of business and operating characteristics similar to those of the Debtors (the "Comparable Companies Analysis"). Miller Buckfire assigned equal weightings to the two methodologies.

The DCF Analysis derives an estimated TEV of the Debtors by combining their unlevered projected free cash flows based on the Projections and a terminal value at the end of the projection period, discounted at an appropriate range of discount rates. The terminal value was derived using two methodologies: (1) applying a perpetuity growth rate range of 1.75% to 2.25% to the projected 2012 unlevered free cash flow of the Debtors; and (2) applying an earnings before interest, taxes, depreciation, amortization and rent ("EBITDAR") multiple range of 9.5x to 10.5x to the Debtors' projected EBITDAR in 2012. Miller Buckfire used a discount rate range of 8.25% to 8.75% to perform the DCF Analysis.

The Comparable Companies Analysis considers the market enterprise values of the Selected Companies as a multiple of projected 2007 and 2008 fiscal year EBITDAR, as obtained from recent public research reports published by third parties and guidance provided by the management of the Selected Companies. Miller Buckfire applied ranges of ratios to the Debtors' projected EBITDAR to derive a range of implied values based on Miller Buckfire's analysis of such ratios for the Selected Companies. Miller Buckfire assumed a multiple of 2007 EBITDAR of 11.5x to 12.5x and a multiple of 2008 EBITDAR of 10.5x to 11.5x.

Calpine's TEV includes an estimated value for its NOL carryforwards of $1.0 to $1.1 billion.

Based on the methodologies described above, and after further review, discussions, considerations, and assumptions, Miller Buckfire has estimated a TEV range for the Reorganized Debtors as of the Effective Date of $19.2 and $21.3 billion, with a midpoint of $20.268 billion.

>    c.    Equity Value

After determining the TEV of the Reorganized Debtors, Miller Buckfire estimated the reorganized equity value of the Reorganized Debtors by deducting the net debt, which ranges from $10.7 billion to $11.9 billion. After these adjustments, the estimated reorganized range of equity values of the Reorganized Debtors (the "Reorganized Equity Value") is between $8.379 billion and $9.613 billion. Based on a hypothetical 500 million shares of New Calpine Common Stock outstanding, the value per share is $16.76 to $19.23.

| ($ millions) | High Claims | Low Claims |
|---|---|---|
| TEV (midpoint) | $20,268 | $20,268 |
| Less: Funded Exit Facility | (7,631) | (7,000) |
| Less: Reinstated Net Project and Other Debt | (4,259) | (4,248) |
| Plus: Available Cash not Distributed to Creditors | - | 593 |
| **Reorganized Equity Value** | **$8,379** | **$9,613** |

### d. Distribution to Holders of Allowed Claims and Interests

Assuming Miller Buckfire's $20.268 billion midpoint TEV, after adding approximately $1.4 billion of Available Cash, the Reorganized Debtors project their reorganization value (the "Reorganization Value") to be $21.697 billion. As set forth below, assuming a $21.697 billion Reorganization Value and using the Debtors' estimates of the high-end and low-end ranges of Allowed Claims at the conclusion of the Claims objection, reconciliation, and resolution process, the Debtors estimate that the residual value remaining for Holders of Allowed Interests, after satisfaction of all Allowed Claims, is approximately $0.00 to $3.53 per share.

| (\$ millions) | High Claims | | Low Claims | |
|---|---|---|---|---|
| Total Enterprise Value (midpoint) | \$ | 20,268 | \$ | 20,268 |
| Plus: Available Cash | | 1,429 | | 1,429 |
| **Reorganization Value (midpoint)** | \$ | 21,697 | \$ | 21,697 |
| Non-Debtor Net Project Debt | | (4,059) | | (4,059) |
| DIP Facility Claims | | (4,000) | | (4,000) |
| Administrative Claims | | (1) | | (1) |
| Priority Tax Claims | | (84) | | (73) |
| First Lien Debt Claims | | (125) | | - |
| Second Lien Debt Claims | | (4,424) | | (3,773) |
| Other Secured Claims | | (601) | | (153) |
| Other Priority Claims | | (2) | | (2) |
| Convenience Claims | | (22) | | (22) |
| **Reorganized Equity Value** | \$ | 8,379 | \$ | 9,613 |
| Unsecured Claims (High and Low Estimates) | \$8,941 | <100% | \$7,980 | 100% |
| Residual Value Remaining for Equity | \$0 | \$0.00 | \$1,633 | \$3.53 |

The Debtors' estimates of the value of potential recoveries under the Plan to Holders of Allowed Unsecured Claims and Interests described in the Disclosure Statement: (1) do not take into account that a certain percentage of New Calpine Common Stock will be reserved for the Management and Director Equity Incentive Plans, and that there may be further dilution of the New Calpine Common Stock as a result of the exercise of rights or options under such Incentive Plans; (2) do not take into account a certain percentage of New Calpine Common Stock that may be issued pursuant to a rights offering; (3) exclude shares that may be issued to satisfy Allowed Subordinated Equity Securities Claims, to the extent such Claims are Allowed; and (4) assume no distributions on account of any Old Calpine Common Stock held by or for the benefit of the Debtors, including with respect to the Share Lending Agreement.

### e. Reservations

The estimates of value contained in the Disclosure Statement are not predictions or guarantees of the future value or price of the New Calpine Common Stock nor any other debt or equity instrument to be issued pursuant to the Plan. The value of any securities issued under the Plan is subject to many unforeseeable circumstances and, therefore, cannot be accurately predicted. In addition, the actual amounts of Allowed Claims could materially exceed the amounts estimated by the Debtors for purposes of estimating the anticipated recoveries for the Holders of Allowed Claims and Interests. Accordingly, no representation can be or is being made with respect to whether such percentage recoveries will actually be realized by the Holders of Allowed Claims and Interests.

Miller Buckfire's estimates of TEV and reorganized equity value of the Reorganized Debtors do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if the Debtors sold their assets. These estimates assume that the Reorganized Debtors will continue as the owners and

K&E 11469276 47

operators of their businesses and assets, and that such assets are operated in accordance with the Debtors' business plan. Miller Buckfire developed such estimates solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to Holders of Allowed Claims and Interests.

Miller Buckfire's estimates are not entirely mathematical, but rather involve complex considerations and judgments concerning various factors that could affect the value of an operating business. Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, Miller Buckfire's estimates are not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, the Debtors, Miller Buckfire, and any other party do not assume responsibility for the accuracy of such estimates. Depending on the results of the Debtors' operations or changes in the financial markets, Miller Buckfire's estimates performed as of the Effective Date may differ materially.

In addition, the valuation of newly issued securities, such as the New Calpine Common Stock, is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities held by Creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors that generally influence the prices of securities. Other factors, many of which are not possible to predict, may also affect actual market prices of such securities. Accordingly, the implied reorganized equity value estimated by Miller Buckfire does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

These estimated ranges of values and recoveries represent a hypothetical value that reflects the estimated intrinsic value of the Debtors derived through the application of various valuation methodologies. The value ascribed in Miller Buckfire's estimates does not purport to be an estimate of the post-reorganization market trading value, and such trading value may be materially different from the reorganization value ranges associated with Miller Buckfire's estimates. Indeed, there can be no assurance that a trading market will develop for the new securities issued pursuant to the reorganization. Miller Buckfire's estimates are based on economic, market, financial, and other conditions as they exist on, and on the information made available as of, the date of the Disclosure Statement. It should be understood that, although subsequent developments may affect Miller Buckfire's conclusions, after the Confirmation Hearing, Miller Buckfire does not have any obligation to update, revise, or reaffirm its analysis.

Furthermore, in the event that the actual total Allowed Claims differ from those assumed by the Debtors, the actual recoveries realized by Holders of Allowed Claims and Interests could be significantly higher or lower than estimated by the Debtors.

The summary set forth above does not purport to be a complete description of the Valuation Analysis performed by Miller Buckfire. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description.

IN LIGHT OF THE FOREGOING, THE VALUATION ANALYSIS IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE

DEBTORS, THE REORGANIZED DEBTORS, AND THEIR PROFESSIONALS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION ANALYSIS WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE DESCRIBED IN THE DISCLOSURE STATEMENT.

      3.     Application of the Best Interests Test to the Liquidation Analysis and the Valuation Analysis

Notwithstanding the difficulties in quantifying recoveries to Holders of Allowed Claims and Interests with precision, the Debtors believe that, taking into account the Liquidation Analysis and the Valuation Analysis, the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.

Based on the Liquidation Analysis and the Valuation Analysis, the Debtors believe that the Holders of Allowed Impaired Claims and Interests will receive more under the Plan than they would in a hypothetical chapter 7 liquidation. The chapter 7 liquidation proceeds would satisfy in full all Secured Claims. However, not all Unsecured Claims would be paid in full, and Interests would receive no distribution. In contrast, the Debtors believe that the litigation-risk adjusted outcome under the Plan is that Allowed Unsecured Claims (other than Allowed Subordinated Debt Securities Claims and Allowed Subordinated Equity Securities Claims) will receive New Calpine Common Stock sufficient to be satisfied in full and that Allowed Interests will receive New Calpine Common Stock valued at approximately $1.80 per share of Old Calpine Common Stock.

Holders of Allowed Claims and Interests will receive a better recovery under the Plan as a result of, among other things, the Debtors' belief that the continued operation of the Debtors as going concerns rather than a liquidation will allow the realization of more value on account of the Debtors' assets. Moreover, the Debtors' employees will retain their jobs and most likely assert few if any Claims other than those currently pending. In the event of a chapter 7 liquidation, the aggregate amount of Unsecured Claims no doubt will increase as a result of rejection or repudiation of a greater number of the Debtors' executory contracts and unexpired leases. Chapter 7 liquidation also would give rise to additional costs, expenses, and Administrative Claims. The resulting increase in both Unsecured and Administrative Claims necessarily would decrease the percentage recoveries to Unsecured Creditors. All of these factors lead to the conclusion that recoveries under the Plan would be greater than the recoveries available in chapter 7 liquidation.

D.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses based on the Projections included in the Plan Supplement.

The Projections consist of the following unaudited pro forma financial statements: a projected income statement from January 1, 2007 through December 31, 2012; a projected cash flow statement for January 1, 2007 through December 31, 2012; and a balance sheet projected as of an assumed Effective Date of December 31, 2007. The Projections generally are based on the forecasted financial results of the Debtors, the Reorganized Debtors, and their non-Debtor Affiliates and the Debtors' April 2007 business plan.

In general, as illustrated by the Projections, the Debtors believe that with a significantly deleveraged capital structure, the Debtors' business will return to viability. The decrease in the amount of debt on the Debtors' balance sheet will substantially reduce their interest expenses and improve cash flow. Based on the terms of the Plan, on the Effective Date the Debtors will have approximately $11 billion of debt and other liabilities in contrast to more than $17 billion of consolidated debt (including debt at non-Debtor projects) prior to the Petition Date. Thereafter, based on the Projections, the Debtors should have sufficient cash flow to pay and service their debt obligations, including the New Credit Facility, and to fund operations. The Debtors believe that Confirmation and Consummation is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

In the event the Bankruptcy Court does not authorize the Debtors to substantively consolidate the Estates, the Plan still satisfies the feasibility test. To the extent that any of the Debtors may not generate their own income or may not be profitable on their own as going-concerns, they will be funded post-Confirmation by the Reorganized Debtors. Thus, even without substantive consolidation, Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of any of the Debtors that may not be profitable stand-alone enterprises.

THE DEBTORS' MANAGEMENT PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE VI OF THE DISCLOSURE STATEMENT ENTITLED "CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING"), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE

FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.    MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.    THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AND INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto) and other financial information set forth in Calpine's Annual Report on Form 10-K for the fiscal year ended December 31, 2006, Calpine's Quarterly Reports on Form 10-Q for the first quarter ending March 31, 2007, and any other recent Calpine report to the Securities and Exchange Commission. These filings are available by visiting the Securities and Exchange Commission's website at http://www.sec.gov or the Debtors' website at http://www.calpine.com.

E.    Acceptance By Impaired Classes

The Bankruptcy Code also requires, as a condition to confirmation, that each class of claims or equity interests that is impaired but still receives distributions under the plan accept the plan. A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest, or cures any default and reinstates the original terms of the obligation.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code: (1) an impaired class of claims has accepted the Plan if the holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims in such class actually voting have voted to accept the plan of reorganization; and (2) an impaired

class of interests has accepted the plan of reorganization if the holders of at least two-thirds in amount of the allowed interests of such class actually voting have voted to accept the plan of reorganization.    To the extent substantive consolidation is not authorized by the Confirmation Order, the Debtors must meet this requirement for each separate Plan proposed.

F.    Confirmation Without Acceptance By All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if the plan has not been accepted by all impaired classes entitled to vote on the plan, so long as the plan has been accepted by at least one impaired non-insider class.

Section 1129(b) of the Bankruptcy Code states that notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan shall be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram-down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it provides a treatment to the class that is substantially equivalent to the treatment that is provided to other classes that have equal rank.    In determining whether a plan discriminates unfairly, courts will take into account a number of factors, including the effect of applicable subordination agreements between parties. Accordingly, two classes of unsecured creditors could be treated differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured claims includes the requirements that:    (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the secured claims, whether the property subject to the liens is retained by debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement that either:    (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (2) the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of equity interests includes the requirements that either: (1) the plan provide that each holder of an equity interest in such class receive or retain under the plan, on account of such equity interest, property of a value, as of the effective date, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such interest; or (2) if the class does not receive such an amount as required under (1), no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors intend to seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that is presumed to reject the Plan, and reserve the right to do so with respect to any other rejecting Class of Claims or Interests, as applicable.    Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtors submit that the Plan does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement for Secured Creditors, all Holders of Secured Claims shall retain the Liens securing such Claims to the extent of the Allowed amount of the Secured Claims or shall receive deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date, at least equivalent to the value of the Secured Creditor's interest in the Debtors' property subject to the Liens. With respect to the fair and equitable treatment requirement for unsecured Creditors, the Plan provides that each Holder of an Allowed Unsecured Claim shall receive on account of such Claim property of a value equal to the amount of such Claim, or if not, then no junior Claims or Interests will receive distributions under the Plan. With respect to the fair and equitable treatment for Interest Holders, the Plan does not provide for distributions to any Holder of an Interest junior to such Interest Holders. Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtors are required to seek "cram down."

## ARTICLE VI.
## CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THE DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS ARTICLE PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN, THE FINANCIAL PROJECTIONS IN THE PLAN SUPPLEMENT, AND OTHER RISKS THAT COULD IMPACT THE REORGANIZED DEBTORS' FUTURE BUSINESS OPERATIONS AND PERFORMANCE. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.    Certain Bankruptcy Considerations

1.    *Undue Delay in Confirmation May Significantly Disrupt the Operations of the Debtors.* The impact that a continued prolonging of the Chapter 11 Cases may have on operations of the Debtors cannot be accurately predicted or quantified. Since the filing of the Chapter 11 Cases, the Debtors have suffered certain disruptions in operations.

The continuation of the Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could further adversely affect the Debtors' operations and relationships with the Debtors' customers, vendors, employees, and regulators. If Confirmation and Consummation do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs, Professional fees, and similar expenses. Prolonged Chapter 11 Cases may also make it more difficult to retain and attract management and other key personnel, and would require senior management to spend a significant amount of time and effort dealing with the Debtors' financial reorganization instead of focusing on the operation of the Debtors' businesses. Finally, any delay in Confirmation or Consummation could result in the expiration of the New Credit Facility financing commitments.

2.    *The Debtors May Not Be Able to Obtain Confirmation or Consummation.* The Debtors cannot ensure that they will receive the requisite acceptances to confirm the Plan. Even if the Debtors receive the requisite acceptances, the Debtors cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting Creditor or Interest Holder might challenge the adequacy of the Disclosure

157

Statement or the solicitation procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. As discussed in further detail in Article V, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things: a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; confirmation is not likely to be followed by a liquidation or a need for further financial reorganization; and the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtors believe that the Plan complies with section 1129 of the Bankruptcy Code.

Confirmation and Consummation are also subject to certain conditions described in Article IV above. If the Plan is not confirmed, it is unclear whether a restructuring of the Debtors could be implemented and what distributions Holders of Allowed Claims or Interests ultimately would receive. If an alternative feasible reorganization could not be proposed, it is possible that the Debtors would have to liquidate their assets, in which case, as set forth in the Liquidation Analysis, it is likely that Holders of Claims and Interests would receive substantially less favorable treatment than they would receive under the Plan.

3. *The Bankruptcy Court Might Not Authorize Substantive Consolidation.* The Plan contemplates substantive consolidation of all of the Estates into one Estate. The Debtors can provide no assurance, however, that Holders of Claims and Interests will not object to substantive consolidation of one or more of the Estates or that the Bankruptcy Court will determine that substantive consolidation is appropriate. The Debtors reserve the right to seek Confirmation and Consummation even if the Bankruptcy Court does not authorize substantive consolidation of the Estates. In the event that some or all of the Estates are not substantively consolidated, such failure will not affect the validity of the vote taken by Impaired Classes to accept or reject any individual Plan or require any re-vote or re-solicitation of the Impaired Classes.

4. *Parties in Interest May Object to the Debtors' Classification of Claims.* Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there is no assurance that the Bankruptcy Court will necessarily hold that the Claims classification scheme complies with the Bankruptcy Code.

5. *The Debtors May Object to the Amount, or the Secured or Priority Status, of a Claim and Procedures for Contingent and Unliquidated Claims.* The Debtors reserve the right to object to the amount, or the Secured or Priority status, of any Claim or Interest. The estimates set forth in the Disclosure Statement cannot be relied on by any Creditor or Equity Holder whose Claim or Interest is subject to an objection. Any such Holder of a Claim or Interest may not receive its specified share of the estimated distributions described in the Disclosure Statement. Moreover, notwithstanding any language in any Holder's Proof of Claim or otherwise, the Holder of a contingent or unliquidated Claim shall not be entitled to receive or recover any amount in excess of the amount stated in the Holder's Proof of Claim, if any, as of the Distribution Record Date, or if the Proof of Claim provides no monetary value of such Holders' Claim on the Distribution Record Date, then the amount the Debtors elect to withhold on account of such Claim.

158

B.    Factors Affecting the Value of the Securities to be Issued Under the Plan

1.    *The Reorganized Debtors May Not be Able to Achieve their Projected Financial Results.* The Reorganized Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that the Reorganized Debtors have assumed in projecting their future business prospects. If the Reorganized Debtors do not achieve these projected revenue or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. The financial projections represent management's view based on currently known facts and hypothetical assumptions about their future operations. The Projections do not, however, guarantee the Reorganized Debtors' future financial performance.

2.    *The Plan Exchanges Senior Securities for Junior Securities.* If the Plan is confirmed and consummated, Holders of Claims and Interests will receive shares of New Calpine Common Stock. Thus, in agreeing to the Plan, certain of such Holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation preference over equity securities, for shares of New Calpine Common Stock, which will be subordinate to all future Creditor Claims.

3.    *A Liquid Trading Market for the New Calpine Common Stock May Not Develop.* Although the Plan requires the New Calpine Common Stock be listed on a national exchange on the Effective Date, the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for the New Calpine Common Stock will develop. The liquidity of any market for the New Calpine Common Stock will depend, among other things, upon the number of Holders of New Calpine Common Stock, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted. Therefore, the Debtors cannot assure that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be.

4.    *The Trading Price for the New Calpine Common Stock May be Depressed Following the Effective Date.* Following the Effective Date, recipients of New Calpine Common Stock under the Plan may seek to dispose of such stock to obtain liquidity, which could cause the initial trading prices for these securities to be depressed, particularly in light of the lack of established trading markets for these securities. Further, the possibility that recipients of New Calpine Common Stock may determine to sell all or a large portion of their shares in a short period of time may adversely affect the market price of the New Calpine Common Stock.

5.    *Significant Holders.* Under the Plan, certain Holders of Allowed Claims and Interests may receive New Calpine Common Stock. If Holders of a significant number of shares of New Calpine Common Stock were to act as a group, such Holders might be in a position to control the outcome of actions requiring shareholder approval, including the election of directors.

6.    *The Debtors' Financial Projections are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They are Based.* The Projections are based on numerous assumptions including: timely Confirmation and Consummation pursuant to the terms of the Plan; the anticipated future performance of the Reorganized Debtors; energy industry performance; general business and economic conditions; and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Reorganized Debtors' operations. These variations may be material and may adversely affect the ability of the Reorganized Debtors to make payments with respect to indebtedness following Consummation. Because the actual results achieved

159

throughout the periods covered by the Projections may vary from the projected results, the Projections should not be relied upon as an assurance of the actual results that will occur.

Except with respect to the Projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement. Such events may have a material impact on the information contained in the Disclosure Statement. Neither the Debtors nor the Reorganized Debtors intend to update the Projections. The Projections, therefore, will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

7.    *The Actual Allowed Amounts of Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery of Claims and Interests.* The estimated Claims set forth in the Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in the Disclosure Statement. Such differences may materially and adversely affect, among other things: the percentage recoveries to Holders of Allowed Claims and Interests under the Plan; the Reorganized Debtors' ability to consummate the Plan; the Reorganized Debtors' ability to meet the Projections; and the Reorganized Debtors' need to raise additional debt or equity financing. The Creditors' Committee believes that the Debtors' assumed New Calpine Total Enterprise Value may be greater than the actual enterprise value of the Reorganized Debtors as may be determined by the Bankruptcy Court and believes that the Debtors' Claims estimates may be lower than the actual amount of Allowed Claims upon completion of the Claims reconciliation process, each of which may have a material impact on the recoveries to Holders of Allowed Claims and Interests. The Equity Committee believes that the Debtors' assumed New Calpine Total Enterprise Value may be lower than the actual enterprise value of the Reorganized Debtors as may be determined by the Bankruptcy Court, and that this may have a material impact on the recoveries to Holders of Allowed Claims and Interests.

8.    *The Valuation Analysis of New Calpine Common Stock, and the Estimated Recoveries to Holders of Claims and Interests, is not Intended to Represent the Trading Values of the New Calpine Common Stock.* The Valuation Analysis is based on the Projections developed by the Debtors' management and on certain generally accepted valuation principles. It is not intended to represent the trading values of Reorganized Calpine's securities in public or private markets. The Valuation Analysis is based on numerous assumptions (the realization of many of which are beyond the Debtors' and the Reorganized Debtors' control), including the Reorganized Debtors' successful reorganization, an assumed Effective Date on or about December 31, 2007, the Reorganized Debtors' ability to achieve the operating and financial results included in the Projections, the Reorganized Debtors' ability to maintain adequate liquidity to fund operations and the assumption that capital and equity markets remain consistent with current conditions. Even if the Debtors achieve the Projections, the trading market values for the New Calpine Common Stock could be adversely impacted by the lack of trading liquidity for these securities, lack of institutional research coverage, and concentrated selling by recipients of these securities.

9.    *The New Calpine Common Stock May be Issued in Odd Lots.* Holders of Allowed Claims and Interests may receive odd lot distributions (*i.e.*, less than 100 shares) of New Calpine Common Stock under the Plan. Holders may find it more difficult to dispose of odd lots in the marketplace and may face increased brokerage charges in connection with any such disposition.

10.    *The Reorganized Debtors Do Not Expect to Pay Cash Dividends on the New Calpine Common Stock for the Foreseeable Future.* The terms of the New Credit Facility may limit, among other things, Reorganized Calpine's ability to pay dividends, and it is not anticipated that any Cash dividends will be paid on the New Calpine Common Stock in the near future.

160

JA 1631

11.     *Restrictions on Transfer.*  Holders of securities issued pursuant to the Plan who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, including holders who are deemed to be "affiliates" or "control persons" within the meaning of the Securities Act, will be unable freely to transfer or to sell their securities except pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws (and Calpine is under no obligation to register such securities), or (c) pursuant to the provisions of Rule 144 under the Securities Act or another available exemption from registration requirements.

12.     *Transfer Restrictions on the New Calpine Common Stock May Be Contained in the Certificate of Incorporation for New Calpine Which May Limit the Liquidity of the New Calpine Common Stock; Any Prohibited Ownership Change Could Limit the Availability of the Debtors' NOLs.*  The Debtors will negotiate in good faith with the Creditors' Committee and the Equity Committee reasonable and customary restrictions on the transfer of New Calpine Common Stock to the extent necessary to avoid any adverse federal income tax consequences resulting from an ownership change (as defined in section 382 of the Internal Revenue Code) in Reorganized Calpine. These transfer restrictions may adversely affect the ability of certain persons to acquire shares of New Calpine Common Stock during the period the restrictions are in place. Furthermore, while the purpose of these transfer restrictions is to prevent an "ownership change" from occurring within the meaning of section 382 of the Internal Revenue Code (which ownership change would adversely affect the Reorganized Debtors' ability to utilize their NOLs or other tax attributes), no assurance can be given that such an ownership change will not occur, in which case the availability of the Reorganized Debtors' substantial NOLs and other federal income tax attributes would be significantly limited or possibly eliminated.

13.     *Possible Charging Liens of Indenture Trustees Could Dilute the Recovery of Holders of Claims Arising from Issuances of Public Securities.*  Certain indenture trustees may elect to assert charging liens under the relevant indenture to recover fees, costs, and expenses incurred during the Chapter 11 Cases. If they do so, the recovery under the Plan by Holders of Claims arising from issuances of public securities could be reduced.

14.     *Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Various Factual Determinations.*  Some of the material consequences of the Plan regarding United States federal income taxes are summarized in Article VII. Many of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, such as valuations, that raise additional uncertainties. The Debtors cannot ensure that the Internal Revenue Service (the "IRS") will not take a contrary view, and no ruling from the IRS has been or will be sought regarding the tax consequences described in Article VII. In addition, the Debtors cannot ensure that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the Debtors' tax treatment, or that a court would not sustain such a challenge. FOR A MORE DETAILED DISCUSSION OF RISKS RELATING TO THE SPECIFIC POSITIONS THE DEBTORS INTEND TO TAKE WITH RESPECT TO VARIOUS TAX ISSUES, PLEASE SEE ARTICLE VII.

C.     Risks Related to the Reorganized Debtors' Business and Financial Condition

1.     Indebtedness

a.     The Reorganized Debtors' Degree of Leverage May Limit Their Financial and Operating Activities

The Reorganized Debtors will have significant indebtedness even after Consummation. The substantial indebtedness of the Reorganized Debtors could adversely impact their financial health and

161

limit their operations. Further, the Debtors' historical capital requirements have been considerable and their future capital requirements could vary significantly and may be affected by general economic conditions, industry trends, performance, and many other factors that are not within their control. The Debtors' substantial level of indebtedness has, in the past, had important consequences, including: limiting their ability to borrow additional amounts for working capital, capital expenditures, debt service requirements, execution of their growth strategy, or other purposes; limiting their ability to use operating cash flow in other areas of their business because they must dedicate a substantial portion of these funds to service the debt; increasing their vulnerability to general adverse economic and industry conditions; limiting their ability to capitalize on business opportunities and to react to competitive pressures and adverse changes in government regulation; limiting their ability or increasing the costs to refinance indebtedness; and limiting their ability to enter into marketing, hedging, optimization, and trading transactions by reducing the number of counterparties with whom they can transact as well as the volume of those transactions. These consequences, and others, may impact the Reorganized Debtors' business and operations. The Reorganized Debtors cannot ensure that they will be able to obtain financing in the future. The Reorganized Debtors cannot ensure that they will not experience losses in the future. Their profitability and ability to generate cash flow will likely depend upon their ability to successfully implement their business strategy and meet or exceed the results forecasted in the Projections. However, the Reorganized Debtors cannot ensure that they will be able to accomplish these results.

In addition, the Reorganized Debtors will have $1.5 billion of debt coming due in 2011, and there can be no assurance of the Reorganized Debtors' ability to pay such debt or otherwise refinance such debt.

      b.      The Covenants in the New Credit Facility Will Restrict the Reorganized Debtors' Activities and Require Them to Meet or Maintain Various Financial Ratios

The New Credit Facility will contain a number of covenants and other provisions that will restrict the Reorganized Debtors' ability to engage in various financing transactions and operating activities, including but limited to: incur additional debt; prepay, redeem, or repurchase indebtedness; pay dividends or repurchase shares of capital stock; make loans or investments; create liens; sell assets; acquire businesses; enter into sale and lease back arrangements; enter into mergers and consolidations; change the nature of the businesses; and amend organizational documents, debt documents and other material agreements.

The New Credit Facility also will require the Reorganized Debtors to maintain various financial ratios. The ability of the Reorganized Debtors to meet these financial covenants and ratios may be affected by events beyond their control. If the Reorganized Debtors default under any of these requirements, the lenders could declare all outstanding borrowings, accrued interest, and fees to be due and payable. If that were to occur, there can be no assurance that the Reorganized Debtors would have sufficient liquidity to repay or refinance this indebtedness or any of their other debt.

      c.      The Reorganized Debtors' Financial Results May be Volatile and May Not Reflect Historical Trends

Following the Reorganized Debtors' emergence from chapter 11, they expect their financial results to continue to be volatile as asset impairments, asset dispositions, restructuring activities, contract terminations and rejections, and claims assessments may significantly impact the Projections. As a result, their historical financial performance is likely not indicative of their financial performance post-Consummation. In addition, upon emergence from Chapter 11, the amounts reported in their subsequent financial statements may materially change relative to their historical financial statements, including as a result of revisions to their operating plans pursuant to the Plan. In addition, as part of their emergence

K&E 11469876.47

from bankruptcy protection, the Reorganized Debtors may be required to adopt fresh start accounting. If fresh start accounting is applicable, their assets and liabilities will be recorded at fair value as of the fresh start reporting date. The fair value of their assets and liabilities may differ materially from the recorded values of assets and liabilities in the Projections. In addition, their financial results after the application of fresh start accounting may be different from historical trends.

> d.    Much of the Indebtedness of the Reorganized Debtors upon Emergence from the Chapter 11 Cases Will Bear Interest at Variable Rates, Which May Lead to Increased Debt Service Obligations

Much of the indebtedness of the Reorganized Debtors upon emergence from the Chapter 11 Cases will bear interest at variable rates. While Calpine may enter into interest rate hedging contracts for a portion of its variable rate debt, an increase in the interest rates on any remaining unhedged debt will reduce the funds available to repay the indebtedness of the Reorganized Debtors and to finance their operations and future business opportunities and, as a result, will intensify the consequences of their leveraged capital structure.

> 2.    Operations

> a.    Expiration, Termination, or Entry into New Power Purchase Agreements

The Reorganized Debtors' revenue may be reduced significantly upon expiration or termination of various power purchase agreements. Some of the electricity the Debtors generate from their existing portfolio is sold under long-term PPAs that expire at various times. The Debtors also sell power under short to intermediate term (one to five year) PPAs. When the terms of each of these various PPAs expire, it is possible that the price paid to the Reorganized Debtors for the generation of electricity under subsequent arrangements may be reduced significantly.

The Debtors' power sales contracts have an aggregate value in excess of current market prices. Values for the Debtors' long-term commodity contracts are calculated using discounted cash flows derived as the difference between contractually based cash flows and the cash flows to buy or sell similar amounts of the commodity on market terms. Inherent in these valuations are significant assumptions regarding future prices, correlations, and volatilities, as applicable. Because in valuing the Debtors' power sales contracts, they are marked-to-market, the aggregate value of the contracts noted above could decrease in response to changes in the market. The Reorganized Debtors are at risk of loss in margins to the extent that these contracts expire or are terminated and they are unable to replace them on comparable terms. The Debtors have four customers with which they have multiple contracts that, when combined, constitute greater than 10% of this value: CDWR $0.5 billion, PG&E $0.4 billion, Wisconsin Power & Light $0.2 billion, and Carolina Power & Light $0.2 billion. The values by customer are composed of multiple individual contracts that expire beginning in 2008 and contain termination provisions standard to contracts in their industry such as negligence, performance default, or prolonged events of force majeure.

Use of commodity contracts, including standard power and gas contracts (many of which constitute derivatives), can create volatility in earnings and may require significant cash collateral. The nature of the transactions that the Reorganized Debtors will enter into and the volatility of natural gas and electric power prices will determine the volatility of earnings that the Reorganized Debtors may experience related to these transactions.

Companies like Calpine using derivatives, many of which are commodity contracts, are sensitive to the inherent risks of such transactions. Consequently, the Debtors are required to post cash collateral for certain commodity transactions in excess of what was previously required. The Debtors use margin

deposits, prepayments, and letters of credit as credit support for commodity procurement and risk management activities. Future cash collateral requirements may increase based on the extent of the Reorganized Debtors' involvement in standard contracts and movements in commodity prices and also based on the Reorganized Debtors' credit ratings and general perception of creditworthiness in this market.

           b.     Fuel Supply

The Reorganized Debtors may be unable to obtain an adequate supply of natural gas in the future. To date, the Debtors' fuel acquisition strategy has included various combinations of the Debtors' own natural gas reserves, natural gas prepayment contracts, short-, medium- and long-term supply contracts, acquisition of natural gas in storage, and natural gas hedging transactions. In their natural gas supply arrangements, the Debtors attempt to match the fuel cost with the fuel component included in the facility's power purchase agreements to minimize a project's exposure to fuel price risk. In addition, the focus of CES is to manage the spark spread for the Debtors' portfolio of generating plants and the Debtors actively enter into hedging transactions to lock in natural gas costs and spark spreads. The Debtors believe that there will be adequate supplies of natural gas available at reasonable prices for each of the Reorganized Debtors' facilities when current natural gas supply agreements expire. However, natural gas supplies may not be available for the full term of the facilities' power purchase agreements, and natural gas prices may increase significantly. Additionally, the Reorganized Debtors' credit ratings may inhibit their ability to procure natural gas supplies from third parties. If natural gas is not available, or if natural gas prices increase above the level that can be recovered in electricity prices, there could be a negative impact on the Reorganized Debtors' results of operations or financial condition.

For the year ended December 31, 2004, the Debtors obtained approximately 7% of their physical natural gas supply needs through owned natural gas reserves. Following the completion of the sales of their oil and natural gas assets in 2005, the Debtors, for the most part, no longer satisfied any of their natural gas supply needs through owned natural gas reserves. Since that time, the Debtors obtain the majority of their physical natural gas supply from the market and utilize the natural gas financial markets to hedge their exposures to natural gas price risk. The Debtors' less-than-investment-grade credit rating increases the amount of collateral that certain of their suppliers require the Debtors to post for purchases of physical natural gas supply and hedging instruments. To the extent that the Reorganized Debtors do not have Cash or other means of posting credit, they may be unable to procure an adequate supply of natural gas or natural gas hedging instruments. In addition, the fact that the Debtors' deliveries of natural gas depend upon the natural gas pipeline infrastructure in markets where they operate power plants exposes the Reorganized Debtors to supply disruptions in the unusual event that the pipeline infrastructure is damaged or disabled.

The Debtors rely on electric transmission and natural gas transportation and distribution facilities owned and operated by other companies. Thus, they depend on facilities and assets that they do not own or control for the transmission to their customers of the electricity produced in their facilities and the transportation and distribution of natural gas fuel to their facilities. If these transmission and transportation and distribution systems are disrupted or capacity on those systems is inadequate, their ability to sell and deliver electric energy products or obtain fuel may be hindered. ISOs that oversee transmission systems in regional power markets have imposed price limitations and other mechanisms to address volatility in their power markets. Existing congestion as well as expansion of transmission systems could affect their performance.

c.    Project Development and Acquisition

The Reorganized Debtors' power project development and acquisition activities may not be successful. The development of power generation facilities is subject to substantial risks. In connection with the development of a power generation facility, the Reorganized Debtors must generally obtain: necessary power generation equipment; governmental permits and approvals; fuel supply and transportation agreements; sufficient equity capital and debt financing; electrical transmission agreements; water supply and wastewater discharge agreements; and site agreements and construction contracts.

To the extent that the Reorganized Debtors' development activities continue or resume, the Reorganized Debtors may be unsuccessful in accomplishing any of these matters or in doing so on a timely basis. In addition, project development is subject to substantial risks including various environmental, engineering, and construction risks relating to equipment, permitting, financing, obtaining necessary construction and operating agreements (including related to fuel supply, transportation and distribution, and electrical transmission), cost-overruns, delays, and performance targets. Although the Reorganized Debtors may attempt to minimize the financial risks in the development of a project by securing a favorable power purchase agreement, obtaining all required governmental permits and approvals, and arranging adequate financing prior to the commencement of construction, the development of a power project may require the Reorganized Debtors to expend significant sums for preliminary engineering, permitting, legal, and other expenses before they can determine whether a project is feasible, economically attractive, or financeable. If the Reorganized Debtors are unable to complete the development of a facility, the Reorganized Debtors might not be able to recover their investment in the project and may be required to recognize additional impairments.

The process for obtaining initial environmental, siting, and other governmental permits and approvals is complicated and lengthy, often taking more than one year, and is subject to significant uncertainties. The Reorganized Debtors cannot assure that they will be successful in the development of power generation facilities in the future or that they will be able to successfully complete construction of their facilities currently in development, nor can the Reorganized Debtors assure that any of these facilities will be profitable or have value equal to the investment in them even if they do achieve commercial operation.

The Reorganized Debtors' projects under construction may not commence operation as scheduled. The commencement of operation of a newly constructed power generation facility involves many risks, including: start-up problems; the breakdown or failure of equipment or processes; and performance below expected levels of output or efficiency.

New plants have no operating history and may employ recently developed and technologically complex equipment. Insurance (including a layer of insurance provided by Calpine's captive insurance subsidiary) is maintained to protect against certain risks, warranties are generally obtained for limited periods relating to the construction of each project and its equipment in varying degrees, and contractors and equipment suppliers are obligated to meet certain performance levels. The insurance, warranties, or performance guarantees, however, may not be adequate to cover lost revenues or increased expenses. As a result, a project may be unable to fund principal and interest payments under its financing obligations and may operate at a loss. A default under such a financing obligation, unless cured, could result in the Reorganized Debtors losing their interest in a power generation facility.

In certain situations, power purchase agreements entered into with a utility early in the development phase of a project may enable the utility to terminate the PPA or to retain posted security as liquidated damages under the PPA. The situations that could allow a utility to terminate a PPA or retain

posted security as liquidated damages include: the cessation or abandonment of the development, construction, maintenance, or operation of the facility; failure of the facility to achieve construction milestones by agreed upon deadlines, subject to extensions due to "force majeure" events; failure of the facility to achieve commercial operation by agreed upon deadlines, subject to extensions due to force majeure events; failure of the facility to achieve certain output minimums; failure by the facility to make any of the payments owing to the utility under the PPA or to establish, maintain, restore, extend the term of, or increase the posted security if required by the PPA; a material breach of a representation or warranty or failure by the facility to observe, comply with, or perform any other material obligation under the PPA; failure of the facility to obtain material permits and regulatory approvals by agreed upon deadlines; or the liquidation, dissolution, insolvency, or bankruptcy of the project entity.

### d.    Success of Operations

The Reorganized Debtors' power generation facilities may not operate as planned. Upon completion of the Reorganized Debtors' projects currently under construction, the Reorganized Debtors will operate nearly all of the power plants in which they currently have an interest. The continued operation of power generation facilities, including, upon completion of construction, the facilities owned directly by the Reorganized Debtors, involves many risks, including: the breakdown or failure of power generation equipment, transmission lines, pipelines or other equipment or processes; performance below expected levels of output or efficiency; the output and efficiency levels at which those generating facilities perform; interruptions in fuel supply; disruptions in the delivery of electricity; adverse zoning; breakdown or failure of equipment (whether due to age or otherwise) or processes; violation of the Debtor's permit requirements or revocation of permits; shortages of equipment or spare parts; labor disputes; operator errors; curtailment of operations due to transmission constraints; restrictions on emissions; implementation of unproven technologies in connection with environmental improvements; and catastrophic events such as fires, explosions, floods, earthquakes or other similar occurrences.

From time to time, the Debtors' power generation facilities have experienced equipment breakdowns or failures. In 2006, for example, the Debtors recorded expenses totaling approximately $27.5 million for these breakdowns or failures compared to $33.8 million in 2005. Continued high failure rates of Siemens-Westinghouse provided equipment represent the highest risk for future breakdowns. The Siemens turbines, which were engineered by Siemens to achieve high fuel efficiency and low emissions, have experienced certain design and operating problems which have impacted their reliability and maintenance costs and, if not corrected, may impair their expected useful lives. In several instances, breakdowns of the Siemens turbines have resulted in plant damage as well as lost power sales. Pursuant to the terms of the various turbine purchase, maintenance, and warranty agreements and the other agreements between Siemens and Calpine, Siemens has been attempting to implement certain product modifications designed to address the issues with the turbines. Calpine and Siemens continue to work to reach a mutually satisfactory resolution of the issues between the parties. To the extent that the parties are unable to reach agreement, Calpine shall pursue remedies in litigation or arbitration against Siemens, including damages claims and the pursuit of avoidance actions related to the agreements between the parties. Because of the foregoing, Calpine has been developing a contingency plan to address these problems on its own and to recover costs and damages from Siemens in the event an agreement cannot be reached.

Although the Reorganized Debtors' facilities contain various redundancies and back-up mechanisms, a breakdown or failure may prevent the affected facility from performing under any applicable power purchase agreements. Although insurance is maintained to partially protect against operating risks, the proceeds of insurance may not be adequate to cover lost revenues or increased expenses. As a result, the Reorganized Debtors could be unable to service principal and interest payments

166

under their financing obligations which could result in the Reorganized Debtors losing their interest in one or more power generation facilities.

     e.    Terrorist Attacks, Future War, or Risk of War may Adversely Impact the Debtors' Results of Operations, their Ability to Raise Capital, or their Future Growth

As power generators, the Debtors may face an above-average risk of an act of terrorism, which could include either a direct act against a generating facility of the Debtors or an inability to operate as a result of systemic damage resulting from an act against the transmission and distribution infrastructure that they use to transport their power. If such an attack were to occur, the Reorganized Debtors' business, financial condition and results of operations could be materially adversely impacted. In addition, such an attack could impact their ability to service their indebtedness, their ability to raise capital, and their future growth opportunities.

     f.    Availability and Productivity of Geothermal Resources

The Reorganized Debtors' geothermal energy reserves may be inadequate for their operations. The development and operation of geothermal energy resources are subject to substantial risks and uncertainties similar to those experienced in the development of oil and gas resources. The successful exploitation of a geothermal energy resource ultimately depends upon: the heat content of the extractable steam or fluids; the geology of the reservoir; the total amount of recoverable reserves; operating expenses relating to the extraction of steam or fluids; price levels relating to the extraction of steam or fluids or power generated; and capital expenditure requirements relating primarily to the drilling of new wells.

In connection with each geothermal power plant, the Reorganized Debtors estimate the productivity of the geothermal resource and the expected decline in productivity. The productivity of a geothermal resource may decline more than anticipated, resulting in insufficient reserves being available for sustained generation of the electrical power capacity desired. An incorrect estimate by the Debtors or an unexpected decline in productivity could, if material, adversely affect the Reorganized Debtors' results of operations or financial condition.

Geothermal reservoirs are highly complex. As a result, there exist numerous uncertainties in determining the extent of the reservoirs and the quantity and productivity of the steam reserves. Reservoir engineering is an inexact process of estimating underground accumulations of steam or fluids that cannot be measured in any precise way, and depends significantly on the quantity and accuracy of available data. As a result, the estimates of other reservoir specialists may differ materially from those of the Reorganized Debtors. Estimates of reserves are generally revised over time on the basis of the results of drilling, testing, and production that occur after the original estimate was prepared. The Reorganized Debtors cannot assure that they will be able to successfully manage the development and operation of the their geothermal reservoirs or that the Reorganized Debtors will accurately estimate the quantity or productivity of their steam reserves.

Seismic disturbances could damage the Reorganized Debtors' projects. Areas where the Reorganized Debtors operate and are developing many of their geothermal and gas-fired projects are subject to frequent low-level seismic disturbances. More significant seismic disturbances are possible. The Debtors' existing power generation facilities are built to withstand relatively significant levels of seismic disturbances, and the Debtors believe they maintain adequate insurance protection. Earthquake, property damage, or business interruption insurance, however, may be inadequate to cover all potential losses sustained in the event of serious seismic disturbances. Additionally, insurance for these risks may not continue to be available to the Reorganized Debtors on commercially reasonable terms or at all.

K&E 11469976.47

The Reorganized Debtors' results will be subject to quarterly and seasonal fluctuations. The Debtors' quarterly operating results have fluctuated in the past and may continue to do so in the future as a result of a number of factors, including: seasonal variations in energy prices; weather; variations in levels of production (including forced outages); unavailability of emissions credits; the timing and size of acquisitions; and the completion of development and construction projects.

Additionally, because the Debtors receive the majority of capacity payments under some of their power purchase agreements, and typically higher energy prices, during the months of May through October, the Reorganized Debtors' revenues and results of operations are, to a large extent, seasonal.

In particular, a disproportionate amount of the Debtors' total revenue has historically been realized during the third fiscal quarter and they expect this trend to continue in the future as U.S. demand for electricity peaks in the third fiscal quarter. If the Debtors' total revenue were below seasonal expectations during that quarter, by reason of facility operational performance issues, cool summers, mild winters or other factors, it could have a disproportionate effect on their expectations and the expectations of securities analysts and investors with regard to their annual operating results.

3.    Market Conditions

Competition could adversely affect the Reorganized Debtors' performance. The power generation industry is characterized by intense competition, and the Reorganized Debtors will encounter competition from utilities, industrial companies, marketing and trading companies, financial institutions, and other independent power producers. In recent years, there has been increasing competition among generators in an effort to obtain power purchase agreements, and this competition has contributed to a reduction in electricity prices in certain markets. In addition, many states are implementing or considering regulatory initiatives designed to increase competition in the domestic power industry. For instance, the CPUC issued decisions that provided that all California electric users taking service from a regulated public utility could elect to receive direct access service commencing April 1998; however, the CPUC suspended the offering of direct access to any customer not receiving direct access service as of September 20, 2001, due to the problems experienced in the California energy markets during 2000 and 2001. As a result, uncertainty exists as to the future course for direct access in California in the aftermath of the energy crisis in that state. In Texas, legislation phased in a deregulated power market, which commenced on January 1, 2001. This competition has put pressure on electric utilities to lower their costs, including the cost of purchased electricity, and increasing competition in the supply of electricity in the future could increase this pressure.

Further, the Reorganized Debtors' revenues and results of operations will depend on market rules, regulations, and other forces beyond their control, including: rate caps, price limitations and bidding rules imposed by ISOs, RTOs and other market regulators that may impair their ability to recover costs and limit their return on their capital investments; and their competitors' entitlement guaranteed rates of return on their capital investments, which returns may in some instances exceed such investments, may limit their ability to sell their power profitably.

The volatility in the California power market, along with significant changes in state laws, regulations, policies and procedures have led to a number of unresolved issues arising in that market, where a significant number of the Debtors' power plants are located. These issues could adversely affect the Reorganized Debtors' performance, and the Reorganized Debtors are unable to predict the impact of such issues on their future financial and operational performance. For additional information regarding the changes in and other issues regarding the California power market, please refer to Calpine's Annual Report on Form 10-K for the fiscal year ended December 31, 2006. These filings are available by visiting

168

the Securities and Exchange Commission's website at http://www.sec.gov or the Debtors' website at http://www.calpine.com.

    4.    Government Regulation

The Reorganized Debtors' activities are subject to complex and stringent energy, environmental, and other governmental laws and regulations which could adversely affect their operations. The construction and operation of power generation facilities require numerous permits, approvals, and certificates from appropriate foreign, federal, state, and local governmental agencies, as well as compliance with environmental protection legislation and other regulations. While the Reorganized Debtors believe that they have obtained the requisite approvals and permits for their existing operations and that their business is operated in accordance with applicable laws, the Reorganized Debtors remain subject to a varied and complex body of laws and regulations that both public officials and private individuals may seek to enforce. Existing laws and regulations may be revised or reinterpreted, or new laws and regulations may become applicable to the Reorganized Debtors that may have a negative effect on their business and results of operations. The Reorganized Debtors may be unable to obtain all necessary licenses, permits, approvals, and certificates for proposed projects, and completed facilities may not comply with all applicable permit conditions, statutes, or regulations. In addition, regulatory compliance for the construction and operation of the Reorganized Debtors' facilities can be a costly and time-consuming process. Intricate and changing environmental and other regulatory requirements may necessitate substantial expenditures to obtain and maintain permits. If a project is unable to function as planned due to changing requirements, loss of required permits or regulatory status or local opposition, it may create expensive delays, extended periods of non-operation, or significant loss of value in a project.

Environmental regulations have had and will continue to have an impact on the Reorganized Debtors' operations and their investment decisions. The Reorganized Debtors are subject to complex and stringent energy, environmental, and other governmental laws and regulations at the federal, state and local levels in connection with the development, ownership, and operation of their energy generation facilities, and in connection with the purchase and sale of electricity and natural gas. Federal laws and regulations govern, among other things, transactions by electric and gas companies, the ownership of the facilities, and access to and service on the electric transmission and natural gas transportation grids. There have been a number of federal legislative and regulatory actions that have recently changed, and will continue to change, how the energy markets are regulated. For example, in March 2005, the EPA adopted a significant air quality regulation, the CAIR, that will affect the Reorganized Debtors' fossil fuel-fired generating facilities located in the eastern half of the United States. The CAIR addresses the interstate transport of $NO_x$ and $SO_2$ from fossil fuel power generation facilities. Individual states are responsible for developing a mechanism for assigning emissions rights to individual facilities. States' allocation mechanisms, which will be complete in late 2007, ultimately will determine the net financial impact upon the Reorganized Debtors. In addition, the potential for future regulation of greenhouse gas emissions continues to be the subject of discussion. The Reorganized Debtors' power generation facilities are significant sources of $CO_2$ emissions, a greenhouse gas. The Reorganized Debtors' compliance costs with any future federal greenhouse gas regulation could be material. Additional legislative and regulatory initiatives may occur. The Reorganized Debtors cannot provide assurance that any legislation or regulation ultimately adopted would not adversely affect the Reorganized Debtors' existing projects.

Complex electric regulations may have a continuing impact on the Reorganized Debtors' business. The Reorganized Debtors' operations are potentially subject to the provisions of various energy laws and regulations, including the FPA, PUHCA 2005, PURPA, and state and local regulations. The FPA regulates wholesale sales of power, as well as electric transmission, in interstate commerce. PUHCA 2005, which repealed the PUHCA of 1935 as of February 8, 2006, subjects "holding

169

companies," as defined in PUHCA 2005, to certain FERC rights of access to the companies' books and records that are determined by FERC to be relevant to the companies' respective FERC-jurisdictional rates. PURPA provides owners of QFs exemptions from certain federal and state regulations, including rate and financial regulations. Each of these laws was created or amended by EPAct 2005, and FERC is still promulgating regulations to implement EPAct 2005's provisions. The Reorganized Debtors cannot predict what the final effects of these regulations will be on their business.

Under the FPA and FERC's regulations, the wholesale sale of power at market-based or cost-based rates requires that the seller have authorization issued by FERC to sell power at wholesale pursuant to a FERC-accepted rate schedule or tariff. All of the Reorganized Debtors' affiliates that own power plants (except for those power plants that are QFs under PURPA or are located in ERCOT), as well as the Reorganized Debtors' power marketing companies (collectively referred to as "Market Based Rate Companies"), are currently authorized by FERC to make wholesale sales of power at market based rates. This authorization could possibly be revoked for any of the Reorganized Debtors' Market Based Rate Companies if: the Reorganized Debtors' Market Based Rate Companies fail in the future to continue to satisfy FERC's applicable criteria or future criteria as possibly modified by FERC; if FERC eliminates or restricts the ability of wholesale sellers of power to make sales at market-based rates; or if FERC institutes a proceeding, based upon its own motion or a complaint brought by a third party, and establishes that any of the Reorganized Debtors' Market Based Rate Companies' existing rates have become either unjust and unreasonable or contrary to the public interest (the applicable standard is determined by the circumstances). FERC could also revoke a seller's market-based rate authority if the seller does not comply with FERC's quarterly and triennial reporting requirements or does not notify FERC of any change in the seller's status that would reflect a departure from the characteristics FERC relied upon in granting market-based rate authority to the seller. If the seller's market-based rate authority is revoked, the seller could be liable for refunds of certain sales made at market-based rates.

The Reorganized Debtors' Market Based Rate Companies also must comply with FERC's application, filing, and reporting requirements for persons holding or proposing to hold certain interlocking directorate positions. If the appropriate filings are not made, FERC can deny the person from holding the interlocking positions.

Under PUHCA 2005, the Reorganized Debtors and certain companies within their organizational structure are holding companies otherwise subject to the books and records access requirements. The Reorganized Debtors and their subsidiary holding companies, however, are exempt from the books and records access requirement because they are holding companies solely with respect to one or more QFs, EWGs, and FUCOs. If one of the Reorganized Debtors' subsidiary project companies were to lose their QF, EWG, or FUCO status, the Reorganized Debtors would lose this exemption. Consequently, all holding companies within the Reorganized Debtors' corporate structure would be subject to the books and records access requirement of PUHCA 2005, in addition to stringent holding company record-keeping and reporting requirements mandated by FERC's rules. If the Reorganized Debtors lose the exemption, the Reorganized Debtors could seek a waiver of the record-keeping and reporting requirements, but the Reorganized Debtors cannot provide assurance that they would obtain such waiver.

To avail themselves of the benefits provided by PURPA, the Reorganized Debtors' project companies must own or, in some instances, operate a QF. For a cogeneration facility to qualify as a QF, FERC requires the QF to produce electricity as well as thermal energy in specified minimum proportions. The QF also must meet certain minimum energy efficiency standards. In addition, EPAct 2005 and FERC's implementing regulations require new cogeneration QFs to demonstrate that their thermal output will be used in a "productive and beneficial manner" and that the facility's electrical, thermal, chemical, and mechanical output will be used fundamentally for industrial, commercial, residential, or institutional purposes. Generally, any geothermal power facility which produces not more than 80 MW of electricity

K&E 11469876.47

qualifies for QF status. FERC's regulations implementing EPAct 2005 require QFs to obtain market-based rate authorization for wholesale sales that are made pursuant to a contract executed after March 17, 2006, and not under a state regulatory authority's implementation of section 210 of PURPA.

Certain factors necessary to maintain QF status are subject to the risk of events outside the Reorganized Debtors' control.   For example, some of the Reorganized Debtors' facilities have temporarily been rendered incapable of meeting FERC's QF criteria due to the loss of a thermal energy customer. Such loss of a steam host could occur, for example, if the steam host, typically an industrial facility, fails for operating, permit, or economic reasons to use sufficient quantities of the QF's steam output. In these cases, the Reorganized Debtors have obtained from FERC limited waivers (for up to two years) of the applicable QF requirements. The Reorganized Debtors cannot provide assurance that such waivers will in every case be granted. During any such waiver period, the Reorganized Debtors would seek to replace the thermal energy customer or find another use for the thermal energy which meets PURPA's requirements, but no assurance can be given that these remedial actions would be available. The Reorganized Debtors also cannot provide assurance that all of the Reorganized Debtors' steam hosts will continue to take and use sufficient quantities of their respective QF's steam output.

If any of the Reorganized Debtors' QFs lose their QF status, the owner of the QF would need to obtain FERC acceptance of a market-based or cost-based rate schedule to continue making wholesale power sales. To maintain the Reorganized Debtors' exemption from PUHCA 2005, the owner would also need to obtain EWG status.  The Reorganized Debtors cannot provide assurance that such FERC acceptance of a rate schedule or approval of EWG status would be obtained. In addition, a loss of QF status could, depending on the facility's particular power purchase agreement, allow the power purchaser to cease taking and paying for electricity or to seek refunds of past amounts paid and thus could cause the loss of some or all contract revenues or otherwise impair the value of a project. If a power purchaser were to cease taking and paying for electricity, there can be no assurance that the costs incurred in connection with the project could be recovered through sales to other purchasers.

FERC has proposed to eliminate prospectively electric utilities' requirement under section 210 of PURPA to purchase power from QFs at the utility's "avoided cost," to the extent FERC determines that such QFs have access to a competitive wholesale electricity market. FERC has also proposed procedures for utilities to file to obtain relief from mandatory purchase obligations on a service territory-wide basis, and provided procedures for affected QFs to file to reinstate the purchase obligation. Consistent with EPAct 2005, FERC proposes to leave intact existing rights under any contract or obligation in effect or pending approval involving QF purchases or sales. FERC has not taken final action on this issue. The Reorganized Debtors cannot predict what effect this proposal, and FERC's final regulations, if any, implementing it, will have on their business.

For those other regulations that FERC will promulgate in the future in connection with EPAct 2005, the Reorganized Debtors cannot predict what effect these future regulations may have on their business. Furthermore, the Reorganized Debtors cannot predict what future laws or regulations may be promulgated. The Reorganized Debtors do not know whether any other new legislative or regulatory initiatives will be adopted or, if adopted, what form they may take. The Reorganized Debtors cannot provide assurance that any legislation or regulation ultimately adopted would not adversely affect the operation of and generation of electricity by their business.

State PUCs have historically had broad authority to regulate both the rates charged by, and the financial activities of, electric utilities operating in their states and to promulgate regulations for implementation of PURPA.  Retail sales of electricity or thermal energy by an independent power producer may be subject to PUC regulation depending on state law. States may also assert jurisdiction over the siting and construction of electricity generating facilities including QFs and EWGs and, with the

exception of QFs, over the issuance of securities and the sale or other transfer of assets by these facilities. The Reorganized Debtors cannot predict what laws or rules will be enacted by states or PUCs or how these laws and rules would affect their business.

Natural gas regulations have a continuing impact upon the Reorganized Debtors' business. The cost of natural gas is ordinarily the largest operational expense of a gas-fired project and is critical to the project's economics. The risks associated with using natural gas can include the need to arrange gathering, processing, extraction, blending, and storage, as well as transportation of the gas from great distances, including obtaining removal, export, and import authority if the gas is imported from a foreign country; the possibility of interruption of the gas supply or transportation (depending on the quality of the gas reserves purchased or dedicated to the project, the financial and operating strength of the gas supplier, whether firm or nonfirm transportation is purchased, and the operations of the gas pipeline); regulatory diversion; and obligations to take a minimum quantity of gas and pay for it (*i.e.*, "take and pay" obligations).

As the owner of more than sixty operating natural gas-fired power plants, the Reorganized Debtors rely on the natural gas pipeline grid for delivery of fuel. The use of pipelines for delivery of natural gas has proven to be an efficient and reliable method of meeting customers' fuel needs. The Reorganized Debtors believe that their risk of fuel supply disruption resulting from pipeline operation difficulties is limited, given the historical performance of pipeline operators and, in certain instances, multiple pipeline interconnections to the generation facilities. However, if a disruption were to occur, the effect could be substantial, including outages at one of more of the Reorganized Debtors' plants until they were able to secure fuel supplies.

As a purchaser and seller of natural gas in the wholesale market, as well as a transportation customer on interstate pipelines, the Reorganized Debtors are subject to FERC regulation regarding the sale of natural gas and the transportation of natural gas. The Reorganized Debtors cannot predict what new regulations FERC may enact in the future or how these regulations would affect their business.

THESE CONSIDERATIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, THE PERFORMANCE OF THE REORGANIZED DEBTORS' INVESTMENT PORTFOLIOS, THE ACHIEVEMENT OF OPERATING EFFICIENCIES, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS, ACTS OF TERRORISM OR WAR, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

## ARTICLE VII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain Creditors and Interest Holders, including Holders of Allowed Second Lien Debt

K&E 11469176.47

Claims, Other Secured Claims, Unsecured Claims, and Old Calpine Common Stock Interests. This summary is based on the Internal Revenue Code, Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Claims or Interests that are not United States persons (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that Holders of Allowed Second Lien Debt Claims, Other Secured Claims, Unsecured Claims, and Old Calpine Common Stock Interests hold such Claims and Interests as "capital assets" within the meaning of section 1221 of the Internal Revenue Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Allowed Second Lien Debt Claims, Other Secured Claims, Unsecured Claims, and Old Calpine Common Stock Interests based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

**The following summary is not a substitute for careful tax planning and advice based on the particular circumstances of each Holder of a Claim or Interest, including Holders of Second Lien Debt Claims, Other Secured Claims, Unsecured Claims, and Old Calpine Common Stock Interests. Each Holder of a Claim or Interest is urged to consult his, her, or its own tax advisors as to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, of the restructuring described in the Plan.**

**IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the U.S. Internal Revenue Code. The tax advice contained in this Disclosure Statement was written to support the promotion or marketing of the transactions described in this Disclosure Statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

A.      Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims and Interests

1.      Consequences to Holders of Allowed Second Lien Debt Claims

Pursuant to the Plan, each Allowed Second Lien Debt Claim will be paid in full in Cash. If a Holder of an Allowed Second Lien Debt Claim receives Cash in satisfaction of its Claim, the satisfaction should be treated as a taxable exchange under section 1001 of the Internal Revenue Code. The Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss if the Holder has held the debt instrument underlying its Claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the amount of Cash received and (y) the Holder's adjusted tax basis in the debt instrument underlying its Claim. To the extent that the Cash received in the exchange is allocable to accrued interest that has not already been taken into income

by the Holder, the Holder may recognize ordinary interest income. *See* Article VII.A.5 below for further information.

        2.      Consequences to Holders of Allowed Other Secured Claims

Pursuant to the Plan, each Allowed Other Secured Claim will either be Reinstated or paid in full in Cash or have all collateral securing such Allowed Other Secured Claim returned. If a Holder of an Allowed Other Secured Claim receives Cash or has all collateral securing such Claim returned in satisfaction of its Claim, the satisfaction should be treated as a taxable exchange under Section 1001 of the Internal Revenue Code. The Holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the Holder has held its Claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the amount of Cash or the fair market value of other property received and (y) the Holder's adjusted tax basis in its Claim. To the extent that the Cash or property received in the exchange is allocable to accrued interest that has not already been taken into income by the Holder, the Holder may recognize ordinary interest income. *See* Article VII.A.5 below for further information. If an Allowed Other Secured Claim is Reinstated, the Holder of such Claim should not recognize gain or loss except to the extent collateral securing such Claim is changed, and the change in collateral constitutes a "significant modification" of the Allowed Other Secured Claim within the meaning of Treasury Regulations promulgated under section 1001 of the Internal Revenue Code.

        3.      Consequences to Holders of Allowed Unsecured Claims

           a.      Exchange of Allowed Unsecured Claims for New Calpine Common Stock

Pursuant to the Plan, Allowed Unsecured Claims (other than Unsecured Convenience Class Claims) will be exchanged for New Calpine Common Stock. The U.S. federal income tax consequences to Holders of Allowed Unsecured Claims depend on whether: (i) the Allowed Unsecured Claims are treated as "securities" of Calpine Corporation (as opposed to not being treated as "securities" or being treated as "securities" of Calpine Corporation's subsidiaries) for purposes of the reorganization provisions of the Internal Revenue Code; and (ii) the Debtors' restructuring qualifies as a tax-free reorganization.

Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that term-length of a debt instrument at issuance is an important factor in determining whether such an instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, among others: the security for payment; the creditworthiness of the obligor; the subordination or lack thereof to other creditors; the right to vote or otherwise participate in the management of the obligor; convertibility of the instrument into an equity interest of the obligor; whether payments of interest are fixed, variable, or contingent; and whether such payments are made on a current basis, or accrued.

To the extent that all or some of the Allowed Unsecured Claims are treated as securities of Calpine, then the exchange of such Allowed Unsecured Claims so treated for New Calpine Common Stock pursuant to the Plan should be treated as a recapitalization and, therefore, a tax-free reorganization. In such case, each Holder of such Allowed Unsecured Claims that are treated as securities of Calpine should not recognize any gain or loss on the exchange, except that a Holder of such Allowed Unsecured Claims may recognize ordinary income to the extent that New Calpine Common Stock is treated as received in satisfaction of accrued but untaxed interest on such Allowed Unsecured Claims. *See* Article

K&E 11469876.47

VII.A.5 below for further information. Such Holder should obtain a tax basis in the New Calpine Common Stock equal to the tax basis of the Allowed Unsecured Claims surrendered for the New Calpine Common Stock and should have a holding period for the New Calpine Common Stock that includes the holding period for the Allowed Unsecured Claims exchanged for the New Calpine Common Stock; provided, however, that the tax basis of any share of New Calpine Common Stock (or portion thereof) treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such New Calpine Common Stock (or portion thereof) should not include the holding period of the Allowed Unsecured Claims exchanged for the New Calpine Common Stock.

To the extent that Allowed Unsecured Claims are not treated as securities of Calpine, or that Holders receive Cash in lieu of New Calpine Common Stock for such Claims, a Holder of such Allowed Unsecured Claims (including a Holder of Allowed Unsecured Convenience Class Claims) will be treated as exchanging its Allowed Unsecured Claims for New Calpine Common Stock or Cash in a taxable exchange under section 1001 of the Internal Revenue Code. Accordingly, each Holder of such Allowed Unsecured Claims should recognize gain or loss equal to the difference between: (i) the fair market value of New Calpine Common Stock (as of the date the stock is distributed to the Holder) or Cash received in exchange for the Allowed Unsecured Claims; and (ii) the Holder's adjusted basis, if any, in the Allowed Unsecured Claims. Such gain or loss should be capital in nature so long as the Allowed Unsecured Claims are held as capital assets (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Holder has a holding period for Allowed Unsecured Claims of more than one year. To the extent that a portion of the Cash received in exchange for the Allowed Unsecured Claims is allocable to accrued but untaxed interest, the Holder may recognize ordinary income. *See* Article VII.A.5 below for further information. A Holder's tax basis in New Calpine Common Stock received should equal the fair market value of the New Calpine Common Stock as of the date such stock is distributed to the Holder. A Holder's holding period for New Calpine Common Stock should begin on the day following the Effective Date.

b.    Exchange of Allowed Unsecured Claims Against Calpine's Subsidiaries

Holders of Allowed Claims against Calpine's Subsidiaries ("Subsidiary Claims") may recognize gain or loss on the exchange of such Claims for New Calpine Common Stock. Although certain Subsidiary Claims may constitute securities, the exchange of Subsidiary Claims for New Calpine Common Stock likely may not qualify as a tax-free reorganization because the Subsidiary Claims were issued by various subsidiaries of Calpine and will be exchanged for equity in Calpine. Accordingly, Holders of Subsidiary Claims may recognize gain or loss equal to the difference between: (i) the fair market value of New Calpine Common Stock (as of the date the stock is distributed to the Holder) received in exchange for the Subsidiary Claims; and (ii) the Holder's adjusted basis in the Subsidiary Claims. Such gain or loss should be capital in nature so long as the Subsidiary Claims are held as capital assets (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Subsidiary Claims were held for more than one year. To the extent that a portion of the New Calpine Common Stock received in exchange for the Subsidiary Claims is allocable to accrued but untaxed interest, the Holder may recognize ordinary income. *See* Article VII.A.5 below for further information. If gains or losses are recognized, a Holder's tax basis in New Calpine Common Stock received should equal the fair market value of the New Calpine Common Stock as of the date the stock is distributed to the Holder, and a Holder's holding period for New Calpine Common Stock should begin on the day following the Effective Date.

The Debtors intend to take reasonable steps to structure the transaction such that Holders of Subsidiary Claims will not recognize gain or loss on the exchange of such Claims for New Calpine Common Stock. Among other actions, the Debtors may cause certain Calpine subsidiaries to be treated as "disregarded entities" solely for U.S. federal tax purposes either by making an election or converting the

175

legal form of certain corporate Entities to limited liability companies. By making this conversion or election prior to the Effective Date, holders of Subsidiary Claims may be treated for tax purposes as though they actually held Claims against Calpine. In that event, the exchange of such Claim (assuming such Claim qualified as a "security" for tax purposes) for New Calpine Common Stock should qualify for tax-free treatment. There is no assurance that the effect of such election would permit holders of Subsidiary Claims to exchange those Claims for New Calpine Common Stock without recognizing gain or loss. If the Debtors do not convert these Entities or make this election, they intend to pursue other alternatives to permit a tax-free exchange for Holders of Subsidiary Claims.

4.    Consequences to Holders of Old Calpine Common Stock Interests

Holders of Old Calpine Common Stock Interests that are exchanged for New Calpine Common Stock should not recognize any gain or loss on such exchange. The Holder's tax basis in its New Calpine Common Stock should equal its tax basis in the shares surrendered, and the Holder's holding period for such shares should include the period during which such Holder held its Old Calpine Common Stock interests.

5.    Accrued But Untaxed Interest

It is expected that a portion of the New Calpine Common Stock received by Holders of Claims will be attributable to accrued but untaxed interest on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.

If the fair value of the New Calpine Common Stock is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such New Calpine Common Stock will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. The IRS could take the position, however, that the consideration received by a Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

6.    Market Discount

Holders who exchange Allowed Unsecured Claims (including Subsidiary Claims) for New Calpine Common Stock may be affected by the "market discount" provisions of sections 1276 through 1278 of the Internal Revenue Code. Under these rules, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Unsecured Claims and Subsidiary Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Internal Revenue Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if such excess is less than a statutory de minimis amount (equal to 0.25 percent of the debt

176

obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Allowed Unsecured Claims and Subsidiary Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Unsecured Claims and Subsidiary Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the Allowed Unsecured Claims and Subsidiary Claims that were acquired with market discount are exchanged in a tax-free transaction for other property (as may occur here), any market discount that accrued on the Allowed Unsecured Claims and Subsidiary Claims (*i.e.*, up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued market discount.

7.      The Rights Offering

If the Debtors pursue a rights offering, a recipient of subscription rights generally should not recognize taxable gain or loss upon the exercise of such rights. The tax basis in the new common stock received upon exercise of the subscription rights should equal the sum of the holder's tax basis in the subscription rights and the amount paid for such new common stock. The holding period in such new common stock received should commence the day following its acquisition.

8.      Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder:   (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.   Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the Internal Revenue Code.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

B.    Certain U.S. Federal Income Tax Consequences to Reorganized Debtors

    1.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, and (y) the fair market value of any new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income under section 108 of the Internal Revenue Code. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Internal Revenue Code.

Because the Plan provides that Holders of Allowed Unsecured Claims will receive New Calpine Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Calpine Common Stock exchanged therefor. This value cannot be known with certainty until after the Effective Date. Thus, although the Debtors believe that no COD Income will be realized because it is expected that all Claims will be fully satisfied, some COD Income may be realized if the New Calpine Common Stock is worth less than currently expected. In that case, a reduction of tax attributes may be required. Nonetheless, despite this reduction (if any), the Debtors expect that they will have significant NOL carryovers remaining after emergence from chapter 11, subject to the limitations discussed below.

    2.    Limitation of Net Operating Loss Carry Forwards and Other Tax Attributes

The Reorganized Debtors will have NOL carryovers and other tax attributes at emergence potentially exceeding $5.0 billion. The precise amount of NOL carryovers that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available NOLs include: the amount of tax losses incurred by the Debtors in 2007; the value of the New Calpine Common Stock; and the amount of COD Income incurred by the Debtors in connection with Consummation. The Debtors anticipate that, taking these factors into account, they will have significant federal NOL carryovers following emergence, subject to the limitations discussed below. The Valuation Analysis concludes that a material portion of the Reorganized Debtors' valuation is derived from the Reorganized Debtors' federal NOLs. In addition, the Reorganized Debtors' subsequent utilization of any losses and NOL carryovers remaining and possibly certain other tax attributes may be restricted as a result of and upon Consummation.

Following Consummation, the Debtors anticipate that any remaining NOL and tax credit carryovers and, possibly, certain other tax attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") may be subject to limitation under section 382 of the Internal Revenue Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan.

Under section 382 of the Internal Revenue Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed more fully below, the Debtors anticipate that the issuance of the New Calpine Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their NOL carryovers will be subject to limitation unless an exception to the general rules of section 382 of the Internal Revenue Code applies.

### a.    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (currently approximately 4.32%, as of July 2007). Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

### b.    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Debtors undergo another "ownership change" within two years after Consummation, then the Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce their NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its NOLs.

The IRS has announced rules that may make it beneficial for the Debtors to utilize the 382(l)(6) Exception. Under these rules, a corporation whose assets generally have a fair market value greater than their tax basis (a "net unrealized built-in gain") is permitted to increase its annual section 382 limitation during the five years immediately after the "ownership change" by an amount equal to the depreciation deductions that a hypothetical purchaser of a debtor's assets would have been permitted to claim if it had acquired the debtor's assets in a taxable transaction. While the Debtors' analysis continues, the Debtors believe they may have a net unrealized built-in gain on stock, and, accordingly their ability to utilize their pre-change losses to offset their taxable income under section 382(l)(6) of the Internal Revenue Code following the Effective Date may be significantly enhanced. At all events, however, it is important to

179

recognize that the Debtors' Pre-Change Losses will be reduced by the amount of COD Income realized as part of the Plan, as discussed above.

While it is not certain, it is doubtful at this point that the Debtors will elect to utilize the 382(l)(5) Exception. In the event that the Debtors do not use the 382(l)(5) Exception, the Debtors expect that their use of their NOLs after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. The Valuation Analysis determines the Reorganized Debtors' valuation based on the assumption that the Reorganized Debtors will utilize the 382(l)(6) Exception and not the 382(l)(5) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their pre-change losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Internal Revenue Code were to occur after the Effective Date.

       3.     Restrictions on Resale of Securities to Protect NOLs

The Debtors expect to emerge from chapter 11 with valuable tax attributes, including more than $5.0 billion of NOLs. The Reorganized Debtors' ability to utilize these NOLs could be subject to limitation if an "ownership change" with respect to the New Calpine Common Stock were to occur after emergence. In order to reduce the risk of an ownership change that might impose such a limitation, the Debtors expect that the Reorganized Calpine Charter may include reasonable and customary restrictions on trading in such stock. The Debtors will negotiate in good faith with the Creditors' Committee and the Equity Committee reasonable and customary restrictions on the transfer of New Calpine Common Stock to the extent necessary to avoid any adverse federal income tax consequences resulting from an ownership change (as defined in section 382 of the Internal Revenue Code) in Reorganized Calpine.

       4.     Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of this rule could cause Reorganized Calpine to owe a modest amount of federal and state income tax on taxable income in future years even though NOL carryforwards are available to offset that taxable income. Additionally, under section 56(g)(4)(G) of the Internal Revenue Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Internal Revenue Code, immediately before the ownership change. The Debtors do not believe they will have a net unrealized built-in loss in their assets immediately after the ownership change.

## ARTICLE VIII.
## VOTING PROCEDURES

On [_____,] 2007, the Bankruptcy Court entered the Solicitation Procedures Order approving the adequacy of the Disclosure Statement and approving procedures for the solicitation of votes to accept or reject the Plan (the "Solicitation Procedures"). A copy of the Solicitation Procedures is attached as an exhibit to the Solicitation Procedures Order and is included in the Plan Supplement. In addition to

approving the Solicitation Procedures, the Solicitation Procedures Order established certain dates and deadlines, including the date for the Confirmation Hearing, the deadline for parties to object to Confirmation, the Record Date, and the Voting Deadline. The Solicitation Procedures Order also approved the forms of Ballots, Master Ballots, and certain Confirmation-related notices. The Solicitation Procedures Order and the Solicitation Procedures should be read in conjunction with this Article VIII of the Disclosure Statement. Capitalized terms used in this Article VIII of the Disclosure Statement that are not otherwise defined in the Disclosure Statement or Plan shall have the meanings ascribed to them in the Solicitation Procedures.

A.    Confirmation Generally

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the requirements of chapter 11 of the Bankruptcy Code. One of these requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code despite the non-acceptance by one or more such Classes. The process by which the Debtors solicit votes to accept or reject the Plan will be governed by the Solicitation Procedures Order and the Solicitation Procedures.

The following is a brief and general summary of the Solicitation Procedures. Holders of Claims and Interests are encouraged to review the Solicitation Procedures Order, the Solicitation Procedures, the relevant provisions of the Bankruptcy Code, and to consult their own advisors. To the extent of any inconsistency between the summary below and (i) the Solicitation Procedures Order or (ii) the Solicitation Procedures, the Solicitation Procedures Order and the Solicitation Procedures shall govern.

B.    Who Can Vote

In general, a holder of a claim or interest may vote to accept or to reject a plan if no party in interest has objected to such claim or interest, and the claim or interest is impaired by the plan but the plan does not make distributions on account of such claim or interest. If the holder of an impaired claim or interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof, or notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), reinstates the maturity of such claim or interest as it existed before the default, compensates the holder of such claim or interest for any damages incurred as a result of reasonable reliance on the holder's legal right to an accelerated payment, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder thereof.

Only the following Holders of Impaired Claims and Interests in Voting Classes shall be entitled to vote on the Plan with regard to such Claims or Interests:

1.    Holders of Claims and Interests for which Proofs of Claims or Interests have been timely Filed, as reflected on the Claims Register, as of the Record Date, provided, however, that

Holders of Disputed Claims or Disputed Interests shall not be entitled to vote unless they become eligible to vote through a Resolution Event (as defined below);

2.    Holders of Claims or Interests that are listed in the Debtors' Schedules, with the exception of those Claims or Interests that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled Claims or Interests that have been superseded by a timely-Filed Proof of Claim or Interest); and

3.    Holders whose Claims or Interests arise pursuant to an agreement or settlement with the Debtors executed prior to the Record Date, as reflected in a document Filed with the Bankruptcy Court, in an order of the Bankruptcy Court, or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, regardless of whether a Proof of Claim or Interest has been Filed.

The assignee of a transferred and assigned Claim or Interest (whether a timely-Filed or scheduled Claim or Interest) shall be permitted to vote such Claim or Interest only if the transfer or assignment has been fully effectuated pursuant to the procedures dictated by Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register as of the close of business on the Record Date.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Solicitation Procedures also set forth assumptions and procedures for tabulating Ballots and Master Ballots.

C.    Classes Impaired Under the Plan

1.    Voting Impaired Classes of Claims and Interests.  The following Classes are Impaired under, and entitled to vote to accept or reject, the Plan:

| Classes |
| --- |
| 1C-1 |
| 1C-2 |
| 1C-3 |
| 1C-4 |
| 1C-5 and 248C-5 |
| 1C-6 through 273C-6 |
| 1C-7 through 273C-7 |
| 1C-8 through 273C-8 |
| 1C-9 through 273C-9 |
| 1C-10 through 273C-10 |
| 1D |
| 1E-1 |
| 1E-2 |

2.    Unimpaired Classes of Claims and Interests.  The following Classes are Unimpaired under the Plan and are deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Thus, Holders in such Classes will not be solicited to vote to accept the Plan. Rather, acceptances of the Plan are being solicited only from those who hold Claims in an Impaired Class whose members will receive a distribution under the Plan. Pursuant to the Solicitation Procedures, these parties shall receive a notice, substantially

182

in the form attached as an exhibit to the Solicitation Procedures Order, notifying them of their non-voting status.

| Classes |
| --- |
| 1A-1 through 273A-1 |
| 1A-2 through 273A-2 |
| 1A-3 through 273A-3 |
| 1B through 273B |
| 1C-11 through 273C-11 |
| 2E-3 through 273E-3 |

3. Non-Voting Impaired Classes of Claims and Interests. There are no Classes of Claims or Interests that do not have the possibility of receiving or retaining any property under the Plan, and, thus, under section 1126(g) of the Bankruptcy Code, there are no Classes that are deemed to reject the Plan.

D. Contents of Solicitation Package

The following materials shall constitute the Solicitation Package:

1. a cover letter describing the contents of the Solicitation Package and instructions for how hard copies of any materials that may be provided on CD-ROM can be obtained at no charge;

2. the Solicitation Procedures Order;

3. the Confirmation Hearing Notice;

4. the approved form of the Disclosure Statement (together with all exhibits annexed thereto, including the Plan in either paper or CD-ROM format);

5. an applicable Ballot and/or Master Ballot and voting instructions;

6. a copy of the Solicitation Procedures

7. the letter to the Holders in each of the Voting Classes urging them to vote to accept the Plan; and

8. a pre-addressed, postage pre-paid return envelope.

Any party who receives a CD-ROM but who desires a paper copy of these documents may request a copy from the KCC. The Solicitation Package (except the Ballots) may also be obtained by any party by accessing KCC's website at www.kccllc.net/calpine.

JA 1654

E.    Distribution of Solicitation Package

The Solicitation Package shall be served on: the Holders of Claims and Interest described in Article VIII.A.1-3; with respect to any Beneficial Holder, to the applicable Nominee, as reflected in the relevant records as of the Record Date; the Internal Revenue Service; the United States Trustee for the Southern District of New York.; and the Core Group and all parties in interest on the 2002 List as of the Record Date.

F.    Temporary Allowance of Disputed Claims for Voting Purposes

The Solicitation Procedures generally provide that Holders of Disputed Claims or Disputed Interests that will not be entitled to vote unless: (a) an order by the Bankruptcy Court is entered allowing such Disputed Claim or Disputed Interest pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order by the Bankruptcy Court is entered temporarily allowing such Disputed Claim or Disputed Interest for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the Holder of the Disputed Claim or Disputed Interest and the Debtors resolving the objection and allowing the Disputed Claim or Disputed Interest in an agreed upon amount; or (d) the pending objection to the Disputed Claim or Disputed Interest voluntarily is withdrawn by the Debtors (each, a "Resolution Event"). No later than two (2) Business Days after a Resolution Event, KCC or FBG, as applicable, shall distribute a Ballot and a pre-addressed, postage pre-paid envelope to the relevant Holder of the Disputed Claim or Disputed Interest, which must be returned to KCC or FBG, as applicable, by no later than the Voting Deadline.

Each Holder of a Disputed Claim or Disputed Interest will receive a notice, substantially in the form attached as an exhibit to the Solicitation Procedures Order, notifying such Holder of the Solicitation Procedures applicable to Disputed Claims and Disputed Interests.

G.    Voting

KCC and FBG will facilitate the solicitation process. For Holders of Claims and Interests on account of publicly-traded securities, FBG will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation. For Holders of all other Claims or Interests, KCC will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation. KCC and FBG will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

BALLOTS CAST BY HOLDERS AND MASTER BALLOTS CAST ON BEHALF OF BENEFICIAL HOLDERS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY KCC OR FBG, AS APPLICABLE, BY THE VOTING DEADLINE, AT THE ADDRESS LISTED ON THE APPLICABLE BALLOT, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER OR PERSONAL DELIVERY. THE BALLOTS AND THE PRE-ADDRESSED, POSTAGE PRE-PAID ENVELOPES ACCOMPANYING THE BALLOTS WILL CLEARLY INDICATE WHETHER THE BALLOT MUST BE RETURNED TO FBG OR KCC, AND WILL CLEARLY INDICATE THE APPROPRIATE RETURN ADDRESS. THE ADDRESS FOR BALLOTS RETURNABLE TO KCC IS: CALPINE CORPORATION, C/O KURTZMAN CARSON CONSULTANTS LLC, 2335 ALASKA AVENUE, EL SEGUNDO, CA 90245, ATTN: BALLOT PROCESSING DEPARTMENT. THE ADDRESS FOR BALLOTS RETURNABLE TO FBG IS CALPINE CORPORATION, C/O FINANCIAL BALLOTING GROUP LLC, 757 THIRD AVENUE - THIRD FLOOR, NEW YORK, N.Y. 10017, ATTN: BALLOTING PROCESSING DEPARTMENT.

FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL KCC TOLL FREE AT (888) 249-2792. THOSE HOLDERS OF CLAIMS AND INTERESTS BASED ON PUBLICLY-TRADED SECURITIES MAY CONTACT FBG DIRECTLY TOLL FREE AT (866) 433-0896, WITH ANY QUESTIONS RELATED TO THE SOLICITATION PROCEDURES APPLICABLE TO SECURITY-BASED CLAIMS AND INTERESTS.

To obtain an additional copy of the Plan, the Disclosure Statement, the Plan Supplement, or other Solicitation Package materials (except Ballots), please refer to KCC's website at http://www.kccllc.net/calpine or request a copy from KCC, by writing to Kurtzman Carson Consultants, LLC, 2335 Alaska Avenue, El Segundo, California 90245, Attn: Calpine Balloting; calling (888) 249-2792; or sending an email to calpineinfo@kccllc.com.

Ballots received after the Voting Deadline will not be counted by the Debtors in connection with the Debtors' request for Confirmation. The method of delivery of Ballots or Master Ballots to be sent to KCC or FBG, as applicable, is at the election and risk of each Creditor, except as otherwise provided, a Ballot will be deemed delivered only when KCC or FBG, as applicable, actually receives the original executed Ballot or Master Ballot. In all cases, sufficient time should be allowed to assure timely delivery. An original executed Ballot or Master Ballot is required. Delivery of a Ballot or Master Ballot to KCC or FBG, as applicable, by facsimile, email, or any other electronic means will not be accepted. Ballots and/or Master Ballots should not be sent to any of the Debtors, the Debtors' agents (other than KCC or FBG, as applicable), any Indenture Trustee (unless specifically instructed to do so), or the Debtors' financial or legal advisors, and any Ballots or Master Ballots sent to such parties will not be counted. The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modification).

H.    Releases Under the Plan

**As set forth in detail in Article IV above, on and after the Effective Date, Holders of Claims and Interests shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Debtor, a Reorganized Debtor, or a Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Debtor, the Reorganized Debtor, or the Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence.**

185

## ARTICLE IX.
## PLAN SUPPLEMENT

Attached as Exhibit B is a list of all of the items that are included in the Plan Supplement. The Debtors reserve the right to modify and supplement the Plan Supplement, as set forth in the Plan.

186

## ARTICLE X.
## RECOMMENDATION

The Debtors recommend the Plan because it provides for greater distributions to the Holders of Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to the Holders of Claims and Interests. **Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan support Confirmation and vote to accept the Plan.**

New York, New York
Dated: June 20, 2007

Respectfully submitted,

CALPINE CORPORATION (for itself and all other Debtors)

By:_____/s/ Gregory L. Doody_____
Name:__Gregory L. Doody_____
Title:___Executive Vice President, General Counsel, and Secretary___

187

JA 1658