**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Calpine Corporation, et al.,<br><br>               Debtors. | Chapter 11<br><br>Case No.  05-60200 (BRL)<br>(Jointly Administered) |

| | |
|---|---|
| HSBC Bank USA, National Association, as Indenture Trustee, The Bank of New York, as Administrative Agent, Wilmington Trust FSB, as Indenture Trustee, Wilmington Trust Company, as Administrative Agent, Wilmington Trust Company, as Collateral Agent, and Manufacturers & Traders Trust Company, as Indenture Trustee,<br><br>               Appellants,<br><br>      - against -<br><br>Calpine Corporation, The Official Committee of Unsecured Creditors of Calpine Corporation, and the Official Committee of Equity Security Holders,<br><br>               Appellees. | Case No. 1:07-cv-03088 (GBD) |

| |
|---|
| Calpine Corporation, The Official Committee of Unsecured Creditors of Calpine Corporation, and the Official Committee of Equity Security Holders,<br><br>               Appellants,<br><br>      - against -<br><br>HSBC Bank USA, National Association, as Indenture Trustee, The Bank of New York, as Administrative Agent, Wilmington Trust FSB, as Indenture Trustee, Wilmington Trust Company, as Administrative Agent, Wilmington Trust Company, as Collateral Agent, and Manufacturers & Traders Trust Company, as Indenture Trustee,<br><br>               Appellees. |

**<u>REPLY BRIEF OF DEBTORS-APPELLEES</u>**

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4800
Richard M. Cieri (RC 6062)
Edward O. Sassower (ES 5823)

KIRKLAND & ELLIS LLP
655 15th St., NW
Washington, D.C.  20005-5793
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)

*Counsel for the Debtors-Appellees*

KIRKLAND & ELLIS LLP
Aon Building
200 East Randolph Drive
Chicago, IL  60601-6636
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200
Marc Kieselstein (admitted *pro hac vice*)

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................1

I.     **All Parties Agree The Memorandum Decision's Damages Award Must Be Reversed**..................................................................................................3

        A.     **Neither The Parties' Contracts Nor The Common Law Provides That Noncompliance With Unenforceable No-Call Clauses Gives Rise To Breach Of Contract Damages.** ..................................4

        B.     **The Memorandum Decision's Damages Award For "Dashed Expectations" Rewrote The Debt Indentures To Provide A Remedy Not Bargained For By The Parties Or Authorized By The Bankruptcy Code.** ................................................................10

II.     **The Bankruptcy Court Did Not Err In Holding The CalGen Debt Was Accelerated.** ................................................................................................24

III.     **The Bankruptcy Court Did Not Err In Diminishing The Collateral Agent's Liens.** ....................................................................................27

IV.     **The Bankruptcy Court Did Not Err In Extinguishing The Lenders' Claims.** .................................................................................................29

V.     **The Bankruptcy Court Did Not Err In Authorizing Repayment Of The CalGen Debt Outside Of A Plan Of Reorganization.** ..................................31

VI.     **The Bankruptcy Court Did Not Err In Limiting The Debtors' Obligation To Pay The Lenders' Professionals' Fees.** ......................................32

CONCLUSION ................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

Alex Sheshunoff Mgmt. Services, L.P. v. Johnson, 209 S.W.3d 644 (Tex. 2006) ...................6

Arthur v. Burkich,
    520 N.Y.S.2d 638, 639 (N.Y. App. Div. 1987) .........................................7, 8

Bankruptcy Receivables Mgmt. v. Lopez (In re Lopez),
    345 F.3d 701 (9th Cir. 2003) ....................................................................6

Butner v. United States, 440 U.S. 48 (1979) ............................................................8

ConFold Pacific, Inc. v. Polaris Indus., Inc.,
    433 F.3d 952 (7th Cir. 2006) ...................................................................23

Continental Sec. Corp. v. Shenandoah Nursing Home P'ship., 188 B.R. 205 (Bankr.
    W.D. Va. 1995).................................................................................passim

DeVanzo v. Newark Ins. Co., 44 A.D.2d 39 (N.Y.A.D. 2 Dept. 1974) ..................................24

Financial Ctr. Assocs. of East Meadow, L.P. v. The Funding Corp.,
    140 B.R. 829 (Bankr. E.D.N.Y. 1992)...........................................................27

Fobian v. Western Farm Credit Bank (In re Fobian), 951 F.2d 1149 (9th Cir. 1991)............21

Guterman v. RGA Assocs., Inc., 196 A.D.2d 785 (N.Y.A.D. 1 Dept. 1993).........................24

Imperial Coronado Partners, Ltd. v. Home Fed. Sav. & Loan Assoc. (In re Imperial
    Coronado Partners, Ltd), 96 B.R. 997 (B.A.P. 9th Cir. 1989)..............................12, 26

In re 268 Limited ....................................................................................20

In re AE Hotel Venture, 321 B.R. 209 (Bankr. N.D. Ill. 2005)..................................13, 19, 27

In re AJ Lane & Co. Inc., 113 B.R. 821 (Bankr. D. Mass. 1990)...........................................13

In re Chateaugay Corp., 201 B.R. 48 (Bankr. S.D.N.Y.1996)...........................................30, 33

In re Command Services Corp.,
    102 B.R. 905 (Bankr. N.D.N.Y. 1989) .........................................................29

In re Dow Corning Corp., 456 F.3d 668 (6th Cir. 2006) ...................................................16, 19

In re Hirsch, 339 B.R. 18 (E.D.N.Y. 2006) ............................................................4

In re Jamesway Corp.,
    201 B.R. 73 (Bankr. S.D.N.Y. 1996)...........................................................6, 34

In re Lappin Electric, 245 B.R. 326 (Bankr. E.D. Wis. 2000)..................................................19

In re Outdoor Sports Headquarters, Inc., 161 B.R. 414 (Bankr. S.D. Ohio 1993) .................19

In re Public Service Co. of New Hampshire, 114 BR 813 (Bankr. D.N.H. 1990) .................26

In re R.H. Macy & Co.,170 B.R. 69 (Bankr. S.D.N.Y. 1994) ...................................................6

In re Ridgewood Apts. of DeKalb County, Ltd.,174 B.R. 712 (Bankr. S.D. Ohio 1994) .........5

In re Skyler Ridge, 80 B.R. 500 (Bankr. C.D. Cal. 1987) .....................................20, 24, 25, 26

In re Vest Associates, 217 B.R. 696 (Bankr. S.D.N.Y. 1998) ..............................13, 14, 15, 16

In re WestPoint Stevens, Inc.,
    333 B.R. 30 (S.D.N.Y. 2005)........................................................................................29

In re WorldCom, Inc.,
    357 B.R. 223 (S.D.N.Y. 2006)........................................................................................6

Joseph F. Sanson Inv. Co. v. 268 Ltd. (In re 268 Ltd.), 789 F.2d 674 (9th Cir. 1986) ..........20

Kaiser-Frazer Corp. v. Otis & Co.,195 F.2d 838 (2d Cir. 1952) ...............................................6

Law Debenture Trust Co. of New York v. Calpine Corp. (In re Calpine Corp.), 356
    B.R. 585 (S.D.N.Y. 2007)........................................................................................31, 32

Montgomery Ward & Co. v. Meridian Leasing Corp. (In re Montgomery Ward
    Holding Corp.), 269 B.R. 1 (D. Del. 2001) ....................................................................6

North Fork Bank & Trust Co. v. Romet Corp.,192 A.D.2d 591 (N.Y.A.D. 2 Dept.
    1993) ........................................................................................................................14, 24

Teachers Ins. & Annuity Assoc. of America v. Butler, 626 F. Supp. 1229 (S.D.N.Y.
    1986) ..................................................................................................................8, 9, 10

Teachers Ins. & Annuity Assoc. of America v. Ormesa Geothermal, 791 F. Supp. 401
    (S.D.N.Y. 1991)................................................................................................8, 9, 10

The City of New York v. R.H. Macy & Co, Inc. (In re R.H. Macy & Co., Inc.), 176
    B.R. 315 (S.D.N.Y. 1994)........................................................................................4, 7

Travel Masters, Inc. v. Star Tours, Inc., 827 S.W.2d 830 (Tex. 1991).......................................6

Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co., 127 S. Ct 1199 (2007)............................21

Universal Reinsurance Corp. v. Allstate Ins. Co., 16 F.3d 125 (7th Cir. 1993) .....................23

## Statutes

11 U.S.C. § 365..........................................................................................................................6

11 U.S.C. § 502(b) ...............................................................................................................19, 21

11 U.S.C. § 502(b)(2) ..................................................................................18, 19, 22

11 U.S.C. § 506(b) ..............................................................................................passim

28 U.S.C. § 1334 ..................................................................................................30, 34

Tex. Bus. & Comm. Code § 15.51 .................................................................................6

## Other Authorities

Ingrid Michelson Hillinger & Michael G. Hillenger, The Story of YMP's (Yield
    Maintenance Premiums") in Bankruptcy, 3 DePaul Bus. & Com. L.J. 449
    (2005) ........................................................................................................................20

Restatement of Contracts, § 580 ...................................................................................6

Restatement of Contracts, § 598 ...................................................................................6

## Rules

Bankruptcy Rule 7001 ..................................................................................................29

## **INTRODUCTION**

The Debtors' opening brief argued their repayment of the CalGen Debt did not entitle the CalGen Lenders to **any** damages because (I) the Debtors' noncompliance with the CalGen Debt no-call provisions (which the Bankruptcy Court correctly held were unenforceable) cannot give rise to an unsecured claim for breach of contract damages; and (II) the Memorandum Decision's damages award for "dashed expectations" rewrote the governing indentures to provide a remedy not bargained for by the parties or authorized by the Bankruptcy Code.[1]  The Lenders' opening briefs do not undermine these arguments; indeed, the Lenders' uniformly agree (with the Debtors and each other) that the Memorandum Decision's damages award was error—but the Lenders (unsurprisingly) argue the Bankruptcy Court should have undertaken an even **greater** departure from settled law and awarded wildly **larger** damage amounts.

But in so arguing, the Lenders' opening briefs exhibit a number of fatal flaws. Most significantly, the conflicting damages theories offered by the Lenders underscore the unprecedented nature of their claims.  Put simply, all of the Lenders assert the Bankruptcy Court should have awarded them secured claims for the full extent of their repayment premium demands, but the CalGen First Lien Noteholders argue the prepayment premium clause in their agreement is valid and must be enforced under Section 506(b) of the Bankruptcy Code, while the Third Lien Noteholders argue the absence of any prepayment premium within their agreement means their claims must be allowed under state law, and the Second Lien Noteholders pick and choose liberally from both arguments.

Furthermore, the Lenders' opening briefs consistently and repeatedly misapprehend the issues before this Court.  For example, the First Lien Noteholders assert

---

[1]  All capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the Debtors' opening brief.

that "[t]he Debtors have ***never disputed*** that, had the First Priority Notes and First Priority Term Loan Notes been paid on or after April 2, 2007 (as opposed to days earlier on March 29, 2007), the 2.5% Prepayment Premiums would have been due."[2]  This is demonstrably incorrect, as the Debtors have always maintained that, because the CalGen Debt is accelerated, and the applicable acceleration clause does not provide for any repayment premium whatsoever, none is due—regardless of the repayment date.  Similarly, the Second Lien Noteholders assert that "[t]here is ***no dispute*** that the Debtors made a voluntary decision to prepay the CalGen Secured Debt, and that the Debtors were under no compulsion to prepay the debt."[3]  This is a remarkable statement, given that the Bankruptcy Court held "the CalGen Secured Debt has been accelerated by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately,'" DA Tab A at 8, and the many parties to this appeal have expended considerable time and effort contesting the point.  And not to be outdone, the Third Lien Noteholders assert that "[i]t ***cannot be disputed*** that by prepaying the Third Priority Notes, CalGen breached on its face the No-Call Provision contained in the Third Priority Indenture, and the Third Priority Noteholders suffered damages (in the form of lost interest) arising from such breach."[4]  Suffice to say, the Debtors, the Committees, and a surfeit of settled caselaw disagree, on the grounds that noncompliance with an unenforceable contractual provision cannot give rise to an allowable claim for breach of contract damages.

   In any event, the unifying trait of the Lenders' opening briefs is their strained efforts to conform the facts and law to somehow support their request for judicial repair of

---

[2] Joint Opening Brief of Appellants, Wilmington Trust FSB as Indenture Trustee and Wilmington Trust Company as Administrative Agent (the "First Lien Noteholders' Opening Br.") at 12 (emphasis added).

[3] Brief of Appellants HSBC Bank USA, National Association, as Indenture Trustee, and the Bank of New York, as Administrative Agent (the "Second Lien Noteholders' Opening Br.") at 23 (emphasis added).

[4] Opening Brief of Appellant Manufacturers & Traders Trust Company (the "Third Lien Noteholders' Opening Br.") at 23 (emphasis added).

the CalGen Debt indentures' drafting omissions.  The various remedies sought by the Lenders simply are not provided for by the parties' agreements or allowed by the Bankruptcy Code. As explained in the Debtors' opening brief, the Memorandum Decision's damages award was the judicial equivalent of an extracontractual consolation prize, and thus constituted reversible error.  And as explained below, the Lenders' opening briefs further establish why it is appropriate for this Court to reverse the Bankruptcy Court's damages award and disallow the CalGen Lenders' makewhole premium claims in their entirety.

I.    **All Parties Agree The Memorandum Decision's Damages Award Must Be Reversed.**

The CalGen Lenders unanimously concur with the Debtors (and the Committees) that the Memorandum Decision's damages award cannot be sustained.  See First Lien Noteholders' Opening Br. at 13-14 ("The Bankruptcy Court's decision is not supported by the plain text of section 506(b), case law construing section 506(b) in the prepayment premium context, or by the Prepayment Provisions of the loan documents at issue."); Second Lien Noteholders' Opening Br. at 2 ("The Bankruptcy Court failed, as a matter of law, to apply the proper measure of damages . . . ."); Third Lien Notheholders' Opening Br. at 30 ("In the Memorandum Decision, the Bankruptcy Court provides no explanation for ignoring the governing case law [in its damages determination].").

Moreover, the Lenders do not successfully challenge either of the Bankruptcy Court's key findings in interpreting the parties' contracts—both of which are amply supported and plainly correct:  (A) the CalGen Debt indentures' "no-call provisions that purport to prohibit optional repayment of debt are unenforceable in chapter 11 cases[,]"[5] and

---

5    DA Tab A at 6 (citing multiple cases).

3

(B) "*[n]one* of the six tranches of CalGen Secured Debt include any form of liquidated damage provision for payment prior to April 1, 2007."[6]

Given these unassailable points, the Lenders' opening briefs set forth a variety of novel theories to support their demands for higher damages and in the form of secured claims instead of unsecured claims. Critically, however, nowhere in their extensive briefing do the Lenders refute the two relatively straightforward and entirely fundamental legal principles that govern this appeal. ***First***, it is black-letter law that noncompliance with an unenforceable contractual provision cannot give rise to breach of contract damages. ***Second***, courts may not rewrite contracts to provide remedies not bargained for by the parties or authorized by the Bankruptcy Code. Accordingly, the Lenders' opening briefs fail to disprove the Debtors' contention that it was reversible error for the Memorandum Decision to hold that the Debtors' repayment of the CalGen Debt entitled the CalGen Lenders to allowable claims for ***any*** damages.[7]

### A. Neither The Parties' Contracts Nor The Common Law Provides That Noncompliance With Unenforceable No-Call Clauses Gives Rise To Breach Of Contract Damages.

The Lenders readily concede the Bankruptcy Court correctly found the CalGen Debt no-call provisions are unenforceable against the Debtors because "the essence of bankruptcy reorganization . . . is to restructure debt . . . and adjust debtor-creditor

---

[6]    Id. at 9 (emphasis in original).

[7]    The lengthy reproduction in the Lenders' opening briefs of the calculations and figures involved in their various damages demands appears to be an invitation for this Court to award these amounts in the first instance. The Debtors believe that, in the event this Court does reverse the Memorandum Decision's damages award on the grounds that the Lenders are entitled to anything other than zero damages, the most appropriate course—given the Bankruptcy Court's familiarity with the underlying documents and the issues of claim allowance relevant to this matter— is to remand for the Bankruptcy Court to perform a recalculation. See, e.g., The City of New York v. R.H. Macy & Co, Inc. (In re R.H. Macy & Co., Inc.), 176 B.R. 315, 318 (S.D.N.Y. 1994) (remanding to bankruptcy court to determine status of claim); In re Hirsch, 339 B.R. 18, 33 (E.D.N.Y. 2006) (remanding to bankruptcy court to determine proper amount of claim).

relationships[,]"[8] and "[i]t would violate the purpose behind the Bankruptcy Code to deny a debtor the ability to reorganize because a creditor has contractually forbidden it."[9]  See First Lien Noteholders' Opening Br. at 22 ("Outside of bankruptcy, [] absolute prepayment bars are generally enforceable, but cannot be specifically enforced against Chapter 11 debtors because the specific performance of such a blanket prohibition would effectively keep the debtor in bankruptcy for years or decades until the loan matures."); Second Lien Noteholders' Opening Br. at 23 ("While the Debtors may have been entitled under the Bankruptcy Code to prepay the debt notwithstanding the contractual prohibition on doing so, the holders of the Second Priority Notes and Second Priority Term Loans are entitled to claims for their damages resulting from those breaches of the agreements."); Third Lien Noteholders' Opening Br. at 25 ("The fact that a bankruptcy court may decline to enforce a lender's equitable remedy, _i.e._, the debtor's specific performance of an agreement prohibiting prepayment of a loan, does not eliminate the lender's remedy at law for money damages arising from the debtor's prepayment (and breach) under such agreement.").  Similarly, the Lenders' opening briefs do not distinguish the extensive precedent that holds a debtor's noncompliance with an unenforceable contractual provision cannot constitute a "breach" of

---

[8]    DA Tab A at 7 (quoting In re Ridgewood Apts. of DeKalb County, Ltd., 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994)).

[9]    Id. (citing Continental Sec. Corp. v. Shenandoah Nursing Home P'ship., 188 B.R. 205, 213 (Bankr. W.D. Va. 1995)).

that contract,[10] and thus necessarily cannot give rise to an unsecured claim for breach of contract damages.[11]

Instead, the Lenders' argue that although the no-call provisions cannot be "specifically enforced" against the Debtors, courts may nonetheless award damages for the Lenders' lost future interest income.  The basis for the Lenders' argument is the slippery slope hypothesis that if Chapter 11 debtors could always repay accelerated debt, despite the ostensible prohibition of a no-call clause, without any prospect of penalty, then the capital markets will suffer an epidemic of borrowers declaring bankruptcy for the purpose of vitiating no-call provisions and repaying debt prior to maturity.  Not only does this argument overlook the legal prerequisites for commencing a Chapter 11 case **and** the massive transaction costs and consequences involved in doing so, but the Lenders also ignore the doctrinal reality that courts may award—and have awarded—damages upon a debtor's repayment of accelerated debt over an unenforceable no-call clause where the parties have **contracted** for that specific remedy.

---

[10]  See, e.g., In re R.H. Macy & Co., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) ("Under any set of facts, however, [lessor] could not demonstrate that the Debtor **breached** the Covenant to Stay Open because this Covenant is **unenforceable** against the Debtor. . . .") (emphasis added); In re Jamesway Corp., 201 B.R. 73, 79 (Bankr. S.D.N.Y. 1996) (finding that under Section 365(f)(1), lease provisions were unenforceable and the lessors' claims were denied); Bankruptcy Receivables Mgmt. v. Lopez (In re Lopez), 345 F.3d 701, 710 (9th Cir. 2003) ("Because the agreement is invalid under federal bankruptcy law, there is no need to review the agreement pursuant to California contract law.").

[11]  See, e.g., In re WorldCom, Inc., 357 B.R. 223, 226 (S.D.N.Y. 2006) ("Something that is unlawful cannot give rise to a valid allowable claim . . . ."); Montgomery Ward & Co. v. Meridian Leasing Corp., (In re Montgomery Ward Holding Corp.), 269 B.R. 1, 12 (D. Del. 2001) (holding liquidated damages clause in parties' contract is an unenforceable penalty and reducing Bankruptcy Court damages award accordingly); cf. also Travel Masters, Inc. v. Star Tours, Inc., 827 S.W.2d 830, 833 (Tex. 1991), superseded by  Act of May 29, 1993, 73d Leg., ch. 965, § 2, 1993 Tex. Gen. Laws 4201, amending Tex. Bus. & Comm. Code § 15.51(b), as recognized in Alex Sheshunoff Mgmt. Services, L.P. v. Johnson, 209 S.W.3d 644 (Tex. 2006) ("Since the covenant not to compete is an unreasonable restraint of trade and unenforceable on grounds of public policy, we hold that Star Tours cannot recover damages . . . for the tortious interference of the covenant not to compete"); Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838, 844 (2d Cir. 1952) ("We therefore conclude that the contract was unenforceable and that Kaiser-Frazer was not entitled to recover damages for Otis' breach thereof) (citing Restatement of Contracts, §§ 580, 598)).

Indeed, In re 360 Inns, 76 B.R. 573 (Bankr. N.D. Tex. 1987)—a case relied on heavily by the Lenders—demonstrates precisely how the Lenders did *not* protect themselves in the instant circumstances. In 360 Inns, the court considered the debtor's treatment in its plan of reorganization of a thirty-year promissory note that prohibited voluntary prepayment during the first ten years of its term—but also required a 10% premium in the event of an ***involuntary*** prepayment during the no-call period. Id. at 575. While the court rejected the debtor's initial plan of reorganization for failing to provide for adequate treatment of the noteholder's prepayment premium, it held that the debtor's modified plan, which treated the involuntary prepayment premium amount as an allowed claim, was permissible and would not preclude confirmation. Id. at 577.

Unlike the note in 360 Inns, the CalGen Debt indentures ***do not provide*** for a premium upon the repayment of accelerated debt prior to April 1, 2007, regardless of whether such repayment is voluntary or involuntary. Having failed to bargain for such protection, the Lenders' cannot rely on 360 Inns or any other decision to support their contention that the Court should come to their rescue by inventing a repayment obligation (or "borrow" a premium obligation that would have been due if repayment occurred during a different time period).

Implicitly acknowledging the deficiency of their indentures, the Lenders attempt to circumvent the absence of a contract remedy by asserting the Debtors' "breach" of the no-call provisions gives right to "common law" damages under state law. See, e.g., Third Lien Noteholders' Opening Br. at 23 ("New York law prohibits prepayment of a loan unless the loan agreement expressly permits the borrower to prepay prior to maturity.") (citing Arthur v. Burkich, 520 N.Y.S.2d 638 (N.Y. App. Div. 1987); Second Lien Noteholders' Opening Br. at 27 ("Where a debtor has breached a creditor's contractual rights, the creditor is entitled to a claim for its damages . . . [which] claim is determined under principles of state

common law governing the breach of contract claims.").  But in so arguing, the Lenders rely on cases that are materially distinct, insofar as they involve breaches of enforceable no-call provisions in circumstances where the underlying debt was not accelerated, and where the "breaching" party was not a Chapter 11 debtor.

In Arthur v. Burkich, 520 N.Y.S.2d 638 (N.Y. App. Div. 1987), for example, the New York Supreme Court held in a two-page decision that "a mortgagor has no right to pay off his obligation prior to its stated maturity date in the absence of a prepayment clause in the mortgage or contrary statutory authority" and dismissed petitioner's application to compel respondent to accept payment in satisfaction of the mortgage.  Id. at 639-40.  This authority, which may be useful in assessing a mortgagor's rights outside of bankruptcy, is wholly irrelevant to the present circumstances where the Bankruptcy Court authorized the Debtors to repay the CalGen Debt based on explicit findings that the no-call provisions contained in the indentures are anathema to the core principles of restructuring embedded in the Bankruptcy Code and, therefore, patently unenforceable against Chapter 11 debtors and, in any event, the underlying debt has been accelerated pursuant to the terms of the indentures.

Similarly, the Lenders rely heavily on Teachers Ins. & Annuity Assoc. of America v. Ormesa Geothermal, 791 F. Supp. 401 (S.D.N.Y. 1991) and Teachers Ins. & Annuity Assoc. of America v. Butler, 626 F. Supp. 1229 (S.D.N.Y. 1986) in an attempt to bolster their argument that "where a loan is prepaid in violation of a prepayment prohibition, New York courts routinely find the borrower in breach of the loan agreement, giving rise to a damage claim."  Third Lien Noteholders' Opening Br. at 23-24.  However, neither of these cases involved Chapter 11 debtors or the early repayment of loans, nor the collision of state law with fundamental tenets of federal bankruptcy law—a scenario where state law must yield. See Butner v. United States, 440 U.S. 48, 55 (1979) (noting that property interests should be analyzed in accordance with state law "[u]nless some federal interest requires a different

result").  Both decisions address state law claims relating to breaches of commitment letters where the parties' negotiations fell apart before the transactions closed.  In <u>Ormesa</u>, for example, although the issue before the court was the borrower's refusal to proceed with the loan under the terms of the commitment letter (because a precipitous decline in interest rates made the loan less advantageous), the actual breach at issue was the borrower's failure to comply with its duty to negotiate in good faith in closing the loan—not the prepayment of a loan by a Chapter 11 debtor against whom no-call clauses are unenforceable.  791 F. Supp. at 407.  In fact, the only discussion of "call protection" in <u>Ormesa</u> related to the borrower's defense that it had been relieved of any obligations under the commitment letter because the lender had walked away from the deal by refusing to give up the call protection it negotiated in the commitment letter.  791 F. Supp at 407-08.

Likewise, in <u>Butler</u>, the central issue was whether the lender's insistence on a default prepayment fee relieved the borrower of its obligations to close the loan.  626 F. Supp. at 1231.  Although the commitment letter contained a "lock-in" period, during which the loan could not be called, it did not contain the "default prepayment fee" that the lenders sought prior to closing, and the borrower argued the request for such a fee justified its repudiation of the loan.  <u>Id.</u> at 1234.  In finding that the lender's requested language was reasonable and that the borrower breached its duty to negotiate in good faith, the court noted that "the parties, pursuant to their duty to negotiate in good faith to close the loan transaction, are expected to negotiate the terms of provisions such as acceleration clauses, default interest rates, lender's remedies and default prepayment fees."  <u>Id.</u>  In fact, the court stated "[t]he Default Prepayment Fee Language was intended to implement the Lock-in provision of the loan; without it, the borrowers could circumvent the Lock-in without consequence, depriving [the lender] of the benefit of its bargain."  <u>Id.</u> at 1235.  Relevant to the court's decision was the fact that lenders in the market typically included such default prepayment fees in their closing

documents as a protective measure (*i.e.,* the Lender's inclusion of the language was consistent with its own past practice as well as industry practice).  Id.

These decisions are not relevant, much less dispositive, to these appeals.  In stark contrast to the situations in Butler and Ormesa—beyond the most obvious distinction that the "breaching" parties were not Chapter 11 debtors—the CalGen Debt had closed and funded, and the parties had been operating under the governing agreements for some time.  The Lenders simply failed to negotiate for exactly the type of protection that the Butler court determined a lender reasonably should seek.  These decisions do not support the Lenders' damages claims because the predicate right to these damages is not part of the parties' governing agreement.  The CalGen Debt indentures provide that upon a Chapter 11 filing all outstanding principal and accrued interest is due and payable immediately—without also providing for an involuntary repayment premium if acceleration and repayment occurs before the no-call periods have expired.  Accordingly, the Debtors' repayment of all outstanding principal and accrued interest of the accelerated CalGen Debt constituted full performance according to the precise terms of the indentures.  The Lenders' reliance on inapposite precedent does not aid their cause.

**B.    The Memorandum Decision's Damages Award For "Dashed Expectations" Rewrote The Debt Indentures To Provide A Remedy Not Bargained For By The Parties Or Authorized By The Bankruptcy Code.**

The Debtor's opening brief explained that, for multiple reasons, the second apparent rationale for the Memorandum Decision's damages award—"The CalGen Secured Lenders' expectation of an uninterrupted payment stream has been dashed giving rise to damages," DA Tab A at 10—also was legal error.  Most importantly, the CalGen Lenders could have bargained for a damages remedy that explicitly required a premium if the Debtors repaid accelerated Debt before April 1, 2007.  But the Lenders failed to do so, and the Memorandum Decision impermissibly repaired their drafting omission by inventing and

applying a "dashed expectations" damages measure that is neither legally cognizable nor justifiable.

In sharp contrast to these simple and incontrovertible points, the Lenders' opening briefs devote extraordinary effort to the daunting task of devising a doctrinal justification for their arguments simultaneously ***defending*** the Bankruptcy Court's decision to award damages while ***challenging*** the type (should have been secured) and amount (should have been higher) of that same award.  Covering all conceivable bases, the Lenders disagree among themselves as to why they are entitled to damages and how their claims should be calculated.  Described summarily:

- The First Lien Noteholders, notwithstanding the Bankruptcy Court's express findings to the contrary, suggest their agreement does contain a valid prepayment premium clause, which, although not in effect at the time of the Debtors' repayment, can be "fairly discerned" or "borrowed" from other provisions of their indenture to serve as a damages measure.

- The Third Lien Noteholders admit (as they must) that their agreement does not itself provide for any prepayment premium and therefore their claims are allowable exclusively by reference to state law—ignoring, among other infirmities, that such claims, even if valid, are for "unmatured interest" and explicitly proscribed by the Bankruptcy Code.

- The Second Lien Noteholders, seeking the best of both worlds, argue a makewhole requirement can be "fairly discerned" among the terms of their indenture and thus repayment during the no-call period gives rise to damages under state law.

The inconsistency among the Lenders' arguments further demonstrates that the Memorandum Decision's damages award was an exercise in judicial free-lancing and not grounded in established precedent—despite the fact that the relevant analysis before the Bankruptcy Court was well-settled.  Had the Lenders included properly drafted prepayment penalties in the CalGen Debt indentures, those payment obligations, to the extent reasonable, may be allowable as secured claims pursuant to Section 506(b) of the Bankruptcy Code.  But the Lenders, sophisticated parties aided by competent counsel, did not bargain for these standard damages remedies.  Indeed, the Bankruptcy Court noted that "[m]odern indentures

11

generally provide for prepayment provisions or penalties **even** during a no-call period **or** if the facility is accelerated." DA Tab A at 8 (emphasis added). Having failed to include such provisions, the Lenders forfeited any right to receive secured claims for repayment premiums.

At this point the Bankruptcy Court's damages inquiry should have been complete, and therefore it was error to proceed to award, even putting aside the lack of any meaningful explanation, unsecured claims for breach of contract damages. The Lenders' opening briefs strive to fill the void and persuade this Court that the Memorandum Decision correctly awarded damages but incorrectly calculated the type and amount of the individual awards—by trying to shoehorn their claims into various common law damages theories. For the following many reasons, the Lenders did not have a right to any claims for breach of contract damages.

### 1.    The Lenders Do Not Have Allowable Secured Claims.

Premiums treated as "charges" under Section 506(b) of the Bankruptcy Code are the **only** available measure of damages for future interest expectancy, and they are allowed **if and only if** the damages are expressly provided for within properly drafted prepayment premium clauses. Section 506(b) of the Bankruptcy Code provides that oversecured lenders may add to their otherwise allowed secured claims "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or **state statute** under which such claim arose." 11 U.S.C. § 506(b) (emphasis in original). The statutory dictates are quite clear: a lender may recover fees and other charges (including any prepayment penalty or makewhole damages enforcing a lockout provision) only to the extent such charges are (a) reasonable[12] and (b) provided for under the agreement under which such

---

[12]    Indeed, even where prepayment premiums are provided for under the applicable agreement, they are subject to disallowance for failure to satisfy the reasonableness requirement of Section 506(b). See, e.g., Imperial Coronado Partners, Ltd. v. Home Fed. Sav. & Loan Assoc. (In re Imperial Coronado Partners, Ltd., 96 B.R. 997, 1000 (B.A.P. 9th Cir. 1989) (although prepayment premium was a "charge" provided for under the
(Continued…)

claim arose.[13]  See. e.g., Shenandoah, 188 B.R. 205, 215 (W.D. Va. 1995) (where there is no prepayment penalty provided for in the contract, "there can be no prepayment fees, costs or charges allowed under the confirmed Plan as none are provided for in the note under § 506(b)."); In re AE Hotel Venture, 321 B.R. 209, 217-20 (Bankr. N.D. Ill. 2005) (enforcing prepayment penalty upon finding the premium was a charge provided for under the agreement and a reasonable liquidated damages provision); In re Vest Assocs., 217 B.R. 696, 700 (Bankr. S.D.N.Y. 1998) ("Recovery of fees, costs, and charges pursuant to section 506(b) is allowed only if they are reasonable and provided for in the agreement under which the claim arose . . . in the absence of such an agreement, postpetition interest is the only added recovery available.").  Twelve years ago the Shenandoah Court observed:  "there is no reported decision which allows a prepayment premium in the absence of a prepayment premium formula provision being set forth in the instrument[,]" and this observation still holds true today.  188 B.R. at 215.

### a.     First Lien Noteholders

In apparent recognition of the need to fit their claims within the parameters of Section 506(b) of the Bankruptcy Code, the First Lien Noteholders' opening brief argues that courts uniformly enforce premiums as secured claims where a written instrument provides "some formula" to calculate the amount.  First Lien Noteholders' Opening Br. at 17.  To that

---

loan agreement, reasonableness requirement of Section 506(b) limited recoverable damages to lender's actual damages); In re Skyler Ridge, 80 B.R. 500, 505 (Bankr. C.D. Cal. 1987) (prepayment penalty provision void because amount of penalty was unreasonable under Section 506(b)).  Accordingly, even if the Lenders' indentures did provide for otherwise enforceable prepayment premiums in connection with the Refinancing—which they do not—the Bankruptcy Court would have to find that those provisions are reasonable before authorizing payment of such provision.  Notably, the type of prepayment formula the Lenders suggest is applicable—a fixed percentage of the principal loan balance that presumes damages regardless of any change in interest rate—has been found to be "unreasonable" for purposes of Section 506(b) analysis.  See, e.g., In re AJ Lane & Co. Inc., 113 B.R. 821, 829 (Bankr. D. Mass. 1990) (prepayment penalty equal to percentage of loan balance unreasonable because it presumes a loss).

[13]  See, e.g., Continental Sec. Corp. v. Shenandoah Nursing Home P'ship, 193 B.R. 769, 775 (W.D. Va. 1996) ("[A] typical prepayment penalty provision contained in a lending instrument is a 'charge' within the meaning of § 506(b)") (collecting cases), aff'd, 104 F.3d 359 (4th Cir. 1996).

end, the First Lien Noteholders even suggest that "if the amount of a prepayment premium can be ***fairly discerned*** from the face of the applicable agreements, it will be allowed" Id. (emphasis added).

But the Bankruptcy Code is not nearly as untethered as the First Lien Noteholders posit. Section 506(b) and caselaw interpreting it plainly emphasize that premiums must be explicit. See, e.g., Shenandoah, 193 B.R. at 777 ("This court . . . cannot enforce the lockout provision by simply supplying a prepayment penalty figure contained elsewhere in the note since no such figure exists."); Vest, 217 B.R. at 699 (even though note prohibited prepayment, no premium was allowable under Section 506(b) where the note was "silent as to any penalties or damages that would arise from the breach of this provision."). And with good reason: anything less than a stringent reading of Section 506(b) would result in all manner of damages that can somehow be "fairly discerned" from the "face" of the agreements being awarded as secured claims. Courts are not (indeed, they cannot) be responsible for "discerning" the parties' intentions with respect to prepayment charges— those intentions must be expressly and unequivocally stated within the agreements.[14]

---

[14] The First Lien Noteholders' argument—that if a premium is provided for in one section of an indenture, that "amount" or "calculation" should be deemed applicable to another section of the indenture addressing different circumstances, despite the parties' failure to state this clearly within their contract—is a drastic departure from basic rules of contract interpretation. See, e.g., North Fork Bank & Trust Co. v. Romet Corp., 192 A.D.2d 591, 592 (N.Y.A.D. 2 Dept. 1993) (refusing to rewrite loan agreement because courts "may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing'") (citation omitted). The Lenders spend pages trying to explain why the Court should infer from their loan agreements and the design of the makewhole clause that prepayment during the lockout period required a *greater* premium payment than that required in the periods closer to maturity. First Lien Noteholders' Opening Br. at 21-24. Notably, the loan agreements did not set forth a decreasing penalty formula as the First Lien Noteholders suggest. In fact, a prepayment premium applied only if the loan was repaid between April 1, 2007 and March 31, 2008. No premium applied to repayment during the immediately preceding two-year lockout period, and no premium applied to repayment after March 31, 2008. It is, therefore, not at all obvious that the Bankruptcy Court misinterpreted the intentions of the parties. The Lenders state "if the parties wanted to permit prepayment more than two years before maturity, they knew full well how to do so." Id. at 24. But it necessarily follows from this argument that the Lenders also knew full well how to provide for an enforceable prepayment penalty in the event the loan was repaid during that two-year period. Hence it is unsurprising that controlling caselaw emphasizes these types of questions of the parties' intentions are to be answered by the agreement itself—they are not for the court to decipher.

Indeed, the Lenders try to recharacterize the law, noting "[t]he case law reveals a sensible pattern under Section 506(b):  prepayment premiums in debt instruments that include a formula from which damages may be ***reasonably calculated*** are allowed as secured claims; those that fail to specify a formula, leaving the court to invent a number out of whole cloth, are not."  First Lien Noteholders' Opening Br. at 20.  But no matter how badly the Lenders want to be on the winning side of those decisions, the Lenders cannot escape the clear holdings of relevant precedent.  This is exactly the same scenario the Courts were confronted with in <u>Shenandoah</u> and <u>Vest</u> and those decisions are clear and directly on point:  where, as here, there is no prepayment premium provided for in the agreement, a creditor is not entitled to increase its secured claim under Section 506(b)of the Bankruptcy Code.  <u>Vest</u>, 217 B.R. at 700 ("Recovery of fees, costs, and charges pursuant to section 506(b) is allowed only if they are reasonable and provided for in the agreement under which such claim arose…in the absence of such an agreement, postpetition interest is the only added recovery available.") ; <u>Shenandoah</u>, 193 B.R. at 777 ("This court . . . cannot enforce the lockout provision by simply supplying a prepayment penalty figure contained elsewhere in the note since no such figure exists").[15]  Here too, the Debtors have no obligation to pay a prepayment premium upon repayment of the Debt during the no-call period.  The First Lien Noteholders' suggestion that the Court "borrow" a prepayment obligation that would have been due in a completely different time period is inconsistent with basic notions of contract law and relevant case law.

---

[15]    Moreover, as set forth above, the First Lien Noteholders' reliance on <u>360 Inns</u> in this context is unwarranted.  In <u>360 Inns</u>, although the note did not contain a damages provision with respect to voluntary prepayment within the first ten years of the loan, there was "a *concrete* 10% damages figure in the note with respect to involuntary prepayment *made within the same period*."  <u>Shenandoah</u> 193 B.R. at 777 (*c*iting <u>360 Inns</u>, 76 B.R. 573 (Bankr. N.D. Tex. 1987)).  In other words, the <u>360 Inns</u> Court did not "infer" a prepayment premium for the relevant repayment date, it merely applied the premium explicitly provided for in the agreement.

b.    Second Lien Noteholders

Continuing with the theme of disregard for precedent, the Second Lien Noteholders urge the Court to adopt the same reading of their indenture as the First Lien Lenders,[16] but further request this Court make new law, claiming "[t]o the extent that the Shenandoah and Vest decisions are considered at all relevant to the factual setting here, they are at odds with the plain language of section 506(b) and should not be followed." Second Lien Noteholders' Opening Br. at 34. This Court should decline the invitation to rewrite the Bankruptcy Code to provide for damages the Lenders failed to write into their contracts.

Moreover, the Second Lien Noteholders argue that Section 506(b) is not the only route to receive secured claims because, even apart from Section 506(b), the Lenders are entitled to secured claims for "interim interest" and prepayment premiums because the CalGen Debtors are solvent. Id. at 35-37.[17] But none of the cases cited by the Second Lien Noteholders stand for the proposition that even if a creditor is not entitled to a secured claim under Section 506(b), it still may receive one if the debtor is solvent.[18] The cited cases only establish that creditors of solvent debtors are entitled to receive the benefit of their contract.

---

[16]  See Second Lien Noteholders' Opening Br. at 31-35 (asserting the court should impose the 3.5% prepayment premium applicable to repayment of the Second Lien Debt between April 1, 2008 and April 1, 2009 as a charge to be added to their secured claim under Section 506(b) of the Bankruptcy Code).

[17]  The Second Lien Noteholders assert that Section 506(b) "may not be used to limit a secured creditor's contractual claims under state law where an estate is solvent and able to pay its creditors in full" because "the purpose of the Bankruptcy Code is to adjust and delimit the rights of creditors where a debtor is unable to pay its creditors in full, not to benefit shareholders or shareholders' estates at the expense of creditors." Second Lien Noteholders' Opening Br. at 35. Again, these arguments fail in mistakenly presuming that the Lenders have rights that are being subordinated to equity. The Lenders do not have any additional rights to payment relating to the Refinancing because no such rights are provided for under their loan agreements. Therefore, there can be no subordination.

[18]  The Lenders rely on In re Dow Corning Corp., 456 F.3d 668, 679-680 (6th Cir. 2006), and cases cited therein to support their assertion that limits to a creditor's recovery of costs under Section 506(b) are inapplicable where the debtor is solvent. As an initial matter, the creditors in Dow Corning sought *unsecured* claims for contractual default interest and other fees and expenses. More fundamentally, in Dow Corning and all of the cases it relied upon, the creditors actually had contractual rights to the compensation they were seeking. Id. at 679 (noting "in solvent debtor cases, rather than considering equitable principles, courts have generally confined themselves to determining and enforcing whatever pre-petition rights a given creditor has against the debtor.").

Here, the Second Lien Noteholders' recovery was not limited because of the Debtors' (in)solvency—it was limited by the terms of the agreements.

<u>c.</u>        <u>Third Lien Noteholders</u>

Lastly, the Third Lien Noteholders admit **no** premiums are provided for in their loan agreement, but they attempt to argue this actually means they are the most deserving of secured claims of all the Lenders. The Third Lien Noteholders urge this Court to ignore the absence of a prepayment premium in their loan agreement and determine the validity and calculation of their damage claim exclusively by reference to state law.[19] Then, assuming the Third Lien Noteholders have a valid state law damage claim "for the lost interest that would have been paid (less mitigation)" had the Debtors not allegedly breached the unenforceable no-call provisions, the Third Lien Noteholders argue this "obligation" of the Debtors is necessarily covered by the Third Lien Noteholders' liens (regardless of whether the damages qualify as a "cost" or "charge" under Section 506(b) of the Bankruptcy Code). Third Lien Noteholders' Opening Br. at 37-38.

Essentially, the Third Lien Noteholders suggest the Court should infer the right to a secured claim exists from the very nature of the indentures because "[i]t defies logic and the basic precepts of secured lending that M&T Bank's oversecured lien on the Collateral, which protects M&T Bank's right to full payment of principal and interest through natural maturity under the Third Priority Indenture Documents, could somehow leave M&T Bank with an unsecured bankruptcy damage claim for lost interest by virtue of CalGen's breach of the loan agreement." <u>Id.</u> But it defies logic and the basic precepts of secured

---

[19]   Of course, as set forth in Section I.A above, the Lenders' reliance on inapposite cases relating to breaches of enforceable no-call provisions in cases **outside of bankruptcy** in support of a valid breach of contract claim in these circumstances is questionable at best.

lending that the CalGen Lenders would negotiate indentures that do not contain sufficiently protective acceleration clauses and involuntary repayment premium provisions.

Having failed to adequately protect their right to lost interest payments resulting from early repayment of their loans, the Third Lien Noteholders seek to correct their drafting omission by conjuring up an unprecedented mechanism for arriving at a secured claim (*i.e.,* state law claim for breach of contract gives rise to makewhole damages for lost interest that can be added to their Section 506(b) secured claims). Unfortunately for the Third Lien Noteholders, their creative efforts cannot withstand scrutiny. Even if the Third Lien Noteholders could prove they have a valid claim under state law for the Debtors' alleged breach of the Debt indentures, the claim they seek—makewhole damages for unmatured interest—is proscribed by the Bankruptcy Code. See 11 U.S.C. § 502(b)(2).[20]

2.    **The Lenders Do Not Have Allowable Common Law Claims for Damages.**

The fundamental flaw in the Lenders' alternative "common law damages" arguments[21] is the presumption that they may have an allowed claim for unmatured interest in spite of the failure of their loan indentures to explicitly provide for a prepayment premium or liquidated damage provision. Absent a properly drafted prepayment premium clause, the Lenders cannot recover damages in the form of makewhole payments because such payments are, by definition, payments of unearned interest which are subject to disallowance under

---

[20]  Section 502(b) of the Bankruptcy Code provides, in pertinent part, that if an objection is made to a creditor's proof of claim, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, *except to the extent that* . . . (2) such claim is for unmatured interest." 11 U.S.C. § 502(b)(2) (emphasis added).

[21]  Similar to the primary damages argument made by the Third Lien Noteholders, the Second Lien Noteholders argue as a fallback position that, even if they are not entitled to a secured claim under Section 506(b) for any portion of their claims, they are at least entitled to an unsecured claim for the full amount of their contract damages under Section 502(b) of the Bankruptcy Code. Second Lien Noteholders' Opening Br. at 37.

Section 502(b) of the Bankruptcy Code. Ultimately, the Lenders seek—and the Bankruptcy Court's "dashed expectations" award impermissibly granted—a fictional damage claim that is inconsistent with applicable jurisprudence and the dictates of Sections 502(b) and 506(b) of the Bankruptcy Code.

Section 502(b) of the Bankruptcy Code explicitly disallows claims for unearned interest. The **only** relevant exception to the disallowance of unmatured interest under the Bankruptcy Code is Section 506(b)'s directive that makewhole premiums may be allowed as part of a creditor's secured claim, if (and only if) the premium is expressly provided for in the agreement. Shenandoah, 193 B.R. at 774 (language of Section 506(b) prohibited creditor from including in its secured claim damages stemming from violation of a lockout provision where the instrument did not contain a damages provision). The only way to reconcile these provisions of the Bankruptcy Code is precisely the way courts have—to construe repayment premiums and makewhole requirements explicitly provided for in the underlying contract as allowable 'charges' under Section 506(b) of the Bankruptcy Code (*i.e.,* the **only** available measure of damages for future interest income expectancy).[22] Importantly,

---

[22]    As the court noted in In re Dow Corning Corp., 456 F.3d 668, 681 (6th Cir. 2005):

> It is undisputed that unsecured creditors are generally prohibited from recovering post-petition interest, because claims for unmatured interest are explicitly prohibited under § 502(b). See 11 U.S.C. § 502(b)(2) (providing that bankruptcy courts cannot allow a claim for "unmatured interest"). Section 506(b) explicitly allows oversecured creditors to recover postpetition interests on their claims, thereby exempting them from the strictures of § 502(b) to the extent their claims are oversecured.

See also In re AE Hotel Venture, 321 B.R. 209, 220 (Bankr. N.D. Ill. 2005) ("Enforceability [of prepayment premium] depends on whether the premium is meant to liquidate damages or impose a penalty."); see also, Lappin Elec. Co. v. Fremont Fin. (In re Lappin Elec. Co.), 245 B.R. 326, 330 (Bankr. E.D. Wis. 2000) ("this court is in agreement with a majority of courts that view a prepayment charge as liquidated damages, not as unmatured interest or an alternative means of paying under the contract…In this case, the charge is independent of the amount owed at termination, thus negating any characterization as interest."); In re AJ Lane, 113 B.R. 821, 827-828 (Bankr. D. Mass. 1990) (collecting cases and noting "[t]he prepayment charge in each of these notes is a provision for liquidated damages, and it must be measured by the rules applicable to such provisions."); In re Outdoor Sports Headquarters, Inc., 161 B.R. 414, 424 (Bankr. S.D. Ohio 1993) ("[l]iquidated damages including prepayment premiums, fully mature at the time of breach and do not represent unmatured interest."). Ingrid Michelson Hillinger & Michael G. Hillenger, The Story of YMP's ("Yield Maintenance Premiums") in Bankruptcy, 3 DePaul Bus. & Com. L.J. 449, 457
(Continued…)

the guiding principal among cases enforcing prepayment premiums as liquidated damage provisions is deference to the parties' contractual choices.  See, e.g., Skyler Ridge, 80 B.R. at 508 ("If secured lenders and borrowers want to contract to protect a secured lender's interest rate through the payment of reasonably calculated liquidated damages, there is no bankruptcy policy to prohibit the enforcement of such action.")  Indeed, precisely because unmatured interest is not compensable in bankruptcy, modern indentures typically do include prepayment premiums that allow lenders to protect against lost interest from premature repayment of their loans.  Having failed to heed the guidance of twenty years' worth of caselaw reconciling Sections 502(b) and 506(b) of the Bankruptcy Code, the Lenders "do not supply any legal authority for the proposition that a bankruptcy court may read into a contract damage provisions which the parties themselves have failed to insert regarding the liquidation or calculation of damages arising out of the prepayment of a loan or note."  Vest, 217 B.R. at 699.[23]  The Lenders' post-hoc efforts to end-run the blatant failure of their loan indentures to provide them with a right to compensation for their lost interest expectancy (by asserting a common law right to breach of contract damages) simply does not work.  The Lenders'

---

(2005) ("even if a [prepayment premium] represents a right to unearned interest as of the petition date, that will not invalidate it if the [premium] holder is oversecured."  This is because courts may characterize the prepayment premium as a "charge," and Section 506(b) allows "reasonable charges provided for under the agreement.").  Compare Shenandoah, 188 B.R. 205 at 214 (W.D. Va. 1995) (where note contained no prepayment premium, "[w]ere the bankruptcy court to hold that Shenandoah must pay Continental the full value of the Note through its maturity, it would essentially be allowing the payment of unmatured interest which is prohibited by § 502.").

[23]  The Second Lien Noteholders cite Joseph F. Sanson Inv. Co. v. 268 Ltd. (In re 268 Ltd.), 789 F.2d 674 (9th Cir. 1986) in support of their assertion that a lender may seek as unsecured claims damages not recoverable as secured claims under Section 506(b) of the Bankruptcy Code.  Second Lien Noteholders' Opening Br. at 37.  In In re 268 Limited, the court considered the enforceability of a contractual fee provision in a deed of trust, which provided that upon a default, five percent of the remaining balance would be paid to mortgagor as attorneys' fees.  Ultimately, the court held that the reasonableness requirement of Section 506(b) of the Bankruptcy Code limited the mortgagor's ability to recover the full contractual amount of the fees as part of its secured claim, but that the mortgagor was not precluded from seeking the excess *contractual* fee as an unsecured claim.  In re 268 Limited certainly does not authorize an unsecured claim for damages where, as here, the contract does not provide the Lenders with a right to such compensation.  See also Shenandoah, 193 B.R. at 777-78 ("the creditor must, of course, first show that it has a 'right to payment' in order to have a 'claim.'  Continental cites no case law for its proposition that the bankruptcy court's failure to enforce the lockout provision of the Note gives rise to an independent 'right to payment.'").

20

"damages" claim, even if valid under state law, is subject to disallowance pursuant to Section 502(b) of the Bankruptcy Code.

Notably, the Lenders recognize the distinction between claim validity and claim allowance[24]—they just chose to ignore that the nature of the claim they seek is, in fact, "otherwise proscribed by the Bankruptcy Code." Id. at 22. The Lenders cite the recent Supreme Court decision in Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co., 127 S. Ct 1199, 1204 (2007), to support their position that "creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, *subject to any qualifying or contrary provisions of the Bankruptcy Code.*" Third Lien Noteholders' Opening Br. at 22 (citations omitted, emphasis added). Travelers, however, makes clear that validity of a claim under state law does *not* mean automatic entitlement to an allowable claim in bankruptcy. As the Court noted in Travelers, "we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy *unless they are expressly disallowed.*" 127 S. Ct. at 1206 (analyzing whether claim at issue fell within any of the nine categories of claims Congress explicitly excepted from allowance in Section 502(b) of the Bankruptcy Code) (emphasis added).

In Travelers, the Court held that a creditor was not precluded from filing an unsecured claim for contractual attorney fees merely because the fees sought were incurred in litigating issues of federal bankruptcy law.[25] Importantly, the Court was persuaded by the fact that "the *character* of a [contractual obligation] to pay attorney's fees presents no

---

[24] "Once a valid claim exists under nonbankruptcy law, it is allowable in bankruptcy *unless otherwise proscribed by the Bankruptcy Code.*" Third Lien Noteholders' Opening Br. at 22 (citing Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co., 127 S. Ct 1199, 1204 (2007) (emphasis added).

[25] In so holding, the Supreme Court overturned the so-called "Fobian Rule" decided in Fobian v. Western Farm Credit Bank (In re Fobian), 951 F.2d 1149, 1153 (9th Cir. 1991), which held that "where the litigated issues involve not basic contract enforcement questions, but issues peculiar to federal bankruptcy law, attorney's fees will not be awarded absent bad faith or harassment by the losing party…".

21

obstacle to enforcing it in bankruptcy," Id. at 1206 (citing Security Mortgage Co. v. Powers, 278 U.S. 149, 154 (1928)). Moreover, the Court held, "we express no opinion with regard to whether, following the demise of the *Fobian Rule*, **other principles of bankruptcy law might provide an independent basis for disallowing Travelers' claim for attorney's fees**." Id. at 1207-08 (emphasis added).

Here, even if the Lenders had a valid state law claim for prepayment of the debt in violation of the no-call provision, the claim—by its very nature—is a claim for unmatured interest, which is proscribed by Section 502(b)(2) of the Bankruptcy Code. Indeed, the Third Lien Noteholders spend pages describing precisely how the Court should have calculated their claim—a claim for "the lost **interest** that would have been paid (less mitigation") had CalGen and the Guarantors not breached the Third Priority Indenture by prepaying." Third Lien Noteholders' Opening Br. at 37-38[26] (emphasis added). Again, the

---

[26] The Third Lien Noteholders also spend considerable time criticizing the Bankruptcy Court's improper use of "estimation" in determining the appropriate amount of their damages claim. Notably, the Bankruptcy Court never implied, much less stated, that it was estimating the Lenders' claims pursuant to Section 502(c) of the Bankruptcy Code. In any event, the Third Lien Noteholders conclude that even "if estimation is appropriate, the Bankruptcy Court is required to estimate a claim in accordance with the legal rules governing the calculation of the claim." Third Lien Noteholders' Opening Br. at 30. The Lenders make very clear that the damages they seek "are calculated by determining the present value of the lender's **lost interest income** as a result of the breach." Id. (emphasis added). It is somewhat disingenuous for the Lenders to ask the Court to engage in a straightforward analysis of their right to a claim under Section 502 of the Bankruptcy Code without acknowledging that, under that same analysis, their claim is expressly disallowed.

Another straw man argument waged at length by the Third Lien Noteholders is their assertion that "[t]he Bankruptcy Court's determination that the CalGen Secured Lender's damages claims are 'not measurable' is wrong and contrary to established case law." Id. at 30. This is blatantly misleading. The Memorandum Decision's full statement on this point is: "[t]he CalGen Secured Lenders' expectation of an uninterrupted payment stream has been dashed giving rise to damages, albeit not measurable **as the Lenders would wish**." DA Tab A at 10 (emphasis added). The Bankruptcy Court quite clearly did not find it was impossible to measure damages; it did find (correctly) that the formula offered by the Lenders was inapplicable.

Moreover, the Third Lien Noteholders note repeatedly that they offered into an evidence an affidavit by an expert witness calculating their damages demands, but "[n]one of the Appellees offered a contrary expert damages calculation," and therefore it was reversible error for the Bankruptcy Court not to award the amounts stated in their affidavit. Id. at 14-15, 32-34. As an initial matter, the Debtors do not need an "expert affidavit" to bolster their position that, as a matter of law, the Lenders are entitled to zero damages. Furthermore, to state the obvious, just because an affidavit is introduced into evidence does not mean it is binding upon the Court.

Lenders ignore that the Debtors are in bankruptcy. Here, there are not only principles of bankruptcy law but specific statutory instructions that provide an independent basis for disallowing any otherwise valid state law claim for damages.

As described above, there is special treatment afforded to properly drafted prepayment provisions under Section 506(b)—they are treated as charges allowed as part of a secured claim. This statutorily-created—and judicially-enforced—rule acknowledges the ability of sophisticated secured parties to negotiate for the full benefit of their bargain in commercial transactions. But where, as here, the Lenders did not bargain for such protection and cannot fit their clams within the explicit provisions of Section 506(b) of the Bankruptcy Code, it was improper for the Bankruptcy Court to look outside the parties' agreements and create a fictional state law claim that would otherwise be disallowed by the Bankruptcy Code.[27]

---

[27] The Debtors' opening brief predicted the Lenders would "attempt to defend the Memorandum Decision's damages award by invoking vague notions of 'fairness' . . . and argue that (1) but for the Debtors' Chapter 11 filing accelerating the Debt and rendering the no-call provisions unenforceable, and (2) because the Debtors repaid the Debt on almost the eve (March 29, 2007) of the earliest makewhole trigger date (April 1, 2007), it would be inequitable to allow the Debtors to evade both of the safeguards intended to protect the Lenders' expectations of future interest payments." Id. at 15-16. The Lenders' opening briefs confirm the Debtors' hypothesis, arguing the interests of public policy must trump any "harsh" outcome that may result from enforcing the parties' contracts as written. See, e.g., Third Lien Noteholders' Opening Br. at 36 ("To affirm the Bankruptcy Court's orders would be to approve contrived bankruptcy voodoo and to distort commercial creditors' contract rights and expectations for no reason.")

But this patently self-interested canard ignores the reality that strictly enforcing contracts as written furthers both legal *and* public policy. As noted by Judge Posner in ConFold Pacific, Inc. v. Polaris Indus., Inc., 433 F.3d 952, 955 (7th Cir. 2006):

> Especially when dealing with a substantial contract between "commercially sophisticated parties . . . who know how to say what they mean and have an incentive to draft their agreement carefully," there is great merit to the rule that the meaning of an unambiguous contract is a question of law rather than fact with the consequence "that unambiguous contractual language must be enforced as it is written." . . . The rule enables contract disputes to be resolved quickly and cheaply, "protects the parties against the vagaries of the litigation process -- a major reason for committing contracts to writing -- without too great a risk of misinterpretation, and by thus minimizing both contractual transaction costs and uncertainty increases the value of contracts as means of conducting business."

Id. at 955 (citations omitted). See also Universal Reinsurance Corp. v. Allstate Ins. Co., 16 F.3d 125, 129-30 (7th Cir. 1993) (noting it is "tempting to relieve [one party] of the consequences of its oversight" but "absent compelling circumstances, it is not our province to rewrite their agreement"). These principles are
(Continued…)

**II.    The Bankruptcy Court Did Not Err In Holding The CalGen Debt Was Accelerated.**

The Lenders' opening briefs devote considerable space to arguing that damages are due because the Debtors' repayment of the CalGen Debt was "voluntary"—but the point ultimately is irrelevant.  Again, the Bankruptcy Court appropriately held that the CalGen Debt indentures do not explicitly require a makewhole premium in these circumstances—*i.e.*, where "none of the agreements governing the CalGen Secured Debt require a prepayment premium for repayment prior to April 1, 2007[,]" and "the CalGen Secured Debt has been accelerated by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately.'"  DA Tab A at 7, 8.

In contrast to the Bankruptcy Court's straightforward (and correct) interpretation of the indentures' plain terms, the Lenders offer a more "nuanced" (and incorrect) reading.  More specifically, the Lenders argue that although the indentures state an event of default accelerates all outstanding debt, which then becomes due and payable immediately, the acceleration clauses don't ***really*** mean "immediately" (if immediately would cause repayment to occur within the no-call period, before the indentures provide for a prepayment premium).  In support of this claim that the parties ***actually*** must have intended for two types of acceleration—notwithstanding that the acceleration clauses themselves do not contain even a hint of a dual definition—the Lenders cite to In re Skyler Ridge, 80 B.R. 500, 507 (Bankr. C.D. Cal. 1987), where the court stated "[t]he automatic acceleration of a

---

equally valid when interpreting New York law.  See, e.g., Guterman v. RGA Accessories, Inc., 196 A.D.2d 785, 785 (N.Y.A.D. 1 Dept. 1993) ("[t]he contract cannot be rewritten, as plaintiff suggests" because "[t]his was not the agreement of the parties, and no basis to reform the contract is alleged"); North Fork Bank & Trust Co. v. Romet Corp., 192 A.D.2d 591, 592 (N.Y.A.D. 2 Dept. 1993) (refusing to rewrite loan agreement because courts "may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing'") (citation omitted); DeVanzo v. Newark Ins. Co., 44 A.D.2d 39, 43 (N.Y.A.D. 2 Dept. 1974) ("A court may not, of course, rewrite a contract to accord with its instinct for the dispensation of equity under the facts of a case.").

debt upon the filing of a bankruptcy case is not the kind of acceleration that eliminates the right to a prepayment premium" because:

> If automatic acceleration of a debt defeats a prepayment premium clause, such a clause could never be enforced in a bankruptcy case. A debtor, under such a rule, could always avoid the effect of a prepayment premium clause by filing a bankruptcy case. Neither the Bankruptcy Code nor case law compels so drastic a result. No bankruptcy policy compels the invalidation of a **_properly drawn_** prepayment premium clause in **_all cases_**.

80 B.R. at 507 (emphasis added).

The Debtors have no disagreement with <u>Skyler Ridge</u>; indeed, this portion of the opinion supports their position that the CalGen indentures must be enforced as written. To be clear, the Debtors do not argue that simply because debt is accelerated prepayment premiums are _per se_ invalid. Rather, the Debtors fully concede that "properly drawn" prepayment premiums will be due even where the debt being repaid is accelerated—as the Debtors did so pay in the context of the Aries settlement.[28]

Furthermore, the acceleration at issue in <u>Skyler Ridge</u> occurred pursuant to the Bankruptcy Code—not an acceleration clause in the parties' contract. The difference between acceleration pursuant to the Code and acceleration pursuant to a contract clause is significant because <u>Skyler Ridge's</u> admonition that a debtor "could always avoid the effect of

---

[28]  As the Bankruptcy Court acknowledged:

> [E]arlier in these Chapter 11 cases the Debtors sold a power plant known as the "Aries Facility," whose relevant financing agreement contained an acceleration clause that specifically required payment of a "Make-Whole Amount" if an event of default accelerated the outstanding loan amounts. Accordingly, the Debtors entered into a settlement that provided for payment of the make-whole premium. The Aries loan documents and the CalGen Secured Debt indentures were executed within days of each other but contained very different terms.

> DA Tab A at 8. In fact, the Aries loan documents closed on March 26, 2004—or on almost the exact same date that the CalGen Debt indentures were executed (March 23, 2004). DA Tab F at 5. In other words, the Aries' lenders negotiated for an acceleration clause that expressly provided for a makewhole payment following an event of default and acceleration of the debt—and the Debtors willingly paid this makewhole amount. The CalGen Lenders negotiated a contemporaneous agreement in which they could have bargained for similar protection.

a prepayment premium clause by filing a bankruptcy case" does not hold true if the parties' contract expressly provides, for example, that in the case of an event of default due to a bankruptcy filing by the borrower, all outstanding debt—including principal, accrued interest, and any premiums owed because of any repayment, whether voluntary or involuntary, during the no-call period or prior to maturity—shall be due and payable immediately without further action or notice.

Of course, the CalGen Debt indentures do not contain any such language. Consequently, nothing in Skyler Ridge (or any other case that states acceleration alone does not defeat a prepayment premium[29]) changes the fact that the CalGen Secured Debt indentures were not "properly drawn" to require a premium upon the repayment of accelerated debt during the no-call period. This appeal would not exist had the CalGen

---

[29]    The Lenders also rely heavily on in Imperial Coronado Partners, Ltd. v. Home Fed. Sav. & Loan Assoc. (In re Imperial Coronado Partners, Ltd.), 96 B.R. 997, 1000 (B.A.P. 9th Cir. 1989)—where the court stated: "In our view, the decision to sell the property and pay off the loan was *voluntary*, and the prepayment premium is therefore enforceable." (emphasis added)—for the proposition that because the because the CalGen Lenders have taken no affirmative acts to collect on the Debt, they did not waive their right to a prepayment premium. But this point, too, is irrelevant here.

As an initial matter, at least one court has specifically cast doubt on the viability of Coronado. In In re Public Service Co. of New Hampshire, 114 B.R. 813, 819 (Bankr. D.N.H. 1990), the Court found that a claim for a prepayment premium was not allowable because it was not triggered by a voluntary prepayment once the debt was accelerated. The court noted "two judges on a Bankruptcy Appellate Panel for the Ninth Circuit did not adopt [this] reasoning in Imperial Coronado Partners, Ltd. . . . However, I find the reasoning of the dissenting opinion . . . more persuasive." To that end, the court elected to adopt the dissenting judge's reasoning in Imperial Coronado and denied the claim for a prepayment premium.

More importantly, the court in Coronado was evaluating the enforceability of a prepayment premium expressly due upon the voluntary prepayment of the loan, and the question before the court was whether the remedy provided for in the agreement was applicable according to its terms. In that context, the court held that the lender's actions to accelerate the loan did not undermine the "voluntary" nature of the prepayment because the Debtor had the option to deaccelerate the loan. Accordingly, the debtor could not avoid payment of the penalty amount *provided for in the agreement* by virtue of the loan being accelerated. Here, the Lenders' rights to a prepayment penalty do not depend on whether the Debtors' repayment of the Debt was voluntary or involuntary—the Lenders simply have no right to prepayment in either case.

Lenders bargained for a premium upon the repayment of accelerated Debt[30]—or even damages in the event of an "involuntary" repayment during the no-call period.[31]

### III.    The Bankruptcy Court Did Not Err In Diminishing The Collateral Agent's Liens.

Based upon an unsupported assertion that the claims underlying its liens were not repaid in full pursuant to the Bankruptcy Court's Amended Repayment Order (authorizing the Debtors to repay the CalGen Debt),[32] the Collateral Agent claims that the Bankruptcy Court erred by releasing or subordinating the Collateral Agent's liens (other than the Disputed CalGen Claims liens) to the liens securing the DIP Refinancing (except as to the Disputed CalGen Claims).[33]

According to the Collateral Agent, the "plain terms" of the governing documents proscribe partial lien releases.  Id. at 8.  But the "plain terms" the Collateral Agent cites in the governing Collateral Trust Agreement merely provide that the Collateral Agent's liens will be released "in whole, upon (A) payment in full and discharge of all outstanding Secured Debt . . . ."  Collateral Trust Agreement § 5.1(a).  In fact, nowhere does Section

---

[30]   See, e.g., In re AE Hotel Venture, 321 B.R. 209, 219 (Bankr. N.D. Ill. 2005) (finding "[b]ecause the loan documents here expressly provide for a prepayment premium *even when the debt is accelerated*, the premium is 'provided for under the agreement'"); Financial Ctr. Assocs. of East Meadow, L.P. v. The Funding Corp. (In re Financial Center Assocs. of East Meadow, L.P.), 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992) (noting "[i]t is not disputed that the agreement between the parties specifically provides for the pre-payment charge *even in the event of acceleration*") (emphasis added).

[31]   See, e.g., In re 360 Inns, Ltd., 76 B.R. 573, 575 (Bankr. N.D. Tex. 1987) (acknowledging "[t]he note prohibits voluntary prepayment during the first ten years of its term, and thereafter provides for a prepayment penalty on a declining scale as the note reaches maturity from 5% to a low of 1% of the amount prepaid.  During the first ten loan years, however, the note does provide for an ***involuntary prepayment penalty*** in the sum of 10%.") (emphasis added).

[32]   See Amended Order (I) Granting Debtors' Limited Objection to Claim Numbers 2664, 3275, 3393 Through 3421 (Inclusive), 3546 through 3554 (inclusive), 3586 through 3588 (inclusive), 3731, 4073, 5653 through 5730 (inclusive), 5791, and 5792; (II) Determining the Value of the CalGen Secured Debt Pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedure, and (III) Authorizing Repayment of CalGen Secured Debt, entered on March 26, 2007 (the "Amended Repayment Order") [attached at DA Tab D].

[33]   See Opening Brief of Wilmington Trust Company as Collateral Agent (the "Collateral Agent Opening Br.") at 7–11.

5.1—or any other provision in the Collateral Trust Agreement—proscribe partial lien releases.

Similarly, nothing in the ancillary Collateral Security Agreement proscribes partial lien releases. The provision the Collateral Agent cites merely sets forth the term of the agreement: "This Agreement shall create a continuing security interest in the Article 9 Collateral and shall remain in full force and effect with respect to all Collateral until the Secured Obligations Termination Date," at which time the security interests in the debt instruments will automatically terminate.[34] Collateral Security Agreement Article 9. Plainly this provision does not state (or mean), as the Collateral Agent avers, that "all liens under those agreements 'remain in full force and effect' until the entire debt, including interest has been paid in full." Collateral Agent Opening Br. at 10. And in any event, the Collateral Security Agreement is governed by the Collateral Trust Agreement,[35] which, as discussed above, does not proscribe partial lien releases.

Notably, the Collateral Agent does not support its argument by citing to any applicable law that proscribes lien releases upon cash payment of underlying claims. For that matter, the Collateral Agent does not cite to any applicable law whatsoever. The Collateral Agent cites a single case in which a district court reversed a bankruptcy court order extinguishing a secured creditor's liens *on the proceeds of* a Section 363 sale where the

---

[34] Presumably the Collateral Agent relies on Article 9 of the Collateral Security Agreement for its argument that (i) its liens should be preserved *in toto* despite the fact that the underlying claims have been repaid, and (ii) the DIP Refinancing essentially should be unwound, in both cases because the Collateral Security Agreement purportedly contains ongoing collateral "monitoring" obligations. Collateral Agent Opening Br. at 10. Needless to say, unwinding a transaction that saves the Debtors' estates approximately $100 million per year on account of a collateral agent's administrative obligations would be an extreme example of letting the tail wag the dog. For the same reason, the Collateral Agent's wholly unsupported assertion that its interpretation of the security documents was "a material inducement" to the Lenders' purchases of the CalGen Debt, as well as the Agent's contention that the potential for difficulty in valuing partial obligations warrants retention (and bars subordination) of all liens, simply are not credible. Id.

[35] Collateral Security Agreement § 1.2.

creditor received in return for its claims a distribution of in-kind securities rather than cash and the transaction was effected pursuant to Section 363 rather than a Chapter 11 plan *specifically* for the purpose of disenfranchising the creditors.  Id. at 9 (citing In re WestPoint Stevens, Inc., 333 B.R. 30, 52 (S.D.N.Y. 2005)).  Other than the fact that WestPoint Stevens was a bankruptcy case involving secured creditors, it bears no resemblance (or relevance) to this appeal.[36]

> Because neither the operative documents nor applicable law prevents release or subordination of the Collateral Agent's liens, the Bankruptcy Court did not err in diminishing the Collateral Agent's liens.

## IV.    The Bankruptcy Court Did Not Err In Extinguishing The Lenders' Claims.

> The Lenders all assign error of some sort to the Amended Repayment Order on the ground that the Order improperly extinguished the Lenders' claims against the CalGen Guarantors.  Revealingly, none of the Lenders points to a specific provision in the Amended Repayment Order or clearly articulates a persuasive argument as to why it would be inappropriate (much less prejudicial) for the Bankruptcy Court to extinguish a guarantee claim in connection with an allowed claim that has been repaid in full or a claim that has been disallowed.

> The Amended Repayment Order properly implemented the Memorandum Decision in that it:  (A) provided for the repayment of the Lenders' outstanding principal and accrued interest at the non-default contract rate; (B) preserved a claim for default-rate interest

---

[36]    The Collateral Agent also cites to Bankruptcy Rule 7001 for the proposition that determination of the extent of a lien requires an adversary proceeding, id. at 9 n.6, but overlooks ample authority holding otherwise, especially where, as here, the lien issue is wrapped up in the determination of numerous other issues.  See, e.g., In re Command Services Corp., 102 B.R. 905, 908 (Bankr. N.D.N.Y. 1989) ("Courts have concluded that where the rights of the affected parties have been adequately presented so that no prejudice has arisen, form will not be elevated over substance and the matter will be allowed to proceed on the merits as originally filed.") (collecting cases); id. at 909 (lien determination may be resolved by motion if it is sought in the context of other relief sharing a similar basis).  Crucially, the Collateral Agent does not—because it cannot—assert that it was prejudiced in any way by the absence of an adversary proceeding.

if the Court determines the Lenders are entitled to it; and (C) awarded the Lenders unsecured claims for their makewhole premium demands. Id. ¶¶ 3-6. Accordingly, given that the Amended Repayment Order determined the amounts of the CalGen Lenders' claims—with the sole exception of default interest[37]—and the Debtors have already repaid those claims in full in cash (as to outstanding principal and accrued interest) or will do so pursuant to the Debtors' Chapter 11 plan of reorganization (as to the Lenders' makewhole claims), the Bankruptcy Court was entirely justified in expunging the Lenders' claims beyond those that were allowable pursuant to the Memorandum Decision and already satisfied by the Debtors.

It is apparent that the Lenders are challenging the Amended Repayment Order because they disagree with the Memorandum Decision, which means the Lenders effectively are arguing that the Bankruptcy Court lacked authority to enter an order implementing its decision, or, alternatively, that the Bankruptcy Court should have stayed the effect of its Memorandum Decision in the absence of a motion for a stay pending appeal. Neither position is tenable. It is beyond cavil that a bankruptcy court has the authority to issue and enforce orders in support of its rulings. In re Chateaugay Corp., 201 B.R. 48, 62 (Bankr. S.D.N.Y.1996) ("Bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant under 28 U.S.C. § 1334."). Moreover, if the Lenders wanted to avoid the effect of the Amended Repayment Order prior to resolution of the instant appeal, they should have sought a stay pending appeal, which they did not.

---

[37] Any suggestion by the Lenders that the guarantee claims must be preserved to secure their *potential* recovery on their default interest claims is especially disingenuous in light of their repeated assertions that CalGen is fully solvent—and thus necessarily possessing sufficient funds to satisfy any default interest awards.

**V.    The Bankruptcy Court Did Not Err In Authorizing Repayment Of The CalGen Debt Outside Of A Plan Of Reorganization.**

At the close of their briefs, the CalGen First and Third Priority Noteholders halfheartedly allege their "procedural due process" rights were violated because the Bankruptcy Court allowed the Debtors to repay the CalGen Debt outside of a Chapter 11 plan of reorganization.  More specifically, the Lenders start with the flawed premise that the Bankruptcy Court "impaired" their claims by not awarding them secured claims for the entire amounts of damages they sought, go on to note that the Bankruptcy Code requires that impaired creditors be allowed to vote on a debtor's proposed reorganization plan, and thus conclude that their inability to vote deprived them of a due process right.

Tellingly, a nearly identical argument has already been waged unsuccessfully in these Chapter 11 Cases.  In mid-2006, the Bankruptcy Court granted the Debtors' motion to repay immediately the outstanding principal and accrued interest of the Calpine Corporation first lien debt, while postponing any litigation on the holders' makewhole claims until a later, more suitable time.  See Law Debenture Trust Co. of New York v. Calpine Corp. (In re Calpine Corp.), 356 B.R. 585, 589 (S.D.N.Y. 2007) (noting the Debtors' repayment motion requested that all parties "reserve all rights to litigate the disputed makewhole premium issue at the appropriate stage of these reorganization cases; for example, in the context of the plan confirmation or claims reconciliation processes . . . .").  The trustee for the Calpine Corporation first lien noteholders appealed Judge Lifland's ruling to the Southern District of New York, asserting the Bankruptcy Court's decision allowing the Debtors to repay principal and interest outside of a reorganization plan constituted unlawful impairment of their claims.  Judge Scheindlin rejected this argument as follows:

> [T]he Trustee's appeal boils down to the notion that because the bankruptcy court failed to order Debtors to pay Noteholders the Make-Whole Premium or make a determination that the Make-Whole Premium was not due, the bankruptcy court "violated the Noteholders' contractual rights and ***impaired their claims outside of a chapter 11 plan***."  Nothing

31

could be further from the truth because the bankruptcy court merely ordered the payment of the outstanding principal of the Notes for now so Debtors' estates would stop losing money, and preserved all parties' rights to litigate the Trustee's Make-Whole Premium Demand later.

In re Calpine, 356 B.R. at 596 (emphasis added).

Judge Scheindlin's reasoning applies with even greater force here. Not only did the Debtors repay the CalGen Lenders all outstanding principal and accrued interest, the Bankruptcy Court contemporaneously decided the Lenders' rights to damages. Accordingly, the Debtors' repayment in full of the CalGen Debt in no way "impaired" the Lenders' claims, and the Lenders' due process arguments are a red herring.

## VI.    The Bankruptcy Court Did Not Err In Limiting The Debtors' Obligation To Pay The Lenders' Professionals' Fees.

Soon after commencing their Chapter 11 Cases, the Debtors agreed, pursuant to an order entered by the Bankruptcy Court—known as the "Cash Collateral Order"—to pay to the CalGen Lenders, as adequate protection, the reasonable fees and expenses of the Lenders' counsel and other consultants. DA Tab E at 7. The Debtors' Refinancing Motion specifically sought to stop paying these fees, and with good reasons: upon the Debtors' repayment in full of the CalGen Debt principal and interest, there would be no justifiable basis for the Debtors to remain obligated to satisfy the Lender's massive legal bills— especially given that through just the first twelve months of the Chapter 11 Cases, the Debtors already had paid more that $5 million in fees to nearly a dozen law firms, financial advisors, and other consultants retained by the Lenders. Id.

Accordingly, in its amended order authorizing the Debtors' Refinancing Motion, the Bankruptcy Court ruled:

> The Debtors are authorized to discontinue all payments to the CalGen Lenders' professionals under the Cash Collateral Order as of the date the Repayment Amounts are paid; provided, however, that any reasonable professionals' fees incurred with respect to the litigation of default interest (before the Bankruptcy Court only) will be paid pursuant to the Cash Collateral Order.

DA Tab D at ¶ 8.  Notwithstanding that the Bankruptcy Court carved out an exception for the sole remaining issue in the Chapter 11 Cases involving the CalGen Lenders—whether the Lenders are entitled to default interest—the Lenders' opening briefs argue the Bankruptcy Court's ruling on this point was error.

As an initial matter, some of the Lenders go so far as to intimate that the Bankruptcy Court ruled the Lenders' counsel may not be paid ***at all*** for appealing the Repayment Motion (or litigating any other non-default interest issue).  See, e.g., Second Lien Noteholders' Opening Br. at 38 ("the Bankruptcy Court signed an order . . . which provided that the Second Priority Indenture Trustee and Second Priority Administrative Agent were not entitled to recover their fees or expenses incurred after March 29, 2007, the date that the Debtors prepaid the principal and non-default interest on their debt.")  This is, to put it mildly, an overstatement, as plainly nothing in the terms of the Bankruptcy Court's order precludes the CalGen Lenders from compensating their professionals for services rendered.

The Bankruptcy Court's order does provide, however, that the Debtors are not required to continue to shoulder this sizable burden, and the Court's ruling was entirely proper as a matter of law.  ***First***, the Cash Collateral Order expressly provides that the Debtors may request reductions in the adequate protection (*i.e.*, professionals' fees) granted to the CalGen Lenders.  DSA Tab L, at ¶ 25 ("nothing in this Order shall constitute a waiver of the Debtors' rights to . . . request reductions in or modifications to the adequate protection and relief provided hereunder . . . .").[38]  ***Second***, a bankruptcy court retains jurisdiction to modify orders previously entered in the case.  In re Chateaugay Corp., 201 B.R. 48, 62 (Bankr. S.D.N.Y. 1996) ("Bankruptcy courts have inherent or ancillary jurisdiction to

---

[38]    The Debtors also submit herewith a Reply Brief Appendix of Debtors-Appellees; *i.e.*, the "Debtors' Supplemental Appendix," to which citations will be set forth as "DSA Tab ___ at ___."

interpret and enforce their own orders wholly independent of the statutory grant under 28 U.S.C. § 1334.").

Furthermore, far from providing adequate protection, the Debtors' payment of the CalGen Lenders' professionals' fees merely incentivizes them to engage in continued litigation, aptly illustrating the concept of a moral hazard. Cf. Constant Ltd. P'ship v. Jamesway Corp. (In re Jamesway Corp.), 179 B.R. 33, 38 (S.D.N.Y. 1995) ("This Court will not create the perverse incentives and moral hazard that necessarily result from requiring bankruptcy courts to allow landlords to benefit from frivolous objections."). Indeed, notably, the instant circumstances are not the first time in these Chapter 11 Cases that the Bankruptcy Court has modified a lender's rights to professionals' fees upon the Debtors' repayment of principal and interest. After the Debtors repaid the holders of the Calpine Corporation first lien debt, the Bankruptcy Court discontinued the Debtors' obligation to continue paying the first lien noteholders' professional fees on essentially identical grounds, finding:

> What we're left with as a practical matter, is this estate funding the litigation against itself with respect to the make whole argument? That's a great incentive to carry on the litigation . . . the mere fact that there is incentive to continue an engine of litigation, based upon the fact that the fees for the adversary in that litigation are coming out of the estate, I find to be improvident, improper, and certainly under the changed circumstances that exist today, call for a modification of the arrangement of paying for fees as adequate protection.

DSA Tab M, at 47-48.

In sum, the Cash Collateral Order expressly provided for the modification of the Debtors' obligation to pay the Lenders' professional's fees, the Bankruptcy Court was authorized to modify its prior order, and the Court carefully and appropriately crafted its ruling to leave the Lenders adequately protected to litigate their default interest claims, while relieving the Debtors of having to fund continued ancillary litigation against their estates.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that this Court

reverse the Memorandum Decision's damages award and disallow the CalGen Lenders'

makewhole premium claims in their entirety.

Dated:  July 9, 2007

KIRKLAND & ELLIS LLP
Marc Kieselstein (admitted *pro hac vice*)
Aon Building
200 East Randolph Drive
Chicago, IL  60601-6636
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

/s/ Richard M. Cieri_____
KIRKLAND & ELLIS LLP
Richard M. Cieri (RC 6062)
Edward O. Sassower (ES 5823)
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4800

KIRKLAND & ELLIS LLP
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
655 15th Street, NW
Washington, D.C.  20005-5793
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

*Counsel for the Debtors-Appellees*