*Execution Version*

CALPINE GENERATING COMPANY, LLC

AND

CALGEN FINANCE CORP.

and each of the Guarantors named herein

FIRST PRIORITY SECURED FLOATING RATE NOTES DUE 2009

FIRST PRIORITY INDENTURE

Dated as of March 23, 2004

—————————————

WILMINGTON TRUST FSB

Trustee

—————————————

NY\876767.3

(5)    purchase money obligations for property acquired in the ordinary course of business and Capital Lease Obligations that impose restrictions on the property purchased or leased of the nature described in clauses (1) and (3) of the preceding paragraph;

(6)    any agreement for the sale or other disposition of a Subsidiary that restricts distributions by that Subsidiary pending the sale or other disposition;

(7)    Permitted Refinancing Indebtedness; *provided,* that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced;

(8)    Liens securing Indebtedness otherwise permitted to be incurred under the provisions of the covenant contained in Section 4.12 that limit the right of the debtor to dispose of the assets subject to such Liens or to use the proceeds of any such disposition;

(9)    provisions limiting or prohibiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements entered into with the approval of the Company's Board of Directors, which limitation or prohibition is applicable only to the assets that are the subject of such agreements;

(10)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business; and

(11)    provisions restricting or encumbering the sale or other disposition of Expansion Assets or the payment of dividends, distributions or similar payments made from cash flow derived exclusively from Expansion Assets, in each case pursuant to the terms of any Expansion Debt incurred pursuant to clause (3) of the definition of Permitted Debt; *provided,* that such encumbrance or restriction will not materially adversely affect the Company's ability to meet its obligations on the Notes when due, and, in the written opinion of the president, chief operating officer or chief financial officer of the Company, is required in order to obtain such Expansion Debt and is customary for financings of such type.

Section 4.09    *Incurrence of Indebtedness and Issuance of Preferred Equity.*

The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "*incur*") any Indebtedness (including Acquired Debt), and the Company will not issue any Disqualified Stock and will not permit any of its Subsidiaries to issue any shares of preferred equity.

The preceding paragraph will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "Permitted Debt"):

(1)    the incurrence by the Company (and the guarantee by its Subsidiaries) of:

(a)    Indebtedness and letters of credit under Credit Facilities in an aggregate principal amount at any one time outstanding under this clause (1)(a) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Company and its Subsidiaries thereunder) not to exceed $800.0 million, *less the*

aggregate amount of all Net Proceeds of Asset Sales, Casualty Events or Condemnation Events applied by the Company or any of its Subsidiaries since the Closing Date to repay any term Indebtedness under any such Credit Facility or to repay, or cash collateralize letters of credit under, any revolving Indebtedness under any such Credit Facility and effect a corresponding commitment reduction thereunder; and

(b)    Indebtedness and letters of credit under Credit Facilities in an aggregate principal amount outstanding under this clause (1)(b) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Company and its Subsidiaries thereunder) not to exceed $100.0 million, *less* the aggregate amount of all Net Proceeds of Asset Sales, Casualty Events and Condemnation Events applied by the Company or any of its Subsidiaries since the Closing Date to repay any term Indebtedness under any such Credit Facility or to repay, or cash collateralize letters of credit under, any revolving Indebtedness under any such Credit Facility and effect a corresponding commitment reduction thereunder;

(2)    the incurrence by the Issuers and the Guarantors of Indebtedness represented by the Notes, the Second Priority Notes and the Third Priority Notes to be issued on the Closing Date, the related Subsidiary guarantees and the other Obligations incurred under the Indentures on the Closing Date, and the Exchange Notes and the related Subsidiary guarantees to be issued pursuant to the Registration Rights Agreement;

(3)    the incurrence by the Company or any of its Subsidiaries of Expansion Debt; *provided*, that:

(a)    any Expansion Debt incurred by the Excluded Subsidiary is recourse only to the Expansion Assets financed with such Expansion Debt and to other Expansion Assets owned by the Excluded Subsidiary (including any rights of the Excluded Subsidiary under Shared Facilities Arrangements);

(b)    if the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Expansion Debt is incurred would have been at least 2.0 to 1.0, determined on a Pro Forma basis as if the Expansion Debt had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved), at least 25% of the cost of such Expansion Assets is financed with Equity Contributions or the proceeds of Perpetual Preferred Stock or Affiliate Subordinated Indebtedness;

(c)    if the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Expansion Debt is incurred would have been less than 2.0 to 1.0, determined on a Pro Forma basis as if the Expansion Debt had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved),

(i)    at least 40% of the cost of such Expansion Assets is financed with Equity Contributions or the proceeds of Perpetual Preferred Stock or Affiliate Subordinated Indebtedness, and

(ii)    after giving effect to such incurrence, the amount of Expansion Debt incurred pursuant to this clause (3), together with the aggregate amount of all other Expansion Debt then outstanding, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Expansion Debt incurred pursuant to this clause (3), does not exceed $250.0 million;

(4)    the incurrence by the Company or any of its Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to refund, refinance or replace, Indebtedness (other than intercompany Indebtedness) that was permitted by this Indenture to be incurred under clauses (2), (3), (4) or (10) of this paragraph;

(5)    the incurrence by the Company or any Guarantor of intercompany Indebtedness between or among the Company and any Guarantor that is subordinated in right of payment to all Secured Obligations pursuant to a customary subordination agreement delivered to the Collateral Agent (together with all other documents or instruments required to effect such subordination and any other documents reasonably requested by the Collateral Agent in connection therewith), and is not secured other than by unperfected security interests; *provided, however,* that (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Guarantor and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Guarantor will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Company or such Guarantor, as the case may be, that was not permitted by this clause (5); and *provided, further,* that any such intercompany Indebtedness must be included in the Collateral;

(6)    the incurrence by the Company or any of its Subsidiaries of Hedging Obligations, in connection with Permitted Debt or otherwise, in the ordinary course of business and not for speculative purposes; *provided,* that (a) such Hedging Obligations have tenors that expire on or prior to the maturity date (or other expiration) of the underlying obligation being hedged, and (b) any such Hedging Obligations hedging or managing interest rate risk with respect to (i) First Priority Lien Debt have tenors that expire on or prior to the Stated Maturity of the Notes, (ii) Second Priority Lien Debt have tenors that expire on or prior to the Stated Maturity of the Second Priority Notes, or (iii) Third Priority Lien Debt have tenors that expire on or prior to the Stated Maturity of the Third Priority Notes;

(7)    the incurrence by the Company or any of its Subsidiaries of Indebtedness in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances, and performance and surety bonds in the ordinary course of business;

(8)    the incurrence by the Company or any of its Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five Business Days;

(9)    the incurrence by the Company of (a) Affiliate Subordinated Indebtedness in an aggregate principal amount not to exceed $250.0 million at any one time outstanding and (b) Working Capital Facility Indebtedness in an aggregate principal amount not to exceed $750.0 million at any one time outstanding;

(10)    the incurrence by the Company of Third Party Subordinated Indebtedness; *provided,* that:

(a)    the net proceeds of the Third Party Subordinated Indebtedness are applied:

(i)    to acquire all or substantially all of the assets of, or any Equity Interests in, a business that constitutes a Permitted Business; *provided*, that in the case of an acquisition of Equity Interests, the business is or becomes a Subsidiary of the Company and a Guarantor concurrently with such acquisition;

(ii)    to make a capital expenditure;

(iii)    to acquire other assets that are not classified as current assets under GAAP and that are used or useful in a Permitted Business; or

(iv)    any combination of the foregoing; and

(b)    the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Third Party Subordinated Indebtedness is incurred would have been at least 2.0 to 1.0, determined on a Pro Forma basis as if the Third Party Subordinated Indebtedness had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved).

The Company will not incur, and will not permit any Subsidiary to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Company or such Subsidiary unless such Indebtedness is also contractually subordinated in right of payment to the Secured Obligations on substantially identical terms or on terms that are more favorable to the holders of the Secured Obligations; *provided, however*, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Company or any of its Subsidiaries solely by virtue of being unsecured or by virtue of being secured on a junior basis.

For purposes of determining compliance with this Section 4.09, in the event that an item of proposed Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (10) above, the Company will be permitted to classify such item of Indebtedness on the date of its incurrence, or later reclassify all or a portion of such item of Indebtedness, in any manner that complies with this Section 4.09. The accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Stock in the form of additional shares of the same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock for purposes of this covenant. Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that the Company or any Subsidiary may incur pursuant to this covenant shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

Section 4.10    *Asset Sales.*

The Company will not, and will not permit any of its Subsidiaries to, consummate any Asset Sale unless:

(12)    any agreement to do any of the foregoing.

Section 4.12    *Liens.*

The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset now owned or hereafter acquired, except Permitted Liens.

Section 4.13    *Business Activities.*

The Company will not, and will not permit any of its Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Company and its Subsidiaries taken as a whole.

The Company will, and will cause its Subsidiaries to, perform all their obligations under the Major Project Documents, and the Company will not, and will not permit any of its Subsidiaries to, terminate, amend or otherwise modify, or consent to any termination, amendment or modification of, or grant any waiver under, any Major Project Document, unless any failure to so perform or any such termination, amendment, modification or waiver would not, when taken together with all other such failures to perform, terminations, amendments, modifications and waivers since the Closing Date, be Materially Adverse, as evidenced by a certificate of the chief financial officer of the Company; *provided, however,* that the provisions of this paragraph will not apply to any amendment, modification or termination of any Major Project Document required under this Indenture in connection with an Asset Sale.

The Company will, and will cause its Subsidiaries to, obtain and maintain all permits and approvals necessary for the construction and operation of the Facilities, including applicable exemptions from PUHCA, unless the failure to do so would not reasonably be expected to have a Material Adverse Effect.

The Company will not, and will not permit any of its Subsidiaries to, use or dispose of any hazardous materials or allow any hazardous materials to be brought onto or stored or used on or transported to or released from the Facilities, other than in accordance with prudent industry practices and in compliance with all applicable environmental laws, except to the extent such non-compliance, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 4.14    *Corporate Existence.*

Subject to Article 5, the Company will do or cause to be done all things necessary to preserve and keep in full force and effect:

(1)    its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidiary; and

(2)    the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries; *provided, however,* that the Company will not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

consideration is offered to be paid and is paid to all Holders that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

Section 4.18    *Restrictions on Activities of CalGen Finance.*

CalGen Finance will not hold any material assets, become liable for any material obligations or engage in any significant business activities; *provided,* that CalGen Finance may be a co-obligor or guarantor with respect to Indebtedness if the Company is an obligor on such Indebtedness and the net proceeds of such Indebtedness are received by the Company, CalGen Finance or one or more of the Company's other Subsidiaries.

Section 4.19    *Deposit of Revenues.*

The Company will, and will cause its Subsidiaries to, deposit all revenues received by the Company and its Subsidiaries, within 10 Business Days of receipt thereof, in the "Revenue Account" established under the Control Agreement. Notwithstanding the foregoing, Excess Cash Flow may be distributed in accordance with Section 4.07.

Section 4.20    *Additional Subsidiaries.*

If the Company or any of its Subsidiaries acquires or creates another Subsidiary after the Closing Date, then (1) that newly acquired or created Subsidiary will become a Guarantor and execute a supplemental indenture in the form of Exhibit G and deliver an Opinion of Counsel reasonably satisfactory to the Trustee within 30 days of the date on which it was acquired or created, and (2) all real and personal property of that Subsidiary will become part of the Collateral within 30 days of the date on which that Subsidiary was acquired or created pursuant to documentation (including Security Documents, financing statements, opinions and other documents) reasonably satisfactory to the Trustee and the Collateral Agent.

Section 4.21    *Maintenance of Insurance.*

The Company will, and will cause its Subsidiaries to, maintain with financially sound and reputable insurance companies, insurance on their property and assets (including the Collateral), in at least such amounts, with such deductibles and against at least such risks as is customary for companies of the same or similar size engaged in the same or similar businesses as those of the Company and its Subsidiaries and furnish to the Collateral Agent, upon written request, full information as to such Persons' property and liability insurance carriers. The Company will, and will cause the Guarantors to, cause all their insurance policies to name the Secured Parties, as a class, as additional insureds, with a waiver of subrogation, and shall cause all their property and casualty policies to name the Collateral Agent as loss payee (together with other lien holders as their interests may appear), with 30 days notice of cancellation or material change.

Section 4.22    *Financial Covenants.*

The Company will cause the ratio of (x) Consolidated EBITDA to (y) Consolidated Interest Expense, as of the end of each fiscal quarter of the Company, to be equal to or greater than 1.05 to 1.0.

The Company will cause the ratio of (x) the aggregate principal amount outstanding of Notes, First Priority Term Loans, Revolving Loans, Second Priority Notes and Second Priority Term Loans to (y) the combined Estimated Peak Capacity of all of the Facilities (including all Facilities in operation and

under construction) owned by the Company and its Subsidiaries (expressed in kilowatts), as of the end of each fiscal quarter of the Company, to be equal to or less than $235 per kilowatt.

Section 4.23    *Changes in Covenants when Third Priority Notes Rated Investment Grade.*

If on any date following the Closing Date:

(1)    after giving effect to the suspension of covenants (and the Event of Default) described below in the Third Priority Indenture, the Third Priority Notes are rated Baa3 or better by Moody's and BBB- or better by S&P; and

(2)    no Default or Event of Default shall have occurred and then be continuing,

then, beginning on that day and subject to the provisions of the following paragraph, the covenants (and the Event of Default) of this Indenture specifically listed below will be suspended:

(a)    Section 4.07 (Restricted Payments);

(b)    Section 4.08 (Dividend and Other Payment Restrictions Affecting Subsidiaries);

(c)    Section 4.09 (Incurrence of Indebtedness and Issuance of Preferred Equity);

(e)    Section 4.10 (Deposit of Revenues);

(d)    Section 4.13 (Business Activities); and

(f)    clause (9) under Section 6.01 (Events of Default).

Notwithstanding the foregoing, if the rating assigned to the Third Priority Notes by either Moody's or S&P should subsequently decline to below Baa3 or BBB-, respectively, the foregoing covenants (and the Event of Default) will be reinstituted with respect to the Notes as of and from the date of such rating decline. Calculations under reinstated Section 4.07 will be made as if such covenant had been in effect since the Closing Date except that no Default will be deemed to have occurred solely by reason of a Restricted Payment made while such covenant was suspended.

## ARTICLE 5.
## SUCCESSORS

Section 5.01    *Merger, Consolidation, or Sale of Assets.*

The Company will not, directly or indirectly:

(1)    consolidate or merge with or into another Person (whether or not the Company is the surviving corporation); or

(2)    sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company and its Subsidiaries taken as a whole, in one or more related transactions, to another Person; or

(3)    lease all or substantially all of its properties or assets, in one or more related transactions, to any other Person.

NY\876767.3

*Execution Version*

THE NOTES ISSUED UNDER THIS SECOND PRIORITY INDENTURE ARE ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES AND ARE SUBJECT TO TREASURY REGULATIONS REGARDING THE REPORTING OF ORIGINAL ISSUE DISCOUNT.  HOLDERS MAY CONTACT THE CHIEF FINANCIAL OFFICER OF THE COMPANY AT 50 WEST SAN FERNANDO STREET, 5TH FLOOR, SAN JOSE, CALIFORNIA 95113, WHO WILL PROVIDE UPON REQUEST INFORMATION RELATING TO ORIGINAL ISSUE DISCOUNT, INCLUDING THE ISSUE PRICE, THE AMOUNT OF ORIGINAL ISSUE DISCOUNT, THE ISSUE DATE, AND THE YIELD TO MATURITY.

CALPINE GENERATING COMPANY, LLC

AND

CALGEN FINANCE CORP.

and each of the Guarantors named herein

SECOND PRIORITY SECURED FLOATING RATE NOTES DUE 2010

SECOND PRIORITY INDENTURE

Dated as of March 23, 2004

WILMINGTON TRUST FSB

Trustee

encumbrance or restriction will not materially adversely affect the Company's ability to meet its obligations on the Notes when due, and, in the written opinion of the president, chief operating officer or chief financial officer of the Company, is required in order to obtain such Expansion Debt and is customary for financings of such type.

Section 4.09    *Incurrence of Indebtedness and Issuance of Preferred Equity.*

The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "*incur*") any Indebtedness (including Acquired Debt), and the Company will not issue any Disqualified Stock and will not permit any of its Subsidiaries to issue any shares of preferred equity.

The preceding paragraph will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "Permitted Debt"):

(1)     the incurrence by the Company (and the guarantee by its Subsidiaries) of:

(a)     Indebtedness and letters of credit under Credit Facilities in an aggregate principal amount at any one time outstanding under this clause (1)(a) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Company and its Subsidiaries thereunder) not to exceed $800.0 million, *less* the aggregate amount of all Net Proceeds of Asset Sales, Casualty Events or Condemnation Events applied by the Company or any of its Subsidiaries since the Closing Date to repay any term Indebtedness under any such Credit Facility or to repay, or cash collateralize letters of credit under, any revolving Indebtedness under any such Credit Facility and effect a corresponding commitment reduction thereunder; and

(b)     Indebtedness and letters of credit under Credit Facilities in an aggregate principal amount outstanding under this clause (1)(b) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Company and its Subsidiaries thereunder) not to exceed $100.0 million, *less* the aggregate amount of all Net Proceeds of Asset Sales, Casualty Events and Condemnation Events applied by the Company or any of its Subsidiaries since the Closing Date to repay any term Indebtedness under any such Credit Facility or to repay, or cash collateralize letters of credit under, any revolving Indebtedness under any such Credit Facility and effect a corresponding commitment reduction thereunder;

(2)     the incurrence by the Issuers and the Guarantors of Indebtedness represented by the First Priority Notes, the Notes and the Third Priority Notes to be issued on the Closing Date, the related Subsidiary guarantees and the other Obligations incurred under the Indentures on the Closing Date, and the Exchange Notes and the related Subsidiary guarantees to be issued pursuant to the Registration Rights Agreement;

(3)     the incurrence by the Company or any of its Subsidiaries of Expansion Debt; *provided*, that:

(a)     any Expansion Debt incurred by the Excluded Subsidiary is recourse only to the Expansion Assets financed with such Expansion Debt and to other Expansion Assets owned by the Excluded Subsidiary (including any rights of the Excluded Subsidiary under Shared Facilities Arrangements);

(b)    if the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Expansion Debt is incurred would have been at least 2.0 to 1.0, determined on a Pro Forma basis as if the Expansion Debt had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved), at least 25% of the cost of such Expansion Assets is financed with Equity Contributions or the proceeds of Perpetual Preferred Stock or Affiliate Subordinated Indebtedness;

(c)    if the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Expansion Debt is incurred would have been less than 2.0 to 1.0, determined on a Pro Forma basis as if the Expansion Debt had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved),

(i)    at least 40% of the cost of such Expansion Assets is financed with Equity Contributions or the proceeds of Perpetual Preferred Stock or Affiliate Subordinated Indebtedness, and

(ii)    after giving effect to such incurrence, the amount of Expansion Debt incurred pursuant to this clause (3), together with the aggregate amount of all other Expansion Debt then outstanding, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Expansion Debt incurred pursuant to this clause (3), does not exceed $250.0 million;

(4)    the incurrence by the Company or any of its Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to refund, refinance or replace, Indebtedness (other than intercompany Indebtedness) that was permitted by this Indenture to be incurred under clauses (2), (3), (4) or (10) of this paragraph;

(5)    the incurrence by the Company or any Guarantor of intercompany Indebtedness between or among the Company and any Guarantor that is subordinated in right of payment to all Secured Obligations pursuant to a customary subordination agreement delivered to the Collateral Agent (together with all other documents or instruments required to effect such subordination and any other documents reasonably requested by the Collateral Agent in connection therewith), and is not secured other than by unperfected security interests; *provided, however*, that (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Guarantor and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Guarantor will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Company or such Guarantor, as the case may be, that was not permitted by this clause (5); and *provided, further*, that any such intercompany Indebtedness must be included in the Collateral;

(6)    the incurrence by the Company or any of its Subsidiaries of Hedging Obligations, in connection with Permitted Debt or otherwise, in the ordinary course of business and not for speculative purposes; *provided*, that (a) such Hedging Obligations have tenors that expire on or prior to the maturity date (or other expiration) of the underlying obligation being hedged, and (b)

any such Hedging Obligations hedging or managing interest rate risk with respect to (i) First Priority Lien Debt have tenors that expire on or prior to the Stated Maturity of the First Priority Notes, (ii) Second Priority Lien Debt have tenors that expire on or prior to the Stated Maturity of the Notes, or (iii) Third Priority Lien Debt have tenors that expire on or prior to the Stated Maturity of the Third Priority Notes;

(7)    the incurrence by the Company or any of its Subsidiaries of Indebtedness in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances, and performance and surety bonds in the ordinary course of business;

(8)    the incurrence by the Company or any of its Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five Business Days;

(9)    the incurrence by the Company of (a) Affiliate Subordinated Indebtedness in an aggregate principal amount not to exceed $250.0 million at any one time outstanding and (b) Working Capital Facility Indebtedness in an aggregate principal amount not to exceed $750.0 million at any one time outstanding;

(10)    the incurrence by the Company of Third Party Subordinated Indebtedness; *provided*, that:

(a)    the net proceeds of the Third Party Subordinated Indebtedness are applied:

(i)    to acquire all or substantially all of the assets of, or any Equity Interests in, a business that constitutes a Permitted Business; *provided*, that in the case of an acquisition of Equity Interests, the business is or becomes a Subsidiary of the Company and a Guarantor concurrently with such acquisition;

(ii)    to make a capital expenditure;

(iii)    to acquire other assets that are not classified as current assets under GAAP and that are used or useful in a Permitted Business; or

(iv)    any combination of the foregoing; and

(b)    the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Third Party Subordinated Indebtedness is incurred would have been at least 2.0 to 1.0, determined on a Pro Forma basis as if the Third Party Subordinated Indebtedness had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved).

The Company will not incur, and will not permit any Subsidiary to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Company or such Subsidiary unless such Indebtedness is also contractually subordinated in right of payment to the Secured Obligations on substantially identical terms or on terms

that are more favorable to the holders of the Secured Obligations; *provided, however*, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Company or any of its Subsidiaries solely by virtue of being unsecured or by virtue of being secured on a junior basis.

For purposes of determining compliance with this Section 4.09, in the event that an item of proposed Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (10) above, the Company will be permitted to classify such item of Indebtedness on the date of its incurrence, or later reclassify all or a portion of such item of Indebtedness, in any manner that complies with this Section 4.09. The accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Stock in the form of additional shares of the same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock for purposes of this covenant. Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that the Company or any Subsidiary may incur pursuant to this covenant shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

Section 4.10    *Asset Sales.*

The Company will not, and will not permit any of its Subsidiaries to, consummate any Asset Sale unless:

    (1)    except with respect to an Asset Sale made pursuant to an Existing Purchase Option, the Company (or any of its Subsidiaries, as the case may be) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests issued or sold or otherwise disposed of;

    (2)    at least 90% of the consideration received in the Asset Sale by the Company or such Subsidiary is in the form of cash. For purposes of this provision, each of the following will be deemed to be cash:

        (a)    any liabilities, as shown on the Company's most recent consolidated balance sheet, of the Company or any of its Subsidiaries (other than contingent liabilities and liabilities that are by their terms subordinated to the Notes or any Subsidiary Guarantee) that are assumed by the transferee of any such assets pursuant to a customary novation or similar agreement that releases the Company or such Subsidiary from further liability;

        (b)    any securities, notes or other obligations received by the Company or any such Subsidiary from such transferee that are promptly, subject to ordinary settlement periods, converted by the Company or such Subsidiary into cash, to the extent of the cash received in that conversion; and

        (c)    in connection with the exercise by a purchaser of an Existing Purchase Option, any amount owed by the Company or the applicable Subsidiary to the purchaser under the agreement containing such Existing Purchase Option that is set off by the purchaser against the purchase price;

(5)    any issuance of Equity Interests (other than Disqualified Stock) of the Company to Affiliates of the Company; *provided*, that such Equity Interests are included in the Collateral;

(6)    Restricted Payments that do not violate Section 4.07;

(7)    loans or advances to employees in the ordinary course of business not to exceed $1.0 million in the aggregate at any one time outstanding;

(8)    Permitted Tax Payments;

(9)    transactions under or pursuant to written agreements with Affiliates of the Company in place as of the Closing Date or any amendment or modification thereto, so long as any such amendment or modification meets the requirements of clause (10) or (11) of this paragraph;

(10)    any amendments or modifications of, or waivers under, any written agreement described under clause (9) of this paragraph that is not a Major Project Document; *provided*, that no such amendment, modification or waiver alters any such agreement in a manner that is materially adverse to the Holders;

(11)    any amendments or modifications of, or waivers under, any Major Project Document, which are permitted by Section 4.13 and are on terms that are no less favorable to the Company or its relevant Subsidiary (as certified to the Trustee in an Officer's Certificate) than those that would have been obtained in a comparable transaction by the Company or such Subsidiary with an unrelated Person; and

(12)    any agreement to do any of the foregoing.

Section 4.12    *Liens.*

The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset now owned or hereafter acquired, except Permitted Liens.

Section 4.13    *Business Activities.*

The Company will not, and will not permit any of its Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Company and its Subsidiaries taken as a whole.

The Company will, and will cause its Subsidiaries to, perform all their obligations under the Major Project Documents, and the Company will not, and will not permit any of its Subsidiaries to, terminate, amend or otherwise modify, or consent to any termination, amendment or modification of, or grant any waiver under, any Major Project Document, unless any failure to so perform or any such termination, amendment, modification or waiver would not, when taken together with all other such failures to perform, terminations, amendments, modifications and waivers since the Closing Date, be Materially Adverse, as evidenced by a certificate of the chief financial officer of the Company; *provided, however*, that the provisions of this paragraph will not apply to any amendment, modification or termination of any Major Project Document required under this Indenture in connection with an Asset Sale.

The Company will, and will cause its Subsidiaries to, obtain and maintain all permits and approvals necessary for the construction and operation of the Facilities, including applicable exemptions from PUHCA, unless the failure to do so would not reasonably be expected to have a Material Adverse Effect.

The Company will not, and will not permit any of its Subsidiaries to, use or dispose of any hazardous materials or allow any hazardous materials to be brought onto or stored or used on or transported to or released from the Facilities, other than in accordance with prudent industry practices and in compliance with all applicable environmental laws, except to the extent such non-compliance, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 4.14    *Corporate Existence.*

Subject to Article 5, the Company will do or cause to be done all things necessary to preserve and keep in full force and effect:

(1)    its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidiary; and

(2)    the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries; *provided, however,* that the Company will not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

Section 4.15    *Offer to Repurchase Upon Change of Control.*

(a)    Upon the occurrence of a Change of Control, the Issuers will make an offer (a "*Change of Control Offer*") to each Holder to repurchase all or any part (equal to $1,000 or an integral multiple of $1,000) of such Holder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest and Special Interest, if any, on the Notes repurchased, to, but excluding, the date of purchase (the "*Change of Control Payment*"), subject to the rights of Holders on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuers will mail a notice to each Holder describing the transaction or transactions that constitute the Change of Control and stating:

(1)    that the Change of Control Offer is being made pursuant to this Section 4.15 and that all Notes tendered will be accepted for payment;

(2)    the purchase price and the purchase date, which shall be no earlier than 30 days and no later than 60 days from the date such notice is mailed (the "*Change of Control Payment Date*");

(3)    that any Note not tendered will continue to accrue interest;

(4)    that, unless the Issuers default in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest after the Change of Control Payment Date;

satisfactory to the Trustee within 30 days of the date on which it was acquired or created, and (2) all real and personal property of that Subsidiary will become part of the Collateral within 30 days of the date on which that Subsidiary was acquired or created pursuant to documentation (including Security Documents, financing statements, opinions and other documents) reasonably satisfactory to the Trustee and the Collateral Agent.

Section 4.21    *Maintenance of Insurance.*

The Company will, and will cause its Subsidiaries to, maintain with financially sound and reputable insurance companies, insurance on their property and assets (including the Collateral), in at least such amounts, with such deductibles and against at least such risks as is customary for companies of the same or similar size engaged in the same or similar businesses as those of the Company and its Subsidiaries and furnish to the Collateral Agent, upon written request, full information as to such Persons' property and liability insurance carriers. The Company will, and will cause the Guarantors to, cause all their insurance policies to name the Secured Parties, as a class, as additional insureds, with a waiver of subrogation, and shall cause all their property and casualty policies to name the Collateral Agent as loss payee (together with other lien holders as their interests may appear), with 30 days notice of cancellation or material change.

Section 4.22    *Financial Covenants.*

The Company will cause the ratio of (x) Consolidated EBITDA to (y) Consolidated Interest Expense, as of the end of each fiscal quarter of the Company, to be equal to or greater than 1.05 to 1.0.

The Company will cause the ratio of (x) the aggregate principal amount outstanding of First Priority Notes, First Priority Term Loans, Revolving Loans, Notes and Second Priority Term Loans to (y) the combined Estimated Peak Capacity of all of the Facilities (including all Facilities in operation and under construction) owned by the Company and its Subsidiaries (expressed in kilowatts), as of the end of each fiscal quarter of the Company, to be equal to or less than $235 per kilowatt.

Section 4.23    *Changes in Covenants when Third Priority Notes Rated Investment Grade.*

If on any date following the Closing Date:

(1)    after giving effect to the suspension of covenants (and the Event of Default) described below in the Third Priority Indenture, the Third Priority Notes are rated Baa3 or better by Moody's and BBB- or better by S&P; and

(2)    no Default or Event of Default shall have occurred and then be continuing,

then, beginning on that day and subject to the provisions of the following paragraph, the covenants (and the Event of Default) of this Indenture specifically listed below will be suspended:

(a)    Section 4.07 (Restricted Payments);

(b)    Section 4.08 (Dividend and Other Payment Restrictions Affecting Subsidiaries);

(c)    Section 4.09 (Incurrence of Indebtedness and Issuance of Preferred Equity);

(e)    Section 4.10 (Deposit of Revenues);

*Execution Version*

CALPINE GENERATING COMPANY, LLC

AND

CALGEN FINANCE CORP.

and each of the Guarantors named herein

THIRD PRIORITY SECURED FLOATING RATE NOTES DUE 2011

11½% THIRD PRIORITY SECURED NOTES DUE 2011

THIRD PRIORITY INDENTURE

Dated as of March 23, 2004

WILMINGTON TRUST FSB

Trustee

(9)      provisions limiting or prohibiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements entered into with the approval of the Company's Board of Directors, which limitation or prohibition is applicable only to the assets that are the subject of such agreements;

(10)      restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business; and

(11)      provisions restricting or encumbering the sale or other disposition of Expansion Assets or the payment of dividends, distributions or similar payments made from cash flow derived exclusively from Expansion Assets, in each case pursuant to the terms of any Expansion Debt incurred pursuant to clause (3) of the definition of Permitted Debt; *provided*, that such encumbrance or restriction will not materially adversely affect the Company's ability to meet its obligations on the Notes when due, and, in the written opinion of the president, chief operating officer or chief financial officer of the Company, is required in order to obtain such Expansion Debt and is customary for financings of such type.

Section 4.09      *Incurrence of Indebtedness and Issuance of Preferred Equity.*

The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "*incur*") any Indebtedness (including Acquired Debt), and the Company will not issue any Disqualified Stock and will not permit any of its Subsidiaries to issue any shares of preferred equity.

The preceding paragraph will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "Permitted Debt"):

(1)      the incurrence by the Company (and the guarantee by its Subsidiaries) of:

(a)      Indebtedness and letters of credit under Credit Facilities in an aggregate principal amount at any one time outstanding under this clause (1)(a) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Company and its Subsidiaries thereunder) not to exceed $800.0 million, *less* the aggregate amount of all Net Proceeds of Asset Sales, Casualty Events or Condemnation Events applied by the Company or any of its Subsidiaries since the Closing Date to repay any term Indebtedness under any such Credit Facility or to repay, or cash collateralize letters of credit under, any revolving Indebtedness under any such Credit Facility and effect a corresponding commitment reduction thereunder; and

(b)      Indebtedness and letters of credit under Credit Facilities in an aggregate principal amount outstanding under this clause (1)(b) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Company and its Subsidiaries thereunder) not to exceed $100.0 million, *less* the aggregate amount of all Net Proceeds of Asset Sales, Casualty Events and Condemnation Events applied by the Company or any of its Subsidiaries since the Closing Date to repay any term Indebtedness under any such Credit Facility or to repay, or cash collateralize letters of credit under, any revolving Indebtedness under any such Credit Facility and effect a corresponding commitment reduction thereunder;

(2)    the incurrence by the Issuers and the Guarantors of Indebtedness represented by the First Priority Notes, the Second Priority Notes and the Notes to be issued on the Closing Date, the related Subsidiary guarantees and the other Obligations incurred under the Indentures on the Closing Date, and the Exchange Notes and the related Subsidiary guarantees to be issued pursuant to the Registration Rights Agreement;

(3)    the incurrence by the Company or any of its Subsidiaries of Expansion Debt; *provided*, that:

(a)    any Expansion Debt incurred by the Excluded Subsidiary is recourse only to the Expansion Assets financed with such Expansion Debt and to other Expansion Assets owned by the Excluded Subsidiary (including any rights of the Excluded Subsidiary under Shared Facilities Arrangements);

(b)    if the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Expansion Debt is incurred would have been at least 2.0 to 1.0, determined on a Pro Forma basis as if the Expansion Debt had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved), at least 25% of the cost of such Expansion Assets is financed with Equity Contributions or the proceeds of Perpetual Preferred Stock or Affiliate Subordinated Indebtedness;

(c)    if the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Expansion Debt is incurred would have been less than 2.0 to 1.0, determined on a Pro Forma basis as if the Expansion Debt had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved),

(i)    at least 40% of the cost of such Expansion Assets is financed with Equity Contributions or the proceeds of Perpetual Preferred Stock or Affiliate Subordinated Indebtedness, and

(ii)    after giving effect to such incurrence, the amount of Expansion Debt incurred pursuant to this clause (3), together with the aggregate amount of all other Expansion Debt then outstanding, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Expansion Debt incurred pursuant to this clause (3), does not exceed $250.0 million;

(4)    the incurrence by the Company or any of its Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to refund, refinance or replace, Indebtedness (other than intercompany Indebtedness) that was permitted by this Indenture to be incurred under clauses (2), (3), (4) or (10) of this paragraph;

(5)    the incurrence by the Company or any Guarantor of intercompany Indebtedness between or among the Company and any Guarantor that is subordinated in right of payment to all Secured Obligations pursuant to a customary subordination agreement delivered to the Collateral

Agent (together with all other documents or instruments required to effect such subordination and any other documents reasonably requested by the Collateral Agent in connection therewith), and is not secured other than by unperfected security interests; *provided, however*, that (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Guarantor and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Guarantor will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Company or such Guarantor, as the case may be, that was not permitted by this clause (5); and *provided, further*, that any such intercompany Indebtedness must be included in the Collateral;

(6)     the incurrence by the Company or any of its Subsidiaries of Hedging Obligations, in connection with Permitted Debt or otherwise, in the ordinary course of business and not for speculative purposes; *provided*, that (a) such Hedging Obligations have tenors that expire on or prior to the maturity date (or other expiration) of the underlying obligation being hedged, and (b) any such Hedging Obligations hedging or managing interest rate risk with respect to (i) First Priority Lien Debt have tenors that expire on or prior to the Stated Maturity of the First Priority Notes, (ii) Second Priority Lien Debt have tenors that expire on or prior to the Stated Maturity of the Second Priority Notes, or (iii) Third Priority Lien Debt have tenors that expire on or prior to the Stated Maturity of the Notes;

(7)     the incurrence by the Company or any of its Subsidiaries of Indebtedness in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances, and performance and surety bonds in the ordinary course of business;

(8)     the incurrence by the Company or any of its Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five Business Days;

(9)     the incurrence by the Company of (a) Affiliate Subordinated Indebtedness in an aggregate principal amount not to exceed $250.0 million at any one time outstanding and (b) Working Capital Facility Indebtedness in an aggregate principal amount not to exceed $750.0 million at any one time outstanding;

(10)     the incurrence by the Company of Third Party Subordinated Indebtedness; *provided*, that:

(a)     the net proceeds of the Third Party Subordinated Indebtedness are applied:

(i)     to acquire all or substantially all of the assets of, or any Equity Interests in, a business that constitutes a Permitted Business; *provided*, that in the case of an acquisition of Equity Interests, the business is or becomes a Subsidiary of the Company and a Guarantor concurrently with such acquisition;

(ii)     to make a capital expenditure;

(iii)     to acquire other assets that are not classified as current assets under GAAP and that are used or useful in a Permitted Business; or

(iv)     any combination of the foregoing; and

(b)    the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Third Party Subordinated Indebtedness is incurred would have been at least 2.0 to 1.0, determined on a Pro Forma basis as if the Third Party Subordinated Indebtedness had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved).

The Company will not incur, and will not permit any Subsidiary to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Company or such Subsidiary unless such Indebtedness is also contractually subordinated in right of payment to the Secured Obligations on substantially identical terms or on terms that are more favorable to the holders of the Secured Obligations; *provided, however*, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Company or any of its Subsidiaries solely by virtue of being unsecured or by virtue of being secured on a junior basis.

For purposes of determining compliance with this Section 4.09, in the event that an item of proposed Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (10) above, the Company will be permitted to classify such item of Indebtedness on the date of its incurrence, or later reclassify all or a portion of such item of Indebtedness, in any manner that complies with this Section 4.09. The accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Stock in the form of additional shares of the same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock for purposes of this covenant. Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that the Company or any Subsidiary may incur pursuant to this covenant shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

Section 4.10    *Asset Sales.*

The Company will not, and will not permit any of its Subsidiaries to, consummate any Asset Sale unless:

(1)    except with respect to an Asset Sale made pursuant to an Existing Purchase Option, the Company (or any of its Subsidiaries, as the case may be) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests issued or sold or otherwise disposed of;

(2)    at least 90% of the consideration received in the Asset Sale by the Company or such Subsidiary is in the form of cash. For purposes of this provision, each of the following will be deemed to be cash:

(a)    any liabilities, as shown on the Company's most recent consolidated balance sheet, of the Company or any of its Subsidiaries (other than contingent liabilities and liabilities that are by their terms subordinated to the Notes or any Subsidiary Guarantee) that are assumed by the transferee of any such assets pursuant to a customary novation or similar agreement that releases the Company or such Subsidiary from further liability;

(2)      transactions between or among the Company and/or any of the Guarantors (other than Shared Facility Arrangements);

(3)      transactions with a Person that is an Affiliate of the Company (but not a Subsidiary of the Company) solely because the Company owns, directly or through a Subsidiary, an Equity Interest in, or controls, such Person;

(4)      payment of reasonable directors' fees to Persons who are not otherwise Affiliates of the Company;

(5)      any issuance of Equity Interests (other than Disqualified Stock) of the Company to Affiliates of the Company; *provided*, that such Equity Interests are included in the Collateral;

(6)      Restricted Payments that do not violate Section 4.07;

(7)      loans or advances to employees in the ordinary course of business not to exceed $1.0 million in the aggregate at any one time outstanding;

(8)      Permitted Tax Payments;

(9)      transactions under or pursuant to written agreements with Affiliates of the Company in place as of the Closing Date or any amendment or modification thereto, so long as any such amendment or modification meets the requirements of clause (10) or (11) of this paragraph;

(10)      any amendments or modifications of, or waivers under, any written agreement described under clause (9) of this paragraph that is not a Major Project Document; *provided*, that no such amendment, modification or waiver alters any such agreement in a manner that is materially adverse to the Holders;

(11)      any amendments or modifications of, or waivers under, any Major Project Document, which are permitted by Section 4.13 and are on terms that are no less favorable to the Company or its relevant Subsidiary (as certified to the Trustee in an Officer's Certificate) than those that would have been obtained in a comparable transaction by the Company or such Subsidiary with an unrelated Person; and

(12)      any agreement to do any of the foregoing.

Section 4.12    *Liens.*

The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset now owned or hereafter acquired, except Permitted Liens.

Section 4.13    *Business Activities.*

The Company will not, and will not permit any of its Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Company and its Subsidiaries taken as a whole.

The Company will, and will cause its Subsidiaries to, perform all their obligations under the Major Project Documents, and the Company will not, and will not permit any of its Subsidiaries to, terminate, amend or otherwise modify, or consent to any termination, amendment or modification of, or grant any waiver under, any Major Project Document, unless any failure to so perform or any such termination, amendment, modification or waiver would not, when taken together with all other such failures to perform, terminations, amendments, modifications and waivers since the Closing Date, be Materially Adverse, as evidenced by a certificate of the chief financial officer of the Company; *provided, however,* that the provisions of this paragraph will not apply to any amendment, modification or termination of any Major Project Document required under this Indenture in connection with an Asset Sale.

The Company will, and will cause its Subsidiaries to, obtain and maintain all permits and approvals necessary for the construction and operation of the Facilities, including applicable exemptions from PUHCA, unless the failure to do so would not reasonably be expected to have a Material Adverse Effect.

The Company will not, and will not permit any of its Subsidiaries to, use or dispose of any hazardous materials or allow any hazardous materials to be brought onto or stored or used on or transported to or released from the Facilities, other than in accordance with prudent industry practices and in compliance with all applicable environmental laws, except to the extent such non-compliance, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 4.14    *Corporate Existence.*

Subject to Article 5, the Company will do or cause to be done all things necessary to preserve and keep in full force and effect:

(1)    its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidiary; and

(2)    the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries; *provided, however,* that the Company will not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

Section 4.15    *Offer to Repurchase Upon Change of Control.*

(a)    Upon the occurrence of a Change of Control, the Issuers will make an offer (a *"Change of Control Offer"*) to each Holder to repurchase all or any part (equal to $1,000 or an integral multiple of $1,000) of such Holder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest and Special Interest, if any, on the Notes repurchased, to, but excluding, the date of purchase (the *"Change of Control Payment"*), subject to the rights of Holders on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuers will mail a notice to each Holder describing the transaction or transactions that constitute the Change of Control and stating:

(1)    that the Change of Control Offer is being made pursuant to this Section 4.15 and that all Notes tendered will be accepted for payment;

*EXECUTION VERSION*

---

**$600,000,000**

**FIRST PRIORITY SECURED INSTITUTIONAL TERM LOANS DUE 2009**

# CREDIT AND GUARANTEE AGREEMENT

Dated as of March 23, 2004

among

## CALPINE GENERATING COMPANY, LLC
The Borrower

## THE GUARANTORS PARTY HERETO FROM TIME TO TIME
The Guarantors

## THE LENDERS PARTY HERETO FROM TIME TO TIME
The Lenders

## MORGAN STANLEY SENIOR FUNDING, INC.
Administrative Agent

and

## MORGAN STANLEY SENIOR FUNDING, INC.
Sole Lead Arranger and Sole Bookrunner

---

SD\428761.4

SECTION 5.06.        *Incurrence of Indebtedness and Issuance of Preferred Equity.*

(a)        The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise with respect to (collectively, "incur"), any Indebtedness (including Acquired Debt), and the Borrower shall not issue any Disqualified Stock and shall not permit any of its Subsidiaries to issue any shares of preferred equity.

(b)        Section 5.06(a) shall not prohibit the incurrence of any of the following items (collectively, "Permitted Debt"):

(i)        (A) the incurrence by the Borrower (and the guarantee by its Subsidiaries) of Indebtedness and letters of credit under Credit Facilities in an aggregate principal amount at any one time outstanding under this clause (i)(A) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Borrower and its Subsidiaries thereunder) not to exceed $800,000,000 *less* the aggregate amount of all Net Proceeds of Asset Sales, Casualty Events or Condemnation Events applied by the Borrower or any of its Subsidiaries since the Closing Date to repay any term Indebtedness under any such Credit Facilities or to repay, or cash collateralize letters of credit under, any revolving Indebtedness under any such Credit Facilities and effect a corresponding commitment reduction thereunder, and (B) the incurrence by the Borrower (and the guarantee by its Subsidiaries) of Indebtedness and letters of credit under Credit Facilities in an aggregate principal amount outstanding under this clause (i)(B) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Borrower and its Subsidiaries thereunder) not to exceed $100,000,000 *less* the aggregate amount of all Net Proceeds of Asset Sales, Casualty Events and Condemnation Events applied by the Borrower or any of its Subsidiaries since the Closing Date to repay any term Indebtedness under any such Credit Facility or to repay, or cash collateralize letters of credit under, any revolving Indebtedness under any such Credit Facility and effect a corresponding commitment reduction thereunder;

(ii)        the incurrence by the Borrower, CalGen Finance and the Guarantors of Indebtedness represented by the Notes, the related Note Guarantees and the other Note Obligations incurred on the Closing Date, and the exchange notes and the related Note Guarantees to be issued pursuant to the Registration Rights Agreement;

(iii)        the incurrence by the Borrower or any of its Subsidiaries of Expansion Debt; *provided*, that:

(A)        any Expansion Debt incurred by the Excluded Subsidiary is recourse only to the Expansion Assets financed with such Expansion Debt and to

other Expansion Assets owned by the Excluded Subsidiary (including any rights of the Excluded Subsidiary under Shared Facilities Arrangements);

(B)    if the Fixed Charge Coverage Ratio for the Borrower's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Expansion Debt is incurred would have been at least 2.0 to 1.0, determined on a Pro Forma basis as if the Expansion Debt had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved), at least 25% of the cost of such Expansion Assets is financed with Equity Contributions or the proceeds of Perpetual Preferred Stock or Affiliate Subordinated Indebtedness;

(C)    if the Fixed Charge Coverage Ratio for the Borrower's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Expansion Debt is incurred would have been less than 2.0 to 1.0, determined on a Pro Forma basis as if the Expansion Debt had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved);

(1)    at least 40% of the cost of such Expansion Assets is financed with Equity Contributions or the proceeds of Perpetual Preferred Stock or Affiliate Subordinated Indebtedness; and

(2)    after giving effect to such incurrence, the amount of Expansion Debt incurred pursuant to this clause (iii), together with the aggregate amount of all other Expansion Debt then outstanding, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Expansion Debt incurred pursuant to this clause (iii), does not exceed $250,000,000;

(iv)    the incurrence by the Borrower or any of its Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to refund, refinance or replace, Indebtedness (other than intercompany Indebtedness) that was permitted by this Agreement to be incurred under clauses (ii), (iii), (iv) or (x) of this Section 5.06(b);

(v)    the incurrence by the Borrower or any Guarantor of intercompany Indebtedness between or among the Borrower and any Guarantors that is subordinated in right of payment to all Secured Obligations on the terms set forth on Exhibit A hereto and is not secured other than by unperfected security interests; *provided, however*, that (A) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Borrower or a Guarantor and (B) any sale or other transfer of any such Indebtedness to a Person that is not either the Borrower

or a Guarantor will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Borrower or such Guarantor, as the case may be, that was not permitted by this clause (v); and *provided, further*, that any such intercompany Indebtedness must be included in the Collateral.

(vi)    the incurrence by the Borrower or any of its Subsidiaries of Hedging Obligations, in connection with Permitted Debt or otherwise, in the ordinary course of business and not for speculative purposes; *provided*, that (A) such Hedging Obligations will have tenors that expire on or prior to the maturity date (or other expiration) of the underlying Obligation being hedged, and (B) any such Hedging Obligations hedging or managing interest rate risk with respect to a particular series of Notes or loans under this Agreement, the Second Priority Term Loan Agreement or the Revolving Loan Agreement will have tenors that expire on or prior to the Stated Maturity of the applicable Notes or loans;

(vii)    the incurrence by the Borrower or any of its Subsidiaries of Indebtedness in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances, and performance and surety bonds in the ordinary course of business;

(viii)    the incurrence by the Borrower or any of its Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five Business Days;

(ix)    the incurrence by the Borrower of (a) Affiliate Subordinated Indebtedness in an aggregate principal amount not to exceed $250,000,000 at any one time outstanding and (b) Working Capital Facility Indebtedness in an aggregate principal amount not to exceed $750,000,000 at any one time outstanding; and

(x)    the incurrence by the Borrower of Third Party Subordinated Indebtedness; *provided*, that:

(A)    the Net Proceeds of the Third Party Subordinated Indebtedness are applied:

(1)    to acquire all or substantially all of the assets of, or any Equity Interests in, a business that constitutes a Permitted Business, *provided*, that in the case of an acquisition of Equity Interests, the business is or becomes a Subsidiary of the Borrower and a Guarantor concurrently with such acquisition;

(2)    to make a capital expenditure;

(3)    to acquire other assets that are not classified as current assets under GAAP and that are used or useful in a Permitted Business; or

(4)    any combination of the foregoing; and

(B)    the Fixed Charge Coverage Ratio for the Borrower's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Third Party Subordinated Indebtedness is incurred would have been at least 2.0 to 1.0, determined on a Pro Forma basis as if the Third Party Subordinated Indebtedness had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved).

(c)    The Borrower shall not incur, and shall not permit any Subsidiary to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Borrower or such Subsidiary unless such Indebtedness is also contractually subordinated in right of payment to the First Priority Term Loans, the applicable First Priority Term Loan Guarantees and the other First Priority Term Loan Obligations on substantially identical terms or on terms that are more favorable to the Lenders hereunder; *provided, however,* that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Borrower or any of its Subsidiaries solely by virtue of being unsecured or by virtue of being secured on a junior basis.

(d)    For purposes of determining compliance with this Section 5.06, in the event that an item of proposed Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (i) through (x) of Section 5.06(b), the Borrower will be permitted to classify such item of Indebtedness on the date of its incurrence, or later reclassify all or a portion of such item of Indebtedness, in any manner that complies with this Section 5.06. The accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Stock in the form of additional shares of the same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock for purposes of this Section 5.06. Notwithstanding any other provision of this Section 5.06, the maximum amount of Indebtedness that the Borrower or any Subsidiary may incur pursuant to this Section 5.06 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

(xi)    any amendments or modifications of, or waivers under, any Major Project Document, which are permitted by Section 5.10(b) (Business Activities) and are on terms that are no less favorable to the Borrower or its relevant Subsidiary (as certified to the Administrative Agent in an Officer's Certificate) than those that would have been obtained in a comparable transaction by the Borrower or such Subsidiary with an unrelated Person; and

(xii)    any agreement to do any of the foregoing.

SECTION 5.09.    *Liens.*  The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset now owned or hereafter acquired, except Permitted Liens.

SECTION 5.10.    *Business Activities.*

(a)    The Borrower shall not, and shall not permit any of its Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Borrower and its Subsidiaries taken as a whole.

(b)    The Borrower shall, and shall cause its Subsidiaries to, perform all their obligations under the Major Project Documents, and the Borrower shall not, and shall not permit any of its Subsidiaries to, terminate, amend or otherwise modify, or consent to any termination, amendment or modification of, or grant any waiver under, any Major Project Document, unless any failure to so perform or any such termination, amendment, modification or waiver would not, when taken together with all other such failures to perform, terminations, amendments, modifications and waivers since the Closing Date, be Materially Adverse, as evidenced by a certificate of the chief financial officer of the Borrower; *provided, however,* that the provisions of this paragraph will not apply to any amendment, modification or termination of any Major Project Document required under this Agreement in connection with an Asset Sale.

(c)    The Borrower shall, and shall cause its Subsidiaries to, obtain and maintain all permits and approvals necessary for the construction and operation of the Facilities, including applicable exemptions from PUHCA, unless the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(d)    The Borrower shall not, and shall not permit any of its Subsidiaries to, use or dispose of any hazardous materials or allow any hazardous materials to be brought onto or stored or used on or transported to or released from the Facilities, other than in accordance with prudent industry practices and in compliance with all applicable Environmental Laws, except to the extent such non-compliance, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.11.    *Payments for Consent.*  The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any holder of any First Priority Term Loan or as an inducement to any consent, waiver or amendment of any of the terms or provisions of any First Priority Term Loan Document unless such consideration is offered to be paid and is paid to all Lenders that consent, waive or

(a)    The Borrower shall not, and shall not permit any of its Subsidiaries to, transfer, convey, sell, lease or otherwise dispose of any Equity Interests in any Subsidiary of the Borrower to any Person (other than the Borrower or a Guarantor), unless:

(i)    such transfer, conveyance, sale, lease or other disposition is of all the Equity Interests in such Subsidiary; and

(ii)    the Net Proceeds from such transfer, conveyance, sale, lease or other disposition are applied in accordance with Sections 2.11 (Mandatory Offers) and 5.07 (Asset Sales; Application of Net Proceeds).

(b)    The Borrower shall not permit any of its Subsidiaries to issue any Equity Interests (other than, if necessary, shares of its Capital Stock constituting directors' qualifying shares) to any Person other than to the Borrower or a Guarantor.

SECTION 5.16.    *Deposit of Revenues*.  The Borrower shall, and shall cause its Subsidiaries to, deposit all revenues received by the Borrower and its Subsidiaries, within 10 Business Days of receipt thereof, in the Revenue Account.

SECTION 5.17.    *Maintenance of Insurance*.  The Borrower shall, and shall cause its Subsidiaries to, maintain with financially sound and reputable insurance companies, insurance on their property, including the Collateral, in at least such amounts, with such deductibles and against at least such risks as is customary for companies of the same or similar size engaged in the same or similar businesses as those of the Borrower and its Subsidiaries and furnish to the Administrative Agent, upon written request, full information as to such Persons' property and liability insurance carriers.  The Borrower shall, and shall cause its Subsidiaries to, cause all their insurance policies to name the Lenders, as a class, as additional insureds with waiver of subrogation and shall cause all its, and its Subsidiaries', property and casualty policies to name the Collateral Agent as loss payee (together with other lien holders as their interests may appear), with the right to receive 30 days notice of any cancellation of or material change in such insurance policies.

SECTION 5.18.    *Coverage Ratio; Kilowatt Test*.

(a)    <u>Consolidated Interest Coverage Ratio</u>.  As of the last day of each fiscal quarter of the Borrower, the Borrower shall cause the Consolidated Interest Coverage Ratio of the Borrower and its Subsidiaries to be equal to or greater than 1.05:1.0.

(b)    <u>Consolidated First and Second Priority Lien Debt to Kilowatt Test</u>.  As of the last day of each fiscal quarter of the Borrower, the Borrower shall cause the ratio of (a) the aggregate outstanding principal amount of First Priority Term Loans, First Priority Notes, Revolving Loans, Second Priority Term Loans and Second Priority Notes, to (b) the combined Estimated Peak Capacity of all the Facilities (including all Facilities in operation and under construction) owned by the Borrower and its Subsidiaries (expressed in kilowatts) to be equal to or less than $235 per kilowatt.

SECTION 5.19.    *Further Assurances; Ratings*.  The Borrower and each Guarantor shall perform such reasonable acts as may be necessary to carry out the intent of this Agreement and

*EXECUTION VERSION*

THE LOANS TO BE MADE HEREUNDER SHALL BE ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES AND ARE SUBJECT TO TREASURY REGULATIONS REGARDING THE REPORTING OF ORIGINAL ISSUE DISCOUNT. FURTHER INFORMATION MAY BE OBTAINED BY SUBMITTING A REQUEST TO THE CHIEF FINANCIAL OFFICER OF THE COMPANY AT 50 WEST SAN FERNANDO STREET, 5TH FLOOR, SAN JOSE, CALIFORNIA 95113.

**$100,000,000**

## SECOND PRIORITY SECURED INSTITUTIONAL TERM LOANS DUE 2010

# CREDIT AND GUARANTEE AGREEMENT

Dated as of March 23, 2004

among

## CALPINE GENERATING COMPANY, LLC
The Borrower

## THE GUARANTORS PARTY HERETO FROM TIME TO TIME
The Guarantors

## THE LENDERS PARTY HERETO FROM TIME TO TIME
The Lenders

## MORGAN STANLEY SENIOR FUNDING, INC.
Administrative Agent

and

## MORGAN STANLEY SENIOR FUNDING, INC.
Sole Lead Arranger and Sole Bookrunner

(J)     provisions restricting cash or other deposits or net worth imposed by customers or suppliers under contracts entered into in the ordinary course of business; and

(K)     provisions restricting or encumbering the sale or other disposition of Expansion Assets or the payment of dividends, distributions or similar payments made from cash flow derived exclusively from Expansion Assets, in each case pursuant to the terms of any Expansion Debt incurred pursuant to clause (iv) of the definition of Permitted Debt; *provided*, that such encumbrance or restriction will not materially adversely affect the Borrower's ability to meet its obligations under this Agreement, and, in the written opinion of the president, chief operating officer or chief financial officer of the Borrower, is required in order to obtain such Expansion Debt and is customary for financings of such type.

SECTION 5.06.     *Incurrence of Indebtedness and Issuance of Preferred Equity.*

(a)     The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise with respect to (collectively, "incur"), any Indebtedness (including Acquired Debt), and the Borrower shall not issue any Disqualified Stock and shall not permit any of its Subsidiaries to issue any shares of preferred equity.

(b)     Section 5.06(a) shall not prohibit the incurrence of any of the following items (collectively, "Permitted Debt"):

(i)     (A) the incurrence by the Borrower (and the guarantee by its Subsidiaries) of Indebtedness and letters of credit under Credit Facilities in an aggregate principal amount at any one time outstanding under this clause (i)(A) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Borrower and its Subsidiaries thereunder) not to exceed $800,000,000 *less* the aggregate amount of all Net Proceeds of Asset Sales, Casualty Events or Condemnation Events applied by the Borrower or any of its Subsidiaries since the Closing Date to repay any term Indebtedness under any such Credit Facilities or to repay, or cash collateralize letters of credit under, any revolving Indebtedness under any such Credit Facilities and effect a corresponding commitment reduction thereunder, and (B) the incurrence by the Borrower (and the guarantee by its Subsidiaries) of Indebtedness and letters of credit under Credit Facilities in an aggregate principal amount outstanding under this clause (i)(B) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Borrower and its Subsidiaries thereunder) not to exceed $100,000,000 *less* the aggregate amount of all Net Proceeds of Asset Sales, Casualty Events and Condemnation Events applied by the Borrower or any of its Subsidiaries since the Closing Date to repay any term Indebtedness under any such Credit Facility or to repay, or cash collateralize letters of credit under, any revolving Indebtedness under any such Credit Facility and effect a corresponding commitment reduction thereunder;

(ii)    the incurrence by the Borrower, CalGen Finance and the Guarantors of Indebtedness represented by the Notes, the related Note Guarantees and the other Note Obligations incurred on the Closing Date, and the exchange notes and the related Note Guarantees to be issued pursuant to the Registration Rights Agreement;

(iii)    the incurrence by the Borrower or any of its Subsidiaries of Expansion Debt; *provided*, that:

(A)    any Expansion Debt incurred by the Excluded Subsidiary is recourse only to the Expansion Assets financed with such Expansion Debt and to other Expansion Assets owned by the Excluded Subsidiary (including any rights of the Excluded Subsidiary under Shared Facilities Arrangements);

(B)    if the Fixed Charge Coverage Ratio for the Borrower's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Expansion Debt is incurred would have been at least 2.0 to 1.0, determined on a Pro Forma basis as if the Expansion Debt had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved), at least 25% of the cost of such Expansion Assets is financed with Equity Contributions or the proceeds of Perpetual Preferred Stock or Affiliate Subordinated Indebtedness;

(C)    if the Fixed Charge Coverage Ratio for the Borrower's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Expansion Debt is incurred would have been less than 2.0 to 1.0, determined on a Pro Forma basis as if the Expansion Debt had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved);

(1)    at least 40% of the cost of such Expansion Assets is financed with Equity Contributions or the proceeds of Perpetual Preferred Stock or Affiliate Subordinated Indebtedness; and

(2)    after giving effect to such incurrence, the amount of Expansion Debt incurred pursuant to this clause (iii), together with the aggregate amount of all other Expansion Debt then outstanding, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Expansion Debt incurred pursuant to this clause (iii), does not exceed $250,000,000;

(iv)    the incurrence by the Borrower or any of its Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to refund, refinance or replace, Indebtedness (other than intercompany Indebtedness) that

was permitted by this Agreement to be incurred under clauses (ii), (iii), (iv) or (x) of this Section 5.06(b);

(v)    the incurrence by the Borrower or any Guarantor of intercompany Indebtedness between or among the Borrower and any Guarantors that is subordinated in right of payment to all Secured Obligations on the terms set forth on Exhibit A hereto and is not secured other than by unperfected security interests; *provided, however,* that (A) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Borrower or a Guarantor and (B) any sale or other transfer of any such Indebtedness to a Person that is not either the Borrower or a Guarantor will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Borrower or such Guarantor, as the case may be, that was not permitted by this clause (v); and *provided, further,* that any such intercompany Indebtedness must be included in the Collateral.

(vi)    the incurrence by the Borrower or any of its Subsidiaries of Hedging Obligations, in connection with Permitted Debt or otherwise, in the ordinary course of business and not for speculative purposes; *provided,* that (A) such Hedging Obligations will have tenors that expire on or prior to the maturity date (or other expiration) of the underlying Obligation being hedged, and (B) any such Hedging Obligations hedging or managing interest rate risk with respect to a particular series of Notes or loans under this Agreement, the First Priority Term Loan Agreement or the Revolving Loan Agreement will have tenors that expire on or prior to the Stated Maturity of the applicable Notes or loans;

(vii)    the incurrence by the Borrower or any of its Subsidiaries of Indebtedness in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances, and performance and surety bonds in the ordinary course of business;

(viii)    the incurrence by the Borrower or any of its Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five Business Days;

(ix)    the incurrence by the Borrower of (a) Affiliate Subordinated Indebtedness in an aggregate principal amount not to exceed $250,000,000 at any one time outstanding and (b) Working Capital Facility Indebtedness in an aggregate principal amount not to exceed $750,000,000 at any one time outstanding; and

(x)    the incurrence by the Borrower of Third Party Subordinated Indebtedness; *provided,* that:

(A)    the Net Proceeds of the Third Party Subordinated Indebtedness are applied:

(1)    to acquire all or substantially all of the assets of, or any Equity Interests in, a business that constitutes a Permitted Business, *provided,* that in the case of an acquisition of Equity Interests, the business

is or becomes a Subsidiary of the Borrower and a Guarantor concurrently with such acquisition;

(2)    to make a capital expenditure;

(3)    to acquire other assets that are not classified as current assets under GAAP and that are used or useful in a Permitted Business; or

(4)    any combination of the foregoing; and

(B)    the Fixed Charge Coverage Ratio for the Borrower's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the Third Party Subordinated Indebtedness is incurred would have been at least 2.0 to 1.0, determined on a Pro Forma basis as if the Third Party Subordinated Indebtedness had been incurred at the beginning of such period and the proceeds therefrom had been applied as intended to be applied (but without giving effect to the completion of any construction projects unless actual completion has been achieved).

(c)    The Borrower shall not incur, and shall not permit any Subsidiary to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Borrower or such Subsidiary unless such Indebtedness is also contractually subordinated in right of payment to the Second Priority Term Loans, the applicable Second Priority Term Loan Guarantees and the other Second Priority Term Loan Obligations on substantially identical terms or on terms that are more favorable to the Lenders hereunder; *provided, however,* that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Borrower or any of its Subsidiaries solely by virtue of being unsecured or by virtue of being secured on a junior basis.

(d)    For purposes of determining compliance with this Section 5.06, in the event that an item of proposed Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (i) through (x) of Section 5.06(b), the Borrower will be permitted to classify such item of Indebtedness on the date of its incurrence, or later reclassify all or a portion of such item of Indebtedness, in any manner that complies with this Section 5.06. The accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Stock in the form of additional shares of the same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock for purposes of this Section 5.06. Notwithstanding any other provision of this Section 5.06, the maximum amount of Indebtedness that the Borrower or any Subsidiary may incur pursuant to this Section 5.06 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

SECTION 5.07.    *Asset Sales; Application of Net Proceeds.*

(a)    <u>Asset Sales.</u>  The Borrower shall not, and shall not permit any of its Subsidiaries to, consummate an Asset Sale unless:

thereto, so long as any such amendment or modification meets the requirements of clause (x) or (xi) of this Section 5.08(b);

(x)     any amendments or modifications of, or waivers under, any written agreement described under clause (ix) of this 5.08(b) that is not a Major Project Document; *provided* that no such amendment, modification or waiver alters any such agreement in a manner than is materially adverse to the interests of the Lenders;

(xi)     any amendments or modifications of, or waivers under, any Major Project Document, which are permitted by Section 5.10(b) (Business Activities) and are on terms that are no less favorable to the Borrower or its relevant Subsidiary (as certified to the Administrative Agent in an Officer's Certificate) than those that would have been obtained in a comparable transaction by the Borrower or such Subsidiary with an unrelated Person; and

(xii)     any agreement to do any of the foregoing.

SECTION 5.09.     *Liens.*  The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset now owned or hereafter acquired, except Permitted Liens.

SECTION 5.10.     *Business Activities.*

(a)     The Borrower shall not, and shall not permit any of its Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Borrower and its Subsidiaries taken as a whole.

(b)     The Borrower shall, and shall cause its Subsidiaries to, perform all their obligations under the Major Project Documents, and the Borrower shall not, and shall not permit any of its Subsidiaries to, terminate, amend or otherwise modify, or consent to any termination, amendment or modification of, or grant any waiver under, any Major Project Document, unless any failure to so perform or any such termination, amendment, modification or waiver would not, when taken together with all other such failures to perform, terminations, amendments, modifications and waivers since the Closing Date, be Materially Adverse, as evidenced by a certificate of the chief financial officer of the Borrower; *provided, however*, that the provisions of this paragraph will not apply to any amendment, modification or termination of any Major Project Document required under this Agreement in connection with an Asset Sale.

(c)     The Borrower shall, and shall cause its Subsidiaries to, obtain and maintain all permits and approvals necessary for the construction and operation of the Facilities, including applicable exemptions from PUHCA, unless the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(d)     The Borrower shall not, and shall not permit any of its Subsidiaries to, use or dispose of any hazardous materials or allow any hazardous materials to be brought onto or stored or used on or transported to or released from the Facilities, other than in accordance with prudent industry practices and in compliance with all applicable Environmental Laws, except to the

extent such non-compliance, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.11.    *Payments for Consent*.  The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any holder of any Second Priority Term Loan or as an inducement to any consent, waiver or amendment of any of the terms or provisions of any Second Priority Term Loan Document unless such consideration is offered to be paid and is paid to all Lenders that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

SECTION 5.12.    *Offer to Prepay Upon Change of Control*.

(a)    If a Change of Control occurs, the Borrower shall make a Mandatory Repayment Offer on the terms set forth herein and in Section 2.11 (Mandatory Repayment Offers).  In such Mandatory Repayment Offer, the Borrower shall offer to prepay each Lender's Second Priority Term Loans in an amount equal to (i) with respect to any such Mandatory Prepayment Offer made on or before April 1, 2009, 101% of the aggregate principal amount of Second Priority Term Loans then outstanding, (ii) with respect to any such Mandatory Prepayment Offer made after April 1, 2009, 100% of the aggregate principal amount of Second Priority Term Loans then outstanding, *plus*, in each case, accrued and unpaid interest thereon, to but excluding the date of repayment, *plus*, in each case, any other amount then required to be paid hereunder.

(b)    The provisions of this Section 5.12 and of Section 2.11 (Mandatory Repayment Offers) that require the Borrower to make a Mandatory Repayment Offer following a Change of Control shall be applicable whether or not any other provisions of this Agreement are applicable; *provided* that, the Borrower shall not be required to make a Mandatory Repayment Offer upon a Change of Control if a third party makes the Mandatory Repayment Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Agreement applicable to a Mandatory Repayment Offer required upon a Change of Control and repays all Second Priority Term Loans (and the other amounts required to be paid pursuant to clause (a) above).

SECTION 5.13.    *Restrictions on Activities of CalGen Finance*.  The Borrower shall not permit CalGen Finance to hold any material assets, become liable for any material obligations or engage in any significant business activities; *provided* that, notwithstanding anything to the contrary contained herein, CalGen Finance may be a co-obligor or guarantor with respect to Indebtedness if the Borrower is an obligor on such Indebtedness and the net proceeds of such Indebtedness are received by the Borrower, CalGen Finance or one or more of the Borrower's other Subsidiaries.

SECTION 5.14.    *Additional Subsidiaries*.  If the Borrower or any of its Subsidiaries acquires or creates another Subsidiary after the Closing Date, then (a) that newly acquired or created Subsidiary will (i) become a Guarantor hereunder, (ii) if such Subsidiary's assets and property consist solely of its ownership interests in any Guarantor, become a Holding Company hereunder and (iii) deliver or cause to be delivered an opinion of counsel reasonably satisfactory to the Administrative Agent within 30 days of the date on which it was acquired or created, and (b) all real and personal property of that Subsidiary will become part of the Collateral within 30

days of the date on which that Subsidiary was acquired or created pursuant to documentation (including security documents, financing statements, opinions and other documents) reasonably satisfactory to the Administrative Agent and the Collateral Agent.

SECTION 5.15.    *Limitation on Issuances and Sales of Equity Interests in Subsidiaries.*

(a)    The Borrower shall not, and shall not permit any of its Subsidiaries to, transfer, convey, sell, lease or otherwise dispose of any Equity Interests in any Subsidiary of the Borrower to any Person (other than the Borrower or a Guarantor), unless:

(i)    such transfer, conveyance, sale, lease or other disposition is of all the Equity Interests in such Subsidiary; and

(ii)    the Net Proceeds from such transfer, conveyance, sale, lease or other disposition are applied in accordance with Sections 2.11 (Mandatory Offers) and 5.07 (Asset Sales; Application of Net Proceeds).

(b)    The Borrower shall not permit any of its Subsidiaries to issue any Equity Interests (other than, if necessary, shares of its Capital Stock constituting directors' qualifying shares) to any Person other than to the Borrower or a Guarantor.

SECTION 5.16.    *Deposit of Revenues*. The Borrower shall, and shall cause its Subsidiaries to, deposit all revenues received by the Borrower and its Subsidiaries, within 10 Business Days of receipt thereof, in the Revenue Account.

SECTION 5.17.    *Maintenance of Insurance*.   The Borrower shall, and shall cause its Subsidiaries to, maintain with financially sound and reputable insurance companies, insurance on their property, including the Collateral, in at least such amounts, with such deductibles and against at least such risks as is customary for companies of the same or similar size engaged in the same or similar businesses as those of the Borrower and its Subsidiaries and furnish to the Administrative Agent, upon written request, full information as to such Persons' property and liability insurance carriers. The Borrower shall, and shall cause its Subsidiaries to, cause all their insurance policies to name the Lenders, as a class, as additional insureds with waiver of subrogation and shall cause all its, and its Subsidiaries', property and casualty policies to name the Collateral Agent as loss payee (together with other lien holders as their interests may appear), with the right to receive 30 days notice of any cancellation of or material change in such insurance policies.

SECTION 5.18.    *Coverage Ratio; Kilowatt Test.*

(a)    <u>Consolidated Interest Coverage Ratio</u>. As of the last day of each fiscal quarter of the Borrower, the Borrower shall cause the Consolidated Interest Coverage Ratio of the Borrower and its Subsidiaries to be equal to or greater than 1.05:1.0.

(b)    <u>Consolidated First and Second Priority Lien Debt to Kilowatt Test</u>. As of the last day of each fiscal quarter of the Borrower, the Borrower shall cause the ratio of (a) the aggregate outstanding principal amount of First Priority Term Loans, First Priority Notes, Revolving Loans, Second Priority Term Loans and Second Priority Notes, to (b) the combined Estimated

Peak Capacity of all the Facilities (including all Facilities in operation and under construction) owned by the Borrower and its Subsidiaries (expressed in kilowatts) to be equal to or less than $235 per kilowatt.

SECTION 5.19.    *Further Assurances; Ratings*.  The Borrower and each Guarantor shall perform such reasonable acts as may be necessary to carry out the intent of this Agreement and the other Second Priority Term Loan Documents promptly after written request by the Administrative Agent.  The Borrower shall, as promptly as practical after the date hereof, perform all reasonable acts as may be necessary to cause Moody's to issue a credit rating in respect of the Second Priority Term Loans.

SECTION 5.20.    *Suspension of Certain Covenants*.  In the event that, from time to time, after giving effect to the suspension of covenants and the event of default provided for in this Section 5.20, the Third Priority Fixed Rate Notes and the Third Priority Floating Rate Notes are rated Baa3 or better by Moody's and BBB- or better by S&P, then the covenants contained in Section 5.04 (Restricted Payments), Section 5.05 (Dividend and Other Payment Restrictions Affecting Subsidiaries), Section 5.06 (Incurrence of Indebtedness and Issuance of Preferred Equity), Section 5.10 (Business Activities), Section 5.16 (Deposit of Revenues) and Section 7.01(i) shall be suspended.  In the event that, at any time, neither the Third Priority Fixed Rate Notes nor the Third Priority Floating Rate Notes are rated Baa3 or better by Moody's and BBB- or better by S&P, the covenants and event of default contained in such Sections shall be reinstated.

## ARTICLE VI.

## SUCCESSORS

SECTION 6.01.    *Merger, Consolidation, or Sale of Assets*.

(a)    The Borrower shall not, directly or indirectly:  (i) consolidate or merge with or into another Person (whether or not the Borrower is the surviving entity);  (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Borrower and its Subsidiaries taken as a whole, in one or more related transactions, to another Person; or (iii) lease all or substantially all of its properties or assets, in one or more related transactions, to any other Person; *provided, however,* that the foregoing shall not apply to:

(i)    a merger of the Borrower with an Affiliate solely for the purpose of reconstituting the Borrower in another jurisdiction; or

(ii)    any sale, transfer, assignment, conveyance, lease or other disposition of assets between or among the Borrower and the Guarantors.

(b)    Notwithstanding the foregoing, the Borrower is permitted to reorganize as a corporation or a limited liability company in accordance with the procedures established in this Agreement, *provided* that the Borrower shall have delivered to the Administrative Agent an Opinion of Counsel in the United States reasonably acceptable to the Administrative Agent confirming that such reorganization is not adverse to the Lenders (it being recognized that such