**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Calpine Corporation., et al., | ) | Case No. 05-60200 (BRL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## SECOND AMENDED FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION

This matter comes on for a final hearing (the "Final Hearing") pursuant to that certain motion filed on December 21, 2005 by the above-captioned debtors (collectively, the "Debtors")[1] seeking, in part, entry of (I) an interim order (a) authorizing the Debtors to obtain postpetition financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(e), and (b) scheduling a final hearing pursuant to Federal Rules of Bankruptcy Procedure 4001(b) and (c) (the "Interim DIP Order"); (II) an interim order (a) authorizing the Debtors to (1) utilize cash collateral of certain prepetition lenders pursuant to 11 U.S.C. §§ 361, 362 and 363, and (2) provide adequate protection, and (b) scheduling a final hearing pursuant to Federal Rules of Bankruptcy Procedure 4001(b) and (c) (the "Interim Cash Collateral Order"); (III) a final order (the "Final DIP Order"), substantially in the form of the Interim DIP Order with the requisite conforming changes authorizing the Debtors to (a) obtain postpetition financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(e), and (b) assume the Geysers Agreement pursuant to 11 U.S.C. §§ 365(a) and consummate the

---

[1] For purposes of this order, the terms "Debtors" and "Project Debtors" shall include Geysers Power Company, LLC and Silverado Geothermal Resources, Inc., which filed chapter 11 petitions on February 3, 2006.

transactions contemplated thereby pursuant to § 363(b) and (c) assume the Agnews Lease

Documents pursuant to 11 U.S.C.§ 365(a); and (IV) a final order authorizing the Debtors to (a)

utilize cash collateral of certain prepetition lenders pursuant to 11 U.S.C. §§ 361, 362 and 363,

and (b) provide adequate protection (the "Motion"). Based upon the Motion and the information

presented to this Court at the Final Hearing, on January 30, 2006, the Court entered the final

order authorizing use of cash collateral and granting of adequate protection (the "Final Cash

Collateral Order"). Following entry of the Final Cash Collateral Order, DZ Bank AG, Celanese

Ltd., U.S. Bank National Association, Quadrangle Debt Recovery Advisors LLC and the Ad Hoc

Committee of certain Series A and B pass-through certificates relating to South Point, Broad

River and RockGen filed appeals from, or motions for reconsideration or stays of, such Order

and/or the Final DIP Order. The Debtors, the DIP Lenders, the Committees, the First Lien

Trustee and such appellants and movants engaged in negotiations to resolve, among other

matters, the issues raised by such appeals and motions for reconsideration or stay, and the

resolutions reached are embodied in the amendments to the Final Cash Collateral Order

contained herein. Accordingly, based on the record presented to the Court at the Interim Hearing

and at the Final Hearing and upon review of the Motion itself, the Court makes the following

findings:

    1.  Certain of the Debtors' first lien debt is comprised of the 9.625% First

Priority Senior Secured Notes due 2014, issued by Calpine Corporation ("Calpine") pursuant to

that certain Indenture (the "Calpine First Lien Indenture"), dated as of September 30, 2004,

between Calpine and Wilmington Trust Company (the "First Lien Trustee"), as Trustee (the

"Calpine First Lien Indenture," and the holders thereof, the "Calpine First Lien Holders").

2.     The Calpine First Lien Indenture is secured by first priority liens upon and security interests in (i) substantially all of the properties and assets owned by Calpine directly (the "Calpine Corp. Collateral")[2], including: (a) the stock and equity interests of Calpine's first-tier domestic subsidiaries including, without limitation, Calpine International Holdings, Inc., Calpine Operations Management Company, Inc., Calpine Fuels Corporation, Calpine Power Company, Calpine Finance Company, Calpine Administrative Services, Inc., Calpine Energy Holdings, Inc., Calpine Northbrook Corporation of Maine, Inc. and Androscoggin Energy, Inc., (b) certain oil and gas reserves and natural gas assets located in the United States (most of which have been sold in accordance with the Calpine First Lien Indenture) and certain power plant assets and (c) certain intercompany notes issued by Calpine to its subsidiaries, but excluding in each case the Excluded Assets (as defined in the Calpine First Lien Indenture) and (ii) 65% of the stock of Calpine Canada Energy Ltd. ("CCEC"). Other than CCEC, the Calpine Corp. Collateral does not include equity interests of any indirect subsidiary of Calpine, including, without limitation, the equity interests of Thermal Power Company, Geysers Power I Company and Geysers Power Company II, LLC. In addition, all of the cash and cash equivalents owned by Calpine (other than cash held in deposit accounts up to $50.0 million in the aggregate and borrowings under the DIP Facility, the "Calpine Corp. Cash Collateral") are "cash collateral" of the Calpine First Lien Holders as defined in section 363(a) of the Bankruptcy Code and such Calpine Corp. Cash Collateral also constitutes "Calpine Corp. Collateral".

---

[2]     The foregoing definition of Calpine Corp Collateral shall also include any collateral or the proceeds thereof granted to the Calpine Corp Lien Holders under their applicable collateral documents but not described above.

3.    The Calpine First Lien Debt is secured by first priority liens on and security interests in the Calpine Corp. Collateral.  In addition, the Calpine First Lien Holders have a first priority lien on the Calpine Corp. Cash Collateral, including the approximately $400 million (the "Designated Asset Sale Proceeds") currently on deposit in a segregated cash collateral account (the "Control Account") at Union Bank of California, N.A. pursuant to the Designated Asset Sale Proceeds Agreement, dated as of July 16, 2003, among Calpine, Union Bank of California, N.A. (the "Depositary Agent") and the Bank of New York.

4.    Calpine's second lien debt is comprised of (i) the $500,000,000 Second Priority Senior Secured Floating Rate Notes Due 2007, (ii) the $1,150,000,000 8.50% Second Priority Senior Secured Notes due 2010, (iii) the $900,000,000 Second Priority 8.75% Senior Secured Notes due 2013, in each case issued by Calpine pursuant to certain indentures, dated as of July 16, 2003, between Calpine and Wilmington Trust Company, as Trustee, (iv) the $400,000,000 9.875% Second Priority Senior Secured Notes due 2011, issued by Calpine pursuant to a certain Indenture, dated as of November 18, 2003, between Calpine and Wilmington Trust Company, as Trustee (and in such capacity under (i), (ii), (iii) and (iv) hereof, the "Second Lien Trustee") and (v) the $750,000,000 Senior Secured Term Loans due 2007 (the "Calpine Second Lien Term Loan"), issued pursuant to that certain Credit Agreement, dated as of July 16, 2003, among Calpine, as borrower, Goldman Sachs Credit Partners, L.P., as sole lead arranger, sole bookrunner and administrative agent and the various co-arrangers, managing agents and lenders named therein (collectively, the "Calpine Second Lien Debt," and the holders thereof, the "Calpine Second Lien Holders", and the Calpine Second Lien Holders, collectively with the Calpine First Lien Holders, the "Calpine Corp. Lienholders").

5.      The Calpine Second Lien Debt is secured by second priority liens on and security interests in the Calpine Corp. Collateral.  In addition, the Calpine Second Lien Holders have a second priority lien on the Calpine Corp. Cash Collateral, including the Designated Asset Sale Proceeds.

6.      Calpine Generating Company, LLC; KIAC Partners; Nissequogue Cogen Partners; Calpine Gilroy Cogen, L.P.; Geysers Power Company, LLC; Silverado Geothermal Resources, Inc.; O.L.S. Energy-Agnews, Inc.; Calpine Hidalgo Power GP, LLC; Calpine Hidalgo Energy Center, L.P.; Calpine Hidalgo Power, LP; Calpine Hidalgo Inc.; Calpine Hidalgo Holdings; MEP Pleasant Hill, LLC and CPN Pleasant Hill, LLC, collectively with the affiliates that comprise the project groups of each of the foregoing, in each case that are Debtors in the Chapter 11 Cases, shall henceforth be referred to as the "Project Debtors," and each individually as a "Project Debtor."  Rumford Power Associates Limited Partnership; Tiverton Power Associates Limited Partnership; Calpine Monterey Cogeneration, Inc.; Calpine Greenleaf, Inc; Calpine Northbrook Project Holdings, LLC; Broad River Holdings, LLC; Broad River Energy LLC; RockGen Energy LLC; South Point Holdings, LLC and South Point Energy Center, LLC, collectively with the affiliates that comprise the project groups of each of the foregoing, in each case that are Debtors in the Chapter 11 Cases, shall henceforth be referred to as the "Project Lessees," and each individually as a "Project Lessee," and the owner lessors of whom shall henceforth be referred to collectively as the "Project Lessors," and each individually as a "Project Lessor."  Any designation by a Debtor as a Project Lessee shall not (i) prejudice in any way the Debtors' or any other party's right subsequently to seek to recharacterize the applicable lease as a financing or the defenses of the applicable Project Lessor to any such attempt or (ii) prejudice in any way any of the rights of the Debtors or the Project Lessors under

5

the Bankruptcy Code including, without limitation, the right of the Debtors to assume or reject

leases under section 365(a) of the Bankruptcy Code.[3]

       7.     As is customary in project financings, the agreements evidencing

indebtedness of the Project Debtors (such agreements, collectively with all related security,

depositary and other agreements, the "Project Loan Documents") owed to project lenders

(collectively, the "Project Lenders") impose restrictions on the Project Debtors' use of project

revenues (such restrictions, the "Cash Waterfall Provisions"). Generally, the Cash Waterfall

Provisions require that project revenues be allocated in a specified order of priority to various

purposes including, without limitation, to fund (a) operations and maintenance, (b) payment of

principal and interest under the Project Loan Documents and (c) various reserve accounts, in

each case prior to becoming available to dividend to parent entities or for other allocation (all

cash other than the cash available to dividend or other allocation after compliance with the Cash

Waterfall Provisions, the "Restricted Cash," and the cash available to dividend or other

allocation, the "Unrestricted Cash").

       8.     Under certain of the Project Loan Documents, upon the occurrence of an

event of default, a Project Debtor may be required to allocate all revenues to repayment of

outstanding indebtedness or may lose the right to allocate revenues in accordance with the Cash

Waterfall Provisions or otherwise without the prior consent of the Project Lenders. In such a

---

[3]    For purposes of this Order, the recharacterization of a Project Lease shall result in such applicable Project Lessee being treated as a Project Debtor, such applicable Project Lessor being treated as a Project Lender, and all applicable Project Lease Documents (as defined below) being treated as Project Loan Documents (as defined below).

circumstance, the Project Debtor may lose the ability to fund operations and maintenance and make other critical payments necessary to continue its operations. In addition, under certain of the Project Loan Documents, upon the occurrence of an event of default, including an event of default triggered by the bankruptcy filing of the Project Debtor or an affiliate of the Project Debtor, a Project Debtor may lose the right to dividend Unrestricted Cash up to its parent entities. Moreover, under certain of the Project Loan Documents, upon the occurrence of an event of default, the right of the Project Debtor to make payments to its affiliates for goods or services (typically operations and maintenance fees and services, but sometimes also payments for power or gas) may be restricted or eliminated entirely.

9.      Good cause has been shown for the entry of this Order, as an immediate and critical need exists for the Debtors to be permitted access to funds to continue to operate their businesses. Without such funds, the Debtors will not be able to, among other things, (i) permit the orderly continuation of the operation of their businesses, (ii) maintain business relationships with vendors, suppliers and customers, (iii) make payroll, (iv) make capital expenditures and (v) satisfy other working capital and operational needs. The Calpine Corp. Cash Collateral use arrangement authorized hereunder is vital to avoid immediate and irreparable harm to the Debtors' estates. Absent the use of the Calpine Corp. Cash Collateral, the Debtors' estates would not have necessary funds to satisfy their respective obligations.

10.      In addition, in order to continue their operations and preserve liquidity, the Project Debtors need to be able to (a) allocate the Restricted Cash in accordance with any applicable Cash Waterfall Provisions and (b) distribute to their parent entities or otherwise allocate Unrestricted Cash, in each case notwithstanding (i) the existence of any defaults related

7

to (a) the Chapter 11 Cases, including, without limitation, non-payment of prepetition amounts and/or default interest and cross-defaults, (b) the incurrence by any Debtor of liens and obligations in connection with the DIP Facility and (c) the making of any Project Intercompany Loan (as defined below) by any Debtor or the incurrence by any Debtor of indebtedness under a Project Intercompany Loan, and (ii) that such distributions may trigger an event of default under certain Project Loan Documents.

11.    The use of the Calpine Corp. Cash Collateral, the Restricted Cash in accordance with applicable Cash Waterfall Provisions, the Unrestricted Cash and the adequate protection arrangements authorized hereunder are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment and are supported by reasonably equivalent value and fair consideration.

12.    The notice requirements set forth in the Interim Order have been complied with and all objections to the entry of this Order have been overruled or withdrawn.

13.    The Debtors have requested immediate entry of this Order pursuant to rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Court concludes that entry of this Order allowing the Debtors the use of the (i) Calpine Corp. Cash Collateral, (ii) the Restricted Cash in accordance with applicable Cash Waterfall Provisions and (iii) the Unrestricted Cash is in the best interests of the Debtors and their estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses.

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED AND, AS APPLICABLE, STIPULATED:**

14.    Subject to the terms and conditions of this Order, the Debtors are hereby authorized as of the date of the entry of this Order and until the occurrence of a Termination Event (as defined below) to (i) use the Calpine Corp. Cash Collateral (a) to pay the Debtors' ordinary and necessary business expenses, (b) to pay expenses related to the administration of the Debtors' estates and the Chapter 11 Cases, (c) to make adequate protection payments of principal and interest or other amounts as provided herein; and (d) as otherwise authorized and approved by this Court, (ii) use the Restricted Cash in accordance with any applicable Cash Waterfall Provisions (notwithstanding (a) the existence of any defaults related to the Chapter 11 Cases, including, without limitation, non-payment of prepetition amounts or default interest and cross-defaults, (b) the incurrence by any Debtor of liens and obligations in connection with the DIP Facility and adequate protection arrangements contemplated hereby and (c) the making of any Project Intercompany Loan by any Debtor or the incurrence by any Debtor of indebtedness under a Project Intercompany Loan) and otherwise to make adequate protection payments as provided herein; (iii) distribute Unrestricted Cash to their parent entities that are Debtors in the Chapter 11 Cases via a Project Intercompany Loan notwithstanding the existence of an event of default or cross-default under the Project Loan Documents related to the commencement of the Chapter 11 Cases by, or the insolvency of, the Project Debtors or any affiliates of the Project Debtors or resulting from the failure by any Debtor to make any payment during the prepetition period and (iv) incur indebtedness under a Project Intercompany Loan; provided, however, that Calpine Greenleaf, Inc. ("Calpine Greenleaf") shall also be authorized to use Restricted Cash to pay the prepetition portion of the invoices for maintenance and similar expenses set forth on **Schedule I** annexed hereto, to the extent payment of such invoices is reasonably necessary for

the adequate protection of the interest of the project lenders for Calpine Greenleaf in any

collateral pledged by the Debtors to secure obligations under the Greenleaf Project Documents

(as defined below); provided, further, however, that neither the First Lien Trustee, the Second

Lien Trustee, the Collateral Trustee, any Calpine Corp. Lienholder, any Project Lender, any

Project Lessor nor any other party shall be entitled to exercise any remedy or take any other

action under any of the Project Loan Documents or other documents solely as a result of the

making of any Project Intercompany Loan by any Debtor or the incurrence by any Debtor of

indebtedness under a Project Intercompany Loan; and provided, further, however, that nothing

contained herein shall constitute a waiver of any right of the First Lien Trustee, Second Lien

Trustee, the Term Loan Agent, the Second Lien Committee, the Project Lenders, the Project

Lessors or any other party to argue that it is entitled to adequate protection due to the diminution

in value of its security interests and liens including in the pledged stock in the first tier Calpine

subsidiaries listed above which is included in the Calpine Corp. Collateral through the grant of

liens in the assets of direct and indirect Calpine subsidiaries as security for the DIP Facility or of

the right of the Debtors or the Official Committee (defined below) to contest such argument.

     15.     As adequate protection, which this Court finds is reasonable and necessary

(i) to protect the Calpine First Lien Holders' interest in the Calpine Corp. Collateral during the

Chapter 11 Cases, including the use of the Calpine Corp. Cash Collateral, pursuant to sections

361 and 363(e) of the Bankruptcy Code, (ii) for any diminution in value of the Calpine Corp.

Collateral including, without limitation, from the use of the Calpine Corp. Cash Collateral and

(iii) for the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the

Court approves the following:

(a)     The Calpine First Lien Holders are hereby granted valid, binding and

enforceable (i) first priority replacement security interests in and replacement liens (the "Calpine

Corp. First Replacement Liens") on the Calpine Corp. Collateral and (ii) junior priority

replacement security interests in and replacement liens (the "First Subsidiary Replacement

Liens" and, collectively with the Calpine Corp. First Replacement Liens, the "First Replacement

Liens") on all property and interests, real and personal, tangible and intangible and all products

and proceeds thereof, and accessions thereto, all inventory, accounts receivable, general

intangibles, equipment, notes, documents, chattel paper, cash and interests in real property

(whether owned or leased), whether now existing or hereafter arising, of all Debtors other than

Calpine (exclusive, in each case, of any avoidance actions available to the bankruptcy estates of

the Debtors pursuant to sections 544, 545, 547, 548, 549, 550, 553(b) or 724(a) of the

Bankruptcy Code or the proceeds thereof).  The Calpine Corp. First Replacement Liens shall be

equal to the extent of the aggregate diminution in value, if any, after the commencement of the

Chapter 11 Cases (the "Petition Date"), of the Calpine Corp. Collateral, including the Calpine

Corp. Cash Collateral, whether by use thereof or the imposition of the automatic stay pursuant to

section 362 of the Bankruptcy Code.  The Calpine Corp. First Subsidiary Replacement Liens

shall be silent liens and shall be junior and subordinate to (i) any valid, perfected and

unavoidable liens which existed on any asset of any Debtor other than Calpine as of the Petition

Date (including, but not limited to, any and all such liens and security interests granted by

Project Debtors in favor of Project Lenders); (ii) the Project Lender Replacement Liens (as

hereinafter defined); provided, however, that in the event that any pre-petition liens or security

interests of the Calpine First Lien Holders were pari passu with the pre-petition liens or security

interests of a Project Lender on any shared collateral, then the Calpine Corp. First Subsidiary

11

Replacement Liens on such shared collateral will be pari passu with the Project Lender

Replacement Liens of such Project Lender on such shared collateral, (iii) the Project Lessor

Replacement Liens (as hereinafter defined); (iv) all liens on assets of any Debtor other than

Calpine granted as security for the DIP Facility pursuant to the DIP Orders[4] (the "DIP Liens")

and (v) the Carve Out (as defined in the Final DIP Order).[5]   The First Lien Trustee shall not be

entitled to undertake any action to realize upon or otherwise enforce any remedies in respect to

the Calpine Corp. First Subsidiary Replacement Liens without the prior express written consent

of (a) the Agents under the DIP Facility, prior to the payment in full in cash of all obligations due

under the DIP Facility and the termination of the commitments of the lenders under the DIP

Facility (the "DIP Lenders") to make further advances or other extensions of credit under the

DIP Facility and (b) any applicable Project Lender or Project Lessor holding a claim against or a

valid, perfected and enforceable prepetition lien on assets of any Project Debtor or Project

Lessee in respect to which the First Lien Trustee is being granted a Calpine Corp. First

Subsidiary Replacement Lien hereunder.

       (b)    Provided that no default or event of default under the DIP Facility shall

have occurred and be continuing, the Debtors shall pay to the First Lien Trustee, for the benefit

of the Calpine First Lien Holders, current payment of all accrued but unpaid interest (whether

prepetition or postpetition) on the Calpine First Lien Indenture at the non-default contract rate set

forth in the Calpine First Lien Indenture on the dates when due thereunder and all fees and

disbursements (whether prepetition or postpetition and without the necessity of submission of a

---

[4] As used herein, the term "DIP Order" means the Interim DIP Order or the Final DIP Order, as the case may be.

[5] Any capitalized term used herein but not defined herein shall have the meaning ascribed thereto in the Interim Cash Collateral Order or the Motion.

fee application) owed to the First Lien Trustee as set forth in the Calpine First Lien Indenture on the dates when due thereunder; provided, however, that nothing contained herein shall be deemed to constitute a waiver of any right of the First Lien Trustee to seek payment of interest accruing from and after the Petition Date at the default rate provided under the First Lien Indenture at any subsequent point in this case or of the Debtors or any party in interest to object thereto.

        (c)      The Debtors shall pay all reasonable fees (in the case of counsel and advisors, monthly or hourly fees, as applicable) and disbursements (whether prepetition or postpetition and without the necessity of submission of a fee application) of counsel for and the financial advisor to the First Lien Trustee (whether incurred prepetition or postpetition); provided, however, that the First Lien Trustee shall deliver all copies of invoices submitted by its counsel and financial advisor to counsel for the Debtors and the Official Committee of Unsecured Creditors of Calpine (the "Official Committee"); provided, further, however, that the Debtors and the Official Committee receive copies of all invoices for such advisors and no objection is interposed within fifteen (15) days of the receipt of applicable invoices by the Debtors and the Official Committee. The rights of all parties shall be reserved with respect to any success, transaction or similar fees that may be sought by the advisors to the First Lien Trustee. To the extent an objection to any such invoices is interposed within the foregoing fifteen (15) day period, the applicable advisor shall be entitled to receive payment for those fees and expenses for which there is no objection and the objecting party and the applicable advisor shall seek to resolve any such objection within ten (10) days of such objection and, if the objection cannot be resolved either the advisor or the objecting party shall be permitted to seek a ruling by this Court as to the reasonableness of such fees and/or expenses on at least five (5)

business days notice. The Debtors are authorized and directed to provide Jefferies & Company, Inc., as the financial advisor to the First Lien Trustee, with the same indemnity that is provided to Miller Buckfire & Co. ("MB") in a non-interim order authorizing the retention of MB.

(d)     The First Lien Trustee reserves all claims with respect to the order entered on December 16, 2005, by the Delaware Supreme Court directing restoration of $312 million in sale proceeds to the Control Account and the Debtors reserve their rights to oppose (or to take any other action with respect to) any such actions or claims of the First Lien Trustee.

(e)     Notwithstanding anything in this Order to the contrary, the Designated Asset Sale Proceeds in the Control Account shall remain on deposit in the Control Account and shall not be released for any purpose pending further order of this Court, following notice and a hearing upon the filing of further pleadings. The Debtors and the First Lien Trustee acknowledge that (i) the Debtors provided notice in the Interim Order of their intent to seek authorization to apply the Designated Asset Sales Proceeds to pay principal under the First Lien Indenture and (ii) they presently dispute the extent, if any, that the First Lien Trustee would have an allowable claim for a make whole premium in connection with any such payment. The Debtors and First Lien Trustee and other parties in interest shall continue to engage in good faith negotiations regarding such issues; provided, however, that if they have not reached agreement by March 1, 2006, at any time thereafter upon at least five (5) days written notice to the other parties, the Debtors, the Official Committee or the First Lien Trustee may file a motion or other appropriate pleading with this Court seeking an adjudication of these issues.

(f)     Subject to the specific terms set forth in paragraph 15, if the adequate protection arrangements provided to the Calpine First Lien Holders described herein are terminated, (i) the Calpine First Lien Holders may seek Bankruptcy Court approval to revoke the

14

Debtors' right to use the Calpine First Lien Holders' cash collateral upon not less than five (5) business days notice to the Debtors and the Official Committee, (ii) the Calpine First Lien Holders may seek additional or different forms of adequate protection, and/or (iii) the Calpine First Lien Holders may seek relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code or other appropriate relief.

16.     As adequate protection, which this Court finds is reasonable and necessary (i) to protect the Calpine Second Lien Holders' interest in the Calpine Corp. Collateral, including the use of the Calpine Corp. Cash Collateral, pursuant to sections 361 and 363(e) of the Bankruptcy Code, (ii) for any diminution in value of the Calpine Corp. Collateral including, without limitation, from the use of the Calpine Corp. Cash Collateral and (iii) for the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Court approves the following:

(a)     The Calpine Second Lien Holders are hereby granted valid, binding and enforceable (i) second priority replacement security interests in and replacement liens (the "Calpine Corp. Second Replacement Liens") on the Calpine Corp. Collateral and (ii) junior priority replacement security interests in and replacement liens (the "Calpine Corp. Second Subsidiary Replacement Liens" and, collectively with the Calpine Corp. Second Replacement Liens, the "Second Replacement Liens") on all property and interests, real and personal, tangible and intangible, and all products and proceeds thereof, and accessions thereto, all inventory, accounts receivable, general intangibles, equipment, notes, documents, chattel paper, cash and interests in real property (whether owned or leased), whether now existing or hereafter arising, of all Debtors other than Calpine (exclusive, in each case, of any avoidance actions available to the bankruptcy estates of the Debtors pursuant to sections 544, 545, 547, 548, 549, 550, 553(b) or

15

724(a) of the Bankruptcy Code or the proceeds thereof); provided, however, that the Calpine Corp. Second Replacement Liens shall be subordinate and junior to the Calpine Corp. First Replacement Liens. The Second Replacement Liens shall be equal to the extent of the aggregate diminution in value, if any, after the Petition Date, of the Calpine Corp. Collateral, including the Calpine Corp. Cash Collateral, whether by use thereof or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code. The Calpine Corp. Second Subsidiary Replacement Liens shall be silent liens and shall be junior and subordinate to (i) any valid, perfected and unavoidable liens which existed on any asset of any Debtor other than Calpine as of the Petition Date (including, but not limited to, any and all such liens and security interests granted by Project Debtors in favor of Project Lenders); (ii) the Calpine Corp. First Subsidiary Replacement Liens, (iii) the Project Lender Replacement Liens; provided, however, that in the event that any pre-petition liens or security interests of the Calpine Second Lien Holders were pari passu with the pre-petition liens or security interests of a Project Lender on any shared collateral, then the Calpine Corp. Second Subsidiary Replacement Liens on such shared collateral will be pari passu with the Project Lender Replacement Liens on such shared collateral, (iv) the Project Lessor Replacement Liens; (v) the DIP Liens and (vi) the Carve Out (as defined in the Final DIP Order). The Second Lien Trustee agrees that it shall not be entitled to undertake any action to realize upon or otherwise enforce any remedies in respect to the Calpine Corp. Second Subsidiary Replacement Liens without the express written consent of (a) the Agent under the DIP Facility, prior to the payment in full of all obligations due under the DIP Facility and the termination of the lenders' commitments to make further advances or other extensions of credit under the DIP Facility and any applicable Project Lender or Project Lessor holding a claim against or a valid, perfected and enforceable prepetition lien on assets of any

Project Debtor or Project Lessee in respect to which the Second Lien Trustee is being granted a Calpine Corp. Second Subsidiary Replacement Lien hereunder.

(b)    Provided that no default or event of default under the DIP Facility shall have occurred and be continuing, the Debtors shall timely pay to the applicable Second Lien Trustee and Term Loan Agent (as defined below) of the Calpine Second Lien Debt for the ratable benefit of the Calpine Second Lien Holders (based upon outstanding principal amount), $78 million on March 31, 2006 and $78 million on June 30, 2006 (the "Periodic Cash Payments"). Absent further order of this Court, the Debtors shall not be required to make any additional payments to the Calpine Second Lien Holders in 2006 beyond such payments. Any payments beyond December 31, 2006 shall be mutually agreed upon by the Debtors, the Official Committee and the ad hoc committee of the Calpine Second Lien Holders (the "Second Lien Committee" and together with the Official Committee, the "Committees") prior to December 31, 2006 and shall be subject to the consent of the DIP Lenders and the approval of this Court, after notice and a hearing. The First Lien Trustee expressly reserves all rights to object to any proposed adequate protection payments to the Calpine Second Lien Debt except for the payments specified above to be made on March 31 and June 30, 2006. In the event that such parties are unable to so agree prior to December 31, 2006, any of such parties may seek appropriate relief from the Court on an expedited basis; provided, however, that any relief granted by the Court shall not amend the terms of the DIP Facility. All rights of all parties (including, but not limited to, the First Lien Trustee) shall be expressly reserved with respect to payment of post-petition interest (including default interest) and all rights of the parties shall be expressly reserved with respect to the ultimate characterization of the Periodic Cash Payments; provided, however, that the compromise and settlement embodied herein and adequate protection

17

being provided to the Calpine Second Lien Holders shall be in exchange for the agreement by the

Calpine Second Lien Holders that, to the extent they receive the payments provided for herein,

they shall not be entitled to and hereby waive (i) any claim for or entitlement to interest at the

default rate that they may have accrued during the period from January 1, 2006 through and

including June 30, 2006 and (ii) any claim for or entitlement to any makewhole amount or any

pre-payment premium or penalty to the extent that such Periodic Cash Payment is ultimately

recharacterized as a payment of principal.  If the Debtors fail to make either of the Periodic Cash

Payments within the timeframes set forth above, the Second Lien Committee may, upon five (5)

business days notice to the Company and the Official Committee, terminate their adequate

protection arrangements described herein without the need for further order of this Court.

      (c)     The Debtors shall no later than 15 days following receipt of any invoice

therefor pay all reasonable fees (in the case of counsel and advisors, monthly or hourly fees, as

applicable) and disbursements (whether prepetition or postpetition and without the necessity of

submission of a fee application) of (i) U.S. and Canadian counsel for and the financial and

technical advisors to the Second Lien Committee, (ii) the Second Lien Trustee and counsel for

the Second Lien Trustee, and (iii) the Agent under the Calpine Second Lien Term Loan (the

"Term Loan Agent") and counsel for the Term Loan Agent; provided, however, that the Second

Lien Committee, the Second Lien Trustee and the Term Loan Agent shall deliver copies of their

respective invoices, as applicable, and all invoices submitted by their respective counsel and

advisors, in each case to counsel for the Official Committee; provided, further, however, that the

Debtors and the Official Committee receive copies of all invoices for such parties and no

objection is interposed within fifteen (15) days of the receipt of applicable invoices by the

Debtors and the Official Committee.  To the extent an objection to any such invoices is

18

interposed within the foregoing fifteen (15) day period, the applicable advisor shall be entitled to receive payment for those fees and expenses for which there is no objection and the objecting party and the applicable advisor shall seek to resolve any such objection within ten (10) days of such objection and, if the objection cannot be resolved either the advisor or the objecting party shall be permitted to seek a ruling by this Court as to the reasonableness of such fees and/or expenses on at least five (5) business days notice.  In addition, the Term Loan Agent reserves the right to propose to the Debtors and the Official Committee at a later date that the fees and expenses of any financial advisor retained by the Term Loan Agent should be paid out of the Debtors' estates, and the Debtors and the Official Committee reserve their right to object to such a proposal.  The Debtors, the Official Committee and the Second Lien Committee shall promptly and collectively consider any proposed success, transaction or similar fees that Houlihan Lokey Howard & Zukin ("Houlihan"), MB or Lazard Freres LLC may seek upon consummation of a plan(s) of reorganization for the Debtors' chapter 11 cases.  Any such success, transaction or similar fee that shall be payable to Houlihan shall constitute additional adequate protection hereunder and shall be the subject of a further order of the Court related hereto.

       (d)    The DIP Facility shall only be utilized directly or indirectly for purposes that maximize or sustain the overall enterprise value of Calpine, including, without limitation, its direct and indirect equity interests; provided, however, that any breach of the foregoing shall not in any way impair, prejudice, alter or modify the rights of the agents under the DIP Facility (the "DIP Agents") or the DIP Lenders to enforce their rights under the DIP Facility and the Final DIP Order.  In furtherance of the foregoing:

             (i)    On or before the date which is thirty (30) days after entry of this Order (the "Determination Date"), the Debtors and the Committees, in consultation with the First Lien Trustee, shall agree upon (i) a list of those projects and facilities of the Debtors that do

not meet the above-stated criteria (collectively, the "Designated Projects") and (ii) a list of those projects and facilities of the Debtors that require (in the exercise of reasonable business judgment) such further analysis to determine if they meet such criteria (collectively, the "Projects under Review"); provided, however, that neither Geysers Power Company, LLC, Calpine Construction Finance Company, L.P., Calpine Generating Company, LLC, Rocky Mountain Energy Center, LLC nor their respective direct or indirect parents or subsidiaries shall be designated as Designated Projects or Projects under Review.

(ii)     Except as may be agreed to by the Debtors and the Committees, in consultation with the First Lien Trustee, from and after the Determination Date, unless otherwise ordered by the Court, the Debtors shall not, directly or indirectly (i) provide any funding, including advancing any amounts available under the DIP Facility, to or for the benefit of the Designated Projects or (ii) make any payments to or for the benefit of the Designated Projects under tolling or other intercompany agreements.

(iii)    If the Debtors and the Committees are unable to reach the agreements described above within the timeframe set forth in paragraph 16(d)(i), then the Second Lien Committee may, upon fifteen (15) calendar days notice to Calpine, the Official Committee and the First Lien Trustee, terminate the adequate protection arrangements approved hereby.

(iv)     On or before the date which is forty-five (45) days after the Determination Date (the "Secondary Date"), the Debtors and the Committees, in consultation with the First Lien Trustee, shall agree upon those Projects under Review that shall thereafter be Designated Projects and those which shall not.

(v)      If the Debtors and the Committees are unable to reach the agreements described above within the timeframe set forth in paragraph 16(d)(iv) hereof, then the Second Lien Committee may, upon fifteen (15) calendar days notice to the Calpine, the Official Committee and the First Lien Trustee, seek court approval to terminate the adequate protection arrangements approved hereby.

(vi)     Except as may be agreed to by the Debtors and the Committees, in consultation with the First Lien Trustee, between the date of entry of this Order through and including the Secondary Date, the Debtors shall not, directly or indirectly, provide any funding, including advancing any amounts available under the DIP Facility, to or for the benefit of any projects or facilities (excluding Geysers Power Company, LLC, Calpine Construction Finance Company,

20

L.P., Calpine Generating Company, LLC, Rocky Mountain Energy Center, LLC and their respective direct or indirect parents or subsidiaries) except amounts required by such entities to discharge obligations arising in the ordinary course of business (including, without limitation, customary and scheduled maintenance); provided, however, the Designated Projects shall also be subject to the restrictions contained in paragraph 16(d)(ii) above.

(vii)    At any time following the Secondary Date, the Debtors, the Official Committee or the Second Lien Committee (the "Noticing Party") may provide notice to the other two parties and the First Lien Trustee (the "Receiving Parties") of projects and/or facilities that the Noticing Party believes (in the exercise of reasonable judgment) should be added to or removed from the definition of Designated Projects. The Receiving Parties shall respond to the Noticing Party within ten (10) business days of receiving such notice whether they concur with such addition or removal.

(viii)    In the event that the Debtor is a Noticing Party and either the Official Committee or the Committee does not concur, then either of the Committees may seek appropriate relief from this Court on an expedited basis. The projects and/or facilities shall be added to or removed from the definition of Designated Projects within twenty (20) days, absent a ruling by this Court.

(ix)    In the event that either of the Committees is the Noticing Party and the Debtors do not concur, then either of the Committees may seek appropriate relief from this Court on an expedited basis. Such projects and/or facilities shall only be added to or removed from the definition of Designated Projects upon a ruling by this Court. Pending the above-contemplated rulings by this Court, the Debtors shall fund or advance, to the extent necessary, only those amounts which are essential to the continued operation of the relevant projects and/or facilities.

(e)    On or before the Secondary Date, the Debtors and the Committees shall use commercially reasonable efforts to agree upon and implement risk management policies for Calpine Energy Services, LP and Calbear Energy L.P.'s activities.

(f)    The Second Lien Trustee reserves all claims with respect to the order entered on December 16, 2005, by the Delaware Supreme Court directing restoration of $312

21

million in sale proceeds to the Control Account and the Debtors reserve their rights to oppose (or to take any other action with respect to) any such actions or claims of the Second Lien Trustee.

(g)    Notwithstanding anything contained herein to the contrary, the Debtors shall provide the Committees and First Lien Trustee with the same financial information required to be provided to the lenders under the DIP Facility.  In addition, the Debtors shall provide the Committees and First Lien Trustee with agreed-upon financial information necessary for the Committees and First Lien Trustee to, among other things, make the determinations and agreements contemplated hereby.

(h)    Subject to the specific terms set forth in paragraph 16, if the adequate protection arrangements provided to the Calpine Second Lien Holders described herein are terminated, (i) the Calpine Second Lien Holders may seek Bankruptcy Court approval to revoke the Debtors' right to use the Calpine Second Lien Holders' cash collateral upon not less than five (5) business days notice to the Debtors and the Official Committee, (ii) the Calpine Second Lien Holders may seek additional or different forms of adequate protection, and/or (iii) the Calpine Second Lien Holders may seek relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code or other appropriate relief.

17.    As adequate protection, which this Court finds is reasonable and necessary (i) to protect (a) the Project Lenders' interest in collateral pledged by the Project Debtors to secure the applicable Project Debtor's obligations under the applicable Project Loan Documents (the "Project Lender Collateral"), including the use of the Restricted Cash and the Unrestricted Cash, pursuant to sections 361 and 363(e) of the Bankruptcy Code, and (b) the Project Lessors' interest in the applicable leased facility and collateral pledged, if any, by the Project Lessees to secure the applicable Project Lessee's obligations (collectively, the "Project Lessor Collateral")

under the related lease, loan and security documents (the "Project Lease Documents"), (ii) for

any diminution in value of the Project Lender Collateral or the Project Lessor Collateral,

including, without limitation, from the use of the Restricted Cash in accordance with the

applicable Cash Waterfall Provisions, the use of the Unrestricted Cash in accordance with the

terms of this Order and the use of the Project Lender Collateral or the Project Lessor Collateral

and (iii) for the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code,

the Court approves the following:

        (a)      Each Project Lender shall receive (i) current payment of all accrued but

unpaid interest and fees (whether prepetition or postpetition, including, without limitation, letter

of credit and agency fees) at the non-default contract rates set forth under such Project Loan

Documents (which contract rates, for avoidance of doubt, shall, with respect to any obligations

of CalGen Holdings, Inc. or its subsidiaries in respect of any amounts drawn under letters of

credit during these Chapter 11 Cases, be determined by reference to the "Base Rate" provided for

in the applicable Project Loan Document) and principal (whether prepetition or postpetition) as

such interest and/or principal would become due and payable absent a default or event of default

under the applicable Project Loan Documents, (ii) (and each Project Lessor shall receive)

reasonable fees (in the case of counsel and advisors, monthly or hourly fees, as applicable) and

disbursements including, without limitation, the fees of counsel and financial advisors to the

Project Lessors, the indenture trustees and pass-through trustees, the Ad Hoc Committee of

Series A and B Certificate Holders, Quadrangle Debt Recovery Advisors LLC and/or agents

under the Project Loan Documents and Project Lease Documents (in each case whether

prepetition or postpetition and without the necessity of submission of a fee application) to the

extent provided for under such Project Loan Documents and Project Lease Documents and (iii)

23

payment of the prepetition portion of the invoices for maintenance and similar expenses set forth

on **Schedule I** annexed hereto, to the extent payment of such invoices is reasonably necessary for

the adequate protection of the interest of the project lenders for Calpine Greenleaf in any

collateral pledged by the Debtors to secure obligations under the Greenleaf Project Documents;

provided, however, that no principal payments on indebtedness owed by CalGen Holdings, Inc.

or its subsidiaries during these Chapter 11 Cases shall be paid absent further order of this Court

and a determination, if necessary, of any intercreditor issues relating thereto; provided, further,

however, the Debtors and the Official Committee receive copies of all invoices for such advisors

and no objection is interposed within fifteen (15) days of the receipt of the applicable invoices by

the Debtors and the Official Committee; provided, further, however, that to the extent an

objection to any such invoices is interposed within the foregoing fifteen (15) day period, the

applicable advisor shall be entitled to receive payment for those fees and expenses for which

there is no objection and the objecting party and the applicable advisor shall seek to resolve any

such objection within ten (10) days of such objection and, if the objection cannot be resolved

either the advisor or the objecting party shall be permitted to seek a ruling by this Court as to the

reasonableness of such fees and/or expenses on at least five (5) business days notice; provided,

further, however, that nothing contained herein shall be deemed to constitute a waiver of any

right of a Project Lender to seek payment of interest accruing from and after the Petition Date at

the rate provided under the applicable Project Loan Documents (including without limitation at

the default or other applicable rate) at any subsequent point in the Chapter 11 Cases or of the

Debtors or any party in interest to object thereto; provided, further, however, that with respect to

a Project Debtor's obligation to pay interest, fees and/or principal and professional fees and

expenses hereunder, such obligation shall cease upon the earlier to occur of (i) a Termination

Event with respect to such Project Debtor or (ii) the date that falls twenty (20) days after receipt

by the Project Lender of notice that the Project Debtor and DIP Lenders have determined to

allow the applicable Project Lender to foreclose upon such Project Lender's collateral; provided,

further, however, that with respect to a Project Lessee's obligation to pay professional fees and

expenses hereunder, such obligation shall cease upon the earlier to occur of (i) a Termination

Event with respect to such Project Lessee, (ii) the date that falls twenty (20) days after receipt by

the Project Lessor of notice that the Project Lessee has determined to reject the lease between the

Project Lessor and the Project Lessee.  In connection with the foregoing, each indenture trustee,

collateral agent or similar entity under a Project Loan Document shall be required to honor all

borrowing certificates, draw-down or transfer requests or similar documents provided to such

indenture trustee by a Project Debtor notwithstanding that such documents represent that there

may be defaults related to (i) the Chapter 11 Cases, including, without limitation, non-payment

of prepetition amounts and/or default interest and cross-defaults, (ii) the incurrence by any

Debtor of liens and obligations in connection with the DIP Facility, (iii) the making of any

Project Intercompany Loan by any Debtor or the incurrence by any Debtor of indebtedness under

a Project Intercompany Loan and (iv) in the case of CalGen Holdings, Inc. or its subsidiaries, the

non-payment of principal payments.

      (b)    The Project Debtors shall, except as provided herein, continue to comply

with all provisions of the applicable Project Loan Documents, including (i) the Cash Waterfall

Provisions and (ii) any provisions providing for the reasonable fees and disbursements of counsel

and other consultants of the Project Lenders.

      (c)    The Project Lenders are hereby granted valid, binding and enforceable

replacement security interests in and replacement liens on all prepetition and postpetition

property (including, without limitation, each Project Intercompany Loan) and proceeds thereof (exclusive of any avoidance actions available to the bankruptcy estates of the applicable Project Debtors pursuant to sections 544, 545, 547, 548, 549, 550, 553(b) or 724(a) of the Bankruptcy Code or the proceeds thereof) of the respective Debtors of whom each such Project Lender is a creditor, and such replacement liens and replacement security interests (collectively, the "Project Lender Replacement Liens") shall (i) be equal to the extent of the aggregate diminution in value, if any, after the Petition Date, of a Project Lender's particular Project Lender Collateral, whether by use or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; (ii) have the relative priority between and among the Project Lenders that each Project Lender's prepetition liens possess in accordance with any intercreditor arrangements and/or applicable law; and (iii) solely with respect to liens on property that, but for the commencement of the applicable Project Debtors' bankruptcy case, would constitute Project Lender Collateral, be first priority liens, senior to all other liens, including liens to secure the DIP Facility.

        (d)      The Project Lessors are hereby granted valid, binding and enforceable security interests in and replacement liens on all prepetition and postpetition property (including, without limitation, each Project Intercompany Loan) and proceeds thereof (exclusive of any avoidance actions available to the bankruptcy estates of the applicable Project Debtors pursuant to sections 544, 545, 547, 548, 549, 550, 553(b) or 724(a) of the Bankruptcy Code or the proceeds thereof) of the respective Project Lessee(s) of whom each such Project Lessor is a creditor or has a pledge of assets, and such replacement liens and security interests (collectively, the "Project Lessor Replacement Liens" and together with the Calpine Corp. First Replacement Liens, the Second Replacement Liens, and the Project Lender Replacement Liens, the "Replacement Liens") shall be equal to the extent of the aggregate diminution in value, if any,

26

after the Petition Date, of a Project Lessor's particular Project Lessor Collateral, whether by use or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; provided, however, that the Project Lessor Replacement Liens shall be subordinate and junior to the DIP Liens and shall be senior to the Calpine Corp. First Replacement Liens and Calpine Corp. Second Replacement Liens; provided, further, however, that the Replacement Liens shall be subject to the payment of the Carve Out.

(e)     The Replacement Liens shall constitute valid and duly perfected security interests and liens as of the Petition Date, and the First Lien Trustee, the Second Lien Trustee, the Term Loan Agent, any trustee or agent under the Project Loan Documents and any Calpine Corp. Lienholder, Project Lender or Project Lessor, as the case may be, shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens.

(f)     To the extent that the guarantees and claims granted to the DIP Agent and the DIP Lenders pursuant to the DIP Orders and the DIP Liens are released if the DIP Credit Agreement remains in full force and effect, or would have been released had the DIP Credit Agreement been in full force and effect, as to any Project Debtor, Project Lessee or Clear Lake Cogeneration, L.P. ("Clear Lake") as provided under Section 6.5(a) of the DIP Credit Agreement or Section 21(x) or (y) of the Security and Pledge Agreement or as a result of a foreclosure by a Project Lender or Project Lessor pursuant to such Section 21 (which such sections are annexed hereto as **Schedule II**), the Subsidiary 507(b) Claims against such Project Debtor, Project Lessee or Clear Lake and the Calpine Corp. First Subsidiary Replacement Liens and the Calpine Corp. Second Subsidiary Replacement Liens on the assets (and equity to the extent necessary to permit

27

a consensual surrender or foreclosure) of such Project Debtor, Project Lessee or Clear Lake shall be automatically canceled and released at such time without further order of the Court.

18.    In addition to the Replacement Liens granted to the Calpine Corp. Lienholders, the Project Lenders and the Project Lessors pursuant to this Order, pursuant to sections 503(b)(1), 507(a) and 507(b) of the Bankruptcy Code, (i) the Calpine Corp. Lienholders are hereby granted "superpriority" administrative claims (the "Calpine Corp. 507(b) Claims") against the estates as to which they hold pre-petition secured claims, (ii) the Calpine Corp. Lienholders are hereby granted "superpriority" administrative claims (the "Subsidiary 507(b) Claims") against the estates as to which they do not hold pre-petition secured claims, (iii) the Project Lenders respectively are hereby granted "superpriority" administrative claims (the "Project Lender 507(b) Claims"), and (iv) the Project Lessors are hereby granted superpriority administrative claims (the "Project Lessor 507(b) Claims" and together with the Calpine Corp. 507(b) Claims, the Subsidiary 507(b) claims, and the Project Lender 507(b) Claims, the "507(b) Claims") against the respective estates as to which they are granted replacement liens hereunder. Such 507(b) Claims shall be for the amount by which adequate protection afforded herein for any diminution of value of the Calpine Corp. Collateral, the Calpine Corp. Cash Collateral, the Project Lender Collateral, or the Project Lessor Collateral, as applicable, from and after the Petition Date proves to be inadequate.  Such 507(b) Claims shall be allowed and shall have priority over all other costs and expenses of the kind specified in or ordered pursuant to sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code; provided, however, that the 507(b) Claims shall be junior and subordinate to any claims granted to the DIP Agents and any DIP Lender by the DIP Order and subject to the payment of the Carve Out; provided, further, however, that the 507(b) Claims granted to the Calpine Second Lien Holders

28

shall be junior to the 507(b) Claims granted to the Calpine First Lien Holders; provided, further, however, that the Subsidiary 507(b) Claims shall be junior to the Project Lender 507(b) Claims and the Project Lessor 507(b) Claims; provided, further, however, that the Project Lender 507(b) Claims shall have the relative priority between and among the Project Lenders that each Project Lender's prepetition claims possess in accordance with any intercreditor arrangements and/or applicable law; provided, further, however, that the Subsidiary 507(b) Claims may be paid under any plan of reorganization of the relevant Debtor in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such claims; provided, further, however, that with respect to proceeds of any avoidance actions available to the bankruptcy estates of the Debtors pursuant to sections 544, 545, 547, 548, 549, 550, 553(b) or 724(a) of the Bankruptcy Code, 507(b) Claims shall share in such proceeds on a pari passu basis with general unsecured claims at the applicable Debtor.

19.    As adequate protection to any Debtor (each, an "Adequately Protected Debtor") that, following the Petition Date, transfers property (including cash) to or for the benefit of any other Debtor (a "Beneficiary Debtor") having a fair value (net of any post-petition reasonable expenses for overhead or other services reasonably allocated or reasonably charged to the Adequately Protected Debtor) in excess of the fair value of the property (including cash) or benefit received post-petition by such Adequately Protected Debtor from the Beneficiary Debtor, such Adequately Protected Debtor shall have (i) an allowed claim against the Beneficiary Debtor under sections 364(c)(1) and 507(b) of the Bankruptcy Code having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (a "Junior Reimbursement Claim") and (ii) a lien on all property of the Beneficiary Debtor's estate under section 364(c)(2) and (3) of the Bankruptcy Code securing such Junior

29

Reimbursement Claim (each, a "Junior Reimbursement Lien").  Any Junior Reimbursement

Claim and Junior Reimbursement Lien shall be subject to and junior only to (i) the Carve out and

(ii) any claims granted to the DIP Agent and the DIP Lenders pursuant to the DIP Orders and the

DIP Liens; provided, however, that a Junior Reimbursement Claim or Junior Reimbursement

Lien may be paid under any plan of reorganization of the relevant Debtor in any combination of

cash, debt, equity or other property having a value on the effective date of such plan equal to the

allowed amount of such claim.  All parties shall be deemed to have reserved their rights with

respect to (i) any resulting intercompany balances as a result of intercompany transactions; (ii)

the pricing under intercompany arrangements; (iii) allocation of costs, fees and expenses

incurred by the various Debtor entities in connection with intercompany transactions for both

prepetition and postpetition periods; and (iv) the contribution rights and subrogation rights, if

any, that any Debtor may have against another Debtor in respect of prepetition or postpetition

transactions and liabilities.  For purposes of clarification, this paragraph applies to all Debtors,

including, without limitation, the Project Lessees.

       20.     Any and all distributions by Project Debtors of Unrestricted Cash or other

assets to their parent entities shall constitute loans (each, a "Project Intercompany Loan"), each

of which shall constitute a Junior Reimbursement Claim of the applicable Project Debtor;

provided, however, neither the First Lien Trustee, the Second Lien Trustee, the Collateral

Trustee, any Calpine Corp. Lienholder, any Project Lender nor any other party shall be entitled

to exercise any remedy or take any other action under any of the Project Loan Documents or

other documents solely as a result of the making of any Project Intercompany Loan by any

Debtor or the incurrence by any Debtor of indebtedness under a Project Intercompany Loan.  For

purposes of clarification, this paragraph applies to all Debtors, including, without limitation, the Project Lessees.

21.     At no time shall the Debtors, the Official Committee or any other person or entity have the right to use the Calpine Corp. Collateral, including the Calpine Corp. Cash Collateral to (i) object to or contest in any manner, or raise any defenses to, the validity, perfection, priority, enforceability or amount of any of the First Lien Obligations, the Calpine Second Lien Debt, the Calpine Corp. Collateral or the Calpine Corp. Cash Collateral, (ii) assert or prosecute any defense, counterclaim or offset to any of the First Lien Obligations, the Calpine Second Lien Debt or the Calpine Corp. Collateral or to assert or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims or causes of action against the Calpine Corp Lienholders or any of their respective agents, advisors or counsel (including the First Lien Trustee, the Second Lien Trustee, the Term Loan Agent and the Collateral Agent) in respect of the Calpine First Lien Debt or Calpine Second Lien Debt; (iii) prevent, hinder or otherwise delay the First Lien Trustee's, Second Lien Trustee's, the Term Loan Agent's, Collateral Agent's or any Calpine Corp. Lienholder's assertion, enforcement or realization on its collateral in accordance with this Order, (iv) seek to modify any of the rights granted to the First Lien Trustee, Second Lien Trustee, the Term Loan Agent, Collateral Agent or any Calpine Corp. Lienholder hereunder, without such parties' prior written consent (collectively, the "Calpine Corp. Lienholder Claims and Defenses"); provided, however, that the Calpine Corp. Cash Collateral (excluding funds in the Control Account) may be used to perform investigations regarding Calpine Corp. Lienholder Claims and Defenses.  The Debtors, the Official Committee or other person or entity shall have the right to assert Calpine Corp. Lienholder Claims and Defenses only in an action commenced in this Court on or before July 30,

2006 or such later date as may be agreed to among the Debtors, the Official Committee, the First Lien Trustee, the Second Lien Trustee and/or Term Loan Agent, as applicable, or as otherwise ordered by the Court for cause shown, after notice and a hearing (the "Investigation Termination Date"). If no such action is commenced on or before the Investigation Termination Date, all Calpine Corp. Lienholder Claims and Defenses shall be deemed, immediately and without further action by the Calpine Corp Lienholders, the First Lien Trustee, the Second Lien Trustee or Term Loan Agent, to have been forever relinquished and waived as to all such persons. If such an action is commenced on or before such date, all Calpine Corp. Lienholder Claims and Defenses shall be deemed, immediately and without further action by the Calpine Corp Lienholders, the First Lien Trustee, the Second Lien Trustee or Term Loan Agent, to have been forever relinquished and waived except with respect to Calpine Corp. Lienholder Claims and Defenses that are expressly asserted in such action. The terms of this Order shall be without prejudice to the right of the Debtors, the Official Committee or other person or entity to commence and prosecute Calpine Corp. Lienholder Claims and Defenses as set forth above.

22.    Notwithstanding anything in this Order, no 507(b) Claim, Junior Reimbursement Claim, Junior Reimbursement Lien or Project Intercompany Loan may be paid (or repaid) unless and until all obligations outstanding under the DIP Facility have been paid, in full, in cash, and all commitments to make further advances or other extensions of credit under the DIP Facility have been cancelled.

23.    At no time shall the Debtors, the Official Committee or any other person or entity have the right to use the Project Lender Collateral, including Restricted Cash and Unrestricted Cash, to (i) object to or contest in any manner, or raise any defenses to, the validity,

perfection, priority, enforceability or amount of any of the Project Lender Collateral, (ii) assert or

prosecute any defense, counterclaim or offset to any of the Project Lender Collateral or to assert

or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims

or any other claims or causes of action against the Project Lenders or any of their respective

agents, advisors or counsel in respect of the Project Lender Collateral, (iii) prevent, hinder or

otherwise delay the Project Lenders' assertion, enforcement or realization on their respective

collateral in accordance with this Order, or (iv) seek to modify any of the rights granted to the

Project Lenders hereunder, without the prior written consent of the applicable Project Lender(s)

(collectively, the "Project Lender Claims and Defenses"); provided, however, that the Project

Lender Collateral may be used to perform investigations regarding Claims and Defenses.  The

terms of this Order shall be without prejudice to the right of the Debtors, the Official Committee

or other person or entity to commence and prosecute Project Lender Claims and Defenses as set

forth above.

      24.    At no time shall the Debtors, the Official Committee or any other person

or entity have the right to use the collateral of a Project Lessor (the "Project Lessor Collateral")

to (i) object to or contest in any manner, or raise any defenses to, the validity, perfection,

priority, enforceability or amount of any of the Project Lessor Collateral, (ii) assert or prosecute

any defense, counterclaim or offset to any of the Project Lessor Collateral or to assert or

prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or

any other claims or causes of action against the Project Lessors or any of their respective agents,

advisors or counsel in respect of the Project Lessor Collateral, (iii) prevent, hinder or otherwise

delay the Project Lessors' assertion, enforcement or realization on their respective collateral in

accordance with this Order, or (iv) seek to modify any of the rights granted to the Project Lessors

33

hereunder, without the prior written consent of the applicable Project Lessor(s) (collectively, the

"Project Lessor Claims and Defenses"); provided, however, that the Project Lessor Collateral

may be used to perform investigations regarding Claims and Defenses.  The terms of this Order

shall be without prejudice to the right of the Debtors, the Official Committee or other person or

entity to commence and prosecute Project Lessor Claims and Defenses as set forth above.

   25. Except as expressly set forth herein and without limitation, nothing in this

Order shall constitute a waiver by the Calpine Corp. Lienholders, the Project Lenders or the

Project Lessors of the right to request additional adequate protection or relief or modification of

the automatic stay or any other rights, claims or privileges of any kind, and nothing in this Order

shall constitute a waiver of the Debtors' rights to oppose any such action by the Calpine Corp.

Lienholders or request different relief or other treatment or to request reductions in or

modifications to the adequate protection and relief provided hereunder; and nothing in this Order

shall constitute a waiver of any right of any Project Lender under any intercreditor or like

agreement with respect to payments and/or other adequate protection granted to any other Project

Lender in this Order.

   26. During the chapter 11 cases, Calpine shall continue to file on a timely

basis all reports due to be filed with the Securities and Exchange Commission.

   27. Upon reasonable written notice to the Debtors by the First Lien Trustee,

the Second Lien Trustee, the Term Loan Agent, the Official Committee or the Second Lien

Committee (or any Project Lender or Project Lessor to the extent already allowed by, and subject

to the terms of, the Project Loan Documents or Project Lease Documents), as the case may be,

such person shall have access to, and the right to examine, the Debtors' books, records and the

Calpine Corp. Collateral, the Project Lender Collateral or the Project Lessor Collateral, as the case may be. In addition, upon receipt by the Debtors of a written detailed request for specific documents from the First Lien Trustee, the Second Lien Trustee, the Term Loan Agent, the Official Committee, the Second Lien Committee, the Project Lenders or the Project Lessors, the Debtors shall provide the requesting party with such documents to the extent they are required to provide, and have already provided, such documents to the lenders under the DIP Facility in accordance with the terms of the DIP Facility or any order of this Court approving the DIP Facility.

28. Subject to paragraph 16, an event establishing grounds for the First Lien Trustee, Second Lien Trustee, the Term Loan Agent, Second Lien Committee and a Project Lender, as applicable, to seek the termination of an individual Debtor's right to use (i) the Calpine Corp. Cash Collateral, (ii) the Restricted Cash of such Debtor in accordance with the Cash Waterfall Provisions of the applicable Project Loan Documents and/or (iii) Unrestricted Cash of such Debtor, in each case pursuant to this Order (a "Termination Event") shall occur upon (a) the failure of such Debtor to make any payment required by this Order to be made by such Debtor, unless cured or waived by the applicable party by the fifth (5th) business day following the delivery of written notice to such Debtor, the Official Committee and the applicable Project Lender, if any, by the applicable party asserting nonpayment, (b) the failure of such Debtor to comply with any other term or provision of this Order applicable to such Debtor, unless cured or waived by the applicable party by the fifth (5th) business day following the delivery of written notice to such Debtor, the Official Committee and the applicable Project Lender, if any, by the applicable party asserting noncompliance by such Debtor with the terms of this Order, (c) the conversion of Calpine's chapter 11 case to a chapter 7 case, (d) the entry of an

35

order in Calpine's chapter 11 case appointing an examiner having expanded powers to operate or manage the financial affairs of any of the Debtors (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code), (e) the filing of a plan of reorganization by the Debtors, without the consent of the First Lien Trustee or the Second Lien Committee that does not propose to satisfy the claims owed under the Calpine First Lien Indenture or in respect of the Calpine Second Lien Debt, as the case may be, in accordance with applicable provisions of the Bankruptcy Code; provided, however, that a Termination Event pursuant to section (e) of this paragraph shall not terminate the Project Debtors' right and ability to use the Project Lender Collateral, including the Restricted Cash and the Unrestricted Cash, pursuant to the terms of this Order, (f) the termination of such Debtor's adequate protection arrangements described herein and (g) the termination of the DIP Facility (subject to applicable term and waiver periods).

29.    Except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding which may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Calpine Corp. Collateral, the Calpine Corp. First Replacement Liens or the Calpine Corp. Second Replacement Liens, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the First Lien Trustee or the Second Lien Committee, as the case may be, and no such consent shall be implied from any other action, inaction or acquiescence by the First Lien Trustee or the Second Lien Committee, as the case may be, or any of the Calpine First Lien Holders or Calpine Second Lien Holders.

30.    Except as expressly permitted under this Order and except for the liens and claims granted pursuant to the DIP Order, no claim or lien having priority to or superiority to

36

or ranking pari passu with those granted by this Order to the First Lien Trustee, the Second Lien Trustee, the Adequately Protected Debtors, the Term Loan Agent, the Project Lenders or the Project Lessors, respectively, shall be granted or allowed while any portion of the obligations due to each of them respectively remain outstanding and the Replacement Liens granted to each of them hereunder shall not be (i) subject to or junior to any lien or security interest that is avoided or preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest whether under Section 364(d) of the Bankruptcy Code or otherwise.

31.    Except as expressly provided in this Order, the liens and superpriority claims granted to the First Lien Trustee, Second Lien Trustee, the Adequately Protected Debtors, the Term Loan Agent, the Project Lenders and the Project Lessors under this Order shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of the Chapter 11 Cases or being another act or omission or (ii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases.  The terms and provisions of this Order shall continue in these Chapter 11 Cases and any successor cases or superseding cases under the Bankruptcy Code and the replacement liens, superpriority claims, and all other rights and remedies granted to the First Lien Trustee, Second Lien Trustee, the Adequately Protected Debtors, the Term Loan Agent, the Second Lien Committee, Project Lenders and the Project Lessors pursuant to this Order shall continue in full force and effect during such successor or superseding cases.

32.     The provisions of this Order, including all findings therein, shall be binding upon all parties in interest in the Chapter 11 Cases and shall inure to the benefit of the First Lien Trustee, the Second Lien Trustee, the Adequately Protected Debtors, the Term Loan Agent, the Second Lien Committee, the Project Lenders and the Project Lessors respectively and their respective successors and assigns, all of whom hereby agree to waive any right to appeal or file a motion to reconsider or stay this Order and in the case of DZ Bank AG, Celanese Ltd., U.S. Bank National Association, Quadrangle Debt Recovery Advisors LLC and the Ad Hoc Committee of certain Series A and B pass-through certificates relating to South Point, Broad River and RockGen agree to withdraw any appeal of, or motion to reconsider or stay, the Final Cash Collateral Order and/or the Final DIP Order that they have previously filed.

33.     The relief granted in this Order is granted on an interim basis, and shall remain in full force and effect until such time as this Court enters a final order on the Motion, provided that, if no objections are received, within the time periods set forth below, to those provisions of this Order that constitute modifications to the relief granted in the Final Cash Collateral Order entered by the Court on January 30, 2006, docket no. 664, then the relief granted in this Order shall apply on a final basis without need for a further hearing or the entry of a final order; provided, further, that no party may object to any provision of this Order that does not constitute a modification to the relief granted in the Final Cash Collateral Order entered by the Court on January 30, 2006, docket no. 664.

34.     The Debtors shall promptly mail copies of this Order to the parties having been given notice of the Final Hearing, and to any other party that has filed a request for notices with this Court and to Committee counsel.  Any party in interest objecting to the relief sought

herein shall serve and file written objections; which objections shall be served upon (1) Kirkland

Ellis LLP, counsel to the Debtors, Citigroup Center, 153 East 53rd Street, New York, NY 10022-

4611, Attn: Mathew Cantor, Esq., and Edward Sassower, Esq.; (2) Simpson Thacher & Bartlett

LLP, counsel to DB and CS as Agents, 425 Lexington Avenue, New York, NY 10017, Attn:

Peter Pantaleo, Esq. and David Mack, Esq.; (3) the Office of the United States Trustee for the

Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004; (4) Akin

Gump Strauss Hauer & Feld LLP, counsel to the Committee appointed in these Chapter 11 cases,

590 Madison Avenue, New York, NY 10022-2524, Attn: Michael S. Stamer, Esq. and Philip C.

Dublin, Esq.; (5) Paul Weiss Rifkind Wharton & Garrison LLP, counsel to the unofficial

committee of second lien debtholders, 1285 Avenue of the Americas, New York, NY 10019-

6064, Attn: Alan W Kornberg, Esq., Andrew N Rosenberg, Esq. and Elizabeth R McColm, Esq.

and (6) Brown Rudnick Berlack Israels LLP, counsel to Wilmington Trust Company, in its

capacity as Indenture Trustee for the holders of first lien secured notes of Calpine Corporation,

One Financial Center Boston, MA  02111, Attn: Steven B. Levine, Esq. and shall be filed with

the Clerk of the United States Bankruptcy Court, Southern District of New York, in each case to

allow actual receipt by the foregoing no later than February 23, 2006 at 4:00 p.m., prevailing

Eastern time.

35.     This Order replaces the Interim Order in its entirety, and the Interim Order

shall have no further legal effect as of the date hereof.

36.     The subject of this Order is a "core" proceeding within the meaning of 28

U.S.C. § 157. This Order shall be fully effective upon its entry.

37.    Nothing in this Order shall in any way impair the provisions of the DIP Order or the DIP Facility.

38.    Notwithstanding anything to the contrary in this Order, none of the liens granted pursuant to this Order shall attach or otherwise apply to the capital stock of Calpine Pasadena Cogeneration, Inc. and Calpine Texas Cogeneration, Inc.

39.    Solely with respect to the Motion, based on the Debtors' representation, it is hereby found that the interests in real property located in Westbrook, Maine which are owned by Calpine Construction Finance Company, L.P. (as shown by documents now of record in the Registry of Deeds for Cumberland County, Maine), as well as personal property located thereon, is not owned by a Debtor as of the date hereof and accordingly such real or personal property shall not be subject to the terms of this Final Order, provided that such finding is without prejudice to the right of the Debtors to seek to obtain orders extending this Final Order to such real and personal property if Calpine Construction Finance Company, L.P., subsequently becomes a Debtor.

40.    Notwithstanding anything in this Order to the contrary, and in light of ongoing discussions between Bethpage Energy Center 3, LLC ("BEC3") and its Project Lenders regarding dismissal of its Chapter 11 case on a consensual basis, BEC3 shall not constitute a Debtor or Project Debtor for purposes of this Order, and BEC3 and its assets shall not otherwise be subject to any provision of this Order, except that BEC3 shall hereby be authorized to use its Restricted Cash and Unrestricted Cash as BEC3 and its Project Lenders may agree.

41.    Notwithstanding anything in this Order to the contrary, the Debtors hereby agree to continue making all payments and performing all obligations under the Facility Lease

40

Agreement (the "Greenleaf Facilities Lease"), dated as of August 10, 1998, among Calpine

Greenleaf, Greenleaf Cogen, LLC and U.S. Bank, National Association; provided, however, that

the foregoing agreement shall not (i) prejudice in any way the Debtors' right subsequently to

seek to recharacterize the Greenleaf Facilities Lease as a financing or the defenses of the

applicable project lenders for Calpine Greenleaf to any such attempt or (ii) prejudice in any way

any of the rights of the Debtors or the project lenders for Calpine Greenleaf under the

Bankruptcy Code with respect to the Greenleaf Facilities Lease including, without limitation, the

right of the Debtors to assume or reject the Greenleaf Facilities Lease under section 365(a) of the

Bankruptcy Code.  Subject to paragraph 16 of this Order, in addition to the Termination Events

set forth in paragraph 28 of this Order, the authorization of Calpine Greenleaf to use the cash

collateral of the related project lenders for Calpine Greenleaf shall terminate immediately upon

the occurrence of any of the following, unless otherwise expressly agreed in writing by the

project lenders for Calpine Greenleaf: (a) the entry by the Court of an order pursuant to section

365(a) of the Bankruptcy Code authorizing (i) Calpine Greenleaf to reject the Greenleaf

Facilities Lease, or (ii) any Debtor to reject any of the security, depositary or other agreements

materially relating to the Greenleaf Facilities Lease (collectively, the "Greenleaf Project

Documents") including, without limitation, that certain ISDA Master Agreement with Calpine

Greenleaf, dated as of June 1, 2005, and all related schedules and confirmations (collectively, the

"Swap Agreement"), the Gas, Sale and Purchase Agreement, dated as of June 12, 2000, between

and Calpine Greenleaf and Calpine Energy Services, L.P. (the "Gas, Sale and Purchase

Agreement") and the power purchase agreements relating to the Calpine Greenleaf facility, (b)

the termination by Calpine Energy Services, L.P. or Calpine Greenleaf of the Swap Agreement,

unless such termination is retracted, cured or waived by Calpine Greenleaf, Calpine Energy

Services, L.P., and/or the related project lenders for Calpine Greenleaf, as the case may be, by

the fifth (5th) business day following the delivery of written notice of such termination to

Calpine Greenleaf, Calpine Energy Services, L.P., the related project lenders for Calpine

Greenleaf and the Official Committee, or (c) a material breach by (i) Calpine Greenleaf under the

Greenleaf Facilities Lease that would excuse non-performance by the lessor, or (ii) any Debtor

under the (I) Swap Agreement or (II) the Gas, Sale and Purchase Agreement, in each case that

would excuse non-performance by the counter-party, unless such material breach is cured or

waived by the applicable party by the fifth (5th) business day following the delivery of written

notice of the alleged material breach to Calpine Greenleaf and the Official Committee by the

applicable party asserting the occurrence of such material breach; provided, that, notwithstanding

anything to the contrary in this Order, (x) any cross-defaults or defaults under any Greenleaf

Project Documents, in each case existing as of the date of entry of this Order and which are

reasonably known to the project lenders for Calpine Greenleaf, and (y) any events of default

under any Greenleaf Project Documents existing as of the date of entry of this Order that could,

with the passage of time or the giving of notice or both, become defaults, and which are

reasonably known to the project lenders for Calpine Greenleaf, are not Termination Events under

any provision of this Order including, without limitation, paragraph 28 of this Order, and the

project lenders for Calpine Greenleaf shall not terminate, or attempt to terminate, the Debtors'

access to cash collateral solely on the basis of such cross-defaults, defaults or events of default.

Notwithstanding anything in this Order to the contrary, the Greenleaf Project Documents shall be

treated as "Project Loan Documents" solely for purposes of this Order, and the project lenders

for Calpine Greenleaf shall receive all of the adequate protection required to be provided to the

Project Lenders pursuant to this Order.

42.    For purposes of clarification, the fee provisions of this order apply not only to the fees of the professionals of indentures trustees, collateral agents or similar entities but also to the fees of the indentures trustees, collateral agents or similar entities themselves.

43.    (a) DZ Bank AG, Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main, New York Branch ("DZ Bank") shall be deemed a "Service Party" under the Order Pursuant To Sections 365 And 554 Of The Bankruptcy Code Authorizing And Approving Expedited Procedures For The Rejection Of Executory Contracts And Unexpired Leases Of Personal And Non-Residential Real Property, that was entered by the Court on December 21, 2005 (the "Rejection Procedures Order"), with respect to that certain Tolling Agreement, dated as of March 26, 2004, between MEP Pleasant Hill, LLC and Calpine Energy Services, L.P.  Any notices served upon DZ Bank shall be sent to Chadbourne & Parke LLP, 30 Rockefeller Plaza, New York, NY 10112, Attn: Joseph H. Smolinsky, Esq., and DZ Bank, 609 Fifth Avenue, New York, NY 10017-1021, Attn.: Daira A. Pishko; (b) The South Point Owner Lessors, the Broad River Owner Lessors, and the RockGen Owner Lessors shall be deemed "Service Parties" under the Rejection Procedures Order with respect to the rejection of any contract or lease to which South Point Energy Center, LLC, Broad River Energy LLC, or RockGen Energy LLC, respectively, is a party, and any notices served upon the South Point Owner Lessors, the Broad River Owner Lessors, or RockGen Owner Lessors shall be sent to Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, NY 10005-1413, Attn: Wilbur F. Foster, Jr.; (c) U.S. Bank National Association ("U.S. Bank"), as Indenture Trustee and Pass Through Trustee, shall be deemed a "Service Party" under the Rejection Procedures Order with respect to the rejection of any contract or lease to which South Point Energy Center, LLC, Broad River Energy LLC, or RockGen Energy LLC is a party, and any notices served upon U.S. Bank shall

43

be sent to (i) Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103-1919,

Attn.: Ira H. Goldman, (ii) Goodwin Procter LLP, 599 Lexington Avenue, New York, NY

10022, Attn: Allan Brilliant and Craig Druehl, and (iii) Weil, Gotshal & Manges LLP, 767 Fifth

Avenue, New York, NY 10153, Attn: George A. Davis; (d) U.S. Bank, as Indenture Trustee and

Pass Through Trustee,  shall be deemed a "Service Party" under the Rejection Procedures Order

with respect to the rejection of any contract or lease to which Rumford Power Associates

Limited Partnership or Tiverton Power Associates Limited Partnership is a party, and any notices

served upon U.S. Bank shall be sent to (i) Kelley Drye & Warren LLP, 101 Park Avenue, New

York, New York 10178, Attn.: Keith Wofford and (ii) Shipman & Goodwin LLP, One

Constitution Plaza, Hartford, CT 06103-1919, Attn.: Ira H. Goldman.

44.    As additional adequate protection to the Project Lenders and the Project

Lessors, Section 6.5(a) of the DIP Credit Agreement and Section 21 of the Security and Pledge

Agreement shall be amended to provide as set forth on Schedule II annexed hereto.

45.    With respect to MEP Pleasant Hill, LLC, Calpine Northbrook Project

Holdings, LLC; Broad River Holdings, LLC; Broad River Energy LLC; RockGen Energy LLC;

South Point Holdings, LLC and South Point Energy Center, LLC, to the extent that Calpine

Energy Services, L.P. ("CES") fails to make any payment (other than any payment that CES is

prohibited from making as a result of having filed for bankruptcy) when due under tolling

agreements, unless cured or waived by the applicable party by the fifth (5th) business day

following the delivery of written notice to such entity, the Official Committee, the First Lien

Trustee, the Second Lien Committee and the applicable Project Lender, if any, by the applicable

party asserting nonpayment, then such entity shall automatically be added to the list of

44

Designated Projects and a Termination Event under paragraph 28 above shall be deemed to have

occurred as to such entity. Any funds advanced by the Project Lenders or the Project Lessors to

such entity, with such entity's consent or as authorized by the Bankruptcy Court by separate

order as adequate protection for the Project Lenders or Project Lessors, as applicable, after such

entity has been deemed a Designated Project, shall be repaid together with interest, fees and

costs, if any, by the Debtors if such entity is not surrendered to the Project Lenders or Project

Lessors, as applicable, within one year from the date hereof.

   46. Baker Hughes Oilfield Operations, Inc. ("Baker Hughes") shall withdraw

with prejudice the Objection of Baker Hughes Oilfield Operations, Inc. To Proposed Order

Authorizing Debtors to Obtain Post-petition Financing Pursuant To 11 U.S.C. 105, 361, 362,

364(c)(1), 364(c)(2) And 364(c)(3) And Proposed Interim Order Authorizing Use of Cash

Collateral And Granting Adequate Protection (the "Baker Hughes Objection") and, to the extent

that the liens and interests described in the Baker Hughes Objection are valid and perfected, then

the Debtors shall be authorized and directed to pay to Baker Hughes within seven (7) days of the

date hereof, pursuant to the Order Pursuant To Section 105(a) Of The Bankruptcy Code

Authorizing The Debtors To Pay Certain Prepetition Mechanics' Lien Claims In The Ordinary

Course Of Business, entered by the Court on February 15, 2006 (the "Mechanics' Lien Order"),

the amount of $320,801.52 (the "Baker Hughes Lien Amount") in full satisfaction of such liens

and interests; provided, however, that upon payment of the Baker Hughes Lien Amount, Baker

Hughes (i) shall be bound by the terms of the Mechanics' Lien Order and shall be required to

comply with every provision thereof, and (ii) shall execute and be bound by the terms of the

letter attached as **Exhibit A** to the Final Order Authorizing Post-petition Financing Pursuant to

11 U.S.C. §§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(e).

SO ORDERED, ADJUDGED, DECREED AND STIPULATED, this 24th day of

February, 2006.

Dated: New York, New York
      February 24, 2006

                              /s/Burton R. Lifland
                              UNITED STATES BANKRUPTCY JUDGE

## Schedule I

### CALPINE GREENLEAF, INC. INVOICES

| VENDOR | OUTAGE | INVOICE NUMBER | AMOUNT |
|---|---|---|---|
| Rexel Norcal Valley | GL1 - Steam Turbine | 425897-00 | $323.36 |
| Rexel Norcal Valley | GL1 - Steam Turbine | 1007664-00 | $106.66 |
| Rexel Norcal Valley | GL1 - Steam Turbine | 1007664-02 | $2,041.07 |
| Rexel Norcal Valley | GL1 - Steam Turbine | 1007664-01 | $730.44 |
| Rexel Norcal Valley | GL1 - Steam Turbine | 1009434-02 | $141.75 |
| Rexel Norcal Valley | GL1 - Steam Turbine | 1009434-01 | $187.34 |
| Trane | GL2 - Chiller Pump | 51463191 | $1,725.16 |
| Trane | GL2 - Chiller Pump | 51426316 | $16,571.00 |
| Consolidated Electrical Distributors | GL1 - Steam Turbine | 9594-457959 | $187.45 |
| Consolidated Electrical Distributors | GL1 - Steam Turbine | 9594-457961 | $6,656.46 |
| TurboCare | GL1 - Steam Turbine | 601240 | $50,715.00 |
| TurboCare | GL1 - Steam Turbine | 601215 | $279,900.00 |
| High Voltage Apparatus Repair & Testing | GL2 - Transformer | 11-05-3851 | $24,209.09 |

**TOTAL**                                                         **$383,494.78**

DIP Credit Agreement

> **6.5 _Limitation on Sale of Assets_.** Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of a Subsidiary of the Borrower, issue or sell any shares of such Subsidiary's Capital Stock to any Person except:

>> (a)  (i) the sale, lease or other disposition of (A) inventory in the ordinary course of business, (B) uneconomical, obsolete, surplus or worn out property, (C) property that is no longer used or useful in the business, or (D) boilers, water lines and related property of Clear Lake Cogeneration, L.P., (ii) the rejection of contracts or leases determined by the Borrower in good faith to be unprofitable (other than (x) facility leases in respect of Material Subsidiaries and (y) leases described in clause (iii) below)) or (iii) so long as no Event of Default shall have occurred and be continuing and the Loans have not become due and payable as a result thereof, the rejection of facility leases in respect of, or the surrender of (including the consensual foreclosure of), Designated Projects (as defined in the Cash Collateral Order) determined by the Borrower in good faith to be unprofitable;

Security and Pledge Agreement

**SECTION 21.  Continuing Security Interest.**  This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the permanent termination of the Commitments, the cancellation or termination of all Letters of Credit (or cash collateralization thereof at a rate of 105%) and payment in full in cash of the Obligations, (ii) be binding upon each of the Grantors, their successors and assigns and (iii) inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent, each Agent and each of the Lenders and their respective permitted successors, transferees and assigns. Upon the permanent termination of the Commitments, the cancellation or termination of all Letters of Credit (or cash collateralization thereof at a rate of 105%) and the payment in full in cash of the Obligations, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Grantors subject to any other existing liens, security interests or encumbrances on such Collateral. Upon (x) any sale, assignment, disposition or other transfer by any of the Grantors of any Collateral that is permitted under the Credit Agreement, (y) the rejection or termination of any facility lease or surrender of any Designated Projects permitted under Section 6.5(a)(iii) of the Credit Agreement or, as to Clear Lake Cogeneration, L.P., the rejection or termination of the long-term steam supply agreement (the "Clear Lake Steam Agreement") with Celanese Ltd. ("Celanese") and Old World Industries, Inc. ("Old World") or of the ground lease with Celanese related to Clear Lake, or (z) the effectiveness of any written consent to the release of the security

interest granted by the Credit Agreement, the Orders or hereby in any Collateral pursuant to Section 11.2 of the Credit Agreement, (A) the security interest in such Collateral (but not any proceeds thereof), shall be automatically released, and (B) as to (1) the rejection or termination of any facility lease in respect of, or the surrender of, any Designated Project (as defined in the Cash Collateral Order) which is the sole facility owned or leased by a Grantor, or (2) the rejection or termination of the ground lease with Celanese related to Clear Lake or the Clear Lake Steam Agreement, the guarantee obligations of such Grantor or Guarantor under the Credit Agreement and hereunder, and the security interests and the claims of the Lenders (including the Superpriority Claims) in respect thereof, shall be automatically released. Upon a surrender of a Designated Project permitted under Section 6.5(a)(iii) of the Credit Agreement effected by way of foreclosure (consensual or otherwise) on the Capital Stock or assets of the relevant project debtor, the security interest in the assets (and Capital Stock to the extent necessary to permit a consensual surrender or foreclosure) of such project debtor, the guarantee obligations of such project debtor under the Credit Agreement and hereunder, and the Superpriority Claims of the Lenders in respect thereof, shall be automatically cancelled and released. Upon any such termination, the Collateral Agent will, at the Grantor's expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence such termination, and the Collateral Agent shall be entitled to rely conclusively on, without independent investigation, a certificate of the applicable Grantor certifying that any specific sale, assignment, disposition or other transfer of any Collateral is permitted under the Credit Agreement.